# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL ABRAMOWITZ, *in his official capacity as Director of Voice of America*; <br> 330 Independence Ave. SW, <br> Washington, DC 20237 <br><br> ANTHONY MICHAEL LaBRUTO; <br> 327 16th St. NE <br> Washington, DC 20002 <br><br> J. DOE 1; <br> Address Withheld <br><br><center>and</center><br> J. DOE 2, <br> Address Withheld <br><br><center>*Plaintiffs,*</center><br><center>–v.–</center><br> KARI LAKE, *in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media*; <br> 330 Independence Ave. SW <br> Washington, DC 20237 <br><br> VICTOR MORALES, *in his official capacity as Acting CEO of the United States Agency for Global Media*; <br> 330 Independence Ave. SW <br> Washington, DC 20237 <br><br><center>and</center><br> UNITED STATES AGENCY FOR GLOBAL MEDIA, <br> 330 Independence Ave., SW <br> Washington, DC 20237 <br><br><center>*Defendants.*</center> | **Civil Case No. 1:25-cv-00887** <br><br><br><br><br><br><br><br><br> <u>**COMPLAINT**</u> |

## INTRODUCTION

1.    Seventy-nine days into the United States of America's entry into World War II, on February 1, 1942, Voice of America (VOA), a United States-funded news outlet, broadcast its first message in German to German citizens abroad: "The news may be good or bad; we shall tell you the truth."[1]

2.    Since its illustrious inception during the height of World War II, VOA has transformed from an outlet designed to counter Nazi propaganda with truthful reporting into a vital source of news to audiences across the globe.  Until March 17, 2025, when all its employees were placed on administrative leave, VOA provided multimedia cultural programming and news in 49 languages and reaches an estimated 362 million people across the world weekly.

3.    Truthful, impartial reporting has always been at the heart of VOA's mission. Congress has recognized that VOA serves "[t]he long-range interests of the United States" not through force or propagandizing, but instead "by communicating directly with the peoples of the world."  22 U.S.C.§ 6202(c).

4.    To be effective, the Voice of America "must win the attention and respect of listeners."  *Id.*  To that end, federal law requires that VOA "serve as a consistently reliable and authoritative source of news" that is "accurate, objective, and comprehensive," *id.* § 6202(c)(1); "represent America, not any single segment of American society," "present a balanced and comprehensive projection of significant American thought and institutions," *id.* § 6202(c)(2); "present the policies of the United States clearly and effectively," and "also present responsible

---

[1] *VOA's first broadcast from New York City to Germany*, VOICE OF AMERICA PUBLIC RELATIONS, https://www.insidevoa.com/a/2365229.html (last accessed March 24, 2025).

discussions and opinion on these policies," *id.* § 6202(c)(3).  In other words, to serve American interests, VOA and its sister entities, must remain independent from the political winds and undue interference.  These principles and statutory objectives are woven not only into the ethos of VOA, but also into its very structure.

5.      For decades, a statutory firewall has existed to insulate the journalists and editorial staff at VOA and its sister entities from political interference by outside executive branch officials.  *See* 22 U.S.C. §§ 6202(a)(5) (requiring that U.S. international broadcasting "be conducted in accordance with the highest professional standards of broadcast journalism"), *id.* § 6202(b)(1) (requiring that the networks produce "news which is consistently reliable and authoritative, accurate, objective, and comprehensive"), *id.* § 6204(b) (requiring that certain executive-branch officials outside the newsrooms "respect the professional independence and integrity of the Agency, its broadcasting services, and the grantees of the Agency").

6.      And for decades, to achieve this goal, Congress has diffused oversight and control over VOA, its director, and its sister networks, across numerous individuals, rather than vest such authority in a single person.

7.      Beyond shoring up the entities' independence, VOA exists entirely as a creature of statute.  Congress created and has consistently appropriated federal funds to it in recognition of its important mission and the value it provides to United States foreign policy objectives.  As recently as March 15, 2025, President Trump signed into law an appropriations bill that funds VOA through September 30, 2025.

8.       On March 14, 2025, however, President Trump issued an executive order titled "Continuing the Reduction of the Federal Bureaucracy," which purports to "reduce the

performance of" VOA's "statutory functions and associated personnel to the minimum presence and function required by law."

9.    Immediately thereafter, the White House issued a release titled "The Voice of Radical America," which maligns VOA, without support. That release promises that "taxpayers are no longer on the hook for radical propaganda."

10.    The White House and those leading the United States Agency for Global Media at this time—principally defendants Victor Morales and Kari Lake—have made clear through both their words and actions that VOA is not merely being downsized: it is being dismantled.

11.    On or before March 14, 2025, defendants terminated contracts with the Associated Press, Reuters, and Agence France-Presse. They also notified VOA employees to stop using material from these wire services.

12.    On March 15, 2025, nearly all 1,300 employees of VOA were placed on administrative leave.  These employees are journalists, producers, and assistants: all fundamental to supporting a free flow of information from the United States to audiences worldwide.

13.    On March 16, 2025, 500 of VOA's personal services contractors (PSCs) were notified that they would be terminated on March 31, 2025.  Some of these PSCs are on J-1 visas and would lose their legal status to remain in the United States when terminated.  Some of these PSCs may face possible persecution by their home countries' governments if forced to return to their home countries.

14.    As a result, for the first time since VOA's inception more than 80 years ago— through 9/11, government shutdowns, and the pandemic—the entity has gone dark.

15.    This executive branch action contravenes baseline constitutional principles and the express will of Congress.  Congress created VOA; required it to fulfill certain statutory objectives,

including producing and broadcasting journalism according to high professional standards; and has consistently appropriated funds to VOA so that it may continue serving its mission. Congress—and only Congress—may alter VOA's appropriations, alter its statutory functions, or ultimately dismantle it.

16.    To protect the vital interests served by VOA, this Court should enjoin the unlawful dismantling of this venerable federal entity.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1).   A substantial part of the events giving rise to this claim occurred in this District, and defendants include an agency and officials of the United States.

## PARTIES

19.    Plaintiff Michael Abramowitz is the current director of VOA.  On April 19, 2024, he was appointed to lead VOA by the former CEO of the United States Agency for Global Media and his appointment was unanimously approved by a bipartisan vote of the International Broadcasting Advisory Board.  Prior to becoming the director of VOA, Abramowitz was the president of Freedom House.  Before that, he directed the United States Holocaust Memorial Museum's Levine Institute for Holocaust Education and was national editor and a White House correspondent at *The Washington Post*.

20.    Plaintiff Anthony Michael LaBruto is an International Multimedia Journalist in the English to Africa Service in the Africa Division of VOA. The Division, which provides reports via television, radio and digital platforms, licenses programs to 1000 affiliate stations in Africa. Plaintiff LaBruto has worked for VOA for the last two years.

21.     Plaintiff J. Doe 1 is a journalist for the international division of VOA that provides news to an authoritarian country.  Plaintiff Doe 1 has worked for VOA since 2022 as a PSC.

22.     Plaintiff J. Doe 2 is a journalist for another foreign division of VOA.  Plaintiff Doe 2 has worked for VOA since 2022 as a PSC.

23.     Defendant Kari Lake is Senior Advisor to the Acting Chief Executive Officer of the United States Agency for Global Media (USAGM) as of March 3, 2025.  Lake has indicated on multiple occasions that she is acting, pursuant to official executive branch authority, in implementing the White House's actions.  She is sued in her official capacity.

24.     Defendant Victor Morales is Acting Chief Executive Officer of USAGM and is sued in that official capacity.  Morales acts, pursuant to statutory authority, in overseeing United States international broadcasting.

25.     Defendant USAGM is an independent United States Agency that oversees and supervises U.S. broadcast networks, including VOA.

## FACTUAL BACKGROUND

**I.  Voice of America Serves United States Interests Abroad by Delivering Independent, Truthful, and Impartial Reporting to Global Audiences.**

26.     VOA's statutory mission is clear: the delivery of impartial and truthful reporting to audiences abroad, particularly those living under authoritarian regimes.

27.     Through meeting this mission, VOA not only delivers a vital service to these audiences who otherwise lack a free press.  It also disseminates, by example, the values of democracy and free speech to those living under authoritarianism.  In this way, VOA directly serves United States interests.

28.     By all accounts, these federal entities have been tremendously successful in doing so.

29.     Today, VOA provides multimedia cultural programming and news in 49 languages and reaches an estimated 362 million people across the world weekly.

30.     VOA principally targets audiences abroad who live in countries without access to free press or under regimes that seek to stifle journalism and free speech.

31.     As a result, VOA, in seeking to deliver impartial news and reporting, has drawn the ire of authoritarian regimes across the world, including those in China and Russia.

## II.   **Voice of America Exists as a Creature of Statute and Congress Has Obligated It to Carry Out Its Statutory Mission.**

32.     Since World War II, VOA and its sister networks have fulfilled their missions by broadcasting truthful, non-partisan news and programming to all corners of the world.

33.     Since that time, Congress has repeatedly reaffirmed VOA's importance and independence.

34.     In 1948, Congress passed the United States Information and Exchange Act of 1948 (the Smith-Mundt Act), Pub. L. 80-402, 62 Stat. 6.  The Smith-Mundt Act created "an information service to disseminate abroad information about the United States, its people, and policies promulgated by the Congress, the President, the Secretary of State and other responsible officials of Government having to do with matters affecting foreign affairs."  Pub. L. 80-402, tit. I § 2(1). With the Smith-Mundt Act, VOA was codified into law.

35.     Although VOA began its broadcasts in the 1940s, Congress codified the entity's charter in the Foreign Relations Authorization Act of 1977.  Pub. L. 94-350, 90 Stat. 823 (1976). The charter amended the Smith-Mundt Act to recognize VOA's importance to United States "long-

range interests." *Id.*, tit. II, § 503. In relevant part, the law codified certain statutory requirements that VOA is required to meet. By its own terms, the Charter requires VOA to continue broadcasting and producing journalism that meets high professional standards:

> (1) VOA will serve as a consistently reliable and authoritative source of news. VOA news will be accurate, objective, and comprehensive.

> (2) VOA will represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions.

> 3) VOA will present the policies of the United States clearly and effectively, and will also present responsible discussion and opinion on these policies.

> *Id.*

36.    Consistent with these missions, Congress passed the International Broadcasting Act (IBA), Pub. L. 103-236, 108 Stat. 432 (1994), 22 U.S.C. §§ 6201, *et. seq.*, which lays out the overarching principles that guide U.S. international broadcasting and insulate U.S. broadcast agencies' newsroom staff from outside executive branch officials who may attempt to influence or interfere with the journalists' work. Indeed, these journalists must, by law, operate according to the highest standards of professional journalism and remain impartial in reporting the news. *See* §§ 6202(a)(5), (b)(1), 6204(b) (statutory provisions considered to be the "firewall" between journalists and executive branch officials).

8

37.     In addition to the Charter, Congress, through these statutory provisions, requires VOA to continue broadcasting and producing first-rate news.  Congress mandated that "United States international broadcasting *shall include*,"

(1) news which is consistently reliable and authoritative, accurate, objective, and comprehensive;

(2) a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society;

(3) clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies, including editorials, broadcast by the Voice of America, which present the views of the United States Government;

(4) the capability to provide a surge capacity to support United States foreign policy objectives during crises abroad;

(5) programming to meet needs which remain unserved by the totality of media voices available to the people of certain nations;

(6) information about developments in each significant region of the world;

(7) a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen;

(8) reliable research capacity to meet the criteria under this section;

(9) adequate transmitter and relay capacity to support the activities described in this section; and

(10) training and technical support for independent indigenous media through government agencies or private United States entities.

22 U.S.C. § 6202(b)(1)–(10) (emphasis added).

### III.    Prior Assaults on U.S. International Broadcasting Entities' Missions.

38.    On June 1, 2018, President Donald Trump nominated Michael Pack to serve as the first presidentially appointed CEO in USAGM history.  Pack was not confirmed by the Senate until June 4, 2020.

39.    Almost immediately, Pack took actions that threatened the journalistic independence of USAGM's broadcast entities, including VOA.

40.    In the first two weeks following his Senate confirmation, in an event deemed the "Wednesday Night Massacre," Pack fired the heads of numerous entities under USAGM's purview, including the directors of Radio Free Europe/Radio Liberty, Radio Free Asia, Middle East Broadcasting Networks, the Office of Cuba Broadcasting, and the Open Technology Fund.[2]

41.    After dismissing the heads of these networks, Pack appointed new heads for all of them, including VOA, whose director had resigned immediately prior to Pack's assumption of the CEO role.

42.    Similarly, Pack dismissed all of the members of the grantee boards[3], named himself the chair of all of the boards, and appointed new members of the boards, who were often political appointees from the Trump Administration.

---

[2] Edward Wong, *New Conservative Media Chief Dismisses Heads of U.S.-Funded News Outlets*, N.Y. TIMES, (June 17, 2020), https://www.nytimes.com/2020/06/17/us/politics/michael-pack-media-agency.html.

[3] The grantee entities are Radio Free Europe/Radio Liberty, Radio Free Asia, and Middle East Broadcasting Networks.  These entities receive funding from USAGM pursuant to grant agreements that require the entities to broadcast within certain guidelines.

43.     In 2020, a court in this District found that a group of career civil servants at USAGM and VOA had demonstrated a likelihood of success on the merits of a claim that USAGM, Pack, and other agency leadership had violated the plaintiffs' "First Amendment rights by taking or influencing personnel actions against individual journalists or editors, attempting directly to monitor VOA and network content through communications with individual editors or journalists, and undertaking their own investigations of alleged discrete breaches of journalistic ethics." *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 385–86 (D.D.C. 2020).  The court enjoined the defendants from continuing such actions.  *Id.* at 386.

## IV.     Congress Reaffirms U.S. International Broadcasting Entities' Independence.

### A. Bipartisan Support for Change

44.     Pack's all-out assault on the principles, values, and missions of the U.S. broadcast entities, including VOA, drew bipartisan criticism.

45.     Within weeks of Pack's firings of the heads of the broadcast entities, a bipartisan group of United States Senators, including Republicans Marco Rubio, Lindsey Graham, Jerry Moran, and Susan Collins, and Democrats Richard Durbin, Patrick Leahy, and Chris Van Hollen, wrote a letter to Pack, expressing their concerns.

46.     The Senators explained that "[t]he termination of qualified, expert staff and network heads for no specific reason as well as the removal of their boards raises serious questions about the preservation of these entities and their ability to implement their statutory missions now and in the future."[4]

---

[4] Letter from Sens. Rubio, Graham, Moran, Collins, Durbin, Leahy, and Van Hollen to Michael Pack (July 1, 2020), at 1 (available at https://www.cnbc.com/2020/07/01/senators-to-review-federal-media-agency-funding-after-ceo-michael-pack-purges-staff.html).

47.    They further noted their "bipartisan and bicameral" concerns, and urged that "Congress set up these networks, and its governance structure at USAGM, to preserve the grantees' independence so they can act as a bulwark against disinformation through credible journalism."[5]

48.    Additionally, several nonpartisan government entities noted the need for reform at USAGM in response to Pack's tenure.[6]

**B. The 2021 Amendments**

49.    Congress addressed these bipartisan concerns in the 2021 National Defense Authorization Act (NDAA), which became law on January 1, 2021, after passing in the Senate by a vote of 81 to 13, and in the House by a vote of 322 to 87, following a veto by President Donald Trump.

50.    Contemporaneous with these structural changes to USAGM, Congress also reaffirmed the primacy of USAGM's firewall—the functional principle that the professional journalist staff at U.S. international broadcast networks be insulated from executive-branch interference—with its broadcast entities.

51.    In the 2021 Consolidated Appropriations Act, passed by Congress in December 2020 with bipartisan support, Congress made appropriations to the agency available only in

---

[5] *Id.*

[6] These entities include both the Department of State Office of the Inspector General and the Congressional Research Service, among others.

accordance with the broadcasting standards and principles enumerated in the International Broadcasting Act, 22 U.S.C. §§ 6202 and 6204. Those provisions embody the statutory firewall.[7]

52.    A joint explanatory statement accompanying the Act emphasized that "[t]he application of this requirement shall be done in a manner that is, at a minimum, consistent with the statutory firewall, journalistic independence and best practices, and the highest standards of professional journalism[.]"[8]

### C.  The Current Statutory Scheme

53.    The 2021 NDAA reset USAGM's relationship with its broadcast entities by reestablishing the broadcast entities' independence and their commitment to impartial, truthful journalism.[9]

54.    The amendments simultaneously diminished the CEO's authority while empowering a seven-member, bipartisan board known as the International Broadcasting Advisory Board (IBAB), to serve as a more meaningful check on the USAGM CEO.

55.    One substantial change concerns the IBAB's and the CEO's authorities to appoint and remove the heads of USAGM's broadcast networks, including VOA.

---

[7] Pub. L. 116-260, div. K, tit. I, 134 Stat. 1698 (2020).

[8] 166 Cong. Rec. H8311 at H8783 (Dec. 21, 2020).

[9] *See, e.g.*, Rachel Treisman and David Folkenflik, *Trump says Kari Lake will lead Voice of America. He attacked it during his first term*, NPR (Dec. 12, 2024), https://www.npr.org/2024/12/12/nx-s1-5226920/voice-of-america-kari-lake-voa (explaining that "[t]he chaos of the Pack era led to congressional reform — most notably, the creation of the International Broadcasting Advisory Board (IBAB))."

56.     Prior to Pack's tenure as CEO, the CEO had full authority to appoint and remove the heads of the broadcast entities as well as members of the entities' boards.

57.     The 2021 amendments, however, require that the IBAB approve by a majority vote the appointment and removal of the heads of the broadcast entities, who are selected or dismissed by the CEO of USAGM.  22 U.S.C. § 6205(e)(1).

## V.     Congressional Appropriations to VOA

58.     Congress has appropriated funds to VOA each year since the Smith-Mundt Act alongside Congress's repeated actions to reaffirm VOA's importance and independence and its statutory commands that VOA continue to deliver impartial and truthful news.

59.     In 2024, Congress appropriated $857,214,000 to USAGM to "carry out international communication activities."  Pub. L. 118-47, div. F., 138 Stat. 460, 735 (2024). Congress specified that "the funds appropriated under this heading shall be allocated in accordance with the table included under this heading in the explanatory statement described in section 4." *Id.* That table states that Congress appropriated $260,032,000 to VOA. 118th Cong., Further Consolidated Appropriations Act, 2024, Legislative Text and Explanatory Statement at 1167 (Comm. Print 2024).

60.     Through the Continuing Appropriations and Extensions Act, 2025, Congress renewed VOA's funding.  Pub. Law No. 118-83, 138 Stat. 1524 (2024).  In relevant part, that law appropriated "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2024 and under the authority and conditions provided in such Acts, for continuing projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2024." *Id.*, Div. A.

61.    Upon the expiration of this continuing resolution, Congress renewed its appropriations to VOA on the same terms through yet another continuing resolution, the American Relief Act, 2025.  Pub. L. 118-158, 138 Stat. 1722 (2024), Div. A.  Those appropriations were made through March 14, 2025.  *Id.*

62.    Finally, on March 15, 2025, President Trump signed into law Congress's further appropriations on the same terms to that run through September 30, 2025.  H.R. 1968, 119th Cong. § 1101(a) (2025).  As before, Congress appropriated "[s]uch amounts as may be necessary, . . . under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024, for projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for, and for which appropriations, funds, or other authority were made available."  *Id.*

63.    The original 2024 appropriations to VOA, which have now been continued three times, provided limited discretion to USAGM to "reprogram[]" funds "within and between amounts designated in such table."  138 Stat. 460, 735 (2024).  But this discretion is narrow: USAGM's reprogramming may not "reduce a designated amount by more than 5 percent" and any such action is subject to "the regular notification procedures of the Committees on Appropriations."  *Id.*

VI.    <u>**The Events Giving Rise to the Claims.**</u>

A.  **USAGM and IBAB Appoint Michael Abramowitz to Head VOA**

64.    In December 2023, the Senate confirmed President Joe Biden's appointment of the six members of the IBAB. As required by the statute's provision that no more than three members may be affiliated with the same political party, the Board is bipartisan.[10]

65.    On April 19, 2024, the Chief Executive Officer of USAGM, with the IBAB's approval, appointed Plaintiff Michael Abramowitz as the director of VOA.

B.  **The 2024 Presidential Election and Personnel Actions within USAGM**

66.    Donald Trump was elected the 47th president of the United States in November 2024. On December 11, 2024, then-President-elect Trump announced his intent to have Defendant Kari Lake lead VOA as its director in a post on the Truth Social network.

67.    Since the President's announcement, Defendant Kari Lake has publicly acknowledged that she may not be unilaterally appointed to be the head of VOA due to the recent amendments to USAGM's structure that require the IBAB's approval of her appointment. After his inauguration, however, President Trump fired all members of the IBAB and the Board is presently vacant.

68.    Nonetheless, Defendant Kari Lake, in her capacity as a Senior Advisor to the Acting USAGM CEO, together with Acting USAGM CEO Victor Morales, began making substantial personnel changes at VOA, including firing numerous probationary employees and contractors.

_____

[10] The seventh member is the Secretary of State.

C. **VOA Goes Dark**

69.    Just hours prior to signing into law Congress's appropriations to VOA, the White House announced that it intended to "reduce the performance of" USAGM's "statutory functions and associated personnel to the minimum presence and function required by law."

70.    On March 15, 2025, nearly all USAGM employees, including employees of VOA, received notice from USAGM that they were being placed on administrative leave until further notice.  USAGM did not provide a reason for placing VOA employees on administrative leave.

71.    In USAGM's Notice of Administrative Leave, employees were told they were not allowed to "enter USAGM premises, access USAGM systems, or attempt to use [their] position or authority with USAGM in any way" without prior permission.  Further, VOA employees were told to "immediately surrender" their USAGM identification badge, press pass, as well as any keys, documents, phones, and equipment.

72.    On March 16, 2025, USAGM notified VOA's personal services contractors (PSCs) that they would be terminated on March 31, 2025.  The PSCs were told to "cease all work immediately" and were barred from "access[ing] any agency buildings or systems." *Id.*  USAGM also did not provide an explanation for the impending termination.  This termination notice applies to the 500 PSCs at VOA.  Some PSCs are foreign journalists who work for VOA in the United States on J-1 visas.  These visas will expire as soon as the PSCs are terminated.

73.    On March 17, 2025, William Martin, Director for Stations and Operations, instructed all USAGM Foreign Service employees to shut down all transmitters at their stations within two days and request the respective Missions to place all locally employed staff on administrative leave. Employees were also told to expect to be placed on administrative leave following the two-day shutdown period.

74.     As a result of the above actions, VOA broadcasts have gone dark for the first time in the entities' existence.  VOA's website has not been updated since the White House executive order.  In other words, all reporting and journalistic work at VOA has ceased.

75.     Plainly, VOA is not serving any of its statutorily and Congressionally mandated functions of, among other things, delivering impartial news and reporting to hundreds of millions of people across the globe without access to a free press.  VOA's existence in name only contradicts Congress's manifest intent that VOA continue producing and broadcasting the news to global audiences.

76.     If the plans to dismantle VOA and impede its statutory functions were not clear enough, defendants have made their promises explicit.

77.     A recent press release posted on USAGM's website claims that "[t]his agency is not salvageable."  The release continues: "[f]rom top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken."  In an interview on Newsmax, Defendant Kari Lake repeated that the agency is "unsalvageable."

78.     In that same Newsmax interview, Defendant Kari Lake stated that she canceled USAGM's lease and its contracts with news organizations.

79.     In a recent interview with Steve Bannon, Defendant Kari Lake compared the situation at VOA to USAID and noted that she was supported by the Department of Government Efficiency.  She repeated that the agency is unsalvageable.

80.     Ric Grenell, President Trump's special envoy for special missions, recently wrote that "We don't need government-paid media outlets."

81.     Elon Musk, the head of the Department of Government Efficiency which has made its mission abolishing statutorily created and funded federal agencies, *see Does 1-26 v. Musk*, --- F. Supp. 3d ---, No. CV 25-0462-TDC, 2025 WL 840574, at *18 (D. Md. Mar. 18, 2025), recently stated, with respect to U.S. international broadcasting entities, "shut them down . . . Nobody listens to them anymore."

82.     Based on both words and actions, the plan is clear: VOA will be dismantled, despite Congress's continued efforts to reaffirm the entities' independence and to fund them commensurate with their missions.

**D.  Harm Caused By Defendants' Unlawful Dismantling of VOA**

**i.    Harm to Plaintiff Michael Abramowitz**

83.     As a result of defendants' unlawful actions, Plaintiff Michael Abramowitz, the Director of VOA, has suffered numerous injuries, including harm to his statutorily protected right to lead VOA, as well as reputational damage.

84.     Defendants' unlawful dismantling of VOA has caused Director Abramowitz to lose his statutory right to execute the organization's vital mission, as explicitly intended and directed by Congress.  The statutory structure of the 2021 NDAA amendments clearly reflects Congress's intent to safeguard the Director's independence.

85.     As described above, Congress empowered the bipartisan and multi-member IBAB to approve the appointment and removals of the heads of U.S. international broadcasting agencies. This decision forges consensus in who should lead these vital entities and protects their directors from arbitrary removal.

86.     Congress deliberately safeguarded the VOA head's position, recognizing that VOA's mission—to provide a "consistently reliable and authoritative" news source, especially in

regions suffering from "censorship or repression"—could make it a target for those who oppose its journalistic content and mission.  22 U.S.C. § 6202(b)(1), (7).

87.     Director Abramowitz is and continues to face irreparable harm as he is unable to carry out his duties as Director of VOA after defendants placed all VOA employees on administrative leave, noticed the terminations of 500 key employees, who are PSCs, and have made clear their intentions to continue dismantling the agency.  These harms have obliterated VOA in all but name.

88.     Because nearly all VOA employees have been placed on administrative leave and VOA's funds have been frozen, VOA has gone dark for the first time in 83 years.

89.     And without VOA's journalists, editors, and administrative staff working, VOA has already shut off its entire newsroom.  Its website has not been updated since March 15, 2025, with the homepage highlighting now outdated articles.  Several radio frequencies have either gone dark or are playing music in lieu of programming.   With its on-air and behind-the-scenes employees on leave, VOA has resorted to looping the same 45-second video on some of its TV channels.  VOA has not published a single story or broadcast since defendants took the actions at issue in this complaint.

90.     Congress created a strong, independent VOA that is required to carry out a variety of statutory functions.  Congress required VOA to continue broadcasting, to continue producing the news, and to continue demonstrating the values of free speech and a free press to audiences across the globe.  Congress protected VOA's director from arbitrary removal to shore up this mission.  As a result of defendants' actions, defendants have utterly deprived Plaintiff Michael Abramowitz of his ability to continue directing the VOA that Congress envisioned and that Congress created.

91.     Failure to restore VOA's employees and funding has large ripple effects across the globe.  An approximate 362 million people worldwide no longer have access to VOA's programming.

92.     For many regions in the world, VOA's broadcasting provides a news lifeline to people living under authoritarian regimes, sometimes as the only open media where all others are censored or severely under-resourced, such as Iran, Russia, Belarus, Afghanistan and North Korea.

93.     By placing staff on leave, terminating forty percent of VOA's workforce, and forcing VOA to stop operating, defendants have effectively paralyzed Director Abramowitz's ability to fulfill VOA's mission.  With no team to lead, no journalists to investigate, and no staff to produce broadcasts or programming, operations have ground to a halt.  The newsroom has fallen silent.

94.     In his capacity as Director, Mr. Abramowitz is also responsible for ensuring that VOA can safely employ its staff.  Some PSCs—including key journalists at VOA—who now face termination may also face persecution or imprisonment should they be forced to return to their home countries.  Dozens of VOA staffers in Washington hold J-1 visas tied to their employment.  If they are terminated, they may be forced to return to countries with a practice of persecuting dissenting voices.  Two VOA contributors are already imprisoned in Myanmar and Vietnam.  These employees are not just at risk of losing their roles in carrying out VOA's mission; they risk losing their safety, their legal right to remain in the U.S., and, in some cases, their personal freedom.  Mr. Abramowitz's inability to protect the safety of his employees also undermines his mandate to carry out the functions of VOA's mission.

95.    The gutting of VOA will also cause immeasurable reputational injury to the perceived credibility and independence of VOA, and in turn, to Director Abramowitz. These networks require such credibility to remain effective and to fulfill U.S. interests abroad.

96.    Director Abramowitz accepted the position to lead a network that has enjoyed bipartisan support due to its storied history of accurately and objectively reporting the news without favor.  Defendants' illegal actions, however, threaten the reason why VOA journalists (and Plaintiffs) go to work for the network each and every day.

97.    Shutting down VOA's critical journalism in authoritarian regions would erode its hard-earned reputation as an independent voice for democracy and press freedom—an achievement built over decades of dedicated effort.

98.    The dismantling of VOA irreparably harms VOA, because it undermines the independent foundation of the network.  And that hit to VOA's reputation—which VOA has earned through independent journalism for the last 80 years—irreparably harms Director Abramowitz, because it undermines his ability to lead the network in the first place.

99.    Defendants' actions have severely harmed Director Abramowitz's reputation.  As part of an effort to gut and undermine VOA, defendants have also volleyed severe and unfounded criticisms of VOA, including that it is wasteful, rotten, and against United States interests. Defendant Kari Lake and other members of the administration have repeatedly suggested that USAGM's broadcasting entities, including VOA, exhibit partisan bias and fail to produce professional journalism.  These attacks on VOA's credibility and reputation directly harm Plaintiff Michael Abramowitz, who serves as the director of an entity that has historically enjoyed wide bipartisan support and has been praised for its work abroad.

100. Defendants' smear campaign of VOA has also affected Director Abramowitz' reputation personally in the eyes of the public. Defendants' attacks have further injured Director Abramowitz by inspiring members of the public to target him. Director Abramowitz has already been the subject of online attacks, including social media posts that have accused of him of having supporting censorship, being someone "whose work sucks up taxpayer money to complain," and having "no place running Voice of America." *See, e.g.*, Natalie G Winters (@nataliegwinters), Threads (Mar. 11, 2025), https://tinyurl.com/r76c25ms; @Zuzza, Truth Social (Mar. 11, 2025), https://truthsocial.com/@Zuzza/posts/114145732455322303.

### ii.    Harm to Plaintiffs, J. Doe 1, J. Doe 2, and LaBruto

101. **Plaintiff LaBruto** has served for two years as an International Multimedia Journalist in VOA's English to Africa Service in the Africa Division, where he reported on key issues such as U.S. foreign assistance, HIV/AIDS relief programs, and military aid—topics of vital interest to African audiences.

102. Like Plaintiffs Doe 1 and 2, on March 15, 2025, Plaintiff LaBruto was notified by email that he was being placed on administrative leave. Hours later, his VOA email access was revoked. He later received notice that his contract, which was set to run through June 2025, would be terminated effective March 31, 2025.

103. LaBruto's reporting has played a crucial role in VOA's public diplomacy mission, reaching millions through television, radio, and digital platforms. His termination disrupts existing media partnerships and silences content critical to African communities that rely on VOA for credible news.

104. **Plaintiff J. Doe 1** is a citizen of an authoritarian country and a journalist for the international division of VOA. Plaintiff has worked as a PSC for VOA since 2022. Plaintiff

relocated Plaintiff's family from their country of origin to the United States to serve VOA's mission of providing independent journalism to non-English speaking audiences in their country of origin.

105.    Plaintiff produced and edited widely viewed digital content for audiences that speak the language of Plaintiff's country of origin. Plaintiff's work has focused on politically sensitive topics, including global conflicts and U.S. policy, reaching audiences in areas where access to uncensored and independent news is severely limited.

106.    On March 15, 2025, Plaintiff was placed on administrative leave with no explanation and on March 16, 2025, was informed that Plaintiff's contract would be terminated effective March 31, 2025. As a result, Plaintiff has been unable to publish or produce content.

107.    Plaintiff is in the United States on a J-1 visa directly tied to Plaintiff's VOA employment. Plaintiff's spouse and children are here on J-2 dependent visas. Termination of Plaintiff's contract will result in the loss of legal immigration status for the entire family, loss of work authorization, and loss of medical insurance.

108.    Returning to Plaintiff's country of origin would expose Plaintiff and Plaintiff's family to grave danger. Under that country's laws, Plaintiff can be prosecuted for treason and face years in prison. Plaintiff is also concerned about the threat of harm from individuals opposed to VOA's mission and content. Plaintiff fears becoming the target of harassment or worse. Plaintiff's fear is heightened because in today's digital environment, identifying information once public, can rapidly spread and become weaponized.

109.    The psychological toll has been severe. Plaintiff reports constant panic attacks, sleeplessness, and extreme distress over their precarious situation. Plaintiff's children, having recently adapted to life in the U.S., are fearful of losing their home, school, and friends.

110.    **Plaintiff J. Doe 2** has worked as a journalist in another foreign division of VOA since late 2022 as a PSC.  Plaintiff reported on U.S. politics, international affairs, and social issues that impact the country Plaintiff specializes in reaching audiences in that country and the global diaspora.

111.    On March 15, 2025, Plaintiff was placed on administrative leave and locked out of Plaintiff's office and VOA systems without prior notice.  A day later, Plaintiff received formal notice that Plaintiff's contract would be terminated effective March 31, 2025: three months early.

112.    Like Plaintiff Doe 1, Plaintiff Doe 2's immigration status depends on employment by VOA.  Plaintiff's J-1 visa and Plaintiff's spouse's J-2 visa will lapse in April 2025, along with their work authorization.  They will lose health insurance, and face significant financial hardship, including the inability to pay the mortgage on their home.

113.    Due to a medical condition, Plaintiff has been advised by their physician not to travel by air for at least five months.  Termination of Plaintiff's contract would force Plaintiff to leave the United States even though Plaintiff cannot safely leave.

114.    Plaintiff's termination not only harms Plaintiff's livelihood and health, but also diminishes VOA's ability to serve its audience.  Plaintiff's sudden termination risks undermining years of trust with partners and viewers.

115.    The sudden and unexplained termination of these three journalists has inflicted immediate and irreparable harm to their professional reputations and financial security. If terminated, VOA's journalism will suffer and the public will no longer have access to these information lifelines, particularly in authoritarian regions.   For Plaintiffs J. Does 1 and 2, termination of their jobs would also threaten their physical safety.

116.    Absent emergency injunctive relief from this Court, Plaintiffs face separation from their communities, loss of health care, income, and in J. Doe 1's case, exposure to state persecution or imprisonment.  The harm is personal, professional, and irreparable.

## FIRST CAUSE OF ACTION

## VIOLATION OF THE ADMINSTRATIVE PROCEDURE ACT

## (ALL DEFENDANTS)

117.    Paragraphs 1 through and including 116 are repeated and re-alleged as if fully set forth herein.

118.    Under the Administrative Procedure Act (APA), a reviewing court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

119.    Defendants' actions to place all VOA employees on administrative leave and terminate the contracts of 500 PSCs have caused VOA to close down for the first time in its history. VOA has ceased functioning, as it is not broadcasting and producing news.  Defendants' actions constitute final agency actions under the APA "for which there is no other adequate remedy."  5 U.S.C. § 704.

120.    Defendants' actions to dismantle VOA are contrary to statutory law and to the constitution for a variety of reasons.

121.    First, VOA is required by law to carry out numerous statutory functions that include producing and disseminating news programming in accordance with the highest professional journalistic standards.  The statutes that Congress required USAGM and VOA to follow not only

26

require objective and truthful journalism: they require that this news and journalism be broadcasted to significant global audiences. *See* 22 U.S.C. § 6202(b)(1)–(10), (c). Moreover, the CEO of USAGM is required, by law, to "respect the professional independence and integrity of the Agency, its broadcasting services, and the grantees of the Agency." 22 U.S.C. § 6204(b). This includes the statutory firewall which protects the professional journalists at VOA from undue interference from outside the newsroom.

122.    By taking the above-mentioned actions which have had the result of shuttering VOA and forcing it off the air, defendants have plainly acted contrary to these statutes which require that VOA continue producing and broadcasting news that meets high editorial standards.

123.    Second, defendants' actions constitute a violation of the constitutional separation of powers and contravene Congress's lawful authority to appropriate funds by effectively dismantling an agency created by Congress. Congress alone has the power to create and abolish federal agencies. Further, Congress sets agencies' statutory mandates and what functions the entities are required to perform.

124.    Through taking the above-mentioned actions, defendants have effectively usurped Congress's constitutional authorities, including the authority to require agencies to carry out certain functions and Congress's spending and appropriations authority. Further, defendants' actions effectively modify or veto duly enacted legislation, including appropriations legislation and the laws obligating VOA to continue broadcasting, because defendants are impeding VOA's reporting and broadcasting operations.

125.    Further, defendants have indicated both through their statements and their actions that they intend to effectively dismantle VOA. This will result in the potential unlawful impoundment of hundreds of millions of dollars that Congress has appropriated to VOA.

126.    Congress appropriated funds to VOA so that it may carry out the functions Congress required.  By law, "United States international broadcasting shall . . . be designed so as to effectively reach a significant audience."  22 U.S.C. § 6202(a)(7).   Likewise, United States international broadcasting is required to meet several statutory mandates, *id.* § 6202(b).  And VOA is required to "serve as a consistently reliable and authoritative source of news."  *Id.* § 6202(c)(1). Through dismantling these entities, the defendants are violating these statutes and the constitution by usurping Congress's lawful role in creating, abolishing, and funding United States agencies. At a minimum, defendants are violating the laws which impose statutory obligations on both VOA and USAGM related to United States international broadcasting.

127.    Third, defendants' actions are arbitrary and capricious because defendants have not articulated a reasoned or adequate basis for barring VOA employees from doing their vital work and for effectively shuttering VOA.

128.    The White House executive order that defendants are ostensibly implementing provides no rationale whatsoever for such drastic changes to VOA.

129.    USAGM's rationale for placing virtually all VOA employees on administrative leave and terminating the contracts of 500 PSC employees, which incorporates statements from Defendant Kari Lake, vaguely references "[w]aste, fraud, and abuse" within USAGM and references a few non-specific "findings."  In fact, one of the "findings"—that USAGM engaged in "[o]bscene over-spending including a nearly quarter-of-a-billion dollar lease for a Pennsylvania high-rise," is directly contradicted by an article still on USAGM's website.

130.    When defendants have articulated rationales for such drastic actions, they have been unlawful.  These include (1) cutting agency spending, a decision reserved for Congress, not defendants; (2) that VOA and related entities put out "anti-American content" and that there is "no

oversight over the editorial side of what is going out over the air and that this agency has tried to put up a wall, a border wall around it, Voice of America and others . . . that says . . . you can't tell us what we say on the airwaves . . . that's not how things should operate," despite preserving VOA's editorial independence being Congress's *deliberate choice* in establishing the statutory firewall and other independence-promoting protections; and (3) that congressionally created U.S. international broadcasting agencies, including VOA, must be abolished or dismantled entirely, despite that such choice being Congress's prerogative.  Articulating unlawful explanations for agency actions is a textbook example of arbitrary and capricious agency action.

131.    Defendants' actions are also arbitrary and capricious because they have failed to consider and follow VOA's statutory mandates and the reliance interests involved.  Defendants' actions will have the result of (1) depriving Plaintiff Michael Abramowitz of his statutory right to continue directing VOA, because the entity has entirely ceased its functions; (2) depriving hundreds of PSCs who are key reporters at VOA of their livelihood and subjecting some PSCs to potential harassment and detention should they be forced to return to their home countries; and (3) depriving hundreds of millions of global listeners of vital, truthful news and reporting that they have come to rely on in the absence of any other objective news sources, among other consequences.  Defendants have not remotely explained how they evaluated these consequences.

## SECOND CAUSE OF ACTION

## VIOLATION OF THE SEPARATION OF POWERS

## (ALL DEFENDANTS)

132.    Paragraphs 1 through and including 116 are repeated and re-alleged as if full set forth herein.

133.    This Court may enjoin unconstitutional conduct by executive actors.  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

134.    Under Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."  U.S. Const. Art. I, Sec. 1.

135.    The Presentment Clause requires that "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it[.]"  U.S. Const. art. I, § 7, cl. 2.

136.    Consistent with the Presentment Clause, a President must "approve all the parts of a Bill, or reject it in toto." *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998).

137.    Under the Spending Clause, "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States."  U.S. Const. art. I, § 8, cl. 1.

138.    Under the Appropriations Clause, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]"  U.S. Const. art. I, § 9, cl. 7.  Under this clause, only Congress may control appropriations and has exclusive power over the federal purse.

139.    Under Article I, Section 1, only Congress has the ability to create and abolish federal agencies.  *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 500; *Myers v. United States*, 272 U.S. 52, 128–29 (1926); *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991).

140.    The Executive has only the powers conferred by the Constitution and federal statute and lacks any inherent power.

141.    By statute, Congress codified VOA's functions and its existence.  Likewise, Congress appropriated funds to VOA commensurate with the obligations it placed on VOA to continue broadcasting and producing news that adheres to high journalistic standards.

142.    Through placing all of VOA's employees on administrative leave, noticing the terminations of approximately forty percent of its workforce, including key journalists, and shuttering VOA's broadcasting and reporting functions, defendants have effectively repealed duly enacted legislation that requires USAGM to respect VOA's newsroom activities and requires that VOA continue broadcasting and producing news.

143.    Defendants' actions also functionally dismantle VOA because, as of today, it exists in name only and cannot carry out any of its statutorily required duties to produce and broadcast the news.  Congress—and only Congress—can decide whether to dismantle an agency, and defendants have usurped Congress's constitutional authority to do so.

144.    Finally, Congress appropriated funds to VOA commensurate with VOA meeting these statutory obligations to broadcast and produce the news to significant audiences across the world.  The likely result of defendants' actions will be the shuttering of VOA, which will constitute an unlawful impoundment of VOA's congressionally appropriated funds, in violation of Congress's exclusive control over the federal purse and duly enacted appropriations legislation.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE TAKE CARE CLAUSE, U.S. CONST. ART. II § 3

## (ALL DEFENDANTS)

145.    Paragraphs 1 through and including 116 are repeated and re-alleged as if full set forth herein.

Case 1:25-cv-00887    Document 1    Filed 03/26/25    Page 32 of 34

146.    The Take Care Clause provides that the executive must "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3.

147.    The Executive violates the Take Care Clause where it fails to execute or otherwise acts contrary to statutes enacted by Congress and signed into law.  *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order.").

148.    Defendants' unlawful actions, including impeding VOA's statutorily required functions through placing all VOA employees on indefinite administrative leave, firing all PSCs, taking VOA off the air, and functionally dismantling VOA, an entity created by Congress, runs afoul of the Constitution's command that the Executive faithfully execute the laws.

## FOURTH CAUSE OF ACTION

### *ULTRA VIRES*

### (ALL DEFENDANTS)

149.    Paragraphs 1 through and including 116 are repeated and re-alleged as if full set forth herein.

150.    The Executive and its agencies may not take actions that exceed their constitutional or statutory authority.

151.    This Court may enjoin "violations of federal law by federal officials."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

152.    Defendants' impeding of VOA's statutorily required functions and dismantling of VOA is contrary to law and exceeds their statutory and constitutional authority.

## PRAYER FOR RELIEF

Plaintiffs request that this Court:

a) Issue a temporary restraining order, preliminary injunction, and permanent injunction;

b) Declare that defendants' actions requiring VOA to cease operations, placing virtually all VOA employees on administrative leave, and terminating 500 fulltime personal contract employees are unlawful;

c) Order defendants to cancel their orders putting approximately 1,300 VOA employees on administrative leave, cancel the termination of personal services contracts with approximately 500 employees, cease dismantling Voice of America, and restore VOA's personnel and operating capacities such that the entities may continue their broadcasting activities at the level before the above actions were taken;

d) Award Plaintiffs their reasonable fees, costs, expenses, including attorneys' fees;

e) Grant such other relief as the Court deems necessary, just, and proper.


Dated: March 26, 2025

Respectfully submitted,

*/s/ William B. Schultz*
William B. Schultz (D.C. Bar No. 218990)
Margaret M. Dotzel (D.C. Bar No. 425431)
Brian J. Beaton, Jr. (D.C. Bar No. 90020963)*
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8136
wschultz@zuckerman.com
mdotzel@zuckerman.com
bbeaton@zuckerman.com

*Attorneys for Plaintiffs*

*\*Pro hac vice forthcoming*

34