## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL ABRAMOWITZ *et al.*,

       *Plaintiffs,*

       –v.–

KARI LAKE, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media;

VICTOR MORALES, in his official capacity as Acting CEO of the United States Agency for Global Media;

       and

UNITED STATES AGENCY FOR GLOBAL MEDIA,

       *Defendants.*

**Civil Action No.  25-cv-00887**

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTIONS FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................................II

INTRODUCTION ............................................................................................................................1

BACKGROUND ...............................................................................................................................3

I.     FACTUAL BACKGROUND ..............................................................................................3

    A.    SINCE WORLD WAR II, VOA HAS DELIVERED VITAL, TRUTHFUL REPORTING TO THOSE LIVING WITHOUT ACCESS TO A FREE PRESS. .....................................................................................3

    B.    VOA GOES DARK ...........................................................................................................5

II.    STATUTORY BACKGROUND .........................................................................................8

    A.    CONGRESS CODIFIES VOA AND REQUIRES IT TO FULFILL ITS STATUTORY MISSION .....................8

    B.    CONGRESS RECOGNIZES THAT EDITORIAL INDEPENDENCE IS INTEGRAL TO VOA'S MEETING ITS STATUTORY OBLIGATIONS .......................................................................................................11

    C.    CONGRESS APPROPRIATES FUNDS SO THAT VOA CAN MEET ITS MISSION ...................................13

III.    THE HARM TO PLAINTIFFS ........................................................................................14

    A.    HARM TO PLAINTIFF MICHAEL ABRAMOWITZ .....................................................................14

    B.    HARM TO PLAINTIFFS J. DOE 1, J. DOE 2, AND LABRUTO ....................................................15

ARGUMENT ..................................................................................................................................17

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.........................................17

    A.    DEFENDANTS MUST COMPLY WITH U.S. INTERNATIONAL BROADCASTING STATUTES..............18

    B.    DEFENDANTS' ACTIONS VIOLATE THE APA.........................................................................23

    C.    DEFENDANTS' ACTIONS ARE UNCONSTITUTIONAL................................................................27

        1.    Defendants' Actions Violate The Presentment Clause, U.S. Const. art. I, § 7, cl. 2. ..............................................................................................................27

        2.    Defendants' Actions Violate The Appropriations And Spending Clauses, U.S. Const. art. I, § 9, cl. 7 and U.S. Const. art I, § 8, cl.1. ............................................28

        3.    Defendants' Actions Violate The Take Care Clause, U.S. Const. art. II, § 3. .........29

        4.    Defendants' Actions, Taken Together Or Separately, Plainly Violate The Separation of Powers. ....................................................................................................30

        5.    Defendants Have Acted *Ultra Vires*. ........................................................33

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT IMMEDIATE INJUNCTIVE RELIEF. ..................................................................................................................34

i

    A.   DEFENDANTS' ACTIONS HAVE CAUSED DIRECTOR ABRAMOWITZ TO LOSE HIS STATUTORY RIGHT TO EXECUTE VOA'S CORE MISSION. ...................................................................34

    B.   DEFENDANTS' ACTIONS HAVE EXPOSED VOA EMPLOYEES TO IMMINENT AND IRREVERSIBLE DANGER .....38

    C.   DEFENDANTS' ACTIONS ARE IRREPARABLY DAMAGING DIRECTOR ABRAMOWITZ'S AND VOA EMPLOYEES' REPUTATIONS. ...................................................................38

    D.   DEFENDANTS' ACTIONS WILL CAUSE PLAINTIFFS J. DOE 1, J. DOE 2, AND LABRUTO (PSC PLAINTIFFS) IRREPARABLE INJURY ...................................................................41

III.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR IMMEDIATE INJUNCTIVE RELIEF. ...................................................................**42**

CONCLUSION ...................................................................**43**

CERTIFICATE OF SERVICE ...................................................................**1**

CERTIFICATE OF COUNSEL ...................................................................**1**

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Aamer v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) ........................................................ 17

*Accrediting Council for Indep. Colleges & Sch. v. DeVos*,
   303 F. Supp. 3d 77 (D.D.C. 2018) ........................................................ 24

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
   321 F.3d 1166 (D.C. Cir. 2003) ........................................................ 33

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State*,
   No. CV 25-00400 (AHA), --- F.Supp.3d ----,2025 WL 752378
   (D.D.C. Mar. 10, 2025) ........................................................ 29, 30, 32, 40

*Al-Marri v. Bush*,
   2005 WL 774843 (D.D.C. Apr. 4, 2005) ........................................................ 38

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
   968 F. Supp. 2d 38 (D.D.C. 2013) ........................................................ 43

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
   928 F.3d 1102 (D.C. Cir. 2019) ........................................................ 17, 40

*Berry v. Reagan*,
   No. CV 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ........................................................ 37

*Burlington Truck Lines v. United States*,
   371 U.S. 156 (1962) ........................................................ 25

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) ......................................................... 34

*City & County of San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) ................................................... 28, 29

*Clinton v. City of New York,*
   524 U.S. 417 (1998) ...................................................................... 28

*Does 1-26 v. Musk,*
   --- F. Supp. 3d ---, No. CV 25-0462-TDC, 2025 WL 840574
   (D. Md. Mar. 18, 2025) ...................................................... 30, 32, 33

*Eco Tour Adventures, Inc. v. Zinke,*
   249 F. Supp. 3d 360 (D.D.C. 2017) ................................................. 24

*Fed. Express Corp. v. United States Dep't of Com.,*
   39 F.4th 756 (D.C. Cir. 2022) .................................................... 33, 34

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
   561 U.S. 477 (2010) .................................................................. 31, 34

*Freytag v. Comm'r of Internal Revenue,*
   501 U.S. 868 (1991) ...................................................................... 31

*Harris v. Bessent,*
   No. 25-5037 (D.C. Cir. Feb. 20, 2025) ............................................ 37

*Harris v. Bessent,*
   No. CV 25-412 (RC), ---- F.Supp.3d ----, 2025 WL 521027 (D.D.C. Feb. 18, 2025) ............ 37

*Holiday CVS, L.L.C. v. Holder,*
   2012 WL 10973832 (D.D.C. Feb. 7, 2012) ...................................... 17

*In re Aiken County,*
   725 F.3d 255 (D.C. Cir. 2013) .................................................. 18, 29

*Kingdomware Techs., Inc. v. United States,*
   579 U.S. 162 (2016) ...................................................................... 22

*League of Women Voters of United States v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ...................................................... 34, 37

*Mittleman v. Postal Regul. Comm'n,*
   757 F.3d 300 (D.C. Cir. 2014) ....................................................... 33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 291983) .................................................................... 24, 25

*Myers v. United States,*
  272 U.S. 52 (1926)................................................................................................ 31

*Nat. Res. Def. Council v. EPA,*
  643 F.3d 311 (D.C. Cir. 2011) ............................................................................. 24

*Nken v. Holder,*
  556 U.S. 418 (2009).............................................................................................. 42

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004)................................................................................................ 27

*Oceana, Inc. v. Locke,*
  670 F.3d 1238 (D.C. Cir. 2011) ........................................................................... 24

*Omar v. Harvey,*
  No. CIV. A. 05-2374 RMU, 2006 WL 286861 (D.D.C. Feb. 6, 2006) ................... 38

*Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.,*
  963 F.Supp. 1 (D.D.C. 1997) ............................................................................... 40

*Ramirez v. U.S. Immigration & Customs Enf't,*
  310 F. Supp. 3d 7 (D.D.C. 2018) .......................................................................... 42

*Strait Shipbrokers Pte. Ltd. v. Blinken,*
  560 F. Supp. 3d 81 (D.D.C. 2021) ........................................................................ 18

*Turner v. U.S. Agency for Glob. Media,*
  502 F. Supp. 3d 333 (D.D.C. 2020) ................................................................ 12, 21

*Turner v. U.S. Agency for Glob. Media,*
  No. 20-5374, 2021 WL 2201669 (D.C. Cir. May 17, 2021) .................................. 12

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.,*
  665 F.3d 1339 (D.C. Cir. 2012) ........................................................................... 29

*West Virginia by & through Morrisey v. U.S. Dep't of the Treasury,*
  59 F.4th 1124 (11th Cir. 2023) ............................................................................. 29

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008).................................................................................................. 17

*Xiaomi Corp. v. Dep't of Def.,*
  No. CV 21-280, 2021 WL 9501449 (D.D.C. Mar. 12, 2021).................................. 40

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952)........................................................................................ 30, 32

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ............................................................................................... 30

**STATUTES**

5 U.S.C. § 706 ............................................................................................ 23, 24, 27

22 U.S.C. § 6201 ..................................................................................................... 9

22 U.S.C. § 6202 ........................................................... 9, 10, 18, 19, 20, 24, 35

22 U.S.C. § 6203 ..................................................................................................... 5

22 U.S.C. § 6204 ..................................................................... 9, 10, 20, 21, 23, 24

22 U.S.C. § 6205 ....................................................................................... 5, 13, 21, 24

U.S. Const. art. II .................................................................................................. 29

**OTHER AUTHORITIES**

*"It Is Full Of Waste, Fraud, And Abuse." Kari Lake Reacts To 1,300 Voice Of
  America Layoffs*, RUMBLE (Mar. 17, 2025) ................................................. 7

118th Cong., Further Consolidated Appropriations Act, 2024,
  Legislative Text and Explanatory Statement (Comm. Print 2024) .................... 13, 22

B-316010, Consolidated Appropriations Act, 2008 – Incorporation by
  Reference (Feb. 25, 2008) ................................................................................ 22

David Enrich,
  *As Voice of America Goes Dark, Some Broadcasts Are Replaced by Music*,
  N.Y. TIMES (Mar. 16, 2025) ............................................................................ 3

Editorial Board,
  *A U.S. Retreat in the War of Ideas*, WALL ST. J., Mar. 19, 2025 ................ 7

Edward Wong,
  *New Conservative Media Chief Dismisses Heads of U.S.-Funded News Outlets*,
  N.Y. TIMES, (June 17, 2020) ........................................................................ 11

Exec. Order No. 14,238, 90 FED REG. 13043 (Mar. 14, 2025) ................... 6, 25

H.R. 1968, 119th Cong. § 1101(a) (2025) .......................................................... 14, 22

Kari Lake @ KariLake, (Mar. 18, 2025) ............................................................. 7

Kari Lake @ Kari Lake), Mar. 19, 2025 ................................................. 8, 15, 26, 39

Kathy Kiely,
 *By firing Voice of America, Radio Free journalists, Trump puts them in danger*,
 USA TODAY (Mar. 19, 2025) ........................................................................... 4

Letter from Sens. Rubio, Graham, Moran, Collins, Durbin, Leahy, and Van Hollen
 to Michael Pack (July 1, 2020) ............................................................... 11, 12

Natalie G Winters (@nataliegwinters),
 Threads (Mar. 11, 2025) ........................................................................... 15, 40

Pub. L. No. 80-402 ............................................................................................... 8

Pub. L. No. 103-236, tit. III (1994) ...................................................................... 9

Pub. L. No. 94-350 (1976) ................................................................................... 8

Pub. L. No. 118-47, div. F., 138 Stat. 460 (2024) ....................................... 13, 22

Pub. Law No. 118-83, 138 Stat. 1524 (2024) ............................................... 13, 22

Pub. L. No. 118-158 (2025) .......................................................................... 14, 22

*Roll Call Vote 116th Congress - 2nd Session*,
 UNITED STATES SENATE ................................................................................ 12

Ronald Reagan,
 *Remarks at a Ceremony Commemorating the 40th Anniversary of the Voice of America*,
 RONALD REAGAN PRESIDENTIAL LIBRARY & MUSEUM (Feb. 24, 1982) ................... 1

Sally Jenkins,
 *Voice of America brought light to dark places. Just ask Martina Navratilova.*,
 WASH. POST. (Mar. 20, 2025) ......................................................................... 4

Sarah Ellison et al.,
 *Trump tapped Kari Lake to run VOA. Then he dismantled it.*,
 WASH. POST. (Mar. 16, 2025) ......................................................................... 8

Serge Schmemann,
 *The Voice of America Falls Silent*, N.Y. TIMES, (Mar. 24, 2025) ............................. 3

*Structure*,
 U.S. AGENCY FOR GLOBAL MEDIA (last accessed Mar. 24, 2025) ............................. 5

Tiffany May,
 *Chinese Nationalists Praise Trump's Cuts to Voice of America*, N.Y. TIMES
 (Mar. 18, 2025) ............................................................................................... 4

*USAGM, Senior Advisor Kari Lake cancels obscenely expensive 15-year-lease
that burdened the taxpayers and enforces Trump's Executive Order to drastically
downsize agency*, U.S. AGENCY FOR GLOBAL MEDIA
(last accessed Mar. 24, 2025)....................................................................... 6, 7, 25, 26

*USAGM signs lease to new Downtown DC HQ, initiating a move that will save
the agency millions*, U.S. AGENCY FOR GLOBAL MEDIA (last accessed Mar. 24, 2025).......... 25

*VOA Battles Shortwave Jamming - 2002-05-20*,
VOA (last accessed Mar. 24, 2025) ........................................................................ 4

*VOA Mission, VOA Firewall and VOA Charter*,
VOA PUBLIC RELATIONS (last accessed Mar. 24, 2025) .......................................... 4

*VOA's first broadcast from New York City to Germany*,
VOICE OF AMERICA PUBLIC RELATIONS, (last accessed Mar. 24, 2025) .................................... 3

Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ................................ 40

## INTRODUCTION

*"Today we have this responsibility: bringing truth to light in a world groping in the darkness of repression and lies.  Let us rededicate ourselves to the task ahead, and like the Founding Father, we can be confident that truth will prevail.  And if truth prevails, freedom shall not perish from this Earth."*

> -President Ronald Reagan, *Remarks at a Ceremony Commemorating the 40th Anniversary of the Voice of America*, February 24, 1982.[1]

Voice of America (VOA) does not win worldwide listenership through propagandizing.  And it does not serve United States interests abroad through military might or intimidation.  It reports and broadcasts the news, truthfully, impartially, and objectively.  That simple mission is a powerful one for those living across the globe without access to a free press and without the ability to otherwise discern what is truly happening.  Through meeting this mission, not only does VOA undermine the foundations of authoritarian regimes, which depend on propaganda and lies, but it also demonstrates the values of democracy and freedom of speech and the press.  That is why global audiences have always tuned in, from those living under the Nazi regime, to those behind the Iron Curtain, to those now living in countries where every effort is made to distort the truth as a means to hold on to power.  That is why global authoritarians have always sought to block access to VOA's programming.  And it is why those same authoritarians are surely celebrating that VOA is shuttered today.

Congress has time and time again recognized VOA's value as one of America's soft-power tools.  It wrote VOA into official existence through legislation.  It requires that VOA continue

---

[1] Ronald Reagan, *Remarks at a Ceremony Commemorating the 40th Anniversary of the Voice of America*, RONALD REAGAN PRESIDENTIAL LIBRARY & MUSEUM (Feb. 24, 1982), https://www.naturl.link/dS7YhX.

broadcasting and producing the news according to the highest professional standards. And it has consistently appropriated funds to VOA commensurate with VOA's statutory obligations to reach wide audiences across the globe. This is because VOA has enjoyed broad bipartisan support for its cost-effective service to United States interests and Congress's acknowledgement that disseminating the truth matters to supporting democracy and freedom across the globe.

Defendants see things differently. They believe that VOA should be dismantled, and they have taken the actions to accomplish their goal. As a result of defendants' actions, today virtually all 1,300 of VOA's employees are on administrative leave and 500 of its employees, some of whom are journalists on J-1 visas who will face likely harassment and worse if forced to return to their home countries, have been told that their contracts will be terminated on March 31. As a result, just 10 days ago VOA went dark for the first time in its 83-year existence. It remains dark today. Defendants have indicated that these steps are among the first in their attack on the American international broadcasting networks that defendants have declared are not salvageable.

This case is not about reasonable disagreements over the size of government or whether VOA is in need of reform. It is about defendants' actions that impede VOA from carrying out the functions that Congress required, including reporting and broadcasting the news to those who lack access to real reporting. By forcing VOA to cease operations and by functionally dismantling the entity, defendants have plainly violated duly enacted laws that guide and obligate VOA's work. And they have violated the Constitution by usurping Congress's rightful authority to require that defendants allow and, indeed, support VOA's operations. The constitutional separation of powers matters, and the Executive cannot freely and blatantly undermine Congress's decision to create an agency and to require that federal agency to perform its statutorily required functions. By

dismantling VOA, defendants are violating not on the international broadcasting statutes and congressional appropriations legislation, but also the Constitution.

This Court should act to find that defendants have acted unlawfully and grant immediate injunctive relief.

## BACKGROUND

### I.  Factual Background

#### A.  Since World War II, VOA Has Delivered Vital, Truthful Reporting To Those Living Without Access To A Free Press.

VOA launched in the most precarious of times during the height of World War II.  Its mission was simple, but powerful: counter Nazi propaganda through truthful, impartial reporting delivered to German citizens who lived under the Nazi regime.  *See* Michael Abramowitz Declaration (Abramowitz Decl.) ¶ 2. The first words spoken embodied that ethos: "The news may be good or bad; we shall tell you the truth."[2]  In this way, VOA complemented United States objectives during the war.  But not through force.  Rather, VOA was the embodiment of America's soft power, as it demonstrated free speech, free press, and democracy in action to those living under totalitarianism.  *See* David Enrich, *As Voice of America Goes Dark, Some Broadcasts Are Replaced by Music*, N.Y. TIMES (Mar. 16, 2025), https://www.naturl.link/z4pAYf; Serge Schmemann, *The Voice of America Falls Silent*, N.Y. TIMES, (Mar. 24, 2025)https://www.naturl.link/QVpNBv.

The defeat of the Nazi regime did not end VOA's value.  Since that time, VOA has expanded to be a global voice for American values, including freedom of speech and freedom of the press, and it has demonstrated those values every day through its reporting to audiences living

---

[2]  *VOA's first broadcast from New York City to Germany*, VOICE OF AMERICA PUBLIC RELATIONS, https://tinyurl.com/5n9azuhs (last accessed Mar. 24, 2025).

under authoritarianism.  *See VOA Mission, VOA Firewall and VOA Charter*, VOA PUBLIC
RELATIONS,  https://tinyurl.com/2233h4td (last accessed Mar. 24, 2025); Abramowitz Decl. ¶ 6.
Its venerable history is difficult to distill.  But examples of its reach and impact abound.  During
the Cold War, VOA broadcasts reached behind the Iron Curtain to tell those living without access
to real reporting the truth.   Abramowitz Decl. ¶ 7. World-famous Czech tennis star Martina
Navratilova has recalled listening to VOA broadcasts while living under Soviet rule so that she
could "find out what was really going on around the world."  Sally Jenkins, *Voice of America
brought light to dark places. Just ask Martina Navratilova.*, WASH. POST. (Mar. 20, 2025),
https://tinyurl.com/5h6rs67u; Abramowitz Decl. ¶ 7.  Likewise, VOA reporting has reached
Chinese listeners for decades; from Tiananmen Square to Xinjiang, VOA has delivered accurate
reporting to listeners who otherwise lack access to sources that will tell them what is actually
happening. *See* Tiffany May, *Chinese Nationalists Praise Trump's Cuts to Voice of America*, N.Y.
TIMES (Mar. 18, 2025), https://tinyurl.com/bdhauxsb; Abramowitz Decl. ¶ 7.

    Because delivering truthful, impartial reporting to those living under authoritarian regimes
has always been a threat to those regimes' existence, authoritarian regimes have consistently
sought to block access to VOA programming.  *See, e.g.*, *VOA Battles Shortwave Jamming - 2002-
05-20*, VOA, https://tinyurl.com/3ecwkm4p (last accessed Mar. 24, 2025).  And many of VOA's
journalists, who hail from such countries and who speak directly to these audiences, have put their
safety on the line, facing possible detention and torture abroad for reporting the news.  *See* Kathy
Kiely, *By firing Voice of America, Radio Free journalists, Trump puts them in danger*, USA
TODAY (Mar. 19, 2025), https://tinyurl.com/56uy2j92.

    Before the actions at issue in this case, VOA provided comprehensive, multimedia
reporting in 49 languages to an estimated 362 million people across the globe on a weekly basis.

It employed approximately 1,300 employees, including at least 1,000 journalists. Abramowitz Decl. ¶ 1. Approximately 500 of VOA's employees, including approximately 450 journalists and representing approximately forty percent of VOA's workforce, are personal services contractors (PSCs), who work fulltime under contract with VOA, an arrangement that has become increasingly prevalent in government in recent years. Abramowitz Decl. ¶ 2. Many of these PSCs are key VOA journalists from other countries who deliver truthful reporting to those living abroad. *Id.*

### B. VOA Goes Dark

Voice of America is one of six global media organizations within the United States Agency for Global Media (USAGM). *Structure*, U.S. AGENCY FOR GLOBAL MEDIA, https://tinyurl.com/yc4hrrek (last accessed Mar. 24, 2025). USAGM's chief executive officer must be appointed by the President and confirmed by the Senate. 22 U.S.C. § 6203(b)(1). The director of VOA is appointed by the CEO of USAGM, whose decision must be ratified by the International Broadcasting Advisory Board (IBAB), the bipartisan, seven-member board that approves the appointments and removals of the directors of United States international broadcasting networks. 22 U.S.C. § 6205(e)(1)–(2); *see* Abramowitz Decl. ¶¶ 12, 20.

Donald Trump was elected the 47th president of the United States in November 2024. On December 11, 2024, then-President-elect Trump announced his intent that Kari Lake lead VOA as its director. Abramowitz Decl. ¶ 21. Shortly after taking office, however, Trump swiftly fired all members of the IBAB. *Id.* As Kari Lake has publicly acknowledged, she could not be immediately appointed to be the head of VOA because her appointment requires approval by the now-vacant IBAB. *Id.* ¶ 22. On March 3, 2025, President Trump appointed Lake as a "Senior Advisor" to Victor Morales, the Acting USAGM CEO. *Id.*

On March 14, 2025, hours prior to signing into law Congress's appropriations to VOA, the White House announced that it intended to "reduce the performance of" VOA's "statutory

functions and associated personnel to the minimum presence and function required by law." Exec. Order No. 14,238, 90 FED. REG. 13043, 13043 (Mar. 14, 2025) (also available at https://tinyurl.com/2wue2bt7) ("March 14 Executive Order"); *see* Abramowitz Decl. ¶ 23.

One day later, on March 15, 2025, nearly all USAGM employees, including approximately 1,300 employees of VOA, received notice from USAGM that they were being placed on administrative leave "until further notice." *USAGM, Senior Advisor Kari Lake cancels obscenely expensive 15-year-lease that burdened the taxpayers and enforces Trump's Executive Order to drastically downsize agency*, U.S. AGENCY FOR GLOBAL MEDIA, https://tinyurl.com/3f5jdumn (last accessed Mar. 24, 2025) (hereafter "USAGM Release"); Abramowitz Decl. ¶ 23. USAGM did not provide a reason for placing VOA employees on administrative leave. J. Doe 1 Decl. VOA employees were told they were barred from entering USAGM premises and accessing USAGM's systems.  All employees were also to immediately surrender their USAGM ID, phones, and equipment.

On March 16, 2025, USAGM notified VOA's personal services contractors (PSCs) that they would be terminated on March 31, 2025.  *Id.* ¶ 26.  The termination notice applies to approximately 500 PSCs who work at VOA, many of whom are key journalists and some of whom are on J-1 visas that will expire 30 days after they are terminated.  Some of these PSCs, including one of the Plaintiffs, fear that they will be targeted and imprisoned by their authoritarian home countries if forced to return.  *Id.* ¶ 34.  USAGM once again did not provide a reason for the termination notice.

On March 17, 2025, William Martin, Director for Stations and Operations, instructed all USAGM Foreign Service employees to shut down all transmitters at their stations within two days and request the respective Missions to place all locally employed staff on administrative leave.

*Id.* ¶ 25. Employees were also told to expect to be placed on administrative leave following the two-day shutdown period. *Id.* Further, 500 PSCs—who are fulltime employees and many of whom are key reporters from other countries working to deliver vital news to those countries— have been informed that they will terminated as of March 31, 2025. *Id.* ¶ 26. As a result of these actions and others, VOA has ceased all broadcasting activities for the first time in 83 years. *Id.* ¶ 27. All VOA reporting has come to a halt, and no news or journalism has been posted to its website since. *Id.* News outlets that reflect a range of political viewpoints have criticized VOA's shuttering. *See, e.g.*, Editorial Board, *A U.S. Retreat in the War of Ideas*, WALL ST. J., Mar. 19, 2025, https://tinyurl.com/398fazk5.

These personnel actions have been taken by the defendants in this action. *See* USAGM Release (featuring commentary from Kari Lake, concerning USAGM's personnel actions following executive order). And defendants have made clear that the cessation of VOA's broadcasting and reporting activities will continue, and that VOA will be effectively dismantled. A March 15, 2025, USAGM press release states that USAGM "is not salvageable," and that "from top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken." *Id.* Kari Lake reiterated that drastic actions were being taken to shut down USAGM and the entities it oversees in the days following March 15 release. In two interviews, Lake stated that USAGM is not salvageable or unsalvageable multiple times, *see* Kari Lake (@KariLake), X (Mar. 18, 2025), https://tinyurl.com/zc3798x4; Kari Lake (@KariLake), X (Mar. 17, 2025), https://tinyurl.com/8yxz3kpr[3], and that VOA and related entities put out "anti-American content" and that there is "no oversight over the editorial side of what is

---

[3]    *See also "It Is Full Of Waste, Fraud, And Abuse." Kari Lake Reacts To 1,300 Voice Of America Layoffs*, RUMBLE (Mar. 17, 2025), https://tinyurl.com/32jjdyj; Kari Lake (@KariLake), X (Mar. 19, 2025) https://tinyurl.com/6t73zdxf.

going out over the air and that this agency has tried to put up a wall, a border wall around it, Voice

of America and others . . . that says . . . you can't tell us what we say on the airwaves . . . that's not

how things should operate," Kari Lake (@KariLake), X (Mar. 19, 2025)

https://tinyurl.com/mr27dr5p.[4]

## II.    Statutory Background

### A.    Congress Codifies VOA and Requires it to Fulfill its Statutory Mission

VOA is a creature of federal statute, and its statutory duties and obligations are codified

into United States law as the result of several different pieces of legislation enacted over the last

eighty years.

In 1948, Congress passed the United States Information and Exchange Act of 1948 (the

Smith-Mundt Act).  Pub. L. No. 80-402.  The Smith-Mundt Act created "an information service

to disseminate abroad information about the United States, its people, and policies promulgated

by the Congress, the President, the Secretary of State and other responsible officials of

Government having to do with matters affecting foreign affairs."  Pub. L. No. 80-402, tit. I § 2(1).

With the Smith-Mundt Act, VOA was codified into law.

Although VOA began its broadcasts in the 1940s, Congress codified the entity's charter in

the Foreign Relations Authorization Act of 1977.  Pub. L. No. 94-350 (1976).  The charter

amended the Smith-Mundt Act to recognize VOA's importance to United States "long-range

interests."  *Id.*, tit. II, § 503.  In relevant part, the law codified certain statutory requirements:

---

[4]    These comments are consistent with other recent comments from members of the Trump
Administration, including Elon Musk, who called for VOA's and Radio Free Europe/Radio
Liberty's shutting down, *see* Elon Musk (@elonmusk), X (Feb. 9, 2025)
https://tinyurl.com/3tc93mr5, as well as Ric Grenell, Special Presidential Envoy for Special
Missions, who said that "[w]e don't need government paid media outlets," Sarah Ellison et al.,
*Trump tapped Kari Lake to run VOA. Then he dismantled it.*, Wash. Post. (Mar. 16, 2025),
https://tinyurl.com/4uddndmh.

> (1) VOA will serve as a consistently reliable and authoritative source of news. VOA news will be accurate, objective, and comprehensive.
>
> (2) VOA will represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions.
>
> (3) VOA will present the policies of the United States clearly and effectively, and will also present responsible discussion and opinion on these policies.

*Id.* (currently codified in 22 U.S.C. § 6202(c)).

Consistent with these missions, in 1994 Congress passed the International Broadcasting Act (IBA), Pub. L. No. 103-236, tit. III (1994), 22 U.S.C. §§ 6201, *et seq.*, which lays out the overarching principles that guide U.S. international broadcasting and insulates U.S. broadcast agencies' newsroom staff from certain executive branch officials who "shall respect the professional independence and integrity of the Agency, its broadcasting services, and the grantees of the Agency."  22 U.S.C. § 6204(b).  *See* §§ 6202(a)(5), (b)(1). These statutory provisions embody the "firewall" between journalists and executive branch officials who must not interfere with the reporting at the entities.

Today, by law VOA is required to carry out a variety of statutory functions in addition to those mentioned above.  Under 22 U.S.C. § 6202(a)(7), "United States international broadcasting shall," among other requirements laid out in the statute, "be designed so as to effectively reach a significant audience."  Similarly, Congress mandated that "United States international broadcasting shall include,"

> (1)    news which is consistently reliable and authoritative, accurate, objective, and comprehensive;

(2)     a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society;

(3)     clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies, including editorials, broadcast by the Voice of America, which present the views of the United States Government;

(4)     the capability to provide a surge capacity to support United States foreign policy objectives during crises abroad;

(5)     programming to meet needs which remain unserved by the totality of media voices available to the people of certain nations;

(6)     information about developments in each significant region of the world;

(7)     a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen;

(8)     reliable research capacity to meet the criteria under this section;

(9)     adequate transmitter and relay capacity to support the activities described in this section; and

(10)    training and technical support for independent indigenous media through government agencies or private United States entities.

22 U.S.C. § 6202(b)(1)–(10).  Accordingly, through statute, Congress required that VOA broadcast and produce the news to reach wide audiences across the globe, and it prescribed that this news must adhere to high journalistic standards.  Congress also requires that the CEO of USAGM "respect the professional independence and integrity of [USAGM], its broadcasting services, and the grantees of [USAGM]."  22 U.S.C. § 6204(b).

10

### B.  Congress Recognizes that Editorial Independence Is Integral to VOA's Meeting its Statutory Obligations

In addition to the statutory firewall and the statutory principles that require that VOA adhere to high journalistic standards, Congress has bolstered VOA's editorial independence through an intricate statutory scheme.  Congress took these actions in response to recent attempts to meddle with VOA's independent journalism and breaches of the statutory firewall.

In 2020, Michael Pack took over as CEO at USAGM.  In the first two weeks following his Senate confirmation, in an event deemed the "Wednesday Night Massacre," Pack fired the heads of numerous entities under USAGM's purview, including the directors of Radio Free Europe/Radio Liberty, Radio Free Asia, Middle East Broadcasting Networks, the Office of Cuba Broadcasting, and the Open Technology Fund.  Edward Wong, *New Conservative Media Chief Dismisses Heads of U.S.-Funded News Outlets*, N.Y. TIMES, (June 17, 2020), https://tinyurl.com/37v9hv6j.  Among other actions, Pack also directly attacked the independence of journalists working at these entities.

Within weeks of Pack's firings of the heads of the broadcast entities, a bipartisan group of United States Senators, including Republicans Marco Rubio, Lindsey Graham, Jerry Moran, and Susan Collins, and Democrats Richard Durbin, Patrick Leahy, and Chris Van Hollen, wrote a letter to Pack, expressing their concerns.  The Senators explained that "[t]he termination of qualified, expert staff and network heads for no specific reason as well as the removal of their boards raises serious questions about the preservation of these entities and their ability to implement their statutory missions now and in the future."[5]  They further noted their "bipartisan and bicameral" concerns, and urged that "Congress set up these networks, and its governance structure at USAGM,

---

[5]    Letter from Sens. Rubio, Graham, Moran, Collins, Durbin, Leahy, and Van Hollen to Michael Pack (July 1, 2020), at 1 (available at https://tinyurl.com/2s3e8ch6).

to preserve the grantees' independence so they can act as a bulwark against disinformation through credible journalism."[6]

In 2020, a federal court in the District of the District of Columbia similarly found that a group of career civil servants at USAGM and VOA had demonstrated a likelihood of success on the merits of a claim that USAGM, Pack, and other agency leadership had violated the plaintiffs' "First Amendment rights by taking or influencing personnel actions against individual journalists or editors, attempting directly to monitor VOA and network content through communications with individual editors or journalists, and undertaking their own investigations of alleged discrete breaches of journalistic ethics." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 385–86 (D.D.C. 2020). The court enjoined the defendants from continuing such actions. *Id.* at 386.[7]

Congress addressed these bipartisan concerns in the 2021 National Defense Appropriations Act (NDAA), which became law on January 1, 2021, after passing in the Senate by a vote of 81 to 13, and in the House by a vote of 322 to 87, following a veto by President Donald Trump. *Roll Call Vote 116th Congress - 2nd Session*, UNITED STATES SENATE, https://tinyurl.com/5eemrkke. Prior to Pack's tenure as CEO, the CEO had full authority to appoint and remove the heads of the broadcast entities as well as members of the entities' boards. The 2021 amendments, however, require that a Presidentially appointed, Senate-confirmed, and party-balanced board of seven, known as the International Broadcasting Advisory Board, approve by a majority vote the appointment and removal of the heads of the broadcast entities, who are selected or dismissed by

---

[6]   *Id.*

[7]   The D.C. Circuit granted the government's motion to dismiss the appeal of this order following the election of President Biden. *Turner v. U.S. Agency for Glob. Media*, No. 20-5374, 2021 WL 2201669 (D.C. Cir. May 17, 2021).

the CEO of USAGM.  22 U.S.C. § 6205(e)(1).  Such a structure protects the directors of United States international broadcasting entities from arbitrary removal, and forges consensus around who should lead these entities' non-partisan work.

### C.  Congress Appropriates Funds So That VOA Can Meet its Mission

In 2024, Congress appropriated $857,214,000 to USAGM to "carry out international communication activities."  Pub. L. No. 118-47, div. F., 138 Stat. 460 (2024).  Congress specified that "the funds appropriated under this heading shall be allocated in accordance with the table included under this heading in the explanatory statement described in section 4."  *Id.* at 735.  That table states that Congress appropriated $260,032,000 to VOA. 118th Cong., Further Consolidated Appropriations Act, 2024, Legislative Text and Explanatory Statement at 1167 (Comm. Print 2024).[8]

Through the Continuing Appropriations and Extensions Act, 2025, Congress renewed VOA's funding.  Pub. Law No. 118-83, 138 Stat. 1524 (2024).  In relevant part, that law appropriated "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2024 and under the authority and conditions provided in such Acts, for continuing projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2024."  *Id.*, Div. A.

Upon the expiration of this continuing resolution, Congress renewed its appropriations to VOA on the same terms through yet another continuing resolution, the American Relief Act, 2025.

---

[8]    The original 2024 appropriation, which has been continued three times, provides discretion to USAGM to "reprogram[]" funds "within and between amounts designated in such table."  138 Stat. 460, 735 (2024).  But this discretion is narrow: USAGM's reprogramming may not "reduce a designated amount by more than 5 percent" and any such action is subject to "the regular notification procedures of the Committees on Appropriations."  *Id.*

Pub. L. No. 118-158 (2025), Div. A.  Those appropriations were made through March 14, 2025.
*Id.*

Finally, on March 15, 2025, President Trump signed into law Congress's further appropriations on the same terms to VOA that run through September 30, 2025.  H.R. 1968, 119th Cong. § 1101(a) (2025).  As before, Congress appropriated "[s]uch amounts as may be necessary, . . . under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024, for projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for, and for which appropriations, funds, or other authority were made available."  *Id.*

## III.    The Harm to Plaintiffs

### A.  Harm to Plaintiff Michael Abramowitz

Defendants' actions have caused immediate and escalating harm to VOA and to Director Michael Abramowitz, by preventing him from carrying out the duties Congress entrusted to him as Director of VOA. *See generally* Abramowitz Decl.

After placing nearly all VOA employees on administrative leave, including Plaintiff Michael Abramowitz, defendants are now initiating the mass termination of approximately 500 PSCs, including many of VOA's most experienced journalists, editors, and technical staff.  *Id.* ¶ 26.  These personnel are essential to VOA's operations and are the very individuals Director Abramowitz relies upon to fulfill VOA's statutory mission.  *Id.* ¶ 33.  Their removal has effectively halted all news production and broadcasting. Without access to its staff, VOA has not published or aired a single piece of news content since March 15, 2025.  *Id.* ¶¶ 27, 33. Its website is frozen, its radio and television channels are looping filler material, and its newsroom has gone dark for the first time in 83 years.  *Id.* ¶ 33.  Defendants have undermined Director Abramowitz's statutory responsibility to lead VOA through their actions.

14

Director Abramowitz's responsibility in ensuring the safety of his employees is also undermined by defendants' unlawful actions. *Id.* ¶ 34. Some of the journalists facing termination hold J-1 visas that are tied directly to their employment at VOA. *Id.* If fired, they will lose their legal status in the United States and may be forced to return to countries where they face persecution, imprisonment, or worse. *Id.* In addition, Defendants have directed the termination of longstanding contracts with critical content providers—including the Associated Press, Reuters, and Agence France-Presse—abruptly severing relationships built over decades that are central to VOA's credibility and global reach. *Id.* ¶ 47.

These developments have not only dismantled the infrastructure Director Abramowitz was hired to lead, but also triggered direct reputational attacks against him personally. *Id.* ¶ 46. Online commentary has accused him of having a "relationship with censorship," being someone "whose work sucks up taxpayer money," and who "has no place running Voice of America." *See, e.g.*, Natalie G Winters (@nataliegwinters), Threads (Mar. 11, 2025), https://tinyurl.com/r76c25ms. These baseless smears—amplified by Defendant Kari Lake's public criticisms of VOA as biased or un-American—undermine Director Abramowitz's credibility as a nonpartisan leader and journalist. *See* Kari Lake (@KariLake), X (Mar. 19, 2025) https://tinyurl.com/mr27dr5p. They also strain VOA's reputation with foreign media partners, stakeholders, and audiences around the world, thereby compounding the harm to his ability to serve effectively in his role. *See id.* ¶ 47.

Taken together, these actions have prevented Director Abramowitz from carrying out his statutory responsibilities, endangered the safety of staff he oversees, and fractured trust with global partners. The cumulative impact of these harms is both ongoing and irreparable.

### B. Harm to Plaintiffs J. Doe 1, J. Doe 2, and LaBruto

**Plaintiff J. Doe No. 1** is a foreign citizen working under a PSC contract with VOA's international division since 2022. Declaration of J. Doe No. 1 (Doe 1 Decl.) ¶ 1. Plaintiff, along

with Plaintiff's family, relocated to the U.S. to support VOA's mission. *Id.* Plaintiff's work includes producing and editing digital content for audiences that speak the language of Plaintiff's home country, which is under an authoritarian regime. *Id.* ¶¶ 1-2. On March 15, 2025, Plaintiff was placed on administrative leave without explanation and barred from producing content. *Id.* ¶ 3. On March 16, 2025, Plaintiff's contract was terminated effective March 31, 2025. *Id.* Plaintiff's reporting has now been silenced. *Id.*

Plaintiff's J. Doe No. 1's J-1 visa—and Plaintiff's family's J-2 visas—are directly tied to Plaintiff's employment. *Id.* ¶ 4. Termination will result in loss of immigration status, income, and health insurance. *Id.* ¶¶ 4, 6. Forced return to Plaintiff's home country would endanger Plaintiff's family due to Plaintiff's critical reporting. *Id.* ¶ 5. Plaintiff could be subject to prosecution for treason under local law, and face decades in prison. *Id.* Plaintiff has experienced severe emotional distress, including panic attacks and sleeplessness. *Id.* ¶ 6. Plaintiff's children fear losing their school and home. *Id.* The termination has left the family without a safety net. *Id.*

**Plaintiff J. Doe No. 2** has served in VOA's international service since 2022 as a journalist in one of the foreign country divisions, which broadcasts across that country and its diaspora. Declaration of J. Doe No. 2 (Doe 2 Decl.) ¶ 1. On March 15, 2025, Plaintiff was locked out of Plaintiff's office and placed on leave without notice. *Id.* ¶ 6. On March 16, 2025, Plaintiff then received a formal notice of contract termination, effective March 31, 2025. *Id.* ¶ 7.

Plaintiff's J-1 visa and Plaintiff's spouse's J-2 visa will soon lapse, forcing them to leave the U.S. by April 2025. *Id.* ¶ 8. Due to a medical condition, Plaintiff has been advised against air travel for at least five months. *Id.* ¶ 9. Termination will leave them without income, health insurance, or means to pay their mortgage. *Id.* ¶ 10. Plaintiff's abrupt termination threatens audience trust and harms VOA's ability to serve the community Plaintiff's work covered. *Id.* ¶ 12.

16

**Plaintiff LaBruto** has worked for two years in VOA's English to Africa Desk in the Africa Division, reporting on U.S. foreign aid, HIV relief, and policy issues relevant to African audiences. Declaration of Anthony Michael LaBruto (LaBruto Decl.) ¶¶ 1-2. He was placed on leave March 15, 2025, and notified that his contract will end March 31, 2025. *Id.* ¶¶ 4-5. His reporting is across 16 different languages and broadcasts across all of Africa via digital, radio, and TV platforms. *Id.* ¶ 1-2. His termination undermines ongoing partnerships and damages VOA's mission in Africa. *Id.* ¶ 6.

The sudden and unexplained terminations of all three of these plaintiffs jeopardize their legal status, financial security, health coverage, and safety—causing irreparable harm both to them and the global audiences they serve.

## ARGUMENT

"The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction." *Holiday CVS, L.L.C. v. Holder*, 2012 WL 10973832, at *1 (D.D.C. Feb. 7, 2012). A plaintiff seeking a temporary restraining order or preliminary injunction must show "(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent such relief; (3) that the equities favor the plaintiff's position; and (4) that the injunction is in the public's interest." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 928 F.3d 1102, 1112 (D.C. Cir. 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). All factors are satisfied here.

## I.    Plaintiffs Are Likely to Succeed on the Merits

This factor weighs heavily in favor of injunctive relief because Plaintiffs are likely to succeed on the merits of any of the below claims. *See Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (for purposes of preliminary injunctive relief, "the first and most important factor"

is "whether petitioners have established a likelihood of success on the merits"); *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 91 (D.D.C. 2021) (same).

### A. Defendants Must Comply With U.S. International Broadcasting Statutes.

Defendants are dismantling VOA.  They have shuttered VOA, forced it to go dark for the first time in over eighty years, placed virtually all of its employees on administrative leave, and noticed the terminations of nearly forty percent of the network's employees, many of whom are key journalists at VOA.  Congress *required*, through several statutes and appropriations legislation, that VOA continue producing and broadcasting news that adheres to the highest journalistic standards.  Congress *required*, through the same, that executive-branch officials not interfere with VOA's newsrooms.  Through their actions, defendants have plainly violated these laws.

"[T]he President must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute."  *In re Aiken County,* 725 F.3d 255, 259 (D.C. Cir. 2013).  The numerous statutes creating, modifying, and obligating VOA require that VOA carry out its statutory mandates; continue running, including by producing and broadcasting the news in accordance with Congress's intent; and act consistent with and utilize the funds that Congress has appropriated to it.

Without a doubt, VOA is *required*, *by congressionally enacted legislation*, to carry out certain functions.  By dismantling VOA—through forcing it to go dark, ceasing its broadcasting and reporting duties, and placing on leave all of its employees and terminating forty percent of employees—defendants have violated these statutes.  Congress has obligated VOA in numerous ways.  Under 22 U.S.C. § 6202(a)(7), "United States international broadcasting *shall*," among other things laid out in the statute, "be designed so as to effectively reach a significant audience." Of course, Congress's use of "shall" in the statute obligates the executive branch and VOA to meet

18

these statutory requirements, and more basically presumes that VOA exists as a functioning entity.

Similarly, Congress mandated that "United States international broadcasting *shall include*,"

(1)    news which is consistently reliable and authoritative, accurate, objective, and comprehensive;

(2)    a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society;

(3)    clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies, including editorials, broadcast by the Voice of America, which present the views of the United States Government;

(4)    the capability to provide a surge capacity to support United States foreign policy objectives during crises abroad;

(5)    programming to meet needs which remain unserved by the totality of media voices available to the people of certain nations;

(6)    information about developments in each significant region of the world;

(7)    a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen;

(8)    reliable research capacity to meet the criteria under this section;

(9)    adequate transmitter and relay capacity to support the activities described in this section; and

(10)    training and technical support for independent indigenous media through government agencies or private United States entities.

22 U.S.C. § 6202(b)(1)–(10). Congress's obligations on VOA are even more exacting than other U.S. international broadcast entities, as the VOA charter, passed in the 1970s, requires VOA to provide certain services and meet certain principles. *See id.* § 6202(c). Congress required that the

CEO of USAGM "respect the professional independence and integrity of . . . its broadcasting services, and the grantees of [USAGM]." 22 U.S.C. § 6204(b).  This provision, which specifically requires that the CEO of USAGM allow VOA and its sister entities to carry out their missions, is a recent affirmation of VOA's importance and its independence.

Simply put, each of the above statutory provisions presumes (1) that VOA exists; (2) that VOA is sufficiently staffed, funded, and capable of carrying out a number of statutory functions; and (3) that the CEO of USAGM and other executive branch officials do not impede VOA from carrying out its functions.  Today, none of these assumptions hold because defendants have disabled VOA through putting all except a few administrative employees on administrative leave, permanently terminating forty percent of its employees effective March 31, 2025, and directly impeding its statutory functions through ceasing VOA's broadcasts and preventing its other broadcasting work.  This lawsuit is not about reasonable efforts to downsize or reorganize VOA in a manner consistent with the law.  It is about defendants' clear violation of a delicate statutory scheme that Congress developed over decades.

In addition, defendants are directly contravening clear statutory mandates that VOA maintain its independence from undue executive branch interference.  Such mandates not only envision a strong, functioning VOA, but also one that employs journalists and other staff who can exercise editorial independence, deliver impartial and truthful news without partisan favor, and demonstrate the values of free press and free speech abroad.  For decades, a statutory firewall has existed to insulate the journalists and editorial staff at VOA and its sister entities from political interference by certain outside executive branch officials.  *See* 22 U.S.C. § 6202(a)(5) (requiring that U.S. international broadcasting "be conducted in accordance with the highest professional standards of broadcast journalism"), 22 U.S.C. § 6202(b)(1) (requiring that the networks produce

"news which is consistently reliable and authoritative, accurate, objective, and comprehensive"), 22 U.S.C. § 6204(b) (requiring that certain executive-branch officials outside the newsrooms "respect the professional independence and integrity of the Agency, its broadcasting services, and the grantees of the Agency").  VOA obviously cannot deliver independent, impartial journalism if its journalists are prohibited from doing their job.

Likewise, Congress sought to insulate the heads of U.S. international broadcasters from arbitrary removal to bolster the statutory firewall and further the broadcasters' editorial independence.  Following the politicizing tenure of prior USAGM CEO Michael Pack, who retaliated against journalists for fulfilling their statutory mandates, *see Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 385–86 (D.D.C. 2020), Congress passed legislation requiring the IBAB's approval of appointments and removals of the heads of U.S. international broadcasting entities, including VOA.  22 U.S.C. § 6205(e)(1).

Defendants' unlawful efforts are an end-run around this statutory scheme which seeks to protect and promote a robust and independent VOA so that it may fulfill its statutory mandates to deliver truthful and impartial news to audiences across the globe.  As before, this structure of course presumes that VOA exists, that directors like Plaintiff be able to exercise control and editorial independence, and that VOA be allowed to do what it is required to do: broadcast the news.  Defendants have made clear that they do not like this statutory structure and the independence it affords VOA and its journalists.  But that complaint is one they can direct to Congress.  By dismantling VOA and impeding its ability to broadcast *in toto*, defendants have circumvented a scheme that envisions an independent VOA full of journalists engaged in First Amendment protected speech.

21

Finally, defendants' actions—putting nearly all VOA employees on administrative leave, permanently terminating the contracts of nearly forty percent of the employees, shutting down its broadcasting activities, and effectively abolishing the agency—is a *de facto* impoundment of congressionally appropriated funds, directly contrary to recently enacted appropriations legislation.  At a minimum, Congress's recent appropriations to VOA reaffirm that VOA *must continue running*.  In 2024, Congress appropriated $857,214,000 to USAGM to "carry out international communication activities."  Pub. L. No. 118-47, div. F., 138 Stat. 460 (2024). Congress specified that "the funds appropriated under this heading *shall be allocated* in accordance with the table included under this heading in the explanatory statement described in section 4."  *Id.* at 735 (emphasis added).  That table makes clear that Congress appropriated $260,032,000 to VOA. 118th Cong., Further Consolidated Appropriations Act, 2024, Legislative Text and Explanatory Statement at 1167 (Comm. Print 2024).  Congress has thrice appropriated further funds to VOA, by reaffirming that funds shall be allocated to VOA in line with the 2024 appropriations law by incorporating the 2024 table by reference.  *See* Pub. Law No. 118-83, 138 Stat. 1524, div. A (2024); Pub. L. No. 118-158 (2025), div. A; H.R. 1968, 119th Cong. § 1101(a) (2025); *see also, e.g.*, B-316010, Consolidated Appropriations Act, 2008 – Incorporation by Reference (Feb. 25, 2008) (explaining that, through incorporating explanatory statements by reference in appropriations laws, Congress makes clear that "the affected agencies are required to obligate and expend the appropriations in accordance with the referenced provisions of the explanatory statement").

Congress's use of "shall" in its appropriations to USAGM and VOA mean just that: funds *must be* allocated and spent as Congress required.  *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016).  Congress's appropriations to VOA reaffirm that VOA must

continue its statutorily required broadcasting activities.  If these basic points about appropriations law were not sufficient, Congress was clearer with respect to VOA and its sister entities.  Under 22 U.S.C. § 6204(a)(6), the CEO of USAGM "shall have" the authority "[t]o allocate funds appropriated for international broadcasting activities among the various elements of the Agency and grantees, subject to reprogramming notification requirements in law for the reallocation of funds."  By taking the at-issue actions—including the firing of forty percent of VOA's employees—defendants have run afoul of this baseline responsibility that the CEO indeed allocate congressionally appropriate funds to VOA.  Even without such an explicit provision, defendants' actions constitute a significant defunding of VOA directly contrary to Congress's precise allocation of funds to the entity.

Through placing all VOA employees administrative leave, terminating almost forty percent of employees, impeding all of VOA's statutorily required broadcasting activities by forcing VOA to go dark, freezing VOA's funds and *de facto* impounding them, and working to, and making explicit their intentions to, abolish VOA, defendants have violated myriad acts of Congress.  On this basis alone, this Court may properly enjoin defendants.  In undertaking these activities, however, defendants have also violated baseline administrative and constitutional principles.

### B.  Defendants' Actions Violate The APA.

Defendants' impeding of VOA's statutory functions and dismantling of an agency created by Congress violates the APA many times over.

*First*, defendants' actions are plainly contrary to law and in excess of their statutory and constitutional authority.  5 U.S.C. § 706(2).  "When a statute commands an agency without qualification to carry out a particular program in a particular way, the agency's duty is clear; if it believes the statute untoward in some respect, then 'it should take its concerns to Congress,' for '[i]n the meantime it must obey [the statute] as written.'"  *Oceana, Inc. v. Locke,* 670 F.3d 1238,

1243 (D.C. Cir. 2011) (quoting *Nat. Res. Def. Council v. EPA,* 643 F.3d 311, 323 (D.C. Cir. 2011));

*see also, e.g., Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 381 (D.D.C. 2017) (an

agency action is "arbitrary, capricious, an abuse of discretion and contrary to law" when it is

"contrary to the plain meaning of the relevant statute and regulations"); *Accrediting Council for*

*Indep. Colleges & Sch. v. DeVos*, 303 F. Supp. 3d 77, 104 (D.D.C. 2018) (collecting cases).

      That is the case here. As noted above, Congress required that VOA carry out a number of

statutory functions, including that it reach a wide audience; broadcast according to high journalistic

standards; and maintain capacity to otherwise support U.S. foreign policy objectives. *See, e.g.*, 22

U.S.C. § 6202(a)(1), (b)(1)–(10), (c). And Congress empowered VOA to carry out these statutory

requirements by protecting the director of VOA from arbitrary removal and enacting the statutory

firewall so that VOA journalists can exercise independence, impartiality, and freedom of speech.

*See* 22 U.S.C. §§ 6202(a)(5), 6202(b)(1), 6204(b) § 6205(e)(1). Congress appropriated millions

of dollars of funding to VOA so that VOA can carry out its mission and meet these statutory

objectives. As discussed, Congress *required* that these funds be made available to VOA. By

impeding VOA's statutory objectives and otherwise working to dismantle VOA, defendants have

violated the APA because they have acted contrary to law.[9]

      *Second*, defendants' actions are arbitrary and capricious. 5 U.S.C. § 706(2). Under the

APA, agencies like USAGM must "cogently explain why it has exercised its discretion in a given

manner." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29,

48 (1983). To that end, agencies must "examine the relevant data and articulate a satisfactory

explanation for its action[,] including a 'rational connection between the facts found and the choice

---

[9]   As discussed, *infra*, defendants' actions likewise violate a number of constitutional provisions,
too, and so defendants acted contrary to law in these senses as well.

made.'" *Id.* at 43 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). Defendants have failed to articulate any adequate rationale—and indeed have likely articulated *unlawful* rationales—to take all of the at-issue actions—placing virtually all VOA employees on administrative leave, firing forty percent of VOA's employees, impeding VOA's statutorily required broadcasting activities, and dismantling the agency—and have failed to consider myriad relevant factors.

At the outset, defendants have failed to articulate a satisfactory rationale for taking the above-mentioned actions. When defendants have given reasons, the reasons have not just been irrational: they have been contrary to the letter and spirit of United States international broadcasting statutes. The White House executive order that defendants are ostensibly implementing provides no rationale whatsoever for such drastic changes to VOA. *See* March 14 Executive Order. USAGM's rationale for placing virtually all VOA employees on administrative leave and terminating the contracts of 500 PSCs, which incorporates statements from Kari Lake, references "[w]aste, fraud, and abuse" within USAGM and references a few non-specific "findings," but with no support for these extremely serious charges. In fact, one of the "findings"—that USAGM engaged in "[o]bscene over-spending including a nearly quarter-of-a-billion dollar lease for a Pennsylvania high-rise," USAGM Release—is directly contradicted by an article *still on USAGM's website, see USAGM signs lease to new Downtown DC HQ, initiating a move that will save the agency millions*, U.S. AGENCY FOR GLOBAL MEDIA, https://tinyurl.com/ycyy7ee8 (last accessed Mar. 24, 2025) ("The agency's move to a modern facility will save taxpayers more than $150 million over the course of its 15-year lease.").

Also, several times when defendants have articulated rationales for such drastic actions, they have been unlawful. These include (1) cutting agency spending, a decision reserved for

Congress, not defendants, *see* USAGM Release; Kari Lake (@KariLake), X (Mar. 19, 2025) https://tinyurl.com/57hecd86; (2) that VOA and related entities put out "anti-American content" and that there is "no oversight over the editorial side of what is going out over the air and that this agency has tried to put up a wall, a border wall around it, Voice of America and others . . . that says . . . you can't tell us what we say on the airwaves . . . that's not how things should operate," Kari Lake (@KariLake), X (Mar. 19, 2025) https://tinyurl.com/mr27dr5p, despite preserving VOA's editorial independence being Congress's *deliberate choice* in establishing the statutory firewall and other independence-promoting protections; and (3) that congressionally created U.S. international broadcasting agencies, including VOA, must be dismantled entirely, despite that such choice being Congress's prerogative, *see* USAGM Release.  Articulating *unlawful* explanations for agency actions is a textbook example of arbitrary and capricious agency action.

Further, defendants have not remotely considered the consequences of their actions, including the reliance interests involved, the harm to VOA employees, and the harms to audiences across the globe which rely on VOA as their only source of truthful and impartial reporting.  VOA employs a number of key journalists who are PSCs working in the United States on J-1 visas. Defendants have noticed the terminations of 500 of the PSCs at VOA, some of whom face potential harassment, detainment, and persecution due to their work at VOA when they will be forced to return to their home countries.  Nor have defendants considered that VOA serves as a vital lifeline to its hundreds of millions of weekly listeners who lack access to a free press and otherwise cannot access truthful and impartial reporting.  That authoritarian regimes across the globe, including in China and Russia, are celebrating VOA's shuttering only further reflects the fact that VOA reached huge numbers of people across the globe and threatened these regimes' foundations through

26

reporting the truth. Defendants, however, do not appear to have at all considered the boon to United States interests abroad that VOA provides through its reporting and broadcasting.

*Third*, in light of defendants' complete shutdown of VOA's broadcasting activities and unlawful *de facto* impoundment of congressionally appropriated funds, this Court should "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1)—namely, VOA's broadcasting activities and lawful access to its funds. Requiring that USAGM properly allocate congressionally appropriated funds to VOA and permit VOA to meet its statutorily required reporting and broadcasting activities are "discrete agency action[s]" that are non-discretionary, per both requirements put on the USAGM CEO, *see supra*, and per congressional appropriations legislation. *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 64 (2004). This Court may appropriately compel the release of such funding so that VOA can retain sufficient personnel and operate at sufficient capacity to meet its statutory obligations.

### C. Defendants' Actions Are Unconstitutional.

As discussed, defendants' have taken the following actions: (1) the placing on administrative leave, or terminating the contracts, of nearly all employees of VOA; (2) the impeding of VOA's statutory obligations, including, *inter alia*, the shutting down of all VOA broadcasting activity; (3) the *de facto* impoundment of congressionally appropriated funds meant to support VOA in meeting its statutory mandates; and (4) the dismantling of, and promised abolition of, VOA as an entity. Taken separately or together, these actions violate numerous provisions of the Constitution as well as black-letter separation of powers principles.

### 1. Defendants' Actions Violate The Presentment Clause, U.S. Const. art. I, § 7, cl. 2.

As discussed throughout this brief, VOA is a creature of statute. Congress created VOA. Congress has repeatedly codified its statutory objectives and the principles which must guide its

work.  Congress obligated VOA to continue running, to continue producing and broadcasting the news, and to continue reaching wide global audiences.  And Congress has worked in recent years to carefully create a statutory scheme that promotes VOA's editorial independence and that of its journalists while still allowing for meaningful executive branch control.  Consistent with these actions, Congress has appropriated money to VOA so that it may carry out its obligations.

By taking the at-issue actions, defendants have effectively repealed these statutes through their shutting down of VOA.  But Congress—and *only* Congress—may repeal or amend legislation that it passes and that is signed into law by the President.  *Clinton v. City of New York,* 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").  Defendants have no constitutional authority to repeal or amend any of the statutes that require VOA to carry out its statutory duties or to repeal or amend duly enacted appropriations legislation.  *See, e.g.*, *City & County of San Francisco v. Trump,* 897 F.3d 1225, 1232 (9th Cir. 2018) ("Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress.").  The totality of defendants' actions has been to shut down VOA and to prevent it from carrying out its statutorily required broadcasting and reporting activities.

### 2.  Defendants' Actions Violate The Appropriations And Spending Clauses, U.S. Const. art. I, § 9, cl. 7 and U.S. Const. art I, § 8, cl.1.[10]

Congress—and *only* Congress—has spending and appropriations authority under the Constitution.  "The powers of Congress involve not only its general shared responsibility over foreign affairs, but its core and 'exclusive power over the federal purse.'"  *AIDS Vaccine Advoc.*

---

[10]  Congress reiterated its constitutional authority over the purse through the Congressional Budget and Impoundment Control Act of 1974.  "The act requires that the funds in question be made available for obligation unless Congress rescinds the appropriation within forty-five days." *AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), --- F.Supp.3d ----, 2025 WL 752378, at *14 (D.D.C. Mar. 10, 2025).

*Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), --- F.Supp.3d ----,2025 WL 752378, at *15 (D.D.C. Mar. 10, 2025) (quoting *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012)). "And if the authority to make law and control spending is to mean anything, it means the President may not disregard a statutory mandate to spend funds 'simply because of policy objections.'" *Id.* (quoting *In re Aiken County*, 725 F.3d 255, 259 (D.D.C. 2013)); *see also, e.g.*, *West Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) ("Allowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted would be inconsistent with the Constitution's meticulous separation of powers." (internal quotation marks omitted)).

Defendants' actions—reducing VOA to a shell of an agency unable to perform its statutorily required functions with an eye toward its severe reduction which would necessarily lead to an impoundment of its appropriations—usurp Congress's constitutional role in controlling the federal purse.

### 3.  Defendants' Actions Violate The Take Care Clause, U.S. Const. art. II, § 3.

Beyond simply usurping Congress's constitutional role, defendants have also violated the Executive's own constitutional duty to "take care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The Take Care Clause places an affirmative "corresponding obligation" on the Executive" to "enforce the laws." *City & County of San Francisco*, 897 F.3d at 1234. That responsibility applies to all duly enacted legislation. *Id.* ("Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations."). Here, defendants are not only failing to take care that the myriad laws applicable to VOA are being faithfully executed—including those statutes obligating VOA to continue delivering vital news and reporting, requiring that VOA exercise editorial

29

independence, and requiring that outside executive branch officials not interfere with VOA's mission—they are actively undermining these laws.  This is clear from defendants' dismantling of VOA, their shutting down of all of VOA's required activities, and their effective proposed impoundment of its funds, just as it is clear from defendants' efforts to violate the statutory firewall and the independence-promoting statutory scheme that lies at the core of VOA's structure.

### 4.  Defendants' Actions, Taken Together Or Separately, Plainly Violate The Separation of Powers.

The constellation of constitutional violations involved in this case leads to the ineluctable conclusion that defendants have engaged in an executive branch power grab plainly at odds with Congress's lawful role and our constitutional structure.

Federal courts apply the familiar framework of *Youngstown Sheet & Tube Co. v. Sawyer,* when considering whether the Executive has transgressed the constitutional separation of powers. 343 U.S. 579 (1952).  *See Does 1-26 v. Musk*, --- F. Supp. 3d ---, No. CV 25-0462-TDC, 2025 WL 840574, at *20 (D. Md. Mar. 18, 2025); *AIDS Vaccine Advoc. Coal.* 2025 WL 752378, at *14. Under Justice Jackson's "familiar tripartite framework," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015), courts assess the constitutionality of executive action by considering whether the President has acted (1) "pursuant to an express or implied authorization of Congress," *Youngstown,* 343 U.S. at 635 (Jackson, J., concurring); (2) "in [the] absence of either a congressional grant or denial of authority," *id.* at 637; or (3) in a manner "incompatible with the expressed or implied will of Congress," *id.*; *see also Musk*, 2025 WL 840574, at *20; *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, at *14.  This framework envisions a spectrum of executive action and a spectrum of potential executive authority: when the Executive's actions fall within the first category, its power is "at its maximum," *Youngstown,* 343 U.S. at 635 (Jackson, J., concurring), and when its actions fall within the third, its "power is at its lowest ebb," *id.* at 637.

30

Without a doubt, defendants are acting in a manner incompatible with Congress's express will for all of the reasons discussed. Congress created VOA, required it to continue broadcasting and to do so pursuant to certain statutory obligations, and has repeatedly reaffirmed and buttressed VOA's editorial independence. Commensurate with this, Congress has appropriated millions of dollars specifically to VOA in recognition of the important statutory mission it performs. Likewise, defendants' actions to dismantle VOA are plainly contrary to the above-mentioned fonts of *congressional* power in the Constitution. This is especially true because Congress—and *only* Congress—may create and dismantle federal agencies. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 500 (2010) ("Congress has plenary control over the salary, duties, and even existence of executive offices."); *Freytag v. Comm'r of Internal Revenue,* 501 U.S. 868, 883 (1991) (Congress has the "authority to create offices"); *Myers v. United States,* 272 U.S. 52, 128–29 (1926) ("The Legislature creates the office, defines the powers, limits its duration, and annexes a compensation." (quoting 1 Annals of Congress, 581, 582)). In spite of this Congressional control, defendants are working to dismantle or severely restrict the activities of VOA by ceasing its broadcasting activities, placing virtually all of its personnel on leave and firing nearly forty percent of its workforce.

The Executive has no inherent or constitutional authority to overcome the fact that its power is at its "lowest ebb" here. As already discussed, defendants are acting directly contrary to Congress's lawmaking, spending, and appropriating powers. Article II, including the Take Care Clause, requires that the Executive *follow* and *faithfully execute* duly enacted statutes and appropriations legislation, not that the Executive entirely ignore and undermine such laws. And though the Executive appreciates some degree of authority with respect to foreign affairs, such

authority is not at all complete, particularly where Congress exercises its own Constitutional authority.

Two courts have recently held that executive actions meant to impound funds appropriated to USAID and to otherwise dismantle the agency and impede its statutory functions were unconstitutional in light of Congress's exercise of its constitutional authority and its enactment of federal statutes. *See Musk*, 2025 WL 840574, at *26 ("[T]he Court finds that it is likely that Plaintiffs will succeed on their Separation of Powers claim relating to the dismantling of USAID."); *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, at *18 (finding that "Plaintiffs are likely to succeed on their separation of powers claims"). In so doing, these courts rejected arguments that the Executive enjoys unbridled power in the realm of foreign relations when Congress has acted as it has here. *Musk*, 2025 WL 840574, at *24 ("*Youngstown* itself, however, illustrates that the fact that an executive action has some nexus to Article II presidential powers, whether relating to foreign policy or the President's role as Commander-in-Chief, does not necessarily render the action constitutional."); *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, at *18 (rejecting "Defendants' unbridled understanding of the President's foreign policy power, which would put the Executive above Congress in an area where it is 'firmly established' that the two branches share power, where Congress is exercising one of its core powers, and where there is no constitutional objection to the laws it has made" (citation omitted)).

In these ways, this case is no different than the *Musk* court's recent findings that executive branch attempts to utterly dismantle USAID transgressed the separation of powers. This Court can and should find that the totality of defendants' actions, together with their explicit promises and statements by other executive branch officials, constitute a dismantling of VOA. *See Musk*, 2025 WL 840574, at *24 (finding that "the closure of USAID headquarters, the placement on leave

or termination of 90 percent of its workforce, and the termination of large numbers of contracts, including those with personal services contractors" constitutes an attempt to dismantle USAID). That dismantling is the consummate separation of powers violation—the total usurping of Congress's constitutional powers to legislate, spend, appropriate, create and abolish federal agencies, and to obligate the Executive to run VOA in a manner consistent with its statutory mandates.  On the other side of this equation, the Executive has a duty to faithfully execute the laws, including laws related to VOA's statutory functions and its appropriations.  Defendants are, unfortunately, following a now familiar playbook, and have made their intentions clear through both words and actions.  This Court should follow the *Musk* court's thorough analysis and find that defendants have transgressed the constitutional separation of powers.  *See id.* at *20–26.

### 5.    Defendants Have Acted *Ultra Vires*.

Even if this Court believed that it lacks "a cause of action for judicial review," it may nonetheless find that defendants have acted "'ultra vires'—that is" in excess of "its statutory authority."  *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (quoting *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003)).  "Judicial review for ultra vires agency action rests on the longstanding principle that if an agency action is unauthorized by the statute under which the agency assumes to act, the agency has violated the law and the courts generally have jurisdiction to grant relief."  *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (cleaned up).  *Ultra vires* review is available where "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory."  *Id.* (internal quotation marks omitted).

Although this Court may review and hold unlawful defendants' actions under the APA and under this Court's inherent power to review unconstitutional actions, *Free Enter. Fund*, 561 U.S. at 491 n.2, defendants have acted *ultra vires* by acting in clear violation of duly enacted United States international broadcasting laws and appropriations legislation. *At a bare minimum*, those laws, as discussed, require that VOA continue broadcasting and producing objective, truthful news that reaches significant global audiences. Today, VOA is shuttered due to defendants' direct actions. USAGM oversees VOA and is ultimately responsible for ensuring that VOA be able to meet its statutorily required objectives. With respect to USAGM, then, such actions constitute a "clear departure by the agency from its statutory mandate." *Fed. Express Corp.,* 39 F.4th at 764 (cleaned up). No statute expressly prohibits judicial review here, and this Court may properly find, even absent any other mechanism for review, that defendants' actions thus exceed their statutory authority.

## II.     Plaintiffs Will Suffer Irreparable Harm Without Immediate Injunctive Relief.

A demonstration of irreparable harm requires two showings. "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation marks omitted)). "Second, the harm 'must be beyond remediation.'" *Id.* (quoting *Chaplaincy*, 454 F.3d at 297). The standard is more than met here.

### A.  Defendants' Actions Have Caused Director Abramowitz To Lose His Statutory Right To Execute VOA's Core Mission.

Defendants' unlawful actions have already inflicted grave, ongoing harm on Director Abramowitz. These include the total obstruction of his statutory duties, injury to his professional

reputation, and the inability to protect over 1,300 employees who rely on him for his leadership and stability. Absent immediate judicial intervention, those harms will deepen.

Before the actions at issue in this case, VOA employed approximately 1,300 employees in total, including approximately 1,000 journalists. *Id.* ¶ 2. Approximately forty percent of these employees are PSCs, some of whom—like Plaintiff J. Doe No. 1—come from countries under severe censorship and restrictions on press freedom. *Id.* This staff was responsible for producing news to a weekly international audience of 362 million across 49 languages. *Id.* ¶ 1.

Defendants' unlawful dismantling of VOA has completely undermined Director Abramowitz's statutory right and responsibility to lead and perform VOA's vital mission: to provide accurate, objective, and comprehensive news to a global audience, especially in countries that suppress freedom of speech. *See* 22 U.S.C. § 6202(b)(1)–(10). *Id.* ¶ 43. Through the 2021 National Defense Authorization Act (NDAA), Congress purposefully insulated the VOA director from political interference by limiting appointment and removal only with approval from a bipartisan oversight board. *Id.* ¶ 20. This statutory structure clearly reflects Congress's intent to safeguard the director's independence.

Defendants disregard that structure wholesale. By placing virtually all staff on administrative leave, initiating the termination of approximating 500 personal services contractors, and completely impeding VOA's required broadcasting activities, defendants have effectively razed VOA to the ground. These personnel are essential to VOA's operations and are individuals Director Abramowitz relies on to execute VOA's mandate. *Id.* ¶ 33. These actions have led to VOA going dark for the first time in its 83-year history. *Id.* VOA has not published or aired a single news story since March 15, 2025. *Id.* In place of its steady stream of journalism across 49

languages, VOA's newsroom is shuttered, broadcasts have ceased, and TV channels have been looping the same 45-second video. *Id.*

With each passing day, it will become increasingly unlikely that Director Abramowitz can restaff VOA even if the administrative leave or scheduled terminations are stopped. *Id.* ¶ 35. The longer employees are on administrative leave, the less likely it is for them to return to VOA if given the opportunity. *Id.* Many of VOA's employees and PSCs are already looking for alternative professional opportunities. *Id.* And if PSCs are terminated on March 31, they will be even less likely to return to VOA. *Id.* Without his staff, Director Abramowitz is simply unable to resume the functions of VOA. *Id.* ¶ 33.

Further, defendants have undermined Director Abramowitz's right and responsibility to lead VOA by stripping away VOA's editorial independence. *Id.* ¶ 8. Like all media outlets, editorial independence is integral to VOA's success and its ability to provide impartial, unbiased reporting to a large audience. *Id.* Through its journalism, VOA also explains the United States to foreign audiences and provides accurate news and information to those in authoritarian countries deprived of access to such news. *Id.* With no staff and no operational capacity, Director Abramowitz is wholly unable to fulfill the duties of producing critical news that Congress charged him with performing.

Director Abramowitz accepted his appointment to be director of VOA with the knowledge and understanding that VOA would continue producing first-rate news and reporting to be disseminated to global audience and that he could be removed only through the approval by a majority vote of the IBAB. *Id.* ¶ 30. Defendants' actions have dismantled a network that had hundreds of millions of weekly listeners across the globe and a reputation for delivering truthful and impartial news to those living under authoritarian regimes. *Id.* ¶ 40. Director Abramowitz

has not only lost the functional right to lead VOA: VOA has been taken away from him, from its employees, and from its worldwide listeners.  Losing the right to continue directing VOA due to defendants' actions is a multifaceted harm.  Each day to which Plaintiff is entitled to remain as director and to continue leading the VOA *that Congress envisioned* is invaluable.  *Id.* ¶ 43.

The harm is also irreparable because it is beyond remediation.  Director Abramowitz, through this lawsuit and through the instant motion, seeks to protect and preserve VOA's statutory obligations to continue producing and broadcasting the news to wide global audiences and his own statutory right to remain the director of VOA *until* the CEO properly removes him with approval by a majority vote of the IBAB.  *Id.* ¶¶ 30-31.  Each day that VOA remains shuttered is a day that Director Abramowitz loses the right to continue leading this revered institution in meeting its statutory requirements.  *Id.*  Immediate injunctive relief is the only way to avoid "a deprivation of [Plaintiff's] statutory right to function as" the head of VOA prior to the IBAB properly voting to remove him from his duties.  *Berry v. Reagan*, No. CV 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983) (holding that U.S. Commission on Civil Rights commissioners showed irreparable harm from firing by President Reagan because, among other factors, commissioners had a statutory right to complete their work as commissioners); *Harris v. Bessent*, No. CV 25-412 (RC), ---- F.Supp.3d ----, 2025 WL 521027, at *8 (D.D.C. Feb. 18, 2025), ("["S]ubtracting time from [plaintiff's] congressionally mandated seven-year term prevents her from carrying out the duties Congress has assigned to her."), *appeal filed, Harris v. Bessent,* No. 25-5037 (D.C. Cir. Feb. 20, 2025).

These injuries are not theoretical. They have happened and are happening now.  They strike at the core of Director Abramowitz's ability to serve in his legally appointed role, as explicitly intended and directed by Congress.  Because statutory duties and organizational leadership cannot be retroactively fulfilled, these harms are irreparable.  *See League of Women Voters of the U.S.,*

838 F.3d at 9 (irreparable harm where action "unquestionably make it more difficult" for the plaintiff to accomplish primary mission).

### B. Defendants' Actions Have Exposed VOA Employees To Imminent And Irreversible Danger.

In his capacity as Director, Mr. Abramowitz is responsible for ensuring that VOA can safely employ its global staff of journalists, broadcasters, editors, and administrative staff: some of whom, like Plaintiffs J. Doe 1 and 2, are in the United States on J-1 visas and, in the case of J. Doe 1, come from authoritarian countries where press freedom is nonexistent. *Id.* ¶ 34. The indefinite administrative leave and impending terminations ordered by defendants expose these individuals to grave risk. If they are forced to return to their countries of origin, these employees face credible threats of persecution and detention. Two VOA contributors are already in detention abroad. Once other journalists are removed from the United States, Director Abramowitz will likely be unable to bring them back. *Id.* ¶ 35.

As courts in this District have recognized, the "possibility of transfer to a government where [a person] might be tortured or indefinitely confined, . . . undeniably would constitute irreparable harm." *Omar v. Harvey*, No. CIV. A. 05-2374 RMU, 2006 WL 286861, at *2 (D.D.C. Feb. 6, 2006) (quoting *Al-Marri v. Bush,* 2005 WL 774843, at *4 (D.D.C. Apr. 4, 2005) (unpublished opinion)). That is precisely the harm here. As Director, Mr. Abramowitz's inability to protect these journalists from unjustified termination, forced return to repressive regime, and subsequent persecution, is a concrete and irreversible injury tied directly to his duties as Director of the VOA.

### C. Defendants' Actions Are Irreparably Damaging Director Abramowitz's And VOA Employees' Reputations.

Beyond gutting his ability to carry out VOA's mission, Defendants' actions have inflicted—and continue to inflict—reputational harm on Director Abramowitz. The position he

38

accepted is one defined by integrity, independence, and the responsibility to speak the truth, even when doing so is politically inconvenient or entails significant personal or institutional risk. His charge was to lead a globally respected institution.

Mr. Abramowitz has devoted much of his life to the public interest. Prior to becoming VOA Director, Mr. Abramowitz was the President of Freedom House, a nonprofit organization that champions democracy and human rights, for over seven years. *Id.* ¶ 4. Before that, he was the United States Holocaust Memorial Museum's Levine Institute for Holocaust Education. *Id.* The bulk of his career has been devoted to journalism: he worked 24 years at *The Washington Post*, where he was national editor and then a White House correspondent. *Id.* When Director Abramowitz accepted his statutorily protected role, it was with the understanding that he would lead a prominent, reputable news agency that had support from both sides of the aisle. *Id.* ¶ 32. It was also with the understanding that he would be able to carry out VOA's statutory obligations to produce and broadcast news to hundreds of millions of people across the globe. *Id.*

The forced shutdown of VOA and public attacks on its credibility have undermined that mandate, and by extension, Mr. Abramowitz's reputation as Director. Defendant Kari Lake and other members of the administration have stated that USAGM and its networks are rife with fraud, produce anti-American content, and are a waste of taxpayer funds. *See* Kari Lake (@KariLake), X (Mar. 19, 2025), https://tinyurl.com/mr27dr5p; USAGM Release. These accusations severely harm VOA's reputation as a non-partisan, objective news broadcasting network, and they severely harm the reputations of VOA employees. *Id.* ¶ 45.

Fueled by defendants' unfounded accusations, Director Abramowitz's reputation has already taken a hit. *Id.* ¶ 46. Director Abramowitz has been the subject of online attacks, accused of having a "relationship with censorship," being someone "whose work sucks up taxpayer money

to complain," and having "no place running Voice of America." *See, e.g.*, Natalie G Winters (@nataliegwinters), Threads (Mar. 11, 2025), https://tinyurl.com/r76c25ms. These baseless statements go to the heart of his professional credibility, weakening his ability to lead VOA and eroding the trust required to maintain the agency's editorial independence.

Moreover, defendants' actions have strained longstanding relationships that VOA–under Director Abramowitz's stewardship–has cultivated with employees, partner organizations, and stakeholders around the world. *Id.* ¶ 47. VOA's credibility is built in part on decades of close collaboration with global media partners. *Id.* But by abruptly terminating contracts with the Associated Press, Reuters, and Agence France Presse, defendants have jeopardized these institutional relationships. *Id.* These partners relied on consistent cooperation and good faith engagement with VOA and the sudden rupture of those relationships threatens VOA's operational effectiveness. *Id.*; *see AIDS Vaccine Advoc. Coal. v. United States Dep't of State,* --- F. Supp. 3d ---, No. CV 25-00400 (AHA), 2025 WL 485324, at *3 (D.D.C. Feb. 13, 2025) (harm to "goodwill, reputation, and relationships" with partners and stakeholders can also constitute irreparable harm).

Courts have routinely recognized that such damage to professional reputation and good will—particularly where it affects the ability to carry out one's duties—is quintessentially irreparable. *See Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 104 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019) (loss of trust and reputation from disrupted operations irreparable); *Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.,* 963 F.Supp. 1, 5 (D.D.C. 1997) (damage to business reputation irreparable); *Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (collecting cases). Because "[i]njury to reputation or goodwill is not easily measurable in monetary terms," it is typically "viewed as irreparable." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.).

### D. Defendants' Actions Will Cause Plaintiffs J. Doe 1, J. Doe 2, And LaBruto (PSC Plaintiffs) Irreparable Injury

The PSC Plaintiffs face immediate and irreparable harm if their terminations are not enjoined prior to March 31, 2025. Their injuries affect their immigration status (J. Does 1 and 2), personal and financial stability, and professional and reputational standing. The harm to the public interest is considerable. None of the harm can be remedied by monetary damages or restored after the fact.

**J. Doe No. 1,** a foreign journalist, faces grave personal risk if Plaintiff's contract is terminated, as Plaintiff will lose legal status in the United States on April 30, 2025 and will have no choice but to return to Plaintiff's home country. Doe 1 Decl. ¶ 4. Plaintiff's work for VOA includes creating digital content for audiences that speak the language of Plaintiff's home country. *Id.* ¶¶ 1-2. Plaintiff's reporting focuses on politically sensitive topics, including global conflicts and U.S. policy, reaching audiences in areas where access to uncensored news is limited. *Id.* ¶ 2. Because of Plaintiff's affiliation to U.S. media, Plaintiff has become a target of her home country's government-sponsored media. *Id.* ¶ 5. It is Plaintiff's understanding that under Plaintiff's home country's law, Plaintiff can be prosecuted for treason and face decades in prison. *Id.* In addition to losing Plaintiff's lawful status, work authorization, income, and health insurance, Plaintiff is experiencing severe psychological distress as Plaintiff confronts the looming possibility of exile and persecution. *Id.* ¶ 6.

**J. Doe No. 2,** who reports for one of the foreign divisions of VOA is also at risk. The termination of Plaintiff's PSC will also similarly cause Plaintiff and Plaintiff's spouse to lose their legal status, forcing them to leave the U.S. by April 30, 2025. Doe 2 Decl. ¶ 8. Due to a medical condition, Plaintiff's physician has advised against air travel for at least five months. *Id.* ¶ 9. Plaintiff and Plaintiff's spouse will also lose health insurance and income, and risk defaulting on

their mortgage. *Id.* ¶ 10. These are harms that cannot be reversed, and for which no financial compensation can substitute.

**LaBruto**, who has served as a journalist in the Africa Division, does not face immigration-related harm, but will nonetheless suffer irreparable injury. His sudden removal from VOA disrupts his ability to report on vital public interest issues: such as U.S. foreign aid and health initiatives in Africa, LaBruto Decl. ¶ 2. and damages the trust and relationships he built with media partners and international audiences, *id.* ¶ 6.

For all three Plaintiffs, the resulting reputational harm, interruption of professional work, and abrupt loss of income and career momentum are precisely the kinds of injuries courts recognize as irreparable. *See Musk*, 2025 WL 840574, at *28 (finding irreparable harm to agency employees when prominent officials accuse their employer, the agency, of being anti-American, evil, and criminal on "large media platform[s]").

Because these harms are immediate, irreparable, and not compensable by money damages, immediate injunctive relief is both necessary and appropriate.

## III.   The Balance of Hardships and Public Interest Favor Immediate Injunctive Relief.

Finally, the balance of the equities and the public interest also favor an injunction. These inquiries typically "merge into one factor when the government is the non-movant," as here. *Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As discussed above, Plaintiffs are likely to succeed on at least one, if not all, of their claims. *See supra*. And defendants' actions have already caused immense harm to Plaintiffs, VOA, its journalists and other employes, United States interests, and the listening public. *See supra.*

Moreover, the harm to the public interest is considerable. Plaintiff Abramowitz and each of the PSC plaintiffs play a vital role in VOA's mission to deliver accurate, independent reporting

to foreign audiences in repressive environments. Their removal not only harms them personally, but also silences trusted voices in communities that rely on VOA for uncensored information. The injury is not just individual, it is institutional, and without intervention by this Court, it will be lasting.

When the balance of the equities and the public interest are "essentially derivative of the parties' arguments on the merits of the case," the public interest balancing "should weigh in favor of whoever has the stronger arguments on the merits." *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 83 (D.D.C. 2013), *judgment reinstated*, 760 F.3d 18 (D.C. Cir. 2014). Here, that is undoubtedly the Plaintiffs.

A temporary restraining order and preliminary injunction are therefore warranted.

## CONCLUSION

Because defendants have acted unlawfully in taking the above-discussed actions, Plaintiffs respectfully request that this Court:

a) Issue a temporary restraining order and preliminary injunction;

b) Declare that defendants' actions requiring VOA to cease operations, placing virtually all VOA employees on administrative leave, and terminating 500 fulltime personal contract employees are unlawful;

c) Order defendants to cancel their orders putting approximately 1,300 VOA employees on administrative leave, cancel the termination of personal services contracts with approximately 500 employees, cease dismantling Voice of America, and restore VOA's personnel and operating capacities such that the entities may continue their broadcasting activities at the level before the above actions were taken;

d) Award Plaintiff his reasonable fees, costs, expenses, including attorneys' fees;

43

e)     Grant such other relief as the Court deems necessary, just, and proper.

Dated: March 26, 2025          Respectfully submitted,

*/s/ William B. Schultz*
William B. Schultz (D.C. Bar No. 218990)
Margaret M. Dotzel (D.C. Bar No. 425431)
Brian J. Beaton, Jr. (D.C. Bar No. 90020963)*
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8136
wschultz@zuckerman.com
mdotzel@zuckerman.com
bbeaton@zuckerman.com

*Attorneys for Plaintiffs*

*\*Pro hac vice forthcoming*

44

## CERTIFICATE OF SERVICE

I hereby certify that, on March 26, 2025, I caused the foregoing to be served on counsel of record via the Court's electronic case filing system.

/s/ *William B. Schultz*

William B. Schultz

*Attorney for Plaintiffs*

**CERTIFICATE OF COUNSEL**

Pursuant to Local Civil Rule 65.1(a), I hereby certify that on March 26, 2025, at 1:58 a.m., I furnished to the United States Attorney's Office for the District of Columbia via email, the application and copies of all pleadings and papers filed in the action to date or to be presented to the Court at the hearing.

/s/ *William B. Schultz*
William B. Schultz

*Attorney for Plaintiffs*