**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MICHAEL ABRAMOWITZ *et al.*,

    *Plaintiffs*,

    –v.–

KARI LAKE, *in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media*;

VICTOR MORALES, *in his official capacity as Acting CEO of the United States Agency for Global Media*;

    and

UNITED STATES AGENCY FOR GLOBAL MEDIA,

    *Defendants*.

Case No. 25-cv-00887

## DECLARATION OF MICHAEL ABRAMOWITZ

1. I am the director of the Voice of America (VOA), the largest United States-funded international broadcaster. Until recently, VOA provided multimedia cultural programming and news in 49 languages and reached an estimated 362 million people across the world weekly. VOA falls under the umbrella of the United States Agency for Global Media (USAGM), and its work is overseen by the chief executive officer of USAGM.

2. Before the actions at issue in this case, VOA employed approximately 1,300 employees in total, including around 1,000 journalists. Approximately 500 of VOA's employees, including approximately 450 journalists and representing approximately forty percent of VOA's workforce, are personal services contractors (PSCs), who work fulltime under contract with VOA,

an arrangement that has become increasingly prevalent in government in recent years. Many of these PSCs are key VOA journalists and some come from authoritarian countries and moved to the United States to deliver truthful reporting to those living abroad.

3. On April 19, 2024, Amanda Bennett, then the CEO of USAGM, with the unanimous approval of the International Broadcasting Advisory Board (IBAB), appointed me to be the director of VOA. Because the VOA director position is currently a senior civil service position, I was also required to apply to the federal government's Senior Executive Service. My application was approved by the federal Office of Personnel Management on June 11, 2024.

4. I have dedicated much of my life to public service. Prior to becoming the director of VOA, I was the president of Freedom House, a nonprofit organization that promotes democracy and human rights, from 2017 to 2024. Before that, I was the director of the United States Holocaust Memorial Museum's Levine Institute for Holocaust Education. The bulk of my career has been devoted to journalism. I spent 24 years as a journalist at *The Washington Post*, where I was national editor and then a White House correspondent.

5. VOA launched during the height of World War II in 1942. Its mission was to counter Nazi propaganda through truthful, impartial reporting delivered to German citizens who lived under the Nazi regime.

6. Since that time, VOA has expanded to be a global voice for telling America's story to the world. It has modeled freedom of speech and freedom of the press, and it has demonstrated those values every day through its reporting to audiences living under authoritarianism and other countries where authoritarians are spreading false narratives about the United States.

7. During the Cold War, VOA broadcasts reached behind the Iron Curtain and disseminated truthful reporting to those living under Soviet rule. For example, world-famous

Czech tennis star Martina Navratilova has recalled listening to VOA broadcasts while living under the Soviet regime. Likewise, VOA reporting was a key source of news for student protestors at Tiananmen Square in 1989, and it continues to reach Chinese listeners who have no other access to reliable news and information. Because delivering truthful, impartial reporting to those living under authoritarian regimes has always been a threat to those regimes' existence, authoritarian regimes have consistently sought to block access to VOA programming. Many of VOA's journalists, who hail from such countries and who speak directly to these audiences, face possible detention and persecution abroad for reporting the news.

8. Like all news agencies, editorial independence is integral to VOA's success and its ability to meet its mission of accurately, objectively, and impartially reporting the news to a worldwide audience. Through meeting this mission, VOA serves U.S. interests abroad by demonstrating the values of free speech, free opinion, and a free press. Through its journalism, VOA also explains the United States to foreign audiences and provides accurate news and information to those in authoritarian countries deprived of access to such news.

9. VOA was codified into law by the Smith-Mundt Act in 1948.

10. Congress codified VOA's charter in the Foreign Relations Authorization Act of 1977. VOA's charter, codified today in 22 U.S.C. § 6202(c), requires that VOA carry out certain broadcasting and news-producing activities.

11. To maintain VOA's independence and to ensure that VOA and its sister entities remain credible in the eyes of the global public, Congress has mandated that certain principles be followed by newsroom staff and the executive-branch officials that oversee U.S. broadcast entities. Similarly, Congress has devised, via statute, certain structures to help insulate newsroom staff at U.S. broadcast entities from undue political influence.

12. Consistent with these missions, in 1994 Congress passed the International Broadcasting Act (IBA), which lays out the overarching principles that guide U.S. international broadcasting and insulates U.S. broadcast agencies' newsroom staff from certain executive branch officials. These statutory provisions embody the "firewall" between journalists and executive branch officials who must not interfere with the reporting at the entities.

13. By law, U.S. international broadcasting must "be conducted in accordance with the highest professional standards of broadcast journalism" and U.S. broadcast networks must produce "news which is consistently reliable and authoritative, accurate, objective, and comprehensive." 22 U.S.C. § 6205(a)(5), (b)(1). Moreover, federal law requires that certain executive-branch officials outside the newsrooms "respect the professional independence and integrity of the [United States Agency for Global Media], its broadcasting services, and the grantees of the [United States Agency for Global Media]." *Id.* § 6204(b).

14. Today, by law VOA is required to carry out a variety of statutory functions in addition to those enumerated in its charter and in other provisions of U.S. code. Under 22 U.S.C. § 6202(a)(1), "United States international broadcasting shall," among other requirements laid out in the statute, "be designed so as to effectively reach a significant audience." Similarly, Congress mandated that "United States international broadcasting shall include," a variety of programming and operational capacity as described by statute. *See* 22 U.S.C. § 6202(b)(1)–(10).

15. Accordingly, through statute, Congress required that VOA broadcast and produce the news to reach wide audiences across the globe, and it prescribed that this news must adhere to high journalistic standards. Congress also requires that the CEO of USAGM "respect the professional independence and integrity of [USAGM], its broadcasting services, and the grantees of [USAGM]." 22 U.S.C. § 6204(b).

16. Federal law also diffuses oversight and supervision of U.S. international broadcast entities across numerous individuals in an effort to promote VOA's editorial independence.

17. Following a number of controversies surrounding former USAGM CEO Michael Pack's running of USAGM and perceived interference with the work of newsroom staff, Congress modified the relationship between the USAGM CEO and the heads of U.S. international broadcasting networks, including VOA.

18. Congress made these changes through the 2021 National Defense Appropriations Act (NDAA).

19. Prior to Pack's tenure as CEO, the CEO had full authority to appoint and remove the heads of the broadcast entities as well as members of the entities' boards.

20. The 2021 amendments, however, require that a Presidentially appointed, Senate-confirmed, and party-balanced board of seven, known as the International Broadcasting Advisory Board (IBAB), approve by a majority vote the appointment and removal of the heads of the broadcast entities, who are selected or dismissed by the CEO of USAGM. 22 U.S.C. § 6205(e)(1). This structure protects the directors of United States international broadcasting entities from arbitrary removal, and forges consensus around who should lead these entities' non-partisan work.

21. Donald Trump was elected the 47th president of the United States in November 2024. On December 11, 2024, then-President-elect Trump announced his intent that Kari Lake lead VOA as its director. After taking office, however, President Trump fired all members of the IBAB, except the Secretary of State who is a member of the Board.

22. As Kari Lake has publicly acknowledged, she could not be immediately appointed to be the head of VOA because her appointment requires approval by the IBAB, which is now

vacant.  On March 3, 2025, President Trump appointed Lake as a "Senior Advisor" to Victor Morales, the Acting USAGM CEO.

23.     On March 14, 2025, hours prior to signing into law Congress's appropriations to VOA, the White House announced that it intended to "reduce the performance of" VOA's "statutory functions and associated personnel to the minimum presence and function required by law."  One day later, on March 15, 2025, nearly all USAGM employees, including approximately 1,300 employees of VOA in addition to me, received notice from USAGM that we were being placed on administrative leave "until further notice."

24.     On or before March 14, 2025, Defendants terminated contracts with the Associated Press, Reuters, and Agence France-Presse.  They also notified VOA employees to stop using material from these wire services.

25.     On March 17, 2025, William Martin, Director for Stations and Operations, instructed all USAGM Foreign Service employees to shut down all transmitters at their stations within two days and request the respective Missions to place all locally employed staff on administrative leave.  Other employees were also told to expect to be placed on administrative leave following the two-day shutdown period.

26.     On March 16, 500 personal services contractors (PSCs) already on administrative leave—who are fulltime employees and approximately ninety percent of whom are key reporters working to deliver vital news—were informed that they will be terminated as of March 31, 2025.

27.     As a result of these actions and others, VOA has ceased all broadcasting activities for the first time in 83 years.  VOA has not produced any journalism since March 15, 2025.  It has not updated its website since that time.  And it has not broadcast over the airwaves since that time.

28. The above-mentioned actions were implemented and ordered by the defendants in this litigation. Defendants have made clear that they intend the cessation of VOA's broadcasting and reporting activities to continue indefinitely, and that VOA will be effectively dismantled.

29. A March 15, 2025, USAGM press release stated that USAGM "is not salvageable," and that "from top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken." VOA is the largest broadcast agency in USAGM, which oversees five other broadcast agencies.

30. I accepted my appointment to be the director of VOA with the knowledge and understanding that federal law requires, through the statutory firewall, that newsroom staff at VOA and other U.S. broadcast entities be free from interference from certain executive-branch officials so that these staff may truthfully and accurately report the news. Further, I was aware of the IBAB's role in approving the appointments and removals of the heads of U.S. international broadcast networks, and that this structure was put in place to promote the independence of U.S. international broadcast entities, like VOA, and to ensure that consensus choices run the networks.

31. I understand that, under federal law, 22 U.S. § 6205, I have a statutory right to remain the director of VOA until the CEO removes me with the approval by a majority vote of the IBAB or until the IBAB votes by a supermajority to unilaterally remove me from my position.

32. When I accepted this statutorily protected role, it was with the understanding that I would be directing a prominent, reputable news agency that enjoys broad bipartisan support. It was also with the understanding that VOA has the capacity to meet its statutory obligations to produce and broadcast the news to significant global audiences.

33. After placing nearly all VOA employees, including me, on administrative leave, defendants are now initiating the mass termination of approximately 500 PSCs, including many of

VOA's most experienced journalists, editors, and technical staff. These personnel—those placed on leave and those whose terminations have been noticed—are essential to VOA's operations and are individuals that I rely upon to fulfill VOA's statutory mission. These actions have led to VOA going dark for the first time in its 83-year history. VOA has not published or aired a single piece of news content since March 15, 2025. Its website is frozen, its radio and television channels are looping filler material, and its newsroom has shuttered.

34. Many of VOA's employees are foreign employees in the United States on J-1 visas. If terminated, they may be forced to return to countries with a practice of imprisoning dissenting voices. Two VOA foreign contributors have already been imprisoned in Myanmar and Vietnam. Recently, state media in an authoritarian country issued death threats to VOA journalists for their work. I worry about the safety of VOA employees.

35. Today, many VOA employees and employees on leave and with personal services contracts are looking for jobs. The longer employees are on administrative leave, the less likely it is that employees will return to VOA if given the opportunity. For the PSCs, if their contracts are terminated on March 31, they will be even less likely—and in the case of foreign employees with terminated visas, potentially unable—to return to VOA if given the opportunity.

36. I thought long and hard about filing this lawsuit, and I came to the conclusion that I had to in order to save an 83-year-old institution that has fought communism and authoritarianism since its inception. I had hoped to help the new VOA director improve the agency, and I had started that process during my tenure, but I have not been given the chance to talk with the new Administration. I believe strongly in democracy and the peaceful transfer of power that has taken place in this country for over 200 years.

37. When this Administration took drastic action, I felt I had to respond. I am speaking for all of those who are afraid to speak. One of my fellow plaintiffs is unnamed because of the fear of retribution from the governments and regimes that he or she fled and came to America to oppose. And some of my colleagues face imprisonment, torture and possible death if they are returned to their home countries, as they are here on J-1 visas. As the Director of Voice of America, which was established by Congress, I feel I must act on behalf of the 1,300 employees of VOA to save this important network.

38. Defendants have effectively taken away my right—and undermined my responsibilities—to lead a reputable and revered U.S. international broadcasting network. Serving as the head of VOA, the country's largest and most influential government-funded international broadcast entity, is a unique privilege.

39. Indeed, my entire career, including my decades as a journalist and years spent advocating for a free press and other freedoms, put me in the position to be considered for the directorship of VOA. I accepted this appointment to be director of VOA with the knowledge and understanding that VOA would continue producing first-rate news and reporting to be disseminated to a global audience and that I could be removed only through the approval by a majority vote of the IBAB.

40. Defendants' actions have dismantled a network that had hundreds of millions of weekly listeners across the globe and a reputation for delivering truthful and impartial news to those living under authoritarian regimes. I have not only lost the functional right to lead VOA: VOA has been taken away from me, from VOA employees, and from its worldwide listeners.

41. Losing the right to continue directing VOA due to defendants' actions is a multifaceted harm.

42. Moreover, although I have not technically been terminated, defendants' actions have completely dismantled the VOA that existed just 11 days ago and that enjoyed a listenership of hundreds of millions of people across the globe and the reputation to go with that. When I accepted my position, I took the helm of a strong, independent United States media organization that has earned repute and trust across the world for decades. And I have directed VOA consistent with Congress's vision. Of course, as I am now on administrative leave, I simply cannot do my job. Even if the decision to place me on administrative leave were reversed, allowing defendants' actions to stand will leave VOA incapable of meeting its statutory requirements to produce and disseminate first-rate journalism to global audiences. In other words, their actions have hampered my ability to meaningfully lead the VOA that Congress created.

43. Each day to which I am entitled to remain as director and to continue leading the VOA that Congress envisioned is invaluable to me. Each day that VOA remains shuttered is a day that I lose the right to continue leading this revered institution in meeting its statutory requirements.

44. Additionally, defendants have justified their actions based on severe, unfounded criticisms of VOA and the broader universe of United States international broadcasting. Defendant Kari Lake and other members of the administration have stated that USAGM and its networks are rife with fraud, produce anti-American content, and are a waste of taxpayer funds. These accusations severely harm VOA's reputation as a non-partisan, objective news broadcasting network, and they severely harm the reputations of VOA employees.

45. That harm to VOA's reputation similarly harms my own reputation and that of my colleagues. Again, I accepted the VOA directorship because of the stellar reputation VOA has historically enjoyed and the bipartisan support for the network. That reputation is under attack by

defendants who have effectively suggested that I am a partisan at the helm of a network that does more harm than good to United States interests.

46. Defendants' unfounded criticisms of VOA has also negatively affected how the public perceives me and VOA journalists. Defendants' negative, untrue, and unverified statements are amplified by myriad criticisms that have been levied against me online. In reaction to defendants' statements, members of the public have accused me of supporting censorship and declared that I am unfit to run VOA.

47. Defendants' actions have also strained the goodwill and long-term relationships I have cultivated with our business partners. By abruptly terminating contracts with the Associated Press, Reuters, and Agence France Presse, defendants have fractured these institutional relationships. My credibility, along with VOA's, has been jeopardized.

On this 25th day of March 2025 I declare under penalty of perjury that the foregoing declaration is true and correct.

*Michael Abramowitz* (signature)

Michael Abramowitz