UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL ABRAMOWITZ, et al.,

                Plaintiffs,

      v.

KARI LAKE,
Senior Advisor to the Acting CEO of U.S.
Agency for Global Media, et al.,

             Defendants.

Civil Action No. 25-0887 (RCL)

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ......................................................................................................................... 4

    I.     Statutory Function of Global Media ................................................................... 4

    II.    Executive Order 14,238 ...................................................................................... 5

    III.   Procedural History .............................................................................................. 6

LEGAL STANDARDS .............................................................................................................. 8

ARGUMENT .............................................................................................................................. 8

    I.     Plaintiffs Are Not Likely to Prevail on the Merits of Their Claims ...................... 9

          A.     This Court Lacks Jurisdiction Over Plaintiffs' Employment Claims ......... 9

          B.     Plaintiffs Are Not Likely to Prevail on their APA Claims (Count I)........ 22

          C.     Plaintiffs Are Not Likely to Prevail on their Constitutional Claims (Counts II and III)..................................................................................................... 27

          D.     Plaintiffs Fail to Establish that Defendants Acted *Ultra Vires* (Count IV) ................................................................................................................. 31

    II.    Plaintiffs Do Not Face Irreparable Harm Justifying Extraordinary Relief .......... 34

    III.   The Equities and Public Interest Weight Against Any Relief .............................. 39

    IV.   Any Relief Should Be Narrowly Tailored ........................................................... 40

    V.    The Court Should Order Plaintiffs to Post Bond Pursuant to Rule 65(c) ............ 41

CONCLUSION........................................................................................................................... 40

## TABLE OF AUTHORITIES

*Page(s)*

**<u>Cases</u>**

*Alabama- Coushatta Tribe of Tex. v. United States*,
757 F.3d 484 (5th Cir. 2014) ................................................................................................. 21

*Albrecht v. Comm. on Employee Benefits of the Federal Reserve Employee Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ................................................................................................. 14

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ................................................................................ 9, 10, 11, 12

*American Foreign Service Association v. Trump*,
Civ. A. No. 25-0352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025) .......... 2, 12, 13, 14, 35

*Arch Coal, Inc. v. Acosta*,
888 F.3d 493 (D.C. Cir. 2018) ................................................................................................. 11

*Arriva Med LLC v. Dep't of Health & Human Servs.*,
239 F. Supp. 3d 266 (D.D.C. 2017) ......................................................................................... 36

*Ayele v. Dist. of Columbia*,
704 F. Supp. 3d 231 (D.D.C. 2023) ......................................................................................... 32

*Baker v. Carr*,
369 U.S. 186 (1962) ................................................................................................................. 28

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) ................................................................................................................... 30

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................................... 22, 23

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964) ................................................................................................................. 30

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ..................................................................................................... 19, 20, 23

*Bowles v. Russell*,
551 U.S. 205 (2007) ................................................................................................................... 9

*Bureau of Alcohol, Tobacco & Firearms v. FLRA*,
464 U.S. 89 (1983) ................................................................................................................... 12

*Cecile Indus., Inc. v. Cheney*,
995 F.2d 1052 (Fed. Cir. 1993) ............................................................................................... 18

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ............................................................... 32, 33, 34, 37

*Chi. & S. Air Lines v. Waterman S. S. Corp.*,
    333 U.S. 103 (1948) ..................................................................................... 29

*Chiang v. Gonzales*,
    2006 WL 8449284 (C.D. Cal. 2006) .......................................................... 13

*Church v. Biden*,
    573 F. Supp. 3d 118 (D.D.C. 2021) ........................................................... 35

*Clinton v. City of N.Y.*,
    524 U.S. 417 (1998) ..................................................................................... 26

*Clinton v. Jones*,
    520 U.S. 681 (1997) ..................................................................................... 29

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006) .................................................................... 21

*Conf. of Catholic Bishops v. Dep't of State*,
    Civ. A. No. 25-465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) .................. 14, 19, 20

*Crowley Gov't Servs., Inc. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022) ................................................................... 14

*Ctr. for Biological Diversity v. Trump*,
    453 F. Supp. 3d 11 (D.D.C. 2020) ............................................................. 25

*Dalton v. Sherwood Van Lines, Inc.*,
    50 F.3d 1014 (Fed. Cir. 1995) .................................................................... 18

*Dalton v. Specter*,
    511 U.S. 462 (1994) ............................................................................... 25, 28

*DCH Reg'l Med. Ctr. v. Azar*,
    925 F.3d 503 (D.C. Cir. 2019) .................................................................... 30

*Dellinger v. Bessent*,
    No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025) ............................... 2, 32

*Dep't of Comm.*,
    39 F.4th 756 (D.C. Cir. 2022) ............................................................... 30, 31

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
    952 F.2d 802 (4th Cir. 1991) ...................................................................... 37

*Elgin v. Dep't of Treasury*,
    567 U.S. 1 (2012) ........................................................................................ 11

*Elm 3DS Innovations LLC v. Lee*,
   Civ. A.No. 16-1036, 2016 WL 8732315 (E.D. Va. Dec. 2, 2016) ........................................... 23

*Farris v. Rice*,
   453 F. Supp. 2d 76 (D.D.C. 2006) ...................................................................................... 35

*Fornaro v. James*,
   416 F.3d 63 (D.C. Cir. 2005) ............................................................................................. 11

*Free Enter. Fund v. Pub. Co. Acct. Bd.*,
   561 U.S. 477 (2010) .......................................................................................................... 29

*Garcia v. Vilsack*,
   563 F.3d 519 (D.C. Cir. 2009) ........................................................................................... 23

*Ghaly v. Dep't of Agric.*,
   228 F. Supp. 2d 283 (S.D.N.Y. 2002) ................................................................................ 11

*Graham v. Ashcroft*,
   358 F.3d 931 (D.C. Cir. 2004) ........................................................................................... 10

*Griffith v. FLRA*,
   842 F.2d 487 (D.C. Cir. 1988) ........................................................................................... 30

*Gulf Oil Corp. v. Brock*,
   778 F.2d 834 (D.C. Cir. 1985) ........................................................................................... 38

*Harrington v. Schlesinger*,
   528 F.2d 455 (4th Cir. 1975) ............................................................................................. 27

*Harris v. Bessent*,
   Civ. A. No. 24-0412 (RC), 2025 WL 521027 (D.D.C. Feb. 18, 2025) ................................. 33

*Heckler v. Chaney*,
   470 U.S. 821, 830 (1985) ............................................................................................ 24, 38

*I.N.S. v. Chadha*,
   462 U.S. 919 (1983) .......................................................................................................... 26

*In re NTE Connecticut, LLC*,
   26 F. 4th 980 (D.C. Cir. 2022) ........................................................................................... 37

*Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985) ....................................................................................... 19, 20

*Jarkesy v. SEC*,
   803 F.3d 9 (D.C. Cir. 2015) ............................................................................................... 12

*Kim v. FINRA*,
   698 F. Supp. 3d 147 (D.D.C. 2023) ................................................................................... 37

*Lee v. United States,*
    127 Fed. Cl. 734 (Fed. Cl. 2016) ................................................................ 19, 20

*Leedom v. Kyne,*
    358 U.S. 184 (1958) ................................................................................ 29, 30

*Louisiana v. Biden,*
    622 F. Supp. 3d 267 (W.D. La. 2022) ............................................................. 23

*Lujan v. Nat'l Wildlife Fed'n.,*
    497 U.S. 871 (1990). .............................................................................. 21, 22

*Lujan v. Defs. Of Wildlife,*
    504 U.S. 555(1992). ..................................................................................... 28

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ....................................................................... 28

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ..................................................................................... 14

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) ................................................................. 15, 19

*Mississippi v. Johnson,*
    71 U.S. (4 Wall) 475 (1866) .................................................................... 28, 29

*Morrison v. Olson,*
    487 U.S. 654 (1988) ..................................................................................... 29

*Mott Thoroughbred Stables, Inc. v. Rodriguez,*
    87 F. Supp. 3d 237 (D.D.C. 2015) ................................................................. 36

*Munaf v. Geren,*
    553 U.S. 674 (2008) ....................................................................................... 8

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................. 8, 37

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ................................................................................. 21, 22

*Nyunt v. Chairman, Broad. Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) ...................................................................... 30

*Office of Personnel Mgmt. v. Richmond,*
    496 U.S. 414 (1990) ..................................................................................... 27

*Perry Cap. LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017) ...................................................................... 24

*Printz v. United States,*
    521 U.S. 898 (1997) ......................................................................................... 29

*Quality Tooling, Inc. v. United States,*
    47 F.3d 1569 (Fed. Cir. 1995) ......................................................................... 18

*Sampson v. Murray,*
    415 U.S. 61 & n.68 (1974) ........................................................................ 34, 35

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) ........................................................................... 8

*Spectrum Leasing Corp. v. United States,*
    764 F.2d 891 (D.C. Cir. 1985) ................................................................... 19, 20

*Steenholdt v. FAA,*
    314 F.3d 633 (D.C. Cir. 2003) ......................................................................... 24

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ......................................................................................... 10

*Turner v. U.S. Agency for Glob. Media,*
    502 F. Supp. 3d 333 (D.D.C. 2020) ............................................................. 31-32

*United States Sugar Corp. v. EPA,*
    830 F.3d 579 (D.C. Cir. 2016) ......................................................................... 25

*United States v. Fausto,*
    484 U.S. 439 (1988) ................................................................................... 10, 11

*Versata Dev. Corp. v. Rea,*
    959 F. Supp. 2d 912 (E.D. Va. 2013) ............................................................. 24

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs,*
    714 F.3d 186 (4th Cir. 2013) ........................................................................... 21

*Webster v. Doe,*
    486 U.S. 592 (1988) ......................................................................................... 24

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ......................................................................................... 8, 37

*Wis. Gas Co. v. Fed. Regul. Comm'n,*
    758 F.2d 669 (D.C. Cir. 1985) ......................................................................... 32

## Statutes, Rules, Regulations, and Other Authorities

5 U.S.C. § 504 ......................................................................................................... 15

5 U.S.C. § 701 ......................................................................................................... 24

5 U.S.C. § 704 .................................................................................................... 23

5 U.S.C. § 2105 ................................................................................... 9, 15, 16, 17

5 U.S.C. § 7703 .................................................................................................. 10

22 U.S.C. § 6202 .......................................................................................... 25, 31

22 U.S.C. § 6204 .................................................................................. 4, 5, 24, 25

22 U.S.C. § 6206 .................................................................................................. 15

22 U.S.C. § 6208 .................................................................................................... 4

28 U.S.C. § 1331 .................................................................................................... 9

41 U.S.C. § 7102 ............................................................................................. 17-18

41 U.S.C. § 7103 .......................................................................................... 17, 18

41 U.S.C. § 7104 .................................................................................................. 18

U.S. Const. art. I, § 7, cl. 2 .................................................................................. 26

U.S. Const. art. I, § 8, cl. 1 .................................................................................. 27

U.S. Const. art. I, § 9, cl. 7 .................................................................................. 27

U.S. Const. art. II, § 3 ................................................................................... 27, 28

Fed. R. Civ. P. 12 ................................................................................................ 24

Fed. R. Civ. P. 65 ................................................................................................ 39

Executive Order 14,238, 90 Fed. Reg. 13043 (Mar. 14, 2025) ....................... passim

Defendants Kari Lake, in her official capacity as a Senior Advisor to the Chief Executive Officer ("CEO") of United States Agency for Global Media ("Global Media"), Victor Morales, in his official capacity as Acting CEO of Global Media, and Global Media, through their undersigned counsel, oppose Plaintiffs' motion for a preliminary injunction ("Pls.' Mot.," ECF No. 4-2).[1] For the reasons explained herein, Plaintiffs are unable to demonstrate that they are likely to succeed on the merits, that they have suffered irreparable harm, and that the balance of the equities or the public interest tip in their favor. The Court should deny Plaintiffs' motion.

## INTRODUCTION

On March 14, 2025, the President issued Executive Order 14,238, *Continuing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 13043 (Mar. 14, 2025), to reduce certain agencies down to their "statutory minimum" as allowed under the law, and to eliminate all "non-statutory" components to the maximum extent allowed by law. *See* https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/. Global Media is one of the entities subject to the President's Executive Order. Since March 14, 2025, and consistent with the President's executive authority, Global Media has begun to comply with the President's directive, including by taking steps to reduce one of Global Media's broadcasting networks, Voice of America.

Plaintiffs are Michael Abramowitz, the current Director of Voice of America, Anthony LaBruto, a journalist in the English to Africa Service in the Africa Division of Voice of America,

---

[1]    Because the Government was ordered to file its opposition to plaintiffs' preliminary injunction motions in this matter and *Widakuswara v. Lake*, Civ. A. No. 25-2390 (RCL), on the same day, the Government is filing this response on a compressed time frame. Should the Court be inclined to award anything other than temporary relief, the Court should stay any such order to allow the Government time to seek reconsideration or authorization to seek appellate review from the Solicitor General, as appropriate. The Government also reserves the right to make additional arguments at a later stage in the litigation.

and one "J. Doe" journalist[2] operating under a personal services contract with Voice of America. They bring a scattershot attack against the President's executive authority to halt the reduction of Voice of America. Their claims fail.

The gravamen of Plaintiffs' complaint is that Defendants have acted "contrary to law" because Voice of America has placed "virtually" all employees on administrative leave and proposed to terminate the contract of 500 personal services contractors. *See* Compl. ¶ 129 (ECF No. 1). Materially similar arguments were rejected by Judge Nichols in *American Foreign Service Association v. Trump*, Civ. A. No. 25-0352 (CJN), 2025 WL 573762, at *8 (D.D.C. Feb. 21, 2025), and for good reason: these claims are nothing more than employment actions cloaked as administrative procedure or constitutional challenges. They fail at the outset.

As to Abramowitz, he purports to challenge his placement on administrative leave, arguing that Defendants have "prevented him from carrying out the duties" entrusted to him by Congress (Pls.' Mot. at 22, Abramowitz Decl. ¶ 31, ECF No. 4-5 at 7), an argument rejected by the D.C. Circuit in *Dellinger v. Bessent*, No. 25-5052, 2025 WL 887518, at *4 (D.C. Cir. Mar. 10, 2025). Plaintiffs further allege that Voice of America has been "shuttered" and forced off air (*id*. ¶ 122), that Defendants actions violate "constitutional separation of powers" and "contravene Congress's lawful authority to appropriate funds by effectively dismantling an agency created by Congress," (*id*. ¶ 123). LaBruto and one Doe Plaintiff argue that the cancellation of their personal service contracts is in violation of the law. Plaintiffs chiefly rely on the Administrative Procedure Act ("APA") (Count I), separation of powers principles (Count II), Article II's Take Care Clause

---

[2]    On March 28, 2025, Plaintiff J. Doe I filed a notice of voluntary dismissal. *See* ECF No. 12.

(Count III), and an argument that Defendants actions are *ultra vires* (Count IV). Simply put, however, Plaintiffs claims are not justiciable.

At bottom, Plaintiffs Abramowitz challenges employment decisions made by the agency, which are precluded pursuant to the Civil Service Reform Act of 1978 and the Federal Service Labor-Management Relations Act. As to LaBruto and the Doe Plaintiff, this Court lacks jurisdiction to entertain claims arising under the terms of their contracts, as the Court of Federal Claims enjoys exclusive jurisdiction over their contract claims.

Plaintiffs' APA claims similarly fail to establish a likelihood of success on the merits. First and foremost, Plaintiffs do not challenge any final agency action that can be contested under the APA. Further, Plaintiffs have another adequate remedy at law.

Even if Plaintiffs' claims were proper, the claims nevertheless fail on their own terms. With respect to Plaintiffs' constitutional claims, they miss the mark because they raise purely statutory arguments. Plaintiffs' Take Care Clause argument similarly fails, as there exists no private right of action whereby Plaintiffs may obtain affirmative relief.

Moreover, Plaintiffs' speculative grievances of harm are misplaced. Abramowitz's complaints of harm based on his misguided belief that he has a legal entitlement to his official position does not establish irreparable harm, just as the D.C. Circuit similarly concluded in *Dellinger*. Nor do vague assertions of reputational harm suffice. As to the remaining Plaintiffs, this Court lacks jurisdiction to entertain claims arising from their purported injuries that may follow from the impending termination of their contracts. And as to Doe II, who is on a J-1 visa tied to their employment contract, they rely on possible future events that are far too speculative and remote to establish the imminent harm necessary for such extraordinary relief.

Weighed against all these flawed arguments is the public's interest in the President taking decisive actions to fulfill executive functions and direct Executive Branch agencies to implement the policies of the United States. Plaintiffs have not borne their burden to show that they are entitled to the extraordinary remedy of a preliminary injunction.  Also, for the reasons discussed in Defendants' opposition to Plaintiffs' motion for a temporary restraining order (*see* ECF No.13 at 37–38), if the Court enters a preliminary injunction, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such temporary order.

## BACKGROUND

### I.     <u>Statutory Function of Global Media</u>

The mission of United States Agency for Global Media is to inform, engage, and connect people around the world in support of freedom and democracy. *See* https://www.usagm.gov/who-we-are/mission/. In furtherance of that mission, Global Media oversees multiple entities, including Voice of America. *See id.*; *see also* 22 U.S.C. § 6208a. To effectuate its oversight authority, Congress granted Global Media's CEO the authority to, among other things: "direct and supervise all broadcasting activities conducted" by such entities; "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all such [entities'] activities within the context of the broad foreign policy objectives of the United States"; and "[t]o undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could be made more efficient and economical." 22 U.S.C. §§ 6204(a)1, (a)(2), (a)(8). Among other requirements, Congress directed that all government-funded and operated international broadcasts under the Global Media umbrella "shall" be "consistent with the broad foreign policy objectives of the United States," and "shall include" "a balanced and comprehensive projection of United States thoughts and institutions." *Id*. § 6202(a)(1), (b)(2); *see also id.* § 6202(c)(2) (same for Voice of America broadcasts).

In December 2016, Congress passed and then-President Obama signed the 2017 National Defense Authorization Act, which established Global Media's current governing structure. National Defense Authorization Act of 2017, Pub. L. 114-328, 130 Stat. 2000, 2549, § 1288. That law restructured governance of the Global Media broadcast networks by dissolving a governing board structure and centralizing control in a single CEO. 22 U.S.C. §§ 6203, 6204(a)(1), (b). Congress vested the CEO with the many powers previously held by the board, including to "ensure" broadcast activities are consistent with the standards Congress established, including that they be "balanced and comprehensive," *id.* §§ 6204(a)(3), 6202(b)(2), and to "appoint such personnel for the [CEO] as the [CEO] may determine to be necessary." *Id.* § 6204(a)(11). The current Acting CEO of Global Media is Victor Morales, who holds broad supervisory authority accorded to him by statute. 22 U.S.C. § 6204(a).

Global Media employs full-time employees and has contractual relationships with Personal Service Contractors ("PSCs"), who are not Global Media employees, but have an employer-employee relationship governed by contract. Global Media currently employs a total of approximately 1,147 full-time employees and as of March 14, 2025 has active employment contracts with approximately 598 PSCs. *See Widakuswara v. Lake*, Civ. A. No. 25-2390, Defs.' Opp. Pls.' Temp. Rest. Order, Decl. of Crystal Thomas ¶ 3 (S.D.N.Y. Mar. 27, 2025) (ECF No. 41).

## II.   Executive Order 14,238

On January 20, 2025, and as amended on March 4, 2025, Charles Ezell, the Acting Director of the U.S. Office of Personnel Management ("OPM"), issued a memorandum (the "OPM Memorandum") titled "Guidance on Probationary Periods, Administrative Leave and Details." *See* https://www.opm.gov/media/yh3bv2fs/guidance-on-probationary-periods-administrative-leaveand-details-1-20-2025-final.pdf. The OPM Memorandum provided that agencies "have the

discretion to grant paid administrative leave to employees to help manage their workforces when it is in their best interest to do so." OPM Mem., at 2. On March 14, 2025, the President issued Executive Order 14,238, which directed that Global Media's "non-statutory components and functions" be eliminated and that its "performance of [its] statutory functions and associated personnel" be reduced to "the minimum presence and function required by law." Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025). In furtherance of the OPM Memorandum and the Executive Order, on March 15, 2015, Global Media placed 1,042 employees on administrative leave with full pay and benefits. Defs.' Opp. TRO, Thomas Decl. ¶ 6 (ECF No. 41). On March 16, 2025, Global Media terminated contracts with all personal services contractors, who will be paid through March 31, 2025. *Id*. All personal services contractors were subsequently reinstated following issuance of the temporary restraining order by the Southern District of New York. The agency has retained the ability to recall employees from administrative leave to work status as it seeks to implement the Executive Order. *Id*.

Further to its intent to uphold Global Media's performance of its statutory functions and associated personnel, on March 26, 2025, the Office of Cuba Broadcasting resumed transmission of radio service and on March 27, 2025, it resumed television broadcasting service. Thomas Decl. ¶ 6 (annexed hereto). In addition to the employees recalled from administrative leave at the Office of Cuba Broadcasting, the agency has recalled approximately 69 other employees from administrative leave to provide mission support including broadcasting support for the Office of Cuba Broadcasting, facilities management, contracts management, and IT support. No additional employees have been placed on administrative leave. Thomas Decl. ¶ 7.

III.    **Procedural History**

On March 26, 2025, Plaintiffs Michael Abramowitz, the current director of Voice of America, Anthony LaBruto, an international multimedia journalist in the English to Africa Service

in the Africa Division of Voice of America, and two J. Doe journalist plaintiffs sued Defendants Global Media and Kari Lake and Victor Morales in their official capacities, for allegedly placing employees and contractors on paid administrative leave, temporarily ceasing broadcasting and programming operations, cancelling personal services contracts effective March 31, 2025, and allegedly preventing Abramowitz from carrying out his statutory functions as Director of Voice of America. *See generally* Compl. (ECF No. 1). Plaintiffs allege violations of the Administrative Procedure Act (Count I), violation of separation of powers principles (Count II), violation of the Take Care Clause (Count III), and *ultra vires* acts (Count IV).

That same day, Plaintiffs moved for a preliminary injunction seeking a declaration that "Defendants actions requiring [Voice of America] to cease operations, placing virtually all [Voice of America] employees on administrative leave, and terminating 500 fulltime personal service contract employees" are "unlawful (Pls.' Mot. at 43 ¶ (b)); an order directing Defendants to "cancel their orders putting approximately 1,300 [Voice of America] employees on administrative leave, cancel the termination of personal services contracts with approximately 500 employees, cease dismantling Voice of America, and restore Voice of America's personnel and operating capacities such that the entities may continue their broadcasting activities at the level before the above actions were taken," among others. *Id.* ¶ (c); *see also* Compl. at 33.

On March 28, 2025, within approximately 48-hours, Defendants filed an opposition to Plaintiffs' motion for a temporary restraining order. *See* Defs. Opp'n (ECF No. 33). Later that same day, the Southern District of New York issued an Order in *Widakuswara* granting the plaintiffs' temporary restraining order and Plaintiffs' counsel in this action contacted the Court to indicate that "the plaintiffs are planning to withdraw their motion for a TRO on Monday [and] will confer with the Government about a schedule for our motion for a preliminary injunction."

The parties filed a Joint Status Report with the Court, and the Court ordered, *inter alia*, Defendants to file their opposition to Plaintiffs' preliminary injunction motion by no later than April 14, 2025. *See* Apr. 10, 2025. Defendants now file this opposition.

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). To warrant relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The third and fourth factors of the analysis—harm to others and the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

Plaintiffs fail to carry their burden to demonstrate that any of the requirements to obtain preliminary injunctive relief are satisfied, because (1) they have not shown there is a likelihood of success on the merits on any of their constitutional or statutory claims because the Court lacks jurisdiction to hear them, and they are unlikely to succeed on the merits; (2) they have not demonstrated irreparable harm because all of Plaintiffs' alleged harms are redressable; and (3) the balance of equities and public interest tip in favor of Defendants because the public has an interest in ensuring that the executive is allowed to take decisive action in how to manage executive agencies. For any one of these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

I.     **Plaintiffs Are Not Likely to Prevail on the Merits of Their Claims**

Plaintiffs cannot show they are likely to succeed on the merits of their claims, which have both threshold and substantive flaws.

A.     **This Court Lacks Jurisdiction Over Plaintiffs' Employment Claims**

First, under the Federal Service Labor–Management Relations Statute ("FSL-MRS") and the Civil Service Reform Act ("CSRA"), Congress has precluded district court jurisdiction over Plaintiffs' challenges to Defendants' decisions to place employees on paid administrative leave. Second, Plaintiffs LaBruto and J. Doe II are not civil service employees appointed under 5 U.S.C. § 2105(a)(1). Instead, they were hired by Voice of America under personal services contracts, which are governed by the Contract Disputes Act; the Court of Federal Claims enjoys exclusive jurisdiction over such claims. Recently, the Supreme Court agreed when it issued its decision to stay a temporary restraining order in *Dep't of Education v. California*, No. 24A910, 2025 WL 1008354, at *1 (Apr. 4, 2025) (per curiam). In *California*, the Supreme Court stayed a temporary restraining order that had "enjoin[ed] the Government from terminating various education-related grants." *Id.* at *1.  The Supreme Court held that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the [Administrative Procedure Act]," *id.* at *1–2, reasoning that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'"  *Id.* at *2 (quoting 28 U.S.C. §1491(a)(1)).

For these reasons, Plaintiffs cannot establish a likelihood of success on the merits, and the Court should deny Plaintiffs' request for relief.

1.  Abramowitz Must Pursue His Claims Through the Statutory Scheme
    <u>Congress Established.</u>

At the outset, this case involves a challenge to policy decisions governing a federal employee (and as discussed below, contractors). The Court lacks jurisdiction over these claims because Congress has established a detailed statutory scheme for adjudicating disputes related to federal employment, and Plaintiffs' claims must follow that process.

"Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider." *Bowles v. Russell*, 551 U.S. 205, 212 (2007). Although district courts have jurisdiction over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("*AFGE*"), 929 F.3d 748, 754 (D.C. Cir. 2019). Here, as detailed below, Congress has precluded district court jurisdiction for the claims brought by Abramowitz regarding his employment.

The CSRA and FSL-MRS together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees. *AFGE*, 929 F.3d at 752 (regarding FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (regarding CSRA more broadly). In these statutes, Congress provided that most federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the Merit Systems Protection Board for employment disputes, the Federal Labor Relations Authority for labor disputes, or the Office of Special Counsel for certain "prohibited personnel practices." For foreign service officers, the Foreign Service Act of 1980 ("FSA") "provides an analogous system for reviewing allegedly adverse actions taken against those employees." *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993)).

Judicial review, if any, is generally available only following the exhaustion of administrative review. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *United States v. Fausto*, 484 U.S. 439, 448–50 (1988)); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

 "Personnel actions" that fall within the Office of Special Counsel's ("OSC") purview include "any. . . significant change[s] in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A)(xii). The CSRA enumerates thirteen circumstances under which personnel actions become "prohibited personnel practices," which must be brought before OSC in the first instance. *Id*. § 2302(b). One of those thirteen "prohibited personnel practices" occurs when a "personnel action" violates "any law, rule, or regulation implementing, or directly concerning, the merit system principles" listed in the statute. *Id*. § 2302(b)(12). These principles require, in relevant part, "proper regard for [employees'] constitutional rights." *Id*. § 2301(b)(2). Consequently, personnel actions that implicate violations of constitutional rights, including alleged violations of the First Amendment, are prohibited personnel practices that generally fall within the CSRA's exclusive remedial scheme. *See, e.g., Weaver v. Info. Agency*, 87 F.3d 1429, 1432 (D.C. Cir. 1996).

Statutory schemes like these largely preclude jurisdiction in the district courts, either altogether or prior to the completion of jurisdictional administrative exhaustion requirements. *AFGE*, 929 F.3d at 754. In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)," to conclude that the union plaintiffs in that case could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754. Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) fairly discernible in the

statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See id*. at 755 (citations omitted).

The Supreme Court repeatedly has held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–15 (2012); *Fausto*, 484 U.S. at 455. Likewise, the D.C. Circuit repeatedly has recognized that the FSL-MRS and the CSRA readily satisfy the first prong of the *Thunder Basin* framework. *See AFGE*, 929 F.3d at 755 (concluding that union plaintiffs could not challenge in district court three executive orders related to federal employment); *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005). In other words, Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework.

With respect to constitutional claims, even in cases centering on CSRA–covered actions, the Supreme Court has considered the availability of "meaningful review" in an Article III judicial forum when evaluating the scope of the CSRA's exclusive remedial scheme, *Elgin*, 567 U.S. at 10, and the D.C. Circuit has similarly consistently determined that federal employees have "a right to federal court review of their constitutional claims," *Weaver*, 87 F.3d at 1433. Although there exists a narrow exception to the exhaustion rule for employees covered under the CSRA when the raise "constitutional claim issues totally unrelated to the CSRA procedures," *Steadman v. Gov., U.S. Soldiers & Airmen's Home*, 918 F.2d 963, 967 (D.C. Cir. 1990), this exception is a narrow one, and does not excuse exhaustion requirement for claims, that, while framed as constitutional challenges, are in truth a disguised "vehicle" to challenge CSRA–covered personnel actions or practices. *Elgin*, 567 U.S. at 22; *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 366 (D.D.C. 2020).

Abramowitz's claims are also of the type to be challenged through this statutory structure. In fact, "[c]laims 'will be found to fall outside of the scope of a special statutory scheme in only limited circumstances, when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claims are wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency.'" *AFGE*, 929 F.3d at 755 (quoting *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 500 (D.C. Cir. 2018)). For example, changes to Global Media's purported autonomy or the "firewall" are necessarily employment actions, because at bottom they challenge policy decisions regarding how employees at the agency can perform their duties, i.e., what news will be broadcast, the way that the agency and its employees will function, conditions of employment or the way that Plaintiffs perform their job. *See e.g.*, 5 U.S.C. §§ 2302(a)(2)(A)(xii); 2301(b)(2), 2302(b)(12). These claims fall squarely within the CSRA's structure. Because Defendants actions have arguably "changed the way" that Plaintiffs perform their job, they are necessarily changes to Plaintiffs "working conditions," covered by the CSRA and subject to the jurisdictional exhaustion requirement.

Here, all three factors point toward preclusion. First, a finding of preclusion will not thwart meaningful judicial review. In essence, Abramowitz challenges his placement on administrative leave (as do other contractor Plaintiffs), and perceived consequences or incidental effects that will flow from that placement, whether related to financial benefits or repatriation. But an employee's placement on administrative leave can be challenged under the CSRA or FSL-MRS. *See e.g., California*, 2015 WL 1008354, at *1 ("[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" (quoting 5 U.S.C. § 702)). Importantly, another judge of this Court recently described that statutory scheme when addressing analogous claims by unions of federal employees

- 13 -

challenging executive actions that they asserted would "systematically dismantle" the agency that employed them. *AFSA*, 2025 WL 573762, at *1 (quoting plaintiffs' complaint). For civil servants, the "applicable statutory scheme is set forth in the FSL-MRS and the CSRA[.]" *Id.* at *8. At bottom, Plaintiffs' complaints are employment claims cloaked as constitutional or APA challenges.

For similar reasons, challenge to the placement on administrative leave is also not "wholly collateral" to the statutory review provisions. Rather, that claim may arise in the context of a specific labor or employment dispute, as set forth above. *See AFGE*, 929 F.3d at 759–60 ("This consideration is 'related' to whether 'meaningful judicial review' is available, and the two considerations are sometimes analyzed together." (quoting *Jarkesy v. SEC*, 803 F.3d 9, 22 (D.C. Cir. 2015))).

*AFGE* is instructive. The district court characterized the claims there as involving "separation-of-powers issues" and "whether a statute or the Constitution has authorized the President to act in a particular way," 929 F.3d at 760, much as Plaintiffs have framed their claims in this case. But the D.C. Circuit nonetheless concluded that the AFGE plaintiffs had to follow the statutory scheme, observing that, like here, the claims at issue could be adjudicated by resorting to the provisions of the relevant congressional legislation. *Id*. at 760-61. And even assuming that the FLRA and MSPB have lesser expertise on questions of constitutional dimension, they may well be able to "offer an interpretation of the Statute[s] in the course of the proceeding that might alleviate or shed light on the constitutional concerns." *Id*. at 761 (cleaned up). Abramowitz's claims are not subject to judicial review unless and until they have been pursued through the comprehensive statutory scheme Congress devised.

Judge Nichols came to the same conclusion in *American Foreign Service Association v. Trump* ("*AFSA*"), Civ. A. No. 25-0352 (CJN), 2025 WL 573762, at *8. In *AFSA*, plaintiffs moved for a preliminary injunction challenging the "dismantling" of the U.S. Agency for Intentional Development ("USAID"), couching their challenges against the President's exercise of his executive powers as violations of the APA and the Constitution. One of the grounds for plaintiffs' challenge was the placement of its members on administrative leave. *Id*. at *8 ("plaintiffs' complaints about the effects on their members of being placed on administrative leave and of being asked to return to the United States on an expedited basis are, at bottom, archetypal complaints about changed employment conditions and their follow-on effects—which at this point appear to be largely financial."). As Judge Nichols found, this "mattered" because "Congress has established 'comprehensive' statutory schemes governing the review of employment disputes arising between the federal government" and, in the case of USAID, its foreign services officers. *Id*. Analyzing plaintiffs' claims with respect to the *Thunder Basin* factors, Judge Nichols concluded that Congress had precluded such claims because they were intended to "proceed exclusively" through the statutory schemes in the CSRA and the FSL-MRS. *Id*. at *8-9. It thus appeared likely that domestic USAID employees or union representatives could object to the agency's administrative leave placements under either the CSRA or FSLMRS. *Id*. (citing *Chiang v. Gonzales*, 2006 WL 8449284, at *7 (C.D. Cal. 2006) (plaintiff's claim regarding her placement on paid administrative leave "f[e]ll within the ambit of the CSRA" and could not be adjudicated in district court)). Much like Abramowitz here, the plaintiffs in *AFSA* sought the "cessation of certain employment conditions presently affecting their members, such as their placement on administrative leave, their expedited repatriation, and their inability to perform certain job duties they previously held." *AFSA*, 2025 WL 573762, at *10. Finally, even if the "farthest reaches of plaintiffs' lawsuit involve

'separation-of-powers issues' and 'whether a statute or the Constitution has authorized the President to act in a particular way,' the 'preliminary' questions the lawsuit poses are plainly employment-related—such as the lawfulness of the government's changes to plaintiffs' members' employment conditions." *Id*. Because the same is certainly true here, the same result is warranted. Abramowitz's claims are precluded.

> 2. This Court Lacks Jurisdiction Over the Claims of Plaintiffs LaBruto and J. Doe II, for they Arise in Contract and Must Be Brought in the Court of <u>Federal Claims.</u>

Generally, the federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *id*., that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). (cleaned up). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id*.

When a party seeks to challenge the terms of a contract that it has entered with the United States, the proper remedy is typically suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract"—including agreements like those that Plaintiffs LaBruto and J. Doe II have— "with the United States." 28 U.S.C. § 1491(a). As the D.C. Circuit has explained, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Comm. on Employee Benefits of the Federal Reserve Employee Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (cleaned up); *see also Conf. of Catholic Bishops v. Dep't of*

*State*, Civ. A. No. 25-465 (TNM), 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025), appeal docketed No. 25-5066 (D.C. Cir.).

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, this Court looks at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). In this case, both of those considerations make clear that Plaintiffs LaBruto and J. Doe II may not receive the relief they seek at this stage.

At the outset, there is no dispute that Global Media has been given express statutory authority for engaging in personal services contracts. In 2002 Congress passed the "Foreign Relations Authorization Act," which gave the Director of the International Broadcasting Bureau the authority to establish a "pilot program [] for the purpose of hiring United States citizens or aliens as personal services contractors." Pub. L. 107-228 § 504(a), 116 Stat. 1350 (2002) (codified at 22 U.S.C. § 6206 note). As directed, these "personal services contractors" were offered "without regard to Civil Service and classification laws, for service in the United States as broadcasters, producers, and writers in the International Broadcasting Bureau to respond to new or emerging broadcast needs or to augment broadcast services." *Id*. Crucially, Congress contemplated that these personal service contractors would be hired "without regard to Civil Service and classification laws." For the purposes of Title 5 of the United States Code, an "employee" is defined as "an individual who is. . . appointed in the civil service" by a federal employee acting in an official capacity. 5 U.S.C. § 2105(a)(1). The Foreign Relations Authorization Act also placed certain conditions on the Director's use of personal services contractors and required that contracts not exceed more than two years. *Id*. § 504(b).

In this case, Plaintiffs LaBruto and J. Doe II fail to allege that they are "employees" of Global Media or Voice of America. Nor could they. The opposite in fact is true, as they repeatedly refer to their status as contractors. *See e.g.,* Pls.' Mot. at 10 (500 of its employees "have been told that their contracts will be terminated on March 31"), *id*. at 13 ("Approximately 500 of [Voice of America's] employees, including approximately 450 journalists and representing approximately forty percent of [Voice of America's] workforce, are personal services contractors (PSCs), who work fulltime under contract with [Voice of America], an arrangement that has become increasingly prevalent in government in recent years"), *id*. at 24 ("On March 16, 2025, Plaintiff [J. Doe II] then received a formal notice of contract termination, effective March 31, 2025."), *id*. at 25 ("[LaBruto] was placed on leave March 15, 2025, and notified that his contract will end on March 31, 2025.").

Notably, Plaintiffs have not provided copies of their contracts in support of their motion, but rather they gloss over the contractual nature of their dispute altogether. A review of the operative documents clarifies that this Court lacks jurisdiction over their claims.

LaBruto signed his latest personal services contract with Voice of America on March 3, 2023. *See* Ex. 1. J. Doe II's contract was signed in June 2024. Ex. 2. Both contracts contain the same termination clause (clause four): "Termination of this Contract shall be conducted in accordance with the terms of the attached [Global Media] Personal Services Contractor Handbook." Article 15 of the Personal Services Handbook governs terminations of the contracts. *See* Ex. 3. Article 15(a) provides: "Either party may terminate this Contract with the Agency at any time for any reason by providing the other party with 15 calendar days' written notice. Should the Agency decide to terminate this Contract for Convenience of the Government, the required written notice will be provided by the [Contracting Officer]. The written notice will explain the

basis for the termination, and the effective date of the termination. [Global Media] reserves the right to require the [personal services contractor] to telework while the Agency determines whether to issue a termination notice. [Global Media] may also place a [Personal Services Contractor] on administrative leave while determining whether to issue a termination notice." *Id*. On March 15 and 16, 2025, in accordance with the terms of the contracts and the Personal Services Contract Handbook, Global Media notified LaBruto and J. Doe II that their contracts would be terminate effective March 31, 2025 (Pls.' Mot. at 6, Compl. ¶ 102).

Clause five of both personal services contracts, titled "status as a personal contractor," states that "the [Personal Services Contractor] will be performing services under this contract. The [Personal Services Contractor] understands and acknowledges that [Personal Services Contractor] is not a [Global Media] employee within the competitive or excepted service or for any other purposes under the law. The [Personal Services Contractor] understands and acknowledges that this applies notwithstanding any and all provisions of this contract." *See id*. at 1. Clause 10 is titled, "Disputes." *Id*. at 2. It states that "This contract is subject to the Contract Disputes Act of 1978. All dispute resolution between the [Personal Services Contractor] and the Government arising out of this Contract shall be conducted in accordance with the procedures included in the Personal Services Contractor Handbook." *Id*. Further, with respect to J. Doe II, that contract explicitly specifies that certain clauses of the Federal Acquisition Regulation ("FAR") are incorporated into the contract. That contract incorporates FAR 212-4, Contract Terms and Conditions, which renders the contract subject to disputes under 41 U.S.C. Chapter 71 (the Contract Disputes Act). *See* https://www.acquisition.gov/far/52.212-4 *(*last visited Mar. 28, 2025).

Simply put, Plaintiffs' contract claims are barred under the provisions of the Contract Disputes Act, specifically 41 U.S.C. § 7103(a), because they were not first. . . submitted to and

- 19 -

denied by a contracting officer. *Id*. The Contract Disputes Act "applies to any express or implied contract. . . made by an executive agency for. . . the procurement of services." 41 U.S.C. § 7102(a)(2). Under the Act, "[e]ach claim by a contractor against the [f]ederal [g]overnment relating to a contract shall be submitted to the contracting officer for a decision." 41 U.S.C. § 7103(a)(1). After such a claim has been made, "a contractor may bring an action directly on the claim in the United States Court of Federal Claims." 41 U.S.C. § 7104(b)(1). That plainly did not occur here.

Moreover, there is no genuine dispute that the Court of Federal Claims enjoys exclusive jurisdiction over claims arising out of the Contracts Disputes Act. *See Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1055 (Fed. Cir. 1993) ("The [Contract Disputes Act] exclusively governs Government contracts and Government contract disputes.").[3] Put differently, "[w]hen the Contract Disputes Act applies, it provides the exclusive mechanism for dispute resolution; the Contract Disputes Act was not designed to serve as an alternative administrative remedy, available at the contractor's option." *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995).

As a general matter, Global Media's personal services contracts contain specific reference to the Contract Disputes Act, in addition to termination provisions that allow Global Media to terminate a contract for "convenience" based upon fifteen days' notice, like the notice given to Plaintiffs here. Not only would the Court of Federal Claims maintain exclusive jurisdiction over Plaintiffs' contract claims, but Plaintiffs can point to no violation of a provision of their contract that would entitle them to relief. Plaintiffs do not argue that Global Media or Voice of America

---

[3]    Similarly, the Federal Circuit has acknowledged that "the Tucker Act, in conjunction with the [Contract Disputes Act], purports to make the Court of Federal Claims the exclusive trial court for hearing disputes over government contracts that fall under the [Contract Disputes Act]." *Quality Tooling, Inc. v. United States*, 47 F.3d 1569, 1572–73 (Fed. Cir. 1995)

- 20 -

somehow violated the notice provisions to which they are entitled under their contracts. Plaintiffs' papers are silent on these critical issues that naturally implicate this Court's jurisdiction to entertain their claims. Nor do Plaintiffs make any attempt to argue otherwise.

In any event, the latter *Megapulse* factor is dispositive here. The nature of relief Plaintiffs LaBruto and Doe II, seek sounds in contract. *See* 672 F.2d at 968; *see also Conf. of Catholic Bishops*, 2025 WL 763738, at *7-8. It asks the Court to "order Defendants to cancel the termination of personal services contracts with approximately 500 employees," and "restore [Voice of America's] personnel and operating capacities such that the entities may continue their broadcasting activities at the level before the above actions were taken." Pls.' Mot. at 51 ¶ (c). Thus Plaintiffs "seek the classic contractual remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). But this Court cannot order the Government to continue to perform under a contract. *Id.* Such a request for an order that the government "must perform" on its contract is one that "must be resolved by the Claims Court." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985); *see also Bowen v. Massachusetts*, 487 U.S. 879, 921 (1988) (Scalia, J., dissenting) ("It is settled that sovereign immunity bars a suit against the United States for specific performance of a contract.").

In *Lee v. United States*, 127 Fed. Cl. 734, 739-40 (Fed. Cl. 2016), four contractors who were providing services to Voice of America through personal services contracts brought suit in the Court of Federal Claims for monetary relief under the Back Pay Act. The United States moved to dismiss, arguing that the court lacked jurisdiction because plaintiffs were not appointed to the civil service, and therefore failed to state a cognizable claim under the Back Pay Act. 127 Fed. Cl. At 739. The Court of Federal Claims ultimately dismissed the suit, premised on the more "fundamental" reason that plaintiffs did not invoke a basis for jurisdiction apart from the Tucker

Act. *Id*. at 740. Regardless of the outcome, the point is that plaintiffs brought their suit in the Court of Federal Claims in the first instance, rather than seek relief from a federal district court.

The D.C. Circuit has suggested that the Claims Court can offer this type of relief. *See Spectrum*, 764 F.2d at 895 n.7 ("The Claims Court . . . ordinarily lacks the authority to grant specific performance of contracts as well as other forms of equitable relief. We note, however, that in limited circumstances the Claims Court when exercising Tucker Act jurisdiction may be empowered to grant such equitable relief where the relief sought is in the form of money."); *but see Bowen*, 487 U.S. at 920–21 (Scalia, J., dissenting); *see also see also Conf. of Catholic Bishops*, 2025 WL 763738, at *7-8. Regardless of the precise remedial powers of the Claims Court, the D.C. Circuit signaled that government contractors seeking specific performance must go there, even if the contractor will be limited to a damages remedy. *Ingersoll-Rand Co.*, 780 F.2d at 80 (noting that the plaintiff "would prefer to avoid becoming subject to the jurisdiction of the Claims Court because there its remedies could not include specific performance," but stressing that the plaintiff could not "avoid[] this remedy restriction" and must have its complaint "resolved by the Claims Court."). After all, Congress designed the APA so that it would "not change existing limitations on specific relief . . . derived from statutes dealing with such matters as government contracts." H.R. Rep. 94-1656, at 13 (1976), as reprinted in 1976 U.S.C.C.A.N. 6121, 6133; *see also Conf. of Catholic Bishops*, 2025 WL 763738, at *7.

In short, Plaintiffs claims sound in contract, appear to arise under the Contract Disputes Act, and should be brought in the Court of Federal Claims. This Court accordingly lacks jurisdiction over them.

### B.    Plaintiffs Are Not Likely to Prevail on their APA Claims (Count I)

Plaintiffs are unlikely to succeed on the merits of their APA claim for the reasons discussed below.

1.      Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of
        <u>a Discrete Final Agency Action</u>

As a threshold matter, Plaintiffs do not identify a discrete and circumscribed agency action that Global Media has taken and that could specifically be redressed by a federal court. Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*., 497 U.S. 871, 891 (1990); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (APA limits judicial review to "circumscribed, discrete agency actions"). These final agency actions must be "circumscribed [and] discrete." *S. Utah*, 542 U.S. at 62. The APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama- Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up). "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

Plaintiffs claims and requested injunction present exactly the type of wholesale challenge that the APA forbids. To the extent that Plaintiffs argue that the "decision to shut down the agency" is the "discrete" agency action challenged, that assertion is belied by the law and the facts.

On the law, Plaintiffs' allegations reveal that they do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of Global Media's management of the agency. Rather than presenting the court with a "narrow question to resolve," *Cobell*, 455 F.3d at 307, Plaintiffs challenge a host of individual actions—some that have occurred and some that have

not, *see, e.g.,* Mot. at 7 ("Defendants are dismantling [Voice of America]"); *id* at 23 (Plaintiffs argue that "placing all VOA employees administrative leave, terminating almost forty percent of employees, impeding all of VOA's statutorily required broadcasting activities by forcing VOA to go dark, freezing VOA's funds and de facto impounding them, and working to, and making explicit their intentions to, abolish VOA, defendants have violated myriad acts of Congress"). Addressing this type of claim would require the Court to supervise all the agency's activities and determine how the agency would accomplish each statutorily-mandated function—an even more extreme kind of supervisory claim than was at issue and rejected in *Lujan. See* 497 U.S. at 892-93. Such a claim would completely circumvent the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *S. Utah*, 542 U.S. at 66-67.[4]

On the facts, Plaintiffs cannot show that there has been a "decision" to shut down the agency because Global Media has not ceased all operations. Thirty-three employees at the Office of Cuba Broadcasting ("Cuba") have been reinstated to work status and broadcasting has currently resumed in Cuba. *See* Thomas Decl. ¶ 6. Indeed, Cuba's news website is up to date, and live radio and television programming is currently being broadcast on its website and into Cuba. See https://www.martinoticias.com (last visited April 13, 2025). In addition to Cuba, the agency has recalled approximately 69 other employees from administrative leave to provide mission support

---

[4]    Although Defendants maintain that Plaintiffs have failed to carry their, in the event the Court reaches the finality analysis, Defendants maintain that Plaintiffs cannot show final agency action either. Considering the operations that are ongoing and the fact that Global Media has only paused other activities while it determines next steps to bring the agency into compliance with the Executive Order, Plaintiffs fail to show that Global Media has consummated any decisionmaking or otherwise met the "finality" test set out in *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

including broadcasting support for the Office of Cuba Broadcasting, facilities management, contracts management, and IT support. *Id.* ¶ 7. Plaintiffs cannot show that such a "decision to shut down the agency" has occurred.

Also, although Plaintiffs attempt to cloak this action as an "administrative" challenge or a Constitutional challenge, at bottom, their challenge is to the underlying Executive Order issued by the President on March 14, 2025. Because an executive order is a presidential action, and not an agency action, Plaintiffs' challenges to EO 14,238 under the APA are not reviewable. *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 288 (W.D. La. 2022) (cleaned up) (holding that a challenge to EO 14008 "cannot be reviewed under the APA because the President is not an agency"). Thus, Plaintiffs' claims that the Executive Order is somehow premised upon evidence that lacked veracity, and did not make appropriate findings, are all non-cognizable under the APA. *See id.*

        2.      Plaintiffs' APA Claims Fail Because There are Other Adequate Remedies <u>Available</u>

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen*, 487 U.S. at 903. As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). Further, a remedy may be adequate even if "the arguments that can be raised [in the alternative proceeding] are not identical to those available in an APA suit." *Elm 3DS Innovations LLC v. Lee*, Civ. A. No. 16-1036, 2016 WL 8732315, at *6 (E.D. Va. Dec. 2, 2016). If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the

APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing putative APA claim under Rule 12(b)(6) because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit). As already described above in § I.A.1, 2, this is, in essence, an employment action, and there are CSRA or FSL-MRS remedies, as well as contract claims potentially available to Plaintiffs that are an adequate alternative. For all these reasons, Plaintiffs are unlikely to succeed on their APA claims.

3.    Global Media's Action are Committed to Agency Discretion By Law

The International Broadcasting Act provides no meaningful standard by which a court might adjudicate Plaintiffs' claims; satisfaction of § 6204(b) is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency action is "committed to agency discretion by law" when a "statute is drawn to that a court would have no meaningful standard against which to judge the agency's exercise of discretion," which renders "meaningful judicial review impossible." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). This is true "even where Congress has not affirmatively precluded review." *Heckler*, 470 U.S. at 830. Hallmarks of a decision committed to agency discretion include a statute that puts the onus on the agency, not the courts, to apply a standard, *see Webster v. Doe*, 486 U.S. 592, 600 (1988), and general criteria that make it difficult for courts to meaningfully second-guess an agency's determination, *see id*. ("advisable in the interests of the United States" is unreviewable).

Section 6204(b) is just such a law. It calls on Global Media's CEO to "respect" the "professional independence" of (among others) the broadcast networks. When read in conjunction with the broad supervisory authority that Congress bestowed on the CEO, neither statutory term in § 6204(b) is capable of judicial application. Congress required the CEO to "supervise" the networks, to "assess the professional integrity" of the networks, and to "ensure" that coverage is

"balanced and comprehensive." 22 U.S.C. § 6204(a); *id*. § 6202(b). The statutory scheme, considered as a whole, requires the CEO to determine the appropriate balance between competing factors—his supervisory demands and the networks' independence. But how to strike that balance is left to the CEO's discretion. *Cf. United States Sugar Corp. v. EPA*, 830 F.3d 579, 640 (D.C. Cir. 2016).

### C.    Plaintiffs Are Not Likely to Prevail on their Constitutional Claims (Counts II and III).

Plaintiffs contend that the Defendants have violated the principle of separation of powers and numerous provisions of the Constitution by allegedly placing employees on administrative leave or terminating their contracts, impeding of the Voice of America's statutory obligations, the de facto impoundment of congressionally appropriated funds meant to support the Voice of America, and the dismantling and abolishing Voice of America as an entity. *See* Pls Mot. at 37-41; *see also* Compl. ¶¶ 132–48.  Plaintiffs are wrong. Plaintiffs' constitutional claims are barred at the outset because they are purely statutory. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review. . . ." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. at 472.  The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the executive officers rely on an unconstitutional statute. *Id.* at 473, n.5.  Neither of those situations applies here. Thus, Plaintiffs cannot bring independent constitutional claims.  *See e.g., Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51–54 (D.D.C. 2020) (dismissing constitutional claims challenging border wall construction based on *Dalton*).  In any event, as discussed further below,

Plaintiffs' constitutional claims fail on their own terms. Plaintiffs therefore cannot prevail at the outset on the merits of the constitutional violations alleged in Counts II and III.

        1.    <u>Count II (Separation of Powers) Fails</u>

Plaintiffs claim that Defendants have violated the principles of the separation of powers because Defendants have violated the Presentment Clause and the Appropriations and Spending Clauses. *See* Pls.' Mot. at 35-37; *see also* Compl. ¶¶ 132–44. Plaintiffs' claims are meritless.

First, in terms of the Presentment Clause, Plaintiffs argue that Defendants have effectively repealed statutes at issue by shutting down of Voice of America and Defendants have no constitutional authority to repeal or amend any of the statutes that require Voice of America to carry out its statutory duties or to repeal or amend duly enacted appropriations legislation. *See* Pls. Mot. at 35-36. The Presentment Clause dictates that every bill passed by both the House of Representatives and the Senate must be presented to the President before it can become law. *See* U.S. Const. art. I, § 7, cl. 2. As an initial matter, there is no evidence that Voice of America has been shut down as Plaintiffs allege nor have Defendants modified or repealed any statute contrary to the Constitution's bicameralism and presentment requirements of Article I, § 7. This case bears no resemblance to the legislative or line-item veto authorities that the Supreme Court struck down in *I.N.S. v. Chadha*, 462 U.S. 919 (1983) and *Clinton v. City of N.Y.*, 524 U.S. 417 (1998). Thus, Plaintiffs' Presentment Clause claim fails.

Next, Plaintiffs argue that Defendants have violated the Appropriations and Spending Clauses. *See* Pls.' Mot. at 36-37. Specifically, Plaintiff argues that Defendants' actions—reducing Voice of America to a shell of an agency unable to perform its statutorily required functions with an eye toward its severe reduction which would necessarily lead to an impoundment of its appropriations—usurp Congress's constitutional role in controlling the federal purse. *Id.* The Appropriations Clause states that "[n]o Money shall be drawn from the Treasury, but in

Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "[I]n other words, [a] payment of money from the Treasury must be authorized by a statute." *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). But the statutory funding disputes, turn solely on "the interpretation and application of congressional statutes under which the challenged expenditures either were or were not authorized," not on a "controversy about the reach or application of" the Appropriations Clause. *Harrington v. Schlesinger*, 528 F.2d 455, 457-58 (4th Cir. 1975). And the Spending Clause provides that Congress has the power to "lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Here, Plaintiffs, have failed to show that the funds appropriated are not being used as authorized by any statute. Merely reducing the size of Global Media, including the Voice of America, does not equate to a violation of the Appropriations and Spending Clause. Accordingly, because Plaintiffs have failed to specify how Defendants have not acted in accordance with their statutory obligations Plaintiffs' claims fail.

        2.      Count III (Take Care Clause Violation) Fails Because the Take Care Clause Cannot be Used to Obtain Affirmative Relief

Plaintiffs attempt to circumvent the limitations of the APA by asserting what can only be characterized as a broad programmatic attack against the President as well as the agency Defendants under the Take Care Clause, U.S. Const. art. II, § 3. *See* Compl. ¶¶ 145-148 (Count III); Pls.' Mot. at 37-38.

It should be noted at the outset that the Government is not aware of any case that ever has held that the Take Care Clause can be used as a mechanism to obtain affirmative relief. Plaintiffs cannot prevail on their Take Care Clause claim because the Take Care Clause does not provide a cause of action against any Defendant, and this Court, in any event, has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional

claims. *See Dalton*, 511 U.S. at 473. Moreover, even if the Clause could furnish a basis for affirmative relief, Plaintiffs seek to rely on violations of purported duties that are not found in the statutes regarding operation of Global Media itself, but rather, are based on Plaintiffs' subjective views about how best to implement and administer Voice of America.

Through the Take Care Clause, the Constitution vests broad, discretionary authority to "take Care that the Laws be faithfully executed" by the President. U.S. Const. art. II, § 3. Inevitably, the Laws that the President executes are those enacted by Congress. But no court has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the way the President executes Congress's laws. Rather, as the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall) 475, 499 (1866); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character."). To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *Baker v. Carr*, 369 U.S. 186, 217 (1962) (courts lack jurisdiction over a claim where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department."); *see also Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 577 (1992) (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or

executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi. & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 114 (1948) (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Bd.*, 561 U.S. 477, 492–93 (2010) ("It is [the President's] responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *see also Printz v. United States,* 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws. To the extent Plaintiffs seek to challenge the other Federal Defendants' alleged attempts to undermine the statutes involving Global Media, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs as shown above.

### D.     Plaintiffs Fail to Establish that Defendants Acted *Ultra Vires* (Count IV)

Plaintiffs' *ultra vires* claim lacks merit. Pls.' Mot. at 41; Compl. ¶¶ 149-152. The leading Supreme Court decision on *ultra vires* review is *Leedom v. Kyne*, 358 U.S. 184 (1958). That case arose from an improper certification of a collective-bargaining unit—an interlocutory order excluded from the judicial-review provision of the National Labor Relations Act. *See id.* at 185, 187. Nonetheless, the Supreme Court held that district-court review was available because the order was "made in excess of [the agency's] delegated powers and contrary to a specific

prohibition" in the National Labor Relations Act. *Id*. at 188–89. Time and again, courts have stressed that ultra vires review has "extremely limited scope." *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988); *see Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (*Kyne* does not "authoriz[e] judicial review of any agency action that is alleged to have exceeded the agency's statutory authority"); *Boire v. Greyhound Corp*., 376 U.S. 473, 479–80 (1964) (*Kyne* was "characterized by extraordinary circumstances"). The D.C. Circuit has described a *Kyne* claim as "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

To sufficiently allege an *ultra vires* claim, the plaintiff must aver: "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (cleaned up). The third requirement is especially demanding. "Only error that is patently a misconstruction of the" pertinent statute, "that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *FedEx v. Dep't of Comm*., 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up). In other words, an agency violates a "clear and mandatory" statutory command only when the error is "so extreme that one may view it as jurisdictional or nearly so." *Griffith*, 842 F.2d at 493. Plaintiffs cannot meet that demanding standard.

To begin, there is no dispute that Plaintiffs have possible remedies via the CSRA or for their contract claims. As a consequence, *ultra vires* review is inappropriate—no federal statute has precluded all judicial review of the agency's conduct. *See e.g., FedEx*, 39 F.4th at 764. Thus,

Plaintiffs have "an alternative review" for their claims, rendering them unable to prevail on either the first or second prongs of the *ultra vires* test. *Id*.

Although the availability of a statutory remedy is alone sufficient to defeat Count IV on the first two prongs of the *ultra vires* test, this claim also fails on the third prong, because Defendants has not violated any "clear and mandatory" statutory command. Plaintiffs allege that Voice of America is required to "continue broadcasting and producing objective, truthful news that reaches significant global audiences." Pls.' Mot. at 42. Voice of America had not been precluded from carrying out those directives. The relevant statute provides that Voice of America will "serve as a consistently reliable and authoritative source of news" and that it will be "accurate, objective, and comprehensive." 22 U.S.C. § 6202(c)(1). Likewise, Voice of America will "present the policies of the United States clearly and effectively and will also present responsible discussions and opinion on these policies." *Id*. (c)(3). The "policies" of the United States are set by the President and his administration. The President, pursuant to his authority, has determined that Voice of America – while continuing to operate—will do so at its statutory minimum. Notably, the Executive Order does not prevent Voice of America from fulfilling these statutory principles, but rather has changed the way in which that mission is accomplished. At bottom, Plaintiffs are unhappy with the direction in which Voice of America is heading, but that does not provide them a basis for the alleged Constitutional claims. Article II affords the President wide latitude in directing executive agencies to carry out the policies of the administration.

Accordingly, Plaintiffs' *ultra vires* claim is unlikely to succeed in the merits. *See, e.g.*, *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 366-67 (D.D.C. 2020) (declining to grant relief with respect to the Voice of America's director's *ultra vires* claim because "the CSRA plainly precludes judicial review of statutory claims by covered employees related to their

employment, whether (or not) the allegations amount to a 'personnel action,' or 'prohibited personnel practice' explicitly enumerated in the CSRA or whether the CSRA provides a remedy for such claims").

## II.    Plaintiffs Do Not Face Irreparable Harm Justifying Extraordinary Relief

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury "both certain and great" and "of such imminence that there is a 'clear and present' need for equitable relief in order to prevent irreparable harm." *Id*. (quoting *Wis. Gas Co. v. Fed. Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id*. at 297–98. The mere fact that a complaint alleges a violation of a constitutional right does not automatically demonstrate an irreparable injury. *Ayele v. Dist. of Columbia*, 704 F. Supp. 3d 231, 239 (D.D.C. 2023) ("[T]here is no per se rule that the violation of any constitutional right is inherently irreparable.").

Abramowitz's assertion of irreparable harm is primarily based on an alleged deprivation of his "statutory right to remain the director of [Voice of America] until the CEO removes" him. Pls.' Mot. at 42-45; *see also* Abramowitz Decl. (ECF No. 4-5) ¶ 31. The D.C. Circuit rejected a materially identical argument in *Dellinger*, 2025 WL 887518, at *4, a case challenging the President's decision to remove Hampton Dellinger as Director of the Office of Special Counsel. The D.C. Circuit held that Dellinger had not demonstrated irreparable harm based on his statutory rights to function as the Director, even "[a]ssuming he is correct that his removal is statutorily ultra vires, and assuming that his removal constitutes a cognizable injury." *Id*. at *4. At worst, Dellinger "would remain out of office for a short period of time." *Id*. The same logic applies here. Abramowitz has failed to demonstrate irreparable harm because even if he prevails on the merits,

the "harm" he experiences will be his "short period of time out of office," to the extent the Court would even consider placement on paid, administrative leave a "short period of time out of office." Unlike *Dellinger* and the other cases upon which Abramowitz relies, he has not been terminated or removed from his position. Indeed, he remains on Voice of America's payroll with full benefits. And, as he argues, Defendant Morales purportedly lacks the authority as CEO to remove him absent approval by a majority vote of the International Broadcasting Advisory Board, which currently lacks its members. Pls.' Mot. at 45. In the absence of such actions, which have not occurred, Abramowitz's allegations of harm are even more abstract than those the D.C. Circuit found insufficient in *Dellinger*.

By contrast, granting a preliminary injunction here will cause significant harm to the Government by preventing implementation of the President's directive to "reduce the performance of [Global Media's] statutory functions and associated personnel to the minimum presence and function required by law." Exec. Order No. 14,238, 90 Fed. Reg. 13043 (Mar. 14, 2025). Critically, Plaintiffs do not confront the D.C. Circuit's controlling decision in *Dellinger*, instead sidestepping the issue entirely by relying on an earlier decision by another judge in this district in *Harris v. Bessent*, Civ. A. No. 24-0412 (RC), 2025 WL 521027, at *8 (D.D.C. Feb. 18, 2025), *appeal filed* No. 25-5037 (D.C. Cir. Feb. 20, 2025). But the Court can easily set Plaintiffs' reliance on *Harris* to the side. First, Judge Contreras's decision in *Harris* is not binding on this Court, second, it is being challenged on appeal, and third, it appears to be in direct tension with the Circuit's discussion of irreparable harm in *Dellinger*.

Nor do the remainder of Plaintiffs' alleged harms satisfy the D.C. Circuit's requirement that such harms be both certain and great, as well as beyond remediation. *Chaplaincy*, 454 F.3d at 297. For example, Plaintiffs LaBruto, J. Doe II, contend that termination of their contracts

"disrupts existing media partnerships and silences content" (Compl. ¶ 103 (regarding LaBruto)) and generally diminishes Voice of America's "ability to serve its audience" (*id.* ¶ 114 (Doe II)). Even assuming any such "disruption" in existing media partnerships, there is no allegation of a complete extinction of any such partnership, nor do Plaintiffs allege more generally that Voice of America will never be able to carry out of its mission or serve its audience. Any such "diminishment" cannot be described as irreparable. Rather, Plaintiffs take aim at what is best described as a temporary pause on its activities while Global Media determines how to bring Voice of America into compliance with the President's directive. Such a directive can hardly demonstrate harm that is incapable of being remediated at a future date.

To the extent Plaintiffs rely on their placement on administrative leave to demonstrate irreparable injury, that also fails.[5] Fundamentally, employment decisions, even up to a loss of employment, are only irreparable in "genuinely extraordinary situation[s]." *Sampson v. Murray*, 415 U.S. 61, 92 & n.68 (1974). Abramowitz posits that he has suffered irreparable harm to his reputation. Compl. ¶ 99; Pls.' Mot. at 23, 39. Loss of income or reputation are not such extraordinary situations. *See Sampson* at 89–92; *see also id.* at 92 n.68 (declining "to define in advance of their occurrence" what might constitute extraordinary circumstances but ruling out "insufficiency of savings or difficulties in immediately obtaining other employment . . . however severely they may affect a particular individual"). And this case does not present such a situation;

---

[5]    To the extent that Plaintiffs seek injunctive relief regarding all employees placed on administrative leave (*see* Pls.' Mot. at 51 ¶ (c), requesting an order that Defendants "cancel" the orders to place approximately 1,300 Voice of America employees on administrative leave), they lack standing to bring such claims, as this action has neither been brought or certified as a class action under Rule 23, nor are Plaintiffs bargaining organizations that purportedly could assert organizational or associational standing on behalf of their members. The Government strongly objects to such overbroad relief and, to the extent the Court considers granting any relief, it should be narrowly tailored and applicable solely to the parties in this action. *See infra* § IV.

the employees at issue here have merely been told to stop work on their current assignments, or in some cases will be terminated from their contracts effective March 31, 2025. *See, e.g., Farris v. Rice*, 453 F. Supp. 2d 76, 79–80 (D.D.C. 2006) ("[C]ases are legion holding that loss of employment does not constitute irreparable injury"). Although Plaintiffs contend that the effective shuttering of Voice of America may constitute such an extraordinary circumstance, Pls.' Mot. at 43-44, such a situation is not before the Court. Global Media has placed its employees on administrative leave temporarily to determine how to bring the agency into compliance with the President's directive that its statutory components function at their statutory minimum. And the placement on administrative leave itself cannot present irreparable injury, especially where any incidental harms Plaintiffs' face from this action can be redressed through the CSRA or FSL-MRS. *See Sampson*, 415 U.S. at 92 n.68; *supra* Section I.A.1.

In any event, those reputational harms are clearly connected to "standard employment harms" and, therefore, are insufficient to demonstrate irreparable injury. *Am. Foreign Serv. Ass'n*, 2025 WL 573762, at *5. Moreover, any argument that a collective reputational injury suffices ("Defendants' actions are damaging…[Voice of America] employees' reputations, Pls.' Mot. at 46)) is at odds with decisions that have held that harms to third parties do not satisfy the irreparable harm requirement. *See, e.g., Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021). Voice of America employees generally are not parties to this lawsuit, and it follows that Plaintiffs cannot rely on speculative harms to third parties to establish irreparable harm in this context.

Moreover, Abramowitz's "evidence" of reputational harm is speculative at best. He argues that his reputation has "taken a hit" because of Defendants' "unfounded accusations," as he has been the subject of "online attacks," that he has been accused of "having a relationship with censorship," that he is someone whose "work sucks up taxpayer money," and that he has no place

"running Voice of America." Pls.' Mot. at 48. These assertions "leave room for substantial doubt." *See Arriva Med LLC v. Dep't of Health & Human Servs.*, 239 F. Supp. 3d 266, 283 (D.D.C. 2017). These vague assertions do not tell the Court whether these individuals who purportedly are posting online would not have done so in the absence of Defendants actions. Indeed, Abramowitz is the Director of a broadcasting news organization who likely would find himself the target of online "attacks" regardless of the administration; such a high-profile position always comes at the risk of online trolling. "Any alleged reputational harm . . . is therefore speculative at best." *Mott Thoroughbred Stables, Inc. v. Rodriguez*, 87 F. Supp. 3d 237, 247 (D.D.C. 2015).

Moreover, even assuming some irreparable harm to his reputation, Abramowitz does not establish that equitable relief would cure it. *See Arriva Med.*, 239 F. Supp. 3d at 283 (explaining that movants must demonstrate that "equitable relief would prevent irreparable harm" (cleaned up)). A preliminary injunction would not prevent Defendants or others from discussing their position on Abramowitz's performance as Director generally or on the role of Voice of America as an agency of the Executive Branch. Nor would placing Abramowitz back in a duty status (as opposed to administrative leave) somehow prevent third parties from making comments online. The Court cannot tailor such broad relief that would prevent anonymous parties online from discussing Abramowitz's capabilities in his role. And Abramowitz provides no theory as to why a preliminary injunction would change anyone's mind about the truthfulness of such allegations. Thus, Abramowitz's allegations of reputational harm cannot justify a preliminary injunction.

Moreover, Doe II alleges that with the termination of his or her contract, they will also lose their J-1 visa status, which is tied to their employment as personal services contractors. *See* Compl. ¶¶ 107-109, 112-115; Pls.' Mot. at 49-50; *see also* Doe II Decl. (ECF No. 4-7). In addition to the loss of their immigration benefits, Doe II speculates that they may be forced to "return" to their

home countries, which would in turn "threaten their physical safety," (Compl. ¶ 115). These allegations are far too speculative to meet the D.C. Circuit's "high" standard. Fear of third-party animus is plainly too speculative to give rise to irreparable harm because Plaintiffs provide no evidence of any credible safety risk. *See Winter*, 555 U.S. at 22; *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991). Plaintiffs do not address any of the considerations that go into their J-1 visa status, including that they are typically afforded a thirty-day grace period to depart from the United States after termination of their employment. What may happen during that time is theoretical. But Plaintiffs' brief is conspicuously silent on these issues. And it is well established that economic loss is ordinarily not on its own sufficient to establish irreparable harm. *In re NTE Connecticut, LLC*, 26 F. 4th 980, 990 (D.C. Cir. 2022) (quoting *Wis. Gas*, 758 F.2d at 674). In sum, these allegations rely on a chain of events that is too attenuated and speculative to constitute injury that is both "certain" and "great" and "of such imminence that there is a 'clear and present' need for equitable relief in order to prevent irreparable harm." *Chaplaincy*, 454 F.3d at 297. Plaintiffs are unable to establish that they will suffer irreparable harm in the absence of extraordinary relief from this Court.

## III.    The Equities and Public Interest Weigh Against Any Relief

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. These factors tilt decisively against granting a preliminary injunction here. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), appeal dismissed, No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025). Granting the preliminary injunction that Plaintiffs seek would disrupt Global Media's efforts to comply with Executive Order 14,238's

directive that Global Media's "non-statutory components and functions" be eliminated and that its "performance of [its] statutory functions and associated personnel" be reduced to "the minimum presence and function required by law." Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025). In this context, granting Plaintiffs' requested preliminary relief would disrupt Global Media's oversight and management of this process to ensure that its mandate under the Executive Order is properly fulfilled while effectively maintaining its statutory obligations.

The public has an interest in permitting the President to take decisive action when it comes to setting his policy priorities for Global Media and its broadcasting networks. Entering any sort of preliminary relief would displace and frustrate the President's decision about how to best address those issues. *Heckler*, 470 U.S. at 831-32. As discussed above, Plaintiffs will not suffer any irreparable harm from the denial of their request for preliminary relief, because the potential harms that plaintiffs have identified are fundamentally economic, and therefore inherently not irreparable; speculative; or asserted on behalf of a third party not before this Court.

Accordingly, on these facts, the balance of the equities and the public interest militate against the entry of relief.

## IV.    **Any Relief Should Be Narrowly Tailored**

For all the foregoing reasons, it would be inappropriate for the Court to issue a preliminary injunction in any form. However, should the Court do so, "an injunction must be narrowly tailored to remedy the harm shown." *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985). Here, at most, Plaintiffs have attempted to show that they face irreparable injury from their placement on administrative leave. Pls.' Mot. at 43. But Plaintiffs have not brought this action on behalf of similarly situated individuals, nor is this a case where organizations or associations sued on behalf of their members. To the extent the Court is inclined to award any preliminary relief, it should be appropriately tailored to only the named Plaintiffs in this action. Preventing Global Media from

placing any employee on administrative leave for any reason whatsoever, as Plaintiffs request, undoubtedly would interfere with day-to-day operations of an Executive Branch agency that should have available to it a full array of leave options. And should the Court decide to issue any preliminary relief, the Government respectfully requests that the Court stay its order for a short period to permit the Government to consider whether to seek reconsideration or appellate review.

V.      **The Court Should Order Plaintiffs to Post Bond Pursuant to Rule 65(c)**

        As previously requested, if the Court enters a preliminary injunction the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such temporary order.  Federal Rule of Civil Procedure 65(c) states, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  The requirements of Rule 65(c) to post security are plainly at play.

*       *       *

**CONCLUSION**

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction in

its entirety.

Dated: April 14, 2025                    Respectfully submitted,
Washington, D.C.
                                          EDWARD R. MARTIN, JR., D.C. Bar #481866
                                          United States Attorney


                                          By:  */s/ Brenda González Horowitz*
                                               BRENDA GONZÁLEZ HOROWITZ
                                               D.C. Bar No. 1017243
                                               STEPHANIE R. JOHNSON
                                               Assistant United States Attorneys
                                               601 D Street, NW
                                               Washington, DC 20530
                                               Main: (202) 252-2500

                                          *Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL ABRAMOWITZ, et al.,

        Plaintiffs,

    v.

KARI LAKE,
Senior Advisor to the Acting CEO of U.S.
Agency for Global Media, et al.,

        Defendants.

Civil Action No. 25-0887 (RCL)

## **[PROPOSED] ORDER**

UPON CONSIDERATION of Plaintiffs' motion for a preliminary injunction, Defendants'

opposition, and the entire record herein, it is hereby

ORDERED that Plaintiffs' motion for a preliminary injunction is DENIED.

It is further ORDERED that the parties shall meet and confer and propose a schedule for

further proceedings in this action.

SO ORDERED:


_____                    _____
Date                                       ROYCE C. LAMBERTH
                                           United States District Judge