**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL ABRAMOWITZ *et al.*, <br><br> *Plaintiffs,* <br><br> –v.– <br><br> KARI LAKE *et al.*, <br><br> *Defendants.* | Case No. 25-cv-00887 (RCL) |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

I.     **Director Abramowitz's Claims Belong in This Court.** ...................................... **2**

II.    **The PSC Plaintiffs' Claims Belong in This Court.** ........................................ **8**

III.   **Plaintiffs Have Shown a Likelihood of Success on The Merits.** ..................... **12**

IV.   **Plaintiffs Have Shown Irreparable Harm.** ................................................... **16**

V.    **Plaintiff Abramowitz Has Standing to Seek Injunctive Relief in This Case.** ............... **19**

VI.   **The Court Should Deny Defendants' Request for Bond.** ................................ **20**

VII.  **Plaintiffs' Requested Relief is Appropriate.** ................................................. **21**

**Conclusion** .................................................................................................................... **23**

## TABLE OF AUTHORITIES

**CASES**

*Albrecht v. Comm. on Employee Benefits of the Federal Reserve Benefits Sys.*,
   357 F.3d 62 (D.C. Cir. 2004) ................................................................. 8, 9

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) .............................................................. 3, 4

*American Foreign Service Association v. Trump*,
   No. 1:25-CV-352 (CJN), --- F.Supp.3d ----, 2025 WL 573762 (D.D.C. Feb. 21, 2025) ........... 5

*Ark Initiative v. Tidwell*,
   816 F.3d 119 (D.C. Cir. 2016) ................................................................ 12

*Aviel v. Gor*, No. CV 25-778,
   --- F.Supp.3d ----, 2025 WL 1009035 (D.D.C. Apr. 4, 2025) ........................... 17, 18

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
   598 U.S. 175 (2023) ........................................................................... 7, 8

*Biden v. Feds for Med. Freedom*,
   144 S. Ct. 480 (2023) ........................................................................... 4

*Biden v. Texas*,
   597 U.S. 785 (2022) ............................................................................ 14

*Bosco v. United States*,
   931 F.2d 879 (Fed. Cir. 1991) ................................................................. 3

*Cemex Inc. v. Dep't of the Interior*,
   560 F. Supp. 3d 268 (D.D.C. 2021) ........................................................... 9

*City & County of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ................................................................ 15

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................ 20

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
   38 F.4th 1099 (D.C. Cir. 2022) ............................................................ 9, 10

*Dalton v. Specter*,
   511 U.S 462 (1994) ............................................................................. 14

*Dellinger v. Bessent*,
   No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025) .............................. 16, 17

*Department of Education v. California*,
    145 S. Ct. 966 (2025)..................................................................................................11, 12

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999) ..................................................................................... 20

*Elgin v. Dep't of Treasury*,
    567 U.S. 1 (2012)....................................................................................................... 3, 7

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) ........................................................................................ 4

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010)................................................................................................... 6, 8

*Graham v. Ashcroft*,
    358 F.3d 931 (D.C. Cir. 2004)..................................................................................... 4

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002).................................................................................................... 12

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985).......................................................................................11

*Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*,
    56 F.3d 279 (D.C. Cir. 1995) ......................................................................................11

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ..................................................................................... 9

*Nat. Res. Def. Council, Inc. v. Morton*,
    337 F. Supp. 167 (D.D.C. 1971) ................................................................................ 20

*Nat'l Treasury Emps. Union v. Vought*,
    No. CV 25-0381 (ABJ), --- F.Supp.3d ----, 2025 WL 942772 (D.D.C. Mar. 28, 2025)..... 14, 15

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    No. 25-CV-333, --- F.Supp.3d ----, 2025 WL 573764 (D. Md. Feb. 21, 2025) ........................ 21

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
    502 F. Supp. 3d 492 (D.D.C. 2020) ........................................................................... 20

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ................................................................................... 10

*RFE/RL, Inc. v. Lake*,
    No. 1:25-CV-799-RCL, --- F.Supp.3d ----, 2025 WL 900481 (D.D.C. Mar. 25, 2025) ...... 1, 12

*Sampson v. Murray*,
    415 U.S. 61 (1974) ................................................................................................ 17, 18

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) ...................................................................... 20

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) ............................................................................ 11

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ........................................................................................ 2, 5, 6

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992) ............................................................................ 10

*United States Conference of Catholic Bishops v. United States Department of State*,
    No. 1:25-CV-00465 (TNM), --- F.Supp.3d ----, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ..... 11

*Weaver v. Info. Agency*,
    87 F.3d 1429 (D.C. Cir. 1986) .............................................................................. 4

*Widakuswara v. Lake*,
    No. 25-CV-2390 (JPO), --- F.Supp.3d ----, 2025 WL 945869
    (S.D.N.Y. Mar. 28, 2025) ........................................................................ 12, 13, 21

**REGULATIONS**

Exec. Order No. 14,238, 90 FED. REG. 13043 (Mar. 14, 2025) ................................... 14

This is a case about the closure of a venerable federal agency established by Congress that has provided objective news and critical information on American values, uninterrupted, for 83 years. The executive branch actions shutting down the Voice of America (VOA) are plainly contrary to basic administrative law and constitutional principles because when Congress creates a federal agency only Congress has the power to dismantle it. Thus, Defendants have violated a myriad of laws and constitutional provisions, and even if Defendants' actions did not run headfirst into the law and the Constitution, their actions are the epitome of arbitrary and capricious: not only do they reflect almost no thought, but Defendants have justified their actions on unlawful grounds. As this Court held in a related context, "the leadership of USAGM cannot, with one sentence of reasoning offering virtually no explanation, force [VOA] to shut down—even if the President has told them to do so." *RFE/RL, Inc. v. Lake*, No. 1:25-CV-799-RCL, --- F.Supp.3d ----, 2025 WL 900481, at *5 (D.D.C. Mar. 25, 2025). In their opposition, Defendants do not even address Plaintiffs' arbitrary and capricious claim.

Plaintiff Michael Abramowitz, the Director of Voice of America, seeks an order directing Defendants to unwind their actions dismantling the agency so that it can operate as it did prior to March 15. This would include, but not be limited to, withdrawing orders placing approximately 1,300 employees on administrative leave and terminating the contracts of approximately 450 contract-journalists.

Defendants' attempts to make this a case about federal employment, from which the remainder of their arguments flow, fundamentally misunderstand the nature of this case, and ignore the central issue in the case which is whether Defendants' closure and prospective permanent dismantling of the entire agency is lawful. In the meantime, Plaintiffs have and continue to suffer irreparable and escalating harm. VOA remains shuttered in plain violation of the law, Voice of

America Director Michael Abramowitz continues to be unable to fulfill his rightful statutory role and carry out the responsibilities that Congress placed on him, Plaintiffs Anthony LaBruto and J. Doe 2 continue to face tremendous uncertainty, and, in J. Doe 2's case, likely irreversible immigration-related consequences. Because there is no question that Defendants have acted unlawfully, that this Court has jurisdiction to hear Plaintiffs' claims, and that only immediate injunctive relief can stave off irreparable harm, this Court should grant Plaintiffs' request for a preliminary injunction.

## I.    Director Abramowitz's Claims Belong in This Court.[1]

Defendants repeatedly (and wrongly) proclaim that Plaintiff Abramowitz challenges his placement on administrative leave and is thus making an employment claim. Def. Opp. at 13, ECF No. 24. From that framing of the case—one of Defendants' own design—Defendants then spar with a strawman, contending that issues related to the decision to place an employee on administrative leave are not otherwise exempt from the CSRA framework under the Supreme Court's decision in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 211–13 (1994). With respect to Director Abramowitz, however, this case is emphatically *not* about his placement on administrative leave. Abramowitz would have the exact same claims if Defendants had closed the agency while leaving his employment status unchanged; instead, he seeks to vindicate VOA's functioning as a means to vindicating his right to lead VOA as its lawful current director. Thus, Abramowitz could (and indeed would) bring the *same set of claims* premised on Defendants' *same actions* regardless of whether he was on administrative leave. Because, with respect to Abramowitz, this case is about Defendants' destruction of a federal network that he has the right

---

[1] Defendants concede that any Civil Service Reform Act (CSRA)-related issues do not apply to LaBruto and J. Doe. 2.

and responsibility to lead, the CSRA has no role to play. Abramowitz's placement on administrative leave is irrelevant to the fundamental administrative law and constitutional issues this lawsuit raises.

Defendants' argument therefore fails out of the gate because it fails to recognize that CSRA and FSL-MRS channeling does not apply simply because the federal government has paired its unlawful acts with an adverse employment action. The CSRA requires that "covered employees appealing *covered agency actions . . .* proceed exclusively through the statutory review scheme." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012) (emphasis added). It "govern[s] *employee relations* in the federal sector." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) (emphasis added) (internal citations omitted). Conversely, the CSRA does not strip jurisdiction over claims outside review of the CSRA's covered personnel actions. *See Bosco v. United States*, 931 F.2d 879, 883 (Fed. Cir. 1991) ("The Supreme Court did not rule that the CSRA provided the only means of judicial review of *any* actions affecting federal employees, but rather that it was the only means of review as to the types of adverse personnel action specifically *covered* by the CSRA."). Because Abramowitz is not fundamentally challenging his placement on administrative leave through this lawsuit—he is challenging Defendants' broad, unlawful attempts to shut down VOA—the CSRA does not impact this case.

Defendants' invocation of a slew of cases on the legality of employment-related actions adds nothing to their argument. A cursory review of these cases reveals that they concern *labor unions contesting employment actions* taken by the government or individual employees challenging *adverse employment actions*. *See Elgin*, 567 U.S. at 5–7 (federal employees discharged for failure to register for Selective Service must bring claims challenging their discharges on constitutional grounds to the Merit Systems Protection Board (MSPB)); *Am. Fed'n*

*of Gov't Emps., AFL-CIO*, 929 F.3d at 761 (labor unions challenging executive orders concerned with federal labor relations must go through administrative process); *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) ("[T]he CSRA precludes judicial review of [plaintiff's] claim that the FBI violated its own regulations in taking personnel action against him.").

"[F]ederal courts across the country have time and again held that the CSRA does not strip § 1331 jurisdiction when federal employees challenge something other than a CSRA-covered personnel action. *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 372–73 (5th Cir. 2023) (en banc).[2] That Defendants did indeed take an adverse employment action against Abramowitz does not alter the calculus. *Id.* at 375 ("In a case like this one, where plaintiffs are *not* challenging a CSRA-covered personnel action, § 1331 jurisdiction would not disappear *even if* the Government took CSRA-covered personnel actions against them."). Even if he had not been placed on leave, Abramowitz would have brought this action to vindicate his statutory mandate to lead an agency that has been rendered inoperative by Defendants' actions. Those actions include obstructing VOA's journalistic and broadcasting operations, cancelling critical broadcasting contracts, and terminating the agreements of approximately 500 PSCs who do not fall under the CSRA. Those actions constitute a coordinated effort to undermine the agency's core mission and legal structure. Whereas each case cited by Defendants shows that artful pleading or the bringing of administrative law or constitutional claims cannot turn a case premised on an employment action into something else, the converse is also true.

Defendants claim support from *Weaver v. United States Information Agency*, 87 F.3d 1429 (D.C. Cir. 1986), but that case held that constitutional claims may be adjudicated outside the

---

[2] The Supreme Court later vacated the Fifth Circuit's preliminary-injunction order on mootness grounds. *Biden v. Feds for Med. Freedom*, 144 S. Ct. 480 (2023).

CSRA. In *Weaver*, a VOA employee was admonished for not submitting an article for prepublication review. While the court held that the CSRA had jurisdiction over whether the admonishment was appropriate, it also held that the district court had jurisdiction over the issue of whether prepublication review violated the First Amendment. *Id.* at 1433. Similarly, this Court has jurisdiction over the APA and constitutional claims that Plaintiffs have raised.

A comparison of this case and Judge Nichols's opinion in *American Foreign Service Association v. Trump* is instructive. No. 1:25-CV-352 (CJN), -- F.Supp.3d ----, 2025 WL 573762 (D.D.C. Feb. 21, 2025). In that case, *unions* that represented USAID employees directly challenged the government's placing of their members on administrative leave. *See id.* at *7 ("[P]laintiffs' complaints about the effects on their members of being placed on administrative leave and of being asked to return to the United States on an expedited basis are, at bottom, archetypal complaints about changed employment conditions and their follow-on effects."). Because the plaintiffs challenged the legality of adverse employment actions, the court found that it likely lacked subject matter jurisdiction. *Id.* at *11. But the court reached this result only because the court found that "the agency is still standing, and so the alleged injuries on which plaintiffs rely in seeking injunctive relief flow essentially from their members' existing employment relationships with USAID." *Id.* at *7. This case is different on both counts raised by Judge Nichols. First, VOA *is* dismantled and has gone completely dark. Second, Director Abramowitz's claims do not hinge on an injury flowing from Defendants' placing of him on administrative leave.

Even if the CSRA were relevant here, the *Thunder Basin* factors demonstrate that Abramowitz's claims are of the type that are not channeled through the CSRA. Claims that otherwise would be covered by the CSRA are exempt from channeling and may proceed in federal district court if "'a finding of preclusion could foreclose all meaningful judicial review'; if the suit

is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212–13). Those factors, together, again show that Abramowitz's claims are not the types that the CSRA envisions and that they properly belong in this Court.

*First*, Abramowitz would lack meaningful judicial review absent proceeding in this Court. Simply put, Abramowitz is asking for review and relief that the MSPB cannot deliver: the undoing of Defendants' unlawful shuttering of VOA. While the MSPB could rule on the validity of placing a federal employee on administrative leave, it has no jurisdiction to order the Defendants to reopen the agency, which would require reversing the wholesale placement of VOA employees on administrative leave, the termination of the contracts of 450 journalists (which the government concedes is not within the jurisdiction of the MSPB), and a myriad of other past actions and future actions that the government could take to close VOA which only an injunction from this Court can prevent. Moreover, as the Declaration of Michael Abramowitz in Support of Plaintiffs' Opposition to Defendants' Motion to Stay (Abramowitz Declaration, ECF No. 19-1) demonstrates, time is of the essence since the longer VOA remains dark the harder it will be to reopen.

Defendant Kari Lake's statements that USAGM is unsalvageable have prompted key staff members and journalists to seek employment elsewhere. *See* Abramowitz Declaration ¶ 6. The specialized skills and unique contacts that these employees have will be irretrievably lost. This rapid exodus threatens Director Abramowitz's ability to maintain the institutional knowledge, expertise, and global contacts necessary to fulfill VOA's mission. The longer Director Abramowitz and virtually the entire staff of VOA are on administrative leave, the more difficult it will be to maintain critical relationships even if a preliminary injunction is issued. *See id.* ¶¶ 5–14. Overseas freelance journalists, essential for covering news globally, are compelled to secure other contracts

due to terminated agreements. *Id.* ¶ 7. As a result, Director Abramowitz is losing the capacity to establish or renew these agreements. Without these relationships, Director Abramowitz cannot fulfill his mandate of providing reliable and timely news coverage.

Finally, while the above points demonstrate that Plaintiffs would not be able to obtain meaningful judicial review under any circumstance, the MSPB currently does not have a quorum which will inevitably further delay any administrative relief, even if relief by the MSPB were sufficient.[3]

*Second*, and for many of the same reasons, Abramowitz's claims are collateral to those that are generally brought to the MSPB. That Defendants placed Director Abramowitz on administrative leave in the midst of their unlawful actions does not bring this case within the MSPB's ambit. Again, Abramowitz "object[s] to the [Defendants' actions] generally, not to anything particular about" employment-related issues. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 193 (2023). Abramowitz's administrative law and constitutional claims "have nothing to do with the [employment]-related matters the [MSPB] 'regularly adjudicates'—and nothing to do with those they would adjudicate in assessing the" decision to put Abramowitz on administrative leave. *Id.* (quoting *Elgin*, 567 U.S. at 22). Fundamentally, Abramowitz's claims concern structural, constitutional, and administrative law questions related to executive branch power and the separation of powers. Abramowitz in no way seeks through this lawsuit the type of relief that the MSPB could give him. Accordingly, this is a case that comfortably belongs in federal district court.

---

[3] The MSPB has not had a quorum since President Trump fired one member of the board and the other retired. Any new appointments would have to be confirmed by the Senate.

*Third*, Abramowitz's claims—concerned with broad government actions to dismantle and shutter VOA and the constitutional separation of powers—are outside of the MSPB's expertise. These claims "raise 'standard questions of administrative' and constitutional law, detached from" any issues related to federal employment. *Axon*, 598 U.S. at 194 (quoting *Free Enter. Fund*, 561 U.S. at 491). Indeed, Defendants have not pointed the Court to a case appropriately channeled to the MSPB that at all approximates the extraordinary nature of this case: the lawful director of a federal entity suing to prevent the wholesale destruction of the entity that he lawfully led. And although the MSPB "knows a good deal about" employment grievances, it knows "nothing special about the separation of powers" or broad challenges to government action divorced from individual personnel actions. *Id.* Again, any employment-related issues in this case are entirely incidental to Abramowitz's administrative and constitutional claims.

## II.    The PSC Plaintiffs' Claims Belong in This Court.[4]

While not arguing that Plaintiffs LaBruto and J. Doe 2 could be resolved by the MSPB (as it has no jurisdiction over contractors), Defendants argue that the Tucker Act and Contract Disputes Act deprive this Court of jurisdiction over their claims. As with Abramowitz's claims, however, Defendants' arguments proceed from a mistaken premise to reach a mistaken conclusion. Just as this case is not about any personnel actions related to Abramowitz, not a single claim in this case turns on the terms of Plaintiffs' contracts. Because no "party seeks to challenge the terms of a contract that it has entered with the United States" here, Def. Opp. at 16, the holding in *Albrecht*, upon which Defendants rely, is inapplicable here, and this Court has jurisdiction over the PSC

---

[4] Since Defendants concede that any Tucker Act issues do not apply to Abramowitz, even if Plaintiffs LaBruto and J. Doe 2 were dismissed, Abramowitz's claims would still be adjudicated.

Plaintiffs' claims. *See Albrecht v. Comm. on Employee Benefits of the Federal Reserve Benefits Sys.*, 357 F.3d 62 (D.C. Cir. 2004).

Defendants acknowledge that not every case tangentially involving a contract is "at its essence a contract action" that must go to the Court of Federal Claims. Def. Opp. at 17 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). Beyond invoking that black-letter law, however, all that Defendants do is reference a slew of contract terms that do not matter to the PSC Plaintiffs' claims because their claims are not tied to their contracts. But "contract issues may arise in various types of cases where the action itself is not founded on a contract" and "[e]xclusive jurisdiction in Claims Court under the Tucker Act does not lie merely because a plaintiff hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106–08 (D.C. Cir. 2022) (alterations adopted, internal quotation marks and citations omitted). Rather, under *Megapulse*, a court looks to both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought" to determine whether a case is really a contract action. *Id.* Both factors show that this Court properly retains jurisdiction over the PSC Plaintiffs' claims.

*First*, Plaintiffs' claims are premised on federal statutes—the APA and international broadcasting statutes—and the Constitution, *not* the terms of their contracts with USAGM. "[W]hen claims stem from something more than just a contract, say the Constitution or the APA, then the litigant may bring the claims in 'federal district court even when the claims depend on the existence and terms of a contract with the government.'" *Cemex Inc. v. Dep't of the Interior*, 560 F. Supp. 3d 268, 276 (D.D.C. 2021) (quoting *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,

967 F.2d 598, 610 (D.C. Cir. 1992)[5]). "[U]nder § 702 and the Tucker Act, litigants may bring common-law contract claims only as actions for money damages in the Claims Court, but they may bring statutory and constitutional claims for specific relief in federal district court." *Transohio Sav. Bank*, 967 F.2d at 610. That is true "even when the claims depend on the existence and terms of a contract with the government." *Id.* This binding, black-letter law definitively shows that Plaintiffs' claims belong with this Court, because they are not premised on Plaintiffs' contracts. *Transohio* disposes of Defendants' Tucker Act argument.

Rather than engage with the facts of this case and the law, Defendants point to various provisions in Plaintiffs' contracts but fail entirely to explain how anything in this case founded on federal statutes and the Constitution has to do with the contract terms Defendants have identified. That is because it does not. Indeed, the D.C. Circuit has "explicitly rejected the broad notion that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act because to do so would deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Crowley Gov't Servs.*, 38 F.4th at 1107 (internal quotation marks and citation omitted).

*Second*, Plaintiffs do not seek contract-related relief: they seek, pursuant to the APA and the Constitution, a cessation of Defendants' unlawful actions. Through this action, Plaintiffs seek to halt Defendants' unlawful dismantling of VOA and to return the network to the *status quo ex ante*: a functioning international broadcasting network capable of carrying out its statutory mandate. Defendants' citations to uncontroversial caselaw that reiterates the basic point that actions seeking money damages on a government contract belong in the Court of Claims

---

[5] *Abrogated on other grounds by Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017).

notwithstanding[6], that Plaintiffs' claims may require the government to continue expending money does not transform this case into a contract action. "Even where a monetary claim may be waiting on the sidelines, as long as the plaintiff's complaint only requests non-monetary relief that has considerable value independent of any future potential for monetary relief . . . [courts] respect the plaintiff's choice of remedies and treat the complaint as something more than an artfully drafted effort to circumvent the jurisdiction of the Court of Federal Claims." *Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995) (internal quotation marks and citations omitted).

Finally, *United States Conference of Catholic Bishops v. United States Department of State*, relied upon heavily by Defendants and currently on appeal, does not call for a different outcome. No. 1:25-CV-00465 (TNM), --- F.Supp.3d ----, 2025 WL 763738 (D.D.C. Mar. 11, 2025). There, the "U.S. Conference of Catholic Bishops [sought] an emergency preliminary injunction preventing the Government from pausing or canceling contracts between them." *Id.* at *1. Unlike here, the entire case concerned the government's "withholding [of] the money due under" certain agreements with the plaintiff. *Id.* at *5. Plaintiffs reiterate that they seek, under federal statutes and the Constitution, the cessation of Defendants' unlawful conduct that has resulted in VOA's shuttering. Likewise, *Department of Education v. California*, a decision on a stay fundamentally concerned with the termination of grants, is similarly inapplicable. 145 S. Ct. 966 (2025). Indeed, the Supreme Court simply reiterated the black-letter principle, in line with the cases discussed

---

[6] *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) ("Spectrum seeks an injunction requiring the government to pay monies owed for computer hardware. The right to these payments is created in the first instance by the contract, not by the Debt Collection Act."); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77–78 (D.C. Cir. 1985) (claim premised on termination of government contract belonged in the Court of Claims because "the essential rights at stake . . . are contractual" and "it is possible to conceive of th[e] dispute as entirely contained within the terms of the contract").

above, that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id.* at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

### III.    Plaintiffs Have Shown a Likelihood of Success on The Merits.

At the outset, Plaintiffs note that this Court should follow its own well-reasoned opinion in *RFE/RL* and Judge Oetken's opinion in *Widakuswara*—both of which concerned TROs but with reasoning that applies with equal force now—to find that Plaintiffs are likely to succeed on the merits of their claims. In *RFE/RL*, this Court explained that the plaintiff, a different network under the USAGM umbrella, was likely to succeed on the merits of its APA claim because the same set of Defendants here acted in an arbitrary and capricious manner in cancelling the network's grant. 2025 WL 900481, at *3. This Court found that

> the "explanation" offered by USAGM can scarcely be characterized as an explanation: it amounted to one line in the termination letter stating that "the award no longer effectuates agency priorities." This conclusory statement, unsupported by any facts or reasoning, is not a "satisfactory explanation" and offers no "rational connection between the facts found and the choices made."

*Id.* (quoting *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016)) (citation omitted). As Plaintiffs explained in their opening brief, Defendants "failed to articulate a satisfactory rationale" for any of the actions they took en route to shuttering VOA and attempting to dismantle it. Pls. Mem. at 25, ECF No. 4-2. And when Defendants did attempt to justify their actions, those justifications were unlawful. *Id.* at 25–27. Likewise, Defendants clearly did not think about a whole host of required considerations, such as reliance interests. *Id.* As this Court previously found, that is not sufficient to shut down a network like VOA. *RFE/RL*, 2025 WL 900481, at *3

Similarly, Judge Oetken's TRO opinion in *Widakuswara* adopts many of the arguments made by Plaintiffs here, and also supports a finding that Plaintiffs have shown a likelihood of

success on the merits. *Widakuswara v. Lake*, No. 25-CV-2390 (JPO), --- F.Supp.3d ----, 2025 WL

945869 (S.D.N.Y. Mar. 28, 2025). Judge Oetken convincingly rejected many of the arguments that

Defendants advance in their opposition, finding that:

- Defendants took final agency actions. *Id.* at *4–5.

- Defendants likely acted in an arbitrary and capricious manner. *Id.* at *5 ("Because Defendants failed to provide adequate reasoning behind the sweeping changes to USAGM and seemingly failed to consider any reliance issues in effectively closing the agency, they have likely violated Section 706(2)(A) of the APA.").

- Defendants likely violated the Take Care Clause. *Id.* at *7 ("Withholding congressionally appropriated funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on this constitutional mandate.").

- Defendants likely violated the constitutional separation of powers. *Id.* ("By withholding the funds statutorily appropriated to fully administer USAGM, VOA, and its affiliates, the executive is usurping Congress's power of the purse and its legislative supremacy." (internal citation omitted)).

Those findings hold true today just as they did when Plaintiffs sought emergency injunctive relief

in this Court.

Beyond these threshold points, Plaintiffs briefly respond to a few points raised by

Defendants, but otherwise stand on the arguments raised in their opening brief.

***The APA.*** Plaintiffs have shown a clear likelihood of success on their APA claims. Rather

than even attempting to address Plaintiffs' statutory and arbitrary and capricious claims,

Defendants raise a host of mistaken points that can be dispensed with easily. First, because

Plaintiffs never challenged the President's executive order, but rather Defendants' unlawful

shuttering and dismantling of VOA, Defendants' argument that the Plaintiffs cannot challenge an

action by the President is nothing more than a red herring. In fact, it is Defendants' actions and

statements that are the genesis of this case, including statements that USAGM is not salvageable,

which prove that Defendants have gone well beyond any attempt to discern the "statutory functions

and associated personnel" that are the "minimum presence and function required by law." Pls. Mem. at 5–6 (quoting Exec. Order No. 14,238, 90 FED. REG. 13043, 13043 (Mar. 14, 2025)). This case has nothing to do with the words of an executive order, and everything to do with Defendants' implementing their lawless plan to destroy VOA. Second, Plaintiffs have indeed identified a plethora of final agency actions that allow for APA review. *Id.* at 5–8 (noting, *inter alia*, placing virtually all VOA employees and contractors on administrative leave, seeking to terminate 500 personal service contractors, shutting down of VOA broadcasting, and public statements that these steps form the first in the total dismantling of VOA). Defendants' boilerplate arguments concerning what constitutes a final agency action do not suggest otherwise. *See Biden v. Texas*, 597 U.S. 785, 807 (2022) (holding that an agency's "attempt[] to terminate" the agency's programming, in the course of implementing an executive order, constitutes a "final agency action"); *Nat'l Treasury Emps. Union v. Vought*, No. CV 25-0381 (ABJ), --- F.Supp.3d ----, 2025 WL 942772, at *9–13 (D.D.C. Mar. 28, 2025) (holding that the acting CFPB Director's "decision to close [the] agency" and "stop work" order constitute discrete, final agency action), *appeal filed National Treasury Employees Union, et al. v. Russell Vought, et al.,* 25-5091. That parts of USAGM and the Office of Cuba Broadcasting are still functioning does not matter—VOA is dark and has been since March 15.

**The Constitution.** Likewise, Plaintiffs' constitutional claims are likely to succeed. First, Defendants are wrong that *Dalton v. Specter,* 511 U.S 462 (1994) bars this case. Plaintiffs are not simply contending that the executive branch Defendants in this case violated the Constitution because they have acted "in excess of [their] statutory authority." *Id.* at 471. Unlike *Dalton,* Plaintiffs' claims are against Defendants and not against the President. They raise APA claims related to Defendants' arbitrary and capricious actions and wholesale disregard of the international

broadcasting statutes on the one hand, and basic constitutional claims related to Defendants' dismantling of VOA and shuttering of the network, on the other hand. Those are exactly the types of claims that courts have routinely allowed. *See, e.g.*, *Vought*, 2025 WL 942772, at *8 ("[Plaintiffs'] argument is that [the acting CFPB director's] actions to close the agency on behalf of the President violated both the separation of powers inherent in the Constitution and the statute that created the CPPB and assigned it mandatory duties.").

Second, the remainder of Defendants' arguments related to the separation of powers hinge on a basic recasting of the facts of this case. Defendants argue that Plaintiffs presented no evidence that VOA was shut down and no evidence that appropriated dollars are not being spent. Def. Opp. at 28. But since March 15, VOA has been shut down. It has not produced any journalism, updated its website, or broadcasted over the airwaves since that time. Abramowitz Declaration ¶ 11. And it is clear that Defendants intended to shut it down. A USAGM press release stated that USAGM "is not salvageable," and that "from top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken" Declaration of Michael Abramowitz ¶ 29, Mar. 26, 2025, ECF No. 4-5. And in any event, neither that inaccurate assertion nor the fact that Defendants are paying VOA employees to sit at home but do no work are defenses to the separation-of-powers violation playing out in real time.

Finally, Defendants advance a cramped understanding of the Take Care clause and delink the Executive's affirmative duty from the statutes and constitutional provisions at issue in this case. *See City & County of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) ("Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations. Moreover, the obligation is an affirmative one, meaning that failure to act may be an abdication of the President's constitutional role.").

*Ultra Vires.* As with most of Defendants' arguments, Defendants' response to Plaintiffs' *ultra vires* claim is entirely divorced from the *facts* of this case. Those facts are that Defendants have entirely shuttered VOA and prevented it from carrying out any and all of its statutorily required functions. Defendants' claim that their actions do "not prevent Voice of America from fulfilling these statutory principles, but rather has changed the way in which that mission is accomplished," Def. Opp. at 33, ignores the fact that VOA has gone dark; VOA is not operating at all. And it betrays that Defendants indeed recognize that VOA *must*, *by law*, carry out the functions that Congress required of it. Defendants have violated a "clear and mandatory" statutory command that VOA continue broadcasting consistent with the international broadcasting statutes.

## IV.    Plaintiffs Have Shown Irreparable Harm.

Plaintiffs have also shown irreparable harm for the reasons stated in their opening brief and in their declarations filed in conjunction with this motion and in opposition to Defendants' motion to stay this case. ECF Nos. 4-6, 4-7, 4-8, 19-1. With respect to Director Abramowitz, Defendants misunderstand his irreparable harm and the core distinctions between this case and the D.C. Circuit's discussion in *Dellinger v. Bessent*, No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025). Although the D.C. Circuit did not recognize Dellinger's "statutory right to function in office" as adequate irreparable harm in a non-precedential order, Dellinger *was removed from his office and sought reinstatement*. His agency was still operating. By contrast here, Abramowitz *remains the lawful current director* of VOA, and Congress has specifically laid out a procedure for his removal that buttresses the statutory firewall of VOA and protects it and its journalists' editorial independence. Abramowitz is required to carry out his Congressionally envisioned role and the responsibilities of his office. There should be no question that he has the present right and obligation to run VOA as Congress envisioned and to ensure that VOA meets its mission of, among

other things, broadcasting truthful reporting to wide global audiences. Defendants do not attempt to address this fundamental difference between *Dellinger* and the circumstances presented here which support Abramowitz's irreparable harm argument because they cannot.

That basic difference drives home another point: the intertwined nature of the harm to VOA caused by Defendants' shuttering of the network and the harm to Abramowitz. As Plaintiffs explained in their opening brief, harm to VOA and harm to Abramowitz are mutually reinforcing. *See, e.g.*, Pls. Mem. at 35 ("Defendants' unlawful dismantling of VOA has completely undermined Director Abramowitz's statutory right and responsibility to lead and perform VOA's vital mission: to provide accurate, objective, and comprehensive news to a global audience, especially in countries that suppress freedom of speech."); *id.* ("By placing virtually all staff on administrative leave, initiating the termination of approximately 500 personal services contractors, and completely impeding VOA's required broadcasting activities, defendants have effectively razed VOA to the ground."); *id.* at 38–40 (discussing irreparable injuries as to Abramowitz and VOA that are mutually compounding, including reputational harms); Pls. Opp'n to Defs. Mot. to Stay at 7-8, ECF No. 19 (Defendants' actions "have prompted key staff members and journalists to seek employment elsewhere" and overseas freelance journalists "are compelled to secure other contracts due to terminated agreements." Without his staff, Abramowitz is unable to "fulfill his mandate of providing reliable and timely news coverage."). Where, as here, the injury to Abramowitz is intertwined with the very survival of VOA as a network, this case presents exactly the type of "genuinely extraordinary situation" discussed in *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). "This unique, irremediable harm distinguishes this case from those where the plaintiff only pleads the loss of her own right to function in a role." *Aviel v. Gor*, No. CV 25-778 (LLA), --- F.Supp.3d ----, 2025 WL 1009035, at *11 (D.D.C. Apr. 4, 2025), *appeal filed Sara Aviel v.*

*Sergio Gor*, 25-5105. Because Abramowitz "is the lawful" director of VOA, Defendants' actions impeding his right to lead VOA harms VOA, and Defendants' unlawful dismantling of VOA directly and irreparably harms Abramowitz—his "right to serve in that role is inextricably intertwined with the organization's survival." *Id.*[7]

Plaintiffs LaBruto and J. Doe 2 have likewise demonstrated irreparable harm. Defendants essentially concede that employment decisions *can constitute* irreparable harm when paired with "genuinely extraordinary" circumstances. Def. Opp. at 36. (quoting *Sampson*, 415 U.S. at 92 n.68). And Defendants then go further, by suggesting that the shuttering of VOA could constitute one such extraordinary circumstance. *Id.* at 37. Defendants' only response, however, is that Defendants are not attempting to shut down VOA altogether even though it has not functioned since March 15 and remains dark today. *Id.* Because the dismantling of VOA—the effective destruction of a congressionally created and funded federal entity— is extraordinary, the actions taken against Plaintiffs constitute irreparable harm. Even if Plaintiffs could be returned to their posts down the line, if Defendants have their way there will be nothing left to which to return. If J. Doe 2's contract is terminated, Plaintiff faces the imminent loss of lawful work authorization and the legal right to remain in the United States. Declaration of J. Doe 2 ¶¶ 8–10, ECF No. 4-7. This sudden and unjustified action would deprive Plaintiff of any meaningful opportunity to lawfully stay in the country.

Finally, Defendants have no good answer for the irreparable harm to LaBruto's, J. Doe 2's, and Abramowitz's reputations. As discussed in Plaintiffs' Complaint and opening brief, Defendants

---

[7] For this reason as well as the nature of Plaintiffs' claims, which concern structural constitutional and administrative issues associated with Defendants' unlawful attempted dismantling of a federal entity created and funded by Congress, Plaintiffs' requested relief is appropriate. Narrower relief would not resolve the fundamental harms and issues at the core of this case.

have not only taken actions to dismantle VOA, but they have justified those actions on the ground that VOA (or USAGM) is corrupt, rotten, ineffective, and anti-American. Pls. Mem. at 39–41. Those aspersions irreparably damage VOA's credibility and that of Abramowitz and the other Plaintiffs, who are, by trade, non-partisan, objective professionals. Defendants suggest that nothing can be done with respect to this reputational harm, so there is no way that it can serve as the basis for immediate injunctive relief. But that is incorrect. Relief that would return VOA to its pre-March 15 state, when it reached hundreds of millions of global listeners weekly and enjoyed a stellar reputation as a voice for truth, immediately alleviates this reputational harm. Indeed, simply letting Plaintiffs and VOA carry out the mission—delivering impartial, truthful news to those without access to it—will show that these reputational attacks are unfounded.

## V.     Plaintiff Abramowitz Has Standing to Seek Injunctive Relief in This Case.

Defendants briefly argue that Plaintiff Abramowitz lacks standing to seek injunctive relief regarding all VOA employees placed on administrative leave because this is not a class action and Plaintiffs are not bargaining organizations that purportedly could assert organizational or associational standing on behalf of their members. Def. Opp. at 36 & n.5. This is yet another attempt by Defendants to reframe Plaintiffs' lawsuit.  Plaintiffs did not bring this lawsuit on behalf the 1,300 VOA employees who were placed on administrative leave. Rather, Plaintiffs brought this lawsuit to ask the Court to order Defendants to cease dismantling VOA so that Plaintiff Michael Abramowitz can carry out his statutory responsibilities.

To establish standing, a plaintiff must demonstrate that (1) the plaintiff suffered or likely will suffer an injury that is concrete, particularized and actual or imminent; (2) such injury is fairly traceable to the defendant's action being challenged; and (3) the requested judicial relief likely

will redress the injury. *Clapper v. Amnesty Int'l USA,* 568 U.S. 398. 409 (2013). Director Abramowitz clearly meets all three requirements.

The first two factors can be addressed together because Plaintiffs allege that the harm to Plaintiff Abramowitz has been caused by Defendants. Defendants' actions (such as placing 1,300 VOA employees on administrative leave) have harmed Director Michael Abramowitz by preventing him from carrying out the duties Congress entrusted to him as Director of VOA. Pls. Mem. at 14. These personnel (along with the approximately 500 PSCs whose contracts Defendants would have terminated but for the TRO currently in effect) are essential to VOA's operations and their removal has effectively halted all news production and broadcasting. Through their actions, Defendants have undermined Director Abramowitz's statutory responsibility to lead VOA.

The requested judicial relief would redress the injury that Defendants have caused Plaintiff Abramowitz because it would restore VOA and allow it to continue to meet its statutory obligations. Without such restoration, Plaintiff Abramowitz, even if taken off administrative leave himself, would be unable to meet those statutory obligations.

## VI.    The Court Should Deny Defendants' Request for Bond.

The Court also should reject Defendants' request for Plaintiffs to post an initial bond of $15.4 million. Defs. Opp. at 41 (referencing ECF No. 13 at 37). Rule 65(c) vests district court "broad discretion . . . to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). Bond is not appropriate "where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases); *cf. Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-

20

239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (setting no bond as doing so would "hold Plaintiffs hostage" for the government's withholding of trillions of dollars); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, --- F.Supp.3d ----, 2025 WL 573764, at *29 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review"); *Widakuswara*, 2025 WL 945869, at *11 (S.D.N.Y. Mar. 28, 2025) (denying bond request as requiring plaintiffs to post millions in bonds "would ensure that very few individual could afford to sue the federal government."). No bond should be ordered here, where Plaintiffs sue to enforce federal laws governing Defendants and stop Defendants' violations of their constitutional and statutory rights.

Defendants' own rationale for their staggering bond request—$1.1 million per day—to "maintain the status quo" and cover "payroll costs and total expenditures that Defendants estimate it would not otherwise incur absent the requested immediate relief," ECF No. 13, at 37—underscores the unlawfulness of their conduct. These so-called "costs" are nothing more than the lawful disbursements of appropriations Congress has already allocated to VOA for this fiscal year. Defendants now attempt to transform routine agency expenditures into a claim that they will incur $1.1 million in additional daily expenses absent the injunction, and they are apparently admitting their intent to imminently terminate those employees if this Court declines to enter an injunction. The bond request is not merely excessive—it is revelatory. Defendants' request reinforces the urgent need for judicial intervention to prevent further unlawful harm.

## VII.    Plaintiffs' Requested Relief is Appropriate.

Finally, Defendants argue that if the Court determines that injunctive relief is appropriate it must limit that relief to taking the three Plaintiffs off administrative leave. Defs. Opp. at 40–41.

Once again, Defendants seem to purposely misunderstand Plaintiffs' causes of action and requests for relief. Returning Plaintiff Abramowitz to his post as the head of VOA and allowing two (out of 450) PSC journalists to remain under contract will do absolutely nothing to turn the lights back on at VOA and thus does nothing to address the harms alleged here. Only cancelling the orders to place approximately 1,300 VOA employees on administrative leave, maintaining the contracts with the 500 PSCs, and reversing all of the actions that have been taken to dismantle VOA would redress the injury that Defendants have caused Plaintiffs because it would restore VOA and allow it to continue to meet its statutory obligations.

*      *      *

In their Complaint and Motion for a TRO and PI, Plaintiffs requested that the Court order Defendants to cancel their directives putting approximately 1,300 VOA employees on administrative leave, cancel the termination of personal services contracts with approximately 500 employees, and cease dismantling VOA by restoring its personnel and operating capacities such that the entities may continue their broadcasting activities at the level that existed before the above actions were taken. Since the Complaint and TRO/PI motions were filed on March 26, Plaintiffs have learned with more specificity what Defendants have done to dismantle VOA. For example, Defendants have cancelled numerous contracts essential to VOA's operations, including contracts with overseas stringers, news wire services, transmitting stations, and many vendors. Abramowitz Declaration ¶¶ 6–9.

Accordingly, Plaintiffs request that the Court order the relief previously requested in their motion, with additional specificity requiring Defendants to restore VOA's personnel and operating capacities to the level that existed before the above actions were taken, and that Defendants work with the Director of VOA to restore or replace contracts that have been cancelled since March 15

and make the USAGM human resources department available for employment matters in the manner it was available prior to March 15.

## <u>CONCLUSION</u>

For the above reasons, the Court should grant the Plaintiffs' motion for a preliminary injunction and issue the order described above.

April 16, 2025                                    Respectfully submitted,

<u>*/s/ William B. Schultz*</u>
William B. Schultz (D.C. Bar No. 218990)
Margaret M. Dotzel (D.C. Bar No. 425431)
Brian J. Beaton, Jr. (D.C. Bar No. 90020963)*
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8136
wschultz@zuckerman.com
mdotzel@zuckerman.com
bbeaton@zuckerman.com

*Attorneys for Plaintiffs*
*\*Pro hac vice pending*