UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL ABRAMOWITZ, et al., )
Plaintiffs, )
vs. ) CASE NO. 1:25-cv-00887-RCL
KARI LAKE, et al., )
Defendants. )
______________________________ )
PATSY WIDAKUSWARA, et al., )
Plaintiffs, )
vs. ) CASE NO. 1:25-cv-01015-RCL
KARI LAKE, et al., )
Defendants. )
______________________________ )

TRANSCRIPT OF MOTION HEARING
**BEFORE THE HONORABLE ROYCE C. LAMBERTH, DISTRICT JUDGE**
Thursday - April 17, 2025
11:28 a.m. - 3:07 p.m.
Washington, DC

**FOR THE PLAINTIFFS (1:25-cv-00887):**
Zuckerman Spaeder, LLP
BY: MARGARET M. DOTZEL, WILLIAM BARNETT SCHULTZ and BRIAN BEATON
2100 L Street, NW, Suite 400
Washington, DC 20037

---

**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
333 Constitution Avenue, NW
Washington, DC 20001
Transcript Produced from the Stenographic Record

**FOR THE PLAINTIFFS (1:25-cv-01015):**

Government Accountability Project
BY: DAVID Z. SEIDE
1612 K Street, NW, Suite 1100
Washington, DC 20006

American Federation of State, County and Municipal Employees
BY: GEORGINA C. YEOMANS
1625 L Street, NW
Washington, DC 20036

Emery Celli Brinckerhoff Abady Ward & Maazel
BY: ANDREW CELLI and DEBRA GREENBERGER
One Rockefeller Plaza, 8th Floor
New York, New York 10020

Norman Eisen PLLC
BY: NORMAN LARRY EISEN
2022 Columbia Road, NW, #214
Washington, DC 20009

Democracy Forward Foundation
BY: KRISTIN LEE BATEMAN
P.O. Box 34553
Washington, DC 20043

**FOR THE DEFENDANTS:**

DOJ-USAO
BY: BRENDA A. GONZALEZ HOROWITZ, ABIGAIL STOUT and STEPHANIE R. JOHNSON
601 D Street, NW
Washington, DC 20530

(Call to Order of the Court at 11:28 a.m.)

DEPUTY CLERK: We are on the record in Civil Actions 25-887 and 25-1015, *Michael Abramowitz, et al. versus Kari Lake, et al.* and *Patsy Widakuswara, et al. versus Kari Lake, et al.*

Starting with plaintiffs' counsel, please approach the podium and state your appearance for the record.

MR. CELLI: Good morning. I'm Andrew Celli from Emery Celli. We're here for the plaintiffs in the Widakuswara case.

MR. SCHULTZ: Good morning. Bill Schultz from Zuckerman Spaeder for the plaintiffs in the Abramowitz case.

MS. YEOMANS: Good morning, Your Honor. Georgina Yeomans for plaintiffs in the Widakuswara case.

THE COURT: Good morning.

MR. EISEN: Good morning, Your Honor. Norman Eisen from State Democracy Defenders Fund for the plaintiffs.

THE COURT: Good morning.

MS. GREENBERGER: Debra Greenberger from Emery Celli for the Widakuswara plaintiffs. I'll just note my pro hac motion is pending.

MR. SEIDE: Good morning, Your Honor. David Seide with the Government Accountability Project for the individual plaintiffs.

MS. DOTZEL: Good morning, Your Honor. Margaret Dotzel here for plaintiff Mike Abramowitz.

MR. BEATON: Good morning, Your Honor. Brian Beaton also for the plaintiffs in the Abramowitz case. I'll also note my pro hac is pending. I'm from the Zuckerman Spaeder firm.

THE COURT: Good morning.

MS. BATEMAN: Kristin Bateman for some of the Widakuswara plaintiffs, and my pro hac is also pending.

THE COURT: The defendants?

MS. JOHNSON: Good morning, Your Honor. Stephanie Johnson on behalf of the defendants with the United States Attorney's Office.

MS. HOROWITZ: Good morning, Your Honor. Assistant U.S. Attorney Brenda Gonzalez Horowitz on behalf of defendants.

MS. STOUT: Good morning, Your Honor. Abigail Stout on behalf of the defendants from the Civil Division, Department of Justice.

THE COURT: Now, my understanding of the -- after counsel consulted among themselves were that each of the cases of Abramowitz and Widakuswara, each of the two cases, I had Abramowitz first, but then the other case was filed in New York, each of those plaintiffs would go for 30 minutes each. And then after the lunch break, the defendants' counsel would argue for about an hour and would have a short rebuttal before we concluded this argument today in these two cases.

I don't know if the counsel for plaintiffs have agreed on who would go first. And then at the end of the day, around

3:30 or so, we expect to conclude. And I invited counsel for the other three related cases to begin about 3:30 with a status conference on the other three preliminary injunction hearings that all relate to this subject matter.

But depending on what happens in these two cases, that could affect the other three cases. So I invited their counsel to all be here today, but depending on how the Court ends up ruling in this case, there may not be an impact or there may be on those cases, but I thought they should have the opportunity to be present and they were invited.

Did counsel decide among yourselves who is going to go first?

MR. CELLI: Does the court have a preference? We thought we would ask Your Honor's view.

THE COURT: The New York case seems broader, so I would probably like the New York case to go first.

MR. CELLI: Thank you.

THE COURT: Some of the allegations were certainly broader.

MR. CELLI: Good morning, and may it please the Court. Your Honor, when we filed our original papers in this case back in the third week of March, we described the situation --

THE COURT: Talk a little louder, if you would.

MR. CELLI: We described the situation when we filed our papers originally as a constitutional emergency, and that

emergency continues to this day. In fact, the conditions on the ground have actually worsened, and you will hear a bit about that.

The Voice of America is silenced. It is off the air. There is no news gathering. There is no reporting. No editing. No broadcasting. And the 1,700 employees of Voice of America, USAGM contractors are not doing the work. They are not allowed to do their essential work, while hundreds of millions of people around the world are being deprived of the news and information and opinion that Congress and our country promised them 80 years ago.

The institution itself is withering. VOA and USAGM, the workforce has been stigmatized and sidelined, and the world is receiving exactly the opposite message from what Congress intended. The message it's hearing in the silence is that America does not believe in a free press and that their concerns as foreign individuals are not important to us.

To cover the topics today, Judge, we divided the argument. Georgina Yeomans will handle the issues of irreparable harm, standing, channeling, and the APA claims. And I will handle the issues of the First Amendment. We can take them in whatever Your Honor prefers -- whatever order Your Honor prefers. Left to our own devices, I would yield the podium to Ms. Yeomans.

THE COURT: However you want to do it is fine.

MR. CELLI: Thank you, Judge.

MS. YEOMANS: Good morning, Your Honor. I would like to start by talking about irreparable harm, which, despite the TRO, has only compounded. So as we stand here today, Voice of America has been silent for over a month. That void has left its global audience without the vital source of news and the spread of democratic ideals and free press that Voice of America was statutorily mandated to provide.

As Your Honor can see in the declaration that we filed with our reply papers from Tom Yazdgerdi of the American Foreign Service Association, the silence of Voice of America is also substantially undermining U.S. interests abroad.

The silence of Voice of America is a First Amendment harm to every single plaintiff that contributes to that programming, which itself is irreparable. There are other irreparable harms that have also arisen during the course of the TRO.

As we submitted in our reply brief on Wednesday from John Doe 4, the personal service contractors have been told that their health insurance is scheduled to expire on April 30th. That is an irreparable harm.

The Newsguild-CWA members who work for Radio Free Asia and have been furloughed since March 21st have been told that their health insurance will expire in May. And we submitted several statements from members about their acute health

insurance that they rely on that insurance to treat. That is irreparable harm as well.

Radio Free Asia has announced that it is likely to furlough tomorrow several employees on H-1B visas, who will be required to leave the country when their visas expire, and in some instances return to countries with repressive regimes that do not tolerate free press, including Vietnam and Hong Kong.

The unions in this case are being harmed on a daily basis in the imposition -- excuse me, interfering with their ability to provide core services to their members because of the information gap and the erratic behavior from USAGM. That itself is irreparable harm.

USAGM has proposed to eliminate the entire bargaining unit of radio broadcast technicians at Voice of America, which would wipe out AFSCME Local 1418 entirely. It has also proposed to terminate the vast majority of AFGE members.

There are several plaintiffs in this case who represent the interests of reporters who do not work for Voice of America and they are being irreparably harmed every day by the entity's silence.

Reporters Without Borders has affiliate members who live and report abroad and rely on Voice of America, Radio Free Asia and Radio Free Europe broadcasts to inform their own reporting and to inform their personal safety as they work often in countries that, again, do not tolerate a free press.

They rely on Voice of America reporting to assess their own safety in doing their work, and that has been silent for over a month.

The same is true of the Newsguild-CWA. That represents 100 employees at Radio Free Asia, but it also represents 27,000 journalists in this country who work at entities like *The New York Times*, *The Associated Press*, *The Wall Street Journal*, *The Boston Globe*, who travel abroad and rely on Voice of America, Radio Free Asia, and Radio Free Europe reporting to similarly inform their own reporting and to assess whether it is safe to do their work abroad.

All of this ties into the harm to the free press that the silencing of Voice of America has created. Voice of America is no longer broadcasting the work of Reporters Without Borders, irreparably harming that agency. And every day that is off the air, its audience slips away and the ideals that it is mandated to disseminate lose purchase abroad.

And finally, the government argues that the employment harms that the individual plaintiffs are experiencing in this case and that the employees who are represented by the unions in this case is not irreparable, but indeed these are not standard employment harms, Your Honor.

USAGM is a completely unique agency that provides a service that is replicated nowhere else. These are highly specialized jobs, and these individuals are unlikely to be able

to find comparable work if this agency ceases to exist or is diminished to merely the Office of Cuba Broadcasting, which is a very small portion of USAGM. That is also irreparable harm.

Turning to the merits, the government raises several issues that it contends divests this Court of jurisdiction. They are wrong on all fronts.

I'll start with the Tucker Act and the Contract Disputes Act arguments. If you have any questions, feel free to interrupt me.

This is clearly not a contract action. There are two bases on which the government asserts the Tucker Act controls. The first is the fact we have challenged USAGM's cessation of its statutorily mandated grant making functions.

They rely primarily on a Supreme Court's stay decision on an emergency basis from the *California versus Department of Education* case. That case simply does not control the analysis here.

The grants at issue are based on explicit statutory mandates that could not be more clear. They require USAGM to fund grants to the specific entities that perform these broadcast services abroad. It's notable that the grant agreements with those broadcast entities are not even in the record in this case because they are completely unnecessary to resolving the question of whether USAGM has failed to fulfill its statutory duty to fund those entities under the law.

I'll also point out that the Supreme Court also denied a stay in a case regarding USAID in, I believe, early March that similarly dealt with grant making entities and a suit against the government for its cancellation of those grants in a case called *AIDS Vaccine*. And the dissent there argued that the Tucker Act controlled that case, but the Supreme Court denied a stay.

So the attempt to read tea leaves from the *California* case simply cannot be the basis on which this Court finds it lacks jurisdiction.

Regarding the Contract Disputes Act and whether the contractors are precluded from bringing claims in this court, I will note first that we cited the *Navab-Safavi* case, which is directly on point with this case. It was a case brought by an employee of the predecessor to this agency alleging that they had been retaliated against on a First Amendment basis in the conciliation of their contract. And the Court held that the Tucker Act and the Contract Disputes Act did not preclude that claim. The government doesn't respond to that precedent, and it is precisely on point.

Again, it's not necessary to look at the personal service contracts to decide this case. The question is whether this is a violation of the First Amendment and whether the agency has failed to fulfill its statutory mandates and whether it is acting in contravention of the separation of powers.

The government argues that because the relief sought in this case can be likened to specific performance that divests this Court of jurisdiction, but that contention was explicitly rejected in the *Megapulse* decision and should similarly be rejected here.

THE COURT: What if we set aside -- what is it exactly you want me to enjoin? If we look under APA, Administrative Procedure Act, what is it you want me to enjoin?

MS. YEOMANS: We want to enjoin the unlawful agency action, which was the decision to --

THE COURT: What's the unlawful final agency action?

MS. YEOMANS: It's the decision to dismantle USAGM, and the way that that has played out is in the silence on the broadcast, which is in direction violation of 22 U.S.C. 6202, and in the termination of the majority of the agency staff, which would render it unable to fulfill its statutory duties, and so -- I'll turn to the injunctive relief that we ask for.

We ask for an injunction of any actions to further carry out the retaliation -- First Amendment retaliation that gave rise to the actions in this case, and also the decision that was made on or around March 15th to implement the executive order in a way that precludes --

THE COURT: Because what the announcement was, was we're going to suspend all operations --

MS. YEOMANS: That was the --

THE COURT: -- and grants?

MS. YEOMANS: Yes, that was the announcement. The only change since then has been the resumption of Office of Cuba Broadcasting broadcasts. That is an incredibly small portion of USAGM functions. I think the government accounted for 33 employees to do those functions, and they do not speak to the 22 U.S.C. 6202 required broadcasts, including Voice of America, which is separate from the Office of Cuba Broadcasting.

THE COURT: That March 15th decision then, Judge Oetken said that was arbitrary and capricious under the Administrative Procedure Act, and that -- on a temporary restraining order.

So in terms of a preliminary injunction, which would now be an appealable order if I agree with him, they would have to convince me he's wrong?

MS. YEOMANS: Absolutely. I will note that they don't address arbitrary and capricious argument at all in their papers.

THE COURT: I understand. They think that that's not even a final agency action, that March 15th determination, that they are just going to stop spending any money and suspend all operations of the agency. That's their argument. And they argue that it's just a Tucker Act and all you can do is go to the Court of Claims?

MS. YEOMANS: I think that's right, and I think it's telling that they devote very little attention to the merits of whether or not they are acting unlawfully and focus mostly on whether this Court has jurisdiction.

In terms of whether the March 15th decision was final agency action, it bears all the hallmarks of final agency action in that it affected a complete and immediate cessation of broadcasting.

THE COURT: We know they somewhat modified their position because in Radio Free Europe, they then changed their position after I entered the temporary restraining order. And now they have offered some sort of grant after they terminated, and that remains to be seen what's happening there. I have got another hearing scheduled there.

So that's somewhat different than what they did in the original March 15th timeframe, because they went ahead and paid out money and said they would look at April.

MS. YEOMANS: Sorry, I didn't mean to cut you off.

THE COURT: Go ahead.

MS. YEOMANS: Two responses to that. First, as Your Honor noted, it was after the temporary restraining order was entered in our case, which did compel them to undo the cancellation of those grant agreements, so it remains to be seen what they would have done or would do in absence --

THE COURT: If I hadn't issued the temporary

restraining order?

MS. YEOMANS: Exactly, and it's actually covered by Judge Oetken's temporary restraining order. And that is the basis on which Radio Free Asia paid their March -- sorry, USAGM paid Radio Free Asia for March, but that is a direct result of the Court's intervention.

And the second response is that final agency action doesn't --

THE COURT: It wasn't exactly voluntary, I agree.

MS. YEOMANS: Yes. The second response, and I think importantly, is that final agency action doesn't mean permanent agency action. It means an agency has made a decision and is carrying it out. The fact that it might change its mind in the future does not make it any less final.

I think that's particularly true here where the evidence shows at a minimum that the agency, A, only restarted the grants in response to a court order, but, B, has no intention of resuming Voice of America, which is the fundamental program --

THE COURT: They have never indicated that.

MS. YEOMANS: No, and there is ample evidence that they are not going to. If I may, first, they have proposed to terminate the entire unit of radio broadcast technicians. And there is evidence in the record that without those technicians, you literally cannot broadcast Voice of America channels. So

that is a very strong indication that they do not intend to resume.

The other is that it's been over a month, and there is nothing stopping the agency from bringing its staff back from administrative leave and having them do the actual work that they are required to do under the law. That would be perfectly consistent with the temporary restraining order, and they have taken no steps to do that. So I don't think there is any indication that they are going to change their mind about Voice of America, and, in fact, all evidence points to the contrary.

I would also like to address the argument that this case is channeled to administrative agencies. So I would like to start by taking a step back and looking at what this case is.

This is a case about -- this is a fundamental case about the separation of powers. An agency is acting in direct contravention of congressional will as expressed through several very clear statutory provisions and through very recent congressional appropriations that say line by line what the money must be used for, including naming Voice of America, separately from Office of Cuba Broadcasting, separate from Radio Free Asia, separately from all the grantees, and saying you may not reappropriate this money without notifying Congress, and you may never reappropriate more than five percent of these funds. This is a fundamental question about

the separation of powers. And the idea that Congress wanted something like this to be channeled to an administrative agency it cannot possibly have been Congress's intention that this be a matter for the MSPB to resolve.

Of course part of reconstituting an agency that has been unlawfully dismantled requires having employees in place to do the work. That is an unremarkable proposition and is part of reasonable relief in this case, and I think it's very telling to look at the recent decision from this Court in the *NTEU versus Vought* case regarding the CFPB where the Court ordered the reconstitution of the agency and did not find jurisdictional issues regarding channeling.

That order has been modified somewhat by the DC Circuit on a stay appeal, but it did not dismiss the case because of jurisdictional issues, and the modifications leave in place restrictions on employment actions that the agency can take.

The government relies heavily on the *American Foreign Service Association* case regarding USAID, but in that case, Judge Nichols carved out an explicit escape hatch for if USAID were actually dismantled and said explicitly that the case before him, that had not yet happened, there had not been the same level of finality that we have here. This is that escape hatch. This is when this becomes relevant.

We also have the *Turner* case, which says that when

there is a fundamental upending about the assumptions of what it is to do this work, it is not a matter for agency adjudication. And this, as we said in our brief, *Turner* to the max, because it's not only a fundamental upending, it is an ending of what it means to do this work, at least as it relates to Voice of America and the grantees.

And then I would also like to point out that the government does not respond to an argument that we made in our opposition to their motion to dissolve the restraining order on channeling. So *Thunder Basin* is a doctrine about gleaning implications from congressional intent from a statutory structure. All of the Supreme Court cases that find that something is channeled to agency action are based on gleaning Congress's intent from the Civil Service Reform Act or similar statutes.

Part of that statute is that the MSPB and the OSC are headed by individuals who are appointed and confirmed by the Senate and who can be removed only for cause. The president has removed the heads of those agencies without cause, as the government has admitted in those litigations. And regardless of whether or not it's constitutional or unconstitutional -- and *Humphrey's Executor* is still good law -- it still undermines the statutory structure that Congress passed with the assumption that these claims would be adjudicated by independent decision-makers. We don't have that anymore, and

so any inference that we could have drawn from the comprehensive statutory scheme of the CSRA has been destroyed and is no longer valid, even if it could plausibly apply to a case where we're fighting for the existence of a statutorily required agency, which I don't think it can.

I can address some of the claims on the merits, if Your Honor would like to hear that, or if you have any more questions about channeling, I'm happy to answer them as well.

THE COURT: I don't think it's necessary.

MS. YEOMANS: Okay. In terms of our ultra vires case, we say this in our brief, but I would like to reiterate that this is a classic sort of *Youngstown* situation where the executive is working in direct contravention of congressional will, and the only way they can do so lawfully is if they have a constitutional right to do so. The government doesn't even argue that they have a constitutional right to not perform their statutory functions in this case.

The same is true of our mandamus case. This is very much like the *In Re Aiken County* case that then Judge Kavanaugh decided and said the stakes are incredibly high when an executive agency flat out refuses to perform its statutory functions.

I also discussed why this is final agency action. And I already mentioned that the government didn't respond to Judge Oetken's ruling that this was arbitrary and capricious action.

The contrary to law argument under the APA is incredibly strong. If you look at the statutory provisions, they are not ambiguous, but even if they were, the agency still has to explain why it took such a drastic change in policy. It has to provide a reasoned basis. It has to show that it considered important reliance and trust. None of that has happened here.

And then finally, on standing, the government doesn't contest that the Newsguild has standing. They also don't contest that the individual plaintiffs have standing. And because the individual plaintiffs are in the same position as members represented by the unions, the unions have associational standing on that basis. And we detailed in our brief why there is ample standing for every plaintiff in this case.

Finally, briefly on the balance of equities. As we said in our brief, there is a strong public interest in requiring the executive agencies follow the law, and as is demonstrated in the declaration that we filed on Wednesday from the president of the American Foreign Service Association, the silence of Voice of America around the world is undermining the United States' interests abroad.

That is the view of the Department of State. That's the government's view. That declaration details State Department cables saying this is undermining American interests

abroad. So the balance of equities could not be clearer in this case.

THE COURT: Well, one problem in the Court trying to balance that is the president says the opposite. How does a Court resolve that kind of an issue?

MS. YEOMANS: Well, Your Honor, the president can say the opposite, but it still stands that we have a very strong showing on the merits that the executive agency exercising authority of the executive is not following the law, and the case law could not be clearer that it is in the public interest to make sure that executive agencies follow the law.

THE COURT: For a Court to evaluate that is a difficult position for a Court to be in, isn't it?

MS. YEOMANS: To evaluate which part in particular?

THE COURT: That issue of what's in the public interest in terms of whether the -- how the journalism should portray America.

MS. YEOMANS: And that's not what we're asking here. That's not what we have to show. What we have to show, and what is very clear, is that Congress wanted this broadcast to happen. Over 80 years that's been the case, and it's not happening. And so it's in the public interest that it happen.

The manner it happens in is not sort of what we're here about. We're here about the fact that it's not happening at all. I point to the State Department cables just to say

that it is the government's own estimation that being silent, right, regardless of what would fill that void, but being silent --

THE COURT: Once the courts start down that road, it's a slippery First Amendment road, isn't it?

MS. YEOMANS: To superintend the substance of the cables?

THE COURT: Yes. Judge Oetken didn't want to reach it, did he?

MS. YEOMANS: I'll let my colleague talk about the First Amendment, because that is not my bailiwick. I think the larger point is there very obviously has to be programming and there isn't.

THE COURT: You can't just stick your head in the ground, I understand, tempting though it is.

MS. YEOMANS: I agree. And each day that there is not, it's very complicated. I'm learning a lot about radio broadcasts, but cables that become empty get snatched up by other countries and then they start broadcasting on them. So the audience and message that we have been sending -- Voice of America reaches over 300 million people every week -- that audience is hearing other voices now that are not representing the values that USAGM is supposed to disseminate across the world.

I will now turn it over to Mr. Celli to address the

First Amendment issues.

THE COURT: Thank you.

Okay. Tell me how to resist my instincts.

MR. CELLI: There is a lot packed into that, Your Honor.

THE COURT: I know.

MR. CELLI: There has been substantial briefing on this, to put it mildly. I would like to focus on really three things this morning.

The first is the factual record, and critical respects in which what the plaintiffs have presented as the facts are now the undisputed facts in the case. The second thing I want to talk about is the defendants' misconstruction of the law of viewpoint discrimination. I think they just get it wrong.

This is an extraordinary case. We have never seen in recent American history a federal government attempt to completely close a media outlet. Even Michael Pack didn't try to do that in the *Turner* case. There is some explanation that's required there.

And then the third issue I want to talk about is the import of Section 6202. This is the statute that they rely on and that they basically characterize as giving the president plenary authority to dictate what Voice of America and these outlets say about the United States. We think that's just a wrong interpretation of statute, but also the First Amendment

is violated by it.

So there are a number of extraordinary things about this case. As I said, perhaps the most extraordinary is that the defendants have now acknowledged that they have animus towards Voice of America and that their motive in closing it was a censorious motive. They acknowledge that by not addressing any of the factual issues that we present in the case.

They don't address "Voice of a Radical America" statement by the president. They don't address any of the comments that Ms. Lake has made about Voice of America. And this is a departure. We thought that they would be talking about saving money and waste, fraud and abuse and expensive leases, but they say no, we're just pausing/closing the institution.

What they don't really address is the why. They don't tell us in their papers why they are closing it, and that's what our factual presentation proves. What it proves is --

THE COURT: The only possible thing they have said is the viewpoint. That's all they have offered, all the president has offered.

MR. CELLI: Precisely, Your Honor. So that is an established fact in the case. I would urge Your Honor to note that in the decision, however Your Honor may decide. They are standing firm on the statement of the president and Ms. Lake's

comments about Voice of America.

THE COURT: And on that statement alone, you would say that's a First Amendment violation?

MR. CELLI: Absolutely. That is the definition of viewpoint discrimination.

There is another thing about the factual record I want to quickly mention because it ties into the 6202 issue. 6202 is the part that says a lot of things. They claim that it gives them plenary authority to dictate the output, but let's be clear. They have never argued -- and I'll be interested to see what they say this morning. They have never argued that Voice of America violated Section 6202.

They have never said that Voice of America did not clearly present the perspective of the United States government, its policies. They never said that it was somehow inconsistent in its presentation with the foreign policy of the United States. They have never said that Voice of America is somehow putting out Chinese propaganda or the view of Russia on any issue.

Their challenges, what they have said is partisan, they have a partisan objection to some of the things that have been broadcast on Voice of America. They say it's not -- it's anti-Trump, that it's not tough enough on Joe Biden, that there is a cultural issue about transgender rights. These have nothing to do with the foreign policy broadly defined under

6202, so I think it's important factually to just establish that there is no allegation of a violation of 6202.

The second point I would like to make has to do with the law on viewpoint discrimination. And basically what they are saying here is that it can't be viewpoint discrimination because they didn't go through and pick out individual articles or stories and cross them out and say you can't broadcast that. That's their view of what viewpoint discrimination means.

Of course, what they have done is they have thrown a padlock on the entire building and kicked out the entire staff, so it is the definition of a prior restraint. They are restraining the entire media operation. That's what they are doing. And the Supreme Court in the *Reed* case and also in the *Turner Broadcasting* case is very clear, if you have animus and you have even a facially neutral action, you can argue that it's facially neutral or close the agency, maybe, I don't know, but those two things together constitute viewpoint discrimination under the law.

Of course, in this case, we have both animus and we have specific story lines and issues that they have identified as problematic from their point of view. They don't like so-called anti-Trump reporting, whatever that means. They don't like reporting about white privilege, about transgender rights. They don't like how the outlet has described Hamas. These are specific things. You can pick your poison if you

will. It's either neutral with animus or it's specific as to certain story lines.

The line I wanted to use was they could use a hammer -- a scalpel or sledgehammer; either way, it's viewpoint discrimination. Had to get that out.

Third, I want to spend a few minutes on Section 6202, because really the defendants distort the meaning of that statute. They claim that 6202 gives the president plenary authority to dictate the content of what is broadcast on VOA, and specifically that VOA is in service of the president's specific foreign policy goals, and that is not what the statute says at all.

It actually has --

THE COURT: It can't be what Congress intended.

MR. CELLI: Of course not. Congress intended the opposite. Congress intended the Voice of America to be a manifestation of freedom of the press, paid for by the government and broadcast to the world. That was the idea, and that means it has to be independent. That's number one.

And if you look at 6202, there are several provisions --

THE COURT: Congress would have never intended otherwise as a body.

MR. CELLI: Exactly. In fact, Congress went even further, not just in the broadcast standards, they included the

statutory firewall, said the Secretary of State and the CEO cannot go and tinker with the content. It has to be independent.

Now, it also can't be the *Daily Worker* or the *People's Daily*. It can't be a mouthpiece of a foreign government. That's obvious and that's clear. As I said before, no one is actually suggesting that that's what VOA is, not even President Trump or Ms. Lake.

So plainly, under the law, the right frame of analyzing this case -- it is a rather unique case -- is not *Garcetti*. *Garcetti* is a case that's about an individual government employee who is speaking the government message, whether it's a lawyer in a courtroom or somebody else whose job it is to speak the government's words.

That is not what Voice of America is doing. Voice of America was set up to be an independent voice. It had to be broadly consistent with the foreign policy of the United States. It couldn't be the *Workers Daily*, but it was to be independent.

So the right frame is the *Pickering* balancing test, which is exactly what Judge Howell did in the *Turner* case. And if one looks at *Pickering* balancing, one has to consider both of the two guardrails that I mentioned; that it has to be consistent with foreign -- general foreign policy goals, the broad foreign policy goals of the United States and explain

them in a clear way, but it also has to be independent, it has to be professional, is the word it uses. When you put those things into the balance, and on the other side you have the very weighty interests of the reporters and journalists who we represent, and the support staff who make it all possible, virtually all the weight is in favor of finding a violation here, because the only thing on the other side is this concept of being generally consistent with foreign policy, which Voice of America has been historically for 80 years.

That is its congressional purpose and that has been its history. Unless there are any other questions, Your Honor, I'll leave it at that.

THE COURT: That's very helpful. Thank you.

MR. CELLI: Thank you.

THE COURT: Mr. Schultz, you and I go back a long ways, don't we?

MR. SCHULTZ: We sure do.

THE COURT: Nice to have you here.

MR. SCHULTZ: It's nice to be here, Your Honor.

I'm representing three plaintiffs who all work for Voice of America, including Michael Abramowitz, who is the director of Voice of America. And as I think you know, Voice of America has operated for something like 83 years. It's got about a thousand journalists. It's broadcast in 49 languages to more than 360 million people.

But this I found really interesting: Until March 15th, it had never closed, even during government shutdowns, it was deemed an essential government function. And so every day for 83 years it broadcasts, and that was until March 15th, when virtually all of its employees received notices that they were being placed on administrative leave.

Now, it's worth looking at those notices because they are very telling. There is really only one substantive statement in those notices and it says this action is not being done for any disciplinary purpose.

But there is nothing in the notice about why the action is being done. There is no explanation, no rationale, and the only rationale really comes from a two-and-a-half-page press release issued the same day. And the press release declares that this agency, it's USAGM, but Voice of America is the biggest part of it, is not salvageable. Those are really critical words, because essentially the leadership of USAGM is making a decision to close the agency.

The press release contains allegations about national security violations, self-dealing, overspending. It says, "From top to bottom, the agency is a giant rot and burden on the American taxpayer," but there is not a shred of evidence to support any of that. And this is all obviously very important to the arbitrary and capricious claim.

And then one day later, on March 16, 450 contract

journalists were notified that on March 31st their contracts would be terminated. That has been halted, at least for a period of time by the temporary restraining order. But that obviously puts those employees in jeopardy, particularly the ones with J-1 visas, which would expire 30 days later.

Now, let me turn to the merits of the case briefly. Our first point is the closure was illegal, that the executive branch does not have the authority to close the Voice of America. And this is because the Voice of America was established by Congress. Its charter was codified in the Foreign Relations Authorization Act of 1977.

And critically, it was funded -- it's been funded by congressional appropriations, most recently on the continuing resolution signed on March 14th. And that continuing resolution has a table that's printed in the federal register, and the table lists Voice of America $260 million. So this decision goes both against the underlying statutes and against the congressional appropriations.

And so our position, and I think --

THE COURT: Signed by the president?

MR. SCHULTZ: Signed by the president.

THE COURT: Into law.

MR. SCHULTZ: Into law, the day before, the day before all this happened. And so our position, and I think it's a simple position, is that Congress created the agency, it funded

the agency. Only Congress can abolish the agency. Only Congress can decide not to give it any funds.

And so there you have got, I think, a clear violation of the Administrative Procedure Act. And these decisions -- there was an executive order the president issued, but these decisions were carried out by agency officials, the classic kind of decisions, as you know well, that are reviewable under the Administrative Procedure Act.

Now, the second aspect to this is that these actions are arbitrary and capricious. Frankly, I think it's kind of a simple argument. The press release says this is unsalvageable, but there is no support, no explanation in either the notices or the press release or anywhere else to explain the basis of this decision, nothing for the Court to review.

I did a word search of the government's brief, the words "arbitrary" and "capricious" don't appear. The government never responds to this argument. What follows from that are a violation of separation of powers. It's the same point. Congress established the agency, it funded the agency. The president does not unilaterally have the ability to abolish it and neither does one of his agencies.

Similarly, the arguments about the take care clause, ultra vires and so on all follow. They really all follow from the same facts. The only argument the defendants really make in response to all of this is that there is no evidence that

the Voice of America has been shut down, but that is contrary to what they are saying and doing. And as my friends in the related case have explained, this can only go on so long before the agency really is destroyed. And I'll spend a minute on that later.

Now, I would like to turn to the issue of channeling. So the government argues that this case doesn't belong in this court, it really needs to be before the Merit Systems Protection Board. And they base that on the fact that they place these employees on administrative leave and they say only that administrative agency has jurisdiction.

And the thing I want to really explain is that this depends on a complete mischaracterization of our case. Our case is not about Mr. Abramowitz being placed on administrative leave. Our case is about the agency being closed. I mean, basically, he was given the job through a somewhat elaborate process of being named as director of this agency. It's a position that's actually protected by Congress, but in any event he still has that position. He's just being told that nobody in the agency can do any work, including him.

And I think the way to really make this point is imagine if they had put everybody on administrative leave except Mr. Abramowitz. He still had his job, he just didn't have an agency to direct. We would have exactly the same case, and there would be no argument that this case could go to the

Merit Systems Protection Board, because we would have his job, he just wouldn't have an agency to run. And that's what our case is about. It's not about everybody being put on administrative leave, except that's a device for closing the agency and taking away his ability to run the agency, which is really the system that Congress set up.

The leading Supreme Court decision is the *Thunder Basin* case. And the defendants, they really argue that, look, any personnel case, if it has that aspect to it, it goes to the administrative agency, it goes to the Merit Systems Protection Board, but *Thunder Basin* makes it clear that that's not true.

It basically says it depends on the intent of Congress, and it sets up a three-part test to decide what that intent is. And I think it's worth my just very briefly going through the three factors that Congress mentions.

The first is could Abramowitz have meaningful judicial relief? Could he get meaningful judicial relief absent a proceeding in this court? I think, based on what I just said, the answer is clearly no, because the relief he's requested is that the agency be opened up. The Merit Systems Protection Board can't deliver that, and, in fact, in the circumstances of this case, if he doesn't get preliminary relief and relief fairly quickly, the damage will be done and will never be undone.

They can take him off administrative leave, but they

don't have the ability the way the Court does by filing a violation of the Administrative Procedure Act or the Constitution to order -- to essentially void what the agency has done and order that it be reopened.

Again, the defendants' answer, I think, is that they haven't closed down the agency, but they have. The agency is dark; in their own words, it's unsalvageable.

The other two factors I can go through very quickly. The second factor is, is the personnel claim collateral to the basic claims in the case, and I think it clearly is. The basic claims here are APA and the Constitution. And the fact that he's on administrative leave, as I explained, is really kind of irrelevant, because, even if he weren't, it would be the same case.

And the final factor is are these claims outside the expertise of the administrative agency. And, again, I think they clearly are. I mean, the Merit Systems Protection Board expertise is about personnel claims. It's not about the Constitution or about the Administrative Procedure Act.

There are half a dozen cases that we cite in our brief which are sort of a mixture of statutory or constitutional claims and personnel claims, all of which the courts decided should be decided in the federal court.

There is one case I think worth mentioning. It's the case called *Weaver versus USIA*. It's a DC Circuit case, and it

involved the constitutionality of a prepublication review requirement. And so the employee was -- there was a policy that said if you want to publish something, you have got to let us review it, and the agency said to the employee you didn't do that and so you're going to be admonished.

And what the Court said when it looked at this is it said the issue of prepublication review is an issue for the Court to decide. The issue of admonishment is an issue for the Merit Systems Protection Board to decide. So here, again, I would say the Administrative Procedure Act constitutional issues are plainly issues for the Court to decide.

The government relies very heavily on a 2019 case, *AFGE versus Trump*, and that was where President Trump in his prior term issued an order that really restricted what federal employee labor unions could negotiate over. The DC Circuit I think appropriately said this is an employment issue, it's about what the unions can negotiate over, and so that goes to the administrative agency, but I would stress that's very different from what we have here.

A word about the Tucker Act. I think this is actually pretty straightforward. First of all, this does not apply to Mr. Abramowitz. The government is not arguing that he has a Tucker Act claim, because it doesn't involve his contract. So even if you ruled in favor of the government on this, it wouldn't really affect the case.

In any event, the two contract employees here are not really arguing about what their contract looks like. They are making the same arguments that the defendants didn't have the authority to close the agency down. And I think a particularly relevant case, it's again the DC Circuit, *TransOhio Savings Bank*, which involved the minimum capital requirements of certain banks, but in that case, the Court said --

THE COURT: I relied on that in the TRO I issued in the Radio Free Europe too.

MR. SCHULTZ: Then you know it well. I won't read the quote, but basically the DC Circuit said, look, if there are two kinds of claims here, if one is contract and one is other, the district court decides the other, the APA or the Constitution. I think that kind of decides it.

On irreparable injury, just focusing on Voice of America, it really derives from the fact that the agency is closed. And this is what makes the preliminary injunction so important, the longer this goes on, the harder it will be to really ever run the agency the way Congress intended when it set up the statute and when it gave its appropriation so very recently.

It will be hard to maintain the contracts of overseas journalists. Since we filed the case, wire service contracts have been canceled, transmitting stations have been canceled, vendors have been canceled, and, of course, the audience is

going elsewhere. I just can't stress enough that all of this makes really every day that the agency is closed costly and hard to recover.

The other irreparable harm we rely on, because it often is, has to do with the reputation of the plaintiffs. I have repeated what was said in the press release and what's being said about how they are running the agency, and that can only be restored by preliminary relief.

So let me just close by saying the relief that we requested is essentially to end the administrative leave, end the termination of the contracts of the personal service employees, and, basically, to restore the Voice of America to the condition it was prior to March 15th. This includes -- and the very end of our reply brief, we put a little more detail in based on a more recent affidavit from Mr. Abramowitz -- reinstating the contracts with overseas stringers, wire services, transmitting stations, and vendors.

The only other thing I would say, Judge Lamberth, is if you do decide to enter a preliminary injunction, I would request that you consider entering it in both cases, because --

THE COURT: That's what I was going to ask you. Is there different relief in your case from the other case or would you -- what would you say?

MR. SCHULTZ: Our relief is only about the Voice of America, right. I think the relief they are seeking is

broader.

THE COURT: Because they have got to cover grants.

MR. SCHULTZ: I think both cases want you to order them to send everybody back to work, to eliminate the termination of these contracts, but our relief, we think, and this is at the end of our reply brief we kind of spelled it out a little more, involves reinstating the contracts of the Voice of America overseas stringers, wire services, transmitting stations and vendors.

And the thing I wanted to mention, it's critical if you decide to do this that you enter the preliminary injunction in both cases, because that will affect what happens in the Court of Appeals, how the Court of Appeals looks at it.

THE COURT: Let me see if I have any other questions before you sit down.

In your proposed PI order then, you would have me cancel putting the employees on administrative leave, cancel the termination of personal services contracts, cease dismantling Voice of America, restore the operating capacities. That's basically it.

MR. SCHULTZ: That's it. The only thing I would add is on the cease dismantling, and it's on page 22 of the reply brief, we would add, and this was found out since we filed our motion, but it's documented in the second affidavit of Mr. Abramowitz, so we would add reinstating contracts of

overseas stringers, wire services, transmitting stations, and vendors. I can say it more slowly. Reinstating contracts with overseas stringers, wire services, transmitting stations, and vendors. It's at the very end of our reply brief. And that spells out --

THE COURT: In the reply brief.

MR. SCHULTZ: Yeah. That spells out what we had in the complaint, but it's based on new information.

THE COURT: Thank you, Mr. Schultz.

I think we'll take our lunch break now and we'll come back at 1:45 p.m. Let me talk to the clerk for a second first.

MS. YEOMANS: Did you have any questions about the scope of the relief we're asking for?

THE COURT: Go ahead, and let's do that before we break.

MS. YEOMANS: I think it's right that ours is a little bit broader because we do address the grants. The relief we ask is a bit broader because we are also affected by the cancellation of the grants.

I think that the particular wire issues that Mr. Schultz was addressing are encompassed within paragraph B of our requested relief, which includes taking steps that would -- precluding the government from taking steps that would cause USAGM or its outlet to be unable to effectively disseminate the news.

We also have, in addition to bringing back the staff as is necessary to comply with the statutory mandates, precluding the government from taking any action in retaliation for First Amendment activity.

THE COURT: All right. Okay.

MS. YEOMANS: Thank you.

THE COURT: Give me just a moment to consult.

(Pause)

THE COURT: Let's just take an hour and we'll come back at 1:30, if that's okay with everybody.

Court will be in recess for one hour.

(Recessed from 12:29 p.m. to 1:33 p.m.)

THE COURT: All right. The government may proceed.

MS. HOROWITZ: Good afternoon, Your Honor. This is Assistant U.S. Attorney Brenda Gonzalez Horowitz on behalf of the government.

Just to give the Court a little bid of a roadmap, I'm intending on addressing plaintiffs' arguments with respect to irreparable harm. I'll then talk about the First Amendment and then go into our channeling arguments. My colleague, Ms. Stout, will then talk about the motion to dissolve and the grantees issue. And then my colleague, Ms. Johnson, will address the remainder of our arguments, which relate to standing, the constitutional issues, and then the remaining two factors for preliminary injunction.

THE COURT: All right.

MS. HOROWITZ: So I would like to start with irreparable harm. So as the Court is well aware, this is a standard that is high. It is one that requires plaintiffs to demonstrate that injury is both certain and great, and that it is of such imminence that there is a clear and present need for equitable relief. It's something that must be beyond remediation.

And I think, as we heard from my friends on the other side this morning, a lot of the harms that they say they are suffering or will suffer are either, one, far too speculative because there is no indication that they have happened, will happen, and, two, they are not harms that are beyond remediation.

So, for example, Mr. Abramowitz poses that he is suffering a loss to his reputation from his inability to serve as the director of Voice of America, but that harm is far too speculative, and even if the Court credited that harm, and what he relies upon to support that, is the notion that he has been attacked online by third parties because of certain comments that agency leadership may have made.

The preliminary injunction is not going to address that harm. Having the Court enter an injunction requiring the agency to bring back its employees, that's not going to stop third parties online from talking about Mr. Abramowitz, whether

he is a sympathizer, whether he has engaged in a radical agenda or not, so entering that type of relief is not going to remediate that harm.

As to his claim that he has a statutory entitlement to remain as the director of Voice of America, I think the DC Circuit was pretty clear when it issued its decision in *Dellinger* that it found -- and in that case, obviously, Mr. Dellinger had been removed, which is not the case here. In fact, as Mr. Abramowitz concedes, he remains on Voice of America payroll. He is still receiving his full pay and benefits.

And so really the crux of his claim is the fact that he's been placed on administrative leave. And I'll talk about that a little bit later when I get to the channeling arguments.

But really, *Dellinger* supports the notion, because it did there, that even an at-worst brief time away from the position or away from the office was not sufficient to establish irreparable harm. If it wasn't sufficient in *Dellinger*, it certainly can't be here, given the fact that Mr. Abramowitz remains in his position.

There are a lot of other sort and vague speculative allegations, harms to third parties, loss of employment with respect to the contractor plaintiffs in both actions with respect to the John Does. They are all personal services contractors, and, again, I'll talk about that when I get to the

Tucker Act arguments, but really the crux of their claims, as I understand them, is that they are on these J-1 visas and that the government has indicated its intent to terminate their contracts, which will in turn potentially, and I say potentially because we don't know what might happen by third-party agencies, they might lose their visa.

As we noted in our papers, typically individuals who are on a J-1 visa are afforded a 30-day sort of grace period to determine whether the visa will be extended, whether they can find another employment to tie to their visa, and so the fact that they have been notified that their contracts will expire does not necessarily mean that they will lose their visa, and that if they lose their visa, they will never be able to return the United States.

Also important to note, and I believe my colleagues in the Southern District of New York noted this in their TRO opposition, is that, as a general matter, J-1 visas carry a two-year term requirement that requires the holder --

THE COURT: But the kind of blunderbuss decision the president made here takes no account of any of that.

MS. HOROWITZ: I'm sorry.

THE COURT: The kind of blunderbuss decision the president made here takes no account of any of those considerations for those people that have visas. They are stranded overseas. They may or may not have those visas, and

they may or may not be able to stay where they are.

MS. HOROWITZ: Well, here, Your Honor --

THE COURT: And the president doesn't care, does he?

MS. HOROWITZ: Here, Your Honor, we're not talking about individuals who are overseas, we are talking about individuals who are employees, contractors of Voice of America, Global Media who are on these J-1 visas in the United States who will be returning to their home country.

But inherent to the agreement of a J-1 visa is that it requires the holder to return to his or her home country upon expiration of the visa before they can apply to be a legal permanent resident of the United States.

And as the Court will note, it is well within --

THE COURT: And the president doesn't care about that either.

MS. HOROWITZ: Your Honor, I think it's well within the statutory authority of the CEO. It's in the statute that he can supervise the personal services contractors, which are tied to the J-1 visas. And so, again, this all hinges on something that may or may not occur, and that's really the crux of the harm that's being alleged here is a hypothetical. This could happen.

My friends on the other side came before you this morning and told you that certain individuals that aren't even government employees, that are employees of a third-party

grantee, RFA, may lose their health insurance if the grantee is terminated for good. I mean, there is so many steps that need to happen in order for that to occur, and it goes back to is this harm that can be remediated or not. Losing your health insurance, while I'm sure is a harm, is not irreparable.

The same thing, I heard my friends on the other side say this is a situation where this is a unique government agency and the journalists in this case will not be able to get the same kind of employment. That's not irreparable harm. These are journalists. At the end of the day, these are journalists who work for a government agency. So even if in a world where they perhaps are no longer employees of Global Media or Voice of America, to say that they will never be able to find another job, I mean, that is the definition of speculative and it does not rise to the level of irreparable harm.

A lot of the other claims that plaintiffs in both cases allege, monetary harm, their loss of employment. I think as we noted in our papers, the case law is pretty clear that those are not harms that have been found to be irreparable or harm that can never be remediated. And so a lot of this hinges on things that may or may not occur.

Certainly, plaintiffs take the position that the agency has been, quote-unquote, "dismantled, shuttered for good." As we noted in our papers, this is a situation where

the agency has put a pause in order to determine how it's going to comply with the executive order. And the executive order, which says, and I note, and my friends on the other side say this in their papers, they are not challenging the executive order, right, because, as we all know, under the APA -- and I'll let my colleague, Abby Stout address that -- that's not a viable claim.

But the executive order allows the agency to bring it down to a function that is consistent with applicable law and eliminate the non-statutory components. And so what it says, "It shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law."

Right now, the agency is determining how it will best go about complying with that executive order. That does not mean that, as my friends put it, this is a complete shuttering of an agency that has gone dark for the first time in 83 years. The agency has taken a pause, and it has put its employees on administrative leave, which it is entitled to do, to determine how best to comply with that executive order.

So I want to talk briefly about the First Amendment, because I think, at least with respect to the New York case, I think my friends really hinge -- hang their hat on this being a First Amendment case. I think that was said this morning. It was said in the papers. This is a case about the First

Amendment. And, Your Honor, I don't totally disagree, but this is a case about government speech, plain and simple. That is where the Court starts its inquiry and that is where the Court ends its inquiry.

So the Court is compelled to follow Supreme Court precedent. I think *Garcetti* is on all fours with the exact situation that we're faced with here. I think we all agree that when you are a government employee and you are speaking as a government employee, the protections of the First Amendment simply do not apply.

And so the question really is whether the Court finds that the speech at issue has been made pursuant to the official duties of the individual. So *Garcetti* laid out a two-step inquiry. Number one is whether the employee was speaking as a citizen on a matter of public concern, and if the answer is no, that ends the Court's inquiry. And I think that is where the Court can end its inquiry here.

When my friend on the other side started his discussion about the First Amendment, the first thing the Court said was, quote, "Tell me how to resist my instincts." And I think your instincts are correct, Your Honor. This is a case about government speech, period. And so that ends the Court's inquiry under *Garcetti*.

There has been no allegation here that the individuals who have made the speech were making it anything other than

their capacity as journalists for a government agency. And that is the crux of the Court's inquiry. Of course, the second step then requires for the Court to determine that if it was as a citizen acting on a matter of public concern, then the question is whether there is a balancing test of whether the relevant government entity had an adequate justification.

So *Garcetti* was pretty clear, "When public employees make statements pursuant to their official duties, the employees are not speaking as private citizens for First Amendment purposes, and thus, have no First Amendment cause of action based on his or her employer's reaction to that speech."

And of course, *Garcetti* acknowledged a limitation, and I think that's where the district court in *Turner* sort of hinged its decision that it would allow the First Amendment arguments to proceed, notwithstanding the government's channeling arguments. And I have a few responses to note why we think that that was incorrect.

THE COURT: Okay.

MS. HOROWITZ: So first, in *Turner*, the only claim that the district court found that did not need to be channeled through the appropriate CSRA or other administrative remedies was with respect to the program director's First Amendment claim. All the other claims the Court found were, quote, "highly doubtful that the plaintiffs would succeed on the merits." I would note that many of those claims are the same

claims that the Court is faced with here. We're talking about APA claims, challenging the change, reorganization of Voice of America and Global Media, ultra vires claims, exact same claims here. And so constitutional claims, separation of powers, again, a lot of the same arguments that are being put before this Court here, the Court in *Turner* rejected, so that's number one.

The only claim the Court found that was sort of viable in terms of not meeting the requiring the jurisdictional exhaustion was the First Amendment claim. And what the Court hung its hat on in *Turner* was an acknowledgement from *Garcetti* that there exists this relationship to the First Amendment and academic scholarship. And *Garcetti* recognized that, that the First Amendment was not intended to limit, quote, "academic scholarship or classroom instruction," meaning teachers and academics. It said nothing about the press.

And in *Turner*, not only was the Court relying on that distinction, but it also heavily relied on Justice Souter's dissent in *Garcetti*, which we would say, of course, is not binding. It may be informative, it may be informational, but that's not controlling precedent. And what is controlling precedent is that when employees make statements pursuant to their official duties, there is not speaking as private citizens for First Amendment purposes.

The Court in *Turner* also relied on two other cases,

one from the Fourth Circuit and one from the Ninth Circuit, *Adams* and *Demers*. Both of those cases specifically related to the acknowledgement that limited carveout that *Garcetti* recognized for academic scholarship, both of those cases dealt with teachers in public institutions who had brought claims under the First Amendment. Those are not the facts before the Court.

None of that is what's happening in this case. Here we're talking about journalists, and, sure, as a general matter, there is, of course, freedom of the press under the First Amendment, but I think the Court would also be remiss not to look at the words of the statute itself of the International Broadcasting Act.

My friends spent a lot of time talking about the statutory firewall and they want this Court to find that that sort of statutory firewall, the integrity of the press, that that sort of diminishes the rest of what the statute says, that somehow that part of the statute should be read to be the most important and everything flows therefrom, and I don't think that's consistent with the terms of statute.

For example, under Section 6202, which sets out the standards and principles for broadcasting, there is both a section for standards and for principles. So the standards say, the first one, it says that broadcasting shall be consistent with broad foreign policy objectives of the United

States. And then when you go down to principles, and this is really where I would direct the Court, is B2, "a balanced and comprehensive projection of United States thoughts and institutions reflecting the diversity of United States culture and society."

And three, clear and effective presentation of the policies of the United States Government, with a capital G, and responsible discussion and opinion on those policies, including editorials, broadcasts by the Voice of America, which present the views of the United States Government, with a capital G.

Again, that is where *Garcetti* ends its inquiry. There is really no need for this Court to get to the *Pickering* analysis, to get to the viewpoint discrimination that plaintiffs want this Court to go, because all the Court needs to do is look at the first step of *Garcetti* and say that this is plain government speech at its core. It's written into the statute.

And so I think, yes, of course, the statute has this firewall baked into it, but that can't be read to the exclusion of the other terms of the statute.

You know, we cited a few other cases in our brief that also held that individuals at Voice of America do not in somewhat analogous circumstances in the sense that they were challenging speech that was made pursuant to their official duties, the Court, for example, in *Jangjoo versus Broadcasting*

*Board of Governors*, a 2017 decision from Judge Berman Jackson found that there was no First Amendment protection. We also cited to a case from Judge Moss in our papers. And so really I think if the Court even was going to get into the *Pickering* balancing test, we noted in our papers why the government would still win there.

I think really this question hinges, first and foremost, on the government's speech aspect, and the statute really demonstrates -- and I never once heard my friends on the other side acknowledge that part of the statute. You know, the discussion this morning was all about the integrity of journalistic ethics and the firewall, but not once did I hear my friends on the other side acknowledge the fact that at the end of the day these are reporters who are speaking on behalf of the United States government, and that is a critical distinction that's going to inform the Court's analysis here.

My friends have some arguments that they have an entitlement to receive information, that they have an entitlement to editorial discretion. Again, I think all of those claims fall away if the Court finds that the First Amendment is not implicated here, because this is plain, simple government speech.

I would also just note that the Smith-Mundt Act has a requirement that Voice of America broadcasting is not intended for domestic audiences. And it was a little unclear to me from

plaintiffs' arguments. To the extent that they are saying that these individuals are entitled to receive access to information within the United States, that would not be consistent with congressional intent and the statute.

Unless the Court has any other questions on the First Amendment, I would switch to our channeling arguments.

So the crux of the claims here are what appear to challenge individual employment decisions with respect to individual employees of the agency, and plaintiffs couch this as this is, again, problematic because essentially what they are saying is no, no, no, this a broad attack on the agency, which is an untenable claim for other reasons, but when you boil down to what is the relief that they seek, and they talked about this this morning, the relief that they want is to be taken off of administrative leave and resume their duties, the relief that they want is to be placed back in their position and be able to perform the duties of their position.

In the Widakuswara case one of their complaints is that they have lost access to their working stations, to their computers, to their offices. When you boil it down all of those claims are appropriately channeled through the administrative remedial scheme that Congress has intended.

I heard a lot this morning about the Merit Systems Protection Board, but I never once heard about the Office of Special Counsel. I never once heard really my friends

acknowledge what it means for an individual who has a complaint against an agency, based on, quote, "a personnel action." As we noted in our papers, personnel actions strictly fall within the Office of Special Counsel's purview, and that can include any significant change in duties, responsibilities, or working conditions. Those are quite broad.

Everything you heard from plaintiffs this morning is challenging exactly that. They are challenging their ability to perform their duties in the statute itself as reporters, their responsibilities as reporters, or, quote, "their working conditions," their inability to access their office, their computers.

Now, the DC Circuit has specifically said that working conditions call to mind the day-to-day circumstances under which an employee performs his or her job. And that's exactly what the plaintiffs are asking for here when they seek relief to be reinstated to their jobs, and so any other outcome, again, would really circumvent the intent of Congress that has said that there is an appropriate administrative remedial scheme for these employees to bring these complaints.

They can go to the office of special counsel if there has been an adverse personnel action, so, for example, a suspension, a termination. They can bring those to the MSPB. For bargaining unit members, they can raise those through their appropriate labor channels.

And I think the DC Circuit has been pretty clear that you get what you get, even if you get nothing at all, but that is exactly what the CSRA was intended to do, it was intended to preclude district court jurisdiction, especially when there are constitutional claims for equitable relief.

My friends, they relied on a case called *Weaver*, but that case was decided before the Supreme Court decided *Elgin*. And *Elgin* made it clear that the CSRA precludes claims even when there are constitutional claims that go along with them. And the Supreme Court was clear in its attempts to reject any sort of carveout to the CSRA for exclusivity for facial or as applied constitutional challenges, because as the Supreme Court noted in *Elgin*, the federal circuit can take judicial notice of facts that are relevant to a constitutional question.

And so really when you analyze the factors under *Thunder Basin*, number one, whether there a fairly discernible -- whether it's fairly discernible in the statutory scheme, I think the case law there is clear that the CSRA is exactly that, and whether these are the types of claims that Congress intended to be reviewed within the statutory structure.

And it's not going to preclude all meaningful review here if they channel their claims through the MSPB if there is an adverse action, through OSC. And the claims -- my friends say no, no, no, these claims are wholly collateral, they have nothing to do with the underlying employment actions, but when

you look at their request for relief, that's exactly what it is, they want be to reinstated, they want to return to their job duties, they want to have access to their work stations. Those are not wholly collateral.

Of course, whether the claims are beyond the expertise of the agency, and the case law again is clear, courts have recognized the expertise of the MSPB, the Office of Special Counsel, and this was affirmed by the DC Circuit in AFGE, which we relied upon in our papers.

And so at bottom, Your Honor, this is challenging discrete employment actions, and just because it's brought by a lot of employees versus just a few employees, doesn't change the outcome.

Unless the Court has any other questions on the channeling arguments, I'll just briefly talk about the Tucker Act.

THE COURT: That's fine.

MS. HOROWITZ: So the John Doe plaintiffs or the J. Doe plaintiffs in the Abramowitz case and the Widakuswara case are personal services contractors who have signed these contracts with the agency. And they came before you and they told you no, no, no, this isn't a contract case, this has nothing to do with contracts, but then the relief they are seeking all sounds in contract.

What they want is for the agency to reinstate their contracts; i.e., they want the agency to perform under the terms of the contract and for them to be paid under the terms of the contract. And so the nature of relief -- when you look at the *Megapulse* factors, and my friends say those don't really apply because this isn't really a contract case, and the type of relief isn't what we're seeking, but then you look at the order that they have proposed and the relief at the end of their complaint, and it's exactly that, order defendants to return Global Media and its contractors to their status prior to March 14th, reinstate and permit employees or contractors that, quote, "had their contracts changed, canceled or modified to return to work."

What they are asking for, the type of relief sought, exactly sounds in contract. There is no other reading, because what they are asking for is for the government to continue paying their contracts and for them to be able to continue their employment relationship.

Judge McFadden in *U.S. Conference of Catholic Bishops*, he said, "When you ask the Court to cancel the termination, pay money due and reinstate contracts, that is something that the Court lacks power to do," and that's not any different outcome here.

So unless the Court has any other questions, I'll turn it over to my colleague, Abby Stout.

THE COURT: All right. Thank you.

Good afternoon, Ms. Stout.

MS. STOUT: Good afternoon, Your Honor. May it please the Court, my name is Abigail Stout, and I'll pick up where my colleague left off.

As she mentioned, I'm going to be addressing the grants issue more broadly and then also the APA claims, as well as the motion to dissolve the TRO. I would like to start with the grants and pick up where my colleague left off.

She talked about the personal services contracts, but the Tucker Act covers much broader ground. So I thought it would be helpful to first start the analysis at the beginning with the text of the Tucker Act. 28 U.S.C. Section 1491 says that the United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded upon any express or implied contract with the United States.

The DC Circuit has held that the Tucker Act provides the exclusive remedy for contractual disputes with the United States. And courts -- the Court of Federal Claims has also confirmed this. For example, in *Trauma Services Group versus United States*, 104 F.3d 1321, the Court said that any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the government, specifically, mutual intent to contract, including

an offer for acceptance, consideration, and a government representative who has actual authority to bind the government.

And in *Pennsylvania Department of Public Welfare versus United States*, a 2001 case, confirms the same thing. It says, "Grant-related agreements have been held to be contracts within the Tucker Act jurisdiction when all requisite elements of a contract were present."

Here my friends on the other side said that the underlying grant agreements aren't attached in this case, so how do we know whether they are contracts, but they haven't disputed these grant agreements have all of the hallmark characteristics of contracts. There is obligations and terms on both sides. There is signatures on these grant agreements. And there is no dispute that there has been a government representative with actual authority to bind the government in these agreements that they have entered into.

So really, we have the Tucker Act. We have a grant agreement, which is the contract. So the only thing plaintiffs say to argue that the Tucker Act doesn't apply is that this actually isn't a contract claim because there are statutory or constitutional issues implicated.

But as the DC Circuit has stated and then the United States Supreme Court in *Department of Education versus California* has recently reaffirmed, the implication of any kind of statutory or constitutional claim doesn't transform a claim

that sounds in essence in contract into one that the United States district court can hear.

In *Ingersoll Rand company versus United States*, that's the DC Circuit case, they warned that no artful pleading can be engaged in by plaintiffs to avoid the Court of Federal Claims. They were clear and said that if the essence of a claim is a request for a specific performance of the original contract, whether or not it is pled as a contract claim, the jurisdiction for that action lies in the Court of Federal Claims.

And that same case even said that even if the contract arguably violates other regulations, it doesn't transform the case into one based on just those regulations. So even if the Court accepts and buys the argument from plaintiffs that these claims somehow implicate the statute or the Constitution, that doesn't transform the claim into something that can be inflated from the Tucker Act.

In fact, we don't even have to guess about this, because the United States Supreme Court in *Department of Education versus California* was very clear, and that case is on all fours here. They said that the defendants there were likely to succeed in showing that the district court lacked jurisdiction to order payment under the APA.

And the facts, although my friends on the other side have said that the case is distinguishable, the facts are actually eerily similar here. In fact, in the district court

in that case, the plaintiffs argued that this wasn't a contract claim, that at issue there there were Department of Education grants. In the district court, plaintiffs argued this isn't really a contract claim, Tucker Act doesn't apply, because we're asking for reinstatement of our grants, so it's an equitable relief.

They also argued that this isn't a contract because the grant agreements that were supplied were based on a statutory scheme, just like plaintiffs here are arguing. In fact, the termination letters in the *Department of Education versus California* case had very similar language to the termination letters here, that were issued here for the grantees, that the grants no longer effectuate the agency priorities.

So truly, each step, the arguments were identical in the court below, and then the First Circuit adopted those arguments. The Supreme Court rejected those arguments when it said that there was a likelihood of success that the district court lacked jurisdiction.

Your Honor, for those reasons, any grantees' specific claims and then any other contract claims should go through the Tucker Act.

I want to make kind of a couple broader points on this topic while we're discussing it. The implications on this on like the other grantee cases, first, if the Court concludes

that it lacks jurisdiction to assess, evaluate or adjudicate the grant terminations in this case, then we would submit that is also dispositive of the other grantee cases.

We also wanted to address how these arguments as well as the channeling arguments that Ms. Gonzalez just presented would affect the motion to dissolve the TRO.

First, we maintain our arguments that the TRO should be dissolved because of the channeling arguments and because of the Tucker Act arguments. And then we also would point out that the district court in the Southern District of New York in their temporary restraining order, they did not analyze the agency action portion and the TRO should be dissolved for that reason as well.

But while we're on this topic, I wanted to quickly address the scope of relief if the Court does decide to enter preliminary injunction, which, of course, our position is that it should not. We would stress these are two very different case that we're arguing today, and that one, as has been acknowledged before, is narrower and one is more broad. So any kind of injunctive relief, if issued, should not be identical in either case, but should address the specific facts of the cases.

There are a lot of claims and issues in both of these cases, and we would also submit that the Court should address that and consider that if it enters any kind of injunctive

relief. Specifically, it should carve off any kind of contract claim or anything related to the contract dispute as not being covered by a preliminary injunction because those should all go to the Court of Federal Claims under the Tucker Act.

And then any employment related dispute, whether that's related to being placed on administrative leave or otherwise, those should also be appropriately channeled, as my colleague explained. Those should also not be covered by any kind of preliminary injunction.

Your Honor, now I would like to turn to the APA claims, and I want to start with the question that Your Honor raised earlier today. "What do you want me to enjoin?"

Your Honor, defendants have shared in that question and kind of head scratching as we have been looking through the papers and even listening to plaintiffs explain what this agency action is today. So I would like to walk through the analysis there.

I want to start with two broad points. First is that the default rule is that the agency is entitled to discretion in deference from the Court. It has broad discretion. And relatedly, as the second point, the general rule is that you can't sue the government. The government has to waive sovereign immunity in order to be sued. It has to provide consent. So the APA is one of those statutes that provides a waiver of sovereign immunity in certain specific limited areas.

So we have got a general rule of deference to agency and then a very specific exception to that rule under the APA. And specifically, the APA requires agency action in order for plaintiffs to be able to bring a claim under the APA.

It seems that my friends on the other side would like to use a lay person's definition of agency action, but the statute does not go that far. In fact, the statute very carefully defines agency action in a very specific way. It's not anything that the agency does. It is very specifically defined under 5 U.S.C. Section 551 that agency action be part of a rule, order, license, sanction, relief, or the equivalent or denial thereof.

Each of those portions of that, whether it be a rule or order, those are also very specifically defined. Here plaintiffs cannot point to any kind of rule or order that's happened in this case. Instead, we're left trying to figure out what exactly the agency action is.

Because they cannot meet the burden of showing what exactly the action or decision is, they have not carried their burden on that point.

So a couple points on what the Supreme Court has described agency action as. First, it has to be discrete and it has to be circumscribed, and it cannot be programmatic. I would like to talk about why any kind of decision here or any kind of alleged agency action is not discrete and not

circumcised [sic], and use a case to explain and illustrate why, and then turn to why this is a programmatic challenge and use another Supreme Court case to show why.

There has to be a discrete circumscribed action. Here I think I heard my friends on the other side say that the agency action is the decision to close the agency.

The issue is that's a very abstract concept. They can point to no order, they can point to no statement, they can point to no policy. There is nothing that they can point to to suggest that a decision has been made. They have used this term, but there is no meat behind it. There is nothing to actually point to and say this is the action, or there is no memo, there is not otherwise any kind of statement.

And so we're left with a very abstract idea of -- because plaintiffs' argument goes because certain actions have happened, there must be a decision to close the agency. The problem is that has not happened and they can't point to that happening. And second, even if that were the case, it would still be abstract.

In *Texas versus Biden* -- in *Biden versus Texas*, the Supreme Court case from 2022 is illustrative on this point. There it very specifically said that any abstract decisions are not agency action under the APA.

In fact, they said to the extent that the Court of Appeals in that case understood itself to be reviewing an

abstract decision apart from a specific agency action, that was error.

There, the Court of Appeals referred to a termination decision. At issue there was an MPP policy, the migrant protection protocol, that once the administrations changed, the next administration wanted to terminate, so it did so through -- or attempted to do so through two memos.

The Court held that those memos were final legal agency action, but any kind of termination decision, it said that was too abstract, you can't figure out what the agency is thinking there, so that is not a final agency action or an agency action at all.

Next, we talked about what it's not, what plaintiffs have not done. They haven't shown a discrete circumscribed act, but they have shown a programmatic challenge, which is impermissible under the APA. And on this point, *Lujan*, the Supreme Court case *Lujan versus Defenders of Wildlife* is illustrative.

There plaintiffs challenged what they called a land withdraw review program, which was basically a series of actions that the agency was engaged in or allegedly engage in, and they said that because the agency was engaging in certain actions and failing to engage in other actions, certain statutes were being violated.

The Court rejected that and said there is not agency

action here and there is not final agency action. In fact, the Court specifically acknowledged plaintiff's concerns that they were alleging that there were violations of the law, but the Court specifically said that referring to continuing and constantly changing operations that the agency was engaging in, was even, if it was engaging in violations of the law, plaintiffs cannot seek wholesale improvement by court decree; instead, these programmatic improvements are normally made by Congress or by the department.

The Court noted the plaintiff's frustration that an across the board challenge to agency programs or agency operations would be maybe faster, but the Court specifically said that's not what the APA allows. You can't just challenge everything that the agency is doing, lump it all in one lawsuit and call that agency action under the APA. They specifically rejected that.

Indeed, the quote that's helpful here is, "It's at least entirely certain that the flaws in the entire program consisting principally of many individual actions referenced in the complaint, and presumably actions yet to be taken as well, cannot be laid before the Court for wholesale correction under the APA." You can't do wholesale correction of a bunch of individualized actions. The Court was very clear.

THE COURT: What was that from?

MS. STOUT: That was from *Lujan versus Defenders of*

*Wildlife*.

THE COURT: I remember *Lujan*.

MS. STOUT: So plaintiffs would like to skip to the arbitrary and capricious step, and have pointed out that we don't respond to that. But, Your Honor, agency action is required first, and that's not here.

And even -- then we would have to get to the final agency action analysis. So plaintiffs, my friends on the other side can't skip the line in the legal analysis.

Finally, I want to discuss plaintiffs' kind of general allegations that there are a bunch of mandatory statutory obligations that the agency is not engaged in. And I want to talk about this in the context of the APA argument that even if there is agency action it's committed to the agency discretion by law.

I think the statute is very helpful and clear on this point. So agency action is committed to agency discretion when the statute is drawn so that the Court would have no meaningful standard by which to judge the agency's exercise of discretion. If we keep that meaningful standard language in mind, and then turn to look at the statute, it becomes clear why it would be impossible for the Court to be able to come in and second guess the agency's judgment and the agency's decision-making here.

So I would like to, as an example, talk about some of the statutory provisions that plaintiffs cite to for their

firewall claims. Specifically, they point to Section 6204. In that section, (a)(3) states that the CEO of USAGM has the authority to ensure that the United States international broadcasting is conducted in accordance with the standards and principles contained in Section 1602 of this title, and those are where the broadcasting principles are set out.

Even if we start there, for the Court to try to come in and evaluate, okay, is the United States conducting itself in accordance with the standards and principles of the title when the statute clearly gives the CEO the discretion to figure that out, it would be an impossible task that would require the Court to wade into the agency's decision-making and judgment, exactly the kind of the instinct that Your Honor may have had in the First Amendment context.

And that's not changed by subsection (b) of that statute that my friends on the other side point out. In that one it's the language that says, "The Secretary of State and the CEO, in carrying out their functions, shall respect the professional independence and integrity of the agency, its broadcasting services and the grantees."

My friends on the other side are asking this Court to figure out if the CEO and the Secretary of State are adequately respecting the professional independence and integrity of the agency. That's something that has been vested in the CEO and Secretary of State's discretion, and it's something that the

Court -- there is no meaningful standard to judge whether they are respecting that or not. That becomes even more clear when you look at the standards and principles in Section 1602. So the Court would have to be evaluating whether, for example, the United States' broadcasting was consistent with the foreign policy objectives of the United States, or whether it was based on reliable information about a potential audience.

These are standards by which -- well, there is no standard for the Court to be able to come in and figure out whether these principles and standards in broadcasting were met.

So, Your Honor, kind of to sum it up here, in terms of the APA claims, first, we maintain our position that there is no agency action. My friends on the other side kind of want to do everything and nothing at once. If they do everything, then that means it's a programmatic challenge. And if they do nothing, on the flip side, then it's not discrete and circumscribed.

And even if the Court finds that there is agency action, the statute provides no meaningful standard for the Court to evaluate it, so the discretion rests with the agency.

THE COURT: Maybe I should have asked your co-counsel this, but how does the -- how does Judge Howell's opinion capture -- how does *Garcetti* capture the statutory firewall that Judge Howell was talking about? Maybe I should have asked

her that. That's better than you. Let me go back to that question.

MS. HOROWITZ: If I --

THE COURT: Thank you, Ms. Stout.

MS. HOROWITZ: If I recall correctly, Your Honor, so the plaintiffs in *Turner* had a discrete claim of violation of the statutory firewall, and that was one of the claims that the Court found needed to be channeled. And so what she allowed to proceed sort of without the jurisdictional exhaustion requirement was the First Amendment claim.

There were several sort of different facts that she looked at in order to determine whether it was likely that the program director could establish a First Amendment violation. My understanding and my reading of *Turner* is really that it was based on allegations that speech was being chilled. In that case, there were specific instances that the plaintiffs pointed to of management, Global Media management having questions or raising inquiries, doing investigations, about specific topics, specific broadcasts, such that they allege that there was this violation of the statutory firewall.

But one of their other arguments that I believe the Court rejected in *Turner* was that the CEO had also either removed or changed to a different position the individual that was sort of in charge of this firewall protection between the journalists and leadership. And the Court found that the CEO,

that was within his discretion under the statute. And so the way that I read *Turner* is really that it hinged on this belief that the program director's speech and her staff's speech had the ability to be chilled because of these specific instances of Global Media management coming in, raising questions about certain broadcasts and certain things that were being published.

Of course, we would argue here that's not the case, because like we said in our papers, this isn't a situation where Global Media has come in and has tinkered or said, "You can't speak on this topic" or "Why did you write this in this way. I'm now going to investigate why it is that you presented this particular topic on behalf of the government in that way."

That hasn't happened here. This has been a pause of all reporting, and so I think that takes us out of the facts of *Turner*.

THE COURT: All right. Not all right. I mean, I understand that's the argument.

MS. JOHNSON: Good afternoon, Your Honor. Stephanie Johnson on behalf of the defendant with the United States Attorney's Office. I'll just briefly address standing and then also the constitutional issues and the ultra vires claim.

I just want to state as an initial matter the government does not concede that the named plaintiffs or the Newsguild has standing. Indeed, we did drop a footnote in our

motion stating that we reserve the right to make additional arguments. So just going to the arguments --

THE COURT: I understand. Probably some -- there is probably some plaintiffs may not have standing. You know Abramowitz does.

MS. JOHNSON: I understand, yes, Your Honor. So just going to --

THE COURT: What about the unions?

MS. JOHNSON: I'm sorry. I missed what you said.

THE COURT: What about the unions?

MS. JOHNSON: Yes, Your Honor, that's what I'm going to get into and specifically address RSF, RSF USA, AFSCME and AFGE and AFSA. Plaintiffs didn't really address this when they were up here. However, it's our position that none of these organizations have associational standing or organizational standing.

Just to talk about the associational standing, the declarations that plaintiff provided, the statements in the declaration mentioned merely that their members fear, are in distress, confused, uncertain regarding their future, their audience retention and continued viability. However, Your Honor, these are all speculative in nature.

Indeed, they are just basically saying that something may happen and they fear that this might happen, that they might be harmed, kind of what my colleague talked about with

the irreparable harm. And that's insufficient to demonstrate standing. Also, in some of the declarations they mention that programming is on every day, and if it suddenly stops, they will lose their audience. However, the record is devoid of any such loss of -- of any such loss.

And then also in terms of reputational injury, they mention that they have reputational injury because of some of the comments that were made, but, again, they point to no concrete harm to their members.

In terms of the statements that defendants have made a decision to terminate 623 AFGE and AFSCME members, again, they have not identified any member that has been terminated.

Plaintiffs also argue that the defendants ignore that the members of the labor organization and RSF produce programming for USAGM and its statutory grantees, and they suffer a First Amendment harm. In terms to demonstrate associational standing, the first requirement necessitates more than generalizations about the organization's members, which that's all that plaintiffs have provided.

Specifically, the organization must point to a particular member and establish she would have standing if she were the plaintiffs herself. That's from, Your Honor, *American Federation of Labor and Congression of Industries, Organizations versus Department of Labor*.

And then also I'll direct the Court's attention to the

DC Circuit case, the *National Association of Home Builders versus EPA*. And also direct the Court's attention to another DC Circuit case, *American Chemical Council versus Department of Transportation* where the Court said, "It is not enough that association merely states that the majority of their members are affected by the harm, alleged harm. When seeking a preliminary relief, this requires a submission on the record showing at least one particular member is substantially likely to suffer that harm."

Based off of the review of plaintiffs' briefs and declarations, plaintiffs have not identified a specific member of the organizations who have standing or suffered a First Amendment harm; rather the declarations just merely provide generalizations that their organization is comprised of a majority of affected individuals, which is not enough to demonstrate standing.

Bringing your attention to the organizational standing, which they also failed to demonstrate. They briefly mention that they devote a considerable number of resources responding to members' concerns and providing guidance pertaining to the reduction in force. However, an organization must allege that the defendants' conduct noticeably impairs the organization's ability to provide services. They cite to in their reply *Food and Drug Administration versus Alliance for Hippocratic Medicine*, which is a United States Supreme Court

case. However, unlike the case that they cited in their brief, in their reply brief, plaintiffs have not demonstrated or provided any evidence or even allege that defendants have impaired their ability to provide services and achieve their organizational mission.

I'll just bring the Court to some of the allegations that they made in their complaint. They say unions claim that if Global Media is dismantled they would no longer be able to represent their members and would lose hundreds of dues paying members, their bargaining positions would be diminished and their ability to carry out their mission would be impaired. However, the key word is "if." They haven't demonstrated that it is happening or that it has happened.

Also, they point to in their complaint, they allege that RSF and RSF USA, they claim that the loss of Voice of America will weaken their ability to amplify press freedom, concerns throughout the world, and they also claim that if, again, if Global Media is dismantled, they would no longer be able to represent their members. Again, this is just purely speculative. Voice of America has not been dismantled. It remains -- Voice of America has not been dismantled and Global Media remains operational.

So neither -- I should say none of those organizations have demonstrated that they have standing to bring their claims.

In terms of Plaintiff Abramowitz, I just want to make it clear, he mentioned in his reply that he has Article III standing. Defendants did not raise that issue, did not say that Abramowitz did not have Article III standing to bring an action on behalf of his purported injuries, because the basic principle is that a person could seek judicial relief, but only for his own injuries.

But I will note that Plaintiff Abramowitz attempts to seek relief on behalf of others, and the onus is on him to demonstrate that he has third-party standing, which has not been demonstrated, at least in the complaint or in their filings.

Then just briefly to touch on the constitutional issues. I think as we have made it clear not only in our brief but both of my colleagues have also mentioned that the outcome of plaintiffs' constitutional issues mainly involve statutory and regulatory -- well, just mainly statutory claims. Apologies.

Indeed, both plaintiffs allege a host of statutory violations, including Sections 6202, 6204, and they made it clear that they are alleging these statutory violations, so plaintiffs merely just attempt to recast their statutory claims into constitutional claims.

And I will just mention that at least -- and I'm probably going to butcher the name -- but Widakuswara, they

didn't even raise any constitutional claims in their opening brief, nor were they seeking relief on any such constitutional claims.

And in terms of the take care clause, it was briefly mentioned by Plaintiff Abramowitz, the government is not aware of any mechanism where an individual can obtain affirmative relief under the take care clause, and plaintiff has not identified any such case.

And then in terms of the appropriation clause, plaintiffs, at least in Abramowitz, they allege that the government has violated the appropriation clause. However, just want to make it clear that merely reducing the size of Global Media to a statutory minimum does not equate to a violation of the appropriation clause, and plaintiffs have not identified any evidence that suggests that the government has violated the appropriation clause.

Just lastly, for the ultra vires claim, as this Court is aware, it's a demanding standard, and only available in limited circumstances, and this case isn't one. Again, in the Widakuswara, they didn't even raise the ultra vires claim in their opening brief. And as my colleagues mentioned, there are other alternative ways that the plaintiffs' claims can be reviewed.

THE COURT: Let me ask you this. I thought the appropriations process was Congress makes an appropriation, in

this case, the president signed it too, so the money has to be expended. Now, if he decides that he wants to shut down the agency, which is what he apparently decided on March 14th -- let me go back to this. In the Reagan days, when I was --

MS. JOHNSON: That was before my time.

THE COURT: -- an AUSA working for Reagan, we called it impoundment in those days. I had a case that I argued in this court. There was so much interest in it that we had to move the argument to the ceremonial courtroom because there was so much press interested. And the president had decided to not expend money for comprehensive education training funds, $600 million, as I recall it, which was a lot of money in those days, but it was two-year money.

So I argued to the chief judge of this court at that time, John Lewis Smith, I think, that the president was only pausing and not spending the money then and he could still spend it the next fiscal year, he just wasn't going to spend it that year.

My recollection is then I ended up winning the case because he was just pausing the expenditure and it didn't -- it was not in violation of the Impoundment Act, the Impoundment Act, having been invoked by Congress because of what Nixon was doing in trying to impound expenditure money.

I thought that the money could have been -- and I thought in light of all of that case law that Congress had put

in provisions in the way it's enacted now so that if the president and Congress enacted these funds these days, if the president wanted to stop the process and the expenditure, you had to go back to Congress and get a rescission. Maybe I don't understand the law now, but I thought the process was now if the president was going to decide to stop a program in mid-track like this, the president had to go back and notify Congress and propose a rescission.

He didn't do that here. So do I not understand the process now? I know my law may be outdated, but tell me how this process is supposed to work here.

MS. JOHNSON: Well, Your Honor, I would just say that in this particular case, the president has not closed Voice of America, has not dismantled Voice of America, and there is no evidence, at least in the record as of today, that that money that has been appropriated for Global Media is being spent elsewhere.

THE COURT: But he doesn't have any obligation to go back and tell Congress anything?

MS. JOHNSON: We're not at that point, Your Honor.

THE COURT: But we're at the point of canceling all contracts, grants, right, or not?

MS. JOHNSON: Your Honor, for the grant issue, I would have my colleague, Abby Stout, address that. But from my understanding, Voice of America has not been dismantled.

Global Media is basically trying to figure out --

THE COURT: While the president tries to figure out what he's going to do, he's going to put all the employees of of the agency on paid leave with pay?

MS. JOHNSON: Well, currently they are on administrative leave, that is correct.

THE COURT: With pay? Because he hasn't decided what to do?

MS. JOHNSON: With the individuals?

THE COURT: With all of this money that's been appropriated for this purpose.

MS. JOHNSON: I will just say for now, Your Honor, there has been no violation of the appropriation clause at this juncture.

THE COURT: That's not arbitrary and capricious or anything like that?

MS. JOHNSON: We don't even get to the arbitrary and capricious because there is no final agency decision yet. Just to --

THE COURT: It's a little hard to swallow, isn't it? We're wasting 1,300 employees paid full-time while the president makes up his mind?

MS. JOHNSON: Well, I would just say in terms of the last two factors, we would request, based off of plaintiffs not being able to -- well, let me just step back.

Just for the last two factors, we would argue that the equities in public interest weigh against any preliminary injunction or any relief as -- and let me just briefly point the Court's decision to a decision in the DC Circuit, which one of my colleagues mentioned before, the *Dellinger* matter. The Court said they could not balance plaintiff's asserted public interest against the public interest asserted by the executive branch. And after all, the only -- and after all, only the president, along with the vice president, elected by the entire nation, and the Court determined that the public interest did not weigh in favor of the appellant. And we would ask the Court to determine the same thing in this matter.

Again, the public has an interest in permitting the president to take critical action when it comes to setting the policy priorities for Global Media and its broadcasting networks, and granting the preliminary injunction would disrupt Global Media's efforts to comply with the executive order.

THE COURT: Other than the administrative leave salaries, what else is Voice of America money being spent on these days?

MS. JOHNSON: Do you mind if I refer to my brief?

THE COURT: Sure.

(Pause)

MS. JOHNSON: May I also confer with my co-counsel?

THE COURT: Sure.

(Pause)

MS. JOHNSON: In terms of how the agency is using its funds, I would just say the money has been allocated and it's up to the agency's discretion on how they use those founds, and besides that, I cannot provide any additional information.

THE COURT: Okay. Thank you.

MS. JOHNSON: Thank you, Your Honor.

THE COURT: Okay. Who wants to go first in rebuttal?

MR. CELLI: Shall I address the First Amendment points, Your Honor? I'm going to be pretty brief.

Let me start by a point of agreement between our side and the government, which is that the statutory firewall claim as a standalone APA claim was denied in the *Turner* case. And I guess what I want to say about that is there -- it's the one area for *Turner* that is quite different than what we have here.

In *Turner*, you had the CEO of USAGM tinkering, if you will, in an aggressive way, but changing the structure of the agency. And Judge Howell felt that that was not something that the federal court should inject themselves into, that he had some discretion.

This is not about -- what we have today is not about an act of discretion or tinkering. He's closed the agency. All this discussion about pause, it's closed. There is no other way to look at it. And having done that, that is, by definition, we argue a violation of the statutory firewall,

because he closed it based on the fact that the president and his appointee, Ms. Lake, hate the content of service. So I think that is definitionally a firewall violation and different from *Turner*.

I would like to draw on something my friend on the other side said. She concluded her argument quite strongly by saying these journalists are speaking on behalf of the U.S. government. And I would just urge the Court to look again at 6202. That is not what the statute --

THE COURT: The statute does not say that.

MR. CELLI: At all. It has these two guardrails. I mentioned them before. One is that it has to be consistent with the broad policy goals of the government and it has to present the policies fairly of the U.S. government. That's not speaking on behalf of them. That's displaying them, including them in the presentation.

In other words, VOA cannot be *Sports Illustrated*. It can't just be about other things. It has to include the position of the government as they say it in a fair way. And no one has suggested, and I listened to my friend argue for a long time, no one has suggested that that hasn't happened. It has happened.

Their problem is not that we haven't presented those policies; their problem is that they have political differences between the way the rest of the news is presented.

THE COURT: I thought through history, as I have read history, Voice of America put barnacles and everything on what they said about America, and that was one of the strengths of Voice of America, that we had the nerve to tell the truth.

MR. CELLI: About ourselves.

THE COURT: About ourselves.

MR. CELLI: To the world.

THE COURT: Don't do that, please, people in the audience.

I mean, I thought that was always a strength of our country.

MR. CELLI: It's the strength of our country. It's the strength of our Constitution, and it's the statute. If you don't like it, talk to Congress. That's what Congress set up here.

Obviously, the other side of the coin is the independence, the fact that they are independent and they are going to do what they do as journalists do. It's true that they draw a government paycheck, and that's different from *The New York Times* or CBS or something like that.

But there are lots of government employees, people who draw government paychecks who are paid to be independent. The quintessential example of that is what Judge Howell found in *Turner*, which is the academic, right. The government doesn't tell the academic scholar what to study, what to teach in the

classroom. They pay the academic to speak their mind and do independent research, and that's exactly the analog here.

Now, it's true as a narrow technical matter, there aren't any cases that say that journalists should be treated like academics, except for one, *Turner*, right here in this courthouse, on these facts, very similar to these facts.

So if you want persuasive authority, I think Judge Howell's decision is very persuasive.

Finally, just very quickly, to distinguish *Jangjoo* and *Navab-Safavi*, these are the two cases that are cited by the government for the proposition that there is no First Amendment right on behalf of journalists. You will look at them, Your Honor. That's not what they say.

The *Jangjoo* case is about internal commentary that an employee was making about working conditions in the office. That's not even a matter of public concern. That doesn't get to the base when it comes to First Amendment.

And the other case, the *Navab-Safavi* case was sort of interesting. That was a case where a very low level employee of VOA had a, I think it was a Facebook page or some kind of an internet, and they were commenting on things. And the Court looked at that and said, okay, that person has a First Amendment right to comment, but we need to balance that against the interest of VOA appearing to be independent to the world. That was the *Pickering* balance. So in that case, the Court

actually took the independence role very seriously and balanced in favor of independence over the individual rights of a very low level employee at VOA. So I think in some ways those cases actually support us.

Thank you, Your Honor.

THE COURT: Thank you.

MS. YEOMANS: Thank you, Your Honor. I hope you will bear with me. I have a lot of things that I would like to address.

And the first is just at the outset, I think the government continues to resist the evidence in this case, which shows that Voice of America is only not closed because there has been a temporary restraining order in this case.

Two days before -- two or three days before the restraining order was entered, USAGM sent notice of its intention to eliminate the entire unit of radio broadcast technicians at Voice of America, as well as nearly 600 other employees, after already having fired its 600 contractors.

The only reason that that hasn't been carried out is because of Judge Oetken's TRO. And as I already mentioned, the evidence shows that you can't run Voice of America without the radio broadcast technicians.

Starting with irreparable harm, I'll first note that the government doesn't respond to a lot of bases that we are alleging irreparable harm that I talked about earlier that I

won't repeat, but I would like to clear up some misrepresentations about the status of some of these harms.

The first is the issue of contractors. They have been told in no uncertain terms that their health insurance will expire on April 30th. They are contractors of Voice of America and they have been told that, and that is in our declaration that we filed on Wednesday, which is Docket 92-3, paragraph 7.

In terms of their prospects of having to return to their home countries, that's something that Judge Oetken addressed in the TRO decision at pages 18 to 20, and specifically rejected the government's argument that this is not harmful because it merely accelerates an inevitable process.

To the idea that it's speculative that these individuals will face harm upon going home, that's also addressed in their declarations, and the government doesn't grapple with that.

Turning to the Newsguild-CWA. They are also told in no uncertain terms that their health insurance will expire in May, because their health insurance carrier cannot continue to cover them if they have not been working for pay for 60 days, and they were furloughed on March 21st. That is John Schluess's declaration at Docket 92-1, paragraph 6. That is not speculative.

And these are irreparable harms. We cite case law,

*Risteen versus Youth for Understanding*, to say that losing your health insurance when you have medical conditions is irreparable harm. There is evidence in the record that individuals who are employeed at RFA who are going to lose their health insurance have medical health conditions. And that's cited at page 22 of our reply.

Finally, discussing the employment harms. The government sort of brushed off the idea that this is an unusual circumstance where losing employment is irreparable by arguing that these plaintiffs could find, I quote, "another job." And that's not the analysis. We cite the *Bonds versus Heyman* case at page 23 of our reply, which held that when it is unlikely that the plaintiff could ever find work approaching what they do now, that is irreparable harm. And you have heard a lot today about how USAGM is a unique agency that does unique work.

Finally, the government doesn't respond to the fact that employees represented by the Newsguild have been told that they will be furloughed, likely starting tomorrow, including individuals who are on H-1B visas.

Turning to channeling very briefly. First, again, the government does not argue that TNGCWA's claims are channeled and so that alone is enough to exercise jurisdiction in this case. There is evidence that their members rely on not only RFA, but also RFE and Voice of America broadcasts and are harmed by their shuttering, so that would extend to the entire

amount of relief that we ask for in this case. But I would like to respond to the government's statement that our claims amount to challenges to individual employment actions.

There is nothing individual about firing 598 contractors, putting your entire staff on administrative leave, and then announcing your intention to reduce in force an entire unit and a total of 623 people in one fell swoop.

I'm a little bit confused by the point that we don't mention the Office of Special Counsel. I think the exact same arguments that we made on channeling apply to the Office of Special Counsel. Really what it comes down to is whether or not those agencies are equipped to rectify this arrogation of legislative authority. This is something that Judge Alsup addressed in his opinion from the Northern District of California in the probationary case and held that it was not. Again, there is just no way to resolve this at the agencies.

Turning to the Tucker Act, there was discussion about how -- a lot of focus on how our relief sounds in contract. Again, as I mentioned earlier, the *Megapulse* decision rejects that that is a basis to divest the court of jurisdiction. This is at 672 F.2d 971, the DC Circuit said the mere fact that an injunction would require the same governmental restraint that specific nonperformance or performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available and the remedial

powers otherwise appropriate.

And again, the government does not address the *Navab-Safavi* case in this context and how it applies and found that the Tucker Act didn't apply to the Voice of America employees claim.

Turning to the grants, Your Honor already rejected the idea that they are under the exclusive jurisdiction of the Court of Federal Claims in the RFE case and is well aware of the *TransOhio* case.

The point of the fact -- the point of my mentioning that the grant agreements are not in the record was not to dispute whether or not they are contractual in nature. I think that's beside the point. The point was that you don't even need to know what's in them in order to resolve this case, because the statutes are controlling.

The government has cited no other case in which the entitlement to a grant flows directly from a statute that says you must enter -- the government shall enter into a grant agreement with Radio Free Asia and can only reallocate that grant under a very specific finding that the government has not attempted to show here, and that's 22 U.S.C. 6208.

And for Radio Free Europe, it's 22 U.S.C. 6207. The idea that California is on all fours with this case is belied by that circumstance.

It's also relevant that the parties in this case are

not grantees. We are third parties harmed by the cancellation of the grant agreement, so we couldn't likely go to the Court of Federal Claims, even if this were a contract dispute.

In terms of the APA, I heard the government say that Judge Oetken didn't rule on whether there was final agency action. He did. It's at page 6 of his decision.

The government argues that this has discretion in how to carry out its function. I think that's belied by the text of 22 U.S.C. 6202, 6207, 6208. And I will just read a snippet of 6202(c). "VOA will serve as a consistently reliable and authoritative source of news. VOA news will be accurate, objective and comprehensive. The United States international broadcasting shall include information about developments in each significant region of the world."

Those are not discretionary mandates, and certainly it's not within the executive's discretion to broadcast nothing.

There was also an argument that this is not final agency action because we cannot point to an order or a rule. I'll first point out that the Federal Reporter is replete with the idea that agency action is to be construed broadly. But the fact that there is not an order or rule is actually part of the problem. The government has not explained what it's doing, but there are very obvious effects of what it is doing, and it is clear that it has made a decision that it's implementing

that is affecting rights. And we know that from the fact that on March 15th they sent emails to all staff putting them on administrative leave. They literally walked the radio broadcast technicians out of the building that day and told them to shut down the broadcasts. They terminated all the grants that day, and then a few days later sent out RIF notices.

There is no question there was agency action. There was a decision and it's being carried out. And the idea that the government can avoid APA review by not telling explicitly what it has decided or saying that it's just a pause, I think would significantly undermine the APA.

On standing, I think there is not a lot more to say. The government didn't respond to the arguments we made in our reply belief on Wednesday. I will say that the concession that Mr. Abramowitz has standing, I'm not sure how he's differently situated from all the other employees who have been put on administrative leave and told that they are going to be terminated and that standing accrues to the unions that represent them, there is not a need to name individuals because everybody is being affected in the same way, but the presidents of the unions who submitted declarations are members of the union who work for the agency.

Turning to the constitutional issues, it is not the case that these -- first of all, it is not the case that we

didn't raise this in our opening brief. It's at page 12. And Judge Oetken addressed it extensively. The government has responded to it extensively, and we have replied. So even if it were somehow not significantly raised, there is no prejudice in deciding that issue at this point.

The point that there is no -- this is not a statutory issue when the government is acting expressly contrary to a statutory directive. That is a constitutional issue. That's a separation of powers issue. That's *In Re Aiken County*.

And finally, on the balance of harms, I think the way the government articulated the balance of harms, and I may have misheard, that the Court can't weigh the executive's interest against the plaintiffs, I think would mean that there could never been be an injunction against the executive, which cannot possibly be the standard. I apologize if I misheard that.

And just to reiterate, even if the Court buys all of the government's arguments today, they still have conceded that the Newsguild-CWA has standing and is not channeled, and as I mentioned, that accrues to all of the relief that we have asked for in this case. I don't think that by dropping a footnote saying they reserve the right to make additional arguments, I don't think that counts as contesting the standing of the plaintiffs.

Thank you, Your Honor.

THE COURT: Okay, Mr. Schultz, you get the last word.

MR. SCHULTZ: Thank you, Your Honor. I have five quick points.

First of all, on irreparable harm, the harm to Mr. Abramowitz is not being allowed to direct his agency. It's also the basis for his standing. The harm is irreparable because they have announced they are going to terminate 500 personal service employees, they are voiding contracts with stringers, wire services, transmitting stations, vendors, and losing their audience. And that's what gives the urgency to the preliminary injunction, because that problem ultimately would just be irrecoverable.

They argue that it's just a temporary pause, but there is no -- there is nothing to support that, as far as I know.

Second point on channeling, I think the main point is the MSPB cannot give us the relief that we want. They can't give Mr. Abramowitz the ability to run his agency. All they can do is allow him to go work there with nothing to do. And that's what -- that's the basic reason why the MSPB is not the appropriate place to go.

The government cited the *Elgin* case. This is a Supreme Court case where an employee was fired for not registering with the Selective Service, and the Court held that this was to be decided first by the MSPB, but that's a situation where all the employee wanted was his job back, and so he could get, he or she, I don't remember, could get their

relief administratively. That is not the case here.

As to the APA, my colleague made the best point, which is the fact that there is no order here does not mean that there is no violation. I mean, it makes it worse. I mean, usually the Court would have some kind of decision to review and would have to decide is this lawful, is this arbitrary and capricious.

The fact that there is no decision to review, but there is an action taken, I think makes their case much, much worse.

They cite *Lujan* for the proposition that we're asking the Court to tell the agency how to manage its decisions and so on, but nothing could be further from the truth. This case has nothing to do with particular policy decisions that the agency might make; it has to do with getting the agency back running again. Those policy decisions will then be made at the Voice of America.

They make the argument that this is all in the discretion of the administrative agency, but that's clearly wrong, because Congress is the ones that established the agency, and the appropriations are the one that sort of ratified that. There is nothing in the law that gave the defendants here the discretion to essentially put the agency out of business, that's what they have done.

Fourth point, in terms of the public interest factor

in injunctions, I think we need to look both to the president and also to Congress, but even as to the president, the executive order says "consistent with the law," and we're not asking for a review of the executive order, but I would say the president said "consistent with the law," and our whole point is everything they have done is inconsistent with the law.

But there is also Congress's interest to take into account when you're talking about the public interest, and that has to do with the underlying statute, the appropriation -- the Impoundment Control Act was really Congress taking control over appropriations back to Congress. The president doesn't have the right to do something that's totally inconsistent with the appropriation.

As you point out and has been pointed out, there is the ability of the president to go to Congress and ask for a rescission. I have read in the newspaper that he's done that recently for a couple of programs. He has not done that here, and I think that's quite telling in terms of the public interest.

And then my final point on relief, the government says that what we're asking for is that these employees be taken off administrative leave. But as you know, that's just a piece of the relief. And it's not just about Abramowitz. It's about all the employees so he has an agency to run.

But in addition to that, as we talked about, it's the

500 contract personal service employees, personal service contractors and the overseas stringers, the wire services. It's basically an order that would tell the administration put the agency back to where it was before March 15th. We're not talking about policy. We're not telling you how to run your agency. We just want you to put it back to where it was before you took these drastic actions.

If there are no further questions --

THE COURT: Thank you, Mr. Schultz.

Thank you to all counsel. That's very helpful to the Court.

I'm going to take this under submission and rule as promptly as I can after I consult with counsel in the other cases after a short recess as well.

MR. SCHULTZ: Your Honor, I know you're aware that the TRO expires tomorrow.

THE COURT: If I cannot get everything done, I will at least act on that by tomorrow.

MR. SCHULTZ: Thank you very much.

THE COURT: Court will be in recess until I call the other cases.

(Proceedings concluded at 3:07 p.m.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 18th day of April, 2025.

/s/ Sonja L. Reeves
SONJA L. REEVES, RDR-CRR
FEDERAL OFFICIAL COURT REPORTER

## #

**#214** [1] - 2:10

## $

**$260** [1] - 31:16
**$600** [1] - 80:12

## /

**/s** [1] - 100:8

## 1

**1,300** [1] - 82:21
**1,700** [1] - 6:6
**100** [1] - 9:5
**10020** [1] - 2:8
**104** [1] - 59:22
**1100** [1] - 2:2
**11:28** [2] - 1:16, 3:1
**12** [1] - 95:1
**12:29** [1] - 41:12
**1321** [1] - 59:22
**1418** [1] - 8:15
**1491** [1] - 59:13
**14th** [3] - 31:14, 58:11, 80:3
**15th** [10] - 12:21, 13:10, 13:21, 14:5, 14:16, 30:2, 30:5, 38:13, 94:2, 99:4
**16** [1] - 30:25
**1602** [2] - 70:5, 71:3
**1612** [1] - 2:2
**1625** [1] - 2:5
**17** [1] - 1:16
**18** [1] - 89:10
**18th** [1] - 100:6
**1977** [1] - 31:11
**1:25-cv-00887** [1] - 1:18
**1:25-cv-00887-RCL** [1] - 1:5
**1:25-cv-01015** [1] - 2:1
**1:25-cv-01015-RCL** [1] - 1:11
**1:30** [1] - 41:10
**1:33** [1] - 41:12
**1:45** [1] - 40:11

## 2

**20** [1] - 89:10
**20001** [1] - 1:24
**20006** [1] - 2:3
**20009** [1] - 2:10
**2001** [1] - 60:4
**20036** [1] - 2:5
**20037** [1] - 1:20
**20043** [1] - 2:13
**2017** [1] - 53:1
**2019** [1] - 36:12
**2022** [2] - 2:10, 66:21
**2025** [2] - 1:16, 100:6
**20530** [1] - 2:16
**2100** [1] - 1:20
**21st** [2] - 7:23, 89:22
**22** [7] - 12:14, 13:7, 39:22, 90:6, 92:21, 92:22, 93:9
**23** [1] - 90:12
**25-1015** [1] - 3:3
**25-887** [1] - 3:3
**27,000** [1] - 9:6
**28** [1] - 59:13

## 3

**30** [2] - 4:20, 31:5
**30-day** [1] - 44:8
**300** [1] - 22:21
**30th** [2] - 7:21, 89:5
**31st** [1] - 31:1
**33** [1] - 13:6
**333** [1] - 1:24
**34553** [1] - 2:12
**360** [1] - 29:25
**3:07** [2] - 1:16, 99:22
**3:30** [2] - 5:1, 5:2

## 4

**4** [1] - 7:19
**400** [1] - 1:20
**450** [1] - 30:25
**49** [1] - 29:24

## 5

**5** [1] - 65:10
**500** [2] - 96:6, 99:1
**551** [1] - 65:10
**598** [1] - 91:4

## 6

**6** [2] - 89:23, 93:6
**60** [1] - 89:21
**600** [2] - 88:17, 88:18
**601** [1] - 2:16
**6202** [15] - 12:14, 13:7, 23:21, 25:7, 25:12, 26:1, 26:2, 27:6, 27:8, 27:20, 51:21, 78:20, 85:9, 93:9
**6202(c)** [1] - 93:10
**6204** [2] - 70:1, 78:20
**6207** [2] - 92:22, 93:9
**6208** [2] - 92:21, 93:9
**623** [2] - 75:11, 91:7
**672** [1] - 91:21

## 7

**7** [1] - 89:7

## 8

**80** [3] - 6:11, 21:21, 29:9
**83** [3] - 29:23, 30:4, 47:17
**8th** [1] - 2:7

## 9

**92-1** [1] - 89:23
**92-3** [1] - 89:7
**971** [1] - 91:21

## A

**a)(3** [1] - 70:2
**a.m** [2] - 1:16, 3:1
**Abady** [1] - 2:6
**Abby** [3] - 47:6, 58:25, 81:24
**Abigail** [2] - 4:13, 59:4
**ABIGAIL** [1] - 2:15
**ability** [12] - 8:10, 32:20, 34:5, 35:1, 55:8, 73:4, 76:23, 77:4, 77:11, 77:16, 96:16, 98:15
**able** [13] - 9:25, 44:13, 45:1, 46:8, 46:13, 54:17, 58:17, 65:4, 69:22, 71:9, 77:8, 77:19, 82:25
**abolish** [2] - 32:1, 32:20
**above-entitled** [1] - 100:4
**Abramowitz** [28] - 3:3, 3:11, 3:25, 4:2, 4:18, 4:19, 29:21, 33:14, 33:23, 34:16, 36:22, 38:15, 39:25, 42:15, 42:25, 43:9, 43:20, 57:20, 74:5, 78:1, 78:4, 78:8, 79:5, 79:10, 94:16, 96:4, 96:16, 98:23
**ABRAMOWITZ** [1] - 1:3
**abroad** [8] - 7:12, 8:22, 9:8, 9:11, 9:17, 10:21, 20:22, 21:1
**absence** [1] - 14:24
**absent** [1] - 34:17
**absolutely** [2] - 13:17, 25:4
**abstract** [6] - 66:7, 66:14, 66:19, 66:22, 67:1, 67:10
**abuse** [1] - 24:13
**academic** [6] - 50:13, 50:14, 51:4, 86:24, 86:25, 87:1
**academics** [2] - 50:16, 87:5
**accelerates** [1] - 89:12
**acceptance** [1] - 60:1
**accepts** [1] - 61:13
**access** [4] - 54:2, 54:19, 55:11, 57:3
**accordance** [2] - 70:4, 70:9
**account** [3] - 44:20, 44:23, 98:8
**Accountability** [2] - 2:1, 3:22
**accounted** [1] - 13:5
**accrues** [2] - 94:19, 95:19
**accurate** [2] - 93:11, 100:3
**achieve** [1] - 77:4
**acknowledge** [4] - 24:6, 53:10, 53:13, 55:1
**acknowledged** [4] - 24:4, 49:12, 63:19, 68:2
**acknowledgement** [2] - 50:11, 51:3
**Act** [40] - 10:7, 10:8, 10:11, 11:6, 11:11, 11:18, 12:8, 13:12, 13:24, 18:14, 31:11, 32:4, 32:8, 35:2, 35:19, 36:10, 36:20, 36:23, 44:1, 51:13, 53:23, 57:16, 59:11, 59:13, 59:18, 59:23, 60:6, 60:17, 60:19, 61:16, 62:4, 62:22, 63:9, 64:4, 80:21, 80:22, 91:17, 92:4, 98:10
**act** [3] - 67:15, 84:22, 99:18
**acting** [5] - 11:25, 14:3, 16:16, 49:4, 95:7
**action** [55] - 10:10, 12:10, 12:11, 13:21, 14:6, 14:7, 15:7, 15:11, 15:12, 18:13, 19:23, 19:25, 26:15, 30:9, 30:12, 41:3, 49:11, 55:2, 55:22, 56:23, 61:9, 63:12, 64:16, 65:3, 65:6, 65:8, 65:10, 65:17, 65:19, 65:22, 65:25, 66:4, 66:6, 66:12, 66:23, 67:1, 67:9, 67:11, 67:12, 68:1, 68:15, 69:5, 69:8, 69:14, 69:17, 71:14, 71:20, 78:5, 83:14, 93:6, 93:19, 93:21, 94:8, 97:9
**Actions** [1] - 3:2
**actions** [17] - 12:18, 12:20, 17:16, 32:9, 43:23, 55:3, 56:25, 57:11, 66:15, 67:21, 67:23, 68:19, 68:20, 68:23, 91:3, 99:7
**activity** [1] - 41:4
**actual** [3] - 16:5, 60:2, 60:15
**acute** [1] - 7:25
**Adams** [1] - 51:2
**add** [3] - 39:21, 39:23, 39:25
**addition** [2] - 41:1, 98:25
**additional** [3] - 74:1, 84:5, 95:21
**address** [22] - 13:18, 16:11, 19:6, 22:25, 24:9, 24:10, 24:16, 40:17, 41:23, 42:22, 47:6, 63:4, 63:15, 63:21, 63:24, 73:21, 74:12, 74:13, 81:24, 84:9, 88:9, 92:2
**addressed** [4] - 89:10, 89:16, 91:14, 95:2
**addressing** [4] - 24:7, 40:21, 41:18, 59:6
**adequate** [1] - 49:6
**adequately** [1] - 70:22
**adjudicate** [1] - 63:1
**adjudicated** [1] - 18:24
**adjudication** [1] -

18:3
**Administration** [1] - 76:24
**administration** [2] - 67:6, 99:3
**administrations** [1] - 67:5
**Administrative** [7] - 12:7, 13:12, 32:4, 32:8, 35:2, 35:19, 36:10
**administrative** [30] - 16:5, 16:12, 17:2, 30:6, 33:10, 33:11, 33:14, 33:22, 34:4, 34:10, 34:25, 35:12, 35:16, 36:18, 38:10, 39:17, 43:13, 47:19, 49:21, 54:15, 54:22, 55:19, 64:6, 82:6, 83:18, 91:5, 94:3, 94:18, 97:19, 98:22
**administratively** [1] - 97:1
**admitted** [1] - 18:20
**admonished** [1] - 36:5
**admonishment** [1] - 36:8
**adopted** [1] - 62:16
**adverse** [2] - 55:22, 56:23
**affect** [4] - 5:6, 36:25, 39:12, 63:6
**affected** [5] - 14:7, 40:18, 76:6, 76:15, 94:21
**affecting** [1] - 94:1
**affidavit** [2] - 38:15, 39:24
**affiliate** [1] - 8:21
**affirmed** [1] - 57:8
**afforded** [1] - 44:8
**AFGE** [5] - 8:16, 36:13, 57:8, 74:13, 75:11
**AFSA** [1] - 74:13
**AFSCME** [3] - 8:15, 74:12, 75:11
**afternoon** [4] - 41:14, 59:2, 59:3, 73:19
**agencies** [8] - 16:12, 18:19, 20:18, 21:11, 32:21, 44:6, 91:12, 91:16
**agency** [146] - 9:15, 9:23, 10:1, 11:15, 11:24, 12:9, 12:11, 12:15, 13:21, 13:23, 14:6, 15:7, 15:11, 15:12, 15:16, 16:4, 16:16, 17:2, 17:5, 17:11, 17:16, 18:2, 18:13, 19:5, 19:21, 19:23, 20:3, 21:8, 26:16, 30:15, 30:18, 30:21, 31:25, 32:1, 32:6, 32:19, 33:4, 33:11, 33:15, 33:17, 33:20, 33:24, 34:2, 34:5, 34:10, 34:20, 35:3, 35:6, 35:16, 36:4, 36:18, 37:4, 37:16, 37:19, 38:2, 38:7, 42:21, 42:24, 46:8, 46:11, 46:24, 47:1, 47:8, 47:14, 47:17, 47:18, 49:1, 54:9, 54:11, 55:2, 57:6, 57:22, 58:1, 58:2, 62:13, 63:12, 64:16, 64:19, 65:1, 65:3, 65:6, 65:8, 65:9, 65:10, 65:17, 65:22, 65:25, 66:6, 66:16, 66:23, 67:1, 67:9, 67:10, 67:11, 67:12, 67:21, 67:22, 67:25, 68:1, 68:5, 68:11, 68:14, 68:15, 69:5, 69:8, 69:12, 69:14, 69:17, 70:19, 70:24, 71:14, 71:19, 71:21, 80:3, 82:4, 82:18, 84:2, 84:18, 84:22, 90:15, 93:5, 93:19, 93:21, 94:8, 94:23, 96:4, 96:16, 97:12, 97:14, 97:15, 97:19, 97:21, 97:23, 98:24, 99:4, 99:6
**agency's** [5] - 69:19, 69:23, 70:12, 84:4
**agenda** [1] - 43:1
**aggressive** [1] - 84:17
**ago** [1] - 6:11
**agree** [4] - 13:15, 15:9, 22:16, 48:7
**agreed** [1] - 4:24
**agreement** [6] - 45:9, 59:22, 60:18, 84:11, 92:19, 93:2
**agreements** [9] - 10:22, 14:23, 60:5, 60:9, 60:11, 60:13, 60:16, 62:8, 92:11
**ahead** [3] - 14:16, 14:19, 40:14
**AIDS** [1] - 11:5
**Aiken** [2] - 19:19, 95:9
**air** [2] - 6:4, 9:16
**al** [8] - 1:3, 1:6, 1:9, 1:12, 3:3, 3:4, 3:5
**allegation** [2] - 26:2, 48:24
**allegations** [6] - 5:18, 30:19, 43:22, 69:11, 72:15, 77:6
**allege** [7] - 46:18, 72:19, 76:22, 77:3, 77:14, 78:19, 79:10
**alleged** [3] - 45:21, 65:25, 76:6
**allegedly** [1] - 67:21
**alleging** [4] - 11:15, 68:3, 78:21, 88:25
**Alliance** [1] - 76:24
**allocated** [1] - 84:3
**allow** [2] - 49:14, 96:17
**allowed** [3] - 6:8, 72:8, 96:4
**allows** [2] - 47:8, 68:13
**alone** [2] - 25:2, 90:22
**Alsup** [1] - 91:13
**alternative** [1] - 79:22
**ambiguous** [1] - 20:3
**Amendment** [39] - 6:21, 7:13, 11:16, 11:23, 12:19, 22:5, 22:11, 23:1, 23:25, 25:3, 41:4, 41:19, 47:21, 47:24, 48:1, 48:9, 48:19, 49:10, 49:14, 49:22, 50:10, 50:12, 50:14, 50:24, 51:6, 51:11, 53:2, 53:21, 54:6, 70:14, 72:10, 72:13, 75:16, 76:13, 84:9, 87:11, 87:17, 87:23
**America** [75] - 6:4, 6:7, 6:16, 7:5, 7:8, 7:11, 7:13, 8:14, 8:19, 8:22, 9:1, 9:9, 9:13, 9:14, 13:8, 15:18, 15:25, 16:10, 16:20, 18:6, 20:21, 21:17, 22:21, 23:23, 24:5, 24:9, 24:11, 25:1, 25:12, 25:13, 25:17, 25:22, 27:16, 28:15, 28:16, 29:9, 29:21, 29:22, 29:23, 30:15, 31:9, 31:16, 33:1, 37:16, 38:12, 38:25, 39:8, 39:19, 42:17, 43:5, 43:10, 45:6, 46:13, 50:3, 52:9, 52:22, 53:24, 77:16, 77:20, 77:21, 81:14, 81:25, 83:19, 86:2, 86:3, 86:4, 88:12, 88:17, 88:21, 89:5, 90:24, 92:4, 97:17
**American** [9] - 2:4, 7:10, 17:18, 20:20, 20:25, 23:16, 30:22, 75:22, 76:3
**amount** [2] - 91:1, 91:3
**ample** [2] - 15:21, 20:14
**amplify** [1] - 77:16
**analog** [1] - 87:2
**analogous** [1] - 52:23
**analysis** [8] - 10:16, 52:13, 53:16, 59:12, 64:17, 69:8, 69:9, 90:11
**analyze** [2] - 56:15, 63:11
**analyzing** [1] - 28:10
**ANDREW** [1] - 2:7
**Andrew** [1] - 3:8
**animus** [4] - 24:4, 26:14, 26:19, 27:1
**announced** [2] - 8:3, 96:6
**announcement** [2] - 12:23, 13:2
**announcing** [1] - 91:6
**answer** [4] - 19:8, 34:19, 35:5, 48:15
**anti** [2] - 25:23, 26:22
**anti-Trump** [2] - 25:23, 26:22
**APA** [26] - 6:20, 12:7, 20:1, 35:11, 37:13, 47:5, 50:2, 59:7, 61:22, 64:10, 64:24, 65:2, 65:3, 65:4, 66:23, 67:16, 68:13, 68:15, 68:22, 69:13, 71:13, 84:13, 93:4, 94:10, 94:12, 97:2
**apart** [1] - 67:1
**apologies** [1] - 78:18
**apologize** [1] - 95:15
**appeal** [1] - 17:14
**appealable** [1] - 13:15
**Appeals** [4] - 39:13, 66:25, 67:3
**appear** [2] - 32:16, 54:7
**appearance** [1] - 3:7
**appearing** [1] - 87:24
**appellant** [1] - 83:11
**applicable** [1] - 47:9
**applied** [1] - 56:12
**applies** [1] - 92:3
**apply** [9] - 19:3, 36:21, 45:11, 48:10, 58:6, 60:19, 62:4, 91:10, 92:4
**appointed** [1] - 18:17
**appointee** [1] - 85:2
**approach** [1] - 3:6
**approaching** [1] - 90:13
**appropriate** [5] - 49:21, 55:19, 55:25, 92:1, 96:19
**appropriated** [2] - 81:16, 82:11
**appropriately** [3] - 36:16, 54:21, 64:7
**appropriation** [9] - 37:20, 79:9, 79:11, 79:14, 79:16, 79:25, 82:13, 98:9, 98:13
**appropriations** [6] - 16:19, 31:13, 31:18, 79:25, 97:21, 98:11
**April** [5] - 1:16, 7:21, 14:17, 89:5, 100:6
**arbitrary** [10] - 13:11, 13:18, 19:25, 30:24, 32:10, 32:16, 69:4, 82:15, 82:17, 97:6
**area** [1] - 84:15
**areas** [1] - 64:25
**arguably** [1] - 61:11
**argue** [13] - 4:22, 13:24, 19:16, 26:15, 34:8, 60:19, 73:8, 75:13, 83:1, 84:25, 85:20, 90:21, 96:12
**argued** [8] - 11:5, 25:10, 25:11, 62:1, 62:3, 62:7, 80:7, 80:14
**argues** [4] - 9:18, 12:1, 33:7, 93:7
**arguing** [5] - 36:22, 37:2, 62:9, 63:18, 90:9
**argument** [20] - 4:23, 6:19, 13:18, 13:23, 16:11, 18:8, 20:1,

32:11, 32:17, 32:24, 33:25, 61:13, 66:15, 69:13, 73:18, 80:9, 85:6, 89:11, 93:18, 97:18
**arguments** [30] - 10:8, 32:22, 37:3, 41:18, 41:20, 41:23, 43:14, 44:1, 49:15, 49:16, 50:5, 53:17, 54:1, 54:6, 57:15, 62:15, 62:17, 63:4, 63:5, 63:7, 63:8, 63:9, 72:21, 74:2, 91:10, 94:14, 95:17, 95:21
**arisen** [1] - 7:16
**arrogation** [1] - 91:12
**artful** [1] - 61:4
**Article** [2] - 78:2, 78:4
**articles** [1] - 26:6
**articulated** [1] - 95:11
**Asia** [9] - 7:22, 8:3, 8:23, 9:5, 9:9, 15:4, 15:5, 16:22, 92:19
**aside** [1] - 12:6
**aspect** [3] - 32:9, 34:9, 53:8
**asserted** [2] - 83:6, 83:7
**asserts** [1] - 10:11
**assess** [3] - 9:1, 9:11, 63:1
**Assistant** [1] - 41:15
**assistant** [1] - 4:11
**associated** [1] - 47:12
**Associated** [1] - 9:7
**association** [1] - 76:5
**Association** [4] - 7:11, 17:19, 20:20, 76:1
**associational** [4] - 20:13, 74:15, 74:17, 75:17
**assumption** [1] - 18:24
**assumptions** [1] - 18:1
**at-worst** [1] - 43:16
**attached** [1] - 60:9
**attack** [1] - 54:11
**attacked** [1] - 42:20
**attempt** [3] - 11:8, 23:16, 78:22
**attempted** [2] - 67:7, 92:21
**attempts** [2] - 56:10, 78:8
**attention** [4] - 14:2, 75:25, 76:2, 76:17
**Attorney** [2] - 4:12, 41:15
**Attorney's** [2] - 4:10, 73:21
**audience** [10] - 7:6, 9:16, 22:20, 22:22, 37:25, 71:7, 74:21, 75:4, 86:9, 96:9
**audiences** [1] - 53:25
**AUSA** [1] - 80:6
**authoritative** [1] - 93:11
**authority** [12] - 21:9, 23:23, 25:9, 27:9, 31:8, 37:4, 45:17, 60:2, 60:15, 70:3, 87:7, 91:13
**Authorization** [1] - 31:11
**available** [2] - 79:18, 91:25
**Avenue** [1] - 1:24
**avoid** [2] - 61:5, 94:10
**aware** [5] - 42:3, 79:5, 79:18, 92:8, 99:15

## B

**B2** [1] - 52:2
**bailiwick** [1] - 22:11
**baked** [1] - 52:19
**balance** [9] - 20:16, 21:1, 21:4, 29:3, 83:6, 87:23, 87:25, 95:10, 95:11
**balanced** [2] - 52:2, 88:1
**balancing** [4] - 28:20, 28:22, 49:5, 53:5
**Bank** [1] - 37:6
**banks** [1] - 37:7
**bargaining** [3] - 8:13, 55:24, 77:10
**barnacles** [1] - 86:2
**BARNETT** [1] - 1:19
**base** [2] - 33:9, 87:17
**based** [14] - 10:18, 18:13, 34:18, 38:15, 40:8, 49:11, 55:2, 61:12, 62:8, 71:6, 72:15, 76:10, 82:24, 85:1
**bases** [2] - 10:11, 88:24
**basic** [4] - 35:10, 78:5, 96:18
**Basin** [4] - 18:10, 34:8, 34:11, 56:16
**basis** [11] - 8:9, 10:15, 11:9, 11:16, 15:4, 20:5, 20:13, 32:13, 91:20, 91:24, 96:5
**Bateman** [1] - 4:5
**BATEMAN** [2] - 2:12, 4:5
**bear** [1] - 88:8
**bears** [1] - 14:6
**Beaton** [1] - 4:1
**BEATON** [2] - 1:19, 4:1
**become** [1] - 22:18
**becomes** [3] - 17:24, 69:21, 71:2
**BEFORE** [1] - 1:15
**begin** [1] - 5:2
**beginning** [1] - 59:12
**behalf** [12] - 4:9, 4:12, 4:14, 41:15, 53:14, 73:13, 73:20, 78:5, 78:9, 85:7, 85:15, 87:12
**behavior** [1] - 8:11
**behind** [1] - 66:11
**belied** [2] - 92:23, 93:8
**belief** [2] - 73:2, 94:15
**belong** [1] - 33:7
**below** [1] - 62:16
**benefits** [1] - 43:11
**Berman** [1] - 53:1
**beside** [1] - 92:13
**best** [3] - 47:14, 47:20, 97:2
**better** [1] - 72:1
**between** [3] - 72:24, 84:11, 85:25
**beyond** [3] - 42:7, 42:13, 57:5
**bid** [1] - 41:17
**Biden** [3] - 25:23, 66:20
**biggest** [1] - 30:16
**bill** [1] - 3:10
**bind** [2] - 60:2, 60:15
**binding** [1] - 50:20
**Bishops** [1] - 58:19
**bit** [5] - 6:2, 40:17, 40:18, 43:14, 91:8
**blunderbuss** [2] - 44:19, 44:22
**Board** [8] - 33:9, 34:1, 34:11, 34:21, 35:17, 36:9, 53:1, 54:24
**board** [1] - 68:11
**body** [1] - 27:23
**boil** [2] - 54:13, 54:20
**Bonds** [1] - 90:11
**Borders** [2] - 8:21, 9:15
**Boston** [1] - 9:8
**bottom** [2] - 30:21, 57:10
**Box** [1] - 2:12
**branch** [2] - 31:8, 83:8
**break** [3] - 4:21, 40:10, 40:15
**BRENDA** [1] - 2:15
**Brenda** [2] - 4:12, 41:15
**BRIAN** [1] - 1:19
**Brian** [1] - 4:1
**brief** [22] - 7:18, 18:3, 19:11, 20:14, 20:17, 32:15, 35:20, 38:14, 39:6, 39:23, 40:4, 40:6, 43:16, 52:21, 77:1, 77:2, 78:14, 79:2, 79:21, 83:21, 84:10, 95:1
**briefing** [1] - 23:7
**briefly** [11] - 20:16, 31:6, 34:14, 47:21, 57:15, 73:21, 76:18, 78:13, 79:4, 83:3, 90:20
**briefs** [1] - 76:10
**Brinckerhoff** [1] - 2:6
**bring** [8] - 42:24, 47:8, 55:20, 55:23, 65:4, 77:6, 77:24, 78:4
**bringing** [4] - 11:12, 16:4, 41:1, 76:17
**broad** [8] - 28:25, 51:25, 54:11, 55:6, 63:19, 64:18, 64:20, 85:13
**broadcast** [17] - 8:14, 10:21, 10:22, 12:14, 15:23, 15:25, 21:20, 25:22, 26:7, 27:9, 27:18, 27:25, 29:24, 88:16, 88:22, 93:16, 94:4
**broadcasting** [14] - 6:6, 9:14, 14:8, 22:19, 51:22, 51:24, 53:24, 70:4, 70:6, 70:20, 71:5, 71:10, 83:15, 93:13
**Broadcasting** [7] - 10:2, 13:4, 13:9, 16:21, 26:14, 51:13, 52:25
**broadcasts** [10] - 8:23, 13:4, 13:7, 22:18, 30:4, 52:9, 72:19, 73:6, 90:24, 94:5
**broader** [7] - 5:15, 5:19, 39:1, 40:17, 40:18, 59:11, 62:23
**broadly** [4] - 25:25, 28:17, 59:7, 93:21
**brought** [3] - 11:14, 51:5, 57:11
**brushed** [1] - 90:8
**Builders** [1] - 76:1
**building** [2] - 26:10, 94:4
**bunch** [2] - 68:22, 69:11
**burden** [3] - 30:21, 65:18, 65:20
**business** [1] - 97:24
**butcher** [1] - 78:25
**buys** [2] - 61:13, 95:16
**BY** [7] - 1:19, 2:2, 2:4, 2:7, 2:9, 2:12, 2:15

## C

**cables** [4] - 20:25, 21:25, 22:7, 22:18
**California** [7] - 10:15, 11:8, 60:24, 61:19, 62:11, 91:15, 92:23
**cancel** [3] - 39:17, 58:20
**canceled** [4] - 37:24, 37:25, 58:12
**canceling** [1] - 81:21
**cancellation** [4] - 11:4, 14:23, 40:19, 93:1
**cannot** [16] - 11:9, 15:25, 17:3, 28:2, 65:15, 65:18, 65:23, 68:7, 68:21, 84:5, 85:17, 89:20, 93:19, 95:14, 96:15, 99:17
**capacities** [1] - 39:19

**capacity** [1] - 49:1
**capital** [3] - 37:6, 52:7, 52:10
**capricious** [10] - 13:11, 13:18, 19:25, 30:24, 32:10, 32:16, 69:4, 82:15, 82:18, 97:7
**capture** [2] - 71:24
**care** [5] - 32:22, 45:3, 45:14, 79:4, 79:7
**carefully** [1] - 65:8
**carried** [4] - 32:6, 65:19, 88:19, 94:9
**carrier** [1] - 89:20
**carry** [4] - 12:19, 44:17, 77:11, 93:8
**carrying** [2] - 15:13, 70:18
**carve** [1] - 64:1
**carved** [1] - 17:20
**carveout** [2] - 51:3, 56:11
**case** [164] - 3:9, 3:11, 3:13, 4:2, 4:19, 5:8, 5:15, 5:16, 5:21, 8:8, 8:17, 9:20, 9:21, 10:16, 10:23, 11:2, 11:5, 11:6, 11:9, 11:13, 11:14, 11:22, 12:2, 12:20, 14:22, 16:12, 16:13, 16:15, 17:8, 17:10, 17:14, 17:19, 17:21, 17:25, 19:4, 19:10, 19:17, 19:18, 19:19, 20:15, 21:2, 21:10, 21:21, 23:12, 23:15, 23:18, 24:3, 24:8, 24:23, 26:13, 26:14, 26:19, 28:10, 28:11, 28:21, 31:6, 33:3, 33:7, 33:13, 33:14, 33:15, 33:24, 33:25, 34:3, 34:8, 34:9, 34:22, 35:10, 35:14, 35:24, 35:25, 36:12, 36:25, 37:5, 37:7, 37:23, 38:22, 43:7, 43:8, 46:8, 46:19, 47:22, 47:24, 47:25, 48:2, 48:21, 51:8, 53:3, 54:18, 56:6, 56:7, 56:18, 57:6, 57:20, 57:23, 58:6, 60:4, 60:9, 61:4, 61:10, 61:12, 61:19, 61:24, 62:1, 62:11, 63:2, 63:18, 63:21, 65:16, 66:1, 66:3, 66:18, 66:21, 66:25, 67:17, 72:16, 73:8, 76:1, 76:3, 77:1, 79:8, 79:19, 80:1, 80:7, 80:19, 80:25, 81:13, 84:13, 87:14, 87:18, 87:19, 87:25, 88:11, 88:13, 89:25, 90:11, 90:23, 91:1, 91:15, 92:3, 92:8, 92:9, 92:14, 92:16, 92:23, 92:25, 94:25, 95:20, 96:20, 96:21, 97:1, 97:9, 97:13
**CASE** [2] - 1:5, 1:11
**cases** [26] - 4:17, 4:18, 4:23, 5:2, 5:5, 5:6, 5:9, 18:12, 35:20, 38:20, 39:3, 39:12, 46:18, 50:25, 51:2, 51:4, 52:21, 62:25, 63:3, 63:22, 63:24, 87:4, 87:10, 88:3, 99:14, 99:21
**Catholic** [1] - 58:19
**CBS** [1] - 86:20
**cease** [2] - 39:18, 39:22
**ceases** [1] - 10:1
**Celli** [5] - 2:6, 3:8, 3:9, 3:18, 22:25
**CELLI** [19] - 2:7, 3:8, 5:13, 5:17, 5:20, 5:24, 7:1, 23:4, 23:7, 24:22, 25:4, 27:15, 27:24, 29:14, 84:9, 85:11, 86:5, 86:7, 86:12
**censorious** [1] - 24:6
**CEO** [10] - 28:1, 45:17, 70:2, 70:10, 70:18, 70:22, 70:24, 72:22, 72:25, 84:16
**ceremonial** [1] - 80:9
**certain** [12] - 27:2, 37:7, 42:5, 42:20, 45:24, 64:25, 66:15, 67:22, 67:23, 68:18, 73:6
**certainly** [4] - 5:18, 43:19, 46:23, 93:15
**CERTIFICATE** [1] - 100:1
**Certified** [1] - 1:23
**certify** [1] - 100:3
**cessation** [2] - 10:12, 14:7
**CFPB** [1] - 17:10
**challenge** [6] - 54:8, 66:2, 67:15, 68:11, 68:13, 71:16
**challenged** [2] - 10:12, 67:19
**challenges** [3] - 25:20, 56:12, 91:3
**challenging** [6] - 47:4, 50:2, 52:24, 55:8, 57:10
**change** [7] - 13:3, 15:13, 16:9, 20:4, 50:2, 55:5, 57:12
**changed** [5] - 14:10, 58:12, 67:5, 70:15, 72:23
**changing** [2] - 68:5, 84:17
**channel** [1] - 56:22
**channeled** [9] - 16:12, 17:2, 18:13, 49:20, 54:21, 64:7, 72:8, 90:21, 95:18
**channeling** [15] - 6:20, 17:12, 18:10, 19:8, 33:6, 41:20, 43:14, 49:16, 54:6, 57:15, 63:5, 63:8, 90:20, 91:10, 96:14
**channels** [2] - 15:25, 55:25
**characteristics** [1] - 60:12
**characterize** [1] - 23:22
**charge** [1] - 72:24
**charter** [1] - 31:10
**Chemical** [1] - 76:3
**chief** [1] - 80:14
**chilled** [2] - 72:15, 73:4
**Chinese** [1] - 25:18
**Circuit** [19] - 17:14, 35:25, 36:15, 37:5, 37:11, 43:6, 51:1, 55:13, 56:1, 57:8, 59:18, 60:22, 61:4, 62:16, 76:1, 76:3, 83:4, 91:21
**circuit** [1] - 56:13
**circumcised** [1] - 66:1
**circumscribed** [4] - 65:23, 66:4, 67:14, 71:18
**circumstance** [2] - 90:9, 92:24
**circumstances** [4] - 34:21, 52:23, 55:14, 79:19
**circumvent** [1] - 55:18
**cite** [6] - 35:20, 69:25, 76:23, 89:25, 90:11, 97:11
**cited** [8] - 11:13, 52:21, 53:3, 77:1, 87:10, 90:6, 92:16, 96:20
**citizen** [2] - 48:15, 49:4
**citizens** [2] - 49:9, 50:24
**Civil** [3] - 3:2, 4:14, 18:14
**claim** [36] - 11:19, 25:8, 27:8, 30:24, 35:9, 36:23, 43:4, 43:12, 47:7, 49:19, 49:23, 50:8, 50:10, 54:12, 59:15, 60:20, 60:25, 61:6, 61:8, 61:15, 62:2, 62:4, 64:2, 65:4, 72:6, 72:10, 73:22, 77:7, 77:15, 77:17, 79:17, 79:20, 84:12, 84:13, 92:5
**Claims** [8] - 13:25, 59:14, 59:20, 61:5, 61:9, 64:4, 92:8, 93:3
**claims** [50] - 6:20, 11:12, 18:24, 19:6, 35:10, 35:11, 35:15, 35:18, 35:22, 37:12, 44:1, 46:17, 49:23, 49:25, 50:1, 50:2, 50:3, 50:4, 51:5, 53:20, 54:7, 54:21, 56:5, 56:8, 56:9, 56:19, 56:22, 56:23, 56:24, 57:5, 59:7, 61:14, 62:21, 63:23, 64:11, 70:1, 71:13, 72:7, 77:25, 78:17, 78:22, 78:23, 79:1, 79:3, 79:22, 90:21, 91:2
**classic** [2] - 19:12, 32:6
**classroom** [2] - 50:15, 87:1
**clause** [8] - 32:22, 79:4, 79:7, 79:9, 79:11, 79:14, 79:16, 82:13
**clear** [31] - 10:19, 16:18, 21:20, 25:10, 26:14, 28:6, 29:1, 32:3, 34:11, 42:6, 43:6, 46:19, 49:7, 52:6, 56:1, 56:8, 56:10, 56:18, 57:6, 61:6, 61:19, 68:23, 69:16, 69:21, 71:2, 78:2, 78:14, 78:21, 79:12, 89:1, 93:25
**clearer** [2] - 21:1, 21:10
**clearly** [7] - 10:10, 25:14, 34:19, 35:10, 35:17, 70:10, 97:19
**CLERK** [1] - 3:2
**clerk** [1] - 40:11
**close** [8] - 23:17, 26:16, 30:18, 31:8, 37:4, 38:9, 66:6, 66:16
**closed** [10] - 30:2, 33:15, 35:6, 37:17, 38:2, 81:13, 84:22, 84:23, 85:1, 88:12
**closing** [3] - 24:5, 24:17, 34:4
**closure** [1] - 31:7
**co** [2] - 71:22, 83:24
**co-counsel** [2] - 71:22, 83:24
**codified** [1] - 31:10
**coin** [1] - 86:16
**collateral** [3] - 35:9, 56:24, 57:4
**colleague** [11] - 22:10, 41:20, 41:22, 47:6, 58:25, 59:5, 59:9, 64:8, 74:25, 81:24, 97:2
**colleagues** [4] - 44:15, 78:15, 79:21, 83:5
**COLUMBIA** [1] - 1:1
**Columbia** [2] - 2:10, 100:3
**coming** [1] - 73:5
**comment** [1] - 87:23
**commentary** [1] - 87:14
**commenting** [1] - 87:21
**comments** [4] - 24:11, 25:1, 42:20, 75:8
**committed** [2] - 69:14, 69:17
**company** [1] - 61:3
**comparable** [1] - 10:1
**compel** [1] - 14:22
**compelled** [1] - 48:5
**complaint** [7] - 40:8, 55:1, 58:9, 68:20, 77:7, 77:14, 78:11

**complaints** [2] - 54:18, 55:20
**complete** [3] - 14:7, 33:13, 47:16
**completely** [3] - 9:23, 10:23, 23:17
**complicated** [1] - 22:17
**comply** [4] - 41:2, 47:2, 47:20, 83:17
**complying** [1] - 47:15
**components** [1] - 47:10
**compounded** [1] - 7:4
**comprehensive** [4] - 19:2, 52:3, 80:11, 93:12
**comprised** [1] - 76:14
**computers** [2] - 54:20, 55:12
**concede** [1] - 73:24
**conceded** [1] - 95:17
**concedes** [1] - 43:9
**concept** [2] - 29:7, 66:7
**concern** [3] - 48:15, 49:4, 87:16
**concerns** [4] - 6:17, 68:2, 76:20, 77:17
**concession** [1] - 94:15
**conciliation** [1] - 11:17
**conclude** [1] - 5:1
**concluded** [3] - 4:23, 85:6, 99:22
**concludes** [1] - 62:25
**concrete** [1] - 75:9
**condition** [1] - 38:13
**conditions** [7] - 6:1, 55:6, 55:11, 55:14, 87:15, 90:2, 90:5
**conduct** [1] - 76:22
**conducted** [1] - 70:4
**conducting** [1] - 70:8
**confer** [1] - 83:24
**conference** [1] - 5:3
**Conference** [2] - 58:19, 100:5
**confirmed** [2] - 18:17, 59:21
**confirms** [1] - 60:4
**conformance** [1] - 100:4
**confused** [2] - 74:20, 91:8
**Congress** [39] - 6:10, 6:14, 16:24, 17:1, 18:23, 21:20, 27:14, 27:15, 27:16, 27:22, 27:24, 31:10, 31:25, 32:1, 32:2, 32:19, 33:18, 34:6, 34:13, 34:15, 37:19, 54:22, 55:18, 56:19, 68:9, 79:25, 80:22, 80:25, 81:2, 81:4, 81:8, 81:19, 86:14, 97:20, 98:2, 98:10, 98:11, 98:15
**Congress's** [3] - 17:3, 18:14, 98:7
**Congression** [1] - 75:23
**congressional** [8] - 16:17, 16:19, 18:11, 19:13, 29:10, 31:13, 31:18, 54:4
**consent** [1] - 64:24
**consider** [3] - 28:22, 38:20, 63:25
**considerable** [1] - 76:19
**consideration** [1] - 60:1
**considerations** [1] - 44:24
**considered** [1] - 20:6
**consistent** [12] - 16:7, 28:17, 28:24, 29:8, 47:9, 51:20, 51:25, 54:3, 71:5, 85:12, 98:3, 98:5
**consistently** [1] - 93:10
**consisting** [1] - 68:19
**constantly** [1] - 68:5
**constitute** [1] - 26:17
**Constitution** [7] - 1:24, 35:3, 35:11, 35:19, 37:14, 61:14, 86:13
**constitutional** [22] - 5:25, 18:21, 19:15, 19:16, 35:21, 36:10, 41:24, 50:4, 56:5, 56:9, 56:12, 56:14, 60:21, 60:25, 73:22, 78:13, 78:16, 78:23, 79:1, 79:2, 94:24, 95:8
**constitutionality** [1] - 36:1
**construed** [1] - 93:21
**consult** [2] - 41:7, 99:13
**consulted** [1] - 4:17
**contained** [1] - 70:5
**contains** [1] - 30:19
**contends** [1] - 10:5
**content** [3] - 27:9, 28:2, 85:2
**contention** [1] - 12:3
**contest** [2] - 20:9, 20:10
**contesting** [1] - 95:22
**context** [3] - 69:13, 70:14, 92:3
**continue** [3] - 58:16, 58:17, 89:20
**continued** [1] - 74:21
**continues** [2] - 6:1, 88:11
**continuing** [3] - 31:13, 31:14, 68:4
**Contract** [3] - 10:7, 11:11, 11:18
**contract** [34] - 10:10, 11:17, 30:25, 36:23, 37:1, 37:2, 37:12, 57:23, 57:25, 58:3, 58:4, 58:6, 58:15, 59:16, 59:23, 59:24, 59:25, 60:7, 60:18, 60:20, 61:1, 61:7, 61:8, 61:10, 62:1, 62:4, 62:7, 62:21, 64:1, 64:2, 91:18, 91:24, 93:3, 99:1
**contractor** [1] - 43:23
**contractors** [14] - 6:7, 7:19, 11:12, 43:25, 45:6, 45:18, 57:21, 58:10, 58:11, 88:18, 89:3, 89:5, 91:5, 99:2
**contracts** [25] - 11:22, 31:1, 37:22, 37:23, 38:11, 38:16, 39:5, 39:7, 39:18, 39:25, 40:2, 44:4, 44:11, 57:22, 57:24, 58:2, 58:12, 58:17, 58:21, 59:10, 60:5, 60:10, 60:12, 81:22, 96:7
**contractual** [2] - 59:19, 92:12
**contrary** [4] - 16:10, 20:1, 33:1, 95:7
**contravention** [3] - 11:25, 16:17, 19:13
**contributes** [1] - 7:14
**control** [2] - 10:16, 98:10
**Control** [1] - 98:10
**controlled** [1] - 11:6
**controlling** [3] - 50:21, 92:15
**controls** [1] - 10:11
**convince** [1] - 13:16
**core** [2] - 8:10, 52:16
**correct** [2] - 48:21, 82:6
**correction** [2] - 68:21, 68:22
**correctly** [1] - 72:5
**costly** [1] - 38:2
**couch** [1] - 54:9
**Council** [1] - 76:3
**Counsel** [4] - 54:25, 57:8, 91:9, 91:11
**counsel** [12] - 3:6, 4:17, 4:21, 4:24, 5:1, 5:6, 5:11, 55:21, 71:22, 83:24, 99:10, 99:13
**Counsel's** [1] - 55:4
**countries** [4] - 8:6, 8:25, 22:19, 89:9
**country** [7] - 6:10, 8:5, 9:6, 45:8, 45:10, 86:11, 86:12
**counts** [1] - 95:22
**County** [3] - 2:4, 19:19, 95:9
**couple** [3] - 62:23, 65:21, 98:17
**course** [14] - 7:16, 17:5, 26:9, 26:19, 27:15, 37:25, 49:2, 49:12, 50:19, 51:10, 52:18, 57:5, 63:16, 73:8
**court** [25] - 5:13, 11:12, 15:17, 33:8, 34:18, 35:23, 37:13, 41:11, 49:13, 49:20, 56:4, 61:2, 61:21, 61:25, 62:3, 62:16, 62:19, 63:10, 68:7, 80:8, 80:14, 84:19, 91:20, 91:25, 99:20
**Court** [131] - 1:23, 3:1, 5:7, 5:20, 10:5, 11:1, 11:6, 11:9, 11:17, 12:3, 13:25, 14:4, 17:9, 17:10, 18:12, 21:3, 21:5, 21:12, 21:13, 26:13, 32:14, 34:7, 35:1, 36:6, 36:8, 36:11, 37:7, 39:13, 41:17, 42:3, 42:18, 42:23, 45:13, 48:3, 48:5, 48:11, 48:17, 48:19, 49:3, 49:23, 50:1, 50:6, 50:8, 50:10, 50:17, 50:25, 51:7, 51:11, 51:15, 52:2, 52:12, 52:14, 52:25, 53:4, 53:20, 54:5, 56:7, 56:10, 56:12, 57:14, 58:20, 58:22, 58:24, 59:4, 59:14, 59:20, 59:22, 60:23, 61:5, 61:9, 61:13, 61:18, 62:17, 62:25, 63:15, 63:24, 64:4, 64:20, 65:21, 66:3, 66:21, 66:24, 67:3, 67:8, 67:17, 67:25, 68:2, 68:4, 68:10, 68:12, 68:21, 68:23, 69:18, 69:22, 70:7, 70:12, 70:21, 71:1, 71:4, 71:9, 71:19, 71:21, 72:8, 72:22, 72:25, 76:4, 76:25, 77:6, 79:17, 83:6, 83:10, 83:12, 85:8, 87:21, 87:25, 92:8, 93:2, 95:12, 95:16, 96:21, 96:22, 97:5, 97:12, 99:11, 100:2, 100:2
**COURT** [90] - 1:1, 3:14, 3:17, 4:4, 4:7, 4:16, 5:15, 5:18, 5:23, 6:25, 12:6, 12:11, 12:23, 13:1, 13:10, 13:20, 14:9, 14:19, 14:25, 15:9, 15:20, 19:9, 21:3, 21:12, 21:15, 22:4, 22:8, 22:14, 23:2, 23:6, 24:19, 25:2, 27:14, 27:22, 29:13, 29:15, 29:18, 31:20, 31:22, 37:8, 38:21, 39:2, 39:14, 40:6, 40:9, 40:14, 41:5, 41:7, 41:9, 41:13, 42:1, 44:19, 44:22, 45:3, 45:14, 49:18, 57:18, 59:1, 68:24, 69:2, 71:22, 72:4, 73:17, 74:3, 74:8, 74:10, 79:24, 80:6, 81:18, 81:21, 82:2, 82:7, 82:10, 82:15, 82:20,

83:18, 83:22, 83:25, 84:6, 84:8, 85:10, 86:1, 86:6, 86:8, 88:6, 95:25, 99:9, 99:17, 99:20, 100:9
**Court's** [9] - 10:14, 15:6, 48:16, 48:22, 49:2, 53:16, 75:25, 76:2, 83:4
**courthouse** [1] - 87:6
**courtroom** [2] - 28:13, 80:9
**courts** [4] - 22:4, 35:22, 57:6, 59:20
**cover** [3] - 6:18, 39:2, 89:21
**covered** [3] - 15:2, 64:3, 64:8
**covers** [1] - 59:11
**created** [2] - 9:13, 31:25
**credited** [1] - 42:18
**critical** [5] - 23:10, 30:17, 39:10, 53:15, 83:14
**critically** [1] - 31:12
**cross** [1] - 26:7
**CRR** [1] - 100:8
**crux** [5] - 43:12, 44:1, 45:20, 49:2, 54:7
**CSRA** [6] - 19:2, 49:21, 56:3, 56:8, 56:11, 56:18
**Cuba** [4] - 10:2, 13:4, 13:8, 16:21
**cultural** [1] - 25:24
**culture** [1] - 52:4
**cut** [1] - 14:18
**CWA** [4] - 7:22, 9:4, 89:18, 95:18

## D

**Daily** [3] - 28:4, 28:5, 28:18
**daily** [1] - 8:8
**damage** [1] - 34:23
**dark** [2] - 35:7, 47:17
**Dated** [1] - 100:6
**David** [1] - 3:21
**DAVID** [1] - 2:2
**day-to-day** [1] - 55:14
**days** [10] - 31:5, 80:4, 80:7, 80:13, 81:2, 83:20, 88:14, 89:21, 94:6
**DC** [24] - 1:17, 1:20, 1:24, 2:3, 2:5, 2:10, 2:13, 2:16, 17:13, 35:25, 36:15, 37:5, 37:11, 43:5, 55:13, 56:1, 57:8, 59:18, 60:22, 61:4, 76:1, 76:3, 83:4, 91:21
**dealing** [1] - 30:20
**dealt** [2] - 11:3, 51:4
**Debra** [1] - 3:18
**DEBRA** [1] - 2:7
**decide** [13] - 5:11, 11:22, 24:24, 32:2, 34:13, 36:8, 36:9, 36:11, 38:19, 39:11, 63:15, 81:6, 97:6
**decided** [10] - 19:20, 35:22, 35:23, 56:7, 80:3, 80:10, 82:7, 94:11, 96:23
**decides** [3] - 37:13, 37:14, 80:2
**deciding** [1] - 95:5
**decision** [42] - 10:14, 12:4, 12:10, 12:12, 12:20, 13:10, 14:5, 15:12, 17:9, 18:25, 24:24, 30:18, 31:17, 32:14, 34:7, 43:6, 44:19, 44:22, 49:14, 53:1, 65:19, 65:24, 66:6, 66:10, 66:16, 67:1, 67:4, 67:9, 69:23, 70:12, 75:11, 82:18, 83:4, 87:8, 89:10, 91:19, 93:6, 93:25, 94:9, 97:5, 97:8
**decision-makers** [1] - 18:25
**decision-making** [2] - 69:23, 70:12
**decisions** [8] - 32:4, 32:6, 32:7, 54:8, 66:22, 97:12, 97:14, 97:16
**declaration** [6] - 7:9, 20:19, 20:24, 74:19, 89:6, 89:23
**declarations** [6] - 74:18, 75:2, 76:11, 76:13, 89:16, 94:22
**declares** [1] - 30:15
**decree** [1] - 68:7
**deemed** [1] - 30:3
**default** [1] - 64:19
**defendant** [1] - 73:20
**Defendants** [2] - 1:7, 1:13
**defendants** [17] - 4:7, 4:9, 4:12, 4:14, 24:4, 27:7, 32:24, 34:8, 37:3, 58:9, 61:20, 64:13, 75:10, 75:13, 77:3, 78:3, 97:23
**DEFENDANTS** [1] - 2:14
**defendants'** [4] - 4:21, 23:13, 35:5, 76:22
**Defenders** [3] - 3:16, 67:17, 68:25
**deference** [2] - 64:20, 65:1
**defined** [3] - 25:25, 65:10, 65:14
**defines** [1] - 65:8
**definition** [5] - 25:4, 26:11, 46:14, 65:6, 84:25
**definitionally** [1] - 85:3
**deliver** [1] - 34:21
**Dellinger** [5] - 43:7, 43:8, 43:15, 43:19, 83:5
**demanding** [1] - 79:18
**Demers** [1] - 51:2
**Democracy** [2] - 2:11, 3:16
**democratic** [1] - 7:7
**demonstrate** [6] - 42:5, 75:1, 75:16, 76:16, 76:18, 78:10
**demonstrated** [5] - 20:19, 77:2, 77:12, 77:24, 78:11
**demonstrates** [1] - 53:9
**denial** [1] - 65:12
**denied** [3] - 11:1, 11:7, 84:13
**deny** [1] - 91:24
**department** [1] - 68:9
**Department** [12] - 4:14, 10:15, 20:23, 20:25, 21:25, 60:3, 60:23, 61:18, 62:2, 62:10, 75:24, 76:3
**departure** [1] - 24:12
**deprived** [1] - 6:9
**DEPUTY** [1] - 3:2
**derives** [1] - 37:16
**described** [4] - 5:22, 5:24, 26:24, 65:22
**despite** [1] - 7:3
**destroyed** [2] - 19:2, 33:4
**detail** [1] - 38:14
**detailed** [1] - 20:13
**details** [1] - 20:24
**determination** [1] - 13:21
**determine** [6] - 44:9, 47:1, 47:19, 49:3, 72:12, 83:12
**determined** [1] - 83:10
**determining** [1] - 47:14
**developments** [1] - 93:13
**device** [1] - 34:4
**devices** [1] - 6:23
**devoid** [1] - 75:4
**devote** [2] - 14:2, 76:19
**dictate** [3] - 23:23, 25:9, 27:9
**differences** [1] - 85:24
**different** [10] - 14:15, 36:19, 38:22, 58:22, 63:17, 72:11, 72:23, 84:15, 85:3, 86:19
**differently** [1] - 94:16
**difficult** [1] - 21:13
**diminished** [2] - 10:2, 77:10
**diminishes** [1] - 51:17
**Diplomate** [1] - 1:22
**direct** [8] - 15:5, 16:16, 19:13, 33:24, 52:2, 75:25, 76:2, 96:4
**direction** [1] - 12:14
**directive** [1] - 95:8
**directly** [2] - 11:14, 92:17
**director** [5] - 29:22, 33:17, 42:17, 43:5, 72:13
**director's** [2] - 49:22, 73:3
**disagree** [1] - 48:1
**discernible** [2] - 56:16, 56:17
**disciplinary** [1] - 30:10
**discrete** [7] - 57:11, 65:22, 65:25, 66:4, 67:14, 71:17, 72:6
**discretion** [17] - 53:19, 64:19, 64:20, 69:14, 69:17, 69:19, 70:10, 70:25, 71:21, 73:1, 84:4, 84:20, 84:22, 93:7, 93:16, 97:19, 97:23
**discretionary** [1] - 93:15
**discrimination** [8] - 23:14, 25:5, 26:4, 26:5, 26:8, 26:18, 27:5, 52:13
**discuss** [1] - 69:10
**discussed** [1] - 19:23
**discussing** [2] - 62:24, 90:7
**discussion** [5] - 48:19, 52:8, 53:11, 84:23, 91:17
**dismantle** [1] - 12:12
**dismantled** [9] - 17:6, 17:21, 46:24, 77:8, 77:18, 77:20, 77:21, 81:14, 81:25
**dismantling** [2] - 39:19, 39:22
**dismiss** [1] - 17:14
**displaying** [1] - 85:15
**dispositive** [1] - 63:3
**dispute** [5] - 60:14, 64:2, 64:5, 92:12, 93:3
**disputed** [1] - 60:11
**Disputes** [3] - 10:8, 11:11, 11:18
**disputes** [1] - 59:19
**disrupt** [1] - 83:16
**disseminate** [3] - 9:17, 22:23, 40:25
**dissent** [2] - 11:5, 50:19
**dissolve** [4] - 18:9, 41:21, 59:8, 63:6
**dissolved** [2] - 63:8, 63:12
**distinction** [2] - 50:18, 53:16
**distinguish** [1] - 87:9
**distinguishable** [1] - 61:24
**distort** [1] - 27:7
**distress** [1] - 74:20
**District** [5] - 44:16, 63:10, 91:14, 100:2
**DISTRICT** [3] - 1:1, 1:1, 1:15
**district** [11] - 37:13, 49:13, 49:20, 56:4, 61:2, 61:21, 61:25, 62:3, 62:18, 63:10,

91:24
**diversity** [1] - 52:4
**divest** [1] - 91:20
**divests** [2] - 10:5, 12:3
**divided** [1] - 6:18
**Division** [1] - 4:14
**Docket** [2] - 89:7, 89:23
**doctrine** [1] - 18:10
**documented** [1] - 39:24
**Doe** [3] - 7:19, 57:19, 57:20
**DOJ** [1] - 2:14
**DOJ-USAO** [1] - 2:14
**domestic** [1] - 53:25
**done** [13] - 14:24, 26:9, 30:10, 30:12, 34:23, 35:4, 67:14, 84:24, 97:24, 98:6, 98:16, 98:17, 99:17
**Dotzel** [1] - 3:25
**DOTZEL** [2] - 1:19, 3:24
**doubtful** [1] - 49:24
**down** [12] - 22:4, 33:1, 35:6, 37:4, 39:15, 47:9, 52:1, 54:13, 54:20, 80:2, 91:11, 94:5
**dozen** [1] - 35:20
**drastic** [2] - 20:4, 99:7
**draw** [3] - 85:5, 86:19, 86:22
**drawn** [2] - 19:1, 69:18
**drop** [1] - 73:25
**dropping** [1] - 95:20
**Drug** [1] - 76:24
**due** [1] - 58:21
**dues** [1] - 77:9
**during** [2] - 7:16, 30:2
**duties** [10] - 12:16, 48:13, 49:8, 50:23, 52:25, 54:15, 54:17, 55:5, 55:9, 57:3
**duty** [1] - 10:25

## E

**early** [1] - 11:2
**editing** [1] - 6:6
**editorial** [1] - 53:19
**editorials** [1] - 52:9
**Education** [5] - 10:16, 60:23, 61:19, 62:2, 62:10
**education** [1] - 80:11
**eerily** [1] - 61:25
**effective** [1] - 52:6
**effectively** [1] - 40:24
**effects** [1] - 93:24
**effectuate** [1] - 62:13
**efforts** [1] - 83:17
**Eisen** [2] - 2:9, 3:15
**EISEN** [2] - 2:9, 3:15
**either** [7] - 27:1, 27:4, 32:12, 42:11, 45:15, 63:21, 72:22
**elaborate** [1] - 33:16
**elected** [1] - 83:9
**elements** [1] - 60:6
**Elgin** [4] - 56:7, 56:8, 56:13, 96:20
**eliminate** [4] - 8:13, 39:4, 47:10, 88:16
**elsewhere** [2] - 38:1, 81:17
**emails** [1] - 94:2
**emergency** [3] - 5:25, 6:1, 10:15
**Emery** [3] - 2:6, 3:8, 3:18
**employee** [14] - 11:15, 28:12, 36:2, 36:4, 36:15, 48:8, 48:9, 48:14, 55:15, 87:15, 87:19, 88:3, 96:21, 96:24
**employed** [1] - 90:4
**employees** [37] - 6:6, 8:4, 9:5, 9:20, 13:6, 17:6, 30:5, 31:4, 33:10, 37:1, 38:12, 39:17, 42:24, 45:6, 45:25, 46:12, 47:18, 49:7, 49:9, 50:22, 54:9, 55:20, 57:12, 58:11, 82:3, 82:21, 86:21, 88:18, 90:17, 92:5, 94:17, 96:7, 98:21, 98:24, 99:1
**Employees** [1] - 2:4
**employer's** [1] - 49:11
**employment** [16] - 9:18, 9:22, 17:16, 36:16, 43:22, 44:10, 46:9, 46:18, 54:8, 56:25, 57:11, 58:18, 64:5, 90:7, 90:9, 91:3
**empty** [1] - 22:18
**enacted** [2] - 81:1, 81:2
**encompassed** [1] - 40:21
**end** [10] - 4:25, 38:10, 38:14, 39:6, 40:4, 46:10, 48:17, 53:14, 58:8
**ended** [1] - 80:19
**ending** [1] - 18:5
**ends** [5] - 5:7, 48:4, 48:16, 48:22, 52:11
**engage** [2] - 67:21, 67:23
**engaged** [4] - 43:1, 61:5, 67:21, 69:12
**engaging** [3] - 67:22, 68:5, 68:6
**enjoin** [4] - 12:7, 12:8, 12:9, 64:12
**ensure** [1] - 70:3
**enter** [6] - 38:19, 39:11, 42:23, 63:15, 92:18
**entered** [4] - 14:11, 14:22, 60:16, 88:15
**entering** [2] - 38:20, 43:2
**enters** [1] - 63:25
**entire** [11] - 8:13, 15:23, 26:10, 26:12, 68:18, 83:9, 88:16, 90:25, 91:5, 91:6
**entirely** [2] - 8:15, 68:18
**entities** [5] - 9:7, 10:20, 10:22, 10:25, 11:3
**entitled** [4] - 47:19, 54:2, 64:19, 100:4
**entitlement** [4] - 43:4, 53:18, 53:19, 92:17
**entity** [1] - 49:6
**entity's** [1] - 8:20
**EPA** [1] - 76:2
**equate** [1] - 79:13
**equipped** [1] - 91:12
**equitable** [3] - 42:7, 56:5, 62:6
**equities** [3] - 20:16, 21:1, 83:2
**equivalent** [1] - 65:11
**erratic** [1] - 8:11
**error** [1] - 67:2
**escape** [2] - 17:20, 17:23
**especially** [1] - 56:4
**essence** [2] - 61:1, 61:6
**essential** [2] - 6:8, 30:3
**essentially** [5] - 30:17, 35:3, 38:10, 54:10, 97:23
**establish** [4] - 26:1, 43:18, 72:13, 75:21
**established** [4] - 24:23, 31:10, 32:19, 97:20
**estimation** [1] - 22:1
**et** [8] - 1:3, 1:6, 1:9, 1:12, 3:3, 3:4
**ethics** [1] - 53:12
**Europe** [5] - 8:23, 9:10, 14:10, 37:9, 92:22
**evaluate** [5] - 21:12, 21:14, 63:1, 70:8, 71:21
**evaluating** [1] - 71:4
**event** [2] - 33:19, 37:1
**evidence** [13] - 15:16, 15:21, 15:24, 16:10, 30:22, 32:25, 77:3, 79:15, 81:15, 88:11, 88:21, 90:3, 90:23
**exact** [3] - 48:6, 50:3, 91:9
**exactly** [16] - 6:14, 12:6, 15:9, 28:21, 33:24, 55:8, 55:15, 56:3, 56:18, 57:1, 58:9, 58:15, 65:17, 65:19, 70:13, 87:2
**Exactly** [2] - 15:2, 27:24
**example** [8] - 42:15, 51:21, 52:25, 55:22, 59:21, 69:24, 71:4, 86:23
**except** [3] - 33:23, 34:4, 87:5
**exception** [1] - 65:2
**exclusion** [1] - 52:19
**exclusive** [2] - 59:19, 92:7
**exclusivity** [1] - 56:11
**excuse** [1] - 8:9
**executive** [20] - 12:22, 19:13, 19:21, 20:18, 21:8, 21:9, 21:11, 31:7, 32:5, 47:2, 47:4, 47:8, 47:15, 47:20, 83:7, 83:17, 95:14, 98:3, 98:4
**executive's** [2] - 93:16, 95:12
**Executor** [1] - 18:22
**exercise** [2] - 69:19, 90:22
**exercising** [1] - 21:8
**exhaustion** [2] - 50:10, 72:9
**exist** [1] - 10:1
**existence** [1] - 19:4
**exists** [1] - 50:12
**expect** [1] - 5:1
**expend** [1] - 80:11
**expended** [1] - 80:2
**expenditure** [3] - 80:20, 80:23, 81:3
**expensive** [1] - 24:13
**experiencing** [1] - 9:19
**expertise** [4] - 35:16, 35:18, 57:5, 57:7
**expiration** [1] - 45:11
**expire** [7] - 7:20, 7:24, 8:5, 31:5, 44:11, 89:5, 89:19
**expires** [1] - 99:16
**explain** [6] - 20:4, 28:25, 32:13, 33:12, 64:15, 66:1
**explained** [4] - 33:3, 35:12, 64:8, 93:23
**explanation** [3] - 23:18, 30:12, 32:12
**explicit** [2] - 10:18, 17:20
**explicitly** [3] - 12:4, 17:21, 94:10
**express** [1] - 59:16
**expressed** [1] - 16:17
**expressly** [1] - 95:7
**extend** [1] - 90:25
**extended** [1] - 44:9
**extensively** [2] - 95:2, 95:3
**extent** [2] - 54:1, 66:24
**extraordinary** [3] - 23:15, 24:2, 24:3

## F

**F.2d** [1] - 91:21
**F.3d** [1] - 59:22
**face** [1] - 89:15
**Facebook** [1] - 87:20
**faced** [2] - 48:7, 50:1
**facial** [1] - 56:11
**facially** [2] - 26:15, 26:16
**fact** [31] - 6:1, 10:12, 15:13, 16:10, 21:24,

24:23, 27:24, 33:9, 34:21, 35:11, 37:16, 43:9, 43:12, 43:19, 44:10, 53:13, 61:17, 61:25, 62:10, 65:7, 66:24, 68:1, 85:1, 86:17, 90:16, 91:21, 92:10, 93:22, 94:1, 97:3, 97:8
**factor** [3] - 35:9, 35:15, 97:25
**factors** [7] - 34:15, 35:8, 41:25, 56:15, 58:5, 82:24, 83:1
**facts** [12] - 23:11, 23:12, 32:24, 51:6, 56:14, 61:23, 61:24, 63:21, 72:11, 73:15, 87:6
**factual** [4] - 23:10, 24:7, 24:18, 25:6
**factually** [1] - 26:1
**failed** [3] - 10:24, 11:24, 76:18
**failing** [1] - 67:23
**fair** [1] - 85:19
**fairly** [4] - 34:23, 56:16, 56:17, 85:14
**fall** [2] - 53:20, 55:3
**far** [4] - 42:11, 42:17, 65:7, 96:13
**faster** [1] - 68:12
**favor** [4] - 29:6, 36:24, 83:11, 88:2
**fear** [2] - 74:19, 74:24
**FEDERAL** [1] - 100:9
**Federal** [9] - 59:14, 59:20, 61:5, 61:9, 64:4, 92:8, 93:3, 93:20, 100:2
**federal** [7] - 1:23, 23:16, 31:15, 35:23, 36:14, 56:13, 84:19
**Federation** [2] - 2:4, 75:23
**fell** [1] - 91:7
**felt** [1] - 84:18
**few** [5] - 27:6, 49:16, 52:21, 57:12, 94:6
**fighting** [1] - 19:4
**figure** [7] - 65:16, 67:10, 70:10, 70:22, 71:9, 82:1, 82:2
**filed** [8] - 4:19, 5:21, 5:24, 7:9, 20:19, 37:23, 39:23, 89:7
**filing** [1] - 35:1
**filings** [1] - 78:12
**fill** [1] - 22:2
**final** [17] - 12:11, 13:21, 14:5, 14:6, 15:7, 15:11, 15:14, 19:23, 35:15, 67:8, 67:11, 68:1, 69:7, 82:18, 93:5, 93:18, 98:20
**finality** [1] - 17:23
**finally** [8] - 9:18, 20:8, 20:16, 69:10, 87:9, 90:7, 90:16, 95:10
**fine** [2] - 6:25, 57:18
**fired** [2] - 88:18, 96:21
**firewall** [13] - 28:1, 51:15, 51:16, 52:19, 53:12, 70:1, 71:24, 72:7, 72:20, 72:24, 84:12, 84:25, 85:3
**firing** [1] - 91:4
**firm** [2] - 4:3, 24:25
**First** [40] - 6:21, 7:13, 11:16, 11:23, 12:19, 22:5, 22:11, 23:1, 23:25, 25:3, 41:4, 41:19, 47:21, 47:24, 47:25, 48:9, 48:19, 49:9, 49:10, 49:14, 49:22, 50:10, 50:12, 50:14, 50:24, 51:6, 51:11, 53:2, 53:20, 54:5, 62:16, 70:14, 72:10, 72:13, 75:16, 76:12, 84:9, 87:11, 87:17, 87:22
**first** [36] - 4:19, 4:25, 5:12, 5:16, 10:12, 11:13, 14:20, 15:22, 23:10, 31:7, 34:16, 36:21, 40:11, 47:17, 48:19, 49:19, 51:24, 52:15, 53:7, 59:12, 62:25, 63:7, 64:18, 65:22, 69:6, 71:13, 75:17, 84:8, 88:10, 88:23, 89:3, 90:20, 93:20, 94:25, 96:3, 96:23
**fiscal** [1] - 80:17
**five** [2] - 16:24, 96:1
**flat** [1] - 19:21
**flaws** [1] - 68:18
**flip** [1] - 71:17
**Floor** [1] - 2:7
**flows** [2] - 51:19, 92:17
**focus** [3] - 14:3, 23:8, 91:18
**focusing** [1] - 37:15
**follow** [5] - 20:18, 21:11, 32:23, 48:5
**following** [1] - 21:9
**follows** [1] - 32:17
**Food** [1] - 76:24
**footnote** [2] - 73:25, 95:20
**FOR** [4] - 1:1, 1:18, 2:1, 2:14
**force** [2] - 76:21, 91:6
**foregoing** [1] - 100:3
**foreign** [12] - 6:17, 25:16, 25:25, 27:11, 28:5, 28:17, 28:24, 28:25, 29:8, 51:25, 71:5
**Foreign** [4] - 7:11, 17:18, 20:20, 31:11
**foremost** [1] - 53:8
**format** [1] - 100:4
**Forward** [1] - 2:11
**Foundation** [1] - 2:11
**founded** [1] - 59:16
**founds** [1] - 84:4
**fours** [3] - 48:6, 61:20, 92:23
**fourth** [1] - 97:25
**Fourth** [1] - 51:1
**frame** [2] - 28:9, 28:20
**frankly** [1] - 32:10
**fraud** [1] - 24:13
**Free** [14] - 7:22, 8:3, 8:22, 8:23, 9:5, 9:9, 14:10, 15:4, 15:5, 16:22, 37:9, 92:19, 92:22
**free** [6] - 6:16, 7:7, 8:7, 8:25, 9:12, 10:8
**freedom** [3] - 27:17, 51:10, 77:16
**friend** [3] - 48:18, 85:5, 85:20
**friends** [23] - 33:2, 42:9, 45:23, 46:6, 47:3, 47:16, 47:23, 51:14, 53:9, 53:13, 53:17, 54:25, 56:6, 56:23, 58:5, 60:8, 61:23, 65:5, 66:5, 69:8, 70:16, 70:21, 71:14
**fronts** [1] - 10:6
**frustration** [1] - 68:10
**fulfill** [3] - 10:24, 11:24, 12:16
**full** [2] - 43:10, 82:21
**full-time** [1] - 82:21
**function** [4] - 30:3, 47:9, 47:12, 93:8
**functions** [7] - 10:13, 13:5, 13:6, 19:17, 19:22, 47:11, 70:18
**fund** [2] - 10:20, 10:25
**Fund** [1] - 3:16
**fundamental** [5] - 15:19, 16:15, 16:25, 18:1, 18:4
**funded** [4] - 31:12, 31:25, 32:19
**funds** [5] - 16:25, 32:2, 80:11, 81:2, 84:3
**furlough** [1] - 8:4
**furloughed** [3] - 7:23, 89:22, 90:18
**future** [2] - 15:14, 74:20

## G

**gap** [1] - 8:11
**Garcetti** [14] - 28:11, 48:6, 48:13, 48:23, 49:7, 49:12, 50:11, 50:13, 50:19, 51:3, 52:11, 52:15, 71:24
**gathering** [1] - 6:5
**general** [6] - 28:24, 44:17, 51:9, 64:21, 65:1, 69:10
**generalizations** [2] - 75:18, 76:14
**generally** [1] - 29:8
**GEORGINA** [1] - 2:4
**Georgina** [2] - 3:12, 6:19
**giant** [1] - 30:21
**given** [2] - 33:16, 43:19
**gleaning** [2] - 18:10, 18:13
**Global** [14] - 45:7, 46:12, 50:3, 58:10, 72:17, 73:5, 73:10, 77:8, 77:18, 77:21, 79:13, 81:16, 83:15, 83:17
**global** [2] - 7:6, 82:1
**Globe** [1] - 9:8
**goals** [4] - 27:11, 28:24, 28:25, 85:13
**GONZALEZ** [1] - 2:15
**Gonzalez** [3] - 4:12, 41:15, 63:5
**government** [87] - 9:18, 10:4, 10:11, 11:4, 11:19, 12:1, 13:5, 17:18, 18:8, 18:20, 19:15, 19:24, 20:8, 23:16, 25:15, 27:18, 28:5, 28:12, 30:2, 30:3, 32:17, 33:7, 36:12, 36:22, 36:24, 40:23, 41:3, 41:13, 41:16, 44:3, 45:25, 46:7, 46:11, 48:2, 48:8, 48:9, 48:22, 49:1, 49:6, 52:16, 53:5, 53:15, 53:22, 58:16, 59:25, 60:1, 60:2, 60:14, 60:15, 64:22, 73:13, 73:24, 79:5, 79:11, 79:15, 84:12, 85:8, 85:13, 85:14, 85:19, 86:19, 86:21, 86:22, 86:24, 87:11, 88:11, 88:24, 89:16, 90:8, 90:16, 90:21, 92:2, 92:16, 92:18, 92:20, 93:4, 93:7, 93:23, 94:10, 94:14, 95:2, 95:7, 95:11, 96:20, 98:20
**Government** [4] - 2:1, 3:22, 52:7, 52:10
**government's** [9] - 20:24, 22:1, 28:14, 32:15, 49:15, 53:8, 89:11, 91:2, 95:17
**governmental** [1] - 91:22
**Governors** [1] - 53:1
**grace** [1] - 44:8
**Grant** [1] - 60:5
**grant** [17] - 10:13, 10:21, 11:3, 14:12, 14:23, 60:9, 60:11, 60:13, 60:17, 62:8, 63:2, 81:23, 92:11, 92:17, 92:18, 92:20, 93:2
**Grant-related** [1] - 60:5
**grantee** [4] - 46:1, 62:25, 63:3
**grantees** [7] - 16:22, 18:6, 41:22, 62:13, 70:20, 75:15, 93:1
**grantees'** [1] - 62:20
**granting** [1] - 83:16
**grants** [16] - 10:18, 10:20, 11:4, 13:1, 15:17, 39:2, 40:17,

40:19, 59:7, 59:9, 62:3, 62:5, 62:13, 81:22, 92:6, 94:6
**grapple** [1] - 89:17
**great** [1] - 42:5
**Greenberger** [1] - 3:18
**GREENBERGER** [2] - 2:7, 3:18
**ground** [3] - 6:2, 22:15, 59:11
**Group** [1] - 59:21
**guardrails** [2] - 28:23, 85:11
**guess** [3] - 61:17, 69:22, 84:14
**guidance** [1] - 76:20

## H

**H-1B** [2] - 8:4, 90:19
**hac** [3] - 3:19, 4:3, 4:6
**half** [2] - 30:13, 35:20
**hallmark** [1] - 60:11
**hallmarks** [1] - 14:6
**halted** [1] - 31:2
**Hamas** [1] - 26:24
**hammer** [1] - 27:4
**handle** [2] - 6:19, 6:21
**hang** [1] - 47:23
**happy** [1] - 19:8
**hard** [3] - 37:22, 38:3, 82:20
**harder** [1] - 37:18
**harm** [38] - 6:20, 7:3, 7:14, 7:21, 8:2, 8:12, 9:12, 10:3, 38:4, 41:19, 42:3, 42:17, 42:18, 42:23, 43:3, 43:18, 45:21, 46:4, 46:5, 46:9, 46:16, 46:18, 46:21, 75:1, 75:9, 75:16, 76:6, 76:9, 76:13, 88:23, 88:25, 89:15, 90:3, 90:14, 96:3, 96:5
**harmed** [5] - 8:8, 8:19, 74:25, 90:25, 93:1
**harmful** [1] - 89:12
**harming** [1] - 9:15
**harms** [12] - 7:16, 9:19, 9:22, 42:10, 42:13, 43:22, 46:20, 89:2, 89:25, 90:7, 95:10, 95:11
**hat** [2] - 47:23, 50:11
**hatch** [2] - 17:20, 17:24
**hate** [1] - 85:2
**head** [2] - 22:14, 64:14
**headed** [1] - 18:17
**heads** [1] - 18:19
**health** [11] - 7:20, 7:24, 7:25, 46:1, 46:4, 89:4, 89:19, 89:20, 90:2, 90:5
**hear** [4] - 6:2, 19:7, 53:12, 61:2
**heard** [10] - 42:9, 46:6, 53:9, 54:23, 54:24, 54:25, 55:7, 66:5, 90:14, 93:4
**HEARING** [1] - 1:15
**hearing** [3] - 6:15, 14:14, 22:22
**hearings** [1] - 5:3
**heavily** [3] - 17:18, 36:12, 50:18
**held** [8] - 11:17, 52:22, 59:18, 60:5, 67:8, 90:12, 91:15, 96:22
**helpful** [5] - 29:13, 59:12, 68:17, 69:16, 99:10
**hereby** [1] - 100:3
**herself** [1] - 75:22
**Heyman** [1] - 90:11
**high** [2] - 19:20, 42:4
**highly** [2] - 9:24, 49:24
**hinge** [1] - 47:23
**hinged** [2] - 49:14, 73:2
**hinges** [3] - 45:19, 46:21, 53:7
**Hippocratic** [1] - 76:25
**historically** [1] - 29:9
**history** [4] - 23:16, 29:11, 86:1, 86:2
**holder** [2] - 44:18, 45:10
**Home** [1] - 76:1
**home** [4] - 45:8, 45:10, 89:9, 89:15
**Hong** [1] - 8:7
**Honor** [57] - 3:12, 3:15, 3:21, 3:24, 4:1, 4:8, 4:11, 4:13, 5:21, 6:22, 6:23, 7:2, 7:9, 9:22, 14:21, 19:7, 21:6, 23:5, 24:22, 24:23, 24:24, 29:11, 29:19, 41:14, 45:2, 45:4, 45:16, 48:1, 48:21, 57:10, 59:3, 62:20, 64:10, 64:11, 64:13, 69:5, 70:13, 71:12, 72:5, 73:19, 74:6, 74:11, 74:22, 75:22, 81:12, 81:20, 81:23, 82:12, 84:7, 84:10, 87:13, 88:5, 88:7, 92:6, 95:24, 96:1, 99:15
**Honor's** [1] - 5:14
**HONORABLE** [1] - 1:15
**hope** [1] - 88:7
**HOROWITZ** [12] - 2:15, 4:11, 41:14, 42:2, 44:21, 45:2, 45:4, 45:16, 49:19, 57:19, 72:3, 72:5
**Horowitz** [2] - 4:12, 41:15
**host** [1] - 78:19
**hour** [3] - 4:22, 41:9, 41:11
**Howell** [4] - 28:21, 71:25, 84:18, 86:23
**Howell's** [2] - 71:23, 87:8
**Humphrey's** [1] - 18:22
**hundreds** [2] - 6:8, 77:9
**hung** [1] - 50:11
**hypothetical** [1] - 45:21

## I

**i.e** [1] - 58:2
**idea** [9] - 17:1, 27:18, 66:14, 89:14, 90:8, 92:7, 92:23, 93:21, 94:9
**ideals** [2] - 7:7, 9:16
**identical** [2] - 62:15, 63:20
**identified** [5] - 26:20, 75:12, 76:11, 79:8, 79:15
**ignore** [1] - 75:13
**Ill** [2] - 78:2, 78:4
**illegal** [1] - 31:7
**illustrate** [1] - 66:1
**Illustrated** [1] - 85:17
**illustrative** [2] - 66:21, 67:18
**imagine** [1] - 33:22
**immediate** [1] - 14:7
**imminence** [1] - 42:6
**immunity** [2] - 64:23, 64:25
**impact** [1] - 5:8
**impaired** [2] - 77:4, 77:11
**impairs** [1] - 76:22
**impermissible** [1] - 67:16
**implement** [1] - 12:21
**implementing** [1] - 93:25
**implicate** [1] - 61:14
**implicated** [2] - 53:21, 60:21
**implication** [1] - 60:24
**implications** [2] - 18:11, 62:24
**implied** [1] - 59:16
**import** [1] - 23:21
**important** [7] - 6:17, 20:6, 26:1, 30:23, 37:18, 44:15, 51:19
**importantly** [1] - 15:11
**imposition** [1] - 8:9
**impossible** [2] - 69:22, 70:11
**impound** [1] - 80:23
**impoundment** [1] - 80:7
**Impoundment** [3] - 80:21, 98:10
**improvement** [1] - 68:7
**improvements** [1] - 68:8
**inability** [2] - 42:16, 55:11
**include** [3] - 55:4, 85:18, 93:13
**included** [1] - 27:25
**includes** [2] - 38:13, 40:22
**including** [10] - 8:7, 13:7, 16:20, 29:21, 33:20, 52:8, 59:25, 78:20, 85:15, 90:18
**inconsistent** [3] - 25:16, 98:6, 98:12
**incorrect** [1] - 49:17
**incredibly** [3] - 13:4, 19:20, 20:2
**indeed** [5] - 9:21, 68:17, 73:25, 74:23, 78:19
**independence** [5] - 70:19, 70:23, 86:17, 88:1, 88:2
**independent** [10] - 18:25, 27:19, 28:3, 28:16, 28:19, 29:1, 86:17, 86:22, 87:2, 87:24
**indicated** [2] - 15:20, 44:3
**indication** [3] - 16:1, 16:9, 42:12
**individual** [16] - 3:22, 9:19, 20:10, 20:11, 26:6, 28:11, 48:13, 54:8, 54:9, 55:1, 68:19, 72:23, 79:6, 88:2, 91:3, 91:4
**individualized** [1] - 68:23
**individuals** [16] - 6:17, 9:25, 18:17, 44:7, 45:5, 45:6, 45:24, 48:24, 52:22, 54:2, 76:15, 82:9, 89:15, 90:4, 90:19, 94:20
**Industries** [1] - 75:23
**inevitable** [1] - 89:12
**inference** [1] - 19:1
**inflated** [1] - 61:15
**inform** [4] - 8:23, 8:24, 9:10, 53:16
**information** [8] - 6:10, 8:11, 40:8, 53:18, 54:2, 71:7, 84:5, 93:13
**informational** [1] - 50:20
**informative** [1] - 50:20
**Ingersoll** [1] - 61:3
**inherent** [1] - 45:9
**initial** [1] - 73:23
**inject** [1] - 84:19
**injunction** [17] - 5:3, 12:18, 13:14, 37:17, 38:19, 39:11, 41:25, 42:22, 42:23, 63:16, 64:3, 64:9, 83:3, 83:16, 91:22, 95:14, 96:10
**injunctions** [1] - 98:1
**injunctive** [3] - 12:17, 63:20, 63:25
**injuries** [2] - 78:5, 78:7
**injury** [4] - 37:15, 42:5, 75:6, 75:7
**inquiries** [1] - 72:18
**inquiry** [8] - 48:3, 48:4, 48:14, 48:16, 48:17, 48:23, 49:2,

52:11
**instances** [3] - 8:6, 72:16, 73:4
**instead** [2] - 65:16, 68:8
**instinct** [1] - 70:13
**instincts** [3] - 23:3, 48:20, 48:21
**institution** [2] - 6:12, 24:15
**institutions** [2] - 51:5, 52:4
**instruction** [1] - 50:15
**insufficient** [2] - 75:1, 91:24
**insurance** [11] - 7:20, 7:24, 8:1, 46:1, 46:5, 89:4, 89:19, 89:20, 90:2, 90:5
**integrity** [4] - 51:16, 53:11, 70:19, 70:23
**intend** [1] - 16:1
**intended** [12] - 6:15, 27:14, 27:15, 27:16, 27:22, 37:19, 50:14, 53:24, 54:22, 56:3, 56:20
**intending** [1] - 41:18
**intent** [8] - 18:11, 18:14, 34:12, 34:14, 44:3, 54:4, 55:18, 59:25
**intention** [4] - 15:18, 17:3, 88:16, 91:6
**interest** [16] - 20:17, 21:10, 21:16, 21:22, 80:8, 83:2, 83:7, 83:10, 83:13, 87:24, 95:12, 97:25, 98:7, 98:8, 98:19
**interested** [2] - 25:10, 80:10
**interesting** [2] - 30:1, 87:19
**interests** [5] - 7:12, 8:18, 20:22, 20:25, 29:4
**interfering** [1] - 8:9
**internal** [1] - 87:14
**International** [1] - 51:12
**international** [2] - 70:3, 93:12
**internet** [1] - 87:21
**interpretation** [1] - 23:25
**interrupt** [1] - 10:9
**intervention** [1] - 15:6
**investigate** [1] - 73:12
**investigations** [1] - 72:18
**invited** [3] - 5:1, 5:6, 5:10
**invoked** [1] - 80:22
**involve** [2] - 36:23, 78:16
**involved** [2] - 36:1, 37:6
**involves** [1] - 39:7
**irrecoverable** [1] - 96:11
**irrelevant** [1] - 35:13
**irreparable** [27] - 6:20, 7:3, 7:15, 7:16, 7:21, 8:2, 8:12, 9:21, 10:3, 37:15, 38:4, 41:19, 42:3, 43:18, 46:5, 46:9, 46:15, 46:20, 75:1, 88:23, 88:25, 89:25, 90:3, 90:9, 90:14, 96:3, 96:5
**irreparably** [2] - 8:19, 9:15
**issue** [26] - 10:18, 21:5, 21:15, 23:20, 25:7, 25:19, 25:24, 33:6, 36:7, 36:8, 36:16, 41:22, 48:12, 59:7, 62:2, 66:7, 67:4, 78:3, 81:23, 89:3, 95:5, 95:7, 95:8, 95:9
**issued** [8] - 14:25, 30:14, 32:5, 36:14, 37:8, 43:6, 62:12, 63:20
**issues** [18] - 6:19, 6:21, 10:5, 17:12, 17:15, 23:1, 24:7, 26:20, 36:11, 40:20, 41:24, 60:21, 63:23, 73:22, 78:14, 78:16, 94:24
**itself** [7] - 6:12, 7:15, 8:12, 51:12, 55:9, 66:25, 70:8

## J

**J-1** [7] - 31:5, 44:2, 44:8, 44:17, 45:7, 45:9, 45:19
**Jackson** [1] - 53:1
**Jangjoo** [3] - 52:25, 87:9, 87:14
**jeopardy** [1] - 31:4
**job** [9] - 28:13, 33:16, 33:23, 34:1, 46:14, 55:15, 57:3, 90:10, 96:24
**jobs** [2] - 9:25, 55:17
**Joe** [1] - 25:23
**John** [5] - 7:19, 43:24, 57:19, 80:15, 89:22
**Johnson** [3] - 4:9, 41:22, 73:20
**JOHNSON** [19] - 2:15, 4:8, 73:19, 74:6, 74:9, 74:11, 80:5, 81:12, 81:20, 81:23, 82:5, 82:9, 82:12, 82:17, 82:23, 83:21, 83:24, 84:2, 84:7
**Journal** [1] - 9:8
**journalism** [1] - 21:16
**journalistic** [1] - 53:12
**journalists** [15] - 9:6, 29:4, 29:24, 31:1, 37:23, 46:8, 46:10, 46:11, 49:1, 51:9, 72:25, 85:7, 86:18, 87:4, 87:12
**Judge** [23] - 6:18, 7:1, 13:10, 15:3, 17:20, 19:19, 19:24, 22:8, 28:21, 38:18, 53:1, 53:3, 58:19, 71:23, 71:25, 84:18, 86:23, 87:7, 88:20, 89:9, 91:13, 93:5, 95:2
**judge** [3] - 69:19, 71:1, 80:14
**JUDGE** [1] - 1:15
**judgment** [3] - 59:15, 69:23, 70:12
**judicial** [4] - 34:16, 34:17, 56:13, 78:6
**Judicial** [1] - 100:5
**juncture** [1] - 82:14
**jurisdiction** [16] - 10:5, 11:10, 12:3, 14:4, 33:11, 56:4, 59:15, 60:6, 61:8, 61:22, 62:19, 63:1, 90:22, 91:20, 91:25, 92:7
**jurisdictional** [4] - 17:12, 17:15, 50:9, 72:9
**Justice** [2] - 4:15, 50:18
**justification** [1] - 49:6

## K

**Kari** [2] - 3:3, 3:4
**KARI** [2] - 1:6, 1:12
**Kavanaugh** [1] - 19:19
**keep** [1] - 69:20
**key** [1] - 77:12
**kicked** [1] - 26:10
**kind** [28] - 21:5, 32:7, 32:10, 35:12, 37:14, 39:6, 44:19, 44:22, 46:9, 60:24, 62:23, 63:20, 63:25, 64:1, 64:9, 64:14, 65:15, 65:24, 65:25, 66:13, 67:9, 69:10, 70:13, 71:12, 71:14, 74:25, 87:20, 97:5
**kinds** [1] - 37:12
**Kong** [1] - 8:7
**KRISTIN** [1] - 2:12
**Kristin** [1] - 4:5

## L

**labor** [3] - 36:15, 55:25, 75:14
**Labor** [2] - 75:23, 75:24
**lacked** [2] - 61:21, 62:19
**lacks** [3] - 11:10, 58:22, 63:1
**laid** [2] - 48:13, 68:21
**Lake** [5] - 3:4, 24:11, 28:8, 85:2
**LAKE** [2] - 1:6, 1:12
**Lake's** [1] - 24:25
**Lamberth** [1] - 38:18
**LAMBERTH** [1] - 1:15
**land** [1] - 67:19
**language** [3] - 62:11, 69:20, 70:17
**languages** [1] - 29:24
**larger** [1] - 22:12
**LARRY** [1] - 2:9
**last** [3] - 82:24, 83:1, 95:25
**lastly** [1] - 79:17
**law** [30] - 10:25, 16:6, 18:22, 20:1, 20:18, 21:9, 21:10, 21:11, 23:13, 26:4, 26:18, 28:9, 31:22, 31:23, 46:19, 47:9, 47:13, 56:18, 57:6, 68:3, 68:6, 69:15, 80:25, 81:5, 81:10, 89:25, 97:22, 98:3, 98:5, 98:6
**lawful** [1] - 97:6
**lawfully** [1] - 19:14
**lawsuit** [1] - 68:14
**lawyer** [1] - 28:13
**lay** [1] - 65:6
**leadership** [3] - 30:17, 42:21, 72:25
**leading** [1] - 34:7
**learning** [1] - 22:17
**leases** [1] - 24:14
**least** [10] - 18:5, 31:2, 47:22, 68:18, 76:8, 78:11, 78:24, 79:10, 81:15, 99:18
**leave** [24] - 8:5, 16:5, 17:15, 29:12, 30:6, 33:10, 33:15, 33:22, 34:4, 34:25, 35:12, 38:10, 39:17, 43:13, 47:19, 54:15, 64:6, 82:4, 82:6, 83:18, 91:5, 94:3, 94:18, 98:22
**leaves** [1] - 11:8
**LEE** [1] - 2:12
**left** [6] - 6:23, 7:5, 59:5, 59:9, 65:16, 66:14
**legal** [3] - 45:11, 67:8, 69:9
**legislative** [1] - 91:13
**less** [1] - 15:14
**letters** [2] - 62:10, 62:12
**level** [4] - 17:23, 46:15, 87:19, 88:3
**Lewis** [1] - 80:15
**license** [1] - 65:11
**lies** [1] - 61:9
**light** [1] - 80:25
**likelihood** [1] - 62:18
**likely** [6] - 8:3, 61:21, 72:12, 76:8, 90:18, 93:2
**likened** [1] - 12:2
**limit** [1] - 50:14
**limitation** [1] - 49:12
**limited** [3] - 51:3, 64:25, 79:19
**line** [4] - 16:19, 27:3, 69:9
**lines** [2] - 26:20, 27:2
**listened** [1] - 85:20
**listening** [1] - 64:15
**lists** [1] - 31:16
**literally** [2] - 15:25,

94:3
**litigations** [1] - 18:20
**live** [1] - 8:22
**LLP** [1] - 1:18
**Local** [1] - 8:15
**look** [19] - 11:21, 12:7, 14:17, 17:9, 20:2, 27:20, 34:8, 37:11, 51:12, 52:15, 57:1, 58:4, 58:7, 69:21, 71:3, 84:24, 85:8, 87:12, 98:1
**looked** [3] - 36:6, 72:12, 87:22
**looking** [3] - 16:13, 30:7, 64:14
**looks** [3] - 28:22, 37:2, 39:13
**lose** [8] - 9:17, 44:6, 44:12, 44:13, 46:1, 75:4, 77:9, 90:4
**losing** [4] - 46:4, 90:1, 90:9, 96:9
**loss** [6] - 42:16, 43:22, 46:18, 75:5, 77:15
**lost** [1] - 54:19
**louder** [1] - 5:23
**low** [2] - 87:19, 88:3
**Lujan** [5] - 67:16, 67:17, 68:25, 69:2, 97:11
**lump** [1] - 68:14
**lunch** [2] - 4:21, 40:10

## M

**Maazel** [1] - 2:6
**main** [1] - 96:14
**maintain** [3] - 37:22, 63:7, 71:13
**majority** [4] - 8:16, 12:15, 76:5, 76:15
**makers** [1] - 18:25
**manage** [1] - 97:12
**management** [3] - 72:17, 73:5
**mandamus** [1] - 19:18
**mandated** [3] - 7:8, 9:17, 10:13
**mandates** [4] - 10:19, 11:24, 41:2, 93:15
**mandatory** [1] - 69:11
**manifestation** [1] - 27:17
**manner** [1] - 21:23
**March** [21] - 5:22, 7:23, 11:2, 12:21, 13:10, 13:21, 14:5, 14:16, 15:4, 15:5, 30:2, 30:5, 30:25, 31:1, 31:14, 38:13, 58:11, 80:3, 89:22, 94:2, 99:4
**Margaret** [1] - 3:24
**MARGARET** [1] - 1:19
**matter** [13] - 5:4, 17:4, 18:2, 44:17, 48:15, 49:4, 51:10, 73:23, 83:5, 83:12, 87:3, 87:16, 100:4
**max** [1] - 18:4
**McFadden** [1] - 58:19
**mean** [14] - 14:18, 15:11, 33:15, 35:17, 44:12, 46:2, 46:14, 47:16, 73:17, 86:10, 95:13, 97:3, 97:4
**meaning** [3] - 27:7, 50:15, 59:23
**meaningful** [7] - 34:16, 34:17, 56:21, 69:18, 69:20, 71:1, 71:20
**means** [7] - 15:12, 18:5, 26:8, 26:22, 27:19, 55:1, 71:16
**meat** [1] - 66:11
**mechanism** [1] - 79:6
**media** [2] - 23:17, 26:12
**Media** [14] - 45:7, 46:13, 50:3, 58:10, 72:17, 73:5, 73:10, 77:8, 77:18, 77:22, 79:13, 81:16, 82:1, 83:15
**Media's** [1] - 83:17
**medical** [2] - 90:2, 90:5
**Medicine** [1] - 76:25
**meet** [1] - 65:18
**meeting** [1] - 50:9
**meets** [1] - 59:24
**Megapulse** [3] - 12:4, 58:5, 91:19
**member** [4] - 75:12, 75:21, 76:8, 76:11
**members** [18] - 7:22, 7:25, 8:10, 8:16, 8:21, 20:12, 55:24, 74:19, 75:9, 75:11, 75:14, 75:18, 76:5, 77:9, 77:10, 77:19, 90:23, 94:22
**members'** [1] - 76:20
**memo** [1] - 66:13
**memos** [2] - 67:7, 67:8
**mention** [7] - 25:7, 39:10, 75:2, 75:7, 76:19, 78:24, 91:9
**mentioned** [13] - 19:24, 28:23, 59:6, 74:19, 78:2, 78:15, 79:5, 79:21, 83:5, 85:12, 88:20, 91:19, 95:19
**mentioning** [2] - 35:24, 92:10
**mentions** [1] - 34:15
**mere** [1] - 91:21
**merely** [7] - 10:2, 74:19, 76:5, 76:13, 78:22, 79:12, 89:12
**Merit** [7] - 33:8, 34:1, 34:10, 34:20, 35:17, 36:9, 54:23
**merits** [6] - 10:4, 14:2, 19:6, 21:8, 31:6, 49:25
**message** [4] - 6:14, 6:15, 22:20, 28:12
**met** [1] - 71:11
**Michael** [3] - 3:3, 23:17, 29:21
**MICHAEL** [1] - 1:3
**mid** [1] - 81:7
**mid-track** [1] - 81:7
**might** [7] - 15:13, 44:5, 44:6, 74:24, 74:25, 91:23, 97:15
**migrant** [1] - 67:4
**Mike** [1] - 3:25
**mildly** [1] - 23:8
**million** [4] - 22:21, 29:25, 31:16, 80:12
**millions** [1] - 6:9
**mind** [7] - 15:13, 16:9, 55:14, 69:20, 82:22, 83:21, 87:1
**minimum** [4] - 15:16, 37:6, 47:12, 79:13
**minute** [1] - 33:4
**minutes** [2] - 4:20, 27:6
**mischaracterization** [1] - 33:13
**misconstruction** [1] - 23:13
**misheard** [2] - 95:12, 95:15
**misrepresentations** [1] - 89:2
**missed** [1] - 74:9
**mission** [2] - 77:5, 77:11
**mixture** [1] - 35:21
**modifications** [1] - 17:15
**modified** [3] - 14:9, 17:13, 58:12
**moment** [1] - 41:7
**monetary** [1] - 46:18
**money** [17] - 13:22, 14:17, 16:20, 16:23, 24:13, 58:21, 80:1, 80:11, 80:12, 80:13, 80:16, 80:23, 80:24, 81:15, 82:10, 83:19, 84:3
**month** [3] - 7:5, 9:3, 16:3
**morning** [24] - 3:8, 3:10, 3:12, 3:14, 3:15, 3:17, 3:21, 3:24, 4:1, 4:4, 4:8, 4:11, 4:13, 5:20, 7:2, 23:9, 25:11, 42:10, 45:24, 47:24, 53:11, 54:14, 54:23, 55:7
**Moss** [1] - 53:3
**most** [3] - 24:3, 31:13, 51:18
**mostly** [1] - 14:3
**motion** [7] - 3:20, 18:9, 39:24, 41:21, 59:8, 63:6, 74:1
**MOTION** [1] - 1:15
**motive** [2] - 24:5, 24:6
**mouthpiece** [1] - 28:5
**move** [1] - 80:9
**MPP** [1] - 67:4
**MR** [34] - 3:8, 3:10, 3:15, 3:21, 4:1, 5:13, 5:17, 5:20, 5:24, 7:1, 23:4, 23:7, 24:22, 25:4, 27:15, 27:24, 29:14, 29:17, 29:19, 31:21, 31:23, 37:10, 38:24, 39:3, 39:21, 40:7, 84:9, 85:11, 86:5, 86:7, 86:12, 96:1, 99:15, 99:19
**MS** [60] - 3:12, 3:18, 3:24, 4:5, 4:8, 4:11, 4:13, 7:2, 12:9, 12:12, 12:25, 13:2, 13:17, 14:1, 14:18, 14:20, 15:2, 15:10, 15:21, 19:10, 21:6, 21:14, 21:18, 22:6, 22:10, 22:16, 40:12, 40:16, 41:6, 41:14, 42:2, 44:21, 45:2, 45:4, 45:16, 49:19, 57:19, 59:3, 68:25, 69:3, 72:3, 72:5, 73:19, 74:6, 74:9, 74:11, 80:5, 81:12, 81:20, 81:23, 82:5, 82:9, 82:12, 82:17, 82:23, 83:21, 83:24, 84:2, 84:7, 88:7
**MSPB** [8] - 17:4, 18:16, 55:23, 56:22, 57:7, 96:15, 96:18, 96:23
**Mundt** [1] - 53:23
**Municipal** [1] - 2:4
**must** [6] - 16:20, 42:7, 66:16, 75:20, 76:22, 92:18
**mutual** [1] - 59:25

## N

**name** [3] - 59:4, 78:25, 94:20
**named** [2] - 33:17, 73:24
**naming** [1] - 16:20
**narrow** [1] - 87:3
**narrower** [1] - 63:19
**nation** [1] - 83:10
**National** [1] - 76:1
**national** [1] - 30:19
**nature** [3] - 58:4, 74:22, 92:12
**Navab** [4] - 11:13, 87:10, 87:18, 92:3
**Navab-Safavi** [4] - 11:13, 87:10, 87:18, 92:3
**nearly** [1] - 88:17
**necessarily** [1] - 44:12
**necessary** [3] - 11:21, 19:9, 41:2
**necessitates** [1] - 75:17
**need** [8] - 42:6, 46:2, 49:20, 52:12, 87:23, 92:14, 94:20, 98:1
**needed** [1] - 72:8
**needs** [2] - 33:8, 52:14
**negotiate** [2] - 36:15, 36:17
**nerve** [1] - 86:4
**networks** [1] - 83:16

**neutral** [3] - 26:15, 26:16, 27:1
**never** [19] - 15:20, 16:24, 23:15, 25:10, 25:11, 25:13, 25:15, 25:17, 27:22, 30:2, 32:17, 34:23, 44:13, 46:13, 46:21, 53:9, 54:24, 54:25, 95:14
**new** [1] - 40:8
**New** [10] - 2:8, 4:19, 5:15, 5:16, 9:7, 44:16, 47:22, 63:10, 86:20
**news** [7] - 6:5, 6:10, 7:6, 40:25, 85:25, 93:11
**Newsguild** [7] - 7:22, 9:4, 20:9, 73:25, 89:18, 90:17, 95:18
**Newsguild-CWA** [4] - 7:22, 9:4, 89:18, 95:18
**newspaper** [1] - 98:16
**next** [3] - 67:6, 67:13, 80:17
**nice** [2] - 29:18, 29:19
**Nichols** [1] - 17:20
**Ninth** [1] - 51:1
**Nixon** [1] - 80:22
**NO** [2] - 1:5, 1:11
**nobody** [1] - 33:20
**non** [1] - 47:10
**non-statutory** [1] - 47:10
**none** [4] - 20:6, 51:8, 74:14, 77:23
**nonperformance** [1] - 91:23
**normally** [1] - 68:8
**Norman** [2] - 2:9, 3:15
**NORMAN** [1] - 2:9
**Northern** [1] - 91:14
**notable** [1] - 10:21
**note** [13] - 3:19, 4:2, 11:13, 13:17, 24:23, 44:15, 45:13, 47:3, 49:16, 49:25, 53:23, 78:8, 88:23
**noted** [9] - 14:21, 44:7, 44:16, 46:19, 46:25, 53:5, 55:3, 56:13, 68:10
**nothing** [19] - 16:4, 25:25, 30:11, 32:14, 50:16, 56:2, 56:25, 57:24, 66:9, 66:11, 71:15, 71:17, 91:4, 93:17, 96:13, 96:17, 97:13, 97:14, 97:22
**notice** [3] - 30:11, 56:13, 88:15
**noticeably** [1] - 76:22
**notices** [5] - 30:6, 30:7, 30:9, 32:12, 94:7
**notified** [2] - 31:1, 44:11
**notify** [1] - 81:7
**notifying** [1] - 16:23
**notion** [2] - 42:19, 43:15
**notwithstanding** [1] - 49:15
**nowhere** [1] - 9:24
**NTEU** [1] - 17:10
**number** [6] - 24:2, 27:19, 48:14, 50:6, 56:16, 76:19
**NW** [6] - 1:20, 1:24, 2:2, 2:5, 2:10, 2:16

## O

**objection** [1] - 25:21
**objective** [1] - 93:12
**objectives** [2] - 51:25, 71:6
**obligation** [1] - 81:18
**obligations** [2] - 60:12, 69:12
**obtain** [1] - 79:6
**obvious** [2] - 28:6, 93:24
**obviously** [5] - 22:12, 30:23, 31:4, 43:7, 86:16
**occur** [3] - 45:20, 46:3, 46:22
**Oetken** [5] - 13:11, 22:8, 89:9, 93:5, 95:2
**Oetken's** [3] - 15:3, 19:25, 88:20
**OF** [2] - 1:1, 1:15
**offer** [1] - 60:1
**offered** [3] - 14:12, 24:20, 24:21
**Office** [11] - 4:10, 10:2, 13:3, 13:8, 16:21, 54:24, 55:4, 57:7, 73:21, 91:9, 91:10
**office** [4] - 43:17, 55:11, 55:21, 87:15
**offices** [1] - 54:20
**OFFICIAL** [1] - 100:9
**official** [4] - 48:12, 49:8, 50:23, 52:24
**Official** [2] - 1:23, 100:2
**officials** [1] - 32:6
**often** [2] - 8:25, 38:5
**once** [7] - 22:4, 53:9, 53:12, 54:24, 54:25, 67:5, 71:15
**One** [1] - 2:7
**one** [41] - 21:3, 27:19, 28:6, 28:22, 30:8, 30:25, 32:21, 35:24, 37:12, 41:11, 42:4, 42:11, 48:14, 50:7, 51:1, 51:24, 54:18, 56:16, 61:1, 61:12, 63:18, 63:19, 64:24, 68:14, 70:17, 72:7, 72:21, 76:8, 79:19, 83:4, 84:14, 85:12, 85:20, 85:21, 86:3, 87:5, 91:7, 97:21
**ones** [2] - 31:5, 97:20
**online** [2] - 42:20, 42:25
**onus** [1] - 78:9
**opened** [1] - 34:20
**opening** [3] - 79:1, 79:21, 95:1
**operated** [1] - 29:23
**operating** [1] - 39:19
**operation** [1] - 26:12
**operational** [1] - 77:22
**operations** [4] - 12:24, 13:23, 68:5, 68:12
**opinion** [4] - 6:10, 52:8, 71:23, 91:14
**opportunity** [1] - 5:9
**opposite** [4] - 6:14, 21:4, 21:7, 27:16
**opposition** [2] - 18:9, 44:17
**Order** [1] - 3:1
**order** [48] - 6:22, 12:22, 13:13, 13:15, 14:11, 14:21, 15:1, 15:3, 15:17, 16:7, 17:13, 18:9, 31:3, 32:5, 35:3, 35:4, 36:14, 39:3, 39:16, 46:3, 47:1, 47:2, 47:5, 47:8, 47:15, 47:20, 58:8, 58:9, 61:22, 63:11, 64:23, 65:3, 65:11, 65:14, 65:15, 66:8, 72:12, 83:17, 88:13, 88:15, 92:14, 93:19, 93:22, 97:3, 98:3, 98:4, 99:3
**ordered** [1] - 17:11
**organization** [4] - 75:14, 75:20, 76:14, 76:21
**organization's** [2] - 75:18, 76:23
**organizational** [3] - 74:15, 76:17, 77:5
**Organizations** [1] - 75:24
**organizations** [3] - 74:15, 76:12, 77:23
**original** [4] - 5:21, 14:16, 61:7, 100:3
**originally** [1] - 5:25
**OSC** [2] - 18:16, 56:23
**otherwise** [5] - 27:23, 64:7, 66:13, 91:25, 92:1
**ourselves** [2] - 86:5, 86:6
**outcome** [4] - 55:17, 57:13, 58:22, 78:15
**outdated** [1] - 81:10
**outlet** [3] - 23:17, 26:24, 40:24
**outlets** [1] - 23:24
**output** [1] - 25:9
**outset** [1] - 88:10
**outside** [1] - 35:15
**overseas** [8] - 37:22, 38:16, 39:8, 40:1, 40:3, 44:25, 45:5, 99:2
**overspending** [1] - 30:20
**own** [7] - 6:23, 8:23, 9:1, 9:10, 22:1, 35:7, 78:7

## P

**p.m** [5] - 1:16, 40:11, 41:12, 99:22
**P.O** [1] - 2:12
**Pack** [1] - 23:17
**packed** [1] - 23:4
**padlock** [1] - 26:10
**page** [8] - 30:13, 39:22, 87:20, 90:6, 90:12, 93:6, 95:1, 100:4
**pages** [1] - 89:10
**paid** [8] - 14:16, 15:4, 15:5, 27:17, 58:3, 82:4, 82:21, 86:22
**papers** [16] - 5:21, 5:25, 7:10, 13:19, 24:17, 44:7, 46:19, 46:25, 47:4, 47:25, 53:3, 53:5, 55:3, 57:9, 64:15, 73:9
**paragraph** [3] - 40:21, 89:7, 89:23
**part** [11] - 17:5, 17:8, 18:16, 21:14, 25:8, 30:16, 34:13, 51:18, 53:10, 65:10, 93:22
**particular** [7] - 21:14, 40:20, 73:13, 75:21, 76:8, 81:13, 97:14
**particularly** [3] - 15:15, 31:4, 37:4
**parties** [5] - 42:20, 42:25, 43:22, 92:25, 93:1
**partisan** [2] - 25:20, 25:21
**party** [3] - 44:6, 45:25, 78:10
**passed** [1] - 18:23
**Patsy** [1] - 3:4
**PATSY** [1] - 1:9
**pause** [6] - 47:1, 47:18, 73:14, 84:23, 94:11, 96:12
**Pause** [3] - 41:8, 83:23, 84:1
**pausing** [2] - 80:16, 80:20
**pausing/closing** [1] - 24:14
**pay** [6] - 43:10, 58:20, 82:4, 82:7, 87:1, 89:21
**paycheck** [1] - 86:19
**paychecks** [1] - 86:22
**paying** [2] - 58:17, 77:9
**payment** [1] - 61:22
**payroll** [1] - 43:10
**pending** [3] - 3:20, 4:3, 4:6
**Pennsylvania** [1] - 60:3
**people** [7] - 6:9, 22:21, 29:25, 44:24, 86:8, 86:21, 91:7
**People's** [1] - 28:4
**percent** [1] - 16:25
**perfectly** [1] - 16:6
**perform** [6] - 10:20, 19:16, 19:21, 54:17,

55:9, 58:2
**performance** [4] - 12:2, 47:11, 61:7, 91:23
**performs** [1] - 55:15
**perhaps** [2] - 24:3, 46:12
**period** [3] - 31:3, 44:8, 48:22
**permanent** [2] - 15:11, 45:12
**permit** [1] - 58:11
**permitting** [1] - 83:13
**person** [2] - 78:6, 87:22
**person's** [1] - 65:6
**personal** [12] - 7:19, 8:24, 11:21, 38:11, 39:18, 43:24, 45:18, 57:21, 59:10, 96:7, 99:1
**personnel** [8] - 34:9, 35:9, 35:18, 35:22, 47:12, 55:2, 55:3, 55:22
**perspective** [1] - 25:14
**persuasive** [2] - 87:7, 87:8
**pertaining** [1] - 76:21
**PI** [1] - 39:16
**pick** [4] - 26:6, 26:25, 59:4, 59:9
**Pickering** [5] - 28:20, 28:22, 52:12, 53:4, 87:25
**piece** [1] - 98:22
**place** [4] - 17:6, 17:16, 33:10, 96:19
**placed** [5] - 30:6, 33:14, 43:13, 54:16, 64:6
**plain** [3] - 48:2, 52:16, 53:21
**plainly** [2] - 28:9, 36:11
**plaintiff** [6] - 3:25, 7:14, 20:14, 74:18, 79:7, 90:13
**Plaintiff** [3] - 78:1, 78:8, 79:5
**plaintiff's** [3] - 68:2, 68:10, 83:6
**Plaintiffs** [2] - 1:4, 1:10
**plaintiffs** [61] - 3:9, 3:11, 3:13, 3:16, 3:19, 3:23, 4:2, 4:6, 4:20, 4:24, 8:17, 9:19, 20:10, 20:11, 23:11, 29:20, 38:5, 42:4, 43:23, 46:17, 46:23, 49:24, 52:14, 54:9, 55:7, 55:16, 57:19, 57:20, 60:18, 61:5, 61:13, 62:1, 62:3, 62:9, 64:15, 65:4, 65:15, 67:13, 67:19, 68:7, 69:3, 69:8, 69:25, 72:6, 72:16, 73:24, 74:4, 74:13, 75:13, 75:19, 75:22, 76:11, 77:2, 78:19, 78:22, 79:10, 79:14, 82:24, 90:10, 95:13, 95:23
**PLAINTIFFS** [2] - 1:18, 2:1
**plaintiffs'** [8] - 3:6, 41:18, 54:1, 66:15, 69:10, 76:10, 78:16, 79:22
**plausibly** [1] - 19:3
**played** [1] - 12:13
**Plaza** [1] - 2:7
**pleading** [1] - 61:4
**pled** [1] - 61:8
**plenary** [3] - 23:23, 25:9, 27:8
**PLLC** [1] - 2:9
**podium** [2] - 3:7, 6:24
**point** [49] - 11:1, 11:14, 11:20, 18:7, 21:25, 22:12, 26:3, 26:21, 31:7, 32:19, 33:21, 63:9, 64:21, 65:15, 65:20, 66:8, 66:9, 66:12, 66:17, 66:21, 67:16, 69:17, 70:1, 70:16, 75:8, 75:20, 77:14, 81:20, 81:21, 83:3, 84:11, 91:8, 92:10, 92:13, 93:19, 93:20, 95:5, 95:6, 96:14, 97:2, 97:25, 98:5, 98:14, 98:20
**pointed** [3] - 69:4, 72:16, 98:14
**points** [6] - 16:10, 62:23, 64:18, 65:21, 84:10, 96:2
**poison** [1] - 26:25
**policies** [5] - 25:15, 52:7, 52:8, 85:14, 85:24
**policy** [18] - 20:4, 25:16, 25:25, 27:11, 28:17, 28:24, 28:25, 29:8, 36:2, 51:25, 66:9, 67:4, 71:6, 83:15, 85:13, 97:14, 97:16, 99:5
**political** [1] - 85:24
**portion** [3] - 10:3, 13:5, 63:12
**portions** [1] - 65:13
**portray** [1] - 21:17
**poses** [1] - 42:15
**position** [19] - 14:10, 14:11, 20:11, 21:13, 31:19, 31:24, 31:25, 33:18, 33:19, 43:17, 43:20, 46:23, 54:16, 54:17, 63:16, 71:13, 72:23, 74:14, 85:19
**positions** [1] - 77:10
**possible** [2] - 24:19, 29:5
**possibly** [2] - 17:3, 95:15
**potential** [1] - 71:7
**potentially** [2] - 44:4, 44:5
**power** [1] - 58:22
**powers** [7] - 11:25, 16:16, 17:1, 32:18, 50:4, 92:1, 95:9
**precedent** [4] - 11:19, 48:6, 50:21, 50:22
**precisely** [2] - 11:20, 24:22
**preclude** [3] - 11:18, 56:4, 56:21
**precluded** [1] - 11:12
**precludes** [2] - 12:22, 56:8
**precluding** [2] - 40:23, 41:3
**predecessor** [1] - 11:15
**preference** [1] - 5:13
**prefers** [2] - 6:22, 6:23
**prejudice** [1] - 95:4
**preliminary** [16] - 5:3, 13:14, 34:22, 37:17, 38:8, 38:19, 39:11, 41:25, 42:22, 63:16, 64:3, 64:9, 76:7, 83:2, 83:16, 96:10
**prepublication** [2] - 36:1, 36:7
**presence** [1] - 47:12
**present** [7] - 5:10, 24:7, 25:14, 42:6, 52:9, 60:7, 85:14
**presentation** [4] - 24:18, 25:16, 52:6, 85:16
**presented** [5] - 23:11, 63:5, 73:12, 85:23, 85:25
**President** [2] - 28:7, 36:13
**president** [36] - 18:18, 20:20, 21:4, 21:6, 23:22, 24:10, 24:20, 24:25, 27:8, 31:20, 31:21, 32:5, 32:20, 44:20, 44:23, 45:3, 45:14, 80:1, 80:10, 80:15, 81:2, 81:3, 81:6, 81:7, 81:13, 82:2, 82:22, 83:9, 83:14, 85:1, 98:1, 98:2, 98:5, 98:11, 98:15
**president's** [1] - 27:10
**presidents** [1] - 94:21
**press** [17] - 6:16, 7:7, 8:7, 8:25, 9:12, 27:17, 30:14, 30:19, 32:11, 32:13, 38:6, 50:16, 51:10, 51:16, 77:16, 80:10
**Press** [1] - 9:7
**presumably** [1] - 68:20
**pretty** [6] - 36:21, 43:6, 46:19, 49:7, 56:1, 84:10
**primarily** [1] - 10:14
**principally** [1] - 68:19
**principle** [1] - 78:6
**principles** [8] - 51:22, 51:23, 52:1, 70:5, 70:6, 70:9, 71:3, 71:10
**printed** [1] - 31:15
**priorities** [2] - 62:14, 83:15
**private** [2] - 49:9, 50:23
**privilege** [1] - 26:23
**pro** [3] - 3:19, 4:3, 4:6
**probationary** [1] - 91:15
**problem** [6] - 21:3, 66:17, 85:23, 85:24, 93:23, 96:10
**problematic** [2] - 26:21, 54:10
**Procedure** [7] - 12:8, 13:12, 32:4, 32:8, 35:2, 35:19, 36:10
**proceed** [3] - 41:13, 49:15, 72:9
**proceeding** [1] - 34:18
**Proceedings** [1] - 99:22
**process** [7] - 33:17, 79:25, 81:3, 81:5, 81:10, 81:11, 89:13
**produce** [1] - 75:14
**Produced** [1] - 1:25
**professional** [3] - 29:2, 70:19, 70:23
**program** [7] - 15:19, 49:22, 67:20, 68:18, 72:13, 73:3, 81:6
**programmatic** [5] - 65:23, 66:2, 67:15, 68:8, 71:16
**programming** [4] - 7:15, 22:12, 75:3, 75:15
**programs** [2] - 68:11, 98:17
**Project** [2] - 2:1, 3:22
**projection** [1] - 52:3
**promised** [1] - 6:11
**promptly** [1] - 99:13
**propaganda** [1] - 25:18
**propose** [1] - 81:8
**proposed** [5] - 8:13, 8:16, 15:22, 39:16, 58:8
**proposition** [3] - 17:7, 87:11, 97:11
**prospects** [1] - 89:8
**protected** [1] - 33:18
**protection** [3] - 53:2, 67:5, 72:24
**Protection** [7] - 33:9, 34:1, 34:10, 34:20, 35:17, 36:9, 54:24
**protections** [1] - 48:9
**protocol** [1] - 67:5
**proves** [2] - 24:18
**provide** [8] - 7:8, 8:10, 20:5, 64:23, 76:13, 76:23, 77:4, 84:5
**provided** [4] - 59:24, 74:18, 75:19, 77:3
**provides** [4] - 9:23, 59:18, 64:24, 71:20

**providing** [1] - 76:20
**provisions** [5] - 16:18, 20:2, 27:21, 69:25, 81:1
**public** [17] - 20:17, 21:10, 21:15, 21:22, 48:15, 49:4, 49:7, 51:5, 83:2, 83:6, 83:7, 83:10, 83:13, 87:16, 97:25, 98:8, 98:18
**Public** [1] - 60:3
**publish** [1] - 36:3
**published** [1] - 73:7
**purchase** [1] - 9:17
**purely** [1] - 77:19
**purported** [1] - 78:5
**purpose** [3] - 29:10, 30:10, 82:11
**purposes** [2] - 49:10, 50:24
**pursuant** [4] - 48:12, 49:8, 50:22, 52:24
**purview** [1] - 55:4
**put** [16] - 23:8, 29:2, 33:22, 34:3, 38:14, 47:1, 47:16, 47:18, 50:5, 80:25, 82:3, 86:2, 94:17, 97:23, 99:3, 99:6
**puts** [1] - 31:4
**putting** [4] - 25:18, 39:17, 91:5, 94:2

## Q

**questions** [11] - 10:8, 19:8, 29:11, 39:14, 40:12, 54:5, 57:14, 58:24, 72:17, 73:5, 99:8
**quick** [1] - 96:2
**quickly** [5] - 25:7, 34:23, 35:8, 63:14, 87:9
**quintessential** [1] - 86:23
**quite** [4] - 55:6, 84:15, 85:6, 98:18
**quote** [10] - 37:11, 46:24, 48:20, 49:23, 50:14, 55:2, 55:10, 58:12, 68:17, 90:10
**quote-unquote** [1] - 46:24

## R

**radical** [1] - 43:1
**Radical** [1] - 24:9
**Radio** [13] - 7:22, 8:22, 8:23, 9:5, 9:9, 14:10, 15:4, 15:5, 16:22, 37:9, 92:19, 92:22
**radio** [7] - 8:3, 8:14, 15:23, 22:17, 88:16, 88:22, 94:3
**raise** [5] - 55:24, 78:3, 79:1, 79:20, 95:1
**raised** [2] - 64:12, 95:4
**raises** [1] - 10:4
**raising** [2] - 72:18, 73:5
**Rand** [1] - 61:3
**rather** [2] - 28:10, 76:13
**ratified** [1] - 97:22
**rationale** [2] - 30:12, 30:13
**RDR** [1] - 100:8
**RDR-CRR** [1] - 100:8
**Re** [2] - 19:19, 95:9
**reach** [1] - 22:8
**reaches** [1] - 22:21
**reaction** [1] - 49:11
**read** [8] - 11:8, 37:10, 51:18, 52:19, 73:2, 86:1, 93:9, 98:16
**reading** [2] - 58:15, 72:14
**reaffirmed** [1] - 60:24
**Reagan** [2] - 80:4, 80:6
**reallocate** [1] - 92:19
**really** [45] - 23:8, 24:16, 27:7, 30:1, 30:8, 30:13, 30:16, 32:23, 32:24, 33:4, 33:8, 33:12, 33:21, 34:6, 34:8, 35:12, 36:14, 36:25, 37:2, 37:16, 37:19, 38:2, 43:12, 43:15, 44:1, 45:20, 47:23, 48:11, 52:2, 52:12, 53:3, 53:7, 53:9, 54:25, 55:18, 56:15, 58:5, 58:6, 60:17, 62:4, 72:14, 73:2, 74:13, 91:11, 98:10
**Realtime** [1] - 1:23
**reappropriate** [2] - 16:23, 16:24
**reason** [3] - 63:13, 88:19, 96:18
**reasonable** [1] - 17:8
**reasoned** [1] - 20:5
**reasons** [2] - 54:12, 62:20
**rebuttal** [2] - 4:22, 84:8
**recast** [1] - 78:22
**receive** [2] - 53:18, 54:2
**received** [1] - 30:5
**receiving** [2] - 6:14, 43:10
**recent** [4] - 16:18, 17:9, 23:16, 38:15
**recently** [4] - 31:13, 37:21, 60:24, 98:17
**recess** [3] - 41:11, 99:14, 99:20
**Recessed** [1] - 41:12
**recognized** [3] - 50:13, 51:4, 57:7
**recollection** [1] - 80:19
**reconstituting** [1] - 17:5
**reconstitution** [1] - 17:11
**record** [12] - 3:2, 3:7, 10:23, 15:24, 23:10, 25:6, 75:4, 76:7, 81:15, 90:3, 92:11, 100:4
**Record** [1] - 1:25
**recover** [1] - 38:3
**rectify** [1] - 91:12
**reduce** [2] - 47:11, 91:6
**reducing** [1] - 79:12
**reduction** [1] - 76:21
**Reed** [1] - 26:13
**REEVES** [2] - 1:22, 100:8
**Reeves** [2] - 100:2, 100:8
**refer** [1] - 83:21
**referenced** [1] - 68:19
**referred** [1] - 67:3
**referring** [1] - 68:4
**reflecting** [1] - 52:4
**Reform** [1] - 18:14
**refuses** [1] - 19:21
**regarding** [6] - 11:2, 11:11, 17:10, 17:12, 17:19, 74:20
**regardless** [2] - 18:20, 22:2
**regimes** [1] - 8:6
**region** [1] - 93:14
**register** [1] - 31:15
**Registered** [1] - 1:22
**registering** [1] - 96:22
**regulations** [3] - 61:11, 61:12, 100:4
**regulatory** [1] - 78:17
**reinstate** [3] - 58:1, 58:11, 58:21
**reinstated** [2] - 55:17, 57:2
**reinstatement** [1] - 62:5
**reinstating** [4] - 38:16, 39:7, 39:25, 40:2
**reiterate** [2] - 19:11, 95:16
**reject** [1] - 56:10
**rejected** [9] - 12:4, 12:5, 50:6, 62:17, 67:25, 68:16, 72:22, 89:11, 92:6
**rejects** [1] - 91:19
**relate** [2] - 5:4, 41:23
**related** [7] - 5:2, 33:3, 51:2, 60:5, 64:2, 64:5, 64:6
**relatedly** [1] - 64:21
**relates** [1] - 18:5
**Relations** [1] - 31:11
**relationship** [2] - 50:12, 58:18
**release** [6] - 30:14, 30:19, 32:11, 32:13, 38:6
**relevant** [5] - 17:24, 37:5, 49:6, 56:14, 92:25
**reliable** [2] - 71:7, 93:10
**reliance** [1] - 20:6
**relied** [5] - 37:8, 50:18, 50:25, 56:6, 57:9
**relief** [48] - 12:1, 12:17, 17:8, 34:17, 34:19, 34:22, 38:8, 38:9, 38:22, 38:24, 38:25, 39:5, 40:13, 40:17, 40:22, 42:7, 43:2, 54:13, 54:14, 54:16, 55:16, 56:5, 57:1, 57:24, 58:4, 58:7, 58:8, 58:14, 62:6, 63:15, 63:20, 64:1, 65:11, 76:7, 78:6, 78:9, 79:2, 79:7, 83:3, 91:1, 91:18, 95:19, 96:15, 97:1, 98:20, 98:23
**relies** [3] - 17:18, 36:12, 42:19
**rely** [8] - 8:1, 8:22, 9:1, 9:9, 10:14, 23:21, 38:4, 90:23
**relying** [1] - 50:17
**remain** [1] - 43:5
**remainder** [1] - 41:23
**remaining** [1] - 41:24
**remains** [6] - 14:13, 14:23, 43:9, 43:20, 77:21, 77:22
**remedial** [3] - 54:22, 55:19, 91:25
**remediate** [1] - 43:3
**remediated** [2] - 46:4, 46:21
**remediation** [2] - 42:8, 42:14
**remedies** [1] - 49:21
**remedy** [1] - 59:19
**remember** [2] - 69:2, 96:25
**remiss** [1] - 51:11
**removed** [4] - 18:18, 18:19, 43:8, 72:23
**render** [2] - 12:16, 59:15
**reopened** [1] - 35:4
**reorganization** [1] - 50:2
**repeat** [1] - 89:1
**repeated** [1] - 38:6
**replete** [1] - 93:20
**replicated** [1] - 9:24
**replied** [1] - 95:3
**reply** [13] - 7:10, 7:18, 38:14, 39:6, 39:22, 40:4, 40:6, 76:24, 77:2, 78:2, 90:6, 90:12, 94:15
**report** [1] - 8:22
**REPORTER** [1] - 100:9
**Reporter** [5] - 1:22, 1:23, 1:23, 93:20, 100:2
**reporters** [5] - 8:18, 29:4, 53:14, 55:9, 55:10
**Reporters** [2] - 8:21, 9:14
**reporting** [8] - 6:5, 8:24, 9:1, 9:10, 26:22, 26:23, 73:15
**represent** [5] - 8:18, 29:5, 77:9, 77:19, 94:20
**representative** [2] -

60:2, 60:15
**represented** [3] - 9:20, 20:12, 90:17
**representing** [2] - 22:22, 29:20
**represents** [2] - 9:5, 9:6
**repressive** [1] - 8:6
**reputation** [2] - 38:5, 42:16
**reputational** [2] - 75:6, 75:7
**request** [4] - 38:20, 57:1, 61:7, 82:24
**requested** [3] - 34:19, 38:10, 40:22
**require** [4] - 10:19, 70:11, 91:22, 91:23
**required** [7] - 8:5, 13:7, 16:6, 19:5, 23:19, 47:13, 69:6
**requirement** [5] - 36:2, 44:18, 53:24, 72:10, 75:17
**requirements** [2] - 37:6, 59:24
**requires** [7] - 17:6, 42:4, 44:18, 45:10, 49:3, 65:3, 76:7
**requiring** [3] - 20:18, 42:23, 50:9
**requisite** [1] - 60:6
**rescission** [3] - 81:4, 81:8, 98:16
**research** [1] - 87:2
**reserve** [2] - 74:1, 95:21
**resident** [1] - 45:12
**resist** [3] - 23:3, 48:20, 88:11
**resolution** [2] - 31:14, 31:15
**resolve** [4] - 17:4, 21:5, 91:16, 92:14
**resolving** [1] - 10:24
**resources** [1] - 76:19
**respect** [7] - 41:18, 43:23, 43:24, 47:22, 49:22, 54:8, 70:18
**respecting** [2] - 70:23, 71:2
**respects** [1] - 23:10
**respond** [8] - 11:19, 18:8, 19:24, 69:5, 88:24, 90:16, 91:2, 94:14
**responded** [1] - 95:3
**responding** [1] - 76:20
**responds** [1] - 32:17
**response** [4] - 15:7, 15:10, 15:17, 32:25
**responses** [2] - 14:20, 49:16
**responsibilities** [2] - 55:5, 55:10
**responsible** [1] - 52:8
**rest** [2] - 51:17, 85:25
**restarted** [1] - 15:16
**restore** [2] - 38:12, 39:19
**restored** [1] - 38:8
**restraining** [12] - 13:13, 14:11, 14:21, 15:1, 15:3, 16:7, 18:9, 26:12, 31:3, 63:11, 88:13, 88:15
**restraint** [2] - 26:11, 91:22
**restricted** [1] - 36:14
**restrictions** [1] - 17:16
**rests** [1] - 71:21
**result** [1] - 15:5
**resume** [2] - 16:2, 54:15
**resuming** [1] - 15:18
**resumption** [1] - 13:3
**retaliated** [1] - 11:16
**retaliation** [3] - 12:19, 41:3
**retention** [1] - 74:21
**return** [7] - 8:6, 44:13, 45:10, 57:2, 58:10, 58:13, 89:8
**returning** [1] - 45:8
**review** [11] - 32:14, 36:1, 36:4, 36:7, 56:21, 67:20, 76:10, 94:10, 97:5, 97:8, 98:4
**reviewable** [1] - 32:7
**reviewed** [2] - 56:20, 79:23
**reviewing** [1] - 66:25
**RFA** [3] - 46:1, 90:4, 90:24
**RFE** [2] - 90:24, 92:8
**RIF** [1] - 94:6
**rights** [4] - 25:24, 26:24, 88:2, 94:1
**rise** [2] - 12:20, 46:15
**Risteen** [1] - 90:1
**Road** [1] - 2:10
**road** [2] - 22:4, 22:5
**roadmap** [1] - 41:17
**Rockefeller** [1] - 2:7
**role** [1] - 88:1
**rot** [1] - 30:21
**ROYCE** [1] - 1:15
**RSF** [5] - 74:12, 75:14, 77:15
**rule** [11] - 64:19, 64:21, 65:1, 65:2, 65:11, 65:13, 65:15, 93:5, 93:19, 93:22, 99:12
**ruled** [1] - 36:24
**ruling** [2] - 5:8, 19:25
**run** [7] - 34:2, 34:5, 37:19, 88:21, 96:16, 98:24, 99:5
**running** [2] - 38:7, 97:15
**Russia** [1] - 25:18

## S

**Safavi** [4] - 11:13, 87:10, 87:18, 92:3
**safe** [1] - 9:11
**safety** [2] - 8:24, 9:2
**salaries** [1] - 83:19
**salvageable** [1] - 30:16
**sanction** [1] - 65:11
**saving** [1] - 24:13
**Savings** [1] - 37:5
**scalpel** [1] - 27:4
**scheduled** [2] - 7:20, 14:14
**scheme** [5] - 19:2, 54:22, 55:20, 56:17, 62:9
**Schluess's** [1] - 89:23
**scholar** [1] - 86:25
**scholarship** [3] - 50:13, 50:15, 51:4
**SCHULTZ** [14] - 1:19, 3:10, 29:17, 29:19, 31:21, 31:23, 37:10, 38:24, 39:3, 39:21, 40:7, 96:1, 99:15, 99:19
**Schultz** [6] - 3:10, 29:15, 40:9, 40:21, 95:25, 99:9
**scope** [2] - 40:13, 63:15
**scratching** [1] - 64:14
**search** [1] - 32:15
**second** [13] - 15:7, 15:10, 23:12, 26:3, 32:9, 35:9, 39:24, 40:11, 49:2, 64:21, 66:18, 69:22, 96:14
**Secretary** [4] - 28:1, 70:17, 70:22, 70:25
**Section** [9] - 23:21, 25:12, 27:6, 51:21, 59:13, 65:10, 70:1, 70:5, 71:3
**section** [2] - 51:23, 70:2
**Sections** [1] - 78:20
**security** [1] - 30:20
**see** [3] - 7:9, 25:11, 39:14
**seek** [5] - 54:13, 55:16, 68:7, 78:6, 78:9
**seeking** [5] - 38:25, 57:25, 58:7, 76:6, 79:2
**SEIDE** [2] - 2:2, 3:21
**Seide** [1] - 3:21
**Selective** [1] - 96:22
**self** [1] - 30:20
**self-dealing** [1] - 30:20
**Senate** [1] - 18:18
**send** [1] - 39:4
**sending** [1] - 22:20
**sense** [1] - 52:23
**sent** [3] - 88:15, 94:2, 94:6
**separate** [2] - 13:8, 16:21
**separately** [2] - 16:21, 16:22
**separation** [6] - 11:25, 16:16, 17:1, 32:18, 50:4, 95:9
**series** [1] - 67:20
**seriously** [1] - 88:1
**serve** [2] - 42:16, 93:10
**Service** [5] - 7:11, 17:19, 18:14, 20:20, 96:22
**service** [10] - 7:19, 9:24, 11:22, 27:10, 37:23, 38:11, 85:2, 96:7, 99:1
**Services** [1] - 59:21
**services** [16] - 8:10, 10:21, 38:17, 39:8, 39:18, 40:1, 40:3, 43:24, 45:18, 57:21, 59:10, 70:20, 76:23, 77:4, 96:8, 99:2
**set** [6] - 12:6, 28:16, 34:6, 37:20, 70:6, 86:14
**sets** [2] - 34:13, 51:21
**setting** [2] - 83:14, 91:24
**several** [7] - 7:25, 8:4, 8:17, 10:4, 16:18, 27:20, 72:11
**shall** [7] - 47:11, 51:24, 59:14, 70:18, 84:9, 92:18, 93:13
**shared** [1] - 64:13
**short** [2] - 4:22, 99:14
**show** [5] - 20:5, 21:19, 66:3, 92:21
**showing** [4] - 21:8, 61:21, 65:18, 76:8
**shown** [2] - 67:14, 67:15
**shows** [3] - 15:16, 88:12, 88:21
**shred** [1] - 30:22
**shut** [3] - 33:1, 80:2, 94:5
**shutdowns** [1] - 30:3
**shuttered** [1] - 46:24
**shuttering** [2] - 47:16, 90:25
**sic** [1] - 66:1
**side** [21] - 29:3, 29:7, 42:10, 45:23, 46:6, 47:3, 48:18, 53:10, 53:13, 60:8, 61:23, 65:5, 66:5, 69:9, 70:16, 70:21, 71:14, 71:17, 84:11, 85:6, 86:16
**sidelined** [1] - 6:13
**sides** [1] - 60:13
**signatures** [1] - 60:13
**signed** [5] - 31:14, 31:20, 31:21, 57:21, 80:1
**significant** [2] - 55:5, 93:14
**significantly** [2] - 94:12, 95:4
**silence** [6] - 6:15, 7:11, 7:13, 8:20, 12:13, 20:21
**silenced** [1] - 6:4
**silencing** [1] - 9:13
**silent** [4] - 7:5, 9:2, 22:1, 22:3
**similar** [4] - 18:14, 61:25, 62:11, 87:6
**similarly** [4] - 9:10, 11:3, 12:5, 32:22
**simple** [4] - 31:25,

32:11, 48:2, 53:21
**simply** [3] - 10:16, 11:9, 48:10
**single** [1] - 7:14
**sit** [1] - 39:15
**situated** [1] - 94:17
**situation** [8] - 5:22, 5:24, 19:12, 46:7, 46:25, 48:7, 73:9, 96:24
**size** [1] - 79:12
**skip** [2] - 69:3, 69:9
**sledgehammer** [1] - 27:4
**slippery** [1] - 22:5
**slips** [1] - 9:16
**slowly** [1] - 40:2
**small** [2] - 10:3, 13:4
**Smith** [2] - 53:23, 80:15
**Smith-Mundt** [1] - 53:23
**snatched** [1] - 22:18
**snippet** [1] - 93:9
**so-called** [1] - 26:22
**society** [1] - 52:5
**somewhat** [5] - 14:9, 14:15, 17:13, 33:16, 52:23
**Sonja** [2] - 100:2, 100:8
**SONJA** [2] - 1:22, 100:8
**sorry** [4] - 14:18, 15:4, 44:21, 74:9
**sort** [17] - 14:12, 19:12, 21:23, 35:21, 43:21, 44:8, 49:13, 50:8, 51:16, 51:17, 56:11, 72:9, 72:11, 72:24, 87:18, 90:8, 97:21
**sought** [2] - 12:1, 58:14
**sounds** [4] - 57:25, 58:15, 61:1, 91:18
**source** [2] - 7:6, 93:11
**Souter's** [1] - 50:18
**Southern** [2] - 44:16, 63:10
**sovereign** [2] - 64:23, 64:25
**Spaeder** [3] - 1:18, 3:11, 4:3
**speaking** [8] - 28:12, 48:8, 48:14, 49:9, 50:23, 53:14, 85:7, 85:15
**special** [1] - 55:21
**Special** [5] - 54:25, 55:4, 57:7, 91:9, 91:11
**specialized** [1] - 9:25
**specific** [20] - 10:20, 12:2, 26:20, 26:25, 27:1, 27:11, 61:7, 62:20, 63:21, 64:25, 65:2, 65:8, 67:1, 72:16, 72:18, 72:19, 73:4, 76:11, 91:23, 92:20
**specifically** [16] - 27:10, 51:2, 55:13, 59:25, 65:3, 65:9, 65:14, 66:22, 68:2, 68:4, 68:12, 68:15, 70:1, 74:12, 75:20, 89:11
**Specifically** [1] - 64:1
**speculative** [8] - 42:11, 42:18, 43:21, 46:15, 74:22, 77:20, 89:14, 89:24
**speech** [12] - 48:2, 48:12, 48:22, 48:25, 49:11, 52:16, 52:24, 53:8, 53:22, 72:15, 73:3
**spelled** [1] - 39:6
**spells** [2] - 40:5, 40:7
**spend** [4] - 27:6, 33:4, 80:17
**spending** [2] - 13:22, 80:16
**spent** [3] - 51:14, 81:16, 83:19
**Sports** [1] - 85:17
**spread** [1] - 7:7
**staff** [7] - 12:15, 16:4, 26:10, 29:5, 41:1, 91:5, 94:2
**staff's** [1] - 73:3
**stakes** [1] - 19:20
**stand** [1] - 7:4
**standalone** [1] - 84:13
**standard** [9] - 9:22, 42:4, 69:19, 69:20, 71:1, 71:9, 71:20, 79:18, 95:15
**standards** [9] - 27:25, 51:22, 51:23, 70:4, 70:9, 71:3, 71:8, 71:10
**standing** [30] - 6:20, 20:8, 20:9, 20:10, 20:13, 20:14, 24:25, 41:24, 73:21, 73:25, 74:4, 74:15, 74:16, 74:17, 75:2, 75:17, 75:21, 76:12, 76:16, 76:18, 77:24, 78:3, 78:4, 78:10, 94:13, 94:16, 94:19, 95:18, 95:22, 96:5
**stands** [1] - 21:7
**start** [12] - 7:3, 10:7, 16:13, 22:4, 22:19, 42:2, 59:8, 59:12, 64:11, 64:18, 70:7, 84:11
**started** [1] - 48:18
**starting** [3] - 3:6, 88:23, 90:18
**starts** [1] - 48:3
**State** [8] - 2:4, 3:16, 20:23, 20:24, 21:25, 28:1, 70:17, 70:22
**state** [2] - 3:7, 73:23
**State's** [1] - 70:25
**statement** [7] - 24:10, 24:25, 25:2, 30:9, 66:8, 66:13, 91:2
**statements** [5] - 7:25, 49:8, 50:22, 74:18, 75:10
**states** [2] - 70:2, 76:5
**STATES** [1] - 1:1
**States** [34] - 4:9, 23:24, 25:14, 25:17, 28:18, 28:25, 44:14, 45:7, 45:12, 52:1, 52:3, 52:4, 52:7, 52:10, 53:15, 54:3, 59:14, 59:16, 59:17, 59:20, 59:22, 60:4, 60:23, 61:2, 61:3, 61:18, 70:3, 70:8, 71:6, 73:20, 76:25, 93:12, 100:2, 100:5
**States'** [2] - 20:22, 71:5
**stating** [1] - 74:1
**stations** [8] - 37:24, 38:17, 39:9, 40:1, 40:3, 54:19, 57:3, 96:8
**status** [3] - 5:2, 58:10, 89:2
**statute** [33] - 18:16, 23:21, 23:25, 27:8, 27:11, 37:20, 45:17, 51:12, 51:17, 51:18, 51:20, 52:17, 52:18, 52:20, 53:8, 53:10, 54:4, 55:9, 61:14, 65:7, 69:16, 69:18, 69:21, 70:10, 70:16, 71:20, 73:1, 85:9, 85:10, 86:13, 92:17, 98:9
**statutes** [5] - 18:15, 31:17, 64:24, 67:24, 92:15
**statutorily** [3] - 7:8, 10:13, 19:4
**statutory** [41] - 10:18, 10:25, 11:24, 12:16, 16:18, 18:11, 18:23, 19:2, 19:17, 19:21, 20:2, 28:1, 35:21, 41:2, 43:4, 45:17, 47:10, 47:11, 51:15, 51:16, 56:17, 56:20, 60:20, 60:25, 62:9, 69:11, 69:25, 71:24, 72:7, 72:20, 75:15, 78:16, 78:17, 78:19, 78:21, 78:22, 79:13, 84:12, 84:25, 95:6, 95:8
**stay** [5] - 10:14, 11:2, 11:7, 17:14, 45:1
**Stenographic** [1] - 1:25
**stenographic** [1] - 100:3
**step** [7] - 16:13, 48:13, 49:3, 52:15, 62:15, 69:4, 82:25
**STEPHANIE** [1] - 2:15
**Stephanie** [2] - 4:8, 73:19
**steps** [4] - 16:8, 40:22, 40:23, 46:2
**stick** [1] - 22:14
**stigmatized** [1] - 6:13
**still** [11] - 18:22, 20:3, 21:7, 33:19, 33:23, 43:10, 53:6, 66:19, 80:16, 95:17
**stop** [4] - 13:22, 42:24, 81:3, 81:6
**stopping** [1] - 16:4
**stops** [1] - 75:3
**stories** [1] - 26:7
**story** [2] - 26:20, 27:2
**Stout** [8] - 4:13, 41:21, 47:6, 58:25, 59:2, 59:4, 72:4, 81:24
**STOUT** [5] - 2:15, 4:13, 59:3, 68:25, 69:3
**straightforward** [1] - 36:21
**stranded** [1] - 44:25
**Street** [5] - 1:20, 2:2, 2:5, 2:16, 9:8
**strength** [3] - 86:10, 86:12, 86:13
**strengths** [1] - 86:3
**stress** [3] - 36:18, 38:1, 63:17
**strictly** [1] - 55:3
**stringers** [6] - 38:16, 39:8, 40:1, 40:3, 96:8, 99:2
**strong** [4] - 16:1, 20:2, 20:17, 21:7
**strongly** [1] - 85:6
**structure** [4] - 18:12, 18:23, 56:20, 84:17
**study** [1] - 86:25
**subject** [1] - 5:4
**submission** [2] - 76:7, 99:12
**submit** [2] - 63:2, 63:24
**submitted** [3] - 7:18, 7:24, 94:22
**subsection** [1] - 70:15
**substance** [1] - 22:6
**substantial** [1] - 23:7
**substantially** [2] - 7:12, 76:8
**substantive** [1] - 30:8
**succeed** [2] - 49:24, 61:21
**success** [1] - 62:18
**suddenly** [1] - 75:3
**sue** [1] - 64:22
**sued** [1] - 64:23
**suffer** [3] - 42:11, 75:16, 76:9
**suffered** [1] - 76:12
**suffering** [2] - 42:11, 42:16
**sufficient** [2] - 43:17, 43:18
**suggest** [1] - 66:10
**suggested** [2] - 85:20, 85:21
**suggesting** [1] - 28:7
**suggests** [1] - 79:15
**suit** [1] - 11:3
**Suite** [2] - 1:20, 2:2
**sum** [1] - 71:12
**superintend** [1] - 22:6
**supervise** [1] - 45:18

**supplied** [1] - 62:8
**support** [6] - 29:5, 30:23, 32:12, 42:19, 88:4, 96:13
**supports** [1] - 43:15
**supposed** [2] - 22:23, 81:11
**Supreme** [19] - 10:14, 11:1, 11:6, 18:12, 26:13, 34:7, 48:5, 56:7, 56:10, 56:12, 60:23, 61:18, 62:17, 65:21, 66:3, 66:21, 67:17, 76:25, 96:21
**suspend** [2] - 12:24, 13:22
**suspension** [1] - 55:23
**swallow** [1] - 82:20
**switch** [1] - 54:6
**swoop** [1] - 91:7
**sympathizer** [1] - 43:1
**system** [1] - 34:6
**Systems** [7] - 33:8, 34:1, 34:10, 34:20, 35:17, 36:9, 54:23

## T

**table** [2] - 31:15, 31:16
**task** [1] - 70:11
**taxpayer** [1] - 30:22
**tea** [1] - 11:8
**teach** [1] - 86:25
**teachers** [2] - 50:15, 51:5
**technical** [1] - 87:3
**technicians** [6] - 8:14, 15:23, 15:24, 88:17, 88:22, 94:4
**temporary** [10] - 13:12, 14:11, 14:21, 14:25, 15:3, 16:7, 31:3, 63:11, 88:13, 96:12
**tempting** [1] - 22:15
**term** [3] - 36:14, 44:18, 66:11
**terminate** [6] - 8:16, 15:23, 44:3, 67:6, 75:11, 96:6
**terminated** [6] - 14:12, 31:2, 46:2, 75:12, 94:5, 94:19
**termination** [10] - 12:15, 38:11, 39:5, 39:18, 55:23, 58:20, 62:10, 62:12, 67:3, 67:9
**terminations** [1] - 63:2
**terms** [25] - 13:14, 14:5, 19:10, 21:16, 50:9, 51:20, 52:20, 58:3, 60:12, 71:12, 75:6, 75:10, 75:16, 78:1, 79:4, 79:9, 82:23, 84:2, 89:4, 89:8, 89:19, 93:4, 97:25, 98:18
**test** [4] - 28:20, 34:13, 49:5, 53:5
**Texas** [2] - 66:20
**text** [2] - 59:13, 93:8
**THE** [93] - 1:1, 1:15, 1:18, 2:1, 2:14, 3:14, 3:17, 4:4, 4:7, 4:16, 5:15, 5:18, 5:23, 6:25, 12:6, 12:11, 12:23, 13:1, 13:10, 13:20, 14:9, 14:19, 14:25, 15:9, 15:20, 19:9, 21:3, 21:12, 21:15, 22:4, 22:8, 22:14, 23:2, 23:6, 24:19, 25:2, 27:14, 27:22, 29:13, 29:15, 29:18, 31:20, 31:22, 37:8, 38:21, 39:2, 39:14, 40:6, 40:9, 40:14, 41:5, 41:7, 41:9, 41:13, 42:1, 44:19, 44:22, 45:3, 45:14, 49:18, 57:18, 59:1, 68:24, 69:2, 71:22, 72:4, 73:17, 74:3, 74:8, 74:10, 79:24, 80:6, 81:18, 81:21, 82:2, 82:7, 82:10, 82:15, 82:20, 83:18, 83:22, 83:25, 84:6, 84:8, 85:10, 86:1, 86:6, 86:8, 88:6, 95:25, 99:9, 99:17, 99:20
**themselves** [2] - 4:17, 84:19
**therefrom** [1] - 51:19
**thereof** [1] - 65:12
**thinking** [1] - 67:11
**third** [10] - 5:22, 23:20, 27:6, 42:20, 42:25, 43:22, 44:6, 45:25, 78:10, 93:1
**third-party** [3] - 44:6, 45:25, 78:10
**thoughts** [1] - 52:3
**thousand** [1] - 29:24
**three** [9] - 5:2, 5:3, 5:6, 23:8, 29:20, 34:13, 34:15, 52:6, 88:14
**three-part** [1] - 34:13
**throughout** [1] - 77:17
**thrown** [1] - 26:9
**Thunder** [4] - 18:10, 34:7, 34:11, 56:16
**Thursday** [1] - 1:16
**tie** [1] - 44:10
**tied** [1] - 45:19
**ties** [2] - 9:12, 25:7
**timeframe** [1] - 14:16
**tinker** [1] - 28:2
**tinkered** [1] - 73:10
**tinkering** [2] - 84:16, 84:22
**title** [2] - 70:5, 70:9
**TNGCWA's** [1] - 90:21
**today** [11] - 4:23, 5:7, 6:18, 7:4, 63:18, 64:12, 64:16, 81:15, 84:21, 90:15, 95:17
**together** [1] - 26:17
**tolerate** [2] - 8:7, 8:25
**Tom** [1] - 7:10
**tomorrow** [4] - 8:4, 90:18, 99:16, 99:18
**took** [3] - 20:4, 88:1, 99:7
**top** [1] - 30:21
**topic** [4] - 62:24, 63:14, 73:11, 73:13
**topics** [2] - 6:18, 72:18
**total** [1] - 91:7
**totally** [2] - 48:1, 98:12
**touch** [1] - 78:13
**tough** [1] - 25:23
**towards** [1] - 24:5
**track** [1] - 81:7
**training** [1] - 80:11
**TRANSCRIPT** [1] - 1:15
**transcript** [3] - 100:3, 100:3, 100:4
**Transcript** [1] - 1:25
**transform** [3] - 60:25, 61:11, 61:15
**transgender** [2] - 25:24, 26:23
**transmitting** [6] - 37:24, 38:17, 39:8, 40:1, 40:3, 96:8
**TransOhio** [2] - 37:5, 92:9
**Transportation** [1] - 76:4
**Trauma** [1] - 59:21
**travel** [1] - 9:8
**treat** [1] - 8:1
**treated** [1] - 87:4
**tries** [1] - 82:2
**TRO** [11] - 7:4, 7:17, 37:8, 44:16, 59:8, 63:6, 63:7, 63:12, 88:20, 89:10, 99:16
**true** [7] - 9:4, 15:15, 19:18, 34:11, 86:18, 87:3, 100:3
**truly** [1] - 62:15
**Trump** [5] - 25:23, 26:22, 28:8, 36:13
**trust** [1] - 20:6
**truth** [2] - 86:4, 97:13
**try** [2] - 23:17, 70:7
**trying** [4] - 21:3, 65:16, 80:23, 82:1
**Tucker** [23] - 10:7, 10:11, 11:6, 11:18, 13:24, 36:20, 36:23, 44:1, 57:15, 59:11, 59:13, 59:18, 59:23, 60:6, 60:17, 60:19, 61:16, 62:4, 62:22, 63:9, 64:4, 91:17, 92:4
**turn** [9] - 12:17, 22:25, 31:6, 33:6, 44:4, 58:24, 64:10, 66:2, 69:21
**Turner** [22] - 17:25, 18:3, 23:18, 26:14, 28:21, 49:13, 49:19, 50:6, 50:11, 50:17, 50:25, 72:6, 72:14, 72:22, 73:2, 73:16, 84:13, 84:15, 84:16, 85:4, 86:24, 87:5
**turning** [6] - 10:4, 89:18, 90:20, 91:17, 92:6, 94:24
**Two** [1] - 14:20
**two** [25] - 4:18, 4:23, 5:5, 10:10, 26:17, 28:23, 30:13, 35:8, 37:1, 37:12, 41:24, 42:13, 44:18, 48:13, 50:25, 63:17, 64:18, 67:7, 80:13, 82:24, 83:1, 85:11, 87:10, 88:14
**two-and-a-half-page** [1] - 30:13
**two-step** [1] - 48:13
**two-year** [2] - 44:18, 80:13
**type** [3] - 43:2, 58:6, 58:14
**types** [1] - 56:19
**typically** [1] - 44:7

## U

**U.S** [6] - 4:12, 7:12, 41:15, 58:19, 85:7, 85:14
**U.S.C** [7] - 12:14, 13:7, 59:13, 65:10, 92:21, 92:22, 93:9
**ultimately** [1] - 96:10
**ultra** [6] - 19:10, 32:23, 50:3, 73:22, 79:17, 79:20
**unable** [2] - 12:16, 40:24
**uncertain** [3] - 74:20, 89:4, 89:19
**unclear** [1] - 53:25
**unconstitutional** [1] - 18:21
**under** [32] - 10:25, 12:7, 13:11, 16:6, 20:1, 25:25, 26:18, 28:9, 32:7, 47:5, 48:23, 51:6, 51:10, 51:21, 55:14, 56:15, 58:2, 58:3, 61:22, 64:4, 65:2, 65:4, 65:10, 66:23, 67:16, 68:15, 68:21, 73:1, 79:7, 92:7, 92:20, 99:12
**underlying** [4] - 31:17, 56:25, 60:9, 98:9
**undermine** [1] - 94:12
**undermines** [1] - 18:23
**undermining** [3] - 7:12, 20:21, 20:25
**understood** [1] - 66:25
**undisputed** [1] - 23:12
**undo** [1] - 14:22
**undone** [1] - 34:24
**unilaterally** [1] - 32:20
**union** [1] - 94:23
**unions** [11] - 8:8, 9:20, 20:12, 36:15, 36:17, 74:8, 74:10,

77:7, 94:19, 94:22
**unique** [5] - 9:23, 28:10, 46:7, 90:15
**unit** [5] - 8:14, 15:23, 55:24, 88:16, 91:7
**United** [36] - 4:9, 20:22, 23:24, 25:14, 25:17, 28:17, 28:25, 44:14, 45:7, 45:12, 51:25, 52:3, 52:4, 52:7, 52:10, 53:15, 54:3, 59:14, 59:16, 59:17, 59:19, 59:22, 60:4, 60:22, 61:1, 61:3, 61:18, 70:3, 70:8, 71:5, 71:6, 73:20, 76:25, 93:12, 100:2, 100:5
**UNITED** [1] - 1:1
**unlawful** [2] - 12:9, 12:11
**unlawfully** [2] - 14:3, 17:6
**unless** [4] - 29:11, 54:5, 57:14, 58:24
**unlike** [1] - 77:1
**unlikely** [2] - 9:25, 90:12
**unnecessary** [1] - 10:23
**unquote** [1] - 46:24
**unremarkable** [1] - 17:7
**unsalvageable** [2] - 32:11, 35:7
**untenable** [1] - 54:12
**unusual** [1] - 90:8
**up** [16] - 5:7, 22:18, 28:16, 34:6, 34:13, 34:20, 37:20, 59:4, 59:9, 71:12, 74:14, 80:19, 82:22, 84:4, 86:14, 89:1
**upending** [2] - 18:1, 18:4
**urge** [2] - 24:23, 85:8
**urgency** [1] - 96:9
**USA** [2] - 74:12, 77:15
**USAGM** [20] - 6:7, 6:12, 8:11, 8:13, 9:23, 10:3, 10:19, 10:24, 12:12, 13:5, 15:4, 22:23, 30:15, 30:17, 40:24, 70:2, 75:15, 84:16, 88:15, 90:15
**USAGM's** [1] - 10:12
**USAID** [3] - 11:2, 17:19, 17:20
**USAO** [1] - 2:14
**uses** [1] - 29:2
**USIA** [1] - 35:25

## V

**Vaccine** [1] - 11:5
**vague** [1] - 43:21
**valid** [1] - 19:3
**values** [1] - 22:23
**vast** [1] - 8:16
**vendors** [6] - 37:25, 38:17, 39:9, 40:2, 40:4, 96:8
**versus** [24] - 3:3, 3:4, 10:15, 17:10, 35:25, 36:13, 52:25, 57:12, 59:21, 60:4, 60:23, 61:3, 61:19, 62:11, 66:20, 67:17, 68:25, 75:24, 76:2, 76:3, 76:24, 90:1, 90:11
**vested** [1] - 70:24
**viability** [1] - 74:21
**viable** [2] - 47:7, 50:8
**vice** [1] - 83:9
**Vietnam** [1] - 8:7
**view** [6] - 5:14, 20:23, 20:24, 25:18, 26:8, 26:21
**viewpoint** [9] - 23:14, 24:20, 25:5, 26:4, 26:5, 26:8, 26:17, 27:4, 52:13
**views** [1] - 52:10
**violated** [5] - 24:1, 25:12, 67:24, 79:11, 79:16
**violates** [1] - 61:11
**violation** [17] - 11:23, 12:14, 25:3, 26:2, 29:6, 32:3, 32:18, 35:2, 72:6, 72:13, 72:20, 79:14, 80:21, 82:13, 84:25, 85:3, 97:4
**violations** [5] - 30:20, 68:3, 68:6, 78:20, 78:21
**vires** [6] - 19:10, 32:23, 50:3, 73:22, 79:17, 79:20
**virtually** [2] - 29:6, 30:5
**visa** [8] - 44:6, 44:8, 44:9, 44:10, 44:12, 44:13, 45:9, 45:11
**visas** [10] - 8:4, 8:5, 31:5, 44:2, 44:17, 44:24, 44:25, 45:7, 45:19, 90:19
**vital** [1] - 7:6
**vOA** [1] - 93:10
**VOA** [9] - 6:12, 27:9, 27:10, 28:7, 85:17, 87:20, 87:24, 88:3, 93:11
**Voice** [72] - 6:4, 6:6, 7:4, 7:7, 7:11, 7:13, 8:14, 8:18, 8:22, 9:1, 9:9, 9:13, 13:7, 15:18, 15:25, 16:9, 16:20, 18:6, 20:21, 22:20, 23:23, 24:5, 24:9, 24:11, 25:1, 25:12, 25:13, 25:17, 25:22, 27:16, 28:15, 29:8, 29:21, 29:22, 30:15, 31:8, 31:9, 31:16, 33:1, 37:15, 38:12, 38:24, 39:7, 39:19, 42:17, 43:5, 43:9, 45:6, 46:13, 50:2, 52:9, 52:22, 53:24, 77:15, 77:20, 77:21, 81:13, 81:14, 81:25, 83:19, 86:2, 86:4, 88:12, 88:17, 88:21, 89:5, 90:24, 92:4, 97:16
**voice** [1] - 28:16
**voices** [1] - 22:22
**void** [3] - 7:5, 22:2, 35:3
**voiding** [1] - 96:7
**voluntary** [1] - 15:9
**Vought** [1] - 17:10
**vs** [2] - 1:5, 1:11

## W

**wade** [1] - 70:12
**waive** [1] - 64:22
**waiver** [1] - 64:25
**walk** [1] - 64:16
**walked** [1] - 94:3
**Wall** [1] - 9:8
**wants** [2] - 80:2, 84:8
**Ward** [1] - 2:6
**warned** [1] - 61:4
**Washington** [8] - 1:17, 1:20, 1:24, 2:3, 2:5, 2:10, 2:13, 2:16
**waste** [1] - 24:13
**wasting** [1] - 82:21
**ways** [3] - 29:16, 79:22, 88:3
**weaken** [1] - 77:16
**Weaver** [2] - 35:25, 56:6
**Wednesday** [4] - 7:18, 20:19, 89:7, 94:15
**week** [2] - 5:22, 22:21
**weigh** [3] - 83:2, 83:11, 95:12
**weight** [1] - 29:6
**weighty** [1] - 29:4
**Welfare** [1] - 60:3
**white** [1] - 26:23
**whole** [1] - 98:5
**wholesale** [3] - 68:7, 68:21, 68:22
**wholly** [2] - 56:24, 57:4
**WIDAKUSWARA** [1] - 1:9
**Widakuswara** [10] - 3:4, 3:9, 3:13, 3:19, 4:6, 4:18, 54:18, 57:20, 78:25, 79:20
**Wildlife** [2] - 67:17, 69:1
**WILLIAM** [1] - 1:19
**win** [1] - 53:6
**winning** [1] - 80:19
**wipe** [1] - 8:15
**wire** [8] - 37:23, 38:16, 39:8, 40:1, 40:3, 40:20, 96:8, 99:2
**withdraw** [1] - 67:20
**withering** [1] - 6:12
**word** [5] - 29:2, 32:15, 36:20, 77:12, 95:25
**words** [6] - 28:14, 30:17, 32:16, 35:7, 51:12, 85:17
**Worker** [1] - 28:4
**Workers** [1] - 28:18
**workforce** [1] - 6:13
**world** [10] - 6:9, 6:13, 20:21, 22:24, 27:18, 46:12, 77:17, 86:7, 87:24, 93:14
**worse** [2] - 97:4, 97:10
**worsened** [1] - 6:2
**worst** [1] - 43:16
**worth** [3] - 30:7, 34:14, 35:24
**write** [1] - 73:11
**written** [1] - 52:16

## Y

**Yazdgerdi** [1] - 7:10
**year** [4] - 44:18, 80:13, 80:17, 80:18
**years** [6] - 6:11, 21:21, 29:9, 29:23, 30:4, 47:17
**YEOMANS** [25] - 2:4, 3:12, 7:2, 12:9, 12:12, 12:25, 13:2, 13:17, 14:1, 14:18, 14:20, 15:2, 15:10, 15:21, 19:10, 21:6, 21:14, 21:18, 22:6, 22:10, 22:16, 40:12, 40:16, 41:6, 88:7
**Yeomans** [3] - 3:13, 6:19, 6:24
**yield** [1] - 6:23
**York** [10] - 2:8, 4:20, 5:15, 5:16, 9:7, 44:16, 47:22, 63:10, 86:20
**Youngstown** [1] - 19:12
**yourselves** [1] - 5:11
**Youth** [1] - 90:1

## Z

**Zuckerman** [3] - 1:18, 3:11, 4:3