UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL ABRAMOWITZ, et al., Plaintiffs, v. KARI LAKE, et al., Defendants. | CA No. 25-0887 (RCL) |
| PATSY WIDAKUSWARA, et al., Plaintiffs, v. KARI LAKE, et al., Defendants. | CA No. 25-1015 (RCL) Washington, D.C. Monday, June 23, 2025 11:00 a.m. |

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For Plaintiffs Case No. 25-0877: | WILLIAM B. SCHULTZ, ESQ. Zuckerman Spaeder LLP 2100 L Street NW Suite 400 Washington, DC 20037 |
| For Plaintiffs Case No. 25-1015: | GEORGINA C. YEOMANS, ESQ. American Federation of State, County and Municipal Employees 1625 L Street NW Washington, DC 20036 |
| For Defendants: | BRENDA A. GONZALEZ HOROWITZ, ESQ. U.S. Attorney's Office 601 D Street NW Washington, DC 20530 |

Court Reporter: BRYAN A. WAYNE, RPR, CRR
U.S. Courthouse, Room 4704-A
333 Constitution Avenue NW
Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

DEPUTY CLERK: Your Honor, we're on the record in related cases 25-887 and civil case 25-1015.

Counsel, please state your appearances for the record.

MR. SCHULTZ: Bill Schultz for the Abramowitz plaintiffs.

MR. BEATON: Brian Beaton, also on behalf of the Abramowitz plaintiffs.

MS. YEOMANS: Good morning, Your Honor. Georgina Yeomans for the Widakuswara plaintiffs.

MR. BLUMIN: Matthew Blumin, also for the Widakuswara plaintiffs.

MS. HOROWITZ: Good morning, Your Honor. Assistant U.S. attorney Brenda Gonzalez Horowitz for the defendants.

THE COURT: All right. We'll start with the plaintiff, Mr. Schultz.

MR. SCHULTZ: Thank you, Your Honor. What's clear what comes out of the papers on the motion to show cause is that the plaintiffs and the government have very different views of what is required of VOA by congressional statutes, by this court's order, and importantly, by the appropriations.

In the government's view, the congressional statutes are satisfied with a Voice of America that produces 25 Web stories per week, about 3- to 500 words each, no TV, one radio station show which broadcasts five minutes a day into Afghanistan,

minimal content in four languages, and about 20 to 30 employees. And with this few, they believe they're justified in firing virtually all employees. And that's what they're doing. They fired 500 personal service employees, and just last Friday they announced a RIF for 639 VOA and USAGM employees.

THE COURT: Well, what does that mean? Those were terminated?

MR. SCHULTZ: My understanding is it's effective in September. There's a process they have to go through, but it's the notice that they're going to begin the process and terminate those employees, and this even includes most of the employees of the Persia service they brought back because of the events in Iran. That service, my understanding is almost all of those employees got the notice as well.

THE COURT: The RIF notice.

MR. SCHULTZ: The RIF notice. Yeah. In plaintiff's view, this does not comply with the provision of this court's April 22nd order not stayed by the D.C. Circuit that said VOA must fulfill its statutory mandate to, quote, serve as a consistently reliable and authoritative source of news.

And that mandate is spelled out in more detail in other provisions of the statute which require that VOA have international broadcasting that must include, quote, information about developments in each significant region

of the world; quote, shall be designed to effectively reach a significant audience; quote, shall include news which is consistently reliable and authoritative, accurate, objective, and comprehensive and have adequate transmitter and relay capacity to support these activities. There's more, but I think this is enough to make the point I want to make.

And in addition to these statutes, the defendants must comply with appropriation laws, and that's probably the best measure of what Congress expected, how Congress sees the scope of activities that it expects from VOA and USAGM.

Appropriations laws, just like any other duly enacted statute, it must be followed. Before each appropriation, U.S. Agency for Global Media, which is the parent of VOA, provides a detailed budget justification to Congress. In 2025, it's about a hundred pages long. And after this, in 2025, VOA received $260 million in appropriations, which was about the same that they've received every year, and it's about what they asked. There were a few additions they didn't get, but it's been the same basic program.

There's an Appendix A and B of this budget document that provides detailed information to Congress, country by country, of how the money will be spent, how many employees, how many video hours, how many radio hours, and how many broadcast hours for each country.

Now, we're not saying that this has to be followed exactly,

but my point is that this is what VOA told Congress it would do with this money, and this is a very good measure of the scope of the program that Congress thought it was funding with its appropriation.

In its opinion, the Court found, and I quote, Defendants have not provided any indication that the $260 million in VOA appropriations is being spent to fulfill its statutory mandate to provide a, quote, consistently reliable source of news, and then the Court cited the statute. That was true when the Court issued the opinion, and it's clearly just as true today.

I want to just provide a few words about the relief that we've asked for, to put it in context. My first point is recisions. This is the procedure that the executive branch can go through when it wants to eliminate a program or severely reduce appropriations. And what it has to do is go to Congress and ask Congress for a recision. It's actually done that for some other programs, but it hasn't done it here. There's no request pending to Congress. They've never gone through that procedure.

THE COURT: What's the statute that requires that, the recision provision?

MR. SCHULTZ: I don't have it in my head. We can get it to you.

THE COURT: The statute says if you're going to -- how do you decide when you have to make a recision?

MR. SCHULTZ: Well, my understanding is the appropriations statute says, here's the appropriations, you have to spend this money. It's not in that statute, but there's a general opportunity that -- and I don't even know if it's by statute, but the administration can go to Congress and say we want a new law that allows us not to spend the money, and it's called a recision. That process is called a recision, but it's not -- I don't know if there's a statute. I can find out.

THE COURT: What they're talking about, they sent something to Congress. They didn't bother to give it to me about recision. I don't know what it is. I don't know what the authority for it is, so do you know?

MR. SCHULTZ: Yes. They sent a letter, and it's actually -- we attached it. I think it's Attachment E --

THE COURT: That's the letter that --

MR. SCHULTZ: I believe that's what they sent to Congress.

THE COURT: They would call that the recision message?

MR. SCHULTZ: It's not a recision message, I don't think. It's just a notice --

THE COURT: We're not doing what you told us to do.

MR. SCHULTZ: This is what we're planning to do, right.

THE COURT: This is what we're planning to do. It's totally inconsistent with what Congress appropriated the money

for.

MR. SCHULTZ: Right. I mean, they're basically saying we're planning to almost eliminate this agency. But in my understanding, they're not asking --

THE COURT: They think they don't have to go back to Congress to do that.

MR. SCHULTZ: Well, they say they don't.

THE COURT: Right.

MR. SCHULTZ: But I think the law says they do.

THE COURT: Right.

MR. SCHULTZ: And this letter is not requesting permission from Congress. There are various provisions in these statutes that Congress wants to be notified about significant changes, but this is just a notice. And this is just, here's where we're going; we're going to end up with 20 or 30 people running VOA and maybe 60 to 80 people for all the programs under the --

THE COURT: They're taking the position the president can do whatever he wants, and if he notifies Congress, that's nice. He doesn't have to notify me, despite my outstanding injunction.

MR. SCHULTZ: That seems to be their position. I mean, their position, as laid out in their brief, is they can run VOA with 30 people, and the appropriation is never mentioned in their opposition. They never discuss it.

The second contextual point I wanted to make has to do with the importance of a preliminary injunction. We're at a preliminary injunction stage. I think that we've showed that the statutes have been violated. That was barely even contested in the earlier hearing.

But unless the Court does something at this stage, VOA is going to be lost. Even if we prevail later, the problem is people will have found other jobs, they will have gone on with their lives, VOA will essentially have been eliminated, and this is what preliminary injunctions are for.

THE COURT: I agree.

MR. SCHULTZ: And this is why we're pressing, asking so urgently, for the Court to act.

The third point I wanted to make is we're very mindful that the Court has no interest in micromanaging the agency, and so we've tried to craft relief that doesn't require that.

And finally, the fourth point I wanted to make, contextual point, it's important that the *en banc* D.C. Circuit, in its separate statement, explicitly recognized that the court has authority to order personnel actions in connection with the non-stayed provision of your court's order that VOA and the government must comply with the statutory mandate.

So in terms of relief, what we're asking for on preliminary injunction at this stage, in light of the show cause order and in light of the fact that there's a clear violation of the

law, we're asking that the Court order the defendants to devise a plan, which the Court will review, and that plan would describe, first, how defendants will operate VOA, provide meaningful programming that's consistent with the 2025 budget. It's got to be a program that's consistent with the budget that has the robust program that was presented to Congress in the budget justification.

The plan that we're asking for would show how they would spend the appropriation including for VOA $260 million, and then there's also significant money for USAGM support services for VOA. The plan would have to show how they're going to actually spend that money.

And third, the plan would identify personnel on administrative leave or the personal service employees who were fired that will be brought back or other people that would be brought back, but it will actually lay out in terms of personnel who they're going to bring back so that VOA will be the organization that it promised Congress it would run when it asked for the appropriation. This is included in the proposed order that we submitted and also at the end of our brief. Thank you very much.

MS. YEOMANS: Good morning, Your Honor. I'll start with the recision point because Your Honor had some questions there. I believe the statute is the Impoundment Control Act from the 1970s, and there was a separate notification that the

defendants sent to Congress on June 20, just last Friday. I believe it was a notice of recision, but it was for funds only from the grantees, not from Voice of America, and purported to reallocate about $17 million from the grantees back to USAGM, I think for mission support funding, but did not purport to request recision of any of Voice of America's funds. I have copies of that letter if it will be helpful for the Court to have that, and I have some I can share with defense counsel as well.

THE COURT: That would be helpful. That's what a recision request looks like.

MS. YEOMANS: Yes.

THE COURT: But it only deals with the contract.

MS. YEOMANS: It does, yes.

(Document tendered to court and counsel.)

THE COURT: Give me just a moment.

(Court reviewing document.)

They provide the notice pursuant to the regular notification procedures, which of course they don't specify, but anyway. Certainly a mystery to me. Okay. You're going to have to tell me a lot more. Go ahead.

MS. YEOMANS: So --

THE COURT: I don't take words like that.

MS. YEOMANS: Okay. Yeah, well, if you look at page 2, I think that is the clearest point where you can actually

see what money they're moving around. And you can see that they don't purport to be taking any money away from Voice of America, and I think we've made a fairly strong circumstantial showing that there's no way that they could spend the money that's been appropriated to them based on what they have announced that they are going to do.

From Mr. Abramowitz's declaration attached to their motion, you can see that prior to 2025, prior to March 15, they spent 170 million on full-time equivalent salaries, 60 million on personal-services contractor salaries, and 30 million on maintaining general operational capacity. The vast majority of VOA money goes to staff, and they've fired all of the contractors, which is the 30 million, and they purported to terminate 639 of their full-time staff last Friday, which is the vast majority of their budget.

They've also ended their lease -- or they listed the building for sale and terminated the lease for the building that they were going to take over. It's a mystery to me where $260 million could go based on those announcements.

And I think that the broader point is that we know basically two things, and we're here because we need to know more. We know that the defendants contend that their current levels of programming are sufficient to meet the statutory minimum. As Mr. Schultz says, that amounts to a handful of articles posted online, two and a half minutes, my understanding

is, of original radio content that is translated in two languages and therefore takes up five minutes of radio time, no television.

That's my understanding, is that's it. And they maintain that that is sufficient to meet the statutory minimum. And I think we've made a strong showing in our brief pointing to multiple indicia of congressional intent that it be doing much more than that.

We also know that defendants' position and their plan has been remarkably hard to pin down. So I'd like to just briefly walk through a timeline of things that have happened since this court entered the injunction:

On May 23, the Widakuswara plaintiffs emailed the defendants and set forth our position that they were not compliant with part 3 of this court's injunction. It's my understanding that the next week is when they resumed putting articles online and started up the five minutes of radio broadcast daily during the weekday.

On the 31st, we filed our motion for an order to show cause.

On June 3, the defendants sent a staffing plan to Congress that purported to set forth the statutory minimum of 81 employees remaining at the entire U.S. Agency for Global Media including two employees for the Farsi language service and 11 employees for Voice of America.

On June 4, the defendants responded to Mr. Abramowitz's

motion for an order to show cause and did not mention that staffing plan that had been submitted to Congress the day before.

On June 13, the defendants responded to our motion and again did not mention that staffing plan.

And then on June 20, they announced wide-scale RIFs amounting to firing 85 percent of the agency and sent that recision letter to Congress.

This is why we're asking the Court to order the defendants to submit their plans. It's been remarkably hard to pinpoint what they plan to do or what they think the statutory minimum is, aside from the plainly insufficient status of broadcasting when we filed our motion.

And I think that a good example has been Persian news, which defendants reactivated between responding to Mr. Abramowitz's motion and ours. On June 13, they brought back 39 journalists after having told Congress they only needed two for the Farsi or Persian language service, presumably because of conflicts escalating in that country, representing to this court that they had done that and resuming a plan for 24/7 coverage, and then a week later terminated 17 of those journalists that they had just brought back.

And my understanding is they were unable to provide live news coverage of the president's speech regarding Iran on Saturday, as was planned, because of the lack of staff to

provide live television programming. Everything had to just be broadcast on the internet.

That's just one example of the chaotic nature of the purported compliance with this court's injunction, and just goes to show that we need a plan so that we can evaluate it. That is the quintessential agency administrative review.

Unless the Court has further questions, I think the rest is contained in our briefs. I can quickly run through the statutory provisions we think the defendants are not compliant with, or I can discuss the appropriations more. But I welcome the Court's questions.

THE COURT: Tell me what they're not complying with right now. Since they haven't offered me anything, I don't know that I need anything to start the contempt trial right away with the order to show cause. There's certainly enough for me to order to show cause right now. I may give them another opportunity to see if they want to file anything more with me. I can't imagine the paucity of the information they have provided me when I have an outstanding injunction that they're clearly not obeying.

MS. YEOMANS: We agree entirely, Your Honor. The statutory provisions I think are laid out extensively in our reply brief starting on page 3, the most obvious of which is the defendants' position that they don't have to broadcast anything on the radio. That is very clearly included in Voice

of America's charter and animates the entire apparatus of broadcasting to nations of the world that are --

THE COURT: What would be the purposes of Voice of America if there's no voice?

MS. YEOMANS: Exactly. There's also a statutory requirement that they broadcast television, which they have submitted sworn declarations that they are not doing. There are the multiple provisions within the standards and principles that govern USAGM programming including meeting the needs unserved by the people of certain nations, information about developments in each significant region of the world, a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen, reliable research capacity to meet the criteria under that section.

There are numerous statutory provisions that discuss broadcasting to North Korea as a priority of the USAGM. There's no plan for that to happen through Voice of America. There's an ongoing requirement that they report to Congress about the effectiveness of their North Korea reporting.

There is the Appropriations Act which, as Mr. Schultz explained, informs what Congress wanted USAGM to be doing and specifically prohibited any changes to programming hours previously justified to Congress without specific notification.

There is a prohibition on, as we've already discussed,

moving funds around. There are explicit requirements regarding the Persian News Network and 24-hour-a-day, 7-day-a-week coverage that has not yet resumed, and I think we can fairly glean from the termination of 17 of the Persian news journalists is not a plan that is going to be seen through.

And there are various intents of Congress apparent throughout the years in appropriations acts regarding Russian language service, Latin American Division news programming, Pacific Islands, a Ukrainian service, Kurdish language service, Croatian and Serbian programs. The list goes on, Your Honor, and the defendants have not acknowledged those requirements or attempted to explain how they're compliant with them.

THE COURT: Okay. Thank you.

MS. YEOMANS: Thank you, Your Honor.

MS. HOROWITZ: Good morning, Your Honor.

THE COURT: Good morning.

MS. HOROWITZ: The agency has been complying with this court's injunction in good faith. The materials that we submitted in support of our opposition to plaintiffs' motion to show cause outlined the various news stories, broadcasts --

THE COURT: News stories aren't the way the Court gets information. You have affidavits. You have evidence. You've given me very little of anything. You haven't even given me the recision or whatever you did Congress. I don't know what

you've done with Congress, but if you're talking about whether you're violating my order, you've got to take it seriously. You don't give me news clips. You tell me.

MS. HOROWITZ: We provided declarations, Your Honor, in support of our position that the defendants are complying with the Court's injunction and --

THE COURT: Yeah, that's nice to hear.

MS. HOROWITZ: I appreciate, Your Honor -- and we are taking it very seriously. I appreciate --

THE COURT: I don't think so.

MS. HOROWITZ: I appreciate the Court's concern. What we provided in our declarations is the outline of four language services in addition to the Office of Cuba Broadcasting that is currently transmitting. That included explanations of transmissions over the radio, news stories, as well as the resumption of some television programming.

And I want to correct something that Ms. Yeomans came up here and said just a moment ago, because my understanding is that the agency was able to broadcast live regarding the events that happened over the weekend with the United States' bombing in Iran. What I understand is that Voice of America was able to air the president's address from the White House live, with simultaneous translation in Persian language on their satellite TV channels live into Iran and the neighboring countries and across the entire Middle East.

So, contrary to the representations made by Ms. Yeomans, the agency has been addressing and responding to current events. As I think as we noted in our subsequent declaration that was updated when we filed our opposition to the Widakuswara plaintiffs -- that was the Soltani declaration -- she indicated that the agency had in fact resumed live television broadcasting given the events that were happening in the Middle East in Israel and Iran.

So it is true that it is a fluctuating situation, but the agency I think is taking steps to respond to current events that are happening and ensuring that that information is being broadcast to where it needs to be broadcast.

THE COURT: Wouldn't it be helpful if those in Russia that might listen to the U.S. heard about it, or those in China, other people that may be allied with Iran, wouldn't that be helpful for them to know?

MS. HOROWITZ: Well, per --

THE COURT: But you're not going to do that.

MS. HOROWITZ: Well, perhaps, Your Honor, but the agency is one of the -- one of the language services that the agency identified was the Mandarin language service, which we note is required by statute, and the agency is complying with that. And so I can't speak to specifically what they're airing, you know, on a moment-by-moment basis, because that is changing in response to world events.

My understanding of the RIF notices that went out last week is that Voice of America intends on retaining 250 employees. And so I did want to update the Court on that because that is different from the information that was provided in the declarations.

In the June 3rd memo from Ms. Lake, which I did not have a copy of, Your Honor, the one that she sent to Congress, the statutory minimum memo as I understand it --

THE COURT: Why would the Court not be given a copy of it?

MS. HOROWITZ: I did not have a copy of that, Your Honor.

THE COURT: That's your excuse?

MS. HOROWITZ: I was not aware that that letter had been sent out and I did not have a copy of that. What I understand from that is that there was a statutory minimum of 81 positions that had been identified. What I am told by Voice of America and what I understand is the plan is to retain 250 employees. So again, contrary to these, you know, assertions that, you know, Voice of America has gone completely offline or is dark, that's not the case.

And I think one of the points we'd really like to make is that the agency has retained discretion, and certainly I think the D.C. Circuit recognized that when it stayed the first portion of the Court's injunction relating to returning all employees back to work as it existed pre-March 14th is

that the agency has to be able to take personnel actions in order to effectuate its mission, and the agency is doing that.

And what I understand the plan to be is that, to the extent that there are news-event situations happening around the world that the agency needs to respond to, much like it did over the weekend with the bombings in Iran, the agency is not beholden to keeping employees on staff as full-time employees and paying them a salary and benefits and having them on staff for an entire year when those services are not needed.

But rather, I think the goal is to try to bring people in on some sort of contract status in order to make sure that the agency is broadcasting that information out on an as-needed basis as it determines what it needs to do to comply with the International Broadcasting Act and the information that's happening around the world that requires news and immediate coverage.

I do want to take a moment to note that plaintiffs identify various portions of the statute that they say the government has violated, but, to be clear, none of the briefs from plaintiffs have identified a single news story that they say did not provide a reliable or authoritative source of news. They briefly mention the statutory firewall in their papers, but they provide no evidence that the agency is not complying with that. In fact, I don't think they even mention that in their reply at all.

And so there's all these various portions of the International Broadcasting Act that they say that the agency is violating, for example, reaching a significant audience. As we pointed out in our briefing, the word "significant" is not defined within the statute. And so what I think that means is that that affords the government, the agency, broad discretion in how it determines what a significant audience means, and it's not plaintiffs' role to determine what "significant" means. That's left to the agency.

And I think the agency is taking good-faith steps to make sure it is complying with this court's order. The materials that we submitted in response to the show cause request outlines exactly what the agency is doing. Of course, that has all been put in flux a bit given the RIF notices that went out at the end of last week, and so as I stand here today --

THE COURT: Well, that's another problem. In light of my order saying restore them to the condition they were in March 14, how do you go ahead and RIF them and not at least inform the Court that you're going to do that before you do it?

MS. HOROWITZ: Well, my understanding, Your Honor, of the March 14th portion where you ordered restoration of those employees, that portion of the injunction is stayed by the D.C. Circuit.

THE COURT: Paragraph 3 was not stayed, and the circuit made that clear.

MS. HOROWITZ: That is correct, Your Honor, but paragraph 3 talks about Voice of America and ensuring that Voice of America is serving as an authoritative and reliable source of news.

THE COURT: So you think you can go down to how many employees, you're saying now 28, and that they're still fulfilling all the function they had originally?

MS. HOROWITZ: No, Your Honor. My understanding was that the statutory minimum memo identified 31 employees -- I'm sorry -- 31 journalists.

However, what I understand from the agency is that post RIF -- and again, the RIF is a long process. That doesn't mean that individuals are terminated immediately. I heard my friends on the other side say, you know, these employees have been terminated. That is an inaccurate statement of the law. They have been given a notice of intent for a reduction in force.

THE COURT: Okay.

MS. HOROWITZ: So right now those employees are, you know, to the extent they have some time to determine whether they want to continue in their position, some of those employees -- of course, the RIF procedures are incredibly complicated, and I do not purport to be an expert on RIF procedures or an HR specialist, but what I understand is that the agency has to look at the positions. It does a ranking of

everybody that was in there. Some individuals will be given an opportunity to perhaps change or move into a different position. And so what that looks like now is not what it may look like in a month from now, which I think is part of the reason why this request is premature.

I think the agency needs to be allowed to take the personnel actions that it wants to take, which the *en banc* court understood that the agency might do that when it declined to lift the stay on that provision of the Court's injunction, and the third prong of the Court's injunction does not talk about personnel actions. And I think that it is wholly within an executive agency's discretion and decisionmaking about what personnel actions they want to take and how they can effectuate the agency's mission with those personnel actions.

Finally, Your Honor, I want to add, there's been a lot of discussion about the Impoundment Control Act, and that was also brought up in plaintiffs' -- in the Widakuswara plaintiffs' reply to our opposition to the motion to show cause. My understanding is that there is no private right of action under the Impoundment Control Act. That is not one of the claims in this case.

They have various constitutional claims, a claim under the APA, and my understanding of the Court's injunction is that the Court premised entry of its injunction on a likelihood

of success on the merits and a showing of the preliminary injunction factors under the APA for failure to adequately explain its decisionmaking as arbitrary and capricious.

So I would push back on any notion that plaintiffs have standing or are in a position to bring claims, you know, regarding defendants' actions as to recision or the Impoundment Control Act that is a part of this lawsuit.

I think finally there was a request for discovery, and I heard it again just now a moment ago. This is an APA case. The Court entered its injunction on the grounds that plaintiffs were likely to succeed on the merits under the APA. It is well settled. I do not need to tell this court that the under the APA the review is a record review. Discovery is incredibly unusual in an APA case.

I do not think it's warranted here. Any materials that the agency is putting together regarding its statutory minimum, what it needs to do to comply with the International Broadcasting Act, the various provisions of the International Broadcasting Act, all of that would be privileged under either some sort of deliberative process privilege because the agency has not taken a final action with respect to those steps, privilege under the attorney work product or attorney-client privilege. And so we would push back on any notion that plaintiffs would be entitled to discover that information when the agency is still in the process of determining what

statutory minimum means.

Unless the Court has any other questions...

THE COURT: I don't really follow all that. What do you think the court of appeals' seven members said when they said I still have authority under that section 3? What can the Court do? You're saying I can't do anything, my hands are tied.

MS. HOROWITZ: No, Your Honor. That's not what I'm saying at all. I think that if the Court believes that plaintiffs have met the grounds for the motion, certainly the Court could ask for -- I think the Court alluded to this earlier, the Court could ask for additional information from the government in the form of affidavits or declarations about what is the plan, what is the agency doing today to comply with my order, what is the agency planning on doing to comply with my order. But I think with respect to document requests under Rule 26 from plaintiffs, we would push back on any notion that they would be entitled to that.

THE COURT: Okay. All right.

MS. HOROWITZ: Thank you.

THE COURT: Who wants to go first?

MR. SCHULTZ: Just a couple of things. I know the Court knows this, but I think it's worth remembering that on March 15, VOA put all the employees on administrative leave. So they're getting paid, but they're not working. And then

since it's -- that's 1400 employees, roughly. It has since fired 550. So there are 850 employees on administrative leave.

Now, some large number of them have been notified that they're going to be separated, but the point is, having people sit at home is not complying with these congressional statutes or with the appropriation. There's no way that that can be sufficient. And they've made it very clear in their notice to Congress and elsewhere that they think they can run this agency with about 30 employees. And it's true they called some back for the Persian service, but most of those employees also got notices of an intent to terminate.

Counsel for the government relied on what's going on with Cuba Broadcasting, but that's obviously not the Voice of America. That really is not about this case.

I think that the Court correctly called out the government in terms of what the D.C. Circuit said in its separate statement. It quoted the government as saying that the district court lacks any authority, quote, to order personnel actions beyond those that the government itself determines are necessary or appropriate to carry out its statutory mandate. And then the Court very specifically said, no, that's wrong; the Court can order personnel actions in connection with the requirement that it carry out its statutory mandate.

And again, I just want to stress that I think the

appropriations issue is central and that it's very helpful to see what VOA told Congress it was going to do with those appropriations. I mean, page after page, in detail, for about 40 countries, they say this is what we're going to do, and that describes the program that VOA thought complied with the statute and that Congress would be getting when they made that appropriation.

If the Court doesn't have any other questions, I want to thank you for your time.

THE COURT: What's your position about the Impoundment Control Act issue that she raised?

MR. SCHULTZ: We're not making our major argument under the Impoundment Control Act, but our position is the appropriation is a law of Congress. And I think we cited, I think by then-Judge Kavanaugh, where he said that in connection with the Nuclear Regulatory Commission, it's a law of Congress that they have to follow. Whether this is an impoundment or not -- I don't know if it's an impoundment when you put everybody on administrative leave. I mean, you're still spending the money.

THE COURT: Right.

MR. SCHULTZ: So there may be Impoundment Control Act issues. I don't agree with what the government said, but I don't think that that's what the Court has to resolve.

THE COURT: All right. Thank you, Mr. Schultz.

MS. YEOMANS: Thank you, Your Honor. I'll start with that question as well. We're not bringing a claim under the Impoundment Control Act. We're bringing APA and constitutional claims, and each one of those claims cites the 2024 Appropriations Act as law that the defendants are currently violating. So we absolutely have encompassed the allegation that not spending this money is a violation of law within our complaint and within the counts that this court entered the injunction on.

Starting back at the beginning of defendants' argument regarding the Iran broadcast, I just want to clarify that the information I have from those working on the broadcast was that there was not capacity to do a live broadcast via television and that it was broadcast only over the internet. That is the best information that I have, and that's why I represented it to the Court.

It's also not correct that the Soltani declaration says that they have brought back television. It says that they began implementing a plan for television. And Jeff Reber's declaration filed that same day says in unequivocal terms that they are not currently broadcasting television.

I heard the government say that the agency is not beholden to keeping employees that it had as employees on March 14, and even if that's the defendants' view, the agency is required to think through and explain itself before taking dramatic action

reversing course from its previous action. And it's also true that part 3 of this court's injunction remains in place, and I read the D.C. Circuit's statement in the same way that Your Honor does, as indicating that Your Honor has broad powers to enforce that part of the injunction which can encompass rulings regarding agency personnel.

Regarding the word "significant," we responded to this argument in our reply brief. It's not defined, but it does not give USAGM boundless discretion. For one thing, there are multiple congressional indications in the laws I recited earlier that contemplate broadcast to countries that are currently not being contemplated -- entire countries that are not being contemplated by the defendants.

I'd also like to briefly address the reductions in force and the idea that they are not terminations. My understanding is that everybody, or nearly everybody -- we're still gathering information -- that received a reduction in force notice have been placed on administrative leave.

So they are not working any longer, and that means that the defendants' representation that they have 39 journalists working on the Persian news service is no longer accurate because 17 of those people received notices and were placed on administrative leave.

THE COURT: Those 17 are still being paid until the termination takes effect, right?

MS. YEOMANS: In the normal course. Yes, Your Honor. I will note that there's a -- I believe it's an OPM regulation that says that the government is not supposed to put people on administrative leave pending reductions in force, but that is what we're seeing here.

And even if -- I think the description of the RIF process was a little bit off. My understanding is that the defendants have identified the positions that they intend to eliminate and have generated a retention register identifying the positions that they're going to eliminate.

And so those 17 positions within the Persian news service have been identified for elimination regardless of whether those individual people can then exercise their rights to take a different position that's not being eliminated. So it's still affecting the capability of these services. I think what Ms. Horowitz was talking about was more about individual rights based on seniority to perhaps move into a different position as part of the RIF process.

Finally, I'd like to correct just one thing I said earlier, which is that the letter I gave Your Honor from June 20 was a notice of reprogramming under the Appropriations Act, not an Impoundment Control Act recision request.

And then, you know, we've asked for a plan. I think that's a reasonable thing to do given that this is an APA case, and we've asked for document production and explained that Your

Honor has broad authority to enforce this injunction, and that's a reasonable measure to do so. And I will also note that we have First Amendment and an Appointments Clause claim that of course we would be entitled to discovery on in the regular course. Thank you, Your Honor.

THE COURT: Let me ask the government one question, then. In light of what you said at the very end of your argument, would the government file a supplement Thursday or Friday with whatever additional information you want to provide, and then I would have it teed up whether I can order more information and order the plan and all that sort of stuff or not?

MS. HOROWITZ: Yes, Your Honor.

THE COURT: I think it would help me since you're conceding you're going to have to -- or would provide some information.

MS. HOROWITZ: Yes, Your Honor. We would be happy to do that.

THE COURT: I think that would be helpful to the Court before I decide this question, because obviously I'm not going to be the final decisionmaker.

MS. HOROWITZ: I would ask that you give us till Friday since things are changing on a daily basis.

THE COURT: That's fine.

MS. HOROWITZ: Thank you.

THE COURT: And after we see that, if the plaintiffs want to file a further reply, you can notify me what kind of deadline you can impose on yourselves for that. Since she's saying they wouldn't cooperate in discovery, let's see what they give us without that. And then I have to decide if I'm going to order discovery and other things, and I think it will be more prudent to see what the government is willing to give voluntarily first.

MR. SCHULTZ: Would Wednesday be too long?

THE COURT: The following Wednesday?

MR. SCHULTZ: Yes.

THE COURT: That's fine.

Okay. All right. Anything else either side wants to raise today? All right. Thank you very much, counsel.

(Proceedings adjourned at 11:49 a.m.)

* * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne