# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL ABRAMOWITZ *et al.*,

         *Plaintiffs,*

      –v.–

KARI LAKE *et al.*,

         *Defendants.*

Case No. 25-cv-00887 (RCL)

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' <u>MOTION TO DISMISS</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

BACKGROUND ................................................................................................................. 1

I.    Factual Background ...................................................................................................... 1

    A.    Since World War II, VOA Has Delivered Vital, Truthful Reporting
        to Those Living Without Access to a Free Press. ............................................... 1

    B.    VOA Goes Dark. ..................................................................................................... 3

II.    Statutory Background .................................................................................................. 6

    A.    Congress Codified VOA and Requires it to Fulfill its Statutory Mission. ...................... 6

    B.    Congress Recognizes that Editorial Independence Is Integral to VOA's Meeting its
        Statutory Obligations. ............................................................................................ 8

    C.    Congress Appropriates Funds So That VOA Can Meet its Mission. ............................. 10

ARGUMENT ..................................................................................................................... 12

I.    Legal Standard ............................................................................................................ 12

II.    This Court Has Jurisdiction Over All Claims in This Case. ................................................. 12

    A.    None of the Plaintiffs' Claims Are Channeled Through the CSRA. ............................... 12

    B.    The PSC Plaintiffs' Claims Belong in This Court. ..................................................... 19

    C.    Plaintiffs Have Challenged Actions Subject to APA Review. ....................................... 22

        1.    Defendants' Actions to Implement a Categorical Policy Are Discrete and
            Final Actions. ................................................................................................... 22

        2.    Defendants' Dismantling of VOA Is Not Committed to Agency Discretion. ........... 26

        3.    No Other Adequate Remedy Exists. ................................................................... 28

        4.    Plaintiffs Do Not Challenge the Executive Order. ............................................... 28

III.    Plaintiffs Have Sufficiently Alleged Viable Constitutional Claims. .................................... 29

    A.    Dalton Does Not Bar Review. ................................................................................. 29

    B.    The Presentment Clause ......................................................................................... 30

C.  Appropriations and Spending Clauses ........................................................ 31

D.  Take Care Clause ................................................................................ 31

E.  Separation of Powers .......................................................................... 32

F.  Ultra Vires ...................................................................................... 34

IV.  The Court Should Order Defendants to Produce the Administrative Record. ..................... 36

CONCLUSION .............................................................................................. 38

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*AFL-CIO v. Dep't of Labor*,
  No. 25-cv-339 (JDB), ----F. Supp. 3d ----, 2025 WL 1129227 (D.D.C. Apr. 16, 2025) ............ 35

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
  321 F.3d 1166 (D.C. Cir. 2003) .................................................................................................. 34

*AIDS Vaccine Advoc Coal. v. United States Dep't of State*,
  770 F. Supp. 3d 121 (D.D.C. 2025) .............................................................................. 31, 32, 33

*Albrecht v. Comm. on Employee Benefits of the Federal Reserve Benefits Sys.*,
  357 F.3d 62 (D.C. Cir. 2004) ...................................................................................................... 19

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) ................................................................................ 13, 14, 16, 28

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
  No. CV 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) .................................... 17

*American Foreign Service Association v. Trump*,
  768 F. Supp. 3d 6 (D.D.C. 2025) ......................................................................................... 17, 18

*Arab v. Blinken*,
  600 F. Supp. 3d 59 (D.D.C. 2022) .............................................................................................. 37

*Axon Enter. v. Fed. Trade Commn.*,
  598 U.S. 175 (2023) ...................................................................................................................... 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................................................... 12

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................................................................... 22

*Bosco v. United States*,
  931 F.2d 879 (Fed. Cir. 1991) ..................................................................................................... 14

*Carr v. Saul*,
  593 U.S. 8392 (2021) .................................................................................................................... 16

*Carroll v. Off. of Fed. Cont. Compliance Programs, United States Dep't of Lab.*,
  235 F. Supp. 3d 79 (D.D.C. 2017) .............................................................................................. 37

*Cemex Inc. v. Dep't of the Interior*,
  560 F. Supp. 3d 268 (D.D.C. 2021) ............................................................................................ 20

*Chi. Women in Trades v. Trump*,
  No. 25-cv-2005, 2025 WL 1331743 (N.D. Ill. May 7, 2025) ................................................. 35

*City & County of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ........................................................................................ 31, 32

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ............................................................................................................... 30

*Cody v. Cox*,
  509 F.3d 606 (D.C. Cir. 2007) ............................................................................................... 27

*Connecticut v. United States Dep't of the Interior*,
  344 F. Supp. 3d 279 (D.D.C. 2018) ..................................................................................... 37

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022) ....................................................................................... 19, 21

*Dalton v. Specter*,
  511 U.S. 462 (1994) ......................................................................................................... 29, 30

*Dellinger v. Bessent*,
  768 F. Supp. 3d 33 (D.D.C. 2025) ........................................................................................ 18

*Delta Air Lines, Inc. v. Export–Import Bank of U.S.*,
  85 F.Supp.3d 250 (D.D.C. 2015) .......................................................................................... 12

*Department of Education v. California*,
  145 S. Ct. 966 (2025) ............................................................................................................. 22

*Diakanua v. Rubio*,
  No. CV 24-1027, 2025 WL 958271 (D.D.C. Mar. 31, 2025) ................................................ 37

*Does 1-26 v. Musk*,
  771 F. Supp. 3d 637 (D. Md. 2025) ...................................................................................... 33

*Drake v. F.A.A.*,
  291 F.3d 59 (D.C. Cir. 2002) ........................................................................................... 26, 27

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012) ................................................................................................. 13, 14, 15, 16

*Farrell v. Tillerson*,
  315 F. Supp. 3d 47 (D.D.C. 2018) ........................................................................................ 38

*Fed. Express Corp. v. United States Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) ............................................................................................... 35

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) .................................................................................. 15, 33, 35

*Freytag v. Comm'r of Internal Revenue*,
   501 U.S. 868 (1991) ............................................................................................ 33

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) ............................................................................. 25

*Graham v. Ashcroft*,
   358 F.3d 931 (D.C. Cir. 2004) ........................................................................... 14

*Grundmann v. Trump*,
   770 F. Supp. 3d 166 (D.D.C. 2025) .............................................................. 13, 18

*Han v. Lynch*,
   223 F. Supp. 3d 95 (D.D.C. 2016) ..................................................................... 12

*Hisp. Affs. Project v. Acosta*,
   901 F.3d 378 (D.C. Cir. 2018) ........................................................................... 24

*Hi-Tech Furnace Sys., Inc. v. F.C.C.*,
   224 F.3d 781 (D.C. Cir. 2000) ........................................................................... 26

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013) ...................................................................... 28, 31

*Indep. Equip. Dealers Ass'n v. E.P.A.*,
   372 F.3d 420 (D.C. Cir. 2004) ........................................................................... 23

*Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985) ............................................................................. 21

*Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*,
   402 F.3d 1249 (D.C. Cir. 2005) ......................................................................... 12

*Jimenez Verastegui v. McAleenan*,
   No. CV 18-2358 (TJK), 2019 WL 2550385 (D.D.C. June 20, 2019) ................... 38

*Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*,
   56 F.3d 279 (D.C. Cir. 1995) ............................................................................. 22

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ........................................................................................... 18

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ...................................................................................... 23, 25

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
   --- F. Supp. 3d ----, Civ. No. DLB-25-1363, 2025 WL 1585051
   (D. Md. June 5, 2025) ........................................................................................... 26

*Massachusetts v. Kennedy*,
   --- F. Supp. 3d ----, Civ. Action No. 25-10814-WGY, 2025 WL 1371785
   (D. Mass. May 12, 2025) ...................................................................................... 26

*McMahon v. New York*,
   No. 24A1203, 2025 WL 1922626 (U.S. July 14, 2025) ....................................... 15

*Mdewakanton Sioux Indians of Minnesota v. Zinke*,
   264 F. Supp. 3d 116 (D.D.C. 2017) ..................................................................... 37

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ....................................................................... 19, 20

*Mittleman v. Postal Regul. Comm'n*,
   757 F.3d 300 (D.C. Cir. 2014) ............................................................................. 34

*Myers v. United States*,
   272 U.S. 52 (1926) ............................................................................................... 33

*Nat'l Ass'n of Immigr. Judges v. Owen*,
   139 F.4th 293 (4th Cir. 2025) ........................................................... 13, 15, 17, 18

*National Fair Housing Alliance v. United States Dep't of Housing and Urban Development*,
   No. CV 25-1965 (SLS), 2025 WL 2105567 (D.D.C. July 28, 2025) ..................... 34

*Nat'l Treasury Emps. Union v. Trump*,
   770 F. Supp. 3d 1 (D.D.C. 2025) ......................................................................... 17

*New York v. Trump*,
   133 F.4th 51 (1st Cir. 2025) ................................................................................ 25

*Norton v. Southern Utah Wilderness Alliance*,
   542 U.S. 55 (2004) ............................................................................................... 25

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ............................................................................. 18

*Oceana, Inc. v. Locke*,
   670 F.3d 1238 (D.C. Cir. 2011) ........................................................................... 24

*Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*,
   878 F. Supp. 2d 241 (D.D.C. 2012) ..................................................................... 12

*Rhode Island v. Trump,*
   --- F. Supp. 3d ----, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868
   (D.R.I. May 6, 2025) ................................................................................................ 17, 26

*Robbins v. Reagan,*
   780 F.2d 37 (D.C. Cir. 1985) ......................................................................................... 27

*Sec'y of Labor v. Twentymile Coal Co.,*
   456 F.3d 151 (D.C. Cir. 2006) ....................................................................................... 27

*Sharifymoghaddam v. Blinken,*
   No. 1:23-CV-1472-RCL, 2023 WL 8047007 (D.D.C. Nov. 17, 2023) ........................ 37

*Sierra Club v. Jackson,*
   648 F.3d 848 (D.C. Cir. 2011) ................................................................................. 27, 36

*Spectrum Leasing Corp. v. United States,*
   764 F.2d 891 (D.C. Cir. 1985) ....................................................................................... 21

*Sunoco Pipeline, L.P. v. U.S. Dep't of Transportation,*
   No. 21-CV-1760 (TSC), 2023 WL 11195824 (D.D.C. Sept. 29, 2023) ....................... 36

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994) ........................................................................................... 13, 14, 15

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision,*
   967 F.2d 598 (D.C. Cir. 1992) ....................................................................................... 20

*Trump v. Am. Fed'n of Gov't Emps.,*
   --- S.Ct. ----, No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025) ......................... 15

*Trump v. Wilcox,*
   145 S. Ct. 1415 (2025) ................................................................................................... 18

*Turner v. U.S. Agency for Glob. Media,*
   502 F. Supp. 3d 333 (D.D.C. 2020) .............................................................................. 10

*Turner v. U.S. Agency for Glob. Media,*
   No. 20-5374, 2021 WL 2201669 (D.C. Cir. May 17, 2021) ......................................... 10

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.,*
   665 F.3d 1339 (D.C. Cir. 2012) ..................................................................................... 31

*United States v. Fausto,*
   484 U.S. 439 (1988) ....................................................................................................... 17

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs,*
   714 F.3d 186 (4th Cir. 2013) ......................................................................................... 24

*Vox Media, Inc. v. Mansfield,*
   322 F. Supp. 3d 19 (D.D.C. 2018) ................................................................ 12

*W. Watersheds Project v. Haaland,*
   850 F. App'x 14 (D.C. Cir. 2021) ............................................................... 24

*West Virginia by & through Morrisey v. U.S. Dep't of the Treasury,*
   59 F.4th 1124, 1147 (11th Cir. 2023 ........................................................... 31

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.,*
   --- F. Supp. 3d ----, C.A. No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157
   (D.R.I. Apr. 15, 2025) ................................................................................ 26

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ............................................................................. 32, 33

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
   576 U.S. 1 (2015) .................................................................................... 32

**STATUTES**

22 U.S.C.
   § 6201 ...................................................................................................... 7
   § 6202 ............................................................................................... 6, 7, 8
   § 6203 ...................................................................................................... 3
   § 6204 ................................................................................................. 7, 8
   § 6205 ............................................................................................... 3, 10

5 U.S.C.
   § 551 ...................................................................................................... 23
   § 701 ...................................................................................................... 26
   § 1202 .................................................................................................... 18
   § 1211 .............................................................................................. 13, 18
   § 1214 .................................................................................................... 13
   § 7104 .................................................................................................... 18
   § 7703 .............................................................................................. 15, 18

**OTHER AUTHORITIES**

118th Cong., Further Consolidated Appropriations Act, 2024, Legislative Text and
   Explanatory Statement (Comm. Print 2024).................................................11

David Enrich,
   *As Voice of America Goes Dark, Some Broadcasts Are Replaced by Music,*
   N.Y. TIMES (Mar. 16, 2025) ....................................................................... 1

Editorial Board,
*A U.S. Retreat in the War of Ideas*, WALL ST. J., Mar. 19, 2025 ................................. 5

Edward Wong,
*New Conservative Media Chief Dismisses Heads of U.S.-Funded News Outlets*,
N.Y. TIMES, (June 17, 2020).......................................................................................... 9

H. Rep. No. 95-1403 (July 31, 1978)........................................................................... 18

H.R. 1968, 119th Cong. § 1101(a) (2025) ....................................................................11

International Broadcasting Act, Pub. L. No. 103-236 (1994) ........................................ 7

*It Is Full Of Waste, Fraud, And Abuse." Kari Lake Reacts To 1,300 Voice Of America
Layoffs*, RUMBLE (Mar. 17, 2025)................................................................................. 5

Kathy Kiely,
*By firing Voice of America, Radio Free journalists, Trump puts them in danger*,
USA TODAY (Mar. 19, 2025) ......................................................................................... 2

Letter from Sens. Rubio, Graham, Moran, Collins, Durbin, Leahy, and Van Hollen to
Michael Pack (July 1, 2020 ........................................................................................... 9

Pub. L. No. 80-402 ........................................................................................................ 6

Pub. L. No. 94-350 (1976) ............................................................................................ 6

Pub. L. No. 103-236 (1994) .......................................................................................... 7

Pub. L. No. 118-47, 138 Stat. 460 (2024) .................................................................. 10

Pub. Law No. 118-83, 138 Stat. 1524 (2024) ..............................................................11

Pub. L. No. 118-158 (2025) ..........................................................................................11

*Roll Call Vote 116th Congress - 2nd Session*,
UNITED STATES SENATE ............................................................................................. 10

S. Rep. No. 95-969 (1978)............................................................................... 13, 17, 18

Sally Jenkins,
*Voice of America brought light to dark places. Just ask Martina Navratilova.*,
WASH. POST. (Mar. 20, 2025) ....................................................................................... 2

Serge Schmemann,
*The Voice of America Falls Silent*, N.Y. TIMES (Mar. 24, 2025)................................. 1

*Structure*,
U.S. AGENCY FOR GLOBAL MEDIA (last accessed July 29, 2025) ............................... 3

Tiffany May,
    *Chinese Nationalists Praise Trump's Cuts to Voice of America*, N.Y. TIMES
    (Mar. 18, 2025) ................................................................................................ 2

U.S. Const. art. II, § 3 ............................................................................................ 32

*USAGM, Senior Advisor Kari Lake cancels obscenely expensive 15-year-lease that
    burdened the taxpayers and enforces Trump's Executive Order to drastically
    downsize agency*, U.S. AGENCY FOR GLOBAL MEDIA (last accessed July 29, 2025) ............. 4, 5

*VOA Battles Shortwave Jamming - 2002-05-20*, VOA (last accessed July 29, 2025) .................... 2

*VOA Mission, VOA Firewall and VOA Charter*, VOA PUBLIC RELATIONS
    (last accessed July 29, 2025) ............................................................................ 1

*VOA's first broadcast from New York City to Germany*,
    VOICE OF AMERICA PUBLIC RELATIONS ................................................................. 1

**RULES**

Local Civil Rule 7(n) ........................................................................................ 36, 37, 38

**REGULATIONS**

Exec. Order No. 14,238,
    90 FED REG. 13043 (Mar. 14, 2025) ...................................................................... 4

## BACKGROUND

**I.    Factual Background[1]**

**A.    Since World War II, VOA Has Delivered Vital, Truthful Reporting to Those Living Without Access to a Free Press.**

VOA launched in the most precarious of times during the height of World War II. Its mission was simple, but powerful: counter Nazi propaganda through truthful, impartial reporting delivered to German citizens who lived under the Nazi regime. *See* ECF No. 1 (Compl.) ¶¶ 1-2. The first words spoken embodied that ethos: "The news may be good or bad; we shall tell you the truth." *Id.* ¶ 1.[2] In this way, VOA complemented United States objectives during the war. But not through force. Rather, VOA was the embodiment of America's soft power, as it demonstrated free speech, free press, and democracy in action to those living under totalitarianism. *Id.* ¶¶ 3-4; *see* David Enrich, *As Voice of America Goes Dark, Some Broadcasts Are Replaced by Music*, N.Y. TIMES (Mar. 16, 2025), https://www.naturl.link/z4pAYf; Serge Schmemann, *The Voice of America Falls Silent*, N.Y. TIMES (Mar. 24, 2025), https://www.naturl.link/QVpNBv.

The defeat of the Nazi regime did not end VOA's value. Since that time, VOA has expanded to be a global voice for American values, including freedom of speech and freedom of the press, and it has demonstrated those values every day through its reporting to audiences living under authoritarianism. *See* Compl. ¶¶ 3-5; *VOA Mission, VOA Firewall and VOA Charter*, VOA PUBLIC RELATIONS,  https://tinyurl.com/2233h4td (last accessed July 29, 2025). Its venerable

---

[1]    This background is provided solely by reference to the Complaint given Defendants moved to dismiss. As this Court is well aware through the proceedings related to the preliminary injunction, this case has developed since the filing of the Complaint. Those developments are discussed in Plaintiffs' filings related to the show-cause proceedings. The instant briefing is largely a rehashing of issues related to the preliminary injunction, which the Court properly decided.

[2]    *VOA's first broadcast from New York City to Germany*, VOICE OF AMERICA PUBLIC RELATIONS, https://tinyurl.com/5n9azuhs (last accessed July 29, 2025).

history is difficult to distill. But examples of its reach and impact abound. During the Cold War, VOA broadcasts reached behind the Iron Curtain to tell those living without access to real reporting the truth.  Compl. ¶ 31. World-famous Czech tennis star Martina Navratilova has recalled listening to VOA broadcasts while living under Soviet rule so that she could "find out what was really going on around the world." Sally Jenkins, *Voice of America brought light to dark places. Just ask Martina Navratilova.*, WASH. POST. (Mar. 20, 2025), https://tinyurl.com/5h6rs67u. Likewise, VOA reporting has reached Chinese listeners for decades; from Tiananmen Square to Xinjiang, VOA has delivered accurate reporting to listeners who otherwise lack access to sources that will tell them what is actually happening. Compl. ¶ 31; *see* Tiffany May, *Chinese Nationalists Praise Trump's Cuts to Voice of America*, N.Y. TIMES (Mar. 18, 2025), https://tinyurl.com/bdhauxsb.

Because delivering truthful, impartial reporting to those living under authoritarian regimes has always been a threat to those regimes' existence, authoritarian regimes have consistently sought to block access to VOA programming. Compl. ¶¶ 30-31; *see, e.g.*, *VOA Battles Shortwave Jamming - 2002-05-20*, VOA, https://tinyurl.com/3ecwkm4p (last accessed July 29, 2025). And many of VOA's journalists, who hail from such countries and who speak directly to these audiences, have put their safety on the line, facing possible detention and torture abroad for reporting the news. Compl. ¶¶ 101-116; *see* Kathy Kiely, *By firing Voice of America, Radio Free journalists, Trump puts them in danger*, USA TODAY (Mar. 19, 2025), https://tinyurl.com/56uy2j92.

Before the actions at issue in this case, VOA provided comprehensive, multimedia reporting in 49 languages to an estimated 362 million people across the globe on a weekly basis. Compl. ¶ 2. It employed approximately 1,300 employees, including at least 1,000 journalists.  *Id.* ¶ 12. Approximately 500 of VOA's employees, including approximately 450 journalists and

representing approximately forty percent of VOA's workforce, were personal services contractors (PSCs), who worked fulltime under contract with VOA, an arrangement that has become increasingly prevalent in government in recent years. *Id.* ¶ 13. Many of these PSCs were key VOA journalists from other countries who deliver truthful reporting to those living abroad. *Id.* ¶¶ 12-13.

### B.  VOA Goes Dark.

Voice of America is one of six global media organizations within the United States Agency for Global Media (USAGM). Compl. ¶ 25; *Structure*, U.S. AGENCY FOR GLOBAL MEDIA, https://tinyurl.com/yc4hrrek (last accessed July 29, 2025). USAGM's chief executive officer must be appointed by the President and confirmed by the Senate. 22 U.S.C. § 6203(b)(1). The director of VOA is appointed by the CEO of USAGM, whose decision must be ratified by the International Broadcasting Advisory Board (IBAB), the bipartisan, seven-member board that approves the appointments and removals of the directors of United States international broadcasting networks. 22 U.S.C. § 6205(e)(1)–(2); *see* Compl. ¶¶ 54-57.

Donald Trump was elected the 47th president of the United States in November 2024. On December 11, 2024, then-President-elect Trump announced his intent that Kari Lake lead VOA as its director. Compl. ¶ 66. Shortly after taking office, however, Trump swiftly fired all members of the IBAB. *Id.* ¶ 67. As Kari Lake has publicly acknowledged, she could not be immediately appointed to be the head of VOA because her appointment requires approval by the now-vacant IBAB. *Id.* On March 3, 2025, President Trump appointed Lake as a "Senior Advisor" to Victor Morales, the Acting USAGM CEO. *Id.* ¶ 23.

On March 14, 2025, hours prior to signing into law Congress's appropriations to VOA, the White House announced that it intended to "reduce the performance of" VOA's "statutory functions and associated personnel to the minimum presence and function required by law." Exec.

Order No. 14,238, 90 FED. REG. 13043, 13043 (Mar. 14, 2025) (also available at https://tinyurl.com/2wue2bt7) ("March 14 Executive Order"); *see* Compl. ¶ 69.

One day later, on March 15, 2025, nearly all USAGM employees, including approximately 1,300 employees of VOA, received notice from USAGM that they were being placed on administrative leave "until further notice." *Id.* ¶ 70; *USAGM, Senior Advisor Kari Lake cancels obscenely expensive 15-year-lease that burdened the taxpayers and enforces Trump's Executive Order to drastically downsize agency*, U.S. AGENCY FOR GLOBAL MEDIA, https://tinyurl.com/3f5jdumn (last accessed July 29, 2025) (hereafter "USAGM Release"). USAGM did not provide a reason for placing VOA employees on administrative leave. Compl. ¶ 70. VOA employees were told they were barred from entering USAGM premises and accessing USAGM's systems. *Id.* ¶ 71. All employees were also required to immediately surrender their USAGM ID, phones, and equipment. *Id.*

On March 16, 2025, USAGM notified VOA's personal services contractors (PSCs) that they would be terminated on March 31, 2025. *Id.* ¶ 72. The termination notice applied to approximately 500 PSCs who worked at VOA, many of whom were key journalists and some of whom were on J-1 visas that expired 30 days after they were terminated. *Id.*

On March 17, 2025, William Martin, Director for Stations and Operations, instructed all USAGM Foreign Service employees to shut down all transmitters at their stations within two days and request the respective missions to place all locally employed staff on administrative leave. *Id.* ¶ 73. Employees were also told to expect to be placed on administrative leave following the two-day shutdown period. *Id.* As a result of these actions and others, VOA ceased all broadcasting activities for the first time in 83 years. *Id.* ¶ 27. News outlets that reflect a range of political

viewpoints have criticized VOA's shuttering. *See, e.g.*, Editorial Board, *A U.S. Retreat in the War of Ideas*, WALL ST. J., Mar. 19, 2025, https://tinyurl.com/398fazk5.

These actions were taken by the Defendants in this action. *See* USAGM Release (featuring commentary from Kari Lake, concerning USAGM's personnel actions following executive order); Compl. ¶ 77. And Defendants have made clear that the cessation of VOA's broadcasting and reporting activities will continue, and that VOA will be effectively dismantled. A March 15, 2025, USAGM press release states that USAGM "is not salvageable," and that "from top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken." USAGM Release; Compl. ¶ 78. Kari Lake reiterated that drastic actions were being taken to shut down USAGM and the entities it oversees in the days following the March 15 release. In two interviews, Lake stated that USAGM is not salvageable or unsalvageable multiple times, *see* Compl. ¶ 78-79; Kari Lake (@KariLake), X (Mar. 18, 2025), https://tinyurl.com/zc3798x4; Kari Lake (@KariLake), X (Mar. 17, 2025), https://tinyurl.com/8yxz3kpr[3], and that VOA and related entities put out "anti-American content" and that there is "no oversight over the editorial side of what is going out over the air and that this agency has tried to put up a wall, a border wall around it, Voice of America and others … that says … you can't tell us what we say on the airwaves … that's not how things should operate," Kari Lake (@KariLake), X (Mar. 19, 2025) https://tinyurl.com/mr27dr5p.

---

[3]    *See also "It Is Full Of Waste, Fraud, And Abuse." Kari Lake Reacts To 1,300 Voice Of America Layoffs*, RUMBLE (Mar. 17, 2025), https://tinyurl.com/32jjjdyj; Kari Lake (@KariLake), X (Mar. 19, 2025) https://tinyurl.com/6t73zdxf.

II.    **Statutory Background**

   A.    **Congress Codified VOA and Requires it to Fulfill its Statutory Mission.**

VOA is a creature of federal statute, and its statutory duties and obligations are codified into United States law as the result of several different pieces of legislation enacted over the last eighty years.

In 1948, Congress passed the United States Information and Exchange Act of 1948 (the Smith-Mundt Act). Pub. L. No. 80-402. The Smith-Mundt Act created "an information service to disseminate abroad information about the United States, its people, and policies promulgated by the Congress, the President, the Secretary of State and other responsible officials of Government having to do with matters affecting foreign affairs." Pub. L. No. 80-402, tit. I § 2(1). With the Smith-Mundt Act, VOA was codified into law.

Although VOA began its broadcasts in the 1940s, Congress codified the entity's charter in the Foreign Relations Authorization Act of 1977. Pub. L. No. 94-350 (1976). The charter amended the Smith-Mundt Act to recognize VOA's importance to United States "long-range interests." *Id.*, tit. II, § 503. In relevant part, the law codified certain statutory requirements:

> (1) VOA will serve as a consistently reliable and authoritative source of news. VOA news will be accurate, objective, and comprehensive.
>
> (2) VOA will represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions.
>
> (3) VOA will present the policies of the United States clearly and effectively, and will also present responsible discussion and opinion on these policies.

*Id.* (currently codified in 22 U.S.C. § 6202(c)).

Consistent with these missions, in 1994 Congress passed the International Broadcasting Act (IBA), Pub. L. No. 103-236, tit. III (1994), 22 U.S.C. §§ 6201, *et seq.*, which lays out the overarching principles that guide U.S. international broadcasting and insulates U.S. broadcast agencies' newsroom staff from certain executive branch officials who "shall respect the professional independence and integrity of the Agency, its broadcasting services, and the grantees of the Agency." 22 U.S.C. § 6204(b). *See* §§ 6202(a)(5), (b)(1). These statutory provisions embody the "firewall" between journalists and executive branch officials who must not interfere with the reporting at the entities.

Today, by law VOA is required to carry out a variety of statutory functions in addition to those mentioned above. Under 22 U.S.C. § 6202(a)(7), "United States international broadcasting shall," among other requirements laid out in the statute, "be designed so as to effectively reach a significant audience." Similarly, Congress mandated that "United States international broadcasting shall include,"

(1)    news which is consistently reliable and authoritative, accurate, objective, and comprehensive;

(2)    a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society;

(3)    clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies, including editorials, broadcast by the Voice of America, which present the views of the United States Government;

(4)    the capability to provide a surge capacity to support United States foreign policy objectives during crises abroad;

(5)    programming to meet needs which remain unserved by the totality of media voices available to the people of certain nations;

(6)    information about developments in each significant region of the world;

(7)    a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen;

(8)    reliable research capacity to meet the criteria under this section;

(9)    adequate transmitter and relay capacity to support the activities described in this section; and

(10)   training and technical support for independent indigenous media through government agencies or private United States entities.

22 U.S.C. § 6202(b)(1)–(10). Accordingly, through statute, Congress required that VOA broadcast and produce the news to reach wide audiences across the globe, and it prescribed that this news must adhere to high journalistic standards. Congress also requires that the CEO of USAGM "respect the professional independence and integrity of [USAGM], its broadcasting services, and the grantees of [USAGM]." 22 U.S.C. § 6204(b).

## B.    Congress Recognizes that Editorial Independence Is Integral to VOA's Meeting its Statutory Obligations.

In addition to the statutory firewall and the statutory principles that require that VOA adhere to high journalistic standards, Congress has bolstered VOA's editorial independence through an intricate statutory scheme. Congress took these actions in response to recent attempts to meddle with VOA's independent journalism and breaches of the statutory firewall.

In 2020, Michael Pack took over as CEO at USAGM. Compl. ¶ 38. In the first two weeks following his Senate confirmation, in an event deemed the "Wednesday Night Massacre," Pack fired the heads of numerous entities under USAGM's purview, including the directors of Radio Free Europe/Radio Liberty, Radio Free Asia, Middle East Broadcasting Networks, the Office of Cuba Broadcasting, and the Open Technology Fund. *Id.* ¶ 40; Edward Wong, *New Conservative*

*Media Chief Dismisses Heads of U.S.-Funded News Outlets*, N.Y. TIMES, (June 17, 2020), https://tinyurl.com/37v9hv6j. Among other actions, Pack also directly attacked the independence of journalists working at these entities.

Within weeks of Pack's firings of the heads of the broadcast entities, a bipartisan group of United States Senators, including Republicans Marco Rubio, Lindsey Graham, Jerry Moran, and Susan Collins, and Democrats Richard Durbin, Patrick Leahy, and Chris Van Hollen, wrote a letter to Pack, expressing their concerns. Compl. ¶ 45. The Senators explained that "[t]he termination of qualified, expert staff and network heads for no specific reason as well as the removal of their boards raises serious questions about the preservation of these entities and their ability to implement their statutory missions now and in the future." *Id.* ¶ 46.[4] They further noted their "bipartisan and bicameral" concerns, and urged that "Congress set up these networks, and its governance structure at USAGM, to preserve the grantees' independence so they can act as a bulwark against disinformation through credible journalism." *Id.* ¶ 47.[5]

In 2020, a federal court in the District of the District of Columbia similarly found that a group of career civil servants at USAGM and VOA had demonstrated a likelihood of success on the merits of a claim that USAGM, Pack, and other agency leadership had violated the plaintiffs' "First Amendment rights by taking or influencing personnel actions against individual journalists or editors, attempting directly to monitor VOA and network content through communications with individual editors or journalists, and undertaking their own investigations of alleged discrete

---

[4]    Letter from Sens. Rubio, Graham, Moran, Collins, Durbin, Leahy, and Van Hollen to Michael Pack (July 1, 2020, at 1 (available at https://tinyurl.com/2s3e8ch6).

[5]    *Id.*

breaches of journalistic ethics." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 385-86 (D.D.C. 2020). The court enjoined the defendants from continuing such actions. *Id.* at 386.[6]

Congress addressed these bipartisan concerns in the 2021 National Defense Appropriations Act (NDAA), which became law on January 1, 2021, after passing in the Senate by a vote of 81 to 13, and in the House by a vote of 322 to 87, following a veto by President Donald Trump. Compl. ¶ 49; *Roll Call Vote 116th Congress - 2nd Session*, UNITED STATES SENATE, https://tinyurl.com/5eemrkke. Prior to Pack's tenure as CEO, the CEO had full authority to appoint and remove the heads of the broadcast entities as well as members of the entities' boards. Compl. ¶ 56. The 2021 amendments, however, require that a Presidentially appointed, Senate-confirmed, and party-balanced board of seven, known as the International Broadcasting Advisory Board, approve by a majority vote the appointment and removal of the heads of the broadcast entities, who are selected or dismissed by the CEO of USAGM. *Id.* ¶ 57; 22 U.S.C. § 6205(e)(1). Such a structure protects the directors of United States international broadcasting entities from arbitrary removal, and forges consensus around who should lead these entities' non-partisan work.

### C.    Congress Appropriates Funds So That VOA Can Meet its Mission.

In 2024, Congress appropriated $857,214,000 to USAGM to "carry out international communication activities." Pub. L. No. 118-47, div. F., 138 Stat. 460 (2024). Congress specified that "the funds appropriated under this heading shall be allocated in accordance with the table included under this heading in the explanatory statement described in section 4." *Id.* at 735. That table states that Congress appropriated $260,032,000 to VOA. 118th Cong., Further Consolidated

---

[6]    The D.C. Circuit granted the government's motion to dismiss the appeal of this order following the election of President Biden. *Turner v. U.S. Agency for Glob. Media*, No. 20-5374, 2021 WL 2201669 (D.C. Cir. May 17, 2021).

Appropriations Act, 2024, Legislative Text and Explanatory Statement at 1167 (Comm. Print 2024).[7]

Through the Continuing Appropriations and Extensions Act, 2025, Congress renewed VOA's funding.  Pub. Law No. 118-83, 138 Stat. 1524 (2024).  In relevant part, that law appropriated "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2024 and under the authority and conditions provided in such Acts, for continuing projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2024." *Id.*, Div. A.

Upon the expiration of this continuing resolution, Congress renewed its appropriations to VOA on the same terms through yet another continuing resolution, the American Relief Act, 2025. Pub. L. No. 118-158 (2025), Div. A. Those appropriations were made through March 14, 2025.  *Id.*

Finally, on March 15, 2025, President Trump signed into law Congress's further appropriations on the same terms to VOA that run through September 30, 2025. H.R. 1968, 119th Cong. § 1101(a) (2025). As before, Congress appropriated "[s]uch amounts as may be necessary, … under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024, for projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for, and for which appropriations, funds, or other authority were made available."  *Id.*

---

[7]    The original 2024 appropriation, which has been continued three times, provides discretion to USAGM to "reprogram[]" funds "within and between amounts designated in such table." 138 Stat. 460, 735 (2024). But this discretion is narrow: USAGM's reprogramming may not "reduce a designated amount by more than 5 percent" and any such action is subject to "the regular notification procedures of the Committees on Appropriations." *Id.*

## ARGUMENT

### I.    <u>Legal Standard</u>

"To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead enough facts to state a claim to relief that is plausible on its face and to 'nudge his or her claims across the line from conceivable to plausible.'" *Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*, 878 F. Supp. 2d 241, 245 (D.D.C. 2012) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (cleaned up). The Court "must accept as true all of the factual allegations contained in the complaint" and "give the plaintiff the 'benefit of all inferences that can be derived from the facts alleged.'" *Vox Media, Inc. v. Mansfield*, 322 F. Supp. 3d 19, 23 (D.D.C. 2018) (citations omitted).

Similarly, "[w]hen ruling on a Rule 12(b)(1) motion, the court must 'treat the complaint's factual allegations as true' and afford the plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (quoting *Delta Air Lines, Inc. v. Export–Import Bank of U.S.*, 85 F.Supp.3d 250, 259 (D.D.C. 2015)). "[U]nlike with a motion to dismiss under Rule 12(b)(6)," the Court may consider materials outside the Complaint to determine whether it has subject-matter jurisdiction. *Delta Air Lines*, 85 F. Supp. 3d at 259; *see also Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1254 (D.C. Cir. 2005) (same).

### II.    <u>This Court Has Jurisdiction Over All Claims in This Case.</u>

#### A.    **None of the Plaintiffs' Claims Are Channeled Through the CSRA.**[8]

None of the Plaintiffs' claims in this case, including Director Abramowitz's, are channeled to administrative agencies. Defendants suggest that Abramowitz and the PSC Plaintiffs are

---

[8]    Defendants concede that any Civil Service Reform Act (CSRA)-related issues do not apply to LaBruto and J. Doe, 2, who are/were both PSCs. Defs.' Mem. at 10.

challenging their placement on administrative leave or other adverse employment actions (including the confusing, incomprehensible suggestion that changes to the firewall are channeled, Defs. Mem. at 13), but this case has always been about more than personnel actions. From that framing of the case—one of Defendants' own design—Defendants then spar with a strawman, contending that issues related to the decision to place an employee on administrative leave are not otherwise exempt from the CSRA framework under the Supreme Court's decision in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 211–13 (1994). This case is emphatically *not* about placement on administrative leave—it is about USAGM's responsibility to adhere to the law and operate VOA in the manner Congress prescribed. Plaintiffs would have the exact same claims if Defendants had dismantled VOA while leaving their individual employment statuses unchanged. Plaintiffs, including Abramowitz, would bring the *same set of claims* about the dismantling of VOA premised on Defendants' *same actions* regardless of any personnel actions.

The CSRA was enacted in 1978 to ensure fairness and impartiality in the federal government's relations with its career workforce. *See Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 306 (4th Cir. 2025) (citing S. Rep. 95-969, at 2–3). It created the Merit System Protection Board ("MSPB"), Office of Special Counsel ("OSC"), and the Federal Labor Relations Authority ("FLRA"), each of which plays a role in dispute resolution between federal employees or their representatives and the government. *Id*. at 302; *Grundmann v. Trump*, 770 F. Supp. 3d 166, 170 (D.D.C. 2025); 5 U.S.C. §§ 1211–1214.

The CSRA requires that "covered employees appealing *covered agency actions* . . . proceed exclusively through the statutory review scheme." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012) (emphasis added). It "govern[s] *employee relations* in the federal sector." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) (emphasis added) (internal

citations omitted). Conversely, the CSRA does not strip jurisdiction over claims outside review of the CSRA's covered personnel actions. *See Bosco v. United States*, 931 F.2d 879, 883 (Fed. Cir. 1991) ("The Supreme Court did not rule that the CSRA provided the only means of judicial review of *any* actions affecting federal employees, but rather that it was the only means of review as to the types of adverse personnel action specifically *covered* by the CSRA."). At bottom, Plaintiffs are challenging the dismantling of VOA, not simply covered personnel actions, so the CSRA has nothing to say.

Defendants' invocation of a slew of cases on the legality of employment-related actions adds nothing to their argument. A cursory review of these cases reveals that they concern *labor unions contesting employment actions* taken by the government or individual employees challenging *adverse employment actions*. *See Elgin*, 567 U.S. at 5-7 (federal employees discharged for failure to register for Selective Service must bring claims challenging their discharges on constitutional grounds to the Merit Systems Protection Board (MSPB)); *Am. Fed'n of Gov't Emps., AFL-CIO*, 929 F.3d at 761 (labor unions challenging executive orders concerned with federal labor relations must go through administrative process); *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) ("[T]he CSRA precludes judicial review of [plaintiff's] claim that the FBI violated its own regulations in taking personnel action against him."). Plaintiffs in this case challenge VOA's dismantling, not simply individual personnel actions.

Even if the CSRA were implicated here, the claims in this case are not of the type that Congress channeled. The Supreme Court's *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200 (1994), decision guides analysis of whether Congress implicitly stripped the district court of its jurisdiction over the claims in this case and channeled their resolution through the CSRA's administrative

bodies.[9] *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012). Under *Thunder Basin,* first courts ask whether Congressional intent to "allocate[] initial review to an administrative body … is fairly discernible in the statutory scheme." *Thunder Basin*, 510 U.S. at 207 (quotation marks omitted). If so, courts then ask whether the specific claims at issue "are of the type Congress intended to be reviewed within this statutory structure." *Id*. at 212. If the claims are not of this type, then the district court has jurisdiction. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490–91 (2010).

Under *Thunder Basin*, the claims at issue are not "of the type Congress intended to be reviewed within th[e] statutory structure" because (a) denying district court jurisdiction would "foreclose all meaningful judicial review"; (b) the claims are "entirely collateral" to the CSRA; and (c) the claims fall "outside the agency's expertise." 510 U.S. at 212–13.[10]

Denying jurisdiction would foreclose all meaningful judicial review. This is a case about reviving a Congressionally mandated independent agency. Judicial review under the CSRA would come only after multiple layers of agency review, a process that could take years, particularly given that all three CSRA-administering agencies currently lack a quorum. *See* 5 U.S.C. § 7703 (judicial review provision in CSRA); *Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 305 (4th Cir. 2025) (suggesting lack of quorum could defeat inference of Congressional intent to

---

[9]    As the Court is aware, Plaintiffs have filed a partial motion for summary judgment on a limited aspect of the relief sought in the Complaint, following Defendants' July 8 letter to Director Abramowitz. That motion lays out additional reasons why the relief sought in the motion is not channeled. ECF. No. 59.

[10]    Defendants admit that numerous courts have ruled against their channeling argument. Def. Mem. at 8-9. The Supreme Court's orders in *McMahon v. New York*, No. 24A1203, 2025 WL 1922626, at *1 (U.S. July 14, 2025), and *Trump v. Am. Fed'n of Gov't Emps.,* --- S.Ct. ----, No. 24A1174, 2025 WL 1873449, at *1 (U.S. July 8, 2025), upon which Defendants rely, do not even mention channeling, despite the government arguing for it. If anything, those cases cut against Defendants.

channel). By that time, the dismantling of VOA would be irreversible, rendering judicial review of Plaintiffs' core claims meaningless. Moreover, Plaintiffs could not get the relief they seek—an order that VOA resume broadcasting and refrain from dismantling the agency absent reasoned decision-making—through administrative channels. *Cf. Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 760 (D.C. Cir. 2019).

The issues in this case are collateral to CSRA review provisions. Unlike the cases Defendants rely on, this case challenges something much broader than simply employment actions directed at specific employees—it challenges the dismantling of an agency. Fundamentally, Plaintiffs' claims concern structural, constitutional, and administrative law questions related to executive branch power and the separation of powers.

Finally, this case clearly involves issues outside MSPB's expertise. Fundamental questions about an agency's prerogative to ignore Congressional mandates are decidedly not issues the relevant administrative bodies "customarily handle[]."*Axon Enter. v. Fed. Trade Commn.*, 598 U.S. 175, 186 (2023); *Carr v. Saul*, 593 U.S. 83, 92 (2021) ("[A]gency adjudications are generally ill suited to address structural constitutional challenges."). Plaintiffs have alleged the agency's actions, including its mass removal of staff, should be vacated not because the actions run afoul of civil service laws, but because they were taken pursuant to an overarching unlawful scheme that violates the APA and the separation of powers. There are therefore no threshold employment questions implicating agency expertise. *See AFGE*, 929 F.3d at 761; *Axon,* 598 U.S. at 906 (distinguishing *Elgin* on this basis).

Defendants' citations to inapposite cases do not call for a different result. Defs.' Mem. at 15-16. Unlike here, those cases address federal actions strictly concerned with federal-labor relations or personnel actions. *See, e.g.*, *Nat'l Treasury Emps. Union v. Trump*, 770 F. Supp. 3d 1,

2-4 (D.D.C. 2025) (challenging firing of probationary employees, deferred resignation program, and RIFs); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *1 (D. Mass. Feb. 12, 2025) (challenging deferred resignation program).[11] By contrast, this case concerns an agency's dismantling, which is "not the [type of] run of the mill challenge[] to adverse employment actions with which the MSPB may be familiar" but rather a "constitutional and statutory challenge[] to … the termination of agency functions, the failure to carry out statutory duties, [and] the refusal to expend appropriations." *Rhode Island v. Trump*, --- F. Supp. 3d ----, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868, at *7 (D.R.I. May 6, 2025) (internal citations and quotation marks omitted), *appeal filed State of Rhode Island v. Trump* (1st Cir. 2025); *see supra* n. 10.

This case is not channeled for an additional reason. The President's firing, without cause, of members of each CSRA administrative agency has collapsed any implication of jurisdiction-stripping that may have been discernible from the statutory scheme. *See Owen*, 139 F.4th at 304.

As discussed above, the CSRA's three administrative agencies carry out "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests" of federal employees with "the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988). Congress created the agencies as wholly "independent of any control or direction by the President," S. Rep. No. 95-969, at 24 (1978), and thereby insulated from any

---

[11] Defendants' citation to *American Foreign Service Association v. Trump* is similarly misplaced. 768 F. Supp. 3d 6 (D.D.C. 2025). In that case, the plaintiffs challenged the legality of adverse employment actions. *Id.* at *11. The court found it lacked jurisdiction because "the agency is still standing, and so the alleged injuries on which plaintiffs rely in seeking injunctive relief flow essentially from their members' existing employment relationships with USAID." *Id.* at *7. This case is different on both counts. First, as the Complaint alleges, VOA *is* being dismantled. Second, Plaintiffs' claims do not hinge on an injury flowing from Defendants' placing of them on administrative leave. The injury flows from Defendants' illegal actions to close VOA.

appearance of bias that would attend the executive adjudicating its own employment disputes, *id*. at 6-7 (emphasizing need for "a strong and independent [MSPB] and Special Counsel"); *see also id*. at 7-8 (FLRA structure "will assure impartial adjudication of labor-management cases"). It therefore made the MSPB and FLRA members as well as the Special Counsel removable only for "inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. §§ 1202 (d), 1211(b), 7104(b); *see also* H. Rep. No. 95-1403 (July 31, 1978) (Congress rejected President's proposal that FLRA members "serve at the pleasure of the President"). These guarantees of independence and impartiality at the administrative stage are important because judicial review of the agencies' decisions is deferential. *See* 5 U.S.C.A. § 7703(c). Prejudice from a partial administrative tribunal will not necessarily be rooted out before the Federal Circuit.

But shortly after taking office, President Trump fired members of all three bodies without cause. *See Trump v. Wilcox*, 145 S. Ct. 1415 (2025); *Dellinger v. Bessent*, 768 F. Supp. 3d 33, 37 (D.D.C. 2025); *Grundmann*, 770 F. Supp. 3d at 173. The remaining members, and those appointed in the future, are on notice that they face removal, at any time, including for impartial rulings that contradict the Administration. A "bedrock principle" of the CSRA—federal employees' guarantee of an independent adjudicator—is gone. *Owen*, 139 F.4th at 307. Any implication that Congress intended to channel fundamental challenges to executive overreach—even if it ever existed—is gone with it.

Finally, even if the Court finds that this case implicates CSRA jurisdiction-stripping, it should nonetheless exercise jurisdiction under *Leedom v. Kyne*, 358 U.S. 184 (1958), given Defendants' extraordinarily illegal conduct under unprecedented circumstances. *Cf. Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (*Leedom* jurisdiction did

not apply where, unlike here, USAGM's misconduct was not "extreme"). In short, this is not a case suitable for agency adjudication.

###### B.    The PSC Plaintiffs' Claims Belong in This Court.[12]

While not arguing that Plaintiffs LaBruto and J. Doe 2 could be resolved by the MSPB (as it has no jurisdiction over contractors), Defendants argue that the Tucker Act and Contract Disputes Act deprive this Court of jurisdiction over their claims. Defendants' arguments proceed from a mistaken premise to reach a mistaken conclusion. Just as this case is not simply about any personnel actions, not a single claim in this case turns on the terms of Plaintiffs' contracts. Because no "party seeks to challenge the terms of a contract that it has entered with the United States" here, Defs.' Mem. at 16, the holding in *Albrecht*, upon which Defendants rely, is inapplicable here, and this Court has jurisdiction over the PSC Plaintiffs' claims. *See Albrecht v. Comm. on Employee Benefits of the Federal Reserve Benefits Sys.*, 357 F.3d 62 (D.C. Cir. 2004).

Defendants acknowledge that not every case tangentially involving a contract is "at its essence a contract action" that must go to the Court of Federal Claims. Defs.' Mem. at 17 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). Beyond invoking that black-letter law, however, all that Defendants do is reference a slew of contract terms that do not matter to the PSC Plaintiffs' claims because their claims are not tied to their contracts. But "contract issues may arise in various types of cases where the action itself is not founded on a contract" and "[e]xclusive jurisdiction in Claims Court under the Tucker Act does not lie merely because a plaintiff hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106-08 (D.C. Cir. 2022) (alterations adopted, internal quotation marks

---

[12]    Defendants concede that any contract issues do not apply to Abramowitz. Defs.' Mem. at 16.

and citations omitted). Rather, under *Megapulse*, a court looks to both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought" to determine whether a case is really a contract action. *Id.* Both factors show that this Court properly retains jurisdiction over the PSC Plaintiffs' claims.

*First*, Plaintiffs' claims are premised on federal statutes—the APA and international broadcasting statutes—and the Constitution, *not* the terms of their contracts with USAGM. "[W]hen claims stem from something more than just a contract, say the Constitution or the APA, then the litigant may bring the claims in 'federal district court even when the claims depend on the existence and terms of a contract with the government.'" *Cemex Inc. v. Dep't of the Interior*, 560 F. Supp. 3d 268, 276 (D.D.C. 2021) (quoting *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992)[13]). "[U]nder § 702 and the Tucker Act, litigants may bring common-law contract claims only as actions for money damages in the Claims Court, but they may bring statutory and constitutional claims for specific relief in federal district court." *Transohio Sav. Bank*, 967 F.2d at 610. That is true "even when the claims depend on the existence and terms of a contract with the government." *Id.* This binding, black-letter law definitively shows that Plaintiffs' claims belong with this Court, because they are not premised on Plaintiffs' contracts. *Transohio* disposes of Defendants' Tucker Act argument.

Rather than engage with the facts of this case and the law, Defendants point to various provisions in Plaintiffs' contracts but fail entirely to explain how anything in this case founded on federal statutes and the Constitution has to do with the contract terms Defendants have identified. That is because it does not. Indeed, the D.C. Circuit has "explicitly rejected the broad notion that

---

[13]   *Abrogated on other grounds by Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017).

any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act because to do so would deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Crowley Gov't Servs.*, 38 F.4th at 1107 (internal quotation marks and citation omitted).

*Second*, Plaintiffs do not seek contract-related relief: they seek, pursuant to the APA and the Constitution, a cessation of Defendants' unlawful actions. Through this action, Plaintiffs seek to halt Defendants' unlawful dismantling of VOA and to return the network to the *status quo ex ante*: a functioning international broadcasting network capable of carrying out its statutory mandate. Defendants' citations to uncontroversial caselaw that reiterates the basic point that actions seeking money damages on a government contract belong in the Court of Claims notwithstanding[14], that Plaintiffs' claims may require the government to continue expending money does not transform this case into a contract action. "Even where a monetary claim may be waiting on the sidelines, as long as the plaintiff's complaint only requests non-monetary relief that has considerable value independent of any future potential for monetary relief … [courts] respect the plaintiff's choice of remedies and treat the complaint as something more than an artfully drafted effort to circumvent the jurisdiction of the Court of Federal Claims." *Kidwell v. Dep't of Army, Bd.*

---

[14]    *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) ("Spectrum seeks an injunction requiring the government to pay monies owed for computer hardware. The right to these payments is created in the first instance by the contract, not by the Debt Collection Act."); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77-78 (D.C. Cir. 1985) (claim premised on termination of government contract belonged in the Court of Claims because "the essential rights at stake … are contractual" and "it is possible to conceive of th[e] dispute as entirely contained within the terms of the contract").

*for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995) (internal quotation marks and citations omitted).[15]

### C.    Plaintiffs Have Challenged Actions Subject to APA Review.

Defendants adopted a categorical policy to dismantle VOA. Then they acted on it—reassigning staff, cancelling contracts, and halting operations. That policy, and the actions it triggered, are discrete and final under the APA. Whether Defendants may lawfully carry out that sweeping policy is not committed to agency discretion. Congress drew a line in the sand. The IBA, VOA Charter, and binding appropriations law all provide the same answer: Defendants may not implement a categorical policy to dismantle VOA.

Nor does the APA bar review. Plaintiffs have no other avenue for relief. Other forums lack jurisdiction and cannot provide the equitable relief requested. Without this Court's intervention, there is no remedy at all. Finally, Plaintiffs do not challenge the executive order, and they never have. Rather, Plaintiffs challenge what Defendants did in that order's name: the unlawful dismantling of VOA. That is more than enough to state a claim under the APA.

### 1.    Defendants' Actions to Implement a Categorical Policy Are Discrete and Final Actions.

The APA carries a strong presumption of judicial review. To be reviewable, an agency action must be final—meaning it "mark[s] the consummation of the agency's decisionmaking process," and determines "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). The action must also be discrete. That is, directed "against

---

[15]    The Supreme Court's order in *Department of Education v. California* has no bearing on this case. Although the PSC Plaintiffs' claims belong with this Court for the reasons discussed, *California* concerned the payment of grants which is not implicated here. 145 S. Ct. 966, 968, (2025) (explaining that "the APA's limited waiver of immunity does not extend to orders … *along the lines of what the District Court ordered here*" (emphasis added)).

some particular 'agency action' that causes [the plaintiff] harm;" not "seek[ing] *wholesale* improvement of [a] program." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

But "the term 'agency action' has a broad sweep." *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004). Its hallmark is "concrete impact." *Id.* And that breadth is reflected in the APA's own text, which sweeps in "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Each of those actions is capacious. An "order," for example, includes "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." *Id.* § 551(6). The combination of these expansive statutory definitions and the APA's presumption of reviewability makes clear: "[i]f there is in fact some specific order or regulation, applying some particular measure across the board … and if that order or regulation is final … it can of course be challenged under the APA by a person adversely affected." *Lujan*, 497 U.S. at 890 n.2.

That is precisely what Plaintiffs challenge here. The policy at issue is not amorphous. Nor have Defendants flipflopped on the end goal. It is a discrete and final agency action: Defendants' decision to dismantle VOA. The execution of this plan occurred in quick succession in March 2025, Compl. ¶¶ 12-13, halting only in the face of judicial authority, ECF No. 29. Defendant Kari Lake has maintained repeatedly that the agency is "unsalvageable." Compl. ¶¶ 77, 79. That "mark[s] the consummation of the agency's decisionmaking process," one from "which rights or obligations have been determined"—including those of VOA staff and its global audience.

That Defendants have continued to implement this policy does not negate its finality.[16] The policy itself—and the slew of actions it set off—is final. *See, e.g., Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 195 (4th Cir. 2013) (adoption project is final agency action, not the subsequent activities in carrying it out); *W. Watersheds Project v. Haaland*, 850 F. App'x 14, 15 (D.C. Cir. 2021) (similar).

Critically, Plaintiffs do not challenge an amorphous practice or programmatic goal. They challenge "an identified transgression of … statutory and regulatory language," not an "exercise of broad, unspecified discretion." *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018). Just as in *Acosta*, when the government's "practice of habitually approving and extending H-2A visas for lengthy periods of time" was reviewable, so too here do Plaintiffs challenge a discrete and final pattern of conduct with real consequences. *Id.* Plaintiffs' APA claims rest on two fixed poles: statutory mandates on one hand, and the agency's disregard of those directives on the other. That is a textbook APA claim. *See Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011).

For these reasons, Defendants' effort to recast the challenge as a broad attack on programmatic operations gets the law—and the facts—exactly backwards. They argue that this is merely a challenge to "Global Media's management of the agency," Defs.' Mem. at 22, which would "require the Court to supervise all of the agency's activities." *Id.* at 23. Not so. It is true that Defendants took myriad actions: firing or putting personnel on administrative leave, cancelling contracts, and shutting down essential operations. It is also true that unwinding those decision may

---

[16]  That conclusion is reinforced—and Defendants' position undermined—by their refusal to provide the administrative record. Although the Complaint shows that Defendants adopted this dismantling policy, without the record, neither Plaintiffs nor the Court can definitively assess Defendants' claim that ad hoc operational changes informed their actions. Defendants' nondisclosure not only impedes judicial review but heightens the inference that the agency seeks to avoid scrutiny of its policy. *See infra* § I.V.

take multiple steps. But these were not ad hoc, or individualized, decisions. They were part of a categorical policy to dismantle the agency—one implemented uniformly. That policy, and the concrete steps it entailed, are subject to review.

This is not the kind of "broad programmatic attack" the APA prohibits. In *Lujan*, the plaintiffs sought to overhaul the entirety of internal practices across an agency's land-use program. 497 U.S. 871, 890. There was no "single [agency] order or regulation," or even a "completed universe of [agency] orders and regulations." *Id.* There was just a "continuing (and thus constantly changing)" policy environment. *Id.* Nor is this case like *Norton v. Southern Utah Wilderness Alliance*, where the challenged land-use plan merely listed "priorities" without prescribing action. 542 U.S. 55, 71 (2004). As the Supreme Court explained there, the APA's limitation precludes "broad programmatic attack[s]" on agency activities. *Id.* at 64. And the D.C. Circuit also applied the same principle to barring a challenge to a "budget initiative [that] reflects land use planning" and "sets broad goals and strategies," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 21 (D.C. Cir. 2006).

Judicial review here does not require the Court to oversee the agency's every move. This is not an invitation to micromanage VOA's internal affairs. It is a request for the Court to assess whether the actions Defendants took were lawful in light of Congress's express directives. That is a familiar judicial task. If the Court finds those actions unlawful, it may issue appropriate relief. And if needed, it may ensure compliance through well-established tools. But none of that requires the Court to run the agency. It requires only that the Court enforce the law.

Courts have repeatedly rejected arguments like Defendants' when reviewing similar efforts to swiftly dismantle other government agencies and programs. *See, e.g.*, *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025) ("categorical funding freezes without regard and contrary to legal

authority" reviewable under APA); *Maryland v. Corp. for Nat'l & Cmty. Serv.*, --- F. Supp. 3d ----, Civ. No. DLB-25-1363, 2025 WL 1585051, at *13 (D. Md. June 5, 2025) (reviewing "[t]he decision to terminate grant funding and close over 1,000 AmeriCorps programs on the same day . . . and for the same reason"); *Rhode Island v. Trump*, --- F. Supp. 3d ----, C.A. No. 1:25-cv-128-JJM-LDA, 2025 WL 1303868, at *8 (D.R.I. May 6, 2025) (dismantling of multiple small agencies reviewable); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, --- F. Supp. 3d ----, C.A. No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157, at *11 (D.R.I. Apr. 15, 2025) (agencies freezing federal funding to nonprofits reviewable); *Massachusetts v. Kennedy*, --- F. Supp. 3d ----, Civ. Action No. 25-10814-WGY, 2025 WL 1371785, at *10 (D. Mass. May 12, 2025) (agency terminating already-issued grants reviewable).

### 2.    Defendants' Dismantling of VOA Is Not Committed to Agency Discretion.

Defendants fundamentally mischaracterize this suit. It is not about how the Global Media CEO should "strike [] balance" in his day-to-day job. Defs.' Mem. at 25. It is about whether Defendants may dismantle VOA.

That is not a matter of discretion, but law. The existence and core operations of VOA are governed by statute. And when Defendants took affirmative steps to shut down the agency—by placing staff on administrative leave, cancelling contracts, and stripping it of operational capacity, Compl. ¶¶ 69-82—they acted *contrary* to that law. The existence of VOA is not committed to agency discretion and Defendants' actions to shutter it are plainly subject to review.

The APA presumes judicial review. *See Drake v. F.A.A.*, 291 F.3d 59, 70 (D.C. Cir. 2002). That presumption is overcome only in "narrow" circumstances—where "there is no law to apply." *Hi-Tech Furnace Sys., Inc. v. F.C.C.*, 224 F.3d 781, 788 (D.C. Cir. 2000).[17] Whether this narrow

---

[17]    Defendants do not suggest that any "statutes preclude judicial review." 5 U.S.C. § 701(a)(1).

exception applies depends on whether the type of action is "presumptively outside the bounds of judicial review" and the "language and structure of the statute." *Drake*, 291 F.3d at 70. Defendants do not even attempt to graft this case onto these "narrow categories" of unreviewable actions, such as declining to take enforcement actions. *See, e.g.*, *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007).

Defendants invoke USAGM's CEO's authority to "supervise," "assess the professional integrity" of the networks, and ensure that coverage remains "balanced." Defs.' Mem. at 25. But that is just one obligation of many. Congress required VOA to broadcast impactful, independent journalism across the globe. Defendants do not have the discretion to eliminate it.

When courts assess whether agency action is committed to agency discretion, they ask whether "meaningful standards" exist. *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011). Courts do so by looking to "formal and informal policy statements and regulations" *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 158–59 (D.C. Cir. 2006). Standards against which to evaluate Defendants' actions undoubtedly exist here—and they come not just from the IBA, but from the VOA Charter, appropriations law, and Defendants' own statements. Compl. ¶¶ 35-37, 69-82.

And even when statutory language is "permissive and indeterminate," the D.C. Circuit has "regularly found" that there are standards to apply. *Cody*, 509 F.3d at 610 (collecting cases). That is particularly true when, as here, Congress has expressed a clear mandate and established a structural framework. "[C]ourts have a clear role to play in ensuring that an agency's practical implementation of its program is consistent with its own declared intentions and goals." *Robbins v. Reagan*, 780 F.2d 37, 46 (D.C. Cir. 1985). The question is not whether the CEO has discretion over internal affairs. It is whether Defendants may lawfully implement a sweeping policy to

dismantle the agency. They may not. The IBA says so. The VOA Charter says so. So do Congress's appropriations. "[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013). And Defendants may not nullify a congressional mandate by recasting the destruction of an agency as part of Defendants' "broad supervisory authority." Whether their decision was arbitrary, capricious, or unsupported by law is for this Court to decide.

### 3.    No Other Adequate Remedy Exists.

Unable to defend their actions under the APA, Defendants fall back on the argument that judicial review is barred because "adequate alternative remedies" exist. It is a last-ditch effort—and it fails. There are no alternative remedies. Channeling through another forum would "foreclose all meaningful judicial review." *AFGE*, 929 F.3d at 755. The Civil Service Reform Act cannot provide relief here. None of the three agencies charged with enforcing it has a quorum. Their members, like Plaintiffs, have been barred from their jobs. And even if they were functional, they could not grant the relief Plaintiffs seek: the reversal of Defendants' unlawful dismantling of VOA. Nor does the Court of Federal Claims have jurisdiction. Plaintiffs do not seek damages tied to a contract. They seek to enforce their statutory rights. In short, no other forum can do what the APA requires: assess whether Defendants acted unlawfully and provide appropriate equitable relief. Without this Court's intervention, there is no remedy at all.

### 4.    Plaintiffs Do Not Challenge the Executive Order.

This case is not about the President's executive order. Plaintiffs do not challenge it—they never have. What they challenge is Defendants' unlawful shuttering of VOA. That dismantling was not compelled by executive order. Defendants barred VOA personnel from entering their offices and ordered them to cease work immediately. Compl. ¶ 72. The same day they declared on the VOA website that VOA is "unsalvageable." *Id.* ¶¶ 77-79. And they began to systematically

destroy VOA, until VOA became a shadow of itself. *Id.* ¶¶ 69-82. Those actions and the policy they are meant to implement are at issue, not the executive order.

Nothing in the executive order mandates this result. *Id.* ¶¶ 8, 128. It offers no justification for destroying the agency's core functions. Defendants now invoke the executive order as cover. But that is a red herring. Their actions—not the executive order—are what gave rise to this suit. And those actions are unlawful.

## III.    **Plaintiffs Have Sufficiently Alleged Viable Constitutional Claims.**

This case challenges Defendants' unconstitutional dismantling of a Congressionally created agency: VOA. Plaintiffs assert structural constitutional violations that go well beyond statutory concerns, including breaches of the Presentment Clause, the Appropriations and Spending Clauses, the Take Care Clause, and the separation of powers. These claims are independently justiciable and are not foreclosed by *Dalton v. Specter*, 511 U.S. 462 (1994). Defendants' actions are also ultra vires. Each argument supporting the sufficiency of Plaintiffs' constitutional claims are addressed below.

### A.    **Dalton Does Not Bar Review.**

*Dalton* does not control here. In *Dalton*, the question of jurisdiction was solely based on the issue of whether the President exceeded his authority under the statute by closing a shipyard. *Id.* The Court found that where a statute commits decisionmaking to the President's discretion, judicial review is unavailable. *Id.* at 477. This is because a claim solely based on the President exceeding his statutory authority is not constitutional, but statutory. *Id.* at 472-74. Tellingly, *Dalton* took pains to emphasize what it was *not* doing: repudiating *Marbury v. Madison* or the "nearly two centuries of constitutional adjudication" that followed. *Id.* at 477. *Dalton* thus cannot be read as insulating constitutional violations by the executive from judicial scrutiny.

29

This case is fundamentally different. To start, it is not about presidential action. Plaintiffs bring no claim against the President or executive order. The actions at issue were taken by agency officials. Nor are Plaintiffs solely alleging that Defendants in this case exceeded any statutory authority afforded under the international broadcasting statutes. Although some of the underlying facts overlap, Plaintiffs' constitutional claims are independent and distinct from their APA arguments. Plaintiffs' constitutional claims allege that Defendants' unilateral dismantling of a Congressionally created agency violates structural limits on executive power, including the separation of powers, the Take Care Clause, and other constitutional guarantees. These types of claims are squarely subject to judicial review. *Dalton* does not hold otherwise.

## B.    The Presentment Clause

As discussed throughout the Complaint, VOA is a creature of statute. Congress created VOA. Compl. ¶ 7. Congress has repeatedly codified its statutory objectives and the principles which must guide its work. *Id.* ¶¶ 4-5, 33-37. Congress obligated VOA to continue running, to continue producing and broadcasting the news, and to continue reaching wide global audiences. *Id.* ¶¶ 33-37. And Congress has worked in recent years to carefully create a statutory scheme that promotes VOA's editorial independence and that of its journalists while still allowing for meaningful executive branch control. *Id.* ¶¶ 44-57. Consistent with these actions, Congress has appropriated money to VOA so that it may carry out its obligations. *Id.* ¶¶ 58-63.

By taking the at-issue actions, Defendants have effectively repealed these statutes through their shuttering of VOA. But Congress—and *only* Congress—may repeal or amend legislation that it passes and that is signed into law by the President. *Clinton v. City of New York,* 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). Defendants have no constitutional authority to repeal or amend any of the statutes that require VOA to carry out its statutory duties or to repeal or amend duly enacted

appropriations legislation. *See, e.g.*, *City & County of San Francisco v. Trump,* 897 F.3d 1225, 1232 (9th Cir. 2018) ("Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress."). Defendants' decision to dismantle VOA and to prevent it from carrying out its statutorily required broadcasting and reporting activities is a unilateral repeal of VOA's guiding statutes. As such, Plaintiffs state a valid constitutional claim under the Presentment Clause.

### C.    Appropriations and Spending Clauses

Congress—and *only* Congress—has spending and appropriations authority under the Constitution. "The powers of Congress involve not only its general shared responsibility over foreign affairs, but its core and 'exclusive power over the federal purse.'" *AIDS Vaccine Advoc Coal. v. United States Dep't of State*, 770 F. Supp. 3d 121, 145 (D.D.C. 2025) (quoting *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012)). "And if the authority to make law and control spending is to mean anything, it means the President may not disregard a statutory mandate to spend funds 'simply because of policy objections.'" *Id.* (quoting *In re Aiken County*, 725 F.3d at 259); *see also, e.g.*, *West Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) ("Allowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted would be inconsistent with the Constitution's meticulous separation of powers." (internal quotation marks omitted)).

Defendants' actions—reducing VOA to a shell of an agency unable to perform its statutorily required functions which would necessarily lead to an impoundment of its appropriations—usurp Congress's constitutional role in controlling the federal purse.

### D.    Take Care Clause

Beyond simply usurping Congress's constitutional role, Defendants have also violated the Executive's own constitutional duty to "take care that the Laws be faithfully executed." U.S. Const.

art. II, § 3. The Take Care Clause places an affirmative "corresponding obligation" on the Executive" to "enforce the laws." *City & County of San Francisco*, 897 F.3d at 1234. That responsibility applies to all duly enacted legislation. *Id.* ("Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations.").

Here, Plaintiffs plausibly allege that Defendants are not merely failing to take care that the myriad laws applicable to VOA are being faithfully executed—including those statutes obligating VOA to continue delivering vital news and reporting, requiring that VOA exercise editorial independence, and requiring that outside executive branch officials not interfere with VOA's mission—they are actively undermining these laws. This is clear from Defendants' dismantling of VOA, Compl. ¶¶ 69-82, their shutting down of all of VOA's required activities, *id.* ¶ 90, and their effective proposed impoundment of its funds, *id.* ¶ 144, just as it is clear from Defendants' efforts to violate the statutory firewall and the independence-promoting statutory scheme that lies at the core of VOA's structure, *id.* ¶ 50-52.

### E.    Separation of Powers

Defendants' actions, taken together or separately, violate the separation of powers. The constellation of constitutional violations involved in this case leads to the ineluctable conclusion that defendants have engaged in an executive branch power grab plainly at odds with Congress's lawful role and our constitutional structure.

Federal courts apply the familiar framework of *Youngstown Sheet & Tube Co. v. Sawyer,* when considering whether the Executive has transgressed the constitutional separation of powers. 343 U.S. 579 (1952). *See AIDS Vaccine Advoc Coal. v. United States Dep't of State*, 770 F. Supp. 3d 121, 127 (D.D.C. 2025). Under Justice Jackson's "familiar tripartite framework," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015), courts assess the constitutionality of executive action by

considering whether the President has acted (1) "pursuant to an express or implied authorization of Congress," *Youngstown,* 343 U.S. at 635 (Jackson, J., concurring); (2) "in [the] absence of either a congressional grant or denial of authority," *id.* at 637; or (3) in a manner "incompatible with the expressed or implied will of Congress," *id.*; *see also Does 1-26 v. Musk*, 771 F. Supp. 3d 637, 671 (D. Md. 2025) (stayed pending appeal); *AIDS Vaccine Advoc. Coal.*, 770 F. Supp. 3d at 127. This framework envisions a spectrum of executive action and a spectrum of potential executive authority: when the Executive's actions fall within the first category, its power is "at its maximum," *Youngstown,* 343 U.S. at 635 (Jackson, J., concurring), and when its actions fall within the third, its "power is at its lowest ebb," *id.* at 637.

Without a doubt, Defendants are acting in a manner incompatible with Congress's express will for all of the reasons discussed. Congress created VOA, required it to continue broadcasting and to do so pursuant to certain statutory obligations, and has repeatedly reaffirmed and buttressed VOA's editorial independence. Commensurate with this, Congress has appropriated millions of dollars specifically to VOA in recognition of the important statutory mission it performs. Likewise, defendants' actions to dismantle VOA are plainly contrary to the above-mentioned fonts of *congressional* power in the Constitution. This is especially true because Congress—and *only* Congress—may create and dismantle federal agencies. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 500 (2010) ("Congress has plenary control over the salary, duties, and even existence of executive offices."); *Freytag v. Comm'r of Internal Revenue,* 501 U.S. 868, 883 (1991) (Congress has the "authority to create offices"); *Myers v. United States,* 272 U.S. 52, 128–29 (1926) ("The Legislature creates the office, defines the powers, limits its duration, and annexes a compensation." (quoting 1 Annals of Congress, 581, 582)). In spite of this Congressional control, defendants are working to dismantle or severely restrict the activities of VOA by ceasing its

broadcasting activities, placing virtually all of its personnel on leave and firing nearly forty percent of its workforce.

The Executive has no inherent or constitutional authority to overcome the fact that its power is at its "lowest ebb" here. As already discussed, Defendants are acting directly contrary to Congress's lawmaking, spending, and appropriating powers. *See, e.g.*, *National Fair Housing Alliance v. United States Dep't of Housing and Urban Development*, No. CV 25-1965 (SLS), 2025 WL 2105567, at *7 (D.D.C. July 28, 2025) (outright failure to follow constitutional statutory mandate raises separation-of-powers issue). Article II, including the Take Care Clause, requires that the Executive *follow* and *faithfully execute* duly enacted statutes and appropriations legislation, not that the Executive entirely ignore and undermine such laws. And though the Executive appreciates some degree of authority with respect to foreign affairs, such authority is not at all complete, particularly where Congress exercises its own Constitutional authority.

That dismantling of VOA is the consummate separation of powers violation—the total usurping of Congress's constitutional powers to legislate, spend, appropriate, create and abolish federal agencies, and to obligate the Executive to run VOA in a manner consistent with its statutory mandates. On the other side of this equation, the Executive has a duty to faithfully execute the laws, including laws related to VOA's statutory functions and its appropriations. Defendants are, unfortunately, following a now familiar playbook, and have made their intentions clear through both words and actions.

### F.    Ultra Vires

Even if this Court believed that it lacks "a cause of action for judicial review," it may nonetheless find that Defendants have acted "'ultra vires'—that is" in excess of "its statutory authority." *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (quoting *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003)). "Judicial review for

ultra vires agency action rests on the longstanding principle that if an agency action is unauthorized by the statute under which the agency assumes to act, the agency has violated the law and the courts generally have jurisdiction to grant relief." *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (cleaned up). *Ultra vires* review is available where "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Id.* (internal quotation marks omitted).

Although this Court may review and hold unlawful Defendants' actions under the APA and under this Court's inherent power to review unconstitutional actions, *Free Enter. Fund*, 561 U.S. at 491 n.2, Defendants have also acted ultra vires by acting in clear violation of duly enacted United States international broadcasting laws and appropriations legislation. Those laws, as discussed, require that VOA continue broadcasting and producing objective, truthful news that reaches significant global audiences. Defendants' dismantling of VOA constitutes a "clear departure by the agency from its statutory mandate." *Fed. Express Corp.,* 39 F.4th at 764 (cleaned up); *see also, e.g.*, *AFL-CIO v. Dep't of Labor*, No. 25-cv-339 (JDB), ----F. Supp. 3d ----, 2025 WL 1129227, at *22 (D.D.C. Apr. 16, 2025) (finding an ultra vires claim lies where "[p]laintiffs allege that [the agency] has been directing operations and personnel decisions at Congressionally-created agencies that Congress has imbued with the authority to exercise specific responsibilities" and "no legal source … grants [the agency] the authority to take these actions"); *Chi. Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 1331743, at *1, *5 (N.D. Ill. May 7, 2025) (similar).

No statute expressly prohibits judicial review here, and this Court may properly find, even absent any other mechanism for review, that defendants' actions thus exceed their statutory authority.

## IV.    **The Court Should Order Defendants to Produce the Administrative Record.**

The plain text of Local Rule 7(n) is clear: when the government files a dispositive motion in a review of administrative-agency action, it must concurrently "file a certified list of the contents of the administrative record" and serve the administrative record. *See Sunoco Pipeline, L.P. v. U.S. Dep't of Transportation*, No. 21-CV-1760 (TSC), 2023 WL 11195824, at *5 (D.D.C. Sept. 29, 2023) (rejecting argument that government is excused from its Local Civil Rule 7(n) obligation because it did not rely on the record in its motion). Defendants should not be excused from their obligation here, particularly where they have introduced extra-complaint evidence and where they attack the Complaint's allegations with fact-bound arguments related to jurisdictional issues. Because Defendants' subject matter jurisdiction arguments are intertwined with the record, Defendants must comply with the local rule. *Cf. Sierra Club v. EPA*, 292 F.3d 895, 900-01 (D.C. Cir. 2002) (the administrative record and other evidence may be necessary for a court "to be sure" of a plaintiff's standing in an APA case).

Even if there were no independent requirement that Defendants produce the administrative record, they should be required to do so here because their motion. Defendants' motion to dismiss does not merely raise threshold jurisdictional issues: it raises point-by-point merits arguments related to all of Plaintiffs' claims. In fact, even the jurisdictional arguments that Defendants raise are intertwined with factual issues. They contend that Plaintiffs' claims must be channeled to administrative agencies, but that is informed by whether this case concerns individualized personnel actions as opposed to a policy to dismantle VOA. They argue that the PSC Plaintiffs' claims implicate the Tucker Act, and in so doing introduce evidence *outside the Complaint*. And

they suggest that Defendants took no discrete final agency action, but evidence showing Defendants' implementation of a categorical plan to gut VOA would show otherwise. Defendants have opened the door to issues that could benefit from the record and cannot now simultaneously say they need not produce it.

In support of their argument that they should be excused from filing the administrative record, Defendants cite to a slew of inapposite cases where courts waived the government's compliance with Local Civil Rule 7(n). Those cases are about agency *inaction*.[18] *See Diakanua v. Rubio*, No. CV 24-1027 (TJK), 2025 WL 958271, at *11 n.2 (D.D.C. Mar. 31, 2025) (case concerned delay in adjudicating visa); *Arab v. Blinken*, 600 F. Supp. 3d 59, 65 (D.D.C. 2022) (same); *Sharifymoghaddam v. Blinken*, No. 1:23-CV-1472-RCL, 2023 WL 8047007, at *3 (D.D.C. Nov. 17, 2023) ("The weight of authority indicates that what is dispositive is, as discussed, whether Plaintiffs challenge agency *inaction*." (emphasis added)); *Connecticut v. United States Dep't of the Interior*, 344 F. Supp. 3d 279, 288 (D.D.C. 2018) (challenge to Department of the Interior's failure to approve amendments); *Mdewakanton Sioux Indians of Minnesota v. Zinke*, 264 F. Supp. 3d 116 (D.D.C. 2017) ("Plaintiffs seek to compel the Department of the Interior to consult with them as an Indian tribe."). Understandably in such cases, the administrative record, which may not even exist, may not bear on any dispositive issues. That simply is not the case here, where Defendants' affirmative actions are the genesis of Plaintiffs' claims and may bear on threshold issues.

Because Defendants are required to produce the administrative record and its contents bear on Defendants' motion, the Court should deny the motion on this basis alone and order production

---

[18]    Defendants' citation to *Carroll v. Off. of Fed. Cont. Compliance Programs, United States Dep't of Lab.*, is particularly misguided, as the relevant portions of the record were on the docket. 235 F. Supp. 3d 79, 81 n.1 (D.D.C. 2017) (relevant portions of administrative record already included with complaint)

of the administrative record. *See Jimenez Verastegui v. McAleenan*, No. CV 18-2358 (TJK), 2019 WL 2550385, at *2 (D.D.C. June 20, 2019) (denying motion to dismiss without prejudice and allowing refiling if accompanied by the contents of the administrative record). If the Court were inclined to grant Defendants' motion to dismiss, Plaintiffs respectfully request that the Court order Defendants to produce the administrative record and that Plaintiffs be able to introduce potential evidence from the record contradicting Defendants' arguments. To the extent the Court agrees with Plaintiffs that the motion to dismiss must be denied even without reference to the administrative record, Plaintiffs respectfully request that the Court order Defendants to produce the administrative record within ten days. *See Farrell v. Tillerson*, 315 F. Supp. 3d 47, 71 (D.D.C. 2018) (denying motion to dismiss and ordering government to comply with Local Civil Rule 7(n)). Indeed, the administrative record will aid in the ultimate resolution of this case, including through further dispositive motion practice.

## CONCLUSION

For the above reasons, the Court should deny Defendants' motion to dismiss and order Defendants to produce the administrative record within 10 days.

August 1, 2025

Respectfully submitted,

*/s/ William B. Schultz*
William B. Schultz
Margaret M. Dotzel
Brian J. Beaton, Jr.
Jacobus P. van der Ven
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8106
wschultz@zuckerman.com
mdotzel@zuckerman.com
bbeaton@zuckerman.com
cvanderven@zuckerman.com

*Attorneys for Plaintiffs*