**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

MICHAEL ABRAMOWITZ, *et al.,*

*Plaintiffs,*

–v.–

KARI LAKE, *et al.,*

*Defendants.*

---

**Civil Action No. 1:25-cv-00887-RCL**

**<u>REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.    THIS COURT CAN HEAR THIS DISPUTE NOW ....................................................... 2

    A.    Director Abramowitz's Challenge to his Termination is Ripe ...................................... 2

    B.    Congress Did Not Remove This Court's Jurisdiction to Enforce Congress's
        Statutory Requirements ................................................................................................ 4

        1.    Congress did not intend to nullify its own recently enacted statute ...................... 5

        2.    The three "guideposts" point in the same direction .............................................. 6

            a.    Channeling would foreclose meaningful review ................................................ 6

            b.    Director Abramowitz's claim is wholly collateral to the CSRA ....................... 8

            c.    The MSPB does not have the expertise to decide this dispute .......................... 9

    C.    Director Abramowitz's Complaint Challenges Defendants' Unlawful Action............. 9

II.   DEFENDANTS MUST ABIDE BY CONGRESS'S STATUTORY COMMAND ........... 13

    A.    Congress's Statutory Scheme is Consistent with the Appointments Clause
        Because There is No Restriction on At-Will Removal by a Head of Department ....... 13

    B.    Even if the Advisory Board is Not Viewed as the Head of a Department
        But is Viewed as a Restriction on the Removal Power of the USAGM CEO,
        Congress Has the Power to Condition the Removal of the VOA Director ................. 15

    C.    Congress's Scheme is Similar to Others that Courts Have Blessed and
        Does Not Unduly Restrict the President's Power....................................................... 19

III.  THIS COURT HAS THE POWER TO GRANT RELIEF ................................................ 21

    A.    Director Abramowitz's Harm Cannot be Remedied by Money Damages .................. 21

    B.    This Court Can Prevent Termination and Order Reinstatement ................................. 22

CONCLUSION....................................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) ............................................................... 8

*Am. Petroleum Inst. v. E.P.A.*,
   683 F.3d 382 (D.C. Cir. 2012) ......................................................... 2, 4

*Aviel v. Gor*,
   No. 25-5105, 2025 WL 1600446 (D.C. Cir. June 5, 2025) ................... 19

*Aviel v. Gor*,
   No. CV 25-778 (LLA), 2025 WL 1009035 (D.D.C. Apr. 4, 2025) ......................... 19

*Burnap v. United States*,
   252 U.S. 512 (1920) .......................................................................... 14

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................ 2

*Comans v. Exec. Off. of the Pres.*,
   No. 1:25-cv-01237 (E.D. Va. July 24, 2025) ...................................... 7

*Dellinger v. Bessent*,
   No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025) ................... 22

*Elgin v. Dep't of Treasury*,
   567 U.S. 1 (2012) ............................................................................... 9

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ................................................................... *passim*

*Harris v. Bessent*,
   No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ................... 22

*Jarkesy v. S.E.C.*,
   803 F.3d 9 (D.C. Cir. 2015) ................................................................ 5

*Lee v. Natl. Elec. Contractor Ass'n*,
   322 F. Supp. 3d 43 (D.D.C. 2018) .................................................... 10

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ....................................................................... 7, 8

*Morrison v. Olson*,
   487 U.S. 654 (1988) ................................................................... 14, 16

*Myers v. United States*,
   272 U.S. 52 (1926) ............................................................................................................ 16

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) .............................................................................................................. 3

*Silver v. U.S. Postal Serv.*,
   951 F.2d 1033 (9th Cir. 1991) ...................................................................................... 16, 19

*Susman Godfrey LLP v. Exec. Off. of President*,
   No. CV 25-1107 (LLA), 2025 WL 1779830 (D.D.C. June 27, 2025) .................................... 21

*Taylor v. Mills*,
   892 F. Supp. 2d 124 (D.D.C. 2012) ................................................................................... 11

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) .............................................................................................................. 5

*Trump v. New York*,
   592 U.S. 125 (2020) .............................................................................................................. 3

*Trump v. Wilcox*,
   145 S. Ct. 1415 (2025) ................................................................................................... 7, 22

*United States v. Germaine*,
   99 U.S. 508 (1878) .............................................................................................................. 14

*United States v. Perkins*,
   116 U.S. 483 (1886) ...................................................................................................... 15, 16

*Widakuswara v. Lake*,
   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ................................................... 5

**STATUTES**

15 U.S.C. § 78d(a) ...................................................................................................................... 20

22 U.S.C. § 290f(g), (l) ............................................................................................................... 19

22 U.S.C. § 6203(a) .................................................................................................................... 14

22 U.S.C. § 6205(a) .................................................................................................................... 13

22 U.S.C. § 6205(b)(1)(A) .......................................................................................................... 20

22 U.S.C. § 6205(b)(3) ............................................................................................................... 20

22 U.S.C. § 6205(e)(1) .......................................................................................................... 13, 20

## OTHER AUTHORITIES

Kari Lake (@KariLake), X (Aug. 11, 2025, 12:05 PM),
*available at* https://perma.cc/85JM-LQPB ............................................................................ 2

U.S. Merit Systems Protection Board, *Weekly Number of Cases Received in the Regional and Field Offices Fiscal Year 2025*, available at https://perma.cc/EEM9-AWTH .......................... 7

*Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee*,
43 Op. O.L.C. 263 (2019) .......................................................................................... 19

## RULES

Fed. R. Civ. P. 8(a)(2) .............................................................................................. 10

## CONSTITUTIONAL PROVISIONS

U.S. Const., art. II, § 2 ............................................................................................ 13

## LEGISLATIVE MATERIAL

1 Annals of Congress 389-90 (1789) (Joseph Gales ed., 1834).................................... 15

## **INTRODUCTION**

Just a few years ago, Congress fixed an issue within the U.S. Agency for Global Media (USAGM). Congress was concerned that the unilateral and arbitrary firing of executive officers threatened the mission of the media networks within the USAGM umbrella. And so, to firm up this mission, it required that future network heads could only be removed following the vote of the politically balanced, Senate-confirmed, expert International Broadcasting Advisory Board (IBAB or Advisory Board).

Now USAGM appears to have taken the exact action forbidden by Congress, namely the removal of the Director of Voice of America (VOA) without a vote of the Advisory Board. In their opposition to Plaintiff's motion for partial summary judgment challenging this action, Defendants mainly present reasons that this Court should not hold them to this legal requirement.

In doing so, Defendants present zero evidence of their respect for the laws passed by their co-equal branch—despite recently telling Congress that they were well aware of Congress's requirements. On June 3, 2025, now-Acting CEO Kari Lake sent a notification to Congress acknowledging that she was aware that "[t]he head[] of Voice of America . . . may only be . . . removed if such action has been approved by a majority vote of the Advisory Board." Letter to Senator Graham at 3, ECF No. 54-3. Yet barely a month later, Defendants did the exact opposite of what now-Acting CEO Lake had said was legally required. They removed VOA Director Abramowitz without a majority vote of the Advisory Board.

This should not stand. The repeated attempt by Defendants to avoid this Court's review and Congress's statute do not have solid footing in the law or the facts. This Court should order that Defendants follow the law and refrain from removing Director Abramowitz without obtaining a majority vote of the Advisory Board.

## ARGUMENT

## I.    THIS COURT CAN HEAR THIS DISPUTE NOW

### A.    Director Abramowitz's Challenge to his Termination is Ripe

Defendants' first argument is that, even if they have violated the statute, Director Abramowitz cannot sue—yet.  They say that Director Abramowitz's challenge is not ripe because his removal "is not final," depends "on contingent future events," and only reflects "alleged potential future injuries."  Opposition Brief 5–6, ECF No. 65 (Opp.).  But whether Defendants are invoking Article III ripeness or a prudential doctrine, according to Defendants' own words— outside of their most recent brief—his removal is a done deal.  In their motion to dismiss, Defendants referred to Mr. Abramowitz as "the *former* Director of Voice of America."  ECF No. 58 at 1 (emphasis added).  And just yesterday, Defendant Kari Lake repeated this statement, referring to Mr. Abramowitz on social media as the "Former VOA Director" and suggesting that he would no longer have "the opportunity to continue his employment."[1]  Similarly, in their opposition, Defendants now admit that they have already put someone else in place to "fulfill[] the responsibilities of the Director position."  Opp. 7.

If Defendants mean to raise a *constitutional* ripeness argument, it is "subsumed into the Article III requirement of standing."  *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 386 (D.C. Cir. 2012).  Standing requires "an injury-in-fact that is 'imminent' or 'certainly impending.'"  *Id.*  It does not require that the injury has actually happened; "threatened" injury is sufficient as long as it is not "too speculative."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).

And on this ground, Defendants own words make it perfectly clear that Director Abramowitz's removal is "certainly impending"—there is nothing "speculative" about it.  He was

---

[1] Kari Lake (@KariLake), X (Aug. 11, 2025, 12:05 PM), *available at* https://perma.cc/85JM-LQPB.

told "*in no uncertain terms*" that if he did not accept a "Directed Reassignment" that removed him from his position, he "*would be* subject to removal" from federal service altogether.  Declaration of Michael Abramowitz (Abramowitz Decl.), Attach. A (USAGM Letter to Abramowitz (August 1, 2025)) at 2, ECF No. 64-1 (emphasis added).  No matter which option he chose, the result is the same:  Director Abramowitz is removed from his position as VOA director.

When Director Abramowitz told Defendants that his removal was illegal, they followed through on their threat by going a step further than they had before.  *See* Abramowitz Decl. ¶ 4, ECF 64-1.  On August 1, Director Abramowitz received a letter concluding that "removal from . . . the Federal Service" altogether "is the most appropriate and effective course of action" for his "failure to accept a directed geographic reassignment."  USAGM Letter to Abramowitz at 1, 5, ECF No. 64-1.  That letter left no room for "contingent future events."  *Contra* Opp. 5.  It concluded that Director Abramowitz's purported refusal to accept his "reassignment" meant that there was no "room for . . . rehabilitation" and left "no other adequate or alternative sanction" short of removal from federal service.  USAGM Letter to Abramowitz at 5, ECF No. 64-1.

These unambiguous statements differentiate the cases Defendants cite.  In *Trump v. New York* (*see* Opp. 5-6) the challenged action was only "a prediction" that was "riddled with contingencies and speculation" and "involve[d] a significant degree of guesswork."  592 U.S. 125, 131, 132 (2020).  Not so here—Director Abramowitz has been told "in no uncertain terms" what "would" happen.  And in *National Park Hospital Association* (*see* Opp. 6), the plaintiff mounted a general challenge to a regulatory provision governing contracts, but that issue had yet to arise in "a concrete dispute" about a "particular . . . contract."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003).  Again, not here.  Director Abramowitz challenges Defendants' ability

to remove *him*, now. This is not a general challenge to Defendants' willingness to abide by the Advisory Board's role in the abstract.

Director Abramowitz' removal is both impending and certain. There is no Article III bar to hearing this case.

If, in the alternative, Defendants mean to raise a *prudential* ripeness argument, the elements guiding the Court's prudential analysis are satisfied here. The issue is fit "for judicial decision." *Am. Petroleum Inst.*, 683 F.3d at 387. Defendants have told Director Abramowitz that they are removing him without a vote of the Advisory Board. His position is that this action is plainly illegal. There is no further factual development necessary to adjudicate this dispute. This is a "concrete," mature dispute; there is no broader "policy" that Defendants are trying to "crystallize." *Id.* Similarly, withholding a decision will work a "hardship" to Director Abramowitz. *Id.* Waiting until his firing is further formalized will make it harder to restore his rightful role leading the organization.

**B.    Congress Did Not Remove This Court's Jurisdiction to Enforce Congress's Statutory Requirements**

Defendants' second argument is that, even if they have violated the statute, Director Abramowitz cannot sue—in court. They contend that the exclusive means for challenging "employment disputes" is through the administrative scheme set out in the Civil Service Reform Act (CSRA). Opp. 10-14.

But in making this argument, Defendants refuse to acknowledge that this dispute is about whether they can remove Director Abramowitz from his position as VOA director without a vote of the Advisory Board. Instead, they claim that Director Abramowitz is challenging "whether termination is proper after an employee declines a reassignment." Opp. 13; *see also* Opp. 11-12, 14. Defendants gave Director Abramowitz two choices, both leading to the same result: Accede

to a reassignment that removes you from your position or be fired from federal service and your position as director of VOA. Either way, he is removed from his position, and it is that removal that he challenges. This removal is unlawful, it is happening, and Director Abramowitz's challenge to it can be heard in this Court.

       1.   <u>Congress did not intend to nullify its own recently enacted statute</u>

Whether Director Abramowitz must first present his claims to the Merit Systems Protection Board (MSPB) is determined by what Congress intended. The issue is whether Director Abramowitz's challenge to removal in violation of the specific statute governing VOA is "of the type Congress intended to be reviewed within" the CSRA's administrative review procedures. *Jarkesy v. S.E.C.*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)). Following the Supreme Court, the D.C. Circuit has focused on three factors to guide this inquiry. These factors are "general guideposts" to the congressional intent question, rather than "distinct inputs into a strict mathematical formula." *Id.* at 17.

And on the core congressional intent question, the history of the statute and the facts of this case lead to only one answer. Congress gave the Advisory Board a role in removal because, to protect VOA's mission, it wanted to prevent the political firing of network heads that occurred in 2020 from ever happening again. *See* Pl.'s Mot. for Partial Summ. J. 1-4, ECF No. 59. But if Director Abramowitz's claims are channeled through the CSRA, that is exactly what will happen. His case will languish before an administrative agency, which currently lacks a quorum, and it will be years before he can be reinstated. Defendants will have gotten away with doing the exact thing Congress meant to prevent. And by the time Director Abramowitz is reinstated, the damage to VOA's mission will be done. Congress's law will have accomplished exactly nothing. This cannot be what "Congress intended." *See Jarkesy*, 803 F.3d at 15.

This congressional intent also differentiates the stay-posture decision in *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025). The D.C. Circuit's recent stay decision never addressed the core question here, which is whether Director Abramowitz's claim—that removal without a vote of the Advisory Board violates 22 U.S.C. § 6205(e)(1)—is "of the type Congress intended" to be reviewed under the CSRA. Implicitly acknowledging this, Defendants argue that "congressional mandates" were at issue there too (Opp. 13-14), but *which* congressional mandate makes a difference. While Plaintiff disagrees with the reasoning that the divided panel offered in support of its emergency stay (*see* Opp'n to Mot. to Dismiss 12-19, ECF No. 63), the Congressional mandates discussed in *Widakuswara* contrast with the one at issue here, in which Congress adopted targeted legislation to protect the VOA director from removal. Defendants' jurisdictional argument would effectively nullify this statute.

In any event, as explained in Plaintiff's motion (at 10), the stay decision in *Widakuswara* is not binding on this Court. And the issue in that emergency decision is currently before a merits panel of the D.C. Circuit in Defendants' appeal of this Court's preliminary injunction.

### 2. The three "guideposts" point in the same direction

The three "general guideposts" identified in *Thunder Basin* and *Jarkesy* that assist in this congressional intent inquiry all point in the same direction.

#### a. *Channeling would foreclose meaningful review*

Defendants suggest that channeling presents no issue of judicial review because Director Abramowitz can go to "the MSPB or OSC" and then "appeal to an Article III court . . . 'in due course.'" Opp. 10, 12 (citation omitted). And while review may "not be immediately available" and "may take time," this is of no moment, according to Defendants. Opp. 12.

But "may take time" is, to put it mildly, an understatement, since this administration has hobbled the CSRA-reviewing agencies. The correct question is not whether the subsequent

judicial review happens, but rather, when it happens, whether it would be "meaningful." *Contra* Opp. 10-12. And here judicial review is only meaningful when it can address Director Abramowitz's injury. *Cf. Mathews v. Eldridge*, 424 U.S. 319, 331 (1976) (explaining that a direct action in court is appropriate where "full relief cannot be obtained" through an administrative process, in that case because postdeprivation judicial relief could not address a right to a predeprivation hearing). Review years from now is not. Director Abramowitz has a congressionally recognized interest in fulfilling the duty entrusted to him as VOA director, which is to manage VOA and to protect VOA from editorial interference. Even if the MSPB can not only restore him to federal employment but also reinstate him as Director, that action will come far too late to remedy the damage to VOA's independence.

This delay is due to the President's decision to fire MSPB's members and not restore a quorum, in combination with the administration's decision to summarily fire scores of federal workers, who have then sought relief from an agency that cannot act. As a result, the number of cases before the MSPB has ballooned. Before February 2025, the MSPB field offices generally received fewer than one hundred cases every week.[2] But then starting in February, those numbers started to grow, peaking at 2,225 cases received in a single week.[3]

The Executive has also attacked the MSPB's structure, arguing in court that it is unconstitutional. *See Trump v. Wilcox*, 145 S. Ct. 1415 (2025). And before the MSPB, it has argued that the President's "Constitutional claims and assertion of the President's Article II authority" are insulated from the MSPB's review. Complaint ¶ 32, *Comans v. Exec. Off. of the Pres.*, No. 1:25-cv-01237 (E.D. Va. July 24, 2025), ECF No. 1 (summarizing the government's

---

[2] U.S. Merit Systems Protection Board, *Weekly Number of Cases Received in the Regional and Field Offices Fiscal Year 2025*, available at https://perma.cc/EEM9-AWTH.

[3] *Id.*

motion to dismiss argument). That "assertion of Article II authority" is very similar to what Defendants assert in this case. *See* Opp. 14 (arguing that the removal procedures "are inconsistent with Article II and therefore unconstitutional"); *id.* at 16 ("the Government contends that such approval unlawfully impedes the removal authority contemplated in Article II").

After all of this, Defendants comes to this Court and to say the MSPB really is the right forum for Director Abramowitz to seek relief. This Court need not—and indeed should not—go along with that strategy.

Congress, which just four years ago passed the at-issue statutory provision to insulate the director of VOA from arbitrary removal following devastating, partisan attacks on VOA, did not intend to channel Director Abramowitz's vindication of that regime to administrative agencies that have been crippled. This is a double-strike against Defendants' channeling argument. If Director Abramowitz's claims are channeled, he will be deprived of his statutory responsibility to lead a critical organization for years. That harm cannot be remedied by money damages or reinstatement years later. *Cf. Mathews*, 424 U.S. at 331 (holding that an exhaustion statute did not bar federal court jurisdiction where "full relief cannot be obtained" postdeprivation). And the scheme Congress set up to prevent the USAGM CEO from unilaterally removing the VOA director would be nullified. Defendants, as they are trying to do now, could simply take the action Congress prohibited confident that it would be years before they would see the consequences. This is not what Congress intended. The route Defendants offer plainly does not offer meaningful judicial review.

b. *Director Abramowitz's claim is wholly collateral to the CSRA*

The "wholly collateral" guidepost is "'related' to whether 'meaningful judicial review' is available, and the two considerations are sometimes analyzed together." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 759 (D.C. Cir. 2019). Here, Director Abramowitz's

claims are wholly collateral to the CSRA's statutory scheme "[f]or many of the same reasons" that meaningful judicial review is unavailable through that scheme. *Id.* For the reasons explained above, the CSRA process is crippled, and Director Abramowitz will not receive any relief from CSRA-review for many years, and that is if the MSPB survives. Director Abramowitz simply cannot obtain relief by presenting his claims to the CSRA-review agencies.

c. *The MSPB does not have the expertise to decide this dispute*

On this guidepost, Defendants' primary argument rests on a misstatement of Director Abramowitz's claim. Defendants claim that this matter is about "whether termination is proper after an employee declines a reassignment," and relying on this mischaracterization they argue that the MSPB "regularly adjudicates these types of employment disputes." Opp. 13.

But as explained above, that is not the dispute. It is about whether Defendants can remove Director Abramowitz from his position—through "reassignment" or termination, the mechanism does not matter—without satisfying Congress's directive that they obtain a majority vote of the Advisory Board. On the merits, Defendants' only response is that this statute is unconstitutional under the President's "article II removal power." Opp. 20. Nowhere do Defendants argue that *those* issues are "within the MSPB's bailiwick." Opp. 13. In fact, in *Elgin*, the Supreme Court seemed to accept that "constitutional" challenges to a "federal statute" are not within the "MSPB's expertise." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 23 (2012). It found this third guidepost satisfied instead because there existed "threshold questions . . . unique to the employment context [that] may obviate the need to address the constitutional challenge," *id.* at 22-23, which is clearly not the case here.

**C. Director Abramowitz's Complaint Challenges Defendants' Unlawful Action**

Defendants' third argument for evading review is that, even if they have violated the statute, Director Abramowitz cannot sue—until he amends his complaint. According to

Defendants, Director Abramowitz's complaint does not include a sufficient basis to assert his entitlement to relief.  But it does.  It clearly invokes Congress's removal scheme and the harms Director Abramowitz faces from being unable to fulfill his position.

As Defendants acknowledge, Opp. 10, this question is governed by Federal Rule of Civil Procedure 8.  Under Rule 8, a complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This rule seeks to ensure "that defendants receive fair notice of the claim being asserted."  *Lee v. Natl. Elec. Contractor Ass'n*, 322 F. Supp. 3d 43, 44 (D.D.C. 2018).  As long as the claims raised are "adequately set forth" in the complaint, then "a supplemental pleading is not necessary."  *Laborers' Int'l Union of N. Am. v. Nat'l Post Off. Mail Handlers, Watchmen, Messengers & Grp. Leaders Div. of the Laborers Int'l Union of N. Am.*, No. 88-1731-OG, 1989 WL 251211, at *8 n.11 (D.D.C. Jan. 17, 1989).

That standard is met here.  In his complaint, Director Abramowitz argued that "Congress protected VOA's director from arbitrary removal to shore up this mission" and that, "[a]s result of defendants' actions, defendants have utterly deprived Plaintiff Michael Abramowitz of his ability to continue directing . . . VOA."  Complaint ¶ 90, ECF No. 1.  Based on this claim, and others, the Complaint seeks to set aside Defendants' actions as *ultra vires* (Count IV) and contrary to the APA (Count I).  *Id.* Counts I, IV.  That is precisely the basis on which Director Abramowitz moved for partial summary judgment.  *See* Pl.'s Mot. for Partial Summ. J. 14, ECF No. 59 ("Defendants are seeking to remove Director Abramowitz in contravention of Congress's express statutory protections.  For that reason, we ask that the Court grant partial summary judgment on Count IV or, in the alternative, on Count I, as they pertain to Director Abramowitz's position as VOA director.").  The claim that the statute prevents Defendants from removing

-10-

Director Abramowitz by stripping him of authority certainly includes the claim that they cannot remove him outright.

Defendants argue that Director Abramowitz is "rais[ing] *new claims* at the summary judgment stage, where those claims were not pleaded in the complaint." Opp. 9 (quoting *Taylor v. Mills*, 892 F. Supp. 2d 124, 137 (D.D.C. 2012)) (emphasis added). But that is clearly not right: Director Abramowitz has moved on two claims—Counts I (APA) and IV (*Ultra Vires*)—that appear in the original complaint. This is not a case, for example, where a plaintiff pleaded only a retaliation claim but seeks to assert a hostile work environment claim at summary judgment. *See Taylor*, 892 F. Supp. 2d at 137.

Perhaps Defendants mean to suggest that there is not enough support for these claims in the Complaint. They say, for example, that "the statutory requirement that the Advisory Board approve the removal of the Voice of America Director by majority vote" was an "issue[] . . . not raised in the complaint." Opp. 11. But the Complaint identifies Congress's safeguard, passed in the 2021 NDAA, numerous times:

- "The 2021 amendments . . . require that the IBAB approve by a majority vote the appointment and removal of the heads of the broadcast entities, who are selected or dismissed by the CEO of USAGM. 22 U.S.C. § 6205(e)(1)." Compl. ¶ 57.

- "The statutory structure of the 2021 NDAA amendments clearly reflects Congress's intent to safeguard the Director's independence." *Id.* ¶ 84.

- "Congress empowered the bipartisan and multi-member IBAB to approve the appointment and removals of the heads of U.S. international broadcasting agencies. This decision forges consensus in who should lead these vital entities and protects their directors from arbitrary removal." *Id.* ¶ 85.

- "Congress deliberately safeguarded the VOA head's position, recognizing that VOA's mission—to provide a 'consistently reliable and authoritative' news source . . . could make it a target for those who oppose its journalistic content and mission." *Id.* ¶ 86.

Defendants next suggest that Director Abramowitz has raised another "fundamentally new" issue—"the removal of Mr. Abramowitz from his position as Voice of America Director." Opp. 8. But, again, being deprived of his right to lead VOA—and the illegality of that deprivation—is central to Director Abramowitz's Complaint:

- "Director Abramowitz is and continues to face irreparable harm as he is unable to carry out his duties as Director of VOA." *Id.* ¶ 87.

- "Defendants' unlawful dismantling of VOA has caused Director Abramowitz to lose his statutory right to execute the organization's vital mission, as explicitly intended and directed by Congress." *Id.* ¶ 84

- "Plaintiff Michael Abramowitz . . . has suffered . . . harm to his statutorily protected right to lead VOA." *Id.* ¶ 83.

- Defendants have "depriv[ed] Plaintiff Michael Abramowitz of this statutory right to continue directing VOA." *Id.* ¶ 131.

- "The Executive and its agencies may not take actions that exceed their . . . statutory authority." *Id.* ¶ 150.

Based on these allegations, Defendants were on notice that Director Abramowitz was relying on Congress's statutory protection to ensure that he could fulfill his statutory responsibility to lead the agency. They have, in their words, received "the notice contemplated by Rule 8." Opp. 10. In fact, Defendants own filings suggest they read the Complaint to raise this issue. In their briefing, they explained their view that "this case involves a challenge to policy decisions governing a federal employee"—namely, Director Abramowitz. Opp. to Mot. for Preliminary Injunction 9, ECF No. 13. They believe that "Plaintiffs' claim[]" was a "dispute[] related to federal employment." *Id.*; *see also* Gov't Mot. to Dismiss 10, ECF No. 58. They cannot now turn around and, in their opposition brief, assert that they did not have "notice" of "Mr. Abramowitz's employment challenge." Opp. 10.

It is of course true that certain facts concerning Director Abramowitz post-date the filing of the complaint. *See* Opp. 9. That Defendants, after Director Abramowitz filed his complaint,

took additional actions that make his entitlement to relief stronger and the need for relief more imminent does not render him unable to seek that relief on the existing Complaint.

## II.    DEFENDANTS MUST ABIDE BY CONGRESS'S STATUTORY COMMAND

Congress's command is unambiguous and direct: "The head[] of Voice of America . . . may only be . . . removed if such action has been approved by a majority vote of the Advisory Board." 22 U.S.C. § 6205(e)(1).  Defendants do not debate the language, and they do not suggest that they have followed it.  They accept that they have not.  Their only argument on the merits is that they do not need to follow Congress's command.  For this argument, Defendants rely on their expansive vision of executive power.  That vision is not supported by the case law.

Appointment and removal authority over the VOA director lie with at-will presidential appointees within the executive branch.  Although Defendants challenge this provision as unconstitutional, they cite no authority to support that argument.  To the contrary, courts have blessed similar structures in the past.  The structure Congress created here is constitutional for two independent reasons.

### A.    Congress's Statutory Scheme is Consistent with the Appointments Clause Because There is No Restriction on At-Will Removal by a Head of Department

First, because the Advisory Board qualifies as a "Head[] of Department[]," the Appointments Clause unambiguously gives Congress the power to vest appointment and removal power in the Advisory Board.  Under the Appointments Clause, "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const., art. II, § 2.  As the Supreme Court has held, the Appointments Clause's conferral of appointment authority implies removal authority too: If Congress vests the appointment of an inferior officer "in heads of departments . . . it is ordinarily

-13-

the department head, rather than the President, who enjoys the power of removal." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 493 (2010).

In creating the Advisory Board, Congress made it an independent entity, not subordinate to any other, in the executive branch: "The Advisory Board as established shall exist within the executive branch as an entity described in section 104 of title 5." 22 U.S.C. § 6205(a). The Advisory Board is thus not a "bureau[]" or "lesser division[]" of USAGM. *Burnap v. United States*, 252 U.S. 512, 515 (1920) (citing *United States v. Germaine*, 99 U.S. 508, 510 (1878)). It is not part of USAGM at all. In fact, USAGM occupies a co-equal place in the organizational structure. It too "exist[s] within the Executive branch of Government as an entity described in section 104 of title 5." 22 U.S.C. § 6203(a). And for the same reason that the CEO is the head of USAGM, the Advisory Board is the head of its own independent establishment.

The VOA director is an employee of USAGM. But to protect VOA's editorial independence, Congress chose to vest approval of appointments and removals in a separate "Department"—the Advisory Board. That is constitutionally sound. There is nothing in the text or logic of the Appointments Clause that requires the appointing official to be in the same agency as the appointed inferior officer. By analogy, in *Morrison*, Congress created a "Special Division" of the court of appeals "for the purpose of appointing independent counsels," who were employees of the Department of Justice. *Morrison v. Olson,* 487 U.S. 654, 661 (1988).

For this reason, Defendants' contention that "the head of USAGM is the Chief Executive Officer" and "not the Advisory Board," while true, is inconsequential. Opp. 15, 17. The Advisory Board is its own department, and its members are its head. And by virtue of being the head of its own department, the explicit text of the Constitution allows Congress to vest appointment—and thus removal—in the Advisory Board.

-14-

Even Defendants appear to accept that there would be no constitutional issue if removal power were vested exclusively in "Heads of Departments," where neither the department heads nor the inferior officers enjoyed for-cause removal protections. *See* Opp. 14-16. Here, the VOA director is an inferior officer subject to at-will removal by "Heads of Departments" that are themselves subject to at-will removal by the President. That statute complies with even Defendant's casting of the general rule: that "inferior executive officers be removable at will, and without impediment, by the President or by a department acting on the President's behalf." Opp. 14. Because there is thus no "restriction" on the Advisory Board's authority to remove the Director of VOA, the Court does not have to address the issue of whether there are constitutional limits on Congress's power to protect inferior officers with policy making duties from removal. *See* Opp. 15.

> **B.** **Even if the Advisory Board is Not Viewed as the Head of a Department But is Viewed as a Restriction on the Removal Power of the USAGM CEO, Congress Has the Power to Condition the Removal of the VOA Director**

Second, even if the statute is viewed as a "removal restriction" on directors who are appointed by the CEO of USAGM, Congress had the authority to condition removal of the Director of VOA on approval of the Advisory Board. The Supreme Court has been clear that Congress may condition the removal of inferior officers. *Free Enter. Fund*, 561 U.S. at 493, 502. "We have no doubt," the Court held, "that when congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest." *United States v. Perkins*, 116 U.S. 483, 485 (1886); *see also id.* ("The constitutional authority in congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as congress may enact in relation to the officers so appointed."). As James Madison made clear, "it is in the discretion of the Legislature to say upon

what terms the office shall be held, either during good behavior or during pleasure." 1 Annals of Congress 389-90 (1789) (Joseph Gales ed., 1834).

If the statute is viewed as a removal restriction, then it is exactly the type of restriction that Congress is allowed to impose. Congress believed that an independent, expert board's participation was necessary to protect VOA's mission and independence—features critical to its public interest function of providing impartial, independent journalism. *See* Pl.'s. Mot. for Partial Summ. J. 1, 2-4, ECF No. 59. Congress could have protected the VOA director from arbitrary removal by imposing a for-cause standard—something the Supreme Court has often blessed for inferior officers. *See Free Ent. Fund*, 561 U.S. at 493 ("This Court has upheld for-cause limitations on th[e removal] power as well."). But instead it took a different approach, and one that poses even less of an "impediment on the Article II removal power" (Opp. 20), by keeping at-will removal but requiring a vote of the Advisory Board—itself an entity subject to direct, unrestricted Presidential oversight. Although Congress may not insert itself into the removal process, *see Myers v. United States*, 272 U.S. 52 (1926), nothing prevents Congress from giving other executive branch appointees this authority. *See, e.g.*, *Silver v. U.S. Postal Serv.*, 951 F.2d 1033, 1038 (9th Cir. 1991).

Against this backdrop, Defendants attempt to limit Congress's authority to place limitations on the removal of inferior officers by arguing that the inferior officer exception applies only to inferior officers "with limited duties and no policymaking or administrative authority." Opp. at 14-15.

But the distinction between different classes of inferior officers that Defendants suggest appears nowhere in the constitutional text. The Appointments Clause, from which the inferior officer exception derives, speaks only of "inferior officers" generally. And the hallmark of an

-16-

inferior officer is answering to a superior, principal officer, which the VOA director does. Nothing in the constitutional text divides inferior officers into two classes subject to different removal rules.

Defendants' distinction also appears nowhere in the holdings of the Supreme Court's cases that deal with this exception. *Perkins*, the canonical case, does not make this distinction. *See generally* 116 U.S. 483. And while *Morrison* references the officer's scope of policymaking duty and authority, it does so only in discussing *whether* the independent counsel at issue was an inferior officer. *Morrison*, 487 U.S. at 691 ("As we noted above, however, the independent counsel is an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority."). It does not identify separate classes of inferior officers, only some of whom can enjoy protections.

*Seila Law,* upon which Defendants also rely, Opp. 15, was not about inferior officers at all. Instead, it held that Congress could not adopt for cause protections for a single principal officer, the head of the Consumer Financial Protection Bureau. "Everyone agree[d]" that the official at issue was a principal officer. *Seila Law LLC*, 591 U.S. at 219.

When the Supreme Court has addressed the inferior officer exception head on, it has made clear that Defendants' view of the law is not its own. In *Free Enterprise Fund*, the Court considered a double-layer, for-cause removal protection for members of the Public Company Accounting Oversight Board (PCAOB). These inferior officers could only be removed for cause by the Securities and Exchange Commission, who, in turn, could only be removed for cause by the President. The Court made clear that each of these layers of removal was independently constitutional under the Court's precedents, *Free Ent. Fund*, 561 U.S. at 483, 493, but it held that they could not be combined, *id.* at 484.

If Defendants are right about the law, the Supreme Court's entire analysis about the propriety of the double-layer removal would have been unnecessary. The inferior-officer specific removal protection (the first of the two layers) would be independently unconstitutional. The PCAOB members were inferior officers with policymaking authority. *Free Ent. Fund*, 561 U.S. at 484 (PCAOB officers "determine[] the policy . . . of the United States"). And so, if Defendants were right about the law, these inferior officers must be subject to "the President's unrestricted removal power." Opp. 15. But that is not what the Court held. Instead, it allowed removal restrictions for inferior officers, just not two layers of restrictions.

Thus, the Court accepted that its prior precedents—precedents that remain just as good law today as they did then—covered the removal protection for an inferior officer that "determines the policy" of the United States. *Free Ent. Fund*, 561 U.S. at 484, 493. And far from being unnecessary, it wrote its entire opinion about the constitutionality of layering removal protections.

And when the Court reached the remedy, it held that making PCAOB members (who are inferior officers) removable at will by the Commission, a bipartisan board with for-cause removal protections, solved the constitutional defect. *Id.* at 509 ("Concluding that the removal restrictions are invalid leaves the Board removable by the Commission at will, and leaves the President separated from Board members by only a single level of good-cause tenure."). But again: If Defendants were right about the law, this structure *too* would be unconstitutional. Because the inferior-officer "exception" would not apply—the Supreme Court was clear PCAOB members had policymaking authority—these PCAOB members must be subject to "the President's unrestricted removal power." Opp. 15 (citation omitted). They are not. They are removable only by the SEC, a group with for-cause removal protection.

C.   **Congress's Scheme is Similar to Others that Courts Have Blessed and Does Not Unduly Restrict the President's Power**

The Advisory Board removal statute is thus like ones that courts have condoned.  Courts have approved vesting appointment and removal power in similar boards, have approved joint removal power (even if one entity is not a "head of department"), and have approved the creation of governmental organizations solely for the purpose of appointment and removal.

As discussed above, in *Free Enterprise Fund*, for instance, the Supreme Court approved a multi-member commission serving as the head of department with appointment oversight for inferior officers.  *Free Ent. Fund*, 561 U.S. at 509.  And a court in this district and an emergency motions panel of the D.C. Circuit recently upheld the structure of the Inter American Foundation Board as constitutional, finding that the "government is unlikely to succeed on the merits of its" constitutional arguments.  *Aviel v. Gor*, No. CV 25-778 (LLA), 2025 WL 1009035, at *7 (D.D.C. Apr. 4, 2025); *Aviel v. Gor*, No. 25-5105, 2025 WL 1600446, at *1 (D.C. Cir. June 5, 2025).  The Inter American Foundation Board is similarly structured to the Advisory Board and similarly has power over the appointment and removal of an executive that leads the Inter American Foundation. *See* 22 U.S.C. § 290f(g), (l).

Similarly, in *Silver*, the Ninth Circuit upheld the structure of the Postal Service, which has nine "Governors" who are each appointed by the President and confirmed by the Senate.  951 F.2d at 1038.  They are the "head of the department."  *Id.*  The Postal Service also has a Postmaster General, who is an inferior officer.  *Id.*  Together, the Governors and Postmaster General—one head of department, and one entity that is not the head of a department— "jointly appoint and have the joint power to remove the Deputy Postmaster General," also an inferior officer.  *Id.* at 1038. The Ninth Circuit held that this structure "conforms with the requirements of the Appointments Clause and is therefore constitutional."  *Id.*; *see also Appointment and Removal of Federal Reserve*

*Bank Members of the Federal Open Market Committee*, 43 Op. O.L.C. 263, 264-65 (2019) (concluding that the structure of the Federal Open Market Committee "is constitutional," "even though the boards of directors that select" individuals "for FOMC membership may not make appointments under the Appointments Clause").

In a last attempt to differentiate the Advisory Board structure, Defendants' final arguments are all some version of the same theme—a claim that the removal restrictions here overly restrict the President's power. They argue that there is a "significant restriction" on the President's Article II power because the Advisory Board is "bipartisan" and thus "[r]equir[es] the President to obtain the approval of the opposition party." Opp. 18. But bipartisan boards and commissions across government have appointment authority for inferior officers. The SEC, whose removal authority over at-will inferior officers was blessed in *Free Enterprise Fund*, is one. 15 U.S.C. § 78d(a) ("Not more than three of such commissioners shall be members of the same political party."). Defendants mount an attack on all these removal authorities, including ones blessed by the Supreme Court, in one line in a brief without citation.

And, in any event, Defendants' math is wrong. The Advisory Board has seven members— the Secretary of State and six members "appointed by the President, by and with the advice and consent of the Senate." 22 U.S.C. § 6205(b)(1)(A). Of those six appointed members, "[n]ot more than three . . . may be affiliated with the same political party." *Id.* § 6205(b)(3). Those three members plus the Secretary of State make "a majority . . . of the Advisory Board," *id.* § 6205(e)(1), who can be of the President's party. The President does not need to "obtain the approval of the opposition party" to remove a VOA director.

Defendants next complain that they are hampered in removing a VOA director because "the Advisory Board currently lacks a quorum." Opp. 18. That is a problem entirely of the

government's own making.  It is the President who fired its members and did not appoint new ones.  The Executive has no standing to complain that, because the Advisory Board lacks a quorum, there is an intrusion on the President's Article II power.

In fact, as noted above, the removal structure for the VOA director interferes far less with the President's Article II powers than other schemes the Court has blessed.  The President—who appoints the Advisory Board members, who are removable at will—enjoys more power of removal than, for example, he does over PCOAB members, who can only be removed by a Commission that enjoys for-cause removal.  *Free Enterp. Fund*, 561 U.S. at 509.

## III.    THIS COURT HAS THE POWER TO GRANT RELIEF

Defendants make a final attempt to avoid the consequences of their action.  Even if the Court can hear this case, and even if the statute is constitutional, they say, this Court cannot grant meaningful relief.  But these arguments, again, overlook the basic posture of this case and the D.C. Circuit's holdings.

### A.    Director Abramowitz's Harm Cannot be Remedied by Money Damages

Director Abramowitz has moved for partial summary judgment—a final judgment—and injunctive relief.  To be entitled to this relief, he must show that his harm is not reparable by money damages.  His opening brief explains why this is the case.  Pl.'s Mot. for Partial Summ. J. 12-14, ECF No. 59.

Oddly, Defendants do not really take on these arguments.  Rather, they seem to construe his motion as a request for *preliminary relief* "reinstating [Director Abramowitz] during the pendency of litigation."  Opp. 7.  It is not.

Critically, the standards for *preliminary* and *final* injunctive relief are different.  For a preliminary injunction, courts ask whether the plaintiff is likely to face an irreparable injury in the time before the court can resolve the case on the merits.  But for final injunctive relief, the

timeframe for the question is different—it is whether injunctive relief is required to remedy the harm over the long term.  For final injunctive relief, "harms [that] 'cannot be fully compensated by later damages,'. . . are irreparable."  *Susman Godfrey LLP v. Exec. Off. of President*, No. CV 25-1107 (LLA), 2025 WL 1779830, at *24 (D.D.C. June 27, 2025).

Every single case Defendants cite is about the standard for emergency, preliminary relief.  And the rationales they rely upon show why those standards do not apply to Director Abramowitz's request.  Citing *Dellinger v. Bessent*, Defendants rely on that court's reasoning that, without preliminary relief, "[a]t worst, Dellinger 'would remain out of office for a short period of time." Opp. 7 (quoting No. 25-5052, 2025 WL 887518, at *4 (D.C. Cir. Mar. 10, 2025)).  But for final relief, it is the final resolution of the case—not the "short time" between when a court first dockets a case and can resolve it.  Citing *Wilcox*, Defendants rely on "the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation."  Opp. 7-8 (quoting *Wilcox*, 145 S. Ct. at 1415).  But again, here Director Abramowitz seeks a final resolution, not "repeated removal and reinstatement of officers during the pendency of litigation."

### B.    This Court Can Prevent Termination and Order Reinstatement

In the opposition's final pages, Defendants take a swing they have taken in nearly every case challenging this administration's unlawful terminations, using near-verbatim language.  They say that this Court "lacks the power to issue an order enjoining the removal of executive officers." Opp. 20.

This Court need not dwell long here.  The en banc D.C. Circuit has considered and rejected this argument.  *See  Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025) (en banc) ("The government likewise has not shown a strong likelihood of success on the merits of its claim that there is no available remedy for Harris or Wilcox.").  And while the Supreme Court reversed the denial of a stay in this case on different grounds, it did not question

-22-

the availability of injunctive relief to remedy unlawful removals.  *See Wilcox*, 145 S. Ct. at 1415.

That part of the en banc D.C. Circuit's holding remains good law.

Defendants themselves even seem to acknowledge the state of play.  While they cite *Harris*, they cite only the dissent and ignore the en banc court's holding.  Opp. 20-21.  Subsequent panels of the D.C. circuit, however—even those composed of members who dissented in the en banc court—have recognized that the D.C. Circuit's en banc decision should be followed.  "[I]t seems appropriate," Judge Katsas recently wrote, joined by Judge Pillard, "to defer to the views expressed by our en banc Court in denying a stay pending appeal in *Harris*, which found the government unlikely to succeed in its contention that reinstatement is rarely if ever an available remedy for unlawfully removed officials."  *Aviel v. Gor*, 2025 WL 1600446, at *2 (Kastas, J., concurring).

This Court should follow the en banc D.C. Circuit and reject Defendants' attempt to limit this Court's power to remedy Director Abramowitz's harm.

## CONCLUSION

Defendants' opposition brief does not contest the core elements of Director Abramowitz's claim.  Congress required that they seek a vote of the Advisory Board before removing Director Abramowitz.  They did not.  Defendants raise several procedural (and one constitutional) arguments to get out of their oversight, but none has merit.

We respectfully ask that this the Court grant partial summary judgment on Count IV or, in the alternative, on Count I, as they pertain to Director Abramowitz's position as VOA director and enjoin Defendants from removing him from his position as VOA director unless they comply with 22 U.S.C. § 6205(e).

Dated: August 12, 2025                    Respectfully submitted,

                                          */s/ William B. Schultz*
                                          William B. Schultz (D.C. Bar No. 218990)
                                          Margaret M. Dotzel (D.C. Bar No. 425431)
                                          Brian J. Beaton, Jr. (D.C. Bar No. 90020963)
                                          Jacobus P. van der Ven (D.C. Bar No. 1644774)
                                          ZUCKERMAN SPAEDER LLP
                                          2100 L Street NW, Suite 400
                                          Washington, DC 20037
                                          Tel: (202) 778-1800
                                          Fax: (202) 822-8136
                                          wschultz@zuckerman.com
                                          mdotzel@zuckerman.com
                                          bbeaton@zuckerman.com
                                          cvanderven@zuckerman.com

                                          *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 12, 2025, I caused the foregoing to be served on counsel of record via the Court's electronic case filing system.

/s/ *William B. Schultz*
William B. Schultz

*Attorney for Plaintiffs*