UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL ABRAMOWITZ, *et al.*,

     *Plaintiffs,*

v.

KARI LAKE, *et al.*,

     *Defendants.*

Case No. 1:25-cv-887-RCL

## MEMORANDUM OPINION

This dispute arises from yet another twist in the saga of the U.S. Agency for Global Media's efforts to dial back the operations of Voice of America contrary to statutory requirements. After first being placed on administrative leave, then having his responsibilities as director reassigned to another employee, and ultimately refusing an instruction to resign the directorship and accept reassignment to North Carolina, Voice of America Director Michael Abramowitz was told he would be subject to formal termination from Voice of America beginning August 31, 2025. He contends that the foregoing actions are contrary to law, and violate the Administrative Procedure Act, because the director of Voice of America "may only be . . . removed if such action has been approved by a majority vote" of the International Broadcasting Advisory Board, 22 U.S.C. § 6205(e)(1), which has been without quorum since January and, therefore, has taken no such action to date. Plaintiff Abramowitz has therefore filed the instant Motion for Partial Summary Judgement, *see* ECF No. 49, and requests a permanent injunction barring Defendants Kari Lake and the U.S. Agency for Global Media from removing him as Voice of America's director without the consent of the International Broadcasting Advisory Board. Following a slew of threshold arguments why the Court should decline to reach the merits, Defendants raise just one defense as

to why the Court should decline to issue an injunction: they call upon the Court to declare that § 6205(e)(1) violates the separation of powers by unduly interfering with the President's authority to remove inferior officers. Because Supreme Court precedent on the President's removal power directly contradicts their position, the Court cannot do so. The motion will be **GRANTED**.

## I.    BACKGROUND

The law and facts underlying this dispute have been recounted by this Court in earlier opinions. *See, e.g.*, *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 19–22 (D.D.C. 2025). The Court will therefore presume familiarity with the broader circumstances of the case and will recite only the key law and facts giving rise to this motion.

### a.    Relevant Law

The United States Agency for Global Media ("USAGM") is an independent agency of the Executive Branch. *See* 22 U.S.C. § 6203(a); 5 U.S.C. § 104. USAGM is led by a Chief Executive Officer ("CEO"), who is appointed by the President subject to the advice and consent of the Senate. 22 U.S.C. § 6203(b)(1). The CEO "supervise[s] all broadcasting activities" undertaken by USAGM and its subsidiaries. *Id.* § 6204(a)(1). That includes those activities undertaken by Voice of America ("VOA").

The International Broadcasting Advisory Board (the "Advisory Board" or "the Board") is a seven-member panel tasked with governance and oversight of USAGM and its networks. *Id.* § 6205(a), (d). The Advisory Board is independent from USAGM. 22 U.S.C. § 6205(a) (providing that the Board "shall exist within the executive branch" as an independent establishment (citing 5 U.S.C. § 104)). Six members of the Board are specially appointed for that role by the President, subject to Senate advice and consent. *Id.* § 6205(b)(1)(A). No more than three of those members "may be affiliated with the same political party." *Id.* § 6205(b)(3). These six members serve four-year terms that are not subject to renewal, *id.* § 6205(b)(4)(A), and must be

2

"distinguished in the fields of public diplomacy, mass communications, print, broadcast or digital media, or foreign affairs," *id.* § 6205(c)(2).

The Advisory Board thus bears many statutory hallmarks of a traditional, party-balanced multimember commission of experts—yet Congress still subjected the Advisory Board to significant presidential supervision. The President selects a chairperson from among the six members just described, *id.* § 6205(b)(2), and the Secretary of State, a member of the President's cabinet, is the Board's *ex officio* seventh member, *id.* § 6205(b)(1)(B), (b)(4)(B). Perhaps most critically, the statute contains no language limiting the grounds for which the President may remove members of the Advisory Board; they are subject to removal without cause. The possibility of removal ensures that the Board's authority remains "subject to the ongoing supervision and control of the elected President." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 224 (2020).

But though the Board is not independent from the President, it does enjoy independence from the CEO of USAGM. Congress has therefore empowered the Board, when necessary, to serve as a check on the CEO. When Congress enacted the Voice of America charter in 1976, it mandated that the network be "accurate, objective, and comprehensive," and "present a balanced and comprehensive projection of significant American thought and institutions" to the World. 22 U.S.C. § 6202(c)(1)–(2). So when a USAGM CEO unilaterally fired the heads of several networks in June 2020, a bipartisan group of seven senators expressed "deep concern" that the removal of the network heads threatened the networks' "independence" and jeopardized their ability to "act as a bulwark against disinformation through credible journalism." Letter from Sens. Rubio, Graham, Moran, Collins, Durbin, Leahy, and Van Hollen to Michael Pack, CEO, USAGM (July 1, 2020), at 1. The senators stated that the "credibility and independence of these networks" was

"required by law." *Id.* Consequently, Congress acted to shore up the statutory basis for such independence by curtailing the authority of the USAGM CEO to unilaterally fire networks heads without the input of the Board. Now, under current law, the director of Voice of America "may only be . . . removed if such action has been approved by a majority vote of the Advisory Board." 22 U.S.C. § 6205(e)(1). A five-member majority of the Board also "may unilaterally remove any such head of network or grantee network" after "consulting with the Chief Executive Officer." *Id.* § 6205(e)(2).

### b. Key Facts

The following facts are undisputed. Michael Abramowitz was appointed as the director of Voice of America on April 19, 2024, and the Advisory Board unanimously approved his appointment. Statement of Undisputed Material Facts ¶¶ 1–2, Ex. 2 to Mot., ECF No. 59-2 ("SUMF").

In January 2025, President Trump fired six members of the Advisory Board, save for the Secretary of State, and none of those members has since been replaced. *Id.* ¶¶ 10. Then, on March 14, 2025, President Donald Trump issued an executive order directing the "eliminat[ion]" of "the non-statutory components and functions" of USAGM "to the maximum extent consistent with applicable law. Exec. Order No. 14,238, 90 Fed. Reg. 13043 (Mar. 14, 2025). As the Court has described in its prior rulings, the order triggered a flood of activity within USAGM to dial back the agency's operations. *See Widakuswara*, 779 F. Supp. 3d at 20–22. Despite the Board's inquorate status, USAGM has since that time taken several steps to remove Michael Abramowitz as director of Voice of America.

On March 15, 2025, Abramowitz, along with approximately 1,300 other Voice of America employees, were placed on administrative leave "until further notice." *See Widakuswara*, 779 F. Supp. 3d at 20–22. By the beginning of August 2025, the leadership of USAGM had trained

their attention on the official removal of Abramowitz from Voice of America. Like the other facts recounted herein, the following timeline is not in dispute:

- **July 8:** Abramowitz met via videoconference with several members of USAGM leadership, including the defendants. SUMF ¶ 5. Abramowitz was informed that USAGM intended to reassign him to VOA's transmitting station in Greenville, North Carolina. *Id.* Later in the day, then-acting CEO Morales sent Abramowitz a memorandum titled "Notice of Directed Reassignment" (the "Reassignment Memo") indicating that VOA Director Michael Abramowitz would be reassigned to a role as Chief Management Officer in Greenville, North Carolina effective September 6, 2025. Reassignment Memo at 1, Attach. A to Abramowitz Decl., ECF No. 59-1; *see also* SUMF ¶ 6. The Reassignment Memo stated that if Abramowitz did not accept the Greenville reassignment by July 29, 2025, he would be removed as director of Voice of America. *Id.*

- **July 23:** Abramowitz filed the instant motion.

- **August 1:** After concluding that Abramowitz had not accepted the reassignment, USAGM Senior Advisor John Zadrozny sent a letter to Abramowitz indicating that he will be removed from his position effective "no earlier than 30 days from the date [Abramowitz] receive[d] the notice," which would be August 31.[1] Attach. A to Abramowitz Decl. at 1, ECF No. 64-1 ("Removal Letter"). The Removal Letter explained that Abramowitz's refusal to accept reassignment "warrant[ed] removal from [his] position." *Id.* Kari Lake, who was by then the acting CEO of USAGM, had made the decision to remove him. *See id.* at 5.

As of the most recent filing related to this motion, the Advisory Board remains inquorate and, thus, has not taken action to ratify or refuse Abramowitz's removal. SUMF ¶¶ 10–11.

### c. Procedural History

This case originated with the filing of a Complaint and a TRO/PI motion on March 26, 2025, seeking emergency injunctive relief to halt actions taken in compliance with Executive Order 14,238, including the placement of Abramowitz and other USAGM employees and contractors on administrative leave. *See* Compl., ECF No. 1; Mot. for Temporary Restraining Order/Preliminary Injunction, ECF No. 4.

---

[1] Abramowitz declares that he received the letter on August 1. *See* Abramowitz Decl. ¶ 2, ECF No. 64-1.

Following briefing and a hearing on the PI motion and the related PI request in *Widakuswara*,[2] the Court granted a preliminary injunction ordering USAGM to (i) "restore all USAGM employees and personal service contractors who were terminated pursuant to ... Executive Order 14238 ... to their status prior to March 14, 2025" and (ii) to "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news.'" Preliminary Injunction at 3, ECF No. 29. This relief mirrored part of the emergency relief the Court granted in *Widakuswara*. *Id.* The defendants appealed to the D.C. Circuit and obtained a stay of the order to restore USAGM employees to their prior status, which the en banc court left in place later that month. *See Abramowitz v. Lake*, No. 25-5145, Doc. No. 2117911 (D.C. Cir. May 28, 2025) (en banc). But the defendants did not appeal the injunction to the extent it ordered compliance with USAGM's statutory mandate.

The instant summary judgment proceedings began in July. On July 23, Abramowitz moved for partial summary judgment on Counts I and IV of his complaint, which raise claims under the Administrative Procedure Act ("APA") and the *ultra vires* doctrine, respectively, seeking permanent injunctive relief barring the defendants from removing him as the director of Voice of America without the consent of the Board. Mot. for Partial Summary J. ("Mot."), ECF No. 59; *see also* Mem. in Support of Mot., ECF No. 59-1 ("Mem."). On August 4, Abramowitz informed the Court that he had received the Removal Letter. *See* Notice of Termination Letter, ECF No. 64. The defendants responded in opposition to summary judgment on August 5. Response to Mot. for Partial Summary J., ECF No. 65 ("Opp."). Abramowitz replied on August 12. Reply, ECF No. 68. The Court held a motion hearing on August 25, and the motion is now ripe.

---

[2] The *Widakuswara* case originated in the Southern District of New York. After Judge Oetken granted a TRO in *Widakuswara*, the Abramowitz plaintiffs withdrew their TRO request and only pursued a PI. *See* Preliminary Injunction at 3.

## II.    LEGAL STANDARDS

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Partial summary judgment may be granted when a party is so entitled as to "part of [a] claim or defense." *Id.* The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In this case, the parties' filings show "[t]here is no serious dispute of fact," so the Court "must allow summary judgment" for Abramowitz unless the defendants show that he is not entitled to relief a matter of law. *Sherley v. Sebelius*, 689 F.3d 776, 780 (D.C. Cir. 2012).

## III.    ANALYSIS

Before turning to the merits and the availability of relief, the Court addresses several threshold issues raised by the defendants. The defendants contend that Abramowitz's claim is not ripe because he has not yet been formally removed; that Congress stripped the Court of jurisdiction over his claim by channeling federal employment disputes to the Merit System Protection Board ("MSPB") through the Civil Service Reform Act ("CSRA"); and that his motion is improper because his pleadings did not give fair notice that he might challenge his termination.

### a.    Claims related to Abramowitz's removal are ripe.

Because Abramowitz's removal has not yet taken effect, the defendants contend that his claim is not ripe under both constitutional and prudential ripeness doctrines. *See* Opp. at 5–8.

"The ripeness doctrine generally deals with when a federal court can or should decide a case." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). The constitutional dimension of ripeness "is subsumed into the Article III requirement" that the plaintiff present "an injury-in-fact that is 'imminent' or 'certainly impending.'" *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427–28 (D.C. Cir. 1996)); *see also Clapper v. Amnesty*

7

*Int'l USA*, 568 U.S. 398, 411–12 (2013) (holding that to be cognizable, a future injury cannot be "speculative" or "conjectural").

"Even if a case is 'constitutionally ripe,' . . . there may also be 'prudential reasons for refusing to exercise jurisdiction.'" *Am. Petroleum Inst.*, 683 F.3d at 386 (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). To assess prudential ripeness, a Court evaluates "'the fitness of the issues for judicial decision' and the extent to which withholding a decision will cause 'hardship to the parties.'" *Id.* at 387 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

There can be no doubt that Abramowitz's request meets the constitutional test for ripeness because the contents of the Removal Letter unambiguously signal that his formal removal became certain after he declined the Greenville reassignment. For example, the Removal Letter characterizes the earlier Reassignment Memo as having "stated in no uncertain terms that, should [Abramowitz] decline to accept the reassignment, [he] would be subject to removal." Removal Letter at 2. And it further says that the prior memo also "explicitly stated that failure to accept the reassignment would subject [Abramowitz] to removal under adverse action procedures." *Id.* at 4.

The defendants glaringly fail to address the Removal Letter in their ripeness argument. Ignoring its contents, they suppose that "contingent future events" remain between the status quo and Abramowitz's potential removal. Opp. at 5. But the Removal Letter specifically rules out all other courses of action. In a section of the Removal Letter titled "[t]he adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others," the letter states an unequivocal intent to remove Abramowitz:

> You were clearly told [in the Reassignment Memo] that declining the reassignment could lead to removal from your position, and despite that, you chose not to accept the reassignment to Greenville. Because of that, *a lesser action, like a warning, a letter of*

> *reprimand, or suspension would not be effective.* Your decision
> shows that you were not willing to follow through on a critical
> directive, even knowing the possible outcome. Under these
> circumstances, removal is the most appropriate and effective course
> of action. I find that the charge [of declining reassignment] on its
> own is serious enough to warrant removal *and there is no other*
> *adequate or alternative sanction for this charge.*

Removal Letter at 5 (emphases added). The Removal Letter did not leave Abramowitz's

termination up to "guesswork" or "speculation." *Trump v. New York*, 592 U.S. 125, 131–32 (2020)

(cited in Opp. at 5–6). His removal is certainly impending.

Nor do prudential considerations counsel against review. The defendants do not even

attempt to identify a reason to doubt "the fitness of the issue[] for judicial decision." *Am.*

*Petroleum Inst.*, 683 F.3d at 387. The fitness of an issue for judicial review "depends on whether

it is purely legal, whether consideration of the issue would benefit from a more concrete setting,

and whether the agency's action is sufficiently final." *Id.* (quoting *Atl. States Legal Found. v.*

*EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003). "A purely legal claim in the context of a facial challenge

. . . is presumptively reviewable." *Sanchez v. Off. of the State Superintendent of Educ.*, 959 F.3d

1121, 1125 (D.C. Cir. 2020) (Garland, J.) (quoting *Nat'l Ass'n of Home Builders v. U.S. Army*

*Corp. of Eng'rs*, 440 F.3d 459, 464 (D.C. Cir. 2006)). And the defendants confirmed at oral

argument that they intend to fire Abramowitz without the consent of the Advisory Board. So

waiting for the actual removal of Abramowitz would not make the purely legal merits question

before the Court—whether the removal structure for the director of Voice of America is

constitutional—any more amenable to resolution following Abramowitz's actual removal. *Cf.*

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 812 (2003) (holding that addressing

a "purely legal [question]" about whether the Contract Disputes Act covered National Park Service

concession contracts should "await a concrete dispute about a particular . . . contract"). The

"legality *vel non*" of such action will not "become clearer in a concrete setting." *Nat'l Ass'n of Home Builders*, 440 F.3d at 465.

The fact that this issue is fit for decision now also means that defendants begin their hardship argument in a defensive posture. If "there are no significant agency or judicial interests in militating in favor of delay," such as when a case presents a pure question of law, "lack of hardship" will rarely "tip the balance against judicial review." *Sanchez*, at 1125 n.2 (quoting *Nat'l Ass'n of Home Builders*, 440 F.3d at 465).

In any case, the defendants' arguments are grounded in inapposite caselaw and are unpersuasive. The defendants principally cite the injury-weighing analyses contained in D.C. Circuit and Supreme Court decisions on applications for stays pending appeal of permanent injunctions barring the removal of principal officers. *See* Opp. at 7 (first citing *Dellinger v. Bessent*, 2025 WL 887518, at *4 (D.C. Cir. Mar. 10, 2025); then citing *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025); and then citing *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025)); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009) (asking, in relevant part, "whether the applicant will be irreparably injured absent a stay" and whether a stay would "substantially injure the other parties interested in the proceeding"). Weighing the hardship the government might suffer without such a stay, important as such harms may be, is for the Court's appellate overseers to decide should defendants take an appeal. Before this Court, those harms offer no basis to withhold judgment on the merits in the first instance, if Abramowitz is so entitled.

> **b. The Civil Service Reform Act does not strip the Court of jurisdiction over this dispute.**

District courts "have jurisdiction over civil actions arising under the Constitution," but Congress may alter that jurisdiction "by establishing an alternative statutory scheme for

administrative and judicial review." *AFGE AFL-CIO v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019). "Congress of course may do so explicitly, providing in so many words that district court jurisdiction will yield," but it "also may do so implicitly, by specifying a different method to resolve claims about agency action." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). In this case, the defendants contend that the Civil Service Reform Act ("CSRA"), which provides for administrative review through the Merit Systems Protection Board ("MSPB") of government employment–related claims, strips the Court of subject-matter jurisdiction over this case. Although the Court sees the issue as less clear-cut than Abramowitz does, the Court ultimately concludes that it has jurisdiction notwithstanding the CSRA.

Whether the creation of an alternative administrative claim structure, like the CSRA, implicitly precludes federal district-court jurisdiction turns on whether "Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review." *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (citation omitted). The two-step framework for ascertaining such intent emanates from the Supreme Court's decision in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). The inquiry under *Thunder Basin* asks, first, whether "such intent is 'fairly discernible in the statutory scheme,'" and, second, whether "the litigants claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy*, 803 F.3d at 15 (quoting *Thunder Basin*, 510 U.S. at 207, 212).

At step one, the defendants observe that when applying the *Thunder Basin* test, the Supreme Court has inferred from "the CSRA's text, structure, and purpose" that the statute "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5, 10 (2012) (citation and internal quotation marks omitted). The Court agrees that the holding in *Elgin* is both binding and conclusive as to

the step one inquiry and requires the Court to assume that Congress intended to preclude federal-employment suits "in the mine-run of cases." *Jarkesy*, 803 F.3d at 16.

That does not mean, however, that the CSRA's "statutory review scheme . . . necessarily extend[s] to every claim concerning" the removal a federal officer. *See Axon*, 598 U.S. at 185. Rather, as explained above, once the Court has concluded that Congress created a "comprehensive review process," the question remains "whether the *particular* claims brought were 'of the type Congress intended to be reviewed within this statutory structure.'" *Id.* at 186 (quoting *Thunder Basin*, 510 U.S. at 212). Three considerations guide that inquiry: *first*, whether precluding jurisdiction might "foreclose all meaningful judicial review"; *second*, whether the claim is "wholly collateral to [the] statutory review provisions"; and *third*, whether the claims fall "outside the agency's expertise." *Id.* at (quoting *Thunder Basin*, 510 U.S. at 212–13).

Although it poses a tricky practical dilemma, the first consideration favors USAGM: channeling Abramowitz's claim through the MSPB would not foreclose all meaningful judicial review. The defendants contend that because the CSRA allows an eventual appeal to the Federal Circuit, Abramowitz could "obtain review of [his] . . . claim[] through an appeal" in federal court, even to the extent it implicates a dispute over the separation of powers. *Axon*, 598 U.S. at 190–91; *see also Elgin*, 567 U.S. at 21 (explaining that appeals to the Federal Circuit allowed "meaningful review" of constitutional claims "within the CSRA scheme"). Abramowitz responds that the recent removal of MSPB members has rendered the MSPB (like the Advisory Board) inquorate, and he contends that the "lack of quorum in the MSPB raise[s] serious question as to whether the CSRA's adjudicatory scheme continues to function as intended." Mem. at 9 (quoting *Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 305 (4th Cir. 2025)). Yet he cites no authority, binding or otherwise, compelling the conclusion that the lack of a quorum factors into

the *Thunder Basin* analysis—an omission that is notable given that the MSPB similarly lacked a quorum from 2017 to 2022. *See* Jordan Ascher, *Responding to a Quorumless Merit Systems Protection Board*, Yale J. on Reg. Notice & Comment Blog (May 23, 2025).

The second consideration favors Abramowitz: his removal challenge is "wholly collateral" to the CSRA scheme. Whether a dispute is "collateral" requires analysis of the "nature of the claim" and "what [the dispute is] about." *Axon*, 598 U.S. at 194. The defendants seize on the Supreme Court's acknowledgment that a "challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme." *Elgin*, 567 U.S. at 22. Yet Abramowitz's claim is vastly different from the removal claim at issue in *Elgin*. There, federal employees challenged their termination under a policy that mandated such firing if an employee had willfully dodged registration in the Selective Service. *Id.* at 7. But Abramowitz is not a mine-run federal employee; he is among a handful of USAGM network directors to whom the law provides a specialized statutory removal framework. Nor does Abramowitz dispute the defendants' proffered reasons for firing him or challenge an underlying USAGM employment policy akin to the Selective Service registration penalty in *Elgin*. Rather, Abramowitz raises a "discrete" question: whether his termination is contrary to the structure of USAGM and Voice of America—namely, the requirement to gain the Board's approval. *Axon*, 598 U.S. at 194 (issue may be collateral if it "involves something discrete" and "independent of the cause itself" (citation omitted)).

What's more, that discrete question necessarily raises the issue—and indeed, the defendants' sole merits defense—of whether Congress's structuring of the appointment and removal of the director of Voice of America runs afoul of constitutional separation of powers. And cases questioning the constitutionality of such statutes are routinely held to be "collateral" to

agency review schemes, since they ultimately turn on the constitutionality of "the structure . . . of an agency." *Axon*, 598 U.S. at 189. Because Abramowitz is challenging the defendants' "power to proceed" with his termination at all, *Axon*, 598 U.S. at 192, not the substantive rationale underlying his termination, *cf. Elgin*, 567 U.S. at 22, his challenge is collateral to the CSRA review scheme.

Finally, Abramowitz's claims do not "involve 'threshold' and other 'questions unique to the employment context' that 'fall[] squarely within the MSPB's expertise,'" or, as already noted, dispute the "substantive decision" to fire him. *See Axon*, 598 U.S. at 187–89. And the Supreme Court has repeatedly made clear that challenges to agency structure raise "standard questions of administrative law, which the courts are at no disadvantage in answering." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 (2010); *see also Axon*, 598 U.S. at 194 ("On that issue, *Free Enterprise Fund* could hardly be clearer."). The MSPB has no "special" knowledge "about the separation of powers" questions that undergird Abramowitz's dispute. *Axon*, 598 U.S. at 194. The lack of agency expertise weighs in favor of Abramowitz.

On balance, these considerations indicate that Congress did not intend to channel Abramowitz's removal claim through the CSRA scheme. When the *Thunder Basin* factors "point in different directions," the "ultimate question is . . . whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.* at 186. Here, the fact that the CSRA scheme might not entirely foreclose judicial review is of less consequence to the Court's analysis than the plain fact that the MSPB has no comparative advantage when it comes to the separation of powers issue at the heart of this dispute. *See id.* at 186 (explaining that factors two and three "give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to"). The Court has jurisdiction.

### c. The Complaint gives fair notice that Abramowitz would challenge his removal.

To ensure "that defendants receive fair notice of the claim being asserted," *Lee v. Nat'l Elec. Contractor Ass'n*, 322 F. Supp. 3d 43, 44 (D.D.C. 2018), Rule 8(a) requires a complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The defendants contend Abramowitz "raises a fundamentally new claim" in his motion—by seeking a permanent injunction barring his termination without the Board's approval—that was not addressed in the Complaint. Opp. at 8. As such, they contend that Abramowitz's motion improperly "raise[s] new claims at the summary judgment stage." *Taylor v. Mills*, 892 F. Supp. 2d 124, 137 (D.D.C. 2012). The defendants say that Abramowitz would need to file an amended complaint to bring a claim predicated on his purported firing. The Court concludes that the factual allegations and the associated causes of action reasonably put the defendants on notice that the efforts to remove Abramowitz as director would lead him to move for relief in this case.

*First*, giving a reasonable construction to the Complaint, Abramowitz's allegations placed the defendants on fair notice that this suit seeks, in part, to prevent USAGM from removing him as Voice of America director, whether constructively (by placing him on administrative leave and reassigning his duties to others) or through formal termination. As the defendants acknowledge, the Complaint identifies the statutory framework governing the removal of the Voice of America director and challenges the lawfulness thereunder of Abramowitz's placement on administrative leave as part of a wider effort to wind down the agency. In particular, Abramowitz alleged that:

- "The 2021 amendments [to the International Broadcasting Act] require that the [Advisory Board] approve by a majority vote the appointment and removal of the heads of the broadcast entities, who are selected or dismissed by the CEO of USAGM. 22 U.S.C. § 6205(e)(1)." Compl. ¶ 57.

- "Congress empowered the bipartisan and multi-member [Advisory Board] to approve the appointment and removals of the heads of U.S. international broadcasting agencies. This decision forges consensus in who should lead these vital entities and protects their directors from arbitrary removal." *Id.* ¶ 85.
- "Congress deliberately safeguarded the VOA head's position, recognizing that VOA's mission—to provide a 'consistently reliable and authoritative' news source . . . could make it a target for those who oppose its journalistic content and mission." *Id.* ¶ 86.
- Placing Abramowitz on administrative leave "deprived Plaintiff Michael Abramowitz of his ability to continue directing . . . VOA." *Id.* ¶ 90.

These allegations placed the defendants on fair notice that Abramowitz's challenge to the actions taken in response to Executive Order 14,238 included a challenge to his placement on administrative leave. Such allegations were not so "vague or ambiguous" that the defendants would be unable to infer that Abramowitz would dispute his formal removal (if it violated statutory requirements) for the same reason. *Adm'rs of the Tulane Educ. Fund v. Ipsen Pharma SAS*, 771 F. Supp. 2d 32, 42 (D.D.C. 2011) (quoting Fed. R. Civ. P. 12(e)).

It is true, of course, that the most the Complaint says about Abramowitz's potential removal is related to his placement on administrative leave, since that was the extent of USAGM's conduct at that time. But that does not foreclose seeking partial summary judgment based, in part, on post-pleading factual developments. *See Farmer v. Brennan*, 511 U.S. 825, 846 & n.9 (1994) (permitting a plaintiff, at summary judgment, to "rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the [plaintiff] is not entitled to an injunction"). If Abramowitz sought relief on a "categorically distinct" factual or legal theory, he would perhaps be obligated to file a supplemental pleading. *See Taylor*, 892 F. Supp. 2d at 137. But here, the core factual and legal predicate undergirding the Complaint is materially identical to what he now presses on summary judgment.

*Second*, Abramowitz seeks partial summary judgment on precisely the same causes of action that he raises in the Complaint. Specifically, Abramowitz moves for partial judgment on Count IV, alleging USAGM has acted *ultra vires*, or alternatively on Count I, which seeks relief under the APA. The fact that he is not attempting to present a new cause of action or legal theory makes this case unlike those cited in the defendants' opposition, where the plaintiff sought to survive summary judgment under a *separate* statutory provision than the provision cited in his Complaint. *Cf., e.g., id.* at 137 (granting summary judgment to the defendants because the plaintiff opposed summary judgment on hostile-work-environment grounds but had only pleaded a claim under "the anti-retaliation provision of Title VII"). The Complaint gave the defendants notice of what Abramowitz's "claim is and the grounds upon which it rests," so their Rule 8(a) challenge must fail. *Ipsen Pharma*, 771 F. Supp. 2d at 42 (citation omitted).

### d. The removal of Abramowitz is plainly contrary to law.

The foregoing brings the Court to the merits of Abramowitz's claim. Abramowitz asks for judgment on either Count I, which seeks relief under the APA, or Count IV, which seeks *ultra vires* relief. Because the Court concludes that relief is available under the APA, *ultra vires* relief is not. *See Fed. Express Corp. v. U.S. Dep't of Comm.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (explaining that *ultra vires* relief is available only where "there is no alternative procedure for review of the statutory claim" (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009))).

The APA only allows courts to review "final agency action." 5 U.S.C. § 704. To constitute final agency action, the action must mark the consummation of the agency's decisionmaking process" and it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation and

internal quotation marks omitted). Courts "are to apply the finality requirement in a 'flexible' and 'pragmatic' way." *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986) (citation omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (observing that the Supreme Court has "long taken" a "'pragmatic' approach . . . to finality" (citation omitted)). The actions taken by USAGM to date readily meet this standard.

*First*, for the reasons discussed in the ripeness analysis *supra*, the Reassignment Memo constituted the "consummation of the agency's decisionmaking process." Recall that in the Removal Letter, USAGM leadership characterized the Reassignment Memo as "stat[ing] in no uncertain terms that, should [Abramowitz] decline to accept the reassignment, [he] would be subject to removal," Removal Letter at 2, and that "there is no other adequate or alternative sanction" for Abramowitz's failure to accept the reassignment but to remove him, *id.* at 5. Abramowitz's *removal* from the position of Voice of America director was effectuated in the Reassignment Memo, which instructed him that he could accept reassignment to a position *other than* VOA director or face termination from the agency. Abramowitz faced two doors, yet no matter which door he chose, he would be removed from his position. The Court takes the agency at its word that its decisionmaking has concluded and that its mind has been made up—for some time now.

*Second*, concrete legal consequences follow from the actions the agency has already taken. Although the formal removal of Abramowitz has yet to occur, as this Court has previously explained, "*final* does not mean *permanent*." *Widakuswara*, 779 F. Supp. 3d at 32. The defendants' own representations, in and out of court, indicate that they have already effectively removed Abramowitz from his role as director. The defendants admit that they have reassigned "the responsibilities of the Director position" to another USAGM employee. Opp. at 7; *see also*

Rough Tr. at 28:14–17 (defense counsel explaining that "the former head of the Persia division" is performing the functions of the director). They also have referred to Abramowitz in other filings as "the *former* Director of Voice of America." ECF No. 58, at 1 (emphasis added). And Defendant Lake, in an August 11, 2025 post on the social-media platform X, referred to Abramowitz as the "Former VOA director."[3] The agency's actions have defrocked Abramowitz in all but title and salary. *Ciba-Geigy Corp.*, 801 F.2d at 436 (explaining that agency action bears the "indicia of finality" if it carries "direct and immediate" consequences "on the day-to-day business of the parties challenging the action" (citation and internal quotation marks omitted)).

Final agency action violates the APA if it is "not in accordance with law," 5 U.S.C. § 706(2)(A), by "fail[ing] to meet statutory, procedural, or constitutional requirements," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971). The applicable statutory requirements could not be clearer: the director of Voice of America "may only be . . . removed if such action has been approved by a majority vote of the [International Broadcasting] Advisory Board," 22 U.S.C. § 6205(e)(1), or if a five-member majority of the Board "unilaterally remove[s]" him after "consulting with the Chief Executive Officer," *id.* § 6205(e)(2). The defendants do not even feign that their efforts to remove Abramowitz comply with that statutory requirement. How could they, when the Board has been without a quorum since January? The Court thus concludes that their actions violate § 706(2)(A) of the APA.

The defendants make just one argument in their own defense on the merits, inviting the Court to declare § 6205(e)(1) unconstitutional on the ground that it "unlawfully impedes the removal authority contemplated in Article II." Opp. at 16. Abramowitz replies that the removal

---

[3] Kari Lake (@KariLake), X (Aug. 11, 2025, 12:05 PM), *available at* https://perma.cc/85JM-LQPB. The Court takes judicial review of this post, as its authenticity "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *United States v. Flynn*, 507 F. Supp. 3d 116, 126 n.6 (D.D.C. 2020) (quoting Fed. R. Evid. 201(b)(2)).

structure is permissible because Abramowitz can be fired for any reason by the Board and by the CEO, who in turn are removable without cause by the President. Abramowitz has the stronger argument for several reasons.

*First*, the defendants argue incorrectly that that Board-approval requirement is akin to a removal restriction of the ilk usually addressed in removal-power jurisprudence. That is simply not so. Most such cases involve statutory restrictions that limit the *substantive* grounds on which the President or the heads of departments can remove an officer under variations of a "good cause" standard. *Morrison v. Olson*, 487 U.S. 654, 691 (1988) (independent counsels); *see, e.g., Free Enterprise Fund*, 561 U.S. at 485–86 (under Sarbanes-Oxley Act, Public Company Accounting Oversight Board (PCAOB) members could only be fired by SEC "for good cause shown," after findings "on the record" and "after notice and opportunity for a hearing" demonstrating violations of the law or abuse of office); *Humphrey's Executor v. United States*, 295 U.S. 602, 620 (1935) (FTC Commissioners may only be removed by the President for "inefficiency, neglect of duty, or malfeasance in office"); *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 206–07 (2020) (same, for CFPB director under the Dodd-Frank Act as originally enacted). Unlike those cases, the laws governing Voice of America do not impose *any* substantive limitation on the grounds for which the director may be fired. Nor are the principal officers tasked with the director's appointment and removal—the CEO of USAGM and the members of the Board—subject to statutory removal protections. To the contrary, all are removable at will—and *have* been removed—by the President himself. Abramowitz is subject to removal for any reason, including for no reason at all, by executive officers who report directly to the President. He is removable without cause.

*Second*, to the extent the Court agrees with the defendants that diffusing the removal power among two government entities[4] fashions an extra step in the removal of a VOA director, which under the right circumstances could cause a road bump in the removal process. Clearly, if the President wanted to fire Abramowitz, and the USAGM CEO or a majority of the Board *disagreed*, then the President would need to remove and replace some or all of those supervisors to effectively remove the director. *See Seila L.*, 591 U.S. at 204 (explaining that in practice, the President's ability to "supervise" the Executive Branch derives from the "power to remove").

Yet binding precedent indicates that the inconveniences of replacing supervisors in the course of firing an inferior officer does not violate the separation of powers. *Au contraire*, the Supreme Court approved the constitutionality of an even more burdensome arrangement in *Free Enterprise Fund*. The merits question in that case involved a challenge to the structure of the PCAOB, whose members could be removed by the SEC upon finding that termination was supported by "good cause" and after making specific findings on the record. 561 U.S. at 486. Because SEC commissioners *also* enjoyed tenure protection—the President can remove SEC commissioners only for "inefficiency, neglect of duty, or malfeasance in office"—the Court had no difficulty finding that, by erecting "two levels of protection from removal [by the President] for those who nonetheless exercise significant executive power," the PCAOB structure violated the separation of powers. *Id.* at 487, 514. But it is what the Court did next that defeats the defendants' argument: the Court severed the PCAOB removal protections, leaving them "removable by the Commission at will," while leaving the SEC Commissioners' removal protections intact. *Id.* at 509. In other words, to fire a member of the PCAOB over the objection of the SEC, the President

---

[4] Recall that USAGM and the Board are *separate* "independent establishment[s]" under 5 U.S.C. § 104. *See* 22 U.S.C. § 6203(a); *id.* § 6205(a).

21

would need to fire and replace some number of the SEC's commissioners—subject to senatorial advice and consent and for-cause removal protection. It held that such an arrangement "d[id] not violate the separation of powers." *Id.* at 508. And the same conclusion is even stronger here, since Abramowitz's supervisors, unlike the SEC, are removable at will. To the extent the Board's current lack of quorum institutes a practical barrier to removing Abramowitz, the Broadcast Act gives the President a straightforward remedy: replacing the removed members. *See* 22 U.S.C. § 6205(b)(5)(A) ("The President shall appoint, with the advice and consent of the Senate, additional members to fill vacancies on the Advisory Board occurring before the expiration of a term.").

### e. A permanent injunction is appropriate.

To obtain permanent injunctive relief, a movant must show "(1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (citation omitted).

The core injury Abramowitz alleges is that "he is unable to carry out his duties as Director of VOA." Compl. ¶ 87. Impairing "a statutory right to function in a high-ranking public office" is a cognizable harm. *See Aviel v. Gor*, No. 25-cv-778-LLA, 2025 WL 2374618, at *16 (D.D.C. Aug. 14, 2025) (collecting cases). For the substantially the same reasons discussed in the prudential ripeness analysis *supra*, cases analyzing comparative injuries to the parties on applications for stays pending appeal do not provide a useful analog for the Court's ruling in the present posture. On a request for a permanent injunction, the merits are decided, and there is no

longer a question of whether the termination was unlawful. "[H]arms [that] 'cannot be fully compensated by later damages,'" like the statutory right to lead VOA, "are irreparable." *See Susman Godfrey LLP v. Exec. Off. of the President*, No. 25-cv-1107-LLA, 2025 WL 1779830, at *24 (D.D.C. June 27, 2025) (citation omitted). And the Court concludes that the balance of equities and public interest are "essentially derivative of the parties' arguments on the merits of the case," so these factors "weigh in favor of" Abramowitz. *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 83 (D.D.C. 2013), *judgment reinstated*, 760 F.3d 18 (D.C. Cir. 2014).[5]

## IV.    CONCLUSION

Based on the foregoing, the Court will **GRANT** the Motion for Partial Summary Judgment on Count I by separate order.

Date: _____ *1-28-25*

_____
Royce C. Lamberth
United States District Judge

---

[5] Defendants raise one last argument, which is that the Court lacks jurisdiction to enjoin the government from firing an executive branch official, even in a permanent injunction posture. *See* Opp. at 20–21 ("The government is likely to succeed on its remedial challenge because the injunctive relief concocted by the district court is wholly unprecedented and transgresses historical limits on our equitable authority." (quoting *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *4 (D.C. Cir. Apr. 7, 2025) (Rao, J., dissenting))). But as Abramowitz points out, the dissent on which the defendants rely is, by its nature, not the current state of the law. *See Harris*, 2025 WL 1021435, at *2 (en banc) ("The government likewise has not shown a strong likelihood of success on the merits of its claim that there is no available remedy for Harris or Wilcox."); *Aviel v. Gor*, No. 25-5105, 2025 WL 1600446, at *2 (D.C. Cir. June 5, 2025) (Kastas, J., concurring) (deferring to the en banc D.C. Circuit's ruling that "the government [was] unlikely to succeed in its contention that reinstatement is rarely if ever an available remedy for unlawfully removed officials").