BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL ABRAMOWITZ, et al.,

Plaintiffs,

vs. . Case Number 25-cv-887

KARI LAKE, et al.,

Defendants. . Washington, D.C.

August 25, 2025
11:03 a.m.

PATSY WIDAKUSWARA, et al.,

Plaintiffs,

vs. . Case Number 25-cv-1015

KARI LAKE, et al.,

Defendants.

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Abramowitz Plaintiffs: WILLIAM SCHULTZ, ESQ.
BRIAN BEATON, JR., ESQ.
Zuckerman Spaeder LLP
2100 L Street Northwest
Washington, D.C. 20037

-- continued --

APPEARANCES (CONTINUED):

For the Widakuswara Plaintiffs:

GEORGINA YEOMANS, ESQ.
MATTHEW BLUMIN, ESQ.
American Federation of State, County and Municipal Employees
1625 L Street Northwest
Washington, D.C. 20036

DAVID SEIDE, ESQ.
Government Accountability Project
1612 K Street Northwest
Suite 1100
Washington, D.C. 20006

For the Defendants:

ABIGAIL STOUT, ESQ.
MICHAEL VELCHIK, ESQ.
United States Department of Justice
950 Pennsylvania Avenue Northwest
Washington, D.C. 20530

Official Court Reporter:

SARA A. WICK, RPR, CRR
333 Constitution Avenue Northwest
Room 4704-B
Washington, D.C. 20001
202-354-3284

Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY: We are on the record in Civil Case 25-887, Michael Abramowitz, et al., versus Kari Lake, et al., and Civil Case 25-1015, Patsy Widakuswara, et al., versus Kari Lake, et al.

Starting with plaintiffs' counsel, please approach the podium and state your appearance for the record.

MR. SCHULTZ: William Schultz for the Abramowitz plaintiffs.

MS. YEOMANS: Good morning, Your Honor. Georgina Yeomans for the Widakuswara plaintiffs, and I'm joined by my colleagues Matthew Blumin and David Seide.

THE COURT: Good morning.

MR. SEIDE: Good morning.

MS. STOUT: Good morning, Your Honor. Abigail Stout for defendants, and I'm joined by my co-counsel Michael Velchik.

THE COURT: Okay. Good morning.

I want to start with the -- I guess the Abramowitz case first, because Mr. Schultz has an obligation to be away at some point early. We may be finished by the point he has to leave anyway, but we will do Abramowitz first, and then we will come back, and if we haven't finished by the time he has to leave, we will do the other case. But we will first hear the whole summary judgment issue on Mr. Abramowitz and do that total

hearing first, and then we will come back and do the Order to Show Cause, but let's just do summary judgment first.

MR. SCHULTZ: Thank you, Your Honor. And I should have introduced my colleague, Brian Beaton.

And I was hoping to leave at 2:00. So hopefully, that is plenty of time.

THE COURT: Hopefully, we will finish by 2:00, even if we take a recess for lunch.

MR. SCHULTZ: I can make other arrangements, if I need to.

May it please the Court. Plaintiff Michael Abramowitz was appointed director of Voice of America in April of 2024. He was appointed by the CEO of the U.S. Agency on Global Media, but also by the International Broadcasting Advisory Board. That's because under Section 6205(e) of the International Broadcasting Act, the director of VoA and other networks, and I'm quoting here, "may only be appointed or removed if such action has been approved by a majority of the International Broadcasting Advisory Board." This provision is central to the motion before the Court today.

The history of Section 6205(e) shows that Congress adopted this provision because it was concerned about the politicization of the networks just five years ago. In June of 2020, Michael Pack, the new CEO of USAGM, fired several network heads. Congress had a very strong reaction. A

bipartisan group of senators sent a letter signed by then Senator Marco Rubio and Senator Lindsey Graham, among others, strongly objecting to this action.

And subsequently, Congress passed a law which empowered the bipartisan board, the bipartisan advisory board, to protect against politicalization of the director of VoA and other networks. The vote was overwhelming: 81 to 13 in the Senate, 322 to 87 in the House.

And yet, on July 8 of this year, Victor Morales, then the acting CEO of USAGM, sent plaintiff Abramowitz a letter which stated that, and I quote, "you will be reassigned from your current position of director of VoA," closed quote, to a position in North Carolina. Abramowitz was given until July 29 to respond.

But the letter said if he declined, he would be subject to removal. In other words, plaintiff Abramowitz was being removed from his position as director of VoA whether he accepted the reassignment or not.

On July 29, Mr. Abramowitz responded, and he stated that he could only be removed with approval of the advisory board. And then on August 1, he received a second letter from Morales stating that, quote, "removal is the most effective course of action for Abramowitz's," quote, "failure to accept a directed geographic reassignment." The letter said the decision would be finalized no sooner than 30 days later, and that pushes us to

Sunday, August 31.

The action that defendants have taken to fire Director Abramowitz is directly contrary to Section 6205 of the International Broadcasting Act. And in fact, on June 3rd, defendant Lake told this to Congress. She said to Congress the head of Voice of America, quote, "may only be appointed or removed by majority vote of the advisory board."

Now, the defendants don't contest the facts --

THE COURT: Even at that time, she had to know that there were no members of that board.

MR. SCHULTZ: She must have known that.

THE COURT: I didn't know that, and the Court was never informed of that, as far as I know. The president had fired them all when he took office and never appointed anyone.

MR. SCHULTZ: Yes. Shortly after he took office, he fired all of the members of the board. So the only member of the board today, there's a single member, which is Secretary of State Rubio is automatically a member.

And it's a nonpartisan board. It was half Republicans and half Democrats.

THE COURT: By statute, this director cannot be fired except with the concurrence of that board by statute.

MR. SCHULTZ: That's correct; that's exactly correct.

THE COURT: Director Lake is purporting to fire without the statute being followed?

MR. SCHULTZ: That's correct; that is exactly correct. And the defendants don't deny that they're not following the law.

Instead, what they do is they --

THE COURT: So why does the Civil Service Reform Act have anything to do with it?

MR. SCHULTZ: Well, that's our position as well, and let me address that.

As the Court knows, the Civil Service Reform Act says that routine employment disputes, typical employment disputes go through a process, through the Merit Systems Protection Board. And so for example, if Abramowitz were objecting to his transfer, that's the kind of matter that could go before the Merit Systems Protection Board.

But while it's clear that those matters go, the Supreme Court has recognized in the *Thunder Basin* case that not all matters are channeled to the Merit Systems Protection Board. And it is said that a case will not be channeled if channeling would thwart the will of Congress.

So you look to see what would Congress have wanted in this situation. And we would submit that it couldn't be clearer that channeling here to the Merit Systems Protection Board would effectively nullify 6205(e). It would nullify an act of Congress requiring that the advisory board be the one to remove the director of VoA.

In fact, as I said before but I think it's worth saying again, in 2020, Congress empowered the advisory board to approve these removals totally solely to insulate the director of VoA from the political interference from above, such as by being fired by the -- and I don't mean this pejoratively, but politically appointed director of USAGM.

That's the way the system was set up. The director is politically appointed, but Congress said we're going to protect the director of VoA from being fired by also requiring approval of a nonpartisan advisory board.

THE COURT: And in fact, Secretary Rubio, as a senator, was one of those who wanted the system set up that way.

MR. SCHULTZ: He was in the lead; he was one of the ones in the lead and most concerned about the politicization. And so he and 81 other senators supported a statute that was intended to guard against it.

And we would say this does exactly the opposite. If you send it to the Merit Systems Protection Board, it will do the opposite. And that's because the Merit Systems Protection Board takes time.

THE COURT: Lots of people who are senators who have different views once they get into the Executive Branch. I understand that.

MR. SCHULTZ: What's that? I'm sorry.

THE COURT: Lots of people who are senators have

different views once they get into the Executive Branch. I understand that.

MR. SCHULTZ: Yeah. Well, we don't know what Secretary of State Rubio's view is, but yes, it's a different situation when you're in the Executive Branch.

But the Court has identified three factors that can be looked at to see whether -- what the congressional intent is. But I want to stress the whole effort here is, did Congress intend this, is this contrary to the congressional intent.

And one is whether the employee can get meaningful judicial review. And here, because of the situation at the Merit Systems Protection Board, I think the answer is absolutely no. I mean, they are inundated with cases. They also have been removed, and so they're in jeopardy. And it's unclear when -- I mean, it could be months, it could be years before they could even do anything. So he certainly can't get meaningful review there.

The second issue is, is the claim totally collateral. Well, we think it is. I mean, they look at employment issues. This is a constitutional issue, and they can't remedy the constitutional violation.

And then the third is expertise. And again, they don't have the expertise to decide constitutional issues.

So we think that it's very clear, if you look at the intent of Congress, which is what the Supreme Court and the D.C. Circuit in cases has said you must do, that this case belongs in

this court. It's this court that should actually decide it.

Now, the defendants make an argument about ripeness. I won't dwell on that long. The cases are very clear. If the injury is imminent or threatened, it's ripe. There are lots of cases I could talk about where courts have said things aren't ripe, but they're very, very different. Here, it's been made quite clear what's going to happen to Director Abramowitz if the court doesn't intervene.

In fact, as we pointed in our brief, the defendants in their papers have referred to him as the former director. Defendant Lake has referred to him as the former director. It's really very clear what the plan is. And so there shouldn't be any ripeness issue.

The defendants also make an appointments clause argument.

THE COURT: Sorry?

MR. SCHULTZ: Appointments clause argument. And I would like to address that. And I want to start with the appointments clause --

THE COURT: Before you get to that, let me ask you one other question. Do you know any other agencies that have any similar removal instructions, like having this board or anything like that? Is there some other agency that has a similar structure to this?

MR. SCHULTZ: The closest one I know of -- and it's not a board but I think it's similar, because it is not typical

for an employee to work in one agency, so he would be working under the CEO of the U.S. Agency for Global Media, and yet another agency would have the authority -- has to sign off on his appointment and removal.

But I don't think it's so different from the situation in *Morrison v. Olson*. So that was the independent counsel case in the Supreme Court. And there, the structure Congress set up was that a committee of the judiciary would appoint the independent counsel, who would have protections, but he could only be removed by the attorney general for good cause.

So you have the independent counsel working in the Justice Department but being appointed by a separate agency. So it's not -- I don't think it's so far different from that. But it's not a typical structure, but it's one Congress said was needed to protect against the politicalization of Voice of America. And I think this case shows it was, frankly.

So the appointments clause says, "Congress by law may vest the appointment of such inferior officers" -- and we think Abramowitz is an inferior officer, and the government does, too -- "as they think proper, in the president alone, in courts of law, or in heads of departments."

So let's focus a minute on "heads of departments." I think it's critical. When you read this, if the appointment -- and everyone agrees that it's removal as well -- is in the head of a department, then the president can't actually remove the

inferior officer. The head of the department has to do it.

Now, he can remove the head of the department if he doesn't -- if he instructs him to and he doesn't follow it. But it's the head of the department that has the authority.

And here, the International Broadcasting Advisory Board is a separate department. So we really have two departments involved here. One is the U.S. Agency for Global Media. The other is the International Broadcasting Advisory Board. And what Congress has said is in this case, to protect against this politicalization, they gave the advisory board, the head of that department, removal authority. And we think that is just absolutely consistent with the appointments clause.

Now, if -- but even if you don't view the advisory board as a department, we think it's still consistent. If it's not a department, then it really should be reviewed as a restriction on the authority of the CEO of the U.S. Agency of Global Media. The acting CEO is defendant Lake.

And just like Congress can say an inferior officer can only be removed for good cause -- that's what it said for the independent counsel, for example -- Congress can say the inferior officer can only be removed by a vote of the advisory board.

Again, I think *Morrison* is very relevant for the reasons that I said. Now, in *Morrison* -- and the government relies on this, so let me spend a minute on it. In *Morrison*, the Court

said that the independent counsel did not have a policy-making role. And Abramowitz does have a policy-making role. And so they take that statement, and they say well, there can be restrictions on inferior officers if they don't have a policy-making role but that doesn't apply here.

The problem with that argument is the discussion of the lack of a policy-making role of the inferior officer in *Morrison* was totally in the context of deciding whether the independent counsel was a principal officer or an inferior officer. And the Court looked at what the independent counsel does and said he's not like the typical person that runs an agency that has big administrative responsibilities and policy-making responsibilities, and so he is an inferior officer. They never said or really addressed the question of whether an inferior officer with policy-making responsibility could have restrictions, and we don't know of any situation where the Supreme Court has ever said that.

Now, there are two other cases I just would like to mention that the defendants rely on, because they don't apply either.

The first is *Seila Law*. This is the case about whether Congress can place removal restrictions on the head of the Consumer Financial Protection Board. And what the Court said was because it was a single head -- it wasn't like the Federal Trade Commission and *Humphrey's Executor* that had joint responsibility. It was a single head. The Court said

restrictions could not be placed on him.

But that case is about principal officers. It's not about inferior officers. He was a principal officer, and the government lost that case, but it wasn't about what's here.

And the other case that the government cites is *Free Enterprise Fund*, also a Supreme Court case. And that was a case where an inferior officer sort of had double protection from presidential firing. So that was the Security and Exchange Commission. Commissioners are presidentially appointed. Their principal officers are confirmed by the Senate, and they can only be removed for cause.

And then Congress set up the Public Accounting and Oversight Board, but this was a board of inferior officers, and it said they could be appointed and removed by the SEC, but they could only be removed for cause. And the Court said that was too much, you can't have two layers of protection.

But that's not what we're talking about here. Here, the CEO of USAGM can be removed for cause, and we're talking about a single protection of Abramowitz. So it wasn't addressed in that case either.

That concludes my argument, unless the Court has further questions.

I know you are aware of this, but I just want to emphasize that they have given sort of a deadline of August 31. After that, they've said that they're free to sort of carry out their

plan.

THE COURT: I understand. I expect to act promptly.

MR. SCHULTZ: Thank you very much.

THE COURT: Ms. Stout? It's a pleasure to see you, as always.

MS. STOUT: Good morning, Your Honor. Great to see you again.

Your Honor, at the heart of this motion is an individual employee challenging an individual employment decision. Plaintiffs argue that the employment decision may implicate a statute, but that doesn't change the fact that this dispute is over Mr. Abramowitz's reassignment and proposed removal, definitively personnel and employment decisions.

The Court should decline to let plaintiffs do an end run around the Civil Service Reform Act, the CSRA, by challenging an employment decision via the APA or an ultra vires claim.

Now, there are several reasons why the Court should deny the plaintiffs' motion. You heard my friend on the other side talk a lot about the constitutional issue at play. But the Court can deny the motion for several independent reasons and not even have to get to the constitutional question.

And I will touch on three points at today's hearing: First, plaintiffs' summary judgment motion is procedurally improper; second, the Court lacks jurisdiction over Mr. Abramowitz's dispute; and third, to the merits, the statute,

which requires a majority vote of the International Broadcasting Advisory Board for removal, presents an improper removal impediment under Article II.

Now, I want to begin with the procedurally improper point. And as a little bit of background here, if you will remember, plaintiffs filed their complaint back in March, their initial complaint. And then plaintiffs filed their motion for partial summary judgment this month, or in July. The events that happened that are the subject of this motion took place in July and then August.

Back in March, when plaintiffs filed their complaint, what was at issue was Mr. Abramowitz being on administrative leave. Now what's at issue is his proposed reassignment and proposed removal.

These two are totally different sets of facts with totally different arguments implicated by each. Both parties cited Rule 8 in their briefs, and this is significant, because the purpose behind Rule 8 is to provide notice to defendants.

Here, plaintiffs -- defendants were not put on notice of plaintiffs' claims about reassignment and removal because those just hadn't happened yet at the time when they filed their initial complaint in March.

And this isn't some kind of pro forma, you know, procedure for the sake of procedure argument. It has real costs for defendants. Here, plaintiffs jump into summary judgment without

giving plaintiffs notice via complaint, meaning that defendants have lost out on the chance to file a motion for summary judgment. Indeed, we did file a motion for summary judgment in this case and did not address any of this, because plaintiffs' motion for partial summary judgment came afterwards.

And although here at the hearing and in plaintiffs' motion for partial summary judgment you will hear a lot about Mr. Abramowitz's individual employment claims, the rest of this case looks a little bit different than that. Indeed, plaintiffs over and over, aside from this motion, have argued that this case is not about individual personnel actions but in fact that this is about a larger -- the larger alleged dismantling of the Voice of America or decisions that are made in connection to Voice of America, not independent employment actions.

Just by way of example, in response to our motion to dismiss -- this is Docket 63, ECF page 24 -- plaintiffs state that this case is emphatically not about placement on administrative leave. It is about USAGM's responsibility to adhere to the law and operate via a way in the manner Congress prescribed.

So basically, plaintiffs in their motion to dismiss response, which is premised on the complaint filing, is saying that this is not about personnel actions, this is not about reassignment, but then in their motion for summary judgment, they're saying that this is about personnel actions and

defendants should have been on notice.

Generally alleging employment disputes in one's complaint is not enough to cover all employment disputes that could happen in the future. And so for that initial reason, we submit that Your Honor can deny the motion for partial summary judgment on that basis alone as being premature.

Next, I want to move on to the jurisdictional argument that you had a conversation with my friend on the other side about, and this is about the CSRA. And this is the comprehensive statutory scheme that Congress passed to basically touch on and handle all employment disputes. And I know Your Honor is very familiar with this issue, as it's been a common theme throughout this case for many months now.

So I want to address it in the light of a recent D.C. Circuit opinion that just came out on August 15, just a mere week or two ago. And this is the *National Treasury Employees Union v. Vought* case, Number 25-5091. And there, the D.C. Circuit, just as recently as two weeks ago, addressed the importance of the CSRA. They talked about the *Thunder Basin* factors that my friend on the other side was talking about, and they said that right now currently, the state of the law, the Supreme Court and the D.C. Circuit, is that the CSRA is the exclusive remedial scheme for employment disputes. They've said over and over again that the CSRA regulates, quote, "virtually every aspect of the federal government and is the exclusive

review mechanism for federal employment disputes." They also said, quote, "The CSRA provides the exclusive means for federal employees to obtain judicial review of adverse personnel actions, even in circumstances where, unlike here, the CSRA itself forecloses review."

So it also looked at the factors that Mr. Schultz walked through. First, is preclusive intent fairly discernible from the statutory scheme? And second, whether claims are the type that Congress intended to be reviewed within the special scheme.

And the first factor about preclusive intent being fairly discernible from the statutory scheme, the Supreme Court and the D.C. Circuit have been clear. The CSRA, by its structure, by the way Congress laid it out, it is intended to be the remedial scheme for employment disputes.

My friend on the other side focuses on congressional intent of 6205(e), the statute that talks about the International Broadcasting Board requiring approval, but that's not the relevant statute to look at when you're looking at congressional intent. Rather, you're looking at the CSRA. That's the relevant statutory scheme that you're looking at to determine whether judicial review is meant to be precluded.

And here, in Supreme Court cases like *Elgin*, *Faust*, and most recently the D.C. Circuit within the last couple of weeks have said yes.

Moving on to the three factors that my friend on the other

side discussed, this is the question of whether the claim will fall outside the scope of this exclusive review scheme. The first one is whether preclusion might foreclose all meaningful judicial review.

Here, it is clear. The judicial review will not be precluded by Mr. Abramowitz's removal claim going through the MSPB. The MSPB can grant reinstatement. It can grant back pay. And it can grant attorney's fees. Basically, all of the relief that Mr. Abramowitz is looking for here before this district court, the MSPB can grant. And, if Mr. Abramowitz --

THE COURT: It can't grant reinstatement?

MS. STOUT: The MSPB is able to grant reinstatement, Your Honor.

THE COURT: Is that right?

MS. STOUT: Yes, Your Honor. The D.C. Circuit in the *National Treasury Employees Union v. Vought* case also discusses that and says that the MSPB can grant reinstatement, back pay, and attorney's fees.

THE COURT: Okay.

MS. STOUT: And if Mr. Abramowitz is unhappy with the MSPB, then Mr. Abramowitz can appeal to the federal circuit.

THE COURT: I know he can do that, yeah.

MS. STOUT: So he can get federal -- review in a federal court.

Plaintiffs' only argument on this point is that it will

take a long time. But the D.C. Circuit two weeks ago dismissed that and said that it's still the proper forum.

The second point, the second factor, is that the claims are wholly collateral to the statutory review provisions. Now, claims that seek to reverse removal decisions are not wholly collateral to the CSRA. In fact, it's the heartland of the CSRA. *Elgin*, the Supreme Court case, said that "a challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the federal circuit within the CSRA scheme." That's a direct quote.

Plaintiffs argue that this is a constitutional issue, not an employment issue, so it shouldn't go through the scheme. But in *Elgin*, the Supreme Court made clear that just because a constitutional issue is implicated doesn't mean that it falls outside of the scheme.

In fact, the plaintiff in *Elgin*, that was his whole challenge, that the statute precluded -- he was wrongfully terminated because the statute was unconstitutional, and the Court held that the CSRA was still the appropriate forum for his claim.

Finally, and this is a little related to the second factor, whether the claims are beyond the expertise of the agency. Now, the claims seek redress for allegedly unlawful terminations. And this is again the heartland of the CSRA. As mentioned in *Elgin*, this is the very type of -- in *Elgin*, when statutory or

constitutional claims are brought by plaintiffs, that didn't make them fall outside of the CSRA.

So unless Your Honor has questions on that, I will turn finally to the merits and the constitutional argument.

So on the merits, 6205(e), the statute that talks about the advisory board requiring a majority vote in order to effectuate a removal of the Voice of America director, I think it's helpful to step back and look at the removal jurisprudence kind of from a bird's eye view to see really what the heart and the rationale behind the removal jurisprudence is.

And I think it's significant the general rule is at-will removal. The Supreme Court has made this very clear in recent months even. Under Article II, "Inferior executive officers must be removable at will by the president or by a department head acting on the president's behalf." So that's the general rule.

Now, there's one narrow exception to that rule for inferior officers. Plaintiffs and the government both agree that principal officers in *Humphrey's Executor* is not at issue here. And that is the *Morrison* exception that we've been talking about this morning.

Your Honor, that exception extends at most to certain domestic inferior officers with, quote, limited duties and no policy-making or administrative authority.

And I put that last part in quotes, "with limited duties

and no policy-making or administrative authority," because that's not the government's position on what this exception states. That comes directly from the Supreme Court in *Seila Law* when it was recounting the removal jurisprudence and what the exceptions were to the general at-will removal rule. That was the exception, the *Morrison* exception, how they articulated it.

So because I hear plaintiffs not disagree with us that the Voice of America director does exercise significant policy-making authority, the Voice of America director simply falls outside of this exception.

And I think that I heard a lot of, you know, explanation and well, maybe, you know, the board is a separate department, and, you know, two departments -- approval by two departments are okay to effectuate a removal; even though it's never been done before, that doesn't seem like it's inconsistent with the Constitution, so it must be right.

But if we look at it with the backdrop of the Supreme Court saying that the general rule is at-will removal and then there's only one narrow exception for inferior officers, then it becomes evident why the legal gymnastics that plaintiffs try to do to justify the statutory scheme under the International Broadcasting Act just doesn't work.

THE COURT: So you're saying that that provision is unconstitutional that the plaintiffs are relying on?

MS. STOUT: Yes, Your Honor.

THE COURT: That's how you win the case --

MS. STOUT: Yes, Your Honor.

THE COURT: -- if I would find it's unconstitutional?

MS. STOUT: Yes, Your Honor. Well, we would submit that first you could say that it's the procedurally improper, you lack jurisdiction to decide the issue. But if you reach the merits, then our position is that this statute is unconstitutional. And it's unconstitutional for the reasons we stated, that it doesn't fall outside the narrow *Morrison* exception.

THE COURT: Right.

MS. STOUT: So I just want to end by addressing some of plaintiffs' arguments of why they think that it is constitutional.

THE COURT: Okay.

MS. STOUT: So first, the advisory board being a -- they argue that the advisory board is a separate department in that it is constitutionally permissible for two departments to have authority and be involved in the removal of an inferior officer, and I just wanted to point out a few hurdles to plaintiffs' position there.

First, the Court would have to find that the advisory board is a department to begin with, a tall task, considering that it is an advisory board by name and the statutory duties that it has aligned with that.

Second, the Court would have to create a new constitutional exception that basically said two separate entities, USAGM and the advisory board, them both acquiescing to removal or requiring approval for removal is another constitutional exception and not an unlawful removal impediment.

Finally, I wanted to address some of plaintiffs' discussion about kind of the congressional history and the purpose behind this particular provision. And I think that it's telling and also goes to the heart of what the removal jurisprudence is all about.

I heard my friend on the other side talk a lot about this statute was passed specifically to insulate the Voice of America director from political pressure or from political influence. And that actually runs directly counter to all of the removal jurisprudence that the Supreme Court has discussed. When the Supreme Court talks about the reason why statute after statute they found is unconstitutional, it's because there is lack of political accountability and a lack of -- or the presence of insulation between the president and the principal officer of the United States.

*Seila Law* has a real good line on this. It says people, the citizens of the United States, they don't vote for principal officers, or they don't vote for officers of the United States. They vote for the President of the United States, who then uses subordinates, because the president, one person, can't do the

job of the entire Executive Branch, so he has to rely on subordinates to carry out the mission and the function of the Executive Branch, which is a tall task.

But if there isn't that supervision that the president has over those subordinates, then there's not -- there's a breakdown of political accountability. The people who voted for the president, if they dislike something that a principal officer or an inferior officer does, there's no way for those citizens to be able to remediate that because the president is not able to, you know, have that political accountability and take action with the people carrying out the executive power which is vested in the president.

So I think if you read cases like *Free Enterprise Fund*, it talks a lot about the requirement and the heart of the political accountability being so important and the reason why these statutes have been found unconstitutional by the Supreme Court.

And recently in *Wilcox*, the Supreme Court has done the same thing. In *Boyle*, also in recent months, the Supreme Court has done the same thing.

And when viewed through that lens and also the lens of the general rule, it becomes clear that this Court should not create a new constitutional exception for removal here.

So I would just like to end with where I began, that this court can decide this motion on preliminary matters and doesn't have to reach the constitutional question. It lacks

jurisdiction. The motion is procedurally improper. But if it does reach the merits --

THE COURT: Well, isn't the problem the president fired the board here?

MS. STOUT: So that is a fact on the ground, but our position remains the same, that it is still an unconstitutional impediment to the removal.

THE COURT: Let me ask you a couple of questions.

Did the -- who is the acting CEO now? Ms. Lake says in her affidavit that she's no longer the special assistant or whatever. Her original title was --

MS. STOUT: Senior advisor.

THE COURT: -- senior advisor. Now she's what?

MS. STOUT: She's the acting CEO currently.

THE COURT: And then who is the CEO now? She's acting CEO of USAGM?

MS. STOUT: Yes, Your Honor.

THE COURT: And then who is the -- what is Morales now?

MS. STOUT: So he is not acting CEO. He was removed from that position. So he has reverted to his position before he became acting CEO.

THE COURT: Okay. And what is he? He's a defendant, but I don't know what his status is.

MS. STOUT: He is not acting CEO right now. I can

follow up and see what his current position is. He basically reverted to the role that he had before becoming acting CEO.

THE COURT: And is there a current senior advisor to the acting CEO? Because that's named a defendant, but I don't know how we substitute it on dockets what we're doing here.

MS. STOUT: I can run that down and see if there is a --

THE COURT: Okay. So I don't know. I guess the parties are still Lake and Morales. And there's a third or not?

MS. STOUT: The agency itself, USAGM.

THE COURT: Okay. Now, how did Morales become -- is he acting director, or is there an acting director of Voice of America, or what is that? He's acting director of -- well, what is Morales?

MS. STOUT: A bit of an overview, in case it's helpful. So victor Morales was the acting CEO back when this case started.

THE COURT: Of USAGM?

MS. STOUT: Of USAGM. Kari Lake at that time was senior advisor. Then she was deputy CEO and then recently became acting CEO when Mr. Morales was removed from the acting CEO position to go back to the position he was currently engaged in.

THE COURT: All right. Now, has the president ever named any nominees to the board?

MS. STOUT: I am not aware one way or the other whether a nominee has been named yet to the board.

THE COURT: All right. And is anyone performing the duties and functions of the director of Voice of America?

MS. STOUT: My understanding is the former head of the Persia division is currently the director of programming for Voice of America and performing a lot of the functions of the director.

THE COURT: So who is that?

MS. STOUT: I'm not sure of her name.

THE COURT: So because Abramowitz is on leave, someone is in effect the acting director of Voice of America?

MS. STOUT: She is performing a lot of those functions. I'm not sure if the official title has changed, because I think technically right now Mr. Abramowitz is still acting -- or director of VoA since he hasn't been removed from that position yet.

THE COURT: She's performing the duties, in effect.

MS. STOUT: Uh-huh, she's performing a lot of those duties.

THE COURT: And how did she get those duties?

MS. STOUT: She -- I'm not exactly sure the exact, you know, hiring decision or, you know, how she came to be the programming director, but all I know is she is performing, I think, a lot of those functions and duties.

THE COURT: On prudential ripeness, you mostly are talking about the hardship analysis, which we would do in a preliminary injunction. But since we're talking about the merits here, I don't know that any of that would matter. But I guess that really all goes more to the relate question.

MS. STOUT: And to that point, Your Honor, I think that maybe in the reply brief, there also was discussion about a final judgment in the cases cited being in a preliminary posture, but I just wanted to point out that both *Wilcox* and *Boyle* are both at summary judgment and final judgment postures, and obviously, the Supreme Court did not reinstate those employees.

THE COURT: Okay. I don't think I have any other questions right now. Let me hear from Mr. Schultz. Thank you, Ms. Stout.

MS. STOUT: Thank you, Your Honor.

MR. SCHULTZ: Thank you, Your Honor.

I believe I heard at the end of her argument Ms. Stout making the argument that the president ought to be able to fire any inferior officer. That was his prerogative.

And I would only say, that's directly contrary to the appointments clause in the Constitution, which says Congress can give that authority to the president, to the judiciary, or to a department. And if it's to a department, then that department head has to exercise the authority. The president cannot,

according to the constitution and, I would submit, according to all of the case law.

Let me address the issue about the complaint. As you know, the complaint is about the dismantling of Voice of America, but it's also about the placement of virtually all employees, including plaintiff Abramowitz, on administrative leave. It discusses -- and we recount this in our reply brief at pages 11 and 12. But the complaint discusses the role of the International Advisory Board in appointing the director in four separate paragraphs, and they're all recounted, I think, on page 11. And I won't go through them.

It also, in four other paragraphs recounted on page 12, references Abramowitz's statutory right or duty to serve as director of Voice of America. The relief in the complaint covers violations of the Administrative Procedure Act and prohibition of ultra vires acts by the Constitution.

In other words, the plaintiff brought this case to restore VoA. That includes restoring him as director, and firing him is an act that's at the center of what he complains about in his complaint. So even though this happened, obviously, after we filed the complaint, I think it's right in the center and covered by the complaint.

The defendants argue that by doing the partial motion for summary judgment, they can't file their own motion for summary judgment. But I don't understand that.

THE COURT: Obviously, they could have filed a cross-motion.

MR. SCHULTZ: Yeah, I don't understand. They could file a cross partial motion or full motion. I don't know that -- anyway, I just don't understand that at all.

The *NTEU* case, which counsel for the defendants referred to in the D.C. Circuit, is about the Consumer Protection -- Financial Protection Board, and it's about whether the efforts made to really shrink it severely have to be channeled.

But that's very different -- I want to say two things about that. One is, it's very different from the firing of Abramowitz, which is protected by a statute. I mean, that's a totally different thing. Counsel for defendants, I think, was almost suggesting that under Supreme Court law everything has to be channeled. But that is not the case. That's not what the Supreme Court said in *Thunder Basin*, and it's not what it's recently said in *Axon Enterprises v. Federal Trade Commission* at 143 S.Ct. 890.

And interestingly, that case addresses *Elgin*. *Elgin* is the case where an employee was, I think, being fired for not registering for the Secret Service and was making a constitutional challenge, and the Supreme Court said it was channeled, and even though there was a constitutional issue, the MSPB would have the expertise.

But as the Court explained in *Axon*, the MSPB in *Elgin* would

have the expertise because there was another way of disposing of the case without ever getting to the constitutional issue.

That's certainly not the case here. I mean, the constitutional issue has to be decided, and surely, there's no expertise.

The other thing I want to say about the *NTEU* case is the Court, in a separate order, it stayed its mandate pending a petition for rehearing en banc or the Court granting rehearing en banc, and it also left in place the lower court injunction barring the dismantling of the Consumer Financial Protections Board.

And so I don't think the case applies here, but even if it did, I don't know that it's really the law that has to be followed.

Thank you very much.

THE COURT: All right. That motion for judgment is under submission. I will rule promptly, however.

Let's go to the Order to Show Cause issue, and I will hear from the plaintiffs first. I don't know if you all have agreed on who is going to argue that first.

MR. SCHULTZ: I've been asked to go first, and I think I can be pretty brief, Your Honor.

On April 22nd of this year, the Court issued its preliminary injunction. In part 3, it ordered the defendants to, quote, "restore VoA programming such that USAGM fulfills its

statutory mandate that VoA," and then quoting from the statute, "serve as a consistently reliable and authoritative source of news."

The defendants did not seek a stay of that provision. They did not appeal that provision. The provision has been in effect for four months, and it's binding on them.

On May 28, after the proceedings in the Court of Appeals, the Abramowitz plaintiffs filed a motion for an Order to Show Cause, and the Widakuswara plaintiffs filed a similar motion about the same time. This was followed by briefing and oral argument about the Court. And in that argument, the Court essentially put the defendants on notice that it believed they weren't complying with the preliminary injunction.

The Court took the matter under advisement and subsequently asked the defendants to answer further questions, and then it allowed for additional briefing.

And then on July 30th, the Court issued its Order to Show Cause, and that order ordered the defendants to provide specific information and specific documents within 14 days. But the response that was filed 14 days later provided basically the same information that had already been provided and that the Court had already deemed insufficient to gauge compliance with the preliminary injunction. And it didn't provide the documents that the Court specifically required to be produced.

As the joint submission that the plaintiffs in both cases

filed on Friday demonstrates, defendants are in contempt. They're ignoring the Court's orders. And the chart on pages 6 and 7 of that filing summarizes what the Court ordered and what the defendants' response has been.

Specifically, they haven't explained how they've restored VoA consistent with the International Broadcasting Act. They haven't explained how their actions are consistent with appropriations. They haven't supplied the information the Court asked for about placing virtually all the employees on administrative leave. And they haven't produced the three category of documents that were requested.

And I use the word "contempt" carefully, but whatever you call it, they're not in compliance with the Court's orders, and they've been given an endless number of chances to comply.

The remedy is obviously within the Court's discretion, but the specific remedy that the plaintiffs are interested in and are requesting is to be given the opportunity to take expedited depositions of up to three individuals who have submitted affidavits.

THE COURT: Who are the people you want to depose?

MR. SCHULTZ: Well, defendant Lake, affiant Wuco, and we can give you a name today, but we actually haven't decided on the third one.

THE COURT: What was the second one?

MR. SCHULTZ: Wuco, W-u-c-o. They seem to have very

relevant information. We can give you the third one, if the Court wants, but we also --

THE COURT: I would want it.

MR. SCHULTZ: Okay. Well, let us confer. I don't want to do it without my colleagues agreeing. This would allow the plaintiffs to ascertain some of the information that the Court has requested to gauge compliance with the preliminary injunction and to see what defendants have done to restore VoA. It would allow us, we think, to get meaningful information that could support a motion to --

THE COURT: In the same vein, let me say this. You say they're in contempt for failing to produce documents related to the shuttering of Voice of America. They say, based on Lake's affidavit she's given to me, that they don't have any plans to shutter Voice of America.

If I assume for the moment that's true and that the Court couldn't hold defendants in contempt, if I accept that as true, then the discovery you're seeking is to go behind that based on their failure to produce some of the documents that I have ordered and information I've ordered them to produce.

I will go through that with them, but tell me a little more about what they haven't produced that you think they should have produced and how I go behind her statement that they have done all they can do.

I mean, she says they don't have any plans --

MR. SCHULTZ: Let me just address that.

THE COURT: On the face of it -- she clearly has not provided everything I ordered her to provide. On the face of it, it looks to me like she's in contempt just on the face of her response. She clearly has not complied with my order, just on the face of it.

I ordered her to give me plans. I find out that she's sent stuff from -- she says June 7 that she never gave to me. She's made statements in the press that I quoted back to her when I ordered her to give me this stuff that I never knew about.

So on the face of it, she's on the verge of contempt. I don't know how close she is, but she's certainly on the verge of contempt.

But tell me what the deficiencies are that you're trying to explore now.

MR. SCHULTZ: In your order, you said you wanted to know how defendants' actions are consistent with congressional --

THE COURT: Right.

MR. SCHULTZ: I don't think they've done that. They haven't explained how they're consistent. They've just said -- they've given you broad categories of money that they're spending, but they never addressed how putting most of the employees on administrative leave is consistent.

There have been a lot of cases about impoundment, but

that's not what we have here. According to their representations, they're spending the money. It's just I think most of it is going to employees on administrative leave who aren't doing the work.

But they never -- they submitted to Congress in 2025 a detailed justification, which included 48 or so language services and details on how they were going to spend the money, what medium they were going to have for each division, and they've never explained how what they're doing now is -- and then Congress gave them almost all the money they asked for, and they've never explained, as the Court ordered, how what they're doing is consistent with congressional appropriation. So that's a very big one to me.

The Court asked them to identify the precise number of USAGM employees who have been recalled from administrative leave and explain whether they are actively working on VoA programming, what work product they have produced, the precise number of employees that --

THE COURT: So that's a specific order, and she just ignored it.

MR. SCHULTZ: I think so; I think so.

"Produce all documents reflecting the defendants' plan to restore VoA to fulfill its statutory mandate." I don't think they've -- they gave you a couple of documents, but I don't think they've produced all the documents they have on that. I

mean, we would be able to determine that in a deposition.

"Produce all documents reflecting their plans for further termination of staff, including but not limited to an agency RIF and reorganization plan, RIF notices," and so on. They produced one document regarding a RIF, but they didn't produce all the documents reflecting their plans.

And then the last one is what you just referred to, which is documents reflecting their plans to wind down their operations. Now, defendant Lake says she plans to wind it down. She just understands she needs congressional permission. But presumably, they have plans for doing that.

THE COURT: Well, let me ask you this: I understand Congress has to act on appropriation for next year by September 30. Have you seen their appropriations plan for next year?

MR. SCHULTZ: I've seen a little bit.

THE COURT: They must have sent something to Congress. They certainly didn't send it to me.

Wouldn't that be their planning for next year?

MR. SCHULTZ: Well, it could be some of it.

THE COURT: But she didn't send it to me.

MR. SCHULTZ: They didn't.

THE COURT: She pretends like there's no plan, but she must have told Congress. She's not going to tell me? She must have a plan for how many employees there will be next year.

She's told Congress. But she won't tell me. They're going to have 100 employees next year rather than 1,300 or whatever it is. She's not going to tell me, is she?

MR. SCHULTZ: You can ask her lawyers that.

THE COURT: I may ask her in person rather than by deposition, but we will see how this hearing ends.

MR. SCHULTZ: Okay. That's our sense. We think that by -- we may be able to get more information by questioning witnesses. We would ask that whether the Court has a hearing or allows depositions, that it be done quickly, because we would like to move to enforcing the part of the preliminary injunction that it did not appeal.

While VoA is shut down, virtually shut down the way it is, people are getting other jobs. Contracts have been canceled. The longer this goes on, the harder it will be to get things started again, and that's our goal anyway.

THE COURT: Thank you, Mr. Schultz.

MR. SCHULTZ: Thank you.

THE COURT: Ms. Stout?

MS. YEOMANS: May I?

THE COURT: Oh, all right.

MS. YEOMANS: Thank you. Just briefly, and I will try not to duplicate anything Mr. Schultz already said, but I did want to discuss briefly Part A of the Court's Order to Show Cause as well and how the defendants did not comply with that

part of the order in their responses.

They have not explained, even though the Court has asked multiple times, how they came to the conclusion that they need to broadcast in only four languages, and that that somehow satisfies the broad mandates in the international --

THE COURT: Well, we know one language, the statute itself requires broadcasting in Korea, and the statute requires it.

MS. YEOMANS: Yes.

THE COURT: I mean, clearly, they're violating a statute there.

MS. YEOMAN: I agree. And we've pointed out several different congressional indications of intent that they broadcast in other languages.

And I also think it's important to look at the language of the International Broadcasting Act, which discusses broadcasting to significant regions of the world and including voices from citizens of repressed nations, including broadcasting from simply four languages in addition to apparently now a plan to broadcast One America News and Newsmax, neither of which I assume would represent voices from individuals in repressed nations, cannot possibly comply with the act, and the defendants have not explained how they came to the conclusion that it does.

The same is true, I think, of their sort of summary conclusion that they don't have to broadcast to Africa, which I

would maintain is a significant region of the world. They've explained in part that the reason that they think they don't need to is because it would be duplicative of CNN. I don't think that they've explained that that's unique to Africa, and it also is inconsistent with their position that they can broadcast content from OAN and Newsmax, which would also be duplicative of domestic broadcast, which is forbidden by the IBA.

So those are two more ways that we think that their explanations are deficient and that they have not complied with this Court's order. They also haven't explained any plans to expand radio broadcasting or television broadcasting. We are left to assume that they have no plans to live broadcast any Mandarin programming. The references to Mandarin are all about Internet postings and things being sent via the Internet, nothing about radio or television.

And because the defendants refuse to tell us what the plans are to increase any broadcasting in specific means, which this Court did specifically order, we're left in the dark, which is why we think we need an opportunity to ask questions of the relevant decisionmakers. Although as the Court has highlighted today, it's hard to pin down exactly who is in charge of this agency and making these decisions.

While I have your attention, I will point out as well that the defendants are delinquent in their responsibility to produce

the administrative record, and we oppose their delinquency in that and would ask this Court to order them to produce that, which will help us in informing our next steps in enforcing this Court's order.

Thank you.

THE COURT: Okay. Ms. Stout? Oh, all right. The new kid on the block gets to go.

MR. VELCHIK: Thank you, Your Honor. May it please the Court.

THE COURT: Tell me about your background.

MR. VELCHIK: The federal government --

THE COURT: Tell me about your background.

MR. VELCHIK: Oh, my background. Michael Velchik for the United States defendants.

THE COURT: How long have you been with the government?

MR. VELCHIK: April 15th.

THE COURT: This year?

MR. VELCHIK: Yes, sir.

THE COURT: Welcome aboard.

MR. VELCHIK: Thank you, sir.

THE COURT: Where did you come from?

MR. VELCHIK: The United States Senate.

THE COURT: Good.

MR. VELCHIK: Thank you.

The Executive Branch is engaged in world historic efforts to --

THE COURT: Speak a little bit louder in the mic, if you would.

MR. VELCHIK: Sure.

The United States is engaged in world historic efforts to reduce the size of bureaucracy. Federal agencies --

THE COURT: Most people applaud that. I do, too.

MR. VELCHIK: Federal agencies such as USAGM are in the unenviable position between a Scylla and Charybdis. On the one hand, they are required to perform certain statutorily prescribed functions established by Congress. On the other hand, Executive Branch officials are no less bound by executive orders, including, relevant in this case, Executive Order 14-238, which specifically requires the agency to reduce the performance of its statutory functions and associated personnel to the minimum presence and function required by law. It's a tough task.

USAGM has engaged in a robust process to review its statutory obligations and execute those in a way that's consistent with the president's policy directives. This is an iterative process. It has included engaging with other agencies and career staff who have been there decades for their advice. It has also included pulling back employees from administrative leave as the agency continues to calibrate its activities.

I would like to just emphasize three quick points, the most important of which Your Honor already noted, which is that in paragraph 33 of the affidavit provided by Ms. Lake, who is in charge, the agency has no plans to wind down operations. Any suggestions that the agency is trying to get rid of it or dissolve it are inaccurate. I don't know what more you could want than a signed statement under penalty of perjury from the highest official at the agency. I think that's worth emphasizing.

As we engage in this exercise, I think it's important to ask, what does the statute specifically require? The agency has gone through and identified with specificity different provisions that clearly require certain actions or programs. The affidavit lies out with specific citations the four languages that the agency understands --

THE COURT: It overlooked Korean.

MR. VELCHIK: I'm focusing on those four, at a minimum at least. We can all agree on those four.

THE COURT: But those four didn't include Korean.

MR. VELCHIK: I don't believe so. I believe that's a contested point.

In contrast to those very specific citations, I think plaintiffs have some generalized grievances. They point to some very vague and broad statutory terms, but they also ignore the most important parts of it. And I think before Your Honor

really goes down the road of potential discovery or additional rulings, I think there's a lot of ambiguity with the law. I think Congress has delegated some policy decisions to the Executive Branch, and I want to make sure Your Honor is just aware of what the actual statute specifically requires.

Typically, when we interpret a statute, we start at the very beginning. Plaintiffs begin with Section 6202, but they usually skip down to the last parts, at (c). I'm not going to go through the whole thing, but I will just start at the very beginning.

(a)(1), "United States international broadcasting shall be consistent with the broad foreign policy objectives of the United States."

Who gets to decide the foreign policy objectives of the United States? Not me. Not plaintiffs. Not the Court. The President of the United States, in consultation with the Secretary of State.

THE COURT: And with Congress.

MR. VELCHIK: Congress has a constitutionally prescribed role in certain areas, such as treaties and appropriations.

But I just want to acknowledge that there are good-faith disagreements --

THE COURT: Don't leave Congress out. They've got to do the appropriations.

MR. VELCHIK: And I will get to the appropriations, too, because I think that was an important point that you raised about the next appropriations cycle.

THE COURT: When they appropriate these millions of dollars, if you're not going to spend them, don't you have to go back for rescission?

MR. VELCHIK: That is true.

So first of all, we are spending quite a lot. I think we've already spent --

THE COURT: I know, but you're not spending hundreds of millions, and you're not going back for rescission.

He didn't go back for rescission of anything, did he?

MR. VELCHIK: He still retains the ability to do so. He has not for these, but we've already spent --

THE COURT: This is almost September 1st, and he hasn't gone back for rescission, has he?

MR. VELCHIK: No, Your Honor, but we've spent 230 out of the --

THE COURT: How much are you going to spend this year and not go back for rescission?

MR. VELCHIK: I'm not sure that there necessarily will be money left on the table, if you look at how much has been spent so far and you project out. It's, obviously, an actuarial question.

THE COURT: But they went back for rescission on the

other agency internally, but not for Voice of America.

MR. VELCHIK: And they have discretion to continue to re-evaluate based on its programs, its needs, that conversation with Congress --

THE COURT: It's just curious they didn't go back for rescission on Voice of America. They leave the employees at home. So they pay them to do nothing for all these months, but they don't go back for rescission.

Don't you find that curious?

MR. VELCHIK: Congress itself has set up this personnel structure. And I know that we have a separate case that talks about some of the personnel structures that Congress has set up by statute. But Congress specifically allows for agencies to put certain individuals on leaves. It allows for a RIF policy if the agency determines to do that. Part of that is with the knowledge that agencies may have to recalibrate their needs at different times. It may put some individuals on leave and then recall them, and it has done so. Even since the latest affidavit, we've increased the number of employees.

THE COURT: One of the questions I asked was how many employees and how many are on leave, and that wasn't answered. She just wouldn't answer it.

Can you tell me why?

MR. VELCHIK: I believe we say, I think it was, 78 -- we have over 200 employees at USAGM, I believe is in the

affidavit, and there are -- I believe it was 78 were there.

As of today I believe the latest number --

THE COURT: I'm talking about over the course of this -- I thought there were more than a thousand employees.

MR. VELCHIK: On administrative leave cumulatively?

THE COURT: Right.

MR. VELCHIK: I mean, it may vary at different points.

THE COURT: She never answered that.

MR. VELCHIK: I believe it's somewhere in the order of 780 would be total, but I would have to -- I'm not 100 percent sure.

THE COURT: So if you have a thousand employees sitting at home since March, you're saying you didn't need to go for rescission?

MR. VELCHIK: I think the Executive Branch, in part because of this litigation, has been involved in an iterative process. I think the major decision point with the separation of powers in mind is Congress, which is set to set appropriations for the next year.

I mean, the agency is trying to identify just specifically what its statutorily prescribed requirements are, and it sounds like there's still some disagreements. I'm happy to go through the sections of, you know, (a)(1) and how it has to be consistent with foreign policy.

THE COURT: I will try to stop and let you say what

you want to say.

MR. VELCHIK: Right. I think it's perfectly reasonable on the time frame. Given everything going on, I think the great effort to reduce federal bureaucracy, that this was not going to be decided in a single day or a single week. Like even since we submitted the affidavit, we've brought a couple other employees back to Voice of America to increase some programming.

The whole reason Congress established the process of allowing the agency to put some individuals on leave is to allow it the flexibility to recalibrate. And it may be that eventually there is a RIF where some are RIF'ed and others are brought back. But part of the process is sort of the legal interpretation, trying to develop what the agency really needs to do. Part of it has gone on through this litigation. And part of it also just dependent on the programming as the agency decides what it needs -- and it can continue to make those decisions.

But I think the real point in time, like the decision point is sort of the congressional appropriations cycle. So as we look forward to what Congress wants to do, Congress obviously is a coordinate branch of government. It can receive reports from the agency. The agency can give its recommendations. And that is the next major decision point.

And I think the suggestion that because the agency hasn't

either terminated all employees immediately or has still retained the flexibility until that appropriations, I think that misses the point of sort of the role that Congress plays in the iterative process of appropriations. It's not just --

THE COURT: Has she sent requests for the appropriation for next year?

MR. VELCHIK: We provided the congressional notification documents --

THE COURT: Isn't that a plan for what the agency is going to do for next year, and why didn't we get to see it?

She says she doesn't have a plan. She has to have a plan. Why didn't she provide that to me? Why is she stonewalling me, of all people?

MR. VELCHIK: I don't accept the premise of the question. I mean, I think there's a separate process for like the president's budget that comes from OMB. Congress --

THE COURT: She must have told Congress how many employees she's going to have next year.

MR. VELCHIK: I'm not aware of documentation to that effect, and we've provided the Court with the documents that I understand we have.

I will also note that the appropriations cycle --

THE COURT: It can't be true that she can't tell me what the plan is for next year.

MR. VELCHIK: So first of all, the agency produced the

documents that it had available that were responsive to the request. I don't understand --

THE COURT: This is last week.

MR. VELCHIK: Correct.

THE COURT: She couldn't tell me that last week?

MR. VELCHIK: I'm not aware that the agency has an obligation to produce or has anywhere the documents that you seem to think exist.

And also, to the extent that these are predecisional and predeliberative, even a lot of these discussions, I presume, would also implicate executive privilege, and that would sort of be a separate can of worms that we would have to analyze.

But I think the appropriations cycle that you're imagining might have changed, given the move to continuing resolutions and other types of ways to fund the government in recent years by Congress. But I'm not aware that there's a specific report sitting somewhere that has all of the numbers that you're asking for.

We, quite frankly, have a particularly lengthy and detailed affidavit from the highest-ranking official at the agency trying to set out a lot of these numbers. There is some uncertainty. We hope to have some resolution on sort of the treatment of some employees on leave, trying to calibrate exactly how many should be brought off versus how many should be subject to RIFs.

Again, this is an iterative process, and the agency can't

decide every major decision as quickly as we all wish sometimes.

THE COURT: That's just a hide-the-ball answer.

MR. VELCHIK: Well, we respectfully disagree.

But even so, I mean, I will say that if this Court wants to get specific about, you know, obligations and what programming is required, I mean, I do think it merits understanding like very clearly what the statutory obligations are. And right now, the only statutory obligations that plaintiffs have emphasized in this litigation and today are very broad standards.

THE COURT: Did you work on her affidavit?

MR. VELCHIK: Did I work on it?

THE COURT: Did you work on her affidavit?

MR. VELCHIK: I mean, I'm sure -- there's an interagency process. The DOJ lawyers, myself included, provide advice.

THE COURT: I mean, are you so new that you weren't involved?

MR. VELCHIK: I would have to check the -- I have been involved with the agency in preparing these filings. I presume that I was involved.

THE COURT: I just don't understand how her affidavit passed muster. It clearly does not comply with my order. I just don't understand what you all are doing.

Go ahead with what you want to say.

MR. VELCHIK: We respectfully disagree.

The other high-level point that I would just emphasize is going down the statute, it also talks about how the agency's activities cannot duplicate the activities of private United States broadcasters for foreign governments.

And I would just emphasize that Voice of America was established by statute 80 years ago. The world was very different, and the application of these standards may vary over time. It may very well have been the case that there were certain areas behind the Iron Curtain or even in the 1940s that did not have access to any information whatsoever. So Voice of America might have had a statutory obligation to provide radio broadcasting or other media to these individuals.

The world is very different today with the Internet. People have access to a lot of other information from the United States, also from other democratic countries.

And regardless of sort of what you think about the high-level policy decisions of what Voice of America should be doing, I do think that if Your Honor is very intent on sort of identifying these specific requirements that the agency must comply with, I do think it is incumbent either for plaintiffs or this Court to provide more clarity than these very broad, open-ended standards that we find in 6202, which inherently reflect a large delegation of policy decisionmaking to the Executive Branch.

So, I mean, I think it's a little hard to draw the

inference that the specific number of programming or personnel, you know, is inconsistent with this standard when an Executive Branch agency thinks one thing or another. We have over 200 employees. We can bring back more. But the mere fact that we don't have the same number of employees, whether it was a thousand however many years ago, like that itself cannot be a violation of the statute, even the delegation of authority to Congress.

And finally, I will just point out, I mean, everyone is in favor of efficiency. There are different ways of accomplishing the same goal. I won't necessarily go into sort of the personnel components since we are limited to the third prong of the injunction. But I want to point out, there are other ways of doing this, such as adopting artificial intelligence, which the Lake declaration gets into; partnering with other U.S. programs that are already generating content and trying to rebroadcast that through other means.

The agency has at its discretion all the things in order to accomplish these broad standards and promote America's foreign policy abroad, but I don't think the Court should be fixated on the number of employees the way that the plaintiffs think is the sole metric for output.

I mean, maybe for some people in government, doing a good job correlates with the number of employees, but I think we want to be a bit more focused on, you know, end products results and

complying with the statute.

So with that, I'm happy to rest, unless Your Honor has further questions.

THE COURT: I have a few other questions.

You attach identical letters to the chairman of certain House and Senate committees, and they reference a plan that was developed by senior career USAGM leadership who assessed what the statutory minimum was and signed off on it.

Does the reference to that plan in those letters refer solely to the document contained in Exhibit A to your response to my order?

MR. VELCHIK: Could you please refer me to which paragraph in the letter you're referencing?

THE COURT: Exhibit A to your response to my order.

Is that the plan you're talking about?

MR. VELCHIK: The letter to Congress, I think?

THE COURT: Yes.

MR. VELCHIK: I just want to make sure I'm tracking the language. Where in the letter to Congress? I want to make sure I'm tracking the language.

THE COURT: It's attached to your Exhibit A. It talks about a plan.

MR. VELCHIK: I believe it's the attached.

THE COURT: Is that the only document that relates to the plan? Is there any other -- there's no communication other

than that correspondence that has the plan?

MR. VELCHIK: My understanding is that it's the attachment before it is the reference.

THE COURT: That plan was produced to Congress in June. Why did I not get it until this past week? If that was the plan, why didn't I get it until now?

MR. VELCHIK: I've been involved in the latest filing. I don't have personal knowledge to that.

THE COURT: You can't answer that one? All right.

Now, you also represented in your response that the government had reached an agreement with One America News Network to share One America News Network's content on USAGM's network.

The Court order had directed you to produce all documents reflecting the defendants' plan to restore Voice of America programming to fulfill its statutory mandate. You represent that the OANN plan furthers your statutory mandate, but the agreement you reference is not included in the documents provided.

Is it your view that the agreement falls outside the scope of the Court's order?

MR. VELCHIK: I don't think the agency has -- necessarily has a statutorily prescribed obligation to partner specifically with OAN. I have not seen the document, if there is a document, about the agreement.

THE COURT: Who decided that it fell outside the Court's order?

MR. VELCHIK: Well, I think we tried to work with senior leadership to identify relevant custodians and all the documents that we could gather on the time frame to provide them to Your Honor, and I think we've substantially complied, particularly when you include the affidavit.

THE COURT: Well, under 22 U.S.C. Section 6202(c)(3), Voice of America is required to represent America, not any single segment of American society, and therefore must present a balanced and comprehensive projection of significant American thought and institution.

So if Voice of America has identified One America Network to amplify U.S. media organizations only associated with American's conservative thought, does that mean Voice of America has decided to create this agreement with a media organization that's only associated with centrist and liberal thought, and that's their determination?

I don't quite understand it. Is that what is happening here?

MR. VELCHIK: I'm not sure I fully understand the complicated question. But I will say as a general matter, I think the statute speaks in broad terms. I don't understand the agency's efforts to try and work with at least one organization to preclude its abilities to work with any other organization.

I don't think that that implicates or violates the broad standard that you referenced under that specific subsection, particularly when interpreted in the context of all the other subsections.

THE COURT: Is that why the -- I thought the idea of Voice of America was not to be -- take sides in anything, but maybe I'm wrong.

MR. VELCHIK: I don't think the agency's good-faith effort to work with one producer necessarily precludes its ability to do it with others or another way that would implicate its ability to fulfill that statutory function.

I'm not drawing the inference that I think plaintiffs are. I think that's a stretch.

THE COURT: You were talking in your briefing about statutory minimum consists only of specific statutory commands, and you identify only the language requirements Mandarin and Pashto and Urdu and Farsi.

If they didn't exist in the statute, would your -- and of course, I added Korean today, but if they didn't exist in the statute, would your position be that if they weren't in the statute, then Voice of America could go dark altogether?

MR. VELCHIK: I don't think we would go that far. I think when you look at the statute, there's some general vague provisions, and there's some very specific provisions. The specific provisions certainly establish the floor, and we've

identified the floor. We can -- obviously, the Court is familiar with Korea.

So to the extent that it specifically says we have to do Chinese or Mandarin, the agency would have the statutory obligation. We acknowledge that. We are fulfilling that part of the mission.

But I don't think the absence of sort of any specific one would necessarily mean that there are no obligations whatsoever. I think we can have good-faith disagreements with plaintiffs and with anyone else, a member of the public, about how to apply the broad standards.

But certainly, the specific requirements are specific. They're clear, which I think is relevant as we try to make sure that the agency is complying with the statute, but they would be sort of a minimum condition separate from sort of the broader objective, which again balances a lot of trade-offs, delegates a lot to the president's policy directive.

THE COURT: You represented here saying USAGM continues its work to ensure the statutorily required obligations that have been ignored for decades by multiple previous administrations, and they will finally be fulfilled. But you haven't identified those obligations apart from the 50 States Initiative, and you haven't produced any documents that are related to the 50 States Initiative or any other previously unfulfilled obligations.

Explain that to me. You haven't given me any documents that support what you're saying there.

MR. VELCHIK: I'm not sure I follow. What was the first part of the question that you're referencing?

THE COURT: You say in there that USAGM continues its work, that they've ignored this for multiple prior administrations who haven't done their job, and they're going to do the job now, and then you say -- you don't explain any of that, and then you say the 50 States Initiative. I don't even know what that is. I don't understand any of that. You don't explain any of that. It's just a throw-away, I guess.

MR. VELCHIK: I would want to see the language in specificity. But in general, there's a broad standard about what the agency can do. Different administrations might imagine different ways to implement it, some with artificial intelligence, some with partnering with certain domestic producers, some with maybe creating original content here or abroad. There are sort of broad standards on how to do that.

I think the agency is certainly well within its prerogative to try and do things a different way, provided it is like actually continuing to function and there's no plan to wind it down. As the affidavit says, there's no plan to wind it down. We continue to have over 200 employees continue to work on these things.

There are some policy choices about the language, the

programs. Some of them are statutorily required. But the agency is making sure that it is at least producing the statutory minimum, subject to a lot of discretion and different administrations have a different characteristic.

THE COURT: What is the 50 States Initiative?

MR. VELCHIK: I can follow up with more specifics.

THE COURT: Okay. What is USAGM's understanding as to what constitutes a significant audience?

MR. VELCHIK: I think it's a very broad term, and I think Congress uses a broad term to sort of delegate some level of discretion to the agency. I'm not sure there's a specific number, but I think certainly, a lot of electronic communications are reproducible and can reach millions of people. And certainly, I think the agency is doing that.

I think whether -- I don't think it's appropriate for a Court to sit in judgment about whether 1 million or 1.5 billion different listeners are reached with different programs. But certainly, nonzero, positive sum, and I think certainly well below what the agency is performing right now.

THE COURT: Can you explain what part of the response that you provided addresses my order to explain how the defendants' actions are consistent with Voice of America's congressional appropriation?

MR. VELCHIK: Well, we certainly produced the documents of our communications to Congress, and I think that

does show the iterative process of the appropriations cycle.

That's partly a point about the separation of powers, about whether litigation or the appropriations cycle is the best way to address this problem. But I think that is the conversation that legislators are having, and it will be legislators' prerogative to decide going forward for the next cycle.

It is true that agencies are required to comply with statutorily prescribed minimum, and Congress has passed statutes describing what those minima are. But those are also time-limited appropriations, too. And so part of that is in recognition that the next Congress will have to decide, you know, in light of its conversation with the Executive Branch --

THE COURT: The fact that defendant Lake was proposing to Congress that they lop off a thousand employees for the next session wasn't relevant to her telling me about it since she had already sent it to Congress, so she didn't bother to include that in her response to me?

MR. VELCHIK: I don't follow.

THE COURT: She didn't include it. She didn't tell me. She told Congress, but she wasn't going to bother to tell me, even though I asked for it.

MR. VELCHIK: You're referring to the previous document production, not this briefing cycle?

THE COURT: She sent it up to Congress, but she wouldn't send it to me.

MR. VELCHIK: It's been produced; correct?

THE COURT: No. I haven't seen it.

MR. VELCHIK: I'm not sure what document you're referring to.

THE COURT: You just told me she sent up a proposal to Congress.

MR. VELCHIK: I referenced the letters that Your Honor read from earlier, which was in the production.

THE COURT: In the affidavit, she sent me nothing about what she's proposed.

MR. VELCHIK: I have only been discussing what has been produced to this Court, which was the letter you read from. That's the record --

THE COURT: I thought you told me that she has sent a proposal to Congress for the new appropriation.

MR. VELCHIK: I said that she sent the letter which is included in the production that Your Honor read from. I'm not aware of other records that have been communicated to Congress.

THE COURT: Okay. I will find out from her.

MR. VELCHIK: Okay.

THE COURT: All right. The Court's order described the fact that the vast majority of agency employees are on administrative leave, even though Congress appropriated money for their salaries on the assumption they would work to further the agency's mission.

Does your response address that, and where does it address it?

MR. VELCHIK: I think I sort of went through this whole point, too. Should I repeat what I've said?

THE COURT: Where does the response address that?

MR. VELCHIK: I thought we had spoke about this for about five minutes about how Congress --

THE COURT: In the response you filed, where does it address that?

MR. VELCHIK: It addresses it when we break down specifically the number of employees for USAGM and for Voice of America. There's then a breakdown itemized by each division, and then there's commentary about --

THE COURT: So you ignore the monetary impact, millions of dollars wasted?

MR. VELCHIK: I think that's a conclusion with which we would strongly disagree. I mean, that's a conclusory statement. We think that Congress -

THE COURT: It's conclusory that you threw away millions of taxpayer dollars?

MR. VELCHIK: Yeah, we would not describe it that way.

THE COURT: Is Voice of America broadcasting to North Korea? Am I correct about that?

MR. VELCHIK: I would refer to the declaration with the most accurate references.

THE COURT: Does the agency believe Congress has appropriated fiscal year funds in reliance on the 2024 budget justification?

MR. VELCHIK: I mean, that's probably an empirical question. I think the budget justifications, we look at the statute to see what it's requiring. I'm a bit hesitant to endorse, I think, language from some of the legislative history as somehow binding on the agency, and I think a lot of plaintiffs' arguments have done that.

I think you should look to the text of the statutes, including the bottom line numbers, but not necessarily like accompanying legislative history or other documents provided by the Executive Branch. I wouldn't view that necessarily as like legally binding statutory text in the same way that the text of public law is.

THE COURT: All right. Thank you, Counsel.

MR. VELCHIK: Thank you, Your Honor.

MS. YEOMANS: Thank you, Your Honor.

I think that the Court's colloquy with counsel underscores that there are many unanswered questions that we really need the relevant decisionmakers to answer.

I also heard counsel discuss a robust process to review statutory obligations that involved an iterative process of engaging with other agencies and career staff.

To me, that sounds like something that would produce a

robust record, perhaps a memoranda of written analysis, of proposed rulemaking, the type of thing one would expect from reasoned decisionmaking from an agency when it engages in such drastic change of course.

We have seen none of that, despite our consistent efforts to get the defendants to explain their thinking. That is the whole point of why we are here before Your Honor, and that was a large basis of This Honor's decisionmaking in entering the preliminary injunction in the first place.

I also heard counsel discuss how the International Broadcasting Act is phrased broadly, indicating that Congress wanted to give the agency discretion. But Congress also knows that discretion can be abused and for that reason enacted the Administrative Procedure Act, which holds agencies to account when they abuse their discretion and requires them to think about what they're doing before they do it rather than acting first and thinking later, which appears to be the pattern that we're seeing in this case.

I heard counsel assert in regard to a proposed document production that they might be privileged. That is the first time the government has raised the word "privilege" in these proceedings. It is not an assertion that they have made before, and we think it is entirely inappropriate to do So.

And finally, I will just say that as -- I will end where I started. This hearing has shown exactly what we need, which is

an opportunity to get more firm answers to the questions about what the agency plans to do, how it has determined its obligations under the law, and whether it ever intends to come into compliance with the law and this Court's order.

Thank you, Your Honor.

MR. SCHULTZ: Your Honor, I have very little to add.

I wanted to give you the name of the third deponent that we would be requesting.

THE COURT: I'm sorry?

MR. SCHULTZ: And it's Leil, L-e-i-l, Soltani, S-o-l-t-a-n-i. And she submitted an affidavit in June.

The only other point I wanted to make is the defendants are just blind to kind of the severe drop-off from the budget to the performance of VoA. In the 2025 budget justification, they talk about broadcasting in 48 languages, to nearly 100 countries, with a weekly audience of 360 million people.

Now, we acknowledge, there's room to make adjustments and so on and so on. But this to us is so severe in comparison to what they promised Congress and to the congressional appropriation that it's got to kind of inform when you interpret, you know, some of the language in the statutes, which talk about significant audience and significant regions, and so on. You could argue around --

THE COURT: That may be when you go for rescission. Just doing it on their own, I don't know.

MR. SCHULTZ: If they want to go for rescission, they're entitled to do that. The question is whether they're entitled to put virtually everybody on administrative leave, given the budget.

Thank you very much for your time.

THE COURT: You know, it's an awkward position where the plaintiffs are, because I sit here as a -- I think I'm the only living judge that's actually held Cabinet members in contempt. I held three over the course of my career in contempt. The first two, the evidence was so clear that they didn't even appeal. The third appealed, and in the course of that appeal, the Attorney General for George W. Bush authorized a motion in the Court of Appeals to have me removed from the case because I was so biased in favor of the Indians that I got removed from the case.

And ultimately, the case settled with the government for $3.4 billion, the largest settlement against the government in the history of the country. So I took it as a vindication that I had been pushing the government hard enough that it actually cost the government an extra billion dollars by not settling earlier than they could have if I hadn't been removed from the case probably.

But in any event, I have never wanted to and never did the contempt route, and I don't want to do it here. I'm going to authorize the three depositions and see if the plaintiffs

through their depositions can get sufficient information that they can get enough information and work with counsel for the government to get enough information that they can lay out a case that there can be some resolution short of contempt here.

And I'm going to ask that counsel see if they can work out a way to cooperate in getting the information that's necessary to not go through a contempt trial. I don't want to go through a contempt trial, but if that's what it comes to, it will come to that.

I will ask that the depositions be expedited, and hopefully, you all can agree on the schedule. If you can't agree on a schedule, then I will set a hearing date to come back and set a schedule for you. But I will allow the depositions to go forward and see if there's a way to avoid a contempt trial. I don't enjoy and I'm not enthused about having a contempt trial.

I don't think an order to see if we can avoid having a contempt proceeding and trial is the way to go at this stage. I think there's still information that could be shared, that there's a way to avoid having to go forward with that.

So I will issue an order in the next couple of days about how to go forward, and see if you all can't meet and confer and see what kinds of information you can share to see if this can't be done in a civilized way and share enough information that would allow that.

On the other matter, I will get an order and opinion out within the next couple of days as well. So for now, unless there's something further you want to do today, I will leave it at that for today.

Yes?

MS. YEOMANS: A very brief administrative matter.

Several members of our team have not had their pro hoc motions decided, and it's making it difficult for them to keep abreast of the filings in the case.

THE COURT: I will be glad to grant that.

MS. YEOMANS: Thank you.

THE COURT: Okay. Anything else you want to raise? Thanks very much, Counsel. The arguments were helpful to me. So thank you all very much.

(Proceedings adjourned at 12:45 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick August 28, 2025

SIGNATURE OF COURT REPORTER DATE