**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MICHAEL ABRAMOWITZ, *et al.*, |  |
| *Plaintiffs,* |  |
| –v.– | **Case No. 1:25-cv-887-RCL** |
| KARI LAKE, *et al.*, |  |
| *Defendants.* |  |
| PATSY WIDAKUSWARA, *et al.*, |  |
| *Plaintiffs,* |  |
| –v.– | **Case No. 1:25-cv-1015-RCL** |
| KARI LAKE, *et al.*, |  |
| *Defendants.* |  |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.   STATUTORY BACKGROUND .................................................................................. 2

    A.   Congress Created VOA to Serve as a Consistently Reliable Source of
         Impartial News Around the Globe ................................................................. 2

    B.   Congress Appropriated Funds So That VOA and USAGM Can Meet
         Their Missions ............................................................................................... 4

II.  FACTUAL BACKGROUND ....................................................................................... 7

    A.   Defendants Decided to Dramatically Reduce VOA's and USAGM's
         Operation ....................................................................................................... 8

    B.   Defendants Implemented Their Decision. ................................................... 11

III. PROCEDURAL BACKGROUND ............................................................................ 13

LEGAL STANDARD ...................................................................................................... 16

ARGUMENT ................................................................................................................... 16

I.   DEFENDANTS' ACTIONS TO DRASTICALLY REDUCE VOA'S AND
    USAGM'S OPERATION ACROSS THE BOARD VIOLATE THE APA ........................ 16

    A.   Defendants Engaged in Discrete, Final Agency Action ............................. 18

         1.   Defendants Made a Single Decision to Reduce VOA's and
              USAGM's Operation ........................................................................ 18

              a)   This decision is discrete. ...................................................... 18

              b)   This decision is final ............................................................ 20

         2.   In the Alternative, Defendants' Actions Implementing Their
              Decision to Reduce VOA's and USAGM's Operation Are Individually
              Challengeable Under the APA ........................................................ 21

    B.   Defendants' Actions Are Arbitrary and Capricious and in Violation of Law ............. 23

         1.   Defendants' Decisions Are Arbitrary and Capricious. ..................... 23

              a)   Defendants Provided No Reasoned Rationale .......................... 25

        b)    Defendants Failed to Consider Relevant Factors ...................................... 27

    2.    Defendants' Actions Are Contrary to Statute and Not in Accordance with Law .............................................................................................. 30

        (a)    Defendants' Actions Violate Statutes Applicable to USAGM and VOA ............................................................................. 31

        (b)    Defendants' Actions Cannot Be Squared with Congressional Appropriations ................................................................ 32

  C.    Vacatur Is Appropriate ................................................................. 33

  D.    Defendants Have Unlawfully Withheld Required Agency Action ............................. 35

II.    THIS COURT HAS JURISDICTION TO CONSIDER DEFENDANTS' UNLAWFUL ACTIONS AND AFFORD RELIEF ............................................................. 36

  A.    Because a Material Assumption Underlying the CSRA Is Gone, so Too Is Any Congressional Intent to Channel These Claims ...................................... 37

  B.    Plaintiffs' Claims Are Not "Of the Type" Congress Intended to Channel Under the CSRA ...................................................................... 39

    1.    This Circuit Has Held That Claims Similar to Those of Plaintiffs RSF and TNG-CWA Are Not Channeled .......................................... 40

    2.    Plaintiff Abramowitz Seeks to Assert a Statutory Responsibility, not an Employment Claim. .............................................................. 41

III.    THIS COURT SHOULD CONSIDER EXTRA-RECORD EVIDENCE AS PART OF ITS REVIEW ...................................................................... 42

CONCLUSION ....................................................................................... 44

## **TABLE OF AUTHORITIES**

**CASES**

*Action All. of Senior Citizens of Greater Philadelphia v. Heckler*,
    789 F.2d 931 (D.C. Cir. 1986) ................................................................. 41

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
    No. CV 25-00400, 2025 WL 2537200 (D.D.C. Sept. 3, 2025) ................. 36

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
    946 F.3d 615 (D.C. Cir. 2020) ................................................................. 41

*Am. Fed'n of Gov't Emps. v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019) ................................................... 39, 40, 42

*Am. Fed'n of Gov't Emps. v. Trump*,
    No. 25-3293, 2025 WL 1541714 (9th Cir. May 30, 2025) ................. 39, 40

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*,
    No. C 25-01780 WHA, 2025 WL 2633791 (N.D. Cal. Sept. 12, 2025) .... 39

*Am. Great Lakes Ports Ass'n v. Schultz*,
    962 F.3d 510 (D.C. Cir. 2020) ................................................................. 33

*Amerijet Int'l, Inc. v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014) ............................................................... 23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................. 16

*Anderson v. U.S. Dep't of Hous. & Urb. Dev.*,
    731 F. Supp. 3d 19 (D.D.C. 2024) ........................................................... 33

*Axon Enter., Inc. v. F.T.C.*,
    598 U.S. 175 (2023) ............................................................................ 36, 40

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................. 20

*Biden v. Texas*,
    597 U.S. 785 (2022) ............................................................................ 19, 23

*Bosco v. United States*,
    931 F.2d 879 (Fed. Cir. 1991) ................................................................. 42

*Burke v. Coggins*,
    521 F. Supp. 3d 31 (D.D.C. 2021) ...................................................... 33, 34

iii

*Burlington Truck Lines v. United States,*
  371 U.S. 156 (1962) ............................................................................. 23

*Butte County v. Hogen,*
  613 F.3d 190 (D.C. Cir. 2010) ............................................................. 24

*Calloway v. Harvey,*
  590 F. Supp. 2d 29 (D.D.C. 2008) ....................................................... 43

*Carr v. Saul,*
  593 U.S. 83 (2021) ............................................................................... 40

*Ctr. for Biological Diversity v. U.S. Off. of Surface Mining Reclamation & Enf't,*
  No. CV 23-3343, 2025 WL 1503802 (D.D.C. May 27, 2025) ................. 43

*Ctr. for Biological Diversity v. Zinke,*
  260 F. Supp. 3d 11 (D.D.C. 2017) ....................................................... 36

*Dellinger v. Bessent,*
  Civil Action No. 25-0385 (ABJ), --- F. Supp. 3d ----, 2025 WL 665041
  (D.D.C. Mar. 1, 2025) .......................................................................... 38

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ............................................................................. 43

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ................................................................................. 23

*Dep't of State v. Aids Vaccine Advoc. Coal.,*
  No. 25A269, 2025 WL 2740571 (U.S. Sept. 26, 2025) .......................... 36

*Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.,*
  No. CV MJM-25-1458, 2025 WL 1865971 (D. Md. July 7, 2025) ........... 38

*Elgin v. Dep't of Treasury,*
  567 U.S. 1 (2012) .................................................................... 37, 40, 42

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ..................................................................... 24, 25

*FCC v. Fox Tel. Stations, Inc.,*
  556 U.S. 502 (2009) ............................................................................. 23

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ............................................................................. 40

*Grundmann v. Trump,*
  770 F. Supp. 3d 166 (D.D.C. 2025) ...................................................... 38

iv

*Heartland Reg'l Med. Ctr. v. Sebelius*,
  566 F.3d 193 (D.C. Cir. 2009) ............................................... 33

*Hisp. Affs. Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018) ............................................... 19

*Holcomb v. Powell*,
  433 F.3d 889 (D.C. Cir. 2006) ............................................... 16

*Ill. Pub. Telecomms. Ass'n v. FCC*,
  123 F.3d 693 (D.C. Cir. 1997) ............................................... 33

*IMS, P.C. v. Alvarez*,
  129 F.3d 618 (D.C. Cir. 1997) ............................................... 43

*Jarkesy v. S.E.C.*,
  803 F.3d 9 (D.C. Cir. 2015) ............................................. 36, 39

*Kingdom v. Trump*,
  No. 1:25-cv-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) ................... 21, 26

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................... 19

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ....................................... 23, 24, 29

*Nat'l Ass'n of Immigr. Judges v. Owen*,
  139 F.4th 293 (4th Cir. 2025) ............................................... 37, 38

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
  921 F.3d 1102 (D.C. Cir. 2019) ............................................. 24, 25, 30

*Nat'l Treasury Emps. Union v. Vought*,
  149 F.4th 762 (D.C. Cir. 2025) ............................................. 20, 22, 41

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................... 18

*Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.*,
  573 F. Supp. 3d 294 (D.D.C. 2021) ............................................... 42

*Roelofs v. Sec'y of the Air Force*,
  628 F.2d 594 (D.C. Cir. 1980) ............................................... 24

*Safari Club Int'l v. Jewell*,
  111 F. Supp. 3d 1 (D.D.C. 2015) ............................................... 43

*Scenic Am., Inc. v. U.S. Dep't of Transportation*,
  983 F. Supp. 2d 170 (D.D.C. 2013) ................................................................ 18, 19

*St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*,
  85 F. Supp. 3d 197 (D.D.C. 2015) ...................................................................... 33

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F. Supp. 3d 91 (D.D.C. 2017) ...................................................................... 34

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ........................................................................... 36, 37, 39

*Tourus Recs., Inc. v. Drug Enf't Admin.*,
  259 F.3d 731 (D.C. Cir. 2001) ............................................................................ 24

*Trump v. Wilcox*,
  145 S. Ct. 1415 (2025) ....................................................................................... 38

*United States v. Fausto*,
  484 U.S. 439 (1988) ........................................................................................... 37

*United Student Aid Funds, Inc. v. Devos*,
  237 F. Supp. 3d 1 (D.D.C. 2017) ........................................................................ 43

*Venetian Casino Resort, L.L.C. v. E.E.O.C.*,
  530 F.3d 925 (D.C. Cir. 2008) ............................................................................ 19

*Widakuswara v. Lake,*
  779 F. Supp. 3d 10 (D.D.C. 2025) ..................... 13, 14, 17, 22, 25, 27, 30, 35, 36, 41

*Widakuswara v. Lake*,
  No. 1:25-CV-0887-RCL, 2025 WL 2159180 (D.D.C. July 30, 2025) ......................... 15, 32, 33

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ................................. 14, 40

**STATUTES**

5 U.S.C.

§ 551 .................................................................................................. 18, 20
§ 706 .................................................................................................. 23, 35
§ 1202 ........................................................................................................ 38
§ 1211 ........................................................................................................ 38
§ 7104 ........................................................................................................ 38
§ 7703 .................................................................................................. 38, 39

22 U.S.C.

§ 6201...................................................................................................... 3, 7
§ 6202.................................................... 3, 4, 7, 14, 16, 27, 28, 31, 32
§ 6204...................................................................................................... 4
§ 6205...................................................................................................... 4
§ 7813............................................................................................... 27, 28
§ 8754............................................................................................... 27, 28

## OTHER AUTHORITIES

American Relief Act of 2025,
    Pub. L. No. 118-158, 138 Stat. 1722 (2025)............................................ 6

Continuing Appropriations and Extensions Act of 2025,
    Pub. L. No. 118-83, 138 Stat. 1524 (2024)............................................. 6

Continuing Appropriations, Agriculture,
    Legislative Branch, Military Construction and Verterans Affairs,
    and Extension Act, 2026, H.R. 5371, 119th Cong. (2025) ....................... 7

Foreign Relations Authorization Act of 1977,
    Pub. L. No. 94-350, 90 Stat. 823 (1976)................................................. 3

Further Consolidated  Appropriations Act of 2024,
    Pub. L. No. 118-47, 138 Stat. 460 (2024)........................................... 5, 28

Further Consolidated Appropriations Act, 2024,
    Legislative Text and Explanatory Statement (Comm. Print 2024) ........... 5

H. Rep. 95-1403 (July 31, 1978)....................................................... 38

H.R. 1968, 119th Cong. § 1101(a) (2025) ............................................. 6

International Broadcasting Act.
    Pub. L. No. 103-236, § 302, 108 Stat. 382 (1994)................................. 3

Ronald Reagan, *Remarks at a Ceremony Commemorating the 40th Anniversary
    of the Voice of America* (Feb. 24, 1982)............................................. 2

S. Rep. No. 95-969 (1978) ......................................................... 37, 38

United States Information and Exchange Act of 1948,
    Pub. L. No. 80-402, 62 Stat. 6 (1948)................................................. 2

## RULES

Fed. R. Civ. P. 56..................................................................... 16

LCvR 7(n)(1) ................................................................................................................ 42

**EXECUTIVE ORDERS**

Continuing the Reduction of the Federal Bureaucracy,
    Exec. Order No. 14,238, 90 Fᴇᴅ Rᴇɢ. 13043 (Mar. 14, 2025) ............................................ 8, 25

# INTRODUCTION

For over 80 years, listeners across the globe tuned into Voice of America (VOA) to hear truthful, accurate news reporting. Whether that reporting concerned what was happening in listeners' own backyards or developments abroad, listeners could trust that they were not simply hearing propaganda, but an objective take on current events. That was VOA's power and its mission: To defeat disinformation through truth. To prove the value of democracy and a free press by showing, not telling. And to undermine authoritarianism through shedding light on its inevitable flaws, rather than through force.

That all changed in March 2025. Overnight and without consideration for VOA's role in the world, the interests of its listeners, or the laws that Congress passed, Defendants—the United States Agency for Global Media (USAGM), the umbrella agency under which VOA is housed, and its political leadership—decided to drastically slash VOA's and USAGM's operations to a fraction of what they once were. They blindly implemented an Executive Order, eschewing their own substantive and procedural legal obligations. Their resulting conduct did not reflect the reasoned decisionmaking required of agencies, nor was it faithful to the agency's governing statutes. Defendants, for instance, staffed the entities—entities that must, according to statute, put out meaningful programming—with almost no one. To make matters worse, since April they have consistently failed to provide information about their operations in defiance of this Court's orders.

The law requires more. No one doubts that the executive branch is in charge of running its agencies. But it must do so consistent with federal laws, including the Administrative Procedure Act (APA)—our Government's bulwark against arbitrary and unlawful government action. Defendants have failed to do so. Their actions reflect the archetypal APA violation. The result of Defendants' unlawfulness has been the near total shuttering of a venerable institution that has

historically enjoyed bipartisan support. This Court should permanently vacate and set aside their actions.

## BACKGROUND

I.    STATUTORY BACKGROUND

  A.    Congress Created VOA to Serve as a Consistently Reliable Source of Impartial News Around the Globe.

VOA is an international news outlet that broadcasts through digital, television, and radio platforms. It launched during the height of World War II with a simple, but powerful mission: to counter Nazi propaganda through truthful reporting delivered to German citizens living under the Nazi regime. Statement of Undisputed Material Facts (SUMF) ¶ 1. Over the next several decades, Congress formalized VOA's role and cemented its operation through a series of legislative enactments. Throughout this time, VOA maintained responsibility, in the words of President Reagan, to "bring[] truth to light in a world groping in the darkness of repression and lies."[1]

Congress first codified VOA's existence, and its core mission, shortly after it first began broadcasting. In 1948, Congress passed the United States Information and Exchange Act of 1948, known, by the names of its sponsors, as the Smith-Mundt Act. Pub. L. No. 80-402, 62 Stat. 6 (1948); SUMF ¶ 2. The Smith-Mundt Act codified "an information service to disseminate abroad information about the United States, its people, and policies promulgated by the Congress, the President, the Secretary of State and other responsible officials of Government having to do with matters affecting foreign affairs." Pub. L. No. 80-402, § 2(1); SUMF ¶ 3. With the Smith-Mundt Act, VOA first became a creature of statutory law.

---

[1] Ronald Reagan, *Remarks at a Ceremony Commemorating the 40th Anniversary of the Voice of America* (Feb. 24, 1982), https://www.reaganlibrary.gov/archives/speech/remarks-ceremony-commemorating-40th-anniversary-voice-america.

Three decades later, in 1977, Congress further formalized VOA's role and its specific mission by codifying VOA's charter. The Foreign Relations Authorization Act of 1977, Pub. L. No. 94-350, 90 Stat. 823, 831 (1976), amended the Smith-Mundt Act to recognize VOA's importance to United States "long-range interests." *Id.* § 503; SUMF ¶ 4. This law set out three strategic—and now statutory—requirements to guide VOA's operation:

> (1) VOA will serve as a consistently reliable and authoritative source of news. VOA news will be accurate, objective, and comprehensive.

> (2) VOA will represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions.

> (3) VOA will present the policies of the United States clearly and effectively, and will also present responsible discussion and opinion on these policies.

*Id.* (currently codified as 22 U.S.C. § 6202(c)).

Over time, Congress built out VOA's mission by adding additional specific requirements similar to those mentioned above. SUMF ¶ 5. Most notably, in 1994, Congress passed the International Broadcasting Act (IBA). Pub. L. No. 103-236, § 302, 108 Stat. 382, 432-33 (1994) (codified as 22 U.S.C. §§ 6201, *et seq.*); SUMF ¶ 6. The IBA set forth broadcasting principles and standards to govern VOA and USAGM, the larger umbrella agency under which VOA now exists. SUMF ¶ 7. Under 22 U.S.C. § 6202(a)(7), for instance, "United States international broadcasting shall," among other requirements laid out in the statute, "be designed so as to effectively reach a significant audience." Similarly, Congress mandated that "United States international broadcasting shall include" ten different enumerated capacities and standards. 22 U.S.C. § 6202(b)(1)-(10). Accordingly, through statute, Congress required that VOA and USAGM broadcast news to a wide

audience across the globe, and it prescribed that this news must adhere to high journalistic standards.

Through the IBA, Congress also codified structural safeguards to protect VOA's and USAGM's mission. The Act insulates USAGM newsrooms' staff from certain interference by executive branch officials who "shall respect the professional independence and integrity of the Agency, its broadcasting services, and the grantees of the Agency." 22 U.S.C. § 6204(b). *See also* §§ 6202(a)(5), (b)(1); SUMF ¶ 8. These statutory provisions embody the "firewall" between journalists and executive branch officials who must not interfere with the reporting at the entities.

Political leadership has not always respected this statutory scheme. In 2020, after taking office, the CEO of USAGM, Michael Pack, immediately fired several heads of USAGM broadcasting networks and other expert journalist staff for no apparent reason. SUMF ¶ 9. As a result, in 2021 Congress addressed calls for reform in the 2021 National Defense Authorization Act (NDAA). *Id.* ¶ 10. Following the passage of that law, a Presidentially appointed, Senate-confirmed, and party-balanced board of seven, known as the International Broadcasting Advisory Board, must approve by a majority vote the appointment and removal of the heads of the broadcast networks, including VOA. 22 U.S.C. § 6205(e)(1); SUMF ¶ 10. Such a structure was designed to protect the heads of United States international broadcasting networks from arbitrary removal. It passed overwhelmingly: In the Senate by a vote of 81 to 13, and in the House by a vote of 322 to 87, overriding a veto by President Donald Trump. SUMF ¶ 11.

**B.    Congress Appropriated Funds So That VOA and USAGM Can Meet Their Missions.**

In addition to codifying their missions and a structure to protect journalistic integrity, Congress has appropriated significant sums to VOA and USAGM to carry out their goals. Specifically, in 2024, Congress appropriated $857,214,000 to USAGM to "carry out international

communication activities." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F., 138 Stat. 460, 735 (2024). Congress specified that "funds appropriated under this heading shall be allocated in accordance with the table included under this heading in the explanatory statement described in section 4." *Id.* at 735. That table states that Congress appropriated $260,032,000 to VOA. 118th Cong. Further Consolidated Appropriations Act, 2024, Legislative Text and Explanatory Statement at 1167 (Comm. Print 2024).[2]

Congress also provided in the Appropriations Act that "significant modifications to USAGM broadcast hours previously justified to Congress, including changes to transmission platforms (shortwave, medium wave, satellite, Internet, and television), for all USAGM language services shall be subject to regular notification procedures of the Committees on Appropriations." *See* Further Consolidated Appropriations Act of 2024, Pub L. No. 118-47, div. F., 138 Stat. 460, 735-36 (2024).

Congress made this appropriation only after USAGM made a specific presentation to Congress, through a budget justification, as to why the money Congress appropriated was necessary and how it would be spent. That presentation set out detailed information about VOA's broadcast hours across numerous countries, languages, and regions. SUMF ¶ 14. It then requested specific sums to cover the needs for each component of its operation. *Id.* In addition to these amounts, VOA and USAGM requested $238,359,000 for Mission Support (including contracting and procurement and human resources) and $178,473,000 for Technology, Services, and

---

[2] The original 2024 appropriation, which has been extended under a continuing resolution four times, provides discretion to USAGM to "reprogram[]" funds "within and between amounts designated in such table." Pub. L. No. 118-47, div. F., 138 Stat. 460, 735 (2024). But this discretion is narrow: USAGM's reprogramming may not "reduce a designated amount by more than 5 percent" and any reduction of 5 percent or less is subject to "the regular notification procedures of the Committees on Appropriations." *Id.*

Innovation (including operating transmitting stations and disseminating radio and satellite services). *Id.*

After Congress, relying on this presentation, appropriated slightly lower amounts than those requested in 2024, Congress then renewed those sums multiple times. On September 26, 2024, through the Continuing Appropriations and Extensions Act of 2025, Congress renewed VOA's and USAGM's funding. Pub. L. No. 118-83, 138 Stat. 1524 (2024). In relevant part, that law appropriated "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2024 and under the authority and conditions provided in such Acts, for continuing projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2024." *Id.*, Div. A, § 101.  Put simply, this continuing resolution provided for a continuation of the same agency operations as had been conducted in FY24.

Upon the expiration of this continuing resolution, on December 21, 2024, Congress again renewed its appropriations to VOA and USAGM on the same terms through yet another continuing resolution, the American Relief Act of 2025. Pub. L. No. 118-158, 138 Stat. 1722, 1723 (2025). Those appropriations were made through March 14, 2025. *Id.*, Div. A, § 101.

On March 15, 2025, President Trump signed into law Congress's further appropriations on the same terms to VOA and USAGM that ran through September 30, 2025. H.R. 1968, 119th Cong. § 1101(a) (2025).  As before, Congress appropriated "[s]uch amounts as may be necessary, … under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024, for projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for, and for which appropriations, funds, or other authority were made available." *Id.*

6

On November 12, 2025, the President signed into law, following Congress's passage, the Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Verterans Affairs, and Extension Act, 2026, which continues appropriations to USAGM and VOA on the same terms as the above-referenced laws until January 30, 2026. H.R. 5371, 119th Cong., Div. A, § 101 (2025) (enacted); Congress.gov, H.R.5371 - Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, https://www.congress.gov/bill/119th-congress/house-bill/5371 (last accessed Nov. 13, 2025).

## II.    FACTUAL BACKGROUND

Since its first broadcasts 83 years ago, and up until March of this year, VOA, and then USAGM, too, have continued their missions by bringing "consistently reliable" news to countries that "lack adequate sources of free information." 22 U.S.C. §§ 6201(4), 6202(b)(1). They did so through a robust operation, built to achieve their statutory objectives, with the nearly $900 million allocated to USAGM, including more than $260 million allocated by Congress to VOA. Specifically, prior to March 15, 2025, VOA provided comprehensive, multimedia reporting in 49 languages to an estimated 362 million people across the globe on a weekly basis. SUMF ¶ 20. USAGM and VOA employed approximately 1,147 full-time employees and had employment contracts with 598 personal services contractors (PSCs). *Id.* ¶ 21. VOA accounted for approximately 1,300 of these full-time employees and PSCs. *Id.* Many of these PSCs were key VOA journalists from other countries who delivered truthful reporting to those living abroad. *Id.* ¶ 22. Approximately 1,000 of VOA's employees and contractors were journalists. *Id.* ¶ 21. A staff of 32 radio broadcast technicians was essential to keeping this expansive programming running. *Id.* ¶ 23. USAGM provided additional staffing and operational capacity to support VOA and its sister entities. Specifically, USAGM's mission support office provided "a range of support services," including human resources and information technology, among other functions. *Id.* ¶ 24.

These functions were critical to USAGM and VOA's broadcast functions: Mission Support's Office of Technology, Service, and Innovation "manage[d] IT services and infrastructure for USAGM's federal broadcast networks and distribute[d] content for the entire Agency." *Id.*

### A.    Defendants Decided to Dramatically Reduce VOA's and USAGM's Operation.

Things changed dramatically in March of this year. On March 14, 2025, hours prior to signing into law Congress's appropriations to VOA and USAGM, the White House issued an Executive Order, applicable to USAGM, titled "Continuing the Reduction of the Federal Bureaucracy." Exec. Order No. 14,238, 90 FED REG. 13043, 13043 (Mar. 14, 2025) (also available at https://tinyurl.com/2wue2bt7); SUMF ¶ 25. The March 14 Executive Order instructed USAGM (and six other agencies) to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law," and to submit a plan to implement the reductions "within [seven] days," no later than March 21.

USAGM's leadership then made a decision to implement the Executive Order without any independent analysis of whether it embodied sound policy consonant with the mandates governing the agency or with basic principles of administrative procedure. Defendants made this decision almost instantaneously. Then-Senior Adviser Kari Lake testified that she "learned about [the executive order] at night" on March 14th. SUMF ¶ 26. She "didn't know about the executive order" before that. *Id.* But by the very "next day," Lake had already "*decided* to get busy to work" reducing VOA's and USAGM's operation from its current operation—in which approximately 1,147 full-time employees and 598 personal services contractors worked to deliver the news to hundreds of millions of people—to a skeleton crew, which Defendants referred to as the "statutory minimum." *Id.* (emphasis added); *see also id.* (there was a "decision of the team" to "follow the President's executive order" and "reduce" VOA and USAGM to the "minimum presence and

function required by law"). Lake made clear that in her view, the Executive Order was the only direction she needed: "My view is that whatever the President decides to do with this agency in conjunction with the legislature, we will abide by that." *Id.* ¶ 27; *see also id.* ("the President really decided to reduce the agency to its statutory minimum"); *id.* ("And I don't think it needed to be accepted. What needed to be accepted was that the President had ordered us to reduce the agency to its statutory minimum.").

At that point, Lake had been delegated "95 percent of" the "authorities of the CEO"— everything other than "[w]riting reports that were due." *Id.* ¶ 28; *see also id.* (this designation happened before the Executive Order was issued).

As described in more detail in Section B below, Defendants began implementing their plan that day, and continued doing so over the next several days, halting only in the face of judicial intervention. But the "decision" to reduce the agency to its "statutory minimum" was "made on March 15th." *Id.* ¶ 29.

Notably, the decision to reduce operations to the so-called "statutory minimum" was made—and Defendants began implementing that decision by going dark, placing employees on leave, and firing PSCs—before they even formulated their view of what the statutory minimum actually was. It was not until March 18, in conjunction with other staff, that Defendants generated a document—the Statutory Minimum Memorandum—memorializing their decision to adopt the Executive Order's directive and reduce VOA and USAGM to the "statutory minimum" number of personnel necessary to maintain the "statutory minimum" functions. Defendant Lake made clear that they developed this Memorandum following their decision, which was "on the President's Executive Order." *Id.* ¶ 30. This Memorandum "became guidance for what statutory minimum was so that [Defendants] could effectuate the President's executive order," *id.* ¶ 31, and "a guideline to

how we would effectuate the statutory minimum," *id.*; *see also id.* ("I was simply asking them, what is statutory minimum? This is the document."); *id.* ("Q: And wasn't this statutory minimum document laying out the maximum extent consistent with law? A: Yes."). It set out recommendations for how many positions to retain and concluded that "[a]ll other positions would be terminated." *Id.*

Even though it was labeled as a "recommendation," Lake made clear that, in her view, the Statutory Minimum Memorandum was final. It reflects "the decision that this was [the] statutory minimum." *Id.* ¶ 34. It was not a recommendation that "needed to be accepted." *Id.* This memorandum was then used to "guide[] the agency's decisions," from the date it was issued—March 18th—up to the present day. *Id.*[3]

Defendants also made other public, written statements reflecting Defendants' decision to drastically reduce VOA's and USAGM's operation. USAGM issued a press release announcing that USAGM "is not salvageable," and that "from top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken." *Id.* ¶ 35. Kari Lake reiterated that drastic actions were being taken to shut down USAGM and the entities it oversees in the days following the March 15 release. In two interviews, Lake stated that USAGM is not salvageable or unsalvageable multiple times, *id.*, that VOA and related entities put out "anti-American content," and that there is "no oversight over the editorial side of

---

[3] Defendants have also been subject to part (3) of this Court's preliminary injunction since April 22, 2025. Whether Defendants' decisions subsequent to the preliminary injunction going into effect are attributable to the preliminary injunction or Defendants' own thinking is unclear. For example, Defendants did not restart any programming until *after* Plaintiffs initiated show-cause proceedings. And they announced for the first time their intent to restart some digital programming in Korean and Russian in the middle of court-ordered depositions related to compliance with the injunction. But it is clear that the elimination of the vast majority of programming and staff is attributable to the agency action challenged here, as discussed in the next section.

what is going out over the air and that this agency has tried to put up a wall, a border wall around it, Voice of America and others … that says … you can't tell us what we say on the airwaves … that's not how things should operate," *id*.

### B.    Defendants Implemented Their Decision.

In the days following their decision to dramatically reduce VOA's and USAGM's operation to the "statutory minimum," Defendants implemented that decision—first, by shutting the entire agency down and then later by, over a longer period (and only after judicial intervention, *see* n.3, *supra*) bringing a handful of people back to work and broadcasting to a fraction of their previous audience. According to Defendant Lake, the first set of actions was part of the same decision: the agency directed that all staff be placed on administrative leave, and all programming cease, while Defendants determined what the "statutory minimum" was. *Id.* ¶ 36.

On March 15, 2025, Lake "decided to place nearly all USAGM staff on paid administrative leave." *Id.* ¶ 37. That day, 1,042 of the agency's 1,147 full-time employees were placed on administrative leave "until further notice." *Id.*

Also on March 15, 2025, Lake "decided to terminate all the personal service contractors." *Id.* ¶ 38. The next day, USAGM notified USAGM's PSCs that they would be terminated on March 31, 2025. *Id.* The termination notice applied to 598 PSCs who worked at USAGM, many of whom were key journalists and some of whom were on J-1 visas that would expire 30 days after they were terminated. *Id.* Although this termination notice was temporarily stayed by this Court's Preliminary Injunction issued on April 22, it was effectuated in May, when USAGM terminated nearly all of the approximately 598 PSCs who worked at USAGM and VOA. *Id*. Between March 15 and the government shutdown on October 1, hundreds of VOA and USAGM employees were paid their full government salary but prohibited from doing any work. *Id.* ¶ 39.

On March 15, Lake "directed that VOA cease all programming" and, within the next few days, "ordered that the VOA news services, the foreign news services, should shut down their transmitters." *Id.* ¶ 40. As a result, on March 17, 2025, William Martin, Director for Stations and Operations, instructed all USAGM Foreign Service employees to expect to be placed on administrative leave, but to first shut down all transmitters at their stations within two days and requested the respective missions to place all locally employed staff on administrative leave. *Id.*

Days later, as this Court recently explained, Defendants notified union officials that Defendants intended to separate all VOA radio broadcast technicians, represented by Plaintiff AFSCME, and 594 members of Plaintiff AFGE, "including broadcast journalists, technicians, budget analysts, electronics engineers, and others." *Id.* ¶ 41.

 As a result of these actions and others, in March 2025 VOA ceased all broadcasting activities for the first time in 83 years. *Id.* ¶ 42 ("Q: Did all of VOA's language services cease all broadcasting and programming in March 2025? A: Yes."). Rather than "consider[ing] the interest of audiences abroad before … ordering that VOA cease all programming," Lake categorically and immediately "got busy working to effectuate the President's executive order." *Id.* ¶ 43. VOA "continued to sit silent" for months. *Id.* Indeed, Lake explained that the only consideration she gave to the effect of abruptly ceasing all broadcast on audiences abroad was to loop a "graphic" with the "VOA charter" on it, rather than "go to … snow … until [Defendants] determined what the statutory minimum was." *Id.*

Since then—and following this Court's preliminary injunction—Defendants have run a skeletal VOA operation. VOA is operating four language services in a substantially reduced fashion and with substantially fewer personnel (though one of them, Mandarin, is only producing

digital content). *See id.* ¶ 44. Defendants recently decided to restart some digital programming for the Korean and Russian Services. *Id.*

## III.    PROCEDURAL BACKGROUND

On March 24, 2025, the *Widakuswara* Plaintiffs sued in the Southern District of New York (S.D.N.Y.) and sought emergency relief to halt and reverse the agency's dismantling. On March 26, the *Abramowitz* Plaintiffs sought the same relief, but limited to VOA, in the District Court for the District of Columbia (D.D.C.). On March 28, the *Widakuswara* Plaintiffs secured a temporary restraining order pausing USAGM's unlawful conduct. On April 4, at Defendants' request, the *Widakuswara* case was transferred to D.D.C. and assigned to this Court as related to *Abramowitz.*

On April 22, the Court granted Plaintiffs' motions for a preliminary injunction. After finding jurisdiction, the Court explained that the Defendants' actions were likely arbitrary and capricious as they lacked "any analysis whatsoever." *Widakuswara v. Lake,* 779 F. Supp. 3d 10, 33 (D.D.C. 2025). Defendants acted "without considering [USAGM's and VOA's] statutorily or constitutionally required functions as required by the plain language of the EO, and without regard to the harm inflicted on employees, contractors, journalists, and media consumers around the world." *Id.* at 35. The Court also held Defendants' actions were "not in accordance with" statutory and constitutional law. *Id.* at 35-36. As a result, "defendants are likely in direct violation of numerous federal laws," including provisions of the VOA Charter and International Broadcasting Act, as well as congressional appropriations laws. *Id.* at 35.

The Court took immediate action, issuing a three-part preliminary injunction. The preliminary injunction required, among other things, Defendants to "take all necessary steps to return USAGM employees and contractors to their status prior to" the Executive Order "including by restoring all USAGM employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025" (Prong (1)) and to "restore VOA

13

programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news'" (Prong (3)). *Id.* at 40 (quoting 22 U.S.C. § 6202(c)).

On April 24, Defendants appealed Prong (1) of the preliminary injunction and concurrently moved for a partial stay pending appeal in the D.C. Circuit, which a divided motions panel granted on May 3, 2025. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *1 (D.C. Cir. May 3, 2025). Judge Pillard dissented. *Id.* at *6. Plaintiffs sought en banc review of the motions panel's decision, which the Court denied. No. 25-5144, 2025 WL 1556440 (D.C. Cir. May 22, 2025). Chief Judge Srinivasan issued a separate statement, joined by six members of the court, in which he clarified that the en banc denial "should not be understood to accept … the government's assertion" that "the district court lacks any authority … 'to order personnel actions.'" *Widakuswara v. Lake*, No. 25-5144, 2025 WL 2787974, at *1 (D.C. Cir. May 28, 2025). Writing for herself, Judge Pillard explained that prong (1) of the preliminary injunction—which required Defendants to restore USAGM personnel to their status before Defendants' illegal actions—"was well tailored to the defendants' arbitrary and unlawful action," but concurred in the denial of en banc review because en banc review "is not a mere error-correction mechanism." *Id.* at *3.

As this Court noted in issuing the April 22 preliminary injunction, USAGM showed "no signs of returning" to active operations at all until, as a result of prior "successive bouts of injunctive relief" in this Court and the Southern District of New York, it re-emerged "as a skeletal version of its former self." *Widakuswara*, 779 F. Supp. 3d at 31 n.21. When, following this Court's issuance of the April 22 preliminary injunction and the stay proceedings in the D.C. Circuit, VOA had still only resumed at most *de minimis* operations, Plaintiffs each filed motions for an order to show cause to gauge Defendants' level of compliance with prong (3) of the preliminary injunction, which was neither stayed nor appealed. 25-cv-1015, ECF No. 112; 25-cv-887, ECF No. 37. As

part of the show-cause process, Plaintiffs also requested that Defendants be ordered to develop a plan to bring themselves into compliance with the preliminary injunction. *Id.*

This Court deemed Defendants' answers meant to show compliance with the preliminary injunction insufficient. "VOA's staffing levels are inextricably enmeshed with its operational capacity and, in turn, its ability to carry out its statutory mandate, because VOA cannot operate without employees," this Court ruled. *Widakuswara v. Lake*, No. 1:25-CV-0887-RCL, 2025 WL 2159180, at *2 (D.D.C. July 30, 2025). And VOA's appropriations, reflecting Congress's understanding of the level of required operations, must be spent by "VOA *to carry out its statutory mandate* with news and broadcasting operations." *Id.* at *3. Indeed, "surely, when Congress appropriated $260 million to VOA for FY 2025, it did not anticipate that such a significant sum of taxpayer funds would be used to pay employees to sit at home for months on end, making no contributions to VOA's statutory mandate." *Id.* Rather, this Court ruled that Defendants must "engage with the additional statutory provisions regarding required language programming" in appropriations acts. *Id.* at 4. Thus, after "provid[ing] the defendants with every opportunity to demonstrate that they are complying with the preliminary injunction in good faith," the Court ordered Defendants to show cause and to produce information and documents reflecting their plan to, *inter alia*, "restore[] VOA programming such that VOA is producing and broadcasting news consistent with the International Broadcasting Act[] in each relevant medium." *Id.* at *5.

Because Defendants did not provide information regarding their compliance, the Court ordered that Defendant Lake and two other USAGM and VOA officials sit for three expedited depositions. ECF No. 72. These depositions provided insight into Defendants' decisions, decisionmaking, and actions.

## LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is only "'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248).

## ARGUMENT

### I.    DEFENDANTS' ACTIONS TO DRASTICALLY REDUCE VOA'S AND USAGM'S OPERATION ACROSS THE BOARD VIOLATE THE APA.

The APA provides a check against arbitrary exercises of government power. It requires that an agency have a reasoned explanation for its actions—and explain that rationale to the public. And it requires that an agency act consistent with the law, including the statutes that obligate the agency and the Constitution. When the government does not meet these standards, its actions must be set aside.

That is what should happen here. On behalf of all "segment[s] of American society," 22 U.S.C. § 6202(c)(2), prior to March 15, approximately 1,147 full-time employees and 598 personal services contractors worked to deliver impartial news to global listeners. That includes approximately 1,300 employees at VOA who reached about 362 million people on a weekly basis. Then, over the course of an evening, Defendants decided to cut VOA's and USAGM's operation back to a mere fraction—what Defendants call the "statutory minimum." That sort of drastic change, impacting people in all corners of the globe, and made without consideration or

explanation and in contravention of applicable statutes, is exactly what Congress enacted the APA to prevent. That is true whether Defendants are meeting the so-called "statutory minimum" or not.[4] In order to radically change government programming of the type at issue in this case, the APA demands that Defendants take account of the relevant factors, explain their rationale, and operate consistent with law.

But Defendants have never done so. They didn't explain their rationale when they announced their decision, which is what the APA requires. They didn't explain their rationale when they placed employees on leave, cancelled contracts, and shut down programming. They didn't even explain their rationale to the Court after these suits were filed. In the limited discovery Plaintiffs conducted, Defendants once again offered no explanation. In fact, Defendants have never defended this suit on the merits. *See, e.g.*, *Widakuswara*, 779 F. Supp. 3d at 34 ("In their briefing before this Court, [Defendants] do not even use the words 'arbitrary' or 'capricious' anywhere."). And yet they have insisted that their unreasoned decision can stand.

It can no longer. Defendants made a single, discrete, and final—but unreasoned—decision to reduce the agency to the "statutory minimum." That decision should be vacated. And, in the alternative, if this Court views the subsidiary decisions implementing that decision as the correct unit of APA analysis, the result is the same: Those decisions are unreasoned and should be vacated.

In either case, Defendants utterly failed to explain the bases for their decision or actions; did not consider the required factors for making that decision or taking those actions; and have acted contrary to various statutes and the Constitution. As before, the Court should find that Defendants have violated the APA and return VOA and USAGM to the status quo ex ante.

---

[4] To be clear, Plaintiffs do not agree with Defendants' evident belief that simply meeting some self-defined "statutory minimum" is legally sufficient, nor that Defendants are meeting any reasonable notion of a "statutory minimum" in any event.

A.    **Defendants Engaged in Discrete, Final Agency Action.**

Whether viewed as a single decision or a series of decisions implementing a policy, Defendants took discrete, final action that is reviewable under the APA.

1.    **Defendants Made a Single Decision to Reduce VOA's and USAGM's Operation.**

On one day in March, Defendants made a specific, final decision: to reduce VOA and USAGM from entities that employed thousands of people, broadcast in 49 languages, and reached 362 million people, to what Defendants call the "statutory minimum." Defendants then memorialized that decision in a memorandum, which they refer to as "guidance." *See* SUMF ¶ 31. But not just any guidance: This was a "foundational document" that the agency "rel[ied] on" to reduce VOA's and USAGM's operation. *Id.* This decision thus satisfies the APA's standard for discreteness and finality. A decision—reflected in a document characterized as "guidance" or not—that reflects the consummation of an agency's decisionmaking process and "has a binding effect on the agency" is challengeable under the APA. *Scenic Am., Inc. v. U.S. Dep't of Transportation*, 983 F. Supp. 2d 170, 183 (D.D.C. 2013).

a)    ***This decision is discrete.***

The "discreteness" requirement stems from the text of the APA. That law defines the "agency action" that can be challenged as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C § 551(13). These five named items—rule, order, license, sanction, and relief—the Supreme Court said, all "involve circumscribed, discrete agency actions." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). And while the APA permits a challenge to any specific agency action, it does not permit a "broad programmatic" challenge. *Id.* at 64. Put another way, plaintiffs must challenge "some particular

'agency action' that causes [them] harm" rather than "seek[ing] *wholesale* improvement of [a] program." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

That is precisely what Plaintiffs do here. Defendants made a decision to drastically cut an agency, harming each of the Plaintiffs. Plaintiffs now ask for that single decision to be undone.

That the decision had to be implemented does not make it any less discrete. Nearly every agency action, and certainly every challengeable "guidance" document, requires some number of steps to be implemented. *See, e.g.*, *Scenic Am.*, 983 F. Supp. 2d at 174 (guidance that established "criteria" for subsequent decisions was challengeable). In *Biden v. Texas* for example, the Supreme Court entertained a challenge to a memorandum that terminated a government policy, even though that memorandum expressly stated that several subsidiary actions needed to be taken to implement it. The memorandum "direct[ed] DHS personnel to take all appropriate actions" to implement the termination decision, "including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to implement the program." *Biden v. Texas*, 597 U.S. 785, 793 (2022). The Supreme Court did not require that Plaintiffs individually challenge each of the "steps necessary"; the decision to terminate the policy was discrete enough to constitute "agency action" within the meaning of the APA. *Id.* at 807; *see also Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (challenge to the "practice of habitually approving and extending H-2A visas for lengthy periods of time" was challenge to discrete, final action).

As evidenced by *Biden v. Texas*, courts thus look to the character of the agency action to determine whether it is challengeable, without needing to identify *which* of the five named subsidiary items—rule, order, license, sanction, and relief—is at issue. 597 U.S. at 897-98; *see also Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 931 (D.C. Cir. 2008) (finding an agency "policy" reviewable without asking which subcategory of "agency action" it fell within).

19

However, if the Court deems it necessary to slot the agency action challenged here into a subcategory, *see Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 783 (D.C. Cir. 2025), Defendants' decision fits the definition of a "rule"—or, at minimum, the "equivalent … thereof"— to a tee, 5 U.S.C § 551(13). Defendants made a decision to reduce VOA and USAGM to their "statutory minimum" in response to the Executive Order, and that decision was reflected in a written memorandum (and other written documents, like social media posts and a press release) that were used to "guide[] the agency's decisions," from the date it was issued—March 18th—up to the present day. SUMF ¶ 34. Consider that action in comparison to the textual definition of a "rule." Those written documents reflect "an agency statement" (check, the agency spoke through its written statements), "of general … applicability and future effect" (check, the rule guided the agency's decision going forward), "designed to implement … policy or describing the organization … of an agency" (check, the whole purpose was to reorganize the agency to its "statutory minimum" consistent with the new administration's policy) and "includes the … prescription for … services" (check, the goal was to cut back nearly all services). 5 U.S.C § 551(4).

### b)        *This decision is final.*

A decision is final when it "mark[s] the consummation of the agency's decisionmaking process," and determines "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). That has occurred. The deposition testimony could not be any clearer on this point. In not a single deposition, or a single filing, or a single argument before this Court have Defendants ever suggested that they are still considering whether or not to adopt a decision to reduce VOA and USAGM to what they call the "statutory minimum." Their decisionmaking process (such as it is) has been consummated. The "decision" to reduce the agency to its "statutory minimum" was "made on March 15th." SUMF ¶ 29. By then, Lake had already "*decided* to get busy to work" reducing VOA to a fraction of its former self. *Id.* ¶ 26 (emphasis

added); *see also id.* (there was a "decision of the team" to "follow the President's executive order" and "reduce" VOA to the "minimum presence and function required by law"). This was the Defendants' final decision, and it is the decision being challenged in this action.

From this decision, rights and obligations have flowed. Many times over. Over a thousand employees have been placed on administrative leave, paid for more than seven months to do no work. Hundreds have been terminated. Operational capacity at VOA and USAGM has been decimated. Hundreds of millions of listeners have lost out on programming.

Fluctuations in the precise level of staffing and programming do not undermine finality. In her deposition testimony, Lake explained that there were minor fluctuations in agency staffing following the June bombing of Iran because when a "big story breaks, you bring more people in." SUMF ¶ 45. Defendants similarly decided to initiate some digital programming in North Korea following "the President's tweet about South Korea." *Id.* ¶ 44. But the "possibility that a decision may later be revised based on new information does not render 'an otherwise definitive decision nonfinal.'" *Kingdom v. Trump*, No. 1:25-cv-691-RCL, 2025 WL 1568238, at *9 (D.D.C. June 3, 2025) (citation omitted). And that the precise contours of *how to implement* the decision may shift does not otherwise mean that Defendants did not act illegally in the first instance by adopting the radical downsizing decision without analysis, explanation, or consideration of the relevant factors. Moreover, any deviation from the minimum programming identified in the Memorandum *could* be attributable to this Court's orders compelling compliance with prong (3) of the preliminary injunction. *See supra* n.3.

### 2. In the Alternative, Defendants' Actions Implementing Their Decision to Reduce VOA's and USAGM's Operation Are Individually Challengeable Under the APA.

If Defendants had not issued a discrete decision to reduce the entities to the statutory minimum, the actions Defendants took to implement their reduction decision would be reviewable

because they are discrete, final actions challengeable under the APA. This Court has already concluded that the "blanket placement of employees on administrative leave, termination of entire bargaining units of employees, [and] termination of PSCs … are … discrete, final agency actions subject to judicial review." *Widakuswara*, 779 F. Supp. 3d at 33. And in *NTEU v. Vought*, the D.C. Circuit made clear that a "court could … review" as final agency action the "specific actions taken to implement" a decision to wind down an agency. 149 F.4th at 790; *see also id.* at 784 (stating that actions implementing a shutdown decision, such as "firing employees" and "cancelling contracts" are "discrete decisions" that are reviewable).

These actions are:

- Placing 1,042 of the agency's 1,147 full-time employees on administrative leave on March 15, *see* SUMF ¶ 37;

- Cancelling contracts with approximately 598 PSCs, which the Agency originally proposed to do on March 16, and then finally consummated on May 30, *see id.* ¶ 38;

- Suspending all broadcasting and programming except for the limited functions retained by the Memorandum, *see id.* ¶¶ 30-32, 34, 40; and

- Terminating most of USAGM staff, including VOA radio broadcast technicians, which Defendants proposed to do on March 25, but have not yet effectuated only because of this Court's intervention. *Id.* ¶ 41.

Taken together or individually, these actions decimated VOA's and USAGM's abilities to broadcast and disseminate programming. They resulted in VOA going dark for the first time in its existence and programming and broadcasting at *de minimis* levels since. Because Defendants were

required to comply with the APA before taking actions that resulted in the cessation of relied-upon government services, each individual implementing action must be set aside.

### B.    Defendants' Actions Are Arbitrary and Capricious and in Violation of Law.

Black-letter administrative law requires that when an agency terminates a program—or, in this case, drastically reduces its operations across the board—it must comply with the APA. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 18 (2020) ("The creation of [a] program—and its rescission—is an action [that] provides a focus for judicial review" under the APA (cleaned up)); *Biden v. Texas*, 597 U.S. at 808 (memorandum rescinding immigration policy was challengeable final agency action under the APA). Under the APA, a "reviewing court shall ... hold unlawful and set aside agency action … found to be ... arbitrary and capricious … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Defendants' decision to reduce across-the-board VOA's and USAGM's operation is both arbitrary and capricious and contrary to relevant law, so the Court must set it—and the actions Defendants took to implement the decision—aside.

### 1.    Defendants' Decisions Are Arbitrary and Capricious.

The APA requires that an agency "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). When an agency adopts a new policy, the agency must demonstrate, through reasoned explanation, that "the new policy is permissible under the [governing] statute, that there are good reasons for it, and that the agency *believes* it to be better" than its old policy. *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 515 (2009). That reasoned explanation must be "contemporaneous" with its actions; "*post hoc* rationalizations" do not suffice. *See, e.g.*, *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1351 (D.C. Cir. 2014) (internal quotation marks and citation omitted).

As part of this exercise, an agency must undertake "a consideration of the relevant factors." *State Farm*, 463 U.S. at 43. Conversely, when an agency "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it [can] not be ascribed to a difference in view or the product of agency expertise," its action must be set aside as arbitrary and capricious. *Id.*; *see also, e.g.*, *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1113 (D.C. Cir. 2019) (decision to end subsidy for certain telecommunications services provided to tribal lands was arbitrary and capricious because, *inter alia*, the decision did not "indicate that [the agency] considered the effect of eliminating the enhanced subsidy …, namely that many low-income consumers on Tribal lands will lose access to affordable telecommunications service").

Most basically, "a 'fundamental' requirement of administrative law is that an agency 'set forth its reasons' for decision." *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (quoting *Roelofs v. Sec'y of the Air Force*, 628 F.2d 594, 599 (D.C. Cir. 1980)). An agency "must 'articulate a satisfactory explanation' for its action" that is "one of 'reasoning'" rather than "just a 'conclusion.'" *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (quoting *Tourus Records*, 259 F.3d at 737). "[C]onclusory statements do not suffice to explain [an agency] decision." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

Part of an agency's reasoned explanation must reflect that it considered "serious reliance interests" on prior agency policy. *Id.* at 221-22. That includes, among others, the interests of those who may directly benefit from the prior policy or program, *see, e.g.*, *Nat'l Lifeline*, 921 F.3d at 1114 (decision to alter subsidy arbitrary and capricious because agency never "attempted to estimate the number of consumers who would be unable to afford service … or would lose access

to service altogether"), as well as those that may have "crafted business models" or "invested significant resources" into providing a service dependent on the policy or program, *id.*

Defendants' actions in adopting and then implementing their decision to radically downsize VOA's and USAGM's operations across the board were arbitrary and capricious two times over. First, Defendants engaged in no reasoned decisionmaking in deciding, immediately, to implement the March 14 Executive Order by reducing their operations to some supposed bare "statutory minimum" without exception. And second, in crafting their so-called "statutory minimum" plan, Defendants failed to consider important aspects of their responsibilities under governing law. In addition to failing to account for their own statutory duties under the IBA and various appropriations acts, at no time did Defendants consider reliance interests at all.

### a)    *Defendants Provided No Reasoned Rationale.*

The Court previously found that "[n]ot only is there an absence of 'reasoned analysis' from the defendants; there is an absence of any analysis whatsoever." *Widakuswara*, 779 F. Supp. 3d at 33. Instead, the Defendants' "actions taken reflect a hasty, indiscriminate approach" fully at odds with the APA's mandates. *Id.* at 34. Because the record continues to reflect the same—indeed, the evidence produced since the Court's preliminary-injunction ruling only bolsters the Court's initial conclusion—the Court should once again hold that Defendants acted arbitrarily and capriciously by failing entirely to explain the bases for their decision.

To review, Defendants immediately decided to reduce drastically VOA and USAGM's functions across the board in response to the March 14 Executive Order. The Executive Order directed that "[w]ithin 7 days" the "head" of USAGM "submit a report … explaining which components or functions … are statutorily required and to what extent." March 14 Executive Order. Notably, the seven-day deadline referred only to the timeline for agency analysis, not its execution of any changes. Nonetheless, instead of taking the seven days to engage in an analysis

of the agency's statutory directives and how the agency could responsibly fulfill them, the agency immediately began shutting down its functions. *See* SUMF ¶ 26.

That Defendants reacted *automatically* to the Executive Order and have viewed their only responsibility as carrying it out as swiftly and completely as possible—notwithstanding the legal requirements to engage in reasoned decisionmaking and explain that process—only underscores the arbitrariness of their action. Merely premising agency action on an Executive Order does not reflect reasoned decisionmaking. *See Kingdom,* 2025 WL 1568238, at *10 ("[A]s numerous courts have held, the fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt them from arbitrary-and-capricious review.") (collecting cases).

Neither the Statutory Minimum Memorandum nor any statements contemporaneous with Defendants' decision to reduce dramatically VOA and USAGM functions provide a reasoned basis for their decision—or, in fact, any basis at all. The Statutory Minimum Memorandum does little more than list the number of employees that will fill various positions after the downsizing is accomplished. SUMF ¶ 32. It contains no findings, analysis, or consideration of any relevant factors. *Id.* Statements made contemporaneously with the Memorandum simply declare, in wholly conclusory fashion, that USAGM is a broken and unsalvageable agency without any proof or explanation. *See supra* Background § II.A (discussion of press release and contemporaneous statements). The ineluctable conclusion is that Defendants simply immediately reacted to the Executive Order, as Defendant Lake confirmed in sworn testimony, and that they engaged in no independent analysis and therefore provided absolutely no reasoned justification. That is textbook arbitrary and capricious decisionmaking. *Kingdom*, 2025 WL 1568238, at *10 ("If an agency could avoid the need to justify its decisions simply by gesturing to an Executive Order … the President

could unilaterally eviscerate … the APA simply by issuing a carbon-copy executive order mandating that an agency act in a particular way before it does so.").

The overarching decision to reflexively implement the Executive Order in its entirety, as discussed above, is a clear APA violation. In addition, the individual steps taken to effectuate the decision to downsize to the so-called "statutory minimum" are similarly infected with the lack of reasoned analysis, given that they all flow from this original unreasoned decision.

        **b)**      ***Defendants Failed to Consider Relevant Factors.***

In addition, Defendants' radical downsizing decision and the actions taken to implement that decision were done without any regard at all for the various statutes that obligate VOA's and USAGM's functions and without taking into account reliance interests.

As a threshold matter, while the precise level of operations VOA and USAGM must carry out under governing law is subject to *some* reasonable debate, *see* ECF No. 100 at 10, 17-18, Defendant Lake's testimony confirmed what this Court already found: that Defendants decided to reduce VOA's and USAGM's operations across the board before ever determining what was statutorily required, let alone considering what level of programming was warranted as a matter of sound agency policy, *see Widakuswara*, 779 F. Supp. 3d at 34 (explaining that taking actions while determining how to comply with the EO "necessarily means that the defendants took the actions at issue here without any 'reasoned analysis' as to what was 'statutorily required'"); SUMF ¶ 36 (USAGM placed employees on leave before anyone determined what is legally required).

Congress intended USAGM to consider the factors set forth in the IBA when making its programming decisions. Specifically, it articulated broadcasting standards and principles to guide the agency. *See* 22 U.S.C. § 6202. It also mandated specific programming considerations, such as a goal of maintaining twelve hours per day of programming to North Korea and hourly live news updates to Iran. *See id*. §§ 7813, 8754. The Statutory Minimum Memorandum, however, cherry

picks provisions of the IBA to prioritize at the expense of others. For instance, the only broadcasting standard and principle the Memorandum recites is that U.S. "international broadcasting shall not duplicate the activities of private United States broadcasters." *See* SUMF Ex. B at 3 (quoting 22 U.S.C. § 6202(a)(3)). The Memorandum then declares, "The Voice of America functional requirement and scope is duplicative with the activities of private United States broadcasters." *Id.* at 4. It provides no explanation or analysis. Nor does it engage with the myriad other standards and principles set forth in the IBA, including that U.S. "international broadcasting shall include information about developments in each significant region of the world," and "a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen." 22 U.S.C. § 6202(b)(6)-(7).

Turning to specific programming mandates, the Memorandum nods to Congress's recommended goal of hourly live updates to Iran broadcast 24/7 set forth in 22 U.S.C. § 8754 but retains only two employee positions to effectuate that goal. And it contains no reference to Korean programming, ignoring both 22 U.S.C. § 7813 as well as the recent Congressional directive that USAGM maintain the level of programming into Korea that it hosted when the 2024 Appropriations Act was passed. *See* Pub. L. No. 118-47, 138 Stat. 460, 813 (2024) (funding USAGM to "maintain broadcasting hours into North Korea at levels not less than the prior fiscal year"). Defendants have admitted that they could not operate VOA at even the drastically reduced levels it had maintained between late-May 2025 and September 30, 2025, with the staffing contemplated by the Memorandum. *See* SUMF ¶ 46 ("Current operation of Persian service with two employees and zero PSCs is not possible, if that's what you're asking."); *id.* at 229:6-9 ("Current operation of China division with two employees only and zero PSCs or any other journalist, is not possible to maintain at this level."); *id.* at 229:18-230:1 ("Current operation of

Dari and Pashto, with two employees each and zero PSCs or any other journalists, cannot be maintained as current -- and as I -- as I mentioned in my declaration, the current programming is designed based on current staffing levels."); *see also, e.g., id.* at 230:16-19 ("[T]he current level of programming is designed based -- based on current level of employees that we have, so it's not possible to maintain with two people.").

Defendants' conduct since adopting the Memorandum confirms their failure to consider these important aspects. Post-hoc rationalization cannot sustain agency action. *See State Farm*, 463 U.S. at 50. But it is nonetheless telling that even after being repeatedly called on to defend the choices reflected in the Memorandum as part of efforts to enforce part (3) of this Court's preliminary injunction, Defendants have been unable to articulate the bases for their decisionmaking. This Court has expressed frustration with Defendants' failure to explain, for instance, why they "zeroed in on Dari, Pashto, Farsi, and Mandarin" to the exclusion of 45 other language services. ECF No. 56 at 4. Nor have Defendants explained, for instance, "the decision to exclude Africa from their plan to run VOA." *Id*. This Court has described Defendants' insistence on "thumb[ing] their noses at Congress's commands and giv[ing] responses that are dripping with indifference to their statutory obligations" as "the height of arbitrariness." ECF No. 100 at 10-11.

Defendants also did not consider the longstanding reliance interests of, among others, global listeners and organizations that depend on VOA and USAGM programming to support their work and that support VOA and USAGM journalists in their reporting. The reliance interests of global listeners who depend on VOA and USAGM programming to access objective and truthful reporting, especially in countries and regions where censorship and repression are prevalent, cannot be overstated. *See supra* Background § II; *see also* SUMF ¶ 18 (discussing reliance of North Korean people on VOA's daily North Korea program). But Defendants' decision—and the

steps to implement it—to reduce drastically VOA and USAGM functions across the board was made without regard to the hundreds of millions of people globally who listen each week and who have "los[t] access to" vital programming. *Nat'l Lifeline Ass'n*, 921 F.3d at 1113.

By the same token, Defendants did not consider the interests of organizations, like Plaintiffs Reporters Sans Frontières (RSF) and The NewsGuild-CWA (TNG-CWA), that rely on VOA and USAGM programming to support their work. *See, e.g.*, SUMF ¶ 19 (discussing importance of USAGM programming to TNG-CWA reporters abroad). As this Court has already repeatedly found, groups like RSF rely on VOA as a "trustworthy source of news" in countries where they otherwise cannot access objective information. *Widakuswara*, 779 F. Supp. 3d at 38. RSF alone relies on VOA programming in many countries that, as a result of Defendants' radical downsizing decision, lost full access to any VOA broadcasting and reporting. ECF No. 100 at 14-15. It also relies on VOA to report on its own "reports and advocacy efforts." *Widakuswara,* 779 F. Supp. 3d at 28. As with the providers in *National Lifeline*, groups like RSF have functionally "crafted [their] business models" around VOA programming and "invested significant resources" in their work in reliance on that programming remaining, 921 F.3d at 1114, in addition to their own reliance as listeners. They are among the many reliance interests completely ignored by Defendants when reaching their decision.

### 2.    Defendants' Actions Are Contrary to Statute and Not in Accordance with Law.

Defendants' wholesale disregard for the VOA Charter, the IBA, and Congressional appropriations legislation also means that Defendants have not acted in accordance with law in violation of the APA.

**(a)** ***Defendants' Actions Violate Statutes Applicable to USAGM and VOA.***

Both overarching and specific statutory provisions require that VOA and USAGM broadcast to certain places and through certain mediums, and that they maintain certain levels of operations. Defendants' decision to reduce VOA and USAGM to entities that barely broadcast at all—and the individual actions implementing that decision—violates numerous statutory provisions. *See, e.g.*, ECF No. 100 at 11 ("Voice of America is currently operating in direct violation of language-specific, medium-specific, and audience-specific requirements under the [IBA] and related statutes."); *id*. at 12 (explaining that terminating the vast majority of radio technicians means the entities cannot broadcast which "is much of the ball game, given its centrality to VOA's statutorily required functions"); *id.* (losing "subject-matter expertise across key regions and other mediums would make it impossible for VOA to comply with its statutory mandate").

Broadly, VOA is required to "communicat[e] directly with the peoples of the world by radio," 22 U.S.C. § 6202(c), yet Defendants' decision, as well as the actions implementing it, essentially kneecapped VOA's ability to broadcast by radio, *see* ECF No. 100 at 8-9; *see also* ECF No. 62 at 8. Likewise, VOA and USAGM must ensure that U.S. international broadcasting includes "information about developments in each significant region of the world" and "a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen." 22 U.S.C. § 6202(b)(6)-(7). Defendants have already admitted that the entities are not broadcasting to every "significant region" of the world, ECF No. 100 at 10-11, nor are they reaching all nations where censorship and repression prevents certain opinions and voices from reaching their fellow countrymen, SUMF ¶ 47, as a result of their radical downsizing decision and the actions implementing it.

Turning to the specific, it belies belief that these entities could have retained, for example, their required "research capacity," "transmitter and relay capacity," or "capability to provide a surge capacity to support United States foreign policy objectives during crises abroad" in light of the radical downsizing decision and the steps that implemented it. 22 U.S.C. §6202(b)(4), (8), (9). Defendants' radical downsizing decision also violated a host of language-specific statutes. ECF No. 100 at 9-10. Those include, *inter alia*, provisions requiring broadcasting into North Korea, as well as in Kurdish, Croatian, and Serbian. *Id.* Defendants' initial downsizing decision and the steps Defendants took to implement it resulted in VOA and USAGM not being capable of fulfilling these language-specific mandates.

Defendants have never attempted to square their decision with these statutory provisions. Although certain standards "leave[] room for the USAGM leadership's judgment," ECF No. 100 at 10, wholesale abandonment of Congressional directives is a quintessential APA violation. Because that happened here, this provides an additional reason for the Court to set aside the decision.

(b)    ***Defendants' Actions Cannot Be Squared with Congressional Appropriations.***

Appropriations legislation is just that: legislation. And the Executive has to follow appropriations law just as it must follow any other law. Indeed, the Executive may not "waste" appropriations meant to carry out statutory objectives. *Widakuswara*, 2025 WL 2159180, at *3.

Defendants made a drastic downsizing decision fully out of step with the hundreds of millions of dollars the entities received from Congress following specific representations concerning programming and broadcasting. *See supra* Background § I.B. For example, Congress surely did not appropriate hundreds of millions of dollars "to pay employees to sit at home for months on end, making no contribution to VOA's statutory mandate." *Widakuswara*, 2025 WL

2159180, at *3. Yet the effect of Defendants' decision and the actions to implement it was no broadcasting, no work being done by employees, and no capacity to restart programming in a manner at all consistent with what Congress paid for. "The legal term for that is 'waste.'" *Id.* And the legal remedy is setting aside Defendants' illegal decision under the APA as not in accordance with Congressional appropriations legislation.

### C.    Vacatur Is Appropriate.

Defendants' actions are arbitrary and capricious and contrary to law, and therefore they should be vacated. The consequence of vacatur, as always, is that Defendants restore the state of affairs before they took their challenged action. Whether the Court conceives of the challenged action as a single decision to drastically reduce VOA and USAGM or the multiple actions implementing it, the consequences are the same: Defendants must undo their unlawful actions.

"The typical remedy for an arbitrary and capricious agency action is to vacate the rule." *St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*, 85 F. Supp. 3d 197, 208 (D.D.C. 2015). So too for agency actions that contravene statutory authority: "'the practice of the court is ordinarily to vacate' an unlawful rule." *Burke v. Coggins*, 521 F. Supp. 3d 31, 43 (D.D.C. 2021) (quoting *Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997)). Only an "exceptional" case "warrants remand without vacatur." *Anderson v. U.S. Dep't of Hous. & Urb. Dev.*, 731 F. Supp. 3d 19, 45 (D.D.C. 2024) (quoting *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 512 (D.C. Cir. 2020)). In deciding whether a case is one of the "limited circumstances" that justifies a departure from "the normal remedy," a court can consider two factors. *Anderson*, 731 F. Supp. 3d at 44-45 (quoting *Schultz*, 962 F.3d at 512). They are: (1) "the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009) (cleaned up).

33

Nothing here justifies departing from the normal rule. In fact, this is exactly the type of arbitrary, thoughtless action that demands vacatur. Start with the first factor: It is hard to conceive of a case in which the "seriousness of the deficiencies" is starker. Defendants decided, with no explanation, to nearly shutter an agency that provided services to 362 million people per week and employed more than a thousand people. The "lack of a reasoned explanation is a serious failing in an agency's decision." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97-98 (D.D.C. 2017) (citation omitted). That is because lack of explanation "leaves the Court in doubt as to whether the agency chose correctly in making its decision." *Id.* (citation omitted).

Furthermore, the "severity of an agency's error[] ... turns on the extent of doubt whether it chose correctly." *Id.* (citation omitted). Here, the fact that the agency's action also contravenes statutory authority makes it unambiguously clear that there is nothing Defendants can do to justify their decision—because this is not a case in which the "rule is 'potentially lawful but insufficiently or inappropriately explained,'" which is something the agency could seek to remedy. *Burke*, 521 F. Supp. 3d at 43.

Moreover, "[v]acatur is appropriate" when "the Government did not defend the merits of the … [r]ule." *Burke*, 521 F. Supp. 3d at 44. In the eight months since this case was filed, and through multiple rounds of briefing, Defendants have not once defended their conduct on the merits, or explained, for example, how either (1) paying most VOA and USAGM employees to do no work; or (2) firing a critical mass of employees such that broadcasting and programming remains at *de minimis* levels, is consistent with the Congressional appropriation, opting instead at every turn to find an argument why this Court need not (or cannot) reach the merits.

The second factor—the potential for disruption—also favors vacatur. For several months, Defendants' conduct has had drastic consequences, including for VOA's audience, reporters, and

employees. Vacatur is the only way to end those consequences. It restores VOA and USAGM to what they had been for years before the illegal actions at issue here, requiring Defendants, if they wish to make changes (which they of course have ample discretion to do, if they do so correctly), to justify them in the orderly and reasoned way required by the APA.

### D. Defendants Have Unlawfully Withheld Required Agency Action.

As discussed above, VOA and USAGM are required, by law, to produce certain programming and broadcast to different regions and countries through varied mediums. As a result of Defendants' drastic downsizing decision as well as the steps taken to implement it, however, VOA and USAGM ceased broadcasting and programming across the board. As this Court found was likely in April, 779 F. Supp. 3d at 36-37, Defendants are thus unlawfully withholding required programing and broadcasting under 5 U.S.C. § 706(1).

Even today, more than half a year after Defendants made their downsizing decision and in line with the minimal operations contemplated by the Statutory Minimum Memorandum, the entities continue withholding broadcasting to required countries and regions, *see supra*, and through certain mediums, like radio. Though some of those statutory provisions may be broad and others may be more specific, there can no longer be any question that *de minimis* programming and broadcasting (or none at all) does not comply with these statutes. Thus, Defendants are "unlawfully withholding the international broadcasting programming … that USAGM is statutorily required to provide." 779 F. Supp. 3d at 37. While defendants have some level of discretion with respect to how they meet these statutory commands, they cannot utterly fail to broadcast or create programming for certain regions and countries. *See* ECF No. 100 at 10 (explaining that "broad language contained in these standards leaves rooms for the USAGM leadership's judgment … [y]et the defendants do not even feign an effort to exercise such authority"); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 2025 WL

2537200, at *13 (D.D.C. Sept. 3, 2025) ("To be clear, no one disputes that Defendants have significant discretion in *how* to spend the funds at issue…. But Defendants do not have any discretion as to *whether* to spend the funds."), *stayed on other grounds, Dep't of State v. Aids Vaccine Advoc. Coal.*, No. 25A269, 2025 WL 2740571 (U.S. Sept. 26, 2025). Because undertaking *any broadcasting or programming at all* to certain countries and regions under the VOA Charter and the IBA is a discrete and required action, this Court may compel Defendants to restart such programming and "carry out international broadcasting mandated by Congress." 779 F. Supp. 3d at 37; *see, e.g.*, *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 19-21 (D.D.C. 2017).

## II. THIS COURT HAS JURISDICTION TO CONSIDER DEFENDANTS' UNLAWFUL ACTIONS AND AFFORD RELIEF.

This dispute belongs in an Article III court, the only entity capable of enforcing the International Broadcasting Act and the 2024 Appropriations Act. In any channeling inquiry, the "ultimate question" is what "Congress intended" for the particular type of "claim" at issue. *Jarkesy v. S.E.C.*, 803 F.3d 9, 12, 17 (D.C. Cir. 2015); *see also Axon Enter., Inc. v. F.T.C.*, 598 U.S. 175, 186 (2023) ("The ultimate question is how best to understand what Congress has done."). Whether Congress stripped a court of jurisdiction by channeling a claim through an administrative scheme is a two-step inquiry. The first question asks whether it is "fairly discernible" that Congress intended the scheme—here the Civil Service Reform Act—to be the exclusive remedy for claims within its scope. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994). The second question asks whether the specific "claims are of the type Congress intended to be reviewed within" the CSRA's exclusive administrative scheme. *Id.* at 212.

Here, both steps point towards jurisdiction. Congress intended the CSRA to be exclusive only when its administrative agencies could serve as independent arbiters of employees' claims. But those agencies' independence has been removed. And so, thus, has the CSRA's presumption

of exclusivity. And, at step two, for all the reasons this Court previously found, Congress did not intend to channel claims about the wholesale winding down of an agency into an administrative mechanism built for run-of-the-mill employment disputes.

In any event, the D.C. Circuit recently held that claims brought by third parties like RSF and TNG-CWA are not subject to the CSRA scheme. At a minimum, therefore, at least their claims—which are identical in substance to all Plaintiffs'—should proceed.

### A.    Because a Material Assumption Underlying the CSRA Is Gone, so Too Is Any Congressional Intent to Channel These Claims.

*Thunder Basin* is a doctrine of jurisdiction-stripping by implication. The first question under the *Thunder Basin* analysis asks whether it is fairly discernible from the statutory scheme that Congress intended to strip district-court jurisdiction. *See Thunder Basin*, 510 U.S. at 207. So far, the Supreme Court has answered yes in assessing the CSRA. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10-15 (2012). But each of its decisions finding that the CSRA strips federal-court jurisdiction over claims touching on federal employment gleaned Congressional intent from an intact CSRA. This year the CSRA's central promise of unbiased review has been destroyed by the President's firing, without cause, of members of each CSRA administrative agency. *See Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 304 (4th Cir. 2025). No longer can the Court fairly discern a Congressional intent to strip district court jurisdiction over Plaintiffs' claims.

The CSRA's three administrative agencies carry out "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests" of federal employees with "the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988). Congress created the agencies as wholly "independent of any control or direction by the President," S. Rep. No. 95-969, at 24 (1978), and thereby insulated from any appearance of bias that would attend the executive adjudicating its own employment disputes, *id*.

at 6-7 (emphasizing need for "a strong and independent [MSPB] and Special Counsel"); *see also id*. at 7-8 (FLRA structure "will assure impartial adjudication of labor-management cases"). It therefore made the MSPB and FLRA members as well as the Special Counsel removable only for "inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. §§ 1202(d), 1211(b), 7104(b); *see also* H. Rep. 95-1403 (July 31, 1978) (Congress rejected President's proposal that FLRA members "serve at the pleasure of the President"). And because judicial review of the agencies' decisions is deferential, prejudice from an administrative tribunal beholden to the executive branch—necessarily one of the parties in those proceedings—will not be entirely rooted out before the Federal Circuit. *See* 5 U.S.C. § 7703(c).

Shortly after taking office, President Trump fired members of all three bodies without cause, and all litigation efforts by the terminated members to be reinstated have thus far been unsuccessful. *See Trump v. Wilcox*, 145 S. Ct. 1415 (2025); *Dellinger v. Bessent*, Civil Action No. 25-0385 (ABJ), --- F. Supp. 3d ----, 2025 WL 665041 (D.D.C. Mar. 1, 2025); *Grundmann v. Trump*, 770 F. Supp. 3d 166, 173 (D.D.C. 2025). The remaining members, and those who have been appointed since or will be appointed in the future, are thus on notice that they face removal, at any time, including for impartial rulings that contradict the Administration. A "bedrock principle" of the CSRA—federal employees' guarantee of an independent adjudicator—is gone. *Owen*, 139 F.4th at 307. Any implication that Congress intended to channel fundamental challenges to executive overreach—to the extent it ever existed—is gone with it. *See Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv*., No. CV MJM-25-1458, 2025 WL 1865971, at *18 (D. Md. July 7, 2025).

## B.    Plaintiffs' Claims Are Not "Of the Type" Congress Intended to Channel Under the CSRA.

As this Court has previously found, this case is not an employment dispute. It is about Defendants' decision to drastically downsize an agency. The claims at issue are not "of the type Congress intended to be reviewed within th[e] statutory structure" because (a) denying district court jurisdiction would "foreclose all meaningful judicial review"; (b) the claims are "entirely collateral" to the CSRA; and (c) the claims fall "outside the agency's expertise." *Thunder Basin,* 510 U.S. at 212-13. Moreover, although these factors assist the *Thunder Basin* inquiry, they are not "three distinct inputs into a strict mathematical formula," but rather are "general guideposts" for the "ultimate question": what "Congress intended." *Jarkesy*, 803 F.3d at 12, 17.

Denying jurisdiction would foreclose all meaningful judicial review. This is a case about reviving a Congressionally mandated independent agency. Judicial review under the CSRA would come only after multiple layers of agency review, a process that could take years. *See* 5 U.S.C. § 7703 (judicial review provision in CSRA). By that time, Defendants' radical downsizing decision would be irreversible, rendering judicial review of Plaintiffs' core claims meaningless. *See Am. Fed'n of Gov't Emps. v. Trump*, No. 25-3293, 2025 WL 1541714, at *4-5 (9th Cir. May 30, 2025).[5]  Moreover, Plaintiffs could not get the relief they seek—an order that USAGM resume broadcasting and refrain from its across-the-board downsizing absent reasoned decisionmaking—through administrative channels. *Cf. Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 760 (D.C. Cir. 2019).

---

[5] The injunction in *AFGE* was stayed on the merits by 2025 WL 1873449. The government argued the case was channeled, but the Supreme Court did not rule on that basis. *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, No. C 25-01780 WHA, 2025 WL 2633791, at *10 (N.D. Cal. Sept. 12, 2025).

The issues in this case are collateral to CSRA review provisions. This case does not challenge employment actions directed at specific employees: Plaintiffs "challenge the evisceration of their jobs only insofar as it is the means by which they challenge defendants' unlawfully halting the work of [VOA and USAGM]." *Widakuswara*, 2025 WL 1288817, at *8 (Pillard, J., dissenting); *see also AFGE*, 2025 WL 1541714, at *3.

This case involves issues outside the MSPB's expertise. Fundamental questions about an agency's prerogative to ignore Congressional mandates are decidedly not issues the relevant administrative bodies "customarily handle[]." *Axon Enter.*, 598 U.S. at 186; *cf. Carr v. Saul*, 593 U.S. 83, 92 (2021) ("[A]gency adjudications are generally ill suited to address structural constitutional challenges."). Plaintiffs have alleged the agency's actions, including its mass removal of staff, should be vacated not because the actions run afoul of civil service laws, but because they were taken pursuant to an overarching unlawful decision that violates the APA. And agencies know "nothing special," *Axon*, 598 U.S. at 194, about "questions of administrative law," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 (2010). Nor are there threshold employment questions implicating agency expertise. *See AFGE*, 929 F.3d at 761; *Axon*, 598 U.S. at 906 (distinguishing *Elgin* on this basis).

For these reasons, all claims should proceed.  But in any event, the claims of two categories of Plaintiffs are particularly divorced from the employment disputes at the center of the CSRA's function. Those are addressed below.

### 1.    This Circuit Has Held That Claims Similar to Those of Plaintiffs RSF and TNG-CWA Are Not Channeled.

This litigation includes multiple plaintiffs who have no relationship to federal employment but are nonetheless harmed by the agency's unlawful actions. Specifically, RSF and TNG-CWA have members who rely on USAGM broadcasts abroad as a source of authoritative information in

areas where such broadcasts are otherwise scarce. *Widakuswara*, 779 F. Supp. 3d at 28 (finding both organizations likely have standing on this basis). RSF also relies on VOA to report on RSF's own work product, including reports and press freedom advocacy efforts, "meaning that VOA's silence" in most of its prior markets "injured RSF's ability to distribute its broadcasting and amplify press freedom concerns." *Id*.

Both entities accordingly have standing—they have suffered concrete harm from the cessation of USAGM programming. *See, e.g., NTEU*, 149 F. 4th at 776-77 (NAACP had standing to challenge dismantling of CFPB); *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020) (where agency's action deprives group of "information that it relies on to fulfill its mission," group has standing); *Action All. of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986) (agency's restriction of information flow that harmed organization's routine activities constituted injury in fact).

They also are not channeled to administrative review. The D.C. Circuit in *NTEU* was clear that the CSRA channels only claims stemming from a plaintiff's own employment dispute with the federal government. Third-party plaintiffs who "do not seek redress for employment-related injuries," but nonetheless are harmed by an agency's failure to perform its statutory functions are not channeled. 149 F.4th at 776. RSF and TNG-CWA's harms do not directly stem from their own loss of federal employment, and therefore *NTEU* dictates that they are properly in federal district court. *See also Widakuswara*, 779 F. Supp. 3d at 30.

### 2. Plaintiff Abramowitz Seeks to Assert a Statutory Responsibility, not an Employment Claim.

Abramowitz also has not brought an employment claim. As Director of VOA, he seeks to vindicate his statutory responsibility to lead an agency—an agency that has now been reduced to

a shell of its rightful self. Through this lawsuit, he seeks to restore VOA's functions to what they used to, and should, be.

That claim is not subject to the CSRA. The CSRA requires that "covered employees appealing *covered agency actions* ... proceed exclusively through the statutory review scheme." *Elgin,* 567 U.S. at 10 (emphasis added). It "govern[s] *employee relations* in the federal sector." *AFGE,* 929 F.3d at 755 (emphasis added) (internal citations omitted). Conversely, the CSRA does not strip jurisdiction over claims outside review of the CSRA's covered personnel actions. *See Bosco v. United States,* 931 F.2d 879, 883 (Fed. Cir. 1991) ("The Supreme Court did not rule that the CSRA provided the only means of judicial review of *any* actions affecting federal employees, but rather that it was the only means of review as to the types of adverse personnel action specifically *covered* by the CSRA."). If Abramowitz had been allowed to work while virtually all VOA and USAGM employees were either placed on administrative leave or fired, his claim would be precisely the same. Because Abramowitz is challenging Defendants' broad, unlawful attempts to wind down virtually all of VOA's activities, the CSRA does not impact this case.

## III.    THIS COURT SHOULD CONSIDER EXTRA-RECORD EVIDENCE AS PART OF ITS REVIEW.[6]

APA review is ordinarily cabined to the agency's decisionmaking as reflected in the administrative record. *See, e.g.*, *Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.*, 573 F. Supp. 3d 294, 306 (D.D.C. 2021), *dismissed sub nom. Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.*, No. 21-5251, 2022 WL 4002149 (D.C. Cir. Aug. 29, 2022). Of course, Defendants have wrongly withheld the administrative record in this case, despite being required to produce it months ago. *See* LCvR 7(n)(1). Regardless, consideration of extra-record evidence in this case is

---

[6] Even if the Court did not consider the extra-record evidence, the result should remain the same: a finding that Defendants acted unlawfully and a vacatur of their illegal actions.

warranted. A court may consider such evidence "(1) when the agency failed to examine all relevant factors; (2) when the agency failed to explain adequately its grounds for decision; (3) when the agency acted in bad faith; or (4) when the agency engaged in improper behavior." *Safari Club Int'l v. Jewell*, 111 F. Supp. 3d 1, 5 (D.D.C. 2015) (citing *IMS, P.C. v. Alvarez,* 129 F.3d 618, 624 (D.C. Cir. 1997)). "Underlying all of these exceptions is the assessment that resort to extra-record information [is necessary] to enable judicial review to become effective." *Calloway v. Harvey,* 590 F. Supp. 2d 29, 38 (D.D.C. 2008) (internal quotation marks omitted).

Here, Defendants' conduct checks every box. The agency utterly failed to examine all the relevant factors and failed to explain its decisionmaking. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Off. of Surface Mining Reclamation & Enf't*, No. CV 23-3343 (SLS), 2025 WL 1503802, at *12 (D.D.C. May 27, 2025) ("To satisfy the 'relevant factors' exception, the document in question must … point out an *entirely new* general subject matter that the defendant agency failed to consider."). Ms. Lake's testimony underscores that Defendants did little more than consider the text of the Executive Order *to the exclusion of* everything else. Likewise, the record of bad faith and improper behavior in this case has been borne out through repeated motion practice culminating in an order to show cause (and verging on contempt). *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) ("If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case.").

The sum total of this conduct was meant to thwart effective judicial review. Because resort to extra-record evidence here restores the Court's rightful role, there is no bar to its consideration. *See United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 5 (D.D.C. 2017) ("[P]laintiff may supplement the administrative record because the court cannot … determine whether [the agency] has complied with its procedural obligations under the APA.").

## **CONCLUSION**

For the reasons explained above, Plaintiffs respectfully request that the Court grant their motion for partial summary judgment and vacate and set aside Defendants' unlawful actions.

Dated: November 17, 2025

ZUCKERMAN SPAEDER LLP

_____/s/_____
William B. Schultz
Margaret M. Dotzel
Jacobus P. van der Ven
Brian J. Beaton, Jr.

2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8136
wschultz@zuckerman.com
mdotzel@zuckerman.com
cvanderven@zuckerman.com
bbeaton@zuckerman.com

*Counsel for Abramowitz Plaintiffs*

EMERY CELLI BRINCKERHOFF ABADY WARD
& MAAZEL LLP

_____/s/_____
Andrew G. Celli, Jr.
Debra L. Greenberger
Daniel M. Eisenberg
Nick Bourland

One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
acelli@ecbawm.com
dgreenberger@ecbawm.com
deisenberg@ecbawm.com
nbourland@ecbawm.com

*Counsel for Plaintiffs Patsy Widakuswara, Jessica Jerreat, Kathryn Neeper, John Doe 1, John Doe 2, John Doe 3, John Doe 4, American Federation of State, County and Municipal Employees (AFSCME); American Federation of Government Employees (AFGE); American Foreign Service*

Respectfully submitted

AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO (AFSCME)

_____/s/_____
Teague Paterson
Matthew Blumin
Georgina Yeomans

1625 L Street, N.W.
Washington, D.C. 20036
(202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

*Counsel for Plaintiff American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME)*

DEMOCRACY FORWARD FOUNDATION

_____/s/_____
Kristin Bateman
Cynthia Liao
Robin F. Thurston
Skye L. Perryman

P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
cliao@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs American Federation of State, County and Municipal Employees (AFSCME); American Federation of Government Employees (AFGE); American Foreign Service Association (AFSA); The NewsGuild-CWA*

*Association (AFSA); and The NewsGuild-CWA*

GOVERNMENT ACCOUNTABILITY PROJECT

_____/s/_____
David Z. Seide

1612 K Street, NW
Washington, DC 20006
(202) 457-0034
davids@whistleblower.org

*Counsel for Plaintiffs Patsy Widakuswara, Jessica Jerreat, Kathryn Neeper, John Doe 1, John Doe 2, John Doe 3, and John Doe 4*

DEMOCRACY DEFENDERS FUND

_____/s/_____
Norman L. Eisen
Joshua Kolb
Taryn Wilgus Null
Sofia Fernandez Gold

600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Norman@democracydefenders.org
Joshua@democracydefenders.org
Taryn@democracydefenders.org
Sofia@democracydefenders.org

*Counsel for Reporters Sans Frontières, Reporters Without Borders, Inc., American Federation of State, County and Municipal Employees (AFSCME); and American Federation of Government Employees (AFGE)*

AMERICAN FOREIGN SERVICE ASSOCIATION

_____/s/_____
Sharon Papp
Raeka Safai

2101 E Street, N.W.
Washington, D.C. 20037
(202) 338-4045
papp@afsa.org
safai@afsa.org

*Counsel for Plaintiff American Foreign Service Association (AFSA)*

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO

_____/s/_____
Rushab Sanghvi

80 F. Street, NW
Washington, DC 20001
(202) 639-6424
SanghR@afge.org

*Counsel for Plaintiff American Federation of Government Employees, AFL-CIO (AFGE)*

MEDIA FREEDOM & INFORMATION ACCESS
CLINIC – YALE LAW SCHOOL

_____/s/_____
David A. Schulz

127 Wall Street
New Haven, CT 06520
tobin.raju@YLSClinics.org
David.schulz@YLSClinics.org

*Counsel for Plaintiffs Patsy Widakuswara,
Jessica Jerreat, Kathryn Neeper, and John
Does 1-4*

\*\* The views expressed herein do not purport
to represent the institutional views of Yale
Law School, if any.

## CERTIFICATE OF SERVICE

I hereby certify that, on November 17, 2025, I caused the foregoing to be served on counsel of record via the Court's electronic case filing system.


_____/s/_____
William B. Schultz

*Counsel for Abramowitz Plaintiffs*