**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MICHAEL ABRAMOWITZ, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> KARI LAKE, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media; VICTOR MORALES, in his official capacity as acting Chief Executive Officer of the United States Agency for Global Media; and UNITED STATES AGENCY FOR GLOBAL MEDIA, <br><br> *Defendants*. | **Case No. 1:25-cv-00887-RCL** |

**BRIEF OF PROPOSED AMICI CURIAE THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS AND COMMITTEE TO PROTECT JOURNALISTS IN
SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

i

## TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTEREST OF AMICI CURIAE ............................................................................................ 1

INTRODUCTION ................................................................................................................. 3

ARGUMENT ......................................................................................................................... 5

    I.    The editorial independence of USAGM networks is essential to their credibility, their mission, and the safety of their reporters. ......................................................... 5

    II.   Allowing the Executive to shutter VOA unilaterally would destroy the independence that makes them effective. ................................................................. 10

CONCLUSION ..................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Aids Vaccine Advoc. Coal. v. United States Dep't of State*,
 Nos. 25-00400 & 25-00402, 2025 WL 752378 (D.D.C. Mar. 10, 2025)............................ 15

*Am. Freedom Def. Initiative v. WMATA*,
 901 F.3d 356 (D.C. Cir. 2018)....................................................................................... 13

*City & County of San Francisco v. Trump*,
 897 F.3d 1225 (9th Cir. 2018) ...................................................................................... 11

*Husain v. Springer*,
 494 F.3d 108 (2d Cir. 2007)..................................................................................... 12, 13

*Iancu v. Brunetti*,
 588 U.S. 388 (2019) ...................................................................................................... 15

*In re Aiken County*,
 725 F.3d 255 (D.C. Cir. 2013) ...................................................................................... 12

*Koala v. Khosla*,
 931 F.3d 887 (9th Cir. 2019)......................................................................................... 13

*Newspaper Guild of Greater Phila., Local 10 v. NLRB*,
 636 F.2d 550 (D.C. Cir. 1980) ........................................................................................ 4

*Ralis v. RFE/RL, Inc.*,
 770 F.2d 1121 (D.C. Cir. 1985) .............................................................................. *passim*

*Tripp v. Dep't of Defense*,
 284 F. Supp. 2d 50 (D.D.C. 2003) ................................................................................. 12

*Turner v. U.S. Agency for Glob. Media*,
 502 F. Supp. 3d 333 (D.D.C. 2020) ........................................................................ *passim*

*Ward v. Rock Against Racism*,
 491 U.S. 781 (1989) ...................................................................................................... 13

**Statutes:**

22 U.S.C. § 6202 .................................................................................................................... *passim*

22 U.S.C. § 6205................................................................................................................*passim*

Foreign Relations Authorization Act, Fiscal Year 1977,
  Pub. L. No. 94-350, § 503, 90 Stat. 823 (1976) .................................................................. 7

International Broadcasting Act,
  Pub. L. No. 93-129, 87 Stat. 456 (1973) .......................................................................... 5, 8

National Defense Authorization Act for Fiscal Year 2017,
  Pub. L. No. 114-328, § 1288, 130 Stat. 2000 (2016) .............................................................9

National Defense Authorization Act for Fiscal Year 2021,
  Pub. L. No. 116-183, 134 Stat. 3388 (2021) .........................................................................9

Omnibus Consolidated and Emergency Supplemental Appropriations Act,
  Pub. L. No. 105-277, § 1323, 112 Stat. 2681 (1998) .............................................................9

United States International Broadcasting Act of 1994,
  Pub. L. No. 103-236, § 305, 108 Stat. 382 (1994) ................................................................9

**Other Authorities:**

Balen Saih, *VOA Kurdish: Syria's Interim Constitution Raises Fears of Sectarian Division*,
  Voice of Am. (Mar. 15, 2025) .............................................................................................7

Dilshad Anwar, *VOA Kurdish: Senior ISIS Leader Killed in Iraqi Intelligence Operation*,
  Voice of Am. (Mar. 15, 2025) .............................................................................................7

Editorial Board, *A U.S. Retreat in the War of Ideas*, Wall St. J. (Mar. 19, 2025) ......................6

Elon Musk (@elonmusk), X (Feb. 9, 2025, 8:02 AM).................................................................4

Exec. Order No. 14,238, 90 Fed. Reg. 13043 (Mar. 14, 2025)....................................................4

Gregory Mitrovich, Hoover Inst., Cold War Broadcasting Impact (2004)........................... 6

H.R. Rep. No. 510, 93d Cong., 1st Sess. 3–5 (1973),
  *reprinted in* 1973 U.S. Code Cong. & Ad. News 2271......................................................8

Jason Rezaian, *These 10 Jailed Journalists Worked for U.S. Outlets that Trump Silenced*,
    Wash. Post (Mar. 20, 2025) ........................................................................................ 10

Kari Lake (@KariLake), X (March 19, 2025, 7:21 PM).............................................................13

Malali Bashir & Juan Carlos Herrera Martinez, *Afghan Survivors Speak Out: What
    the Taliban Does to Imprisoned Women*, RFE/RL (Mar. 8, 2025) .......................................7

Mario Nawfal (@MarioNawfal), X (Feb. 9, 2025, 6:30 AM)....................................................14

Matthew Rice, *Trump's Special Envoy Rips Voice of America, Radio Free Europe as a
    "Relic of the Past"*, N.Y. Sun (Feb. 10, 2025) ........................................................14

*Musk Calls for Closure of US State Media*, RT (Feb. 9, 2025) ......................................................13

*Myanmar Journalist Sithu Aung Myint Sentenced to Additional 7 Years in Prison*, ,
    Comm. to Protect Journalists (Dec. 13, 2022)...............................................................10, 11

*Reporters Committee Letter: Congress Must Protect Voice of America's Editorial
    Independence*, Reps. Comm. for Freedom of the Press (Apr. 28, 2020) ...........................2

*Senior Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease That Burdened
    The Taxpayers And Enforces Trump's Executive Order To Drastically Downsize
    Agency*, USAGM (March 15, 2025) .....................................................................................13

Serge Schmemmann, *The Voice of America Falls Silent*, N.Y. Times (Mar. 24, 2025) .............7

*The Voice of Radical America*, The White House (March 15, 2025) ....................................4, 13

U.S. Agency for Global Media, Audience and Impact: Overview for 2019 (2019) ..............8

U.S. Agency for Global Media, Audience and Impact: Overview for 2025 (2025)............10

Voice of Am., *VOA's First Broadcasts: "The News May Be Good or Bad; We Shall Tell
    You the Truth"*, YouTube (Mar. 8, 2012).............................................................................6

## INTEREST OF AMICI CURIAE

Amici curiae are the Reporters Committee for Freedom of the Press (the "Reporters Committee") and the Committee to Protect Journalists ("CPJ") (together, "amici").[1] The Reporters Committee is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media. Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, today its attorneys provide *pro bono* legal representation, amicus curiae support, and other legal resources to protect journalists.

The Committee to Protect Journalists is an independent, nonprofit organization that was founded in 1981 to promote press freedom worldwide. It defends the right of journalists to report the news without fear of reprisal. CPJ is a global organization headquartered in New York City. CPJ's board of directors is composed of prominent journalists, media executives, and leaders from related professions.

As organizations committed to defending First Amendment freedoms, such as the right to gather and report the news, amici have a powerful interest in ensuring that the constitutional rights of all journalists, including working journalists at the U.S. Agency for Global Media networks, are not infringed, *see, e.g.*, *Reporters Committee*

---

[1] No party or party counsel authored this amici brief in whole or in part, or made a monetary contribution intended to fund its preparation or submission. No person other than amici made a monetary contribution to the preparation or submission of this brief.

1

*Letter: Congress Must Protect Voice of America's Editorial Independence*, Reps. Comm. for

Freedom of the Press (Apr. 28, 2020), https://perma.cc/34QC-8G5D, and that the U.S.

Agency for Global Media ("USAGM") complies with Congress's instruction to

"respect[] the professional integrity and editorial independence" of the networks, 22

U.S.C. § 6205(d)(6)(a).

 Amici respectfully submit this amici curiae brief pursuant to Local Civil Rule

7(o).

## INTRODUCTION

For decades, Voice of America ("VOA") and its sister networks funded by the U.S. Agency for Global Media ("USAGM") have been vital sources of news and information for hundreds of millions of people around the world—in some countries, the only viable alternative to state-controlled media. Through their work producing credible, independent journalism, these networks and their reporters "export[] the cardinal American values of free speech, freedom of the press, and open debate to the dark corners of the world where independent, objective coverage of current events is otherwise unavailable." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 341–42 (D.D.C. 2020). And to fulfill that purpose, Congress recognized, VOA and its sister networks must operate with "professional integrity and editorial independence." 22 U.S.C. § 6205(d)(6)(a). In other words, they must be—and must be seen by their audience as—"independent broadcasters," not just "house organs for the United States Government." *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1125 (D.C. Cir. 1985).

Lawmakers therefore created a detailed statutory scheme that ensures the networks can operate with the autonomy necessary to secure the audience's trust, producing news free from political tampering "which is consistently reliable and authoritative, accurate, objective, and comprehensive," *id.* § 6202(b)(1). Those values, enshrined in law, are vital to the work, and safety, of USAGM journalists around the world. But with the stroke of a pen, the Administration has moved to eliminate

3

USAGM, *see*, Exec. Order No. 14,238, 90 Fed. Reg. 13043 (Mar. 14, 2025), available at

https://perma.cc/F9SY-ZDEE, refused to disburse congressionally appropriated funds

for VOA, and abruptly placed the network's entire workforce on leave.  It did so, the

White House made express, on the view that that VOA networks produce "radical

propaganda" that is "anti-Trump."  *The Voice of Radical America*, The White House (Mar.

15, 2025), https://perma.cc/8L6A-P9CS.  That attack on Congress's design and VOA's

journalism not only threatens to shutter VOA for the tenure of this Administration; if

upheld, it would severely undermine the USAGM networks' credibility going forward.

Just as it would be for any other news organization, VOA's "credibility is central

to the[] ultimate product and to the conduct of the enterprise."  *Newspaper Guild of

Greater Phila., Local 10 v. NLRB*, 636 F.2d 550, 560 (D.C. Cir. 1980).  If the USAGM

networks were perceived to be subject to the whims of any given presidential

administration—because any disagreement with the content of their reporting could

lead the Executive Branch to simply shutter the networks, leaving them too decimated

to operate—no audience will trust the broadcasters to produce "consistently reliable

and authoritative" news rather than propaganda.  22 U.S.C. § 6202(a)(5).  That concern

is particularly grave here, where VOA's journalists report on countries where their

safety may be at risk if they are perceived to be agents of the government.  If not

blocked here and now, the agency's demolition will cause irreversible damage to VOA's

4

reputation and its ability to serve its central purpose, even if Congress or a future Administration attempts to revive its vital work.

A temporary restraining order and preliminary injunction should issue. The Administration lacks authority to discard Congress's "manifest" intent—consistently expressed over the course of five decades—that VOA and its sister networks "enjoy independence in programming and broadcasting decisions." *Ralis*, 770 F.2d at 1125. For the reasons set forth herein, amici urge the Court to grant Plaintiffs' request for immediate emergency relief to safeguard the independence of USAGM networks and to protect the safety of their dedicated journalists, who work to bring the world the news.

## ARGUMENT

**I.    The editorial independence of USAGM networks is essential to their credibility, their mission, and the safety of their reporters.**

For the better part of a century, Congress has supported the USAGM networks to ensure *bona fide* reporting and "freedom of opinion and expression" can reach countries that do not have a free press. International Broadcasting Act, Pub. L. No. 93-129, 87 Stat. 456, 457–58 (1973).[2]  And from the outset, publicly funded broadcasting overseas has staked its claim to that audience's trust on credibility and autonomy. As Voice of America's first transmission in 1942 announced to the world, "The news may be good

---

[2]    Radio Free Europe and Radio Liberty were two separate organizations until they merged in 1976. *Radio Liberty Is Merged with Radio Free Europe*, N.Y. Times, Oct. 5, 1976, https://bit.ly/4l2pA5j.

or bad; we shall tell you the truth." *See* Voice of Am., *VOA's First Broadcasts: "The News May Be Good or Bad; We Shall Tell You the Truth"*, YouTube (Mar. 8, 2012), https://tinyurl.com/y2ccoc28.

Throughout their history, VOA and its sister networks have consistently provided access for all people, including those living under repressive regimes, to accurate media. *See, e.g.*, Gregory Mitrovich, Hoover Inst., Cold War Broadcasting Impact 18 (2004) (describing VOA's role during the Chernobyl disaster providing "invaluable information to East European, Russian, and Ukrainian audiences about the dangers of radiation and the steps they needed to take to avoid radiation poisoning" while state media remained silent). Even in the last hours before Defendants abruptly shuttered the agency on March 15, VOA was actively publishing reporting—its last, to date—on important international issues from concerns about Syria's interim constitution to Iraq's killing of an ISIS leader. Balen Saih, *VOA Kurdish: Syria's Interim Constitution Raises Fears of Sectarian Division*, Voice of Am. (Mar. 15, 2025), https://perma.cc/8DKL-A5NR; Dilshad Anwar, *VOA Kurdish: Senior ISIS Leader Killed in Iraqi Intelligence Operation*, Voice of Am. (Mar. 15, 2025), https://perma.cc/5LFV-GRFD. Through their independent journalism, these networks have won the trust of audiences "in countries where media are controlled by governments that lie about the world." Editorial Board, *A U.S. Retreat in the War of Ideas*, Wall Street J. (Mar. 19, 2025), https://bit.ly/4iJxUp1; *see also* Serge Schmemann, *Freedom's Frequencies Fall Silent*, N.Y.

6

Times (Mar. 24, 2025), https://tinyurl.com/5xxxu6sh (discussing value of USAGM networks in Russia and beyond).

Since VOA's earliest days, bipartisan majorities in Congress have recognized that independent, professional broadcasters like VOA would advance "[t]he long-range interests" of the United States—not instead of reporting the news, but *by* reporting the news. *See* Foreign Relations Authorization Act, Fiscal Year 1977, Pub. L. No. 94-350, § 503, 90 Stat. 823, 831 (1976). Congress has therefore expressly rejected opportunities "to transform [USAGM networks] from independent broadcasters into house organs for the United States Government," which it saw "as inimical to the fundamental mission of those stations." *Ralis*, 770 F.2d at 1125 (citing H.R. Rep. No. 510, 93d Cong., 1st Sess. 3–5 (1973), *reprinted in* 1973 U.S. Code Cong. & Ad. News 2271, 2272–74).

For good reason. VOA can accomplish its goals only if it maintains meaningful independence—both actual independence and the perception of it—from political control. *See Ralis*, 770 F.2d at 1125. It and its sister "outlets are not intended to promote uncritically the political views and aspirations of a single U.S. official, even if that official is the U.S. President." *Turner*, 502 F. Supp. 3d at 342 (recognizing the First Amendment rights of journalists at Voice of America and rejecting effort to subvert statutory "firewall" protecting them). Listeners turn to these stations as an alternative to state media, not as their second state-media option. *See, e.g.*, U.S. Agency for Global Media, Audience and Impact: Overview for 2019, at 17 (2019) (finding that videos fact-

checking local disinformation are among VOA and RFE/RL's most popular offerings in Russia). Editorial independence for these newsrooms is "central to [the] success of this critical foreign policy" embodied in the USAGM statute. *Turner*, 502 F.Supp. 3d at 342.

The framework carefully crafted by Congress reflects that commitment. In 1994, when Congress acted to consolidate non-military broadcasting into USAGM, it also established firm guardrails protecting the networks' autonomy—including the requirement that agency leadership "respect the[ir] professional independence and integrity." United States International Broadcasting Act of 1994, Pub. L. No. 103-236, § 305, 108 Stat. 382, 436 (1994). Congress retained that requirement when it reorganized the networks in 1998, *see* Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, § 1323, 112 Stat. 2681, 2681–780, again when it reorganized them further in 2016, *see* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1288, 130 Stat. 2000, 2548, and again in 2021 when it revised the structure in response to attacks on Voice of America's independence, *see* National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-183, 134 Stat. 3388, 4023. Those guarantees make possible Congress's goal of ensuring that the audience can trust the networks' journalism will be "reliable and authoritative, accurate, objective, and comprehensive"—not politically motivated. *Id*. § 6202(b)(1).

Today, USGAM networks' independence remains their core value, helping them attract a massive audience. The networks collectively report a staggering 427 million

8

viewers and listeners across all media.  *See* U.S. Agency for Global Media, Audience and Impact: Overview for 2025, at 1 (2025), https://perma.cc/KLY4-HYMX.  And that audience trusts the networks to provide them with factual information about global politics, economic developments, and other subjects.  Eighty-six percent of VOA's weekly audience finds the station to be trustworthy; 76 percent of listeners said they rely on VOA to help them form opinions on important issues.  *Id.* at 2.  The networks could not have achieved that degree of success had they operated as, or been seen as, a Ministry of Truth that could be redirected or dismantled with a single stroke by any given president.

Nor could USAGM reporters do their work safely under those circumstances.  In fulfilling their role, these journalists often report on events in hostile foreign countries, where they risk retaliation and threats to their physical safety.  *See, e.g.*, Jason Rezaian, *These 10 Jailed Journalists Worked for U.S. Outlets that Trump Silenced*, Wash. Post (Mar. 20, 2025), https://bit.ly/4j6N1Z9.  Some of them are freelancers who still live in those nations, and the sudden elimination of their funding has left them without security and in immediate danger of physical harm.  Other journalists have fled their native countries and continue to report on events there from the United States, but now—without jobs—they risk the loss of legal status and removal to a country run by a hostile government that resents their coverage.

9

The dangers are very far from hypothetical.  As amicus Committee to Protect Journalists has documented, at least nine journalists and media workers who worked for or contributed to VOA or its regional outlets have been killed in connection with their work since 2003.  Nine others have been imprisoned over the same period, and two of those remain in prison today: Sithu Aung Myint, a freelancer imprisoned in Myanmar for sedition and violation of a broad criminal law that includes dissemination of "false news," *see Myanmar Journalist Sithu Aung Myint Sentenced to Additional 7 Years in Prison*, Comm. to Protect Journalists (Dec. 13, 2022), https://perma.cc/ZN7W-T33A, and Pham Chi Dung, a VOA contributor and founding chairman of the Independent Journalists Association of Vietnam, for the production and dissemination of "distorted information about the people's government," *see Vietnam Sentences 3 Independent Journalists to More than 10 Years in Prison*, Comm. to Protect Journalists (July 22, 2024), https://perma.cc/HR9E-54F6.  Each attack on the independence of the networks not only threatens their ability to serve their fundamental mission, then—it endangers the lives and liberty of the reporters dedicated to bringing that news to the world audiences.

## II.    Allowing the Executive to shutter VOA unilaterally would destroy the independence that makes it effective.

By executive order, the President has moved to dismantle USAGM, freeze funding to VOA and its sister networks, and effectively shutter the agency.  That move both raises grave First Amendment questions and overturns Congress's "manifest" intent that the networks "enjoy independence in programming and broadcasting

10

decisions." *Ralis*, 770 F.2d at 1125.  If the gambit succeeds, the damage to the project of federally funded broadcasting overseas will be irreparable.  Even if a future Administration or a future Congress were to restore the impounded funds, the knowledge that a threat like this one hangs over the networks heads—a Sword of Damocles waiting to fall if their coverage angers the President—would leave a lasting tarnish on their credibility.

That unilateral demolition is unlawful, as Plaintiffs persuasively explain, as another federal court recently concluded, *see* Opinion & Order, ECF No. 54, *Widakuswara v. Lake*, No. 1:25-cv-02390 (S.D.N.Y. Mar. 28, 2025), and as this Court recently concluded in response to Defendants' companion effort to defund Radio Free Europe/Radio Liberty, *see* Order Granting Motion for TRO, ECF No. 14, *RFE/RL, Inc. v. Lake*, No. 1:25-cv-00799 (D.D.C. Mar. 25, 2025).  "[I]f [Congress's] authority to make law and control spending is to mean anything, it means the President may not disregard a statutory mandate to spend funds 'simply because of policy objections.'"  *Aids Vaccine Advoc. Coal. v. United States Dep't of State*, Nos. 25-00400 & 25-00402, 2025 WL 752378, at *15 (D.D.C. Mar. 10, 2025) (quoting *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013)); *see also City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ("[T]he Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").  And that fundamental separation-of-powers principle has special importance here, where tolerating this degree of

11

presidential control would make a nullity of Congress' stated goal of maintaining VOA

as an independent network rather than a politicized "house organ[] for the United

States Government." *Ralis*, 770 F.2d at 1125. Congress has, through clear and consistent

statutory language, insisted that USAGM networks remain outlets for independent

journalism not dictated by the government. Because of the freedom Congress has

codified, USAGM networks have earned trust and built reputations that have allowed

their journalists to gather and disseminate news to audiences without other access to an

independent press. But if any President has the power to effectively shutter VOA at

any time, the foundation for that reliability disappears—unlikely to return.

The grave First Amendment questions raised by the Defendants' actions likewise

counsel construing the President's power narrowly here. When the government

chooses to establish a news organization with true "editorial independence," 22 U.S.C. §

6205(d)(6)(a), the Constitution holds policymakers to their promise, *see Turner*, 502 F.

Supp.3d at 381–82 (VOA journalists enjoy First Amendment rights against editorial

tampering); *Tripp v. Dep't of Defense*, 284 F. Supp. 2d 50, 56 (D.D.C. 2003) (concluding

that Congress intended *Stars and Stripes*, the military newspaper, "to operate like other

commercial newspapers, and enjoy First Amendment protections and prohibitions").

For instance, "all the circuits that have considered the issue have determined that, at the

very least, when a public university creates or subsidizes a student newspaper and

imposes no *ex ante* restrictions on the content that the newspaper may contain, neither

12

the school nor its officials may interfere with the viewpoints expressed in the publication without running afoul of the First Amendment." *Koala v. Khosla*, 931 F.3d 887, 903 n.9 (9th Cir. 2019) (quoting *Husain v. Springer*, 494 F.3d 108, 124 (2d Cir. 2007)). The same principle controls here, where Congress made clear that VOA is a First Amendment institution with "editorial independence." 22 U.S.C. § 6205(d)(6)(a).

Holding USAGM to Congress's vision—and the broadcasters' professional reality for the last fifty years—squares with the core First Amendment principle that the government must play by the rules it chooses to adopt. It is uncontroversial, for instance, that "[o]nce the state has created a limited public forum" for certain speech, "it must respect the boundaries that it has set." *Husain*, 494 F.3d at 121; *see also Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 365 (D.C. Cir. 2018) (assuming that, even in a nonpublic forum, the government cannot change the rules with intent to censor). And were it otherwise, the government could never credibly commit to producing meaningful journalism—work that "implicates additional constitutional interests that are not fully accounted for by [typical] employee-speech jurisprudence," *Turner*, 502 F. Supp. 3d at 374 (citation omitted)—because it would have no means of tying its own hands and reassuring the audience that VOA is not just an American *Pravda*.

Because VOA's journalists enjoy First Amendment rights, there should be no question that the Constitution does not allow the government to shut down a particular press outlet "because of disagreement with the message [it] conveys." *Ward v. Rock*

13

*Against Racism*, 491 U.S. 781, 791 (1989).  And those First Amendment concerns are especially heightened where government actions "not only penalize and chill speech," but "appear to do so on the basis of perceived viewpoint."  *Turner*, 502 F. Supp. 3d at 381.  Here, Defendants have already made express that their actions were motivated by such unconstitutional viewpoint discrimination.  The Executive Branch has not been shy about its disdain for certain reporting done by Voice of America.  *See The Voice of Radical America*, The White House (Mar. 15, 2025), https://perma.cc/8L6A-P9CS (explaining that the Executive Order was a response to what the President perceived as "radical propaganda" produced by VOA); *Senior Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease That Burdened the Taxpayers and Enforces Trump's Executive Order to Drastically Downsize Agency*, USAGM (Mar. 15, 2025), https://perma.cc/T95P-2ZLA (criticizing work product that purportedly "parrots the talking-points of America's adversaries"); Kari Lake (@KariLake), X (Mar. 19, 2025, 7:21 PM), https://perma.cc/LMM9-LHRR (taking issue with VOA's purportedly "anti-American content").  Likewise, senior adviser to the President Elon Musk insisted that VOA and its sister network Radio Free Europe are "just radical left crazy people talking to themselves."  *Musk Calls for Closure of US State Media*, RT, Feb. 9, 2025, https://perma.cc/VB26-9PG8 (reporting that "[t]he head of DOGE has said Radio Free Europe and Voice of America are essentially 'radical left'" and "called for [them] to be shut down") (citing Mario Nawfal (@MarioNawfal) X, Feb. 9, 2025,

14

https://x.com/MarioNawfal/status/188855091578473310: *see also* Matthew Rice, *Trump's Special Envoy Rips Voice of America, Radio Free Europe as a "Relic of the Past"*, N.Y. Sun, (Feb. 10, 2025), https://perma.cc/CR8F-7Q4M (reporting on Presidential Special Envoy Ric Grenell's statements that Radio Free Europe journalists are "far left activists").

In any context, this sort of avowed discrimination on the basis of a media organization's perceived viewpoint is "poison to a free society." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring). But it causes special damage here, where the USAGM networks' future listeners, readers, and watchers will predictably assume—with good reason—that the networks can now only distribute information that aligns with the policy preferences of whichever president holds office at the time. This harm will persist for administrations to come even if the agency's functions are later restored.

That result contravenes the express will of Congress, and the President lacks any constitutional authority to overturn Congress's judgment that independent reporting, produced with true "editorial independence," 22 U.S.C. § 6205(d)(6)(a), best serves the interests of the United States. Nor can the President override the First Amendment protections for a free press that make that project possible. If not stopped here, the Administration's unilateral shuttering of VOA will put the entire model of federally funded networks at risk, not just today but well into the future. And it will risk, too, the safety of reporters who have committed their careers to producing credible journalism under exceptionally challenging and dangerous conditions. This Court should enjoin it.

15

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to grant Plaintiffs'

motion for a temporary restraining order and preliminary injunction.

Dated: March 28, 2025                           Respectfully submitted,

                                                /s/ Bruce D. Brown
                                                Bruce D. Brown
                                                (D.C. Bar No. 457317)
                                                   *Counsel of Record for Amici Curiae*
                                                Gabriel Rottman (D.C. Bar No. 992728)
                                                Mara Gassmann (D.C. Bar No. 1014532)
                                                Grayson Clary (D.C. Bar No. 1735810)
                                                Renee M. Griffin (D.C. Bar No. 1766634)
                                                Ellen Goodrich (D.C. Bar No. 90017843)*
                                                REPORTERS COMMITTEE FOR
                                                 FREEDOM OF THE PRESS
                                                1156 15th Street NW, Ste. 1020
                                                Washington, DC 20005
                                                Telephone: 202.795.9300
                                                bbrown@rcfp.org

                                                *Of Counsel

                                                *Counsel for Amici Curiae*

16